**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**San Angelo Division**

| | |
|---|---|
| SILENCER SHOP FOUNDATION; GUN OWNERS OF AMERICA, INC; FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC.; B&T USA, LLC; PALMETTO STATE ARMORY, LLC; SILENCERCO WEAPONS RESEARCH, LLC (d/b/a SILENCERCO); GUN OWNERS FOUNDATION; BRADY WETZ; STATE OF TEXAS; STATE OF ALASKA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WEST VIRGINIA; and STATE OF WYOMING, | Case No. 6:25-cv-56-H  **ORAL ARGUMENT REQUESTED** |
| *Plaintiffs*, | |
| v. | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in her Official Capacity as ATTORNEY GENERAL OF THE UNITED STATES; and DANIEL DRISCOLL, in his Official Capacity as ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION .................................................................................................... 1

BACKGROUND ........................................................................................................3

    I.      The Constitution......................................................................................... 3

          A.     The Article I Vesting Clause and the Tenth Amendment.......................... 3

          B.     The Taxing Clause ..................................................................... 4

          C.     The Commerce Clause ............................................................... 4

          D.     The Necessary and Proper Clause............................................... 5

          E.     The Second Amendment ........................................................... 5

    II.     The National Firearms Act.......................................................................... 5

          A.     The Untaxed "Firearms" ........................................................... 5

          B.     The Challenged NFA Provisions ............................................... 6

    III.   The One Big Beautiful Bill Act .................................................................. 8

    IV.   Plaintiffs' Injuries From The Challenged NFA Provisions ................................. 8

LEGAL STANDARD ..............................................................................................13

ARGUMENT............................................................................................................14

    I.      The Challenged NFA Provisions Exceed Congress's Enumerated Powers
            .................................................................................................. 14

          A.     The Challenged NFA Provisions Are Unconstitutional As
               Applied To Untaxed Firearms Because They Exceed Congress's
               Taxing Power .......................................................................... 14

          B.     The Challenged NFA Provisions Are Unconstitutional As
               Applied To Intrastate Possession, Transfer, And Making Of
               Untaxed Firearms Because They Exceed Congress's Commerce
               Power ..................................................................................... 20

    II.     The Challenged NFA Provisions Violate The Second Amendment As
          Applied To Untaxed Firearms .................................................................. 36

          A.     NFA Firearms Are "Arms" As Originally Understood, And The
               Second Amendment Covers Plaintiffs' Proposed Course of
               Conduct .................................................................................. 37

          B.     The Government Cannot Satisfy Its Burden To Show A
               Founding-Era Historical Tradition Of Similar Regulation ...................... 39

    III.   The Court Should Enjoin Enforcement Of The Challenged NFA
          Provisions.............................................................................................. 46

          A.     Injunction Factors ................................................................... 46

TABLE OF CONTENTS *(continued)*

**Page**

B.      Scope Of Relief .......................................................................................... 48

CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airlines for America v. Department of Transportation*,
   110 F.4th 672 (5th Cir. 2024) ........................................................47, 48

*Alabama Association of Realtors v. HHS*,
   594 U.S. 758 (2021)...........................................................................48

*Biden v. Feds for Medical Freedom*,
   144 S. Ct. 480 (2023).........................................................................49

*Bond v. United States*,
   572 U.S. 844 (2014)...........................................................................30

*BST Holdings, L.L.C. v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ..............................30, 33, 34, 35, 46, 47, 48

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016)...........................................................................38

*California v. Texas*,
   593 U.S. 659 (2021)...........................................................................16

*Consumers' Research v. FCC*,
   109 F.4th 743 (5th Cir. 2024) ............................................................11

*Contender Farms, L.L.P. v. Department of Agriculture*,
   779 F.3d 258 (5th Cir. 2015) ...............................................................9

*Data Marketing Partnership, LP v. Department of Labor*,
   45 F.4th 846 (5th Cir. 2022) ..........................................................11, 21

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)..........................................................5, 36, 37, 38, 40

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)...........................................................................46

*Elrod v. Burns*,
   427 U.S. 347 (1976)...........................................................................46

*FCC v. Consumers' Reseasrch*,
   145 S. Ct. 2482 (2025).......................................................................11

*Feds for Medical Freedom v. Biden*,
   63 F.4th 366 (5th Cir. 2023) ..............................................................49

*Firearms Regulatory Accountability Coalition, Inc. v. Garland*,
    2024 WL 4920002 (D.N.D. Apr. 4, 2024)............................................................12

*Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*,
    527 U.S. 627 (1999)............................................................................................18, 20

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
    528 U.S. 167 (2000)....................................................................................................9

*GDF Realty Invs., Ltd. v. Norton*,
    326 F.3d 622 (5th Cir. 2003) ...............................................................................28, 29

*Gibbons v. Ogden*,
    22 U.S. 1 (1824)........................................................................................................21

*Gonzales v. Raich*,
    545 U.S. 1 (2005)..........................................................................................25, 29, 35

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)..................................................................................................39

*Haynes v. United States*,
    390 U.S. 85 (1968).................................................................................14, 16, 17, 20

*Health Freedom Defense Fund, Inc. v. Biden*,
    599 F. Supp. 3d 1144 (M.D. Fla. 2022)...................................................................49

*Healthy Vision Association v. Abbott*,
    138 F.4th 385 (5th Cir. 2025) ....................................................................................8

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964)..................................................................................................18

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011)................................................................................41

*Hobby Distillers Association v. Alcohol & Tobacco Tax & Trade Bureau*,
    740 F. Supp. 3d 509 (N.D. Tex. 2024) ......................................2, 22, 24, 25, 26, 29, 32, 46, 47

*Mississippi ex rel. Hood v. AU Optronics Corporation*,
    571 U.S. 161 (2014)..................................................................................................19

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)..................................................................................................31

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977)..................................................................................................12

*Illinois Association of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ............................................................. 11, 39

*Kinsella v. United States ex rel. Singleton*,
    361 U.S. 234 (1960) ............................................................................................. 5

*Kole v. Village of Norridge*,
    2017 WL 5128989 (N.D. Ill. Oct. 27, 2017) ..................................................... 11

*Lane v. United States*,
    612 F. Supp. 3d 659 (N.D. Tex. 2020) ............................................................... 4

*Lomont v. O'Neill*,
    285 F.3d 9 (D.C. Cir. 2002) ............................................................................. 43

*Luis v. United States*,
    578 U.S. 5 (2016) ............................................................................................ 39

*M'Culloch v. Maryland*,
    17 U.S. 316 (1819) ..................................................................................... 17, 22

*Maloney v. Singas*,
    351 F. Supp. 3d 222 (E.D.N.Y. 2018) ............................................................. 38

*Martin v. Hunter's Lessee*,
    14 U.S. 304 (1816) ........................................................................................... 4

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024) ........................................................................... 44

*Medina v. Planned Parenthood South Atlantic*,
    145 S. Ct. 2219 (2025) .................................................................................... 19

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ........................................................... 5, 6, 7, 8, 25, 49

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ......................................................................................... 4

*National Coalition for Men v. Selective Serve System*,
    969 F.3d 546 (5th Cir. 2020) ........................................................................... 17

*National Federation of Independent Business v. Sebelius*,
    567 U.S. 519 (2012) ...................................... 4, 5, 15, 17, 18, 27, 33, 34, 35

*National Rifle Association of America, Inc. v. ATF*,
    700 F.3d 185 (5th Cir. 2012) ........................................................................... 10

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
　　597 U.S. 1 (2022) ...............................................................3, 5, 36, 37, 38, 39, 40, 42, 43, 45

*New York v. United States*,
　　505 U.S. 144 (1992) ....................................................................................................4

*Nken v. Holder*,
　　556 U.S. 418 (2009) .................................................................................................46

*Oklahoma v. Castro-Huerta*,
　　597 U.S. 629 (2022) .................................................................................................18

*Ortega v. Grisham*,
　　148 F.4th 1134 (10th Cir. 2025) .............................................................................44

*Printz v. United States*,
　　521 U.S. 898 (1997) ....................................................................................................2

*Reese v. ATF*,
　　127 F.4th 583 (5th Cir. 2025) .................................................................................11, 36, 39

*Restaurant Law Center v. Department of Labor*,
　　66 F.4th 593 (5th Cir. 2023) ....................................................................................47

*Ross v. Blake*,
　　578 U.S. 632 (2016) .................................................................................................18

*Sabri v. United States*,
　　541 U.S. 600 (2004) .................................................................................................22

*Smith v. Department of the Treasury*,
　　761 F. Supp. 3d 952 (E.D. Tex. 2025) ...................................................................31, 33, 35

*Snope v. Brown*,
　　145 S. Ct. 1534 (2025) .............................................................................................37, 38

*Sonzinsky v. United States*,
　　300 U.S. 506 (1937) ..............................................................1, 2, 14, 16, 19, 20, 23, 31, 32

*Staples v. United States*,
　　511 U.S. 600 (1994) ...................................................................................................5

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
　　600 U.S. 181 (2023) .................................................................................................12

*Terkel v. CDC*,
　　15 F.4th 683 (5th Cir. 2021) ...................................................................................28

*Terkel v. CDC,*
    521 F. Supp. 3d 662 (E.D. Tex. 2021) ..................................................28, 29, 30, 31

*Texas Top Cop Shop, Inc. v. Garland,*
    758 F. Supp. 3d 607 (E.D. Tex. 2024) ................................................29, 33, 34, 35

*Texas v. ATF,*
    700 F. Supp. 3d 556 (S.D. Tex. 2023) ..............................................................50

*Texas v. ATF,*
    737 F. Supp. 3d 426 (N.D. Tex. 2024) ............................................................12

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ..........................................................................50

*Texas v. United States,*
    945 F.3d 355 (5th Cir. 2019) .....................................................1, 4, 15, 16, 35

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ........................................................................48, 49, 50

*United States v. Ardoin,*
    19 F.3d 177 (5th Cir. 1994) ............................................................................15

*United States v. Bird,*
    124 F.3d 667 (5th Cir. 1997) ..........................................2, 21, 22, 23, 24, 31

*United States v. Bridges,*
    150 F.4th 517 (6th Cir. 2025) ........................................................................16

*United States v. Clay,*
    128 F.4th 163 (3d Cir. 2025) ........................................................................18

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018) ..........................................................7, 15, 16

*United States v. Darby,*
    312 U.S. 100 (1941) ........................................................................18, 20, 22

*United States v. Giannini,*
    455 F.2d 147 (9th Cir. 1972) ..........................................................................20

*United States v. Hall,*
    171 F.3d 1133 (8th Cir. 1999) ....................................8, 27, 28, 30, 31, 32

*United States v. Hicks,*
    649 F. Supp. 3d 357 (W.D. Tex. 2023) ..........................................................11

*United States v. Ho*,
   311 F.3d 589 (5th Cir. 2002) ............................................................3, 4, 5

*United States v. Kagama*,
   118 U.S. 375 (1886)............................................................................31

*United States v. Kebodeaux*,
   570 U.S. 387 (2013)............................................................................21

*United States v. Kebodeaux*,
   687 F.3d 232 (5th Cir. 2012) ....................................21, 24, 26, 32, 33

*United States v. Lopez*,
   514 U.S. 549 (1995)......................2, 8, 21, 23, 27, 28, 30, 31, 32, 35

*United States v. Mann*,
   493 F.3d 484 (5th Cir. 2007) ............................................................32

*United States v. Morrison*,
   529 U.S. 598 (2000)..........................2, 4, 5, 18, 22, 27, 28, 33

*United States v. Munsingwear, Inc.*,
   340 U.S. 36 (1950)..............................................................................49

*United States v. Parker*,
   960 F.2d 498 (5th Cir. 1992) ......................................................16, 23

*United States v. Peterson*,
   2025 U.S. App. LEXIS 22106 (5th Cir. Aug. 27, 2025) ....................37, 38, 42, 45

*United States v. Rahimi*,
   602 U.S. 680 (2024)..........................................................36, 40, 45

*United States v. Ross*,
   458 F.2d 1144 (5th Cir. 1972) ............................................15, 16, 23

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021)............................................................................10

*Vote.Org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ............................................................11

*Wages & White Lion Investments, L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ............................................................47

*Wickard v. Filburn*,
   317 U.S. 111 (1942)......................................................................25, 35

*Williams v. Homeland Insurance Company of New York*,
  18 F.4th 806 (5th Cir. 2021) ............................................................35

*Woods v. Cloyd W. Miller Co.*,
  333 U.S. 138 (1948) ..........................................................................18

**Statutes, Rules, and Regulations**

Federal

27 C.F.R. § 479.62 .......................................................................7, 28

27 C.F.R. § 479.84 .......................................................................7, 28

18 U.S.C. § 921 ...................................................................................6

18 U.S.C. § 922 .................................................................................42

18 U.S.C. § 3559 ..........................................................................8, 41

18 U.S.C. § 3571 ..........................................................................8, 41

26 U.S.C. § 5811 ..........................................................................8, 19

26 U.S.C. § 5812 ...................................................................7, 28, 43

26 U.S.C. § 5821 ..........................................................................8, 19

26 U.S.C. § 5822 ..........................................................................7, 43

26 U.S.C. § 5841 ..........................................................................7, 28

26 U.S.C. § 5845 .....................................................................5, 6, 26

26 U.S.C. § 5861 .........................................................7, 19, 28, 40

26 U.S.C. § 5871 ...................................................................7, 30, 41

26 U.S.C. § 5872 ..........................................................................8, 41

Fed. R. Civ. P. 56 ............................................................................13

Pub. L. No. 73-474, 48 Stat. 1236 (1934) .................................5, 19

Pub. L. No. 119-21, 139 Stat. 72 (2025) .....................1, 8, 15, 19

U.S. Const. ..............................................................1, 4, 5, 14, 20

State

18 Pa.C.S. § 6109 .................................................................................................45

Nev. Rev. Stat. § 202.366 ...................................................................................45

Tex. Gov't Code § 2.052 ......................................................................................30

Tex. Gov't Code § 2.102 ......................................................................................30

**Other Authorities**

ATF, Fact Sheet – Facts and Figures for Fiscal Year 2024 (Mar. 2025),
    https://tinyurl.com/msvn8u3n ......................................................................8

Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making
    Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51
    Fordham Urb. L.J. 25 (2023) ......................................................................41

Joseph G.S. Greenlee, *The Tradition of Short-Barreled Rifle Use and Regulation
    in America*, 25 Wyo. L. Rev. 111 (2025) ...................................................41

Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search
    for Which "'Gangster' Weapons" to Tax*, 25 Wyo. L. Rev. 149 (2025) ..................6

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
    Charleston L. Rev. 205 (2018) ....................................................................41

*The National Firearms Act of 1934: Hearings on H.R. 9066 Before the H. Comm.
    on Ways & Means*, 73d Cong. (1934) ......................................................7, 19

NSSF, NSSF Successfully Leads Effort to Dramatically Reduce ATF NFA Form
    Wait Times, New Data Shows (Apr. 9, 2024), tinyurl.com/jp456ycx.................44

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* (2012) .........................................................................................19, 20

## INTRODUCTION

In 1934, Congress enacted the National Firearms Act ("NFA"). The statute marked the most onerous firearms regulation in the nation's history—subjecting the possession, transfer, and making of short-barreled firearms and silencers to burdensome registration requirements on pain of felony criminal penalties. There were obvious questions about the constitutionality of the statute. So Congress made a quintessentially legislative choice: it enacted the NFA as a taxation scheme, pursuant to its authority to "lay and collect Taxes." U.S. Const. art. I, § 8, cl. 1. Then, in *Sonzinsky v. United States*, 300 U.S. 506 (1937), the Supreme Court upheld the NFA as "only a taxing measure," *id.* at 513, and held that it was forbidden from "speculat[ing] as to the motives which moved Congress to impose" its "tax," *id.* at 514. Numerous lower courts have subsequently upheld the NFA under Congress's power to tax.

Enter the One Big Beautiful Bill Act. Signed on July 4, 2025, the statute eliminated the NFA's tax on short-barreled shotguns, short-barreled rifles, silencers, and a class of guns known as "any other weapon." Pub. L. No. 119-21, § 70436, 139 Stat. 72, 247–48 (2025). But it left behind the onerous regulatory requirements on the possession, transfer, and making of these newly untaxed NFA firearms—the same provisions the Supreme Court upheld "as in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513. As of January 1, 2026, those zombie regulations will authorize the collection of precisely zero dollars of federal revenue.

Applying the NFA to the now-untaxed firearms is flatly unconstitutional. The reason is simple. Congress cannot use its taxing power to sustain a statute that does not collect a tax. *See Texas v. United States*, 945 F.3d 355, 390 (5th Cir. 2019), *reversed on other grounds California v. Texas*, 593 U.S. 659 (2021). Thus, the NFA is unconstitutional as applied to firearms it does not tax. And under binding Supreme Court precedent, the NFA is "***only*** a taxing measure," and

1

courts may "not … ascribe to Congress an attempt … to exercise **_another power_**" to sustain the NFA. _Sonzinsky_, 300 U.S. at 513–14 (emphases added).  That ends this case.

The Government nevertheless may attempt to defend its measure under the Commerce Clause and the Necessary and Proper Clause—"the last, best hope of those who defend ultra vires congressional action." _Printz v. United States_, 521 U.S. 898, 923 (1997).  As already explained, that is a non-starter under _Sonzinsky_.  But even if the Court were to reach the question, the NFA cannot be sustained under the Commerce Clause as applied to the purely _intra_state possession, transfer, and making of NFA firearms.

Out of the gate, the Government faces a high bar because the _intra_state possession, transfer, and making of NFA firearms are not _inter_state commerce.  And the Government cannot overcome that hurdle by claiming that these purely intrastate activities have "substantial effects" on interstate commerce.  _United States v. Lopez_, 514 U.S. 549, 558–59 (1995).  For one, Congress enacted the NFA provisions challenged here solely as a tax and thus they cannot be sustained under Fifth Circuit precedent because Congress's "purpose" was not "in fact … to regulate interstate commerce." _United States v. Bird_, 124 F.3d 667, 682 n.15 (5th Cir. 1997).  Next, even if commerce had been Congress's purpose, the Government cannot rely on the substantial-effects doctrine because the challenged NFA provisions do not serve "a 'comprehensive' regulation of commerce" that "justifies Congressional regulation of local behavior."  _Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau_, 740 F. Supp. 3d 509, 532–33 (N.D. Tex. 2024) (Pittman, J.).  And beyond these fatal flaws, the challenged NFA provisions flunk each of the "significant considerations" outlined by the Supreme Court to assess the constitutionality of laws under the substantial-effects doctrine.  _See United States v. Morrison_, 529 U.S. 598, 609–13 (2000).

2

The challenged provisions not only exceed Congress's enumerated powers, they also infringe Americans' enumerated rights. The Second Amendment protects the right of the people to "keep and bear Arms." The firearms at issue here undeniably are "Arms" under that term's plain meaning. Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), that means the NFA's regulations are "presumptively" unconstitutional, and "the Government bears the burden of proving the constitutionality of its actions." *Id.* at 24. To satisfy that burden, the Government must "demonstrat[e]" that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Ibid.* The Government must identify a broad and enduring Founding-era tradition of historical analogues with a similar "how and why" underlying the modern law's "burden [on] a law-abiding citizen's right to armed self-defense." *Id.* at 29. Here, however, no historical tradition supports registration requirements for arms in common use such as the weapons at issue here.

Plaintiffs—a coalition of States, individual gun owners, firearms businesses, and nationwide firearm membership associations—seek a declaration that the challenged provisions of the NFA are unconstitutional as applied to the untaxed firearms. Each plaintiff is irreparably harmed by the NFA's possession, transfer, and making provisions and so Plaintiffs also seek a permanent injunction against their enforcement.

## BACKGROUND

### I.    The Constitution

#### A.    The Article I Vesting Clause and the Tenth Amendment

Article I, Section I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." This Article I Vesting Clause reflects that the Constitution "creates a federal government of limited and enumerated powers," "and in particular a Congress of limited and enumerated powers." *United States v. Ho*, 311 F.3d 589, 596 (5th Cir.

2002).  The Clause "necessarily implies that some legislative powers are not 'herein granted,' foremost among them 'the police power, which the Founders denied the National Government and reposed in the states.'"  *Ibid.* (quoting *Morrison*, 529 U.S. at 618); *see also Lane v. United States*, 612 F. Supp. 3d 659, 660 (N.D. Tex. 2020) (Starr, J.).

The Tenth Amendment, in turn, provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  The Tenth Amendment "confirms" that Congress holds "not plenary legislative power but only certain enumerated powers."  *Murphy v. NCAA*, 584 U.S. 453, 471 (2018); *see also New York v. United States*, 505 U.S. 144, 156 (1992).

In sum, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."  *Morrison*, 529 U.S. at 607; *see also, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519, 535 (2012) (federal government "must show that a constitutional grant of power authorizes each of its actions"); *Martin v. Hunter's Lessee*, 14 U.S. 304, 326 (1816) (federal government "can claim no powers which are not granted to it by the [C]onstitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication").

### B.    The Taxing Clause

One enumerated power granted to Congress is the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  The "essential feature of any tax" is that "[i]t produces at least some revenue for the Government."  *Sebelius*, 567 U.S. at 564.  Thus, absent a tax, a statute cannot be enacted "under Congress' taxing power."  *Texas*, 945 F.3d at 390.

### C.    The Commerce Clause

Another enumerated power granted to Congress is the authority "[t]o regulate Commerce … among the several States."  U.S. Const. art. I, § 8, cl. 3.  This power "may not be extended so

as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local." *Morrison*, 529 U.S. at 608 (internal quotation marks omitted). It cannot confer a backdoor police power that the Founders "denied" Congress. *Ho*, 311 F.3d at 596.

### D.    The Necessary and Proper Clause

The Necessary and Proper Clause empowers Congress to make laws necessary and proper for "carrying into Execution" its enumerated powers. U.S. Const. art. I, § 8, cl. 18. The Clause "is not itself a grant of power." *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 247 (1960). Rather, it gives Congress "authority to enact provisions 'incidental to [an] enumerated power, and conducive to its beneficial exercise.'" *Sebelius*, 567 U.S. at 559.

### E.    The Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Amendment protects an individual right to possess and carry weapons in case of confrontation. *Id.* at 581–92. And in *Bruen*, the Court held that, to justify a regulation of an arm, the government must establish that the regulation is "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 33–34.

## II.    The National Firearms Act

### A.    The Untaxed "Firearms"

Congress enacted the NFA in 1934. *See* Pub. L. No. 73-474, 48 Stat. 1236 (1934). As amended, the NFA regulates a class of specifically enumerated "firearms." 26 U.S.C. § 5845(a); *see Staples v. United States*, 511 U.S. 600, 602 (1994). "'Firearms' is a term of art—one that is both highly under- and over-inclusive (as compared to the word's ordinary meaning today)." *Mock*

*v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023). "For instance, the NFA's definition of 'firearm' does not include pistols—but it does include both 'silencers' and 'poison gas.'" *Ibid.* (quoting NFA) (alterations accepted). This tortured definition resulted from Congress's attempt to regulate a vague category of so-called "gangster weapons" that was subsequently narrowed during legislative haggling. Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 Wyo. L. Rev. 149, 153, 166–74 (2025).

As relevant to this case, the NFA regulates the following items as firearms:

- Short-barreled shotguns, defined as (i) "a shotgun having a barrel or barrels of less than 18 inches in length," or (ii) "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." 26 U.S.C. § 5845(a)(1)–(2).

- Short-barreled rifles, defined as (i) "a rifle having a barrel or barrels of less than 16 inches in length," or (ii) "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3)–(4).

- Any other weapons ("AOW"), a term of art that "means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire." 26 U.S.C. § 5845(a)(5), (e).

- Silencers, defined as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(25).

**B.    The Challenged NFA Provisions**

"NFA-regulated firearms … are subject to stringent restrictions and requirements." *Mock*, 75 F.4th at 569. That stringency was the point. When Congress enacted the NFA, it had originally desired to outlaw firearms but knew "the Second Amendment prohibits Congress from outright

6

banning firearms." Halbrook, *supra* at 152. Congress also knew that it lacked affirmative author-ity under the Commerce Clause to reach intrastate firearms activities. When the Attorney General was asked if the challenged provisions could reach an intrastate firearm transfer under the Com-merce Clause, he responded: "we would get that person, if he is a criminal, under the taxing pro-vision," because "we have no inherent police powers to go into certain localities and deal with local crime." *The National Firearms Act of 1934: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 6, 8, 23–24 (1934).

Given these limitations, Congress designed the NFA as "a taxing scheme," *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018), "to tax [NFA] weapons out of existence." *Mock*, 75 F.4th at 569. Of course, the NFA "does more than lay taxes." *Cox*, 906 F.3d at 1179. In support of its taxing scheme, the statute imposes regulatory burdens on the gun-owning public. The NFA and its implementing regulations impose the following requirements challenged in this litigation:

- <u>Possession requirements.</u> "A person" cannot "receive" or "possess[ ] a firearm" unless it is properly "registered" with ATF and the person "retain[s] proof of reg-istration." 26 U.S.C. §§ 5841(e), 5812(b), 5861(b)–(d).

- <u>Transfer requirements.</u> "A firearm shall not be transferred" absent a "written ap-plication" to ATF that identifies the "transferee" and provides "his fingerprints and his photograph" and any other information ATF may require "by regulations." 26 U.S.C. §§ 5812; 5861(e); *see also* 27 C.F.R. § 479.84(a)–(b), (d). "[A]ll transfer-ees" must notify about the transfer "the chief law enforcement officer of the locality in which the transferee … is located." 27 C.F.R. § 479.84(c).

- <u>Making Requirements.</u> "Each manufacturer … and maker shall register" with ATF "each firearm he manufactures … or makes," 26 U.S.C. §§ 5841(a)–(c), using a "written application" to ATF that includes "his fingerprints and his photograph" and other information ATF may require "by regulations," *id.* § 5822; *see also* 27 C.F.R. § 479.62(a)–(b), (d); 26 U.S.C. § 5861(f). The maker must also notify "the chief law enforcement of the locality" in which he "is located," 27 C.F.R. § 479.84(c); 26 U.S.C. § 5861(f).

"[T]hose statutory restrictions have teeth." *Mock*, 75 F.4th at 570. Violations of the NFA are punishable by up to "ten years" imprisonment, 26 U.S.C. § 5871, a $250,000 fine ($500,000

for organizations), 18 U.S.C. §§ 3559(a)(3), 3571(b)(3), (c)(3), as well as forfeiture of the non-compliant firearm, 26 U.S.C. § 5872.  "As failure to comply can also be a felony, a violation may also lead to a lifetime ban on ownership of firearms."  *Mock*, 75 F.4th at 571 (citing 18 U.S.C. § 922(g)(1)).  Thousands of people are federally charged and convicted every year for firearms offenses, and ATF subjects Federal Firearms Licensees to nearly 10,000 firearms compliance inspections annually.  ATF, Fact Sheet – Facts and Figures for Fiscal Year 2024 (Mar. 2025), https://tinyurl.com/msvn8u3n.

Because Congress relied on its taxing power to enact the NFA, it did not limit any of these provisions to interstate commerce, and so they reach purely intrastate activity.  *See, e.g.*, *United States v. Hall*, 171 F.3d 1133, 1138 (8th Cir. 1999) (interpreting NFA to criminalize possession of a silencer even absent "a direct connection between interstate commerce and the alleged silencer"); *accord Lopez*, 514 U.S. at 562 (declining to limit gun-control statute to interstate commerce absent "express jurisdictional" statement in the text).

## III.    The One Big Beautiful Bill Act

On July 4, 2025, President Donald J. Trump signed into law the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72.  The Act eliminated the transfer and making tax on all NFA firearms except machineguns and destructive devices, effective January 1, 2026.  *See id*. § 70436, 139 Stat. at 247–48 (to be codified at 26 U.S.C. §§ 5811, 5821).  ATF nevertheless continues to enforce the NFA's regulatory requirements, including the possession, transfer, and making requirements challenged in this litigation.  *See supra* II.B.

## IV.    Plaintiffs' Injuries From The Challenged NFA Provisions

Plaintiffs challenge the NFA's possession, transfer, and making requirements.  *See supra* II.B.  Although only "one plaintiff" needs "standing," *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 400 (5th Cir. 2025), the challenged NFA provisions injure all of the plaintiffs.

8

Organizational plaintiff Silencer Shop Foundation is a Texas-based nonprofit organization dedicated to defending and restoring Second Amendment rights. App. 023 (Spivey Decl. ¶ 3). Silencer Shop Foundation achieves these goals through, among other things, public education regarding the benefits and advantages of utilizing firearm silencers and other NFA-regulated items when engaging in conduct protected by the Second Amendment. App. 023 (Spivey Decl. ¶¶ 4–5). Silencer Shop Foundation wishes to make and acquire silencers, short-barreled rifles, and short-barreled shotguns for demonstration and educational purposes, among other reasons. App. 023–24 (Spivey Decl. ¶¶ 6–8). It also wishes to transfer these types of firearms within Texas to other individuals and organizations. App. 023–24 (Spivey Decl. ¶¶ 6, 9). It would take these actions immediately upon the effective date of the $0 tax rate but for the challenged NFA provisions. App. 026 (Spivey Decl. ¶¶ 13–15). Silencer Shop Foundation objects to the burdensome NFA requirements that cost it time, administrative expenses, and personnel resources. App. 024–26 (Spivey Decl. ¶¶ 10–11). Silencer Shop Foundation also objects that the challenged NFA provisions burden and interfere with its ability to tender temporary possession of such firearms to other persons within Texas to advance the foundation's educational and demonstrative goals. *Ibid.*

The challenged NFA provisions thus injure Silencer Shop Foundation because it is the "object of [NFA] regulation," *Contender Farms, L.L.P. v. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015), as it is directly subject to the challenged NFA provisions. The challenged NFA provisions also injure Silencer Shop Foundation because they subject it to burdens that prevent the Foundation from engaging in activity that it finds desirable and that would further its educational mission. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–83 (2000). And they interfere with Silencer Shop Foundation's constitutional rights—protected by both the Second Amendment and the Constitution's limits on Congress's enumerated

authority—by subjecting Silencer Shop Foundation to unconstitutional restrictions on the making, acquisition, possession, transfer, and use of NFA firearms. *See, e.g.*, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021). These injuries are "fairly traceable to the challenged federal laws, and holding the laws unconstitutional would redress the injury." *NRA v. ATF*, 700 F.3d 185, 192 n.5 (5th Cir. 2012); App. 026 (Spivey Decl. ¶ 16).

Individual plaintiff Brady Wetz is a gun enthusiast who owns NFA firearms and wishes to possess, transfer, acquire, and make additional NFA firearms immediately after their $0 tax rate takes effect on January 1, 2026. App. 002, 005–10 (Wetz Decl. ¶¶ 3, 5, 16, 18, 20–31). But to engage in those activities, Mr. Wetz would have to subject himself to the challenged NFA provisions. App. 003–6, 010 (Wetz Decl. ¶¶ 7–19, 31); *see supra* II.B. However, Mr. Wetz objects to the burdensome NFA requirements that would cost him time, money, and his personal privacy—all on threat of felony criminal prosecution. *Ibid*; *see supra* II.B. Thus, Mr. Wetz will not possess, make, or transfer additional NFA firearms while he remains subject to the challenged provisions. App. 006 (Wetz Decl. ¶ 19).

The challenged NFA provisions thus injure Mr. Wetz because he is the direct object of the challenged NFA provisions; the provisions subject him to burdens that prevent him from engaging in activity he finds desirable; and the provisions burden the exercise of his constitutional rights in violation of the Second Amendment and Congress's lack of enumerated authority. All of these injuries are traceable to the challenged NFA provisions and would be redressed by the relief requested in this suit. *See* App. 006, 010 (Wetz Decl. ¶¶ 8, 30–31).

Commercial plaintiffs B&T USA, LLC ("B&T"), Palmetto State Armory, LLC ("PSA"), and SilencerCo Weapons Research, LLC ("SilencerCo") are companies that make, transfer, and possess NFA firearms as part of their businesses. App. 032 (Key Decl. ¶ 5), 028 (McCallum Decl.

¶¶ 5–6), 036 (Clinger Decl. ¶¶ 5–6). They are injured because they are the object of the challenged NFA requirements and expend time and effort to comply with those provisions. App. 033–34 (Key Decl. ¶¶ 10–14), 029–30 (McCallum Decl. ¶¶ 10–14), 037 (Clinger Decl. ¶¶ 10–14). They have also suffered a constitutional injury. *See, e.g.*, *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014). In addition, the commercial plaintiffs are injured because the challenged NFA provisions deter customers from purchasing products from them, App. 034 (Key Decl. ¶ 15), 030 (McCallum Decl. ¶ 15), 038 (Clinger Decl. ¶ 15), and thus cause "a classic pocketbook injury," *Consumers' Rsch. v. FCC*, 109 F.4th 743, 753 (5th Cir. 2024).[1] And because the challenged NFA provisions regulate the companies' customers, App. 034 (Key Decl. ¶ 15), 030 (McCallum Decl. ¶ 15), 038 (Clinger Decl. ¶ 15), the companies also assert an Article III injury on behalf of those customers, *see, e.g.*, *Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir. 2023) ("Vendors are routinely accorded standing to assert the constitutional rights of customers and prospective customers"); *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("the right to 'keep and bear arms' surely implies the right to purchase them"); *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) ("[A]ccording to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!"), *rev'd on other grounds*, 2025 WL 2058762 (5th Cir. July 23, 2025); *Kole v. Village of Norridge*, 2017 WL 5128989, at *10 (N.D. Ill. Oct. 27, 2017) ("The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ('Our citizens have always

---

[1] *Consumers Research* was reversed on the merits, *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025), leaving the Fifth Circuit's standing analysis untouched—meaning it is still binding precedent, *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022) ("circuit opinions in which the judgment was reversed on some but not all grounds are still precedential with respect to the portions not reversed").

been free to make, vend, and export arms.').").  All of these injuries are traceable to the challenged NFA provisions and would be redressed by the relief requested in this suit.  App. 034 (Key Decl. ¶¶ 16–17), 030 (McCallum Decl. ¶¶ 16–17), 038 (Clinger Decl. ¶¶ 16–17).

Associational plaintiffs Gun Owners of America, Inc. ("GOA"), Firearms Regulatory Accountability Coalition, Inc. ("FRAC"), and Gun Owners Foundation ("GOF") are organizations that bring this suit on behalf of their members and supporters.  Each organization has associational standing.  *See, e.g., Students for Fair Admissions, Inc. ("SFFA") v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *see also FRAC v. Garland*, 2024 WL 4920002, at *2–*4 (D.N.D. Apr. 4, 2024) (recognizing FRAC's associational standing); *Texas v. ATF*, 737 F. Supp. 3d 426, 438–39 (N.D. Tex. 2024) (Kacsmaryk, J.) (recognizing GOA and GOF's associational standing).  Each organization counts as members and supporters, persons, and/or businesses that "have standing to sue in their own right."  *SFFA*, 600 U.S. at 199; *see* App. 012, 014–17 (Pratt Decl. ¶¶ 4–5, 16–18, 26–35), 041–42 (Supp. Pratt Decl. ¶¶ 5–12, 14), 019–022 (White Decl. ¶¶ 7–13, 15).  The interests these organizations "seek to protect" in this litigation "are germane to [their] purpose[s]"—defending their members from unlawful firearms restrictions.  *SFFA*, 600 U.S. at 199; *see* App. 012–14 (Pratt Decl. ¶¶ 6–7, 15), 019, 022 (White Decl. ¶¶ 3–6, 17).  And neither the claims asserted nor the relief requested by the organizations require the participation of individual members because plaintiffs "seek[ ] a declaration, injunction, or some other form of prospective relief" which "if granted, will inure to the benefit of th[eir] members."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see* App. 014–15 (Pratt Decl. ¶¶ 15–18), 021–22 (White Decl. ¶¶ 14, 16–17).

State plaintiffs are injured too.  States, their agencies, and their employees possess and transfer NFA firearms and are not exempt from the reach of the challenged NFA requirements.

App. 43–44 (Prestridge Decl. ¶¶ 3–4). The States will continue these activities, as they are neces-
sary for the States to carry out their law-enforcement responsibilities. App. 44 (Prestridge Decl.
¶ 5). The States are thus the object of the challenged NFA provisions and are injured by the oper-
ational and compliance burdens imposed by those provisions. App. 43–44 (Prestridge Decl. ¶¶ 3–
4). These injuries are traceable to the challenged NFA provisions and would be redressed by the
relief requested in this suit.

<u>All plaintiffs</u> are injured by the application of the challenged NFA requirements to purely
*intra*state activity. Plaintiff Silencer Shop Foundation has concrete plans to possess, transfer, and
make NFA firearms solely within the State of Texas. App. 023–24 (Spivey Decl. ¶¶ 6–9). Plaintiff
Wetz already possesses NFA firearms solely within the State of Texas. App. 002 (Wetz Decl. ¶ 5).
He also has concrete plans to possess, make, transfer, and receive additional NFA firearms solely
within the State of Texas. App. 006–10 (Wetz Decl. ¶¶ 20–30). The commercial plaintiffs actively
engage in—and will continue to engage in—the intrastate possession, transfer, and making of NFA
firearms. App. 032–33 (Key Decl. ¶¶ 7–9), 028–29 (McCallum Decl. ¶¶ 7–9), 036–37 (Clinger
Decl. ¶¶ 7–9). The associational plaintiffs represent individual and commercial members and sup-
porters that engage in—and will continue to engage in—the intrastate possession, transfer, and
making of NFA firearms. App. 20 (White Decl. ¶¶ 9–10); App. 17 (Pratt Decl. ¶ 32). The State
Plaintiffs also engage in—and will continue to engage in—intrastate possession and transfer of
NFA firearms. *See* App. 44 (Prestridge Decl. ¶ 5)

## LEGAL STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact"
and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

The challenged NFA provisions are unconstitutional. *First*, they exceed Congress's enumerated powers. They exceed the taxing power as applied to the now-untaxed classes of firearms. Under binding precedent, this Court cannot rehabilitate the NFA on any other constitutional ground. Furthermore, and though the Court need not reach this issue, the challenged NFA provisions are, at a minimum, unconstitutional as applied to the intrastate possession, transfer, and making of NFA firearms. *Second*, the challenged NFA provisions violate the Second Amendment.

## I.    The Challenged NFA Provisions Exceed Congress's Enumerated Powers

### A.    The Challenged NFA Provisions Are Unconstitutional As Applied To Untaxed Firearms Because They Exceed Congress's Taxing Power

Because the challenged NFA provisions no longer collect a tax, they cannot be upheld under the taxing power. That ends this case because the Supreme Court held that the challenged provisions can be upheld only under the NFA and because Congress explicitly chose to enact the challenged provisions under only the taxing power—to the exclusion of all other powers.

#### 1.    The Challenged Provisions Cannot Be Sustained Under The Taxing Power

Article I of the Constitution gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," § 8, cl. 1, and "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Power[ ]," *id.* cl. 18.

Congress enacted the NFA pursuant to its taxing power. "On its face," the Supreme Court has explained, the statute "is only a taxing measure." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). The NFA establishes "an interrelated statutory system for the taxation of certain classes of firearms," *Haynes v. United States*, 390 U.S. 85, 87 (1968); it "operates as a tax" and is "productive of some revenue," *Sonzinsky*, 300 U.S. at 514. Accordingly, the Supreme Court has

consistently upheld the NFA's "obviously regulatory measures" as a "valid exercise of the taxing power." *See Sebelius*, 567 U.S. at 567 (discussing *Sonzinsky*); *see also Cox*, 906 F.3d at 1181 ("*Sebelius* reaffirmed the NFA's constitutional legitimacy, touting the statute's 'obviously regulatory' tax on sawed-off shotguns."); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) ("making possession of an unregistered weapon unlawful is part of the web of regulation aiding enforcement of the transfer tax").

But the NFA no longer imposes any tax on the vast majority of firearms it purports to regulate. The One Big Beautiful Bill Act, which Congress enacted and the President signed on July 4, 2025, zeroes the making and transfer taxes on nearly all NFA-regulated firearms—specifically, on "any firearm" except "a machinegun or a destructive device." Pub. L. No. 119-21, § 70436, 139 Stat. at 247–48. That means that, as to the majority of NFA-regulated firearms, the constitutional foundation on which the NFA rested has dissolved. Because "*Sonzinsky* had upheld the NFA's registration requirements as 'solely in aid of collecting the tax,'" when the One Big Beautiful Bill Act "end[ed] the … taxation" of most NFA firearms, it thereby "also removed 'the constitutional base for those requirements—i.e., the power to tax.'" *Cox*, 906 F.3d at 1182 (explaining why the NFA's regulatory requirements could not be sustained under the taxing power as to firearms prohibited under the later enacted Gun Control Act); *see Texas*, 945 F.3d at 389–90 (holding the Affordable Care Act's "individual mandate" could not be sustained when, under a new statute, "the shared responsibility payment amount [wa]s set at zero").[2] Therefore, the NFA's

---

[2] As the *Texas* Court explained, the Fifth Circuit's decision in *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994), is not to the contrary. "In that unusual case, Congress had imposed a tax on machine guns, but subsequently outlawed machine guns altogether, which prompted the relevant agency to stop collecting the tax." *Texas*, 945 F.3d at 391. The tax therefore remained on the books and "was non-revenue-producing only in practice." *Ibid.* Here, as in *Texas*, the situation is distinguishable because "the 'tax' here is actually $0.00 as written on the books." *Ibid.* And
*(Cont'd on next page)*

15

regulatory measures cannot be sustained under Congress's taxing power as applied to untaxed firearms.

Nor can the NFA's regulatory measures be sustained by this Court under any other congressional power. As explained, "[t]he NFA, according to *Sonzinsky*, regulates *only* 'in aid of a revenue purpose.'" *Cox*, 906 F.3d at 1181 (emphasis added); *see Sonzinsky*, 300 U.S. at 513 ("it is only a taxing measure"); *Haynes*, 390 U.S. at 98 ("the registration requirement is a valid exercise of the taxing powers, in that it is calculated merely to assure notice to the Treasury of all taxable firearms"). Indeed, the Fifth Circuit has deemed "the power to tax" "the constitutional bedrock" of the NFA. *Ross*, 458 F.2d at 1145 n.3; *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992). In fact, Congress could not have invoked any other ground "since the most expansive notions of the interstate commerce power … came later." *United States v. Bridges*, 150 F.4th 517, 543 (6th Cir. 2025) (Nalbandian, J., concurring in part and concurring in the judgment) (discussing Congress's authority to regulate firearms and citing *Wickard v. Filburn*, 317 U.S. 111 (1942)). That Congress would have lacked police power to regulate firearms under any other enumerated power is exactly what the *Sonzinsky* Court meant by refusing "to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." 300 U.S. at 514; *see* Brief of the United States at 14, *Sonzinsky v. United States*, 300 U.S. 506 (1937) (No. 614) (1937 WL 40682) (distinguishing the NFA from "an effort to regulate interstate commerce"). *Sonzinsky* held the NFA justifiable under the taxing power, and under the taxing power

---

though the Supreme Court later reversed the judgment in *Texas* because the plaintiffs there lacked Article III standing, *see California v. Texas*, 593 U.S. 659 (2021), it cast no doubt on the *Texas* Court's reasoning that "[e]xpanding *Ardoin* to apply" to a zeroed-out tax would wrongly "allow Congress to prohibit conduct that exceeds its commerce power through a two-step process of first taxing it and then eliminating the tax while retaining the prohibition." 945 F.3d at 391 (cleaned up).

16

only.  Therefore, Congress's decision to zero the NFA tax on "any firearm" except "a machinegun or a destructive device" renders the NFA unconstitutional as applied to the newly untaxed firearms.

### 2.    The Challenged Provisions Cannot Be Sustained Under Any Enumerated Power

That the challenged NFA provisions cannot be sustained under the taxing power ends this case—for two reasons.  *First*, this Court must follow *Sonzinsky*'s holding that the NFA must be analyzed under the taxing power.  "The Fifth Circuit is a 'strict stare decisis' court and 'cannot ignore a decision from the Supreme Court unless directed to do so by the Court itself.'"  *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549 (5th Cir. 2020).  Far from revisiting *Sonzinsky*'s core teaching, the Supreme Court has reiterated that the NFA rests on "the taxing power."  *Sebelius*, 567 U.S. at 567; *see Haynes*, 390 U.S. at 98 ("we have repeatedly indicated" "the registration requirement is a valid exercise of the taxing powers").  Therefore, it should make no difference to this Court whether more contemporary case law has sometimes wrongly treated the Commerce Clause as a font of federal police power.  Because *Sonzinsky* accepted that the constitutionality of the NFA's applications must rise or fall on Congress's exercise of its taxing power, this Court must do the same.  That decides this case.

*Second*, even if this Court were not bound by *Sonzinsky* (though, to be clear, it is), Congress itself has made clear that the challenged NFA provisions cannot be sustained under any power other than taxation.  To assess whether Congress has acted pursuant to its constitutional authority, the Supreme Court has employed the same test for over 200 years: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."  *M'Culloch v. Maryland*, 17 U.S. 316, 421 (1819).  By its own terms, this analysis requires an analysis of a statute's "end" (i.e., its purpose) and its means (i.e., how it

17

accomplishes that purpose).  Defining the "end" is legislative and must come from Congress.  *See United States v. Darby*, 312 U.S. 100, 115 (1941) ("The motive and purpose of a regulation of interstate commerce are matters for the legislative judgment").  Whether the "means" satisfy that end is a question for the Judiciary.  *Morrison*, 529 U.S. at 614 ("whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question" (alterations accepted)).

In assessing end, Congress need not specify "the power which it undertakes to exercise" where the power invoked is "plain from" context, *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948), or obvious from the "practical effect [of] the Legislature's enactment," *Sebelius*, 567 U.S. at 570.  But a "court must be able to discern a basis for Congress's exercise of an enumerated power."  *United States v. Clay*, 128 F.4th 163, 183 (3d Cir. 2025).  And where "Congress" is "explicit about invoking its authority under" specific constitutional provisions, it "precludes consideration of" other constitutional provisions "as a basis for the" statute.  *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 n.7 (1999); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252 (1964) (distinguishing prior case by explaining: "Since the commerce power was not relied on by the Government and was without support in the record it is understandable that the Court narrowed its inquiry and excluded the Commerce Clause as a possible source of power.").

Here, the text, structure, and purpose of the NFA make it "explicit" that Congress "invoke[d] its authority under" only the taxing power to enact the challenged provisions.  First, "[s]tatutory interpretation … begins with the text."  *Ross v. Blake*, 578 U.S. 632, 638 (2016).  Applied here, "Congress expresses its intentions through statutory text," *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022), and the statutory text purports "to *tax* the sale or other disposal of" "certain

firearms and machineguns." Pub. L. No. 73-474, 48 Stat. 1236 (Preamble) (emphasis added). Section 3 of the statute—codified in the Internal *Revenue* Code—provided "[t]here shall be levied, collected, and paid upon firearms transferred in the continental United States *a tax* at the rate of $200 for each firearm." *Id.* § 3(a), 48 Stat. at 1237 (emphasis added); *see* 26 U.S.C. §§ 5811, 5821. The One Big Beautiful Bill Act maintains that characterization, setting the "*tax* at the rate of … $0." Pub. L. No. 119-21, § 70436, 139 Stat. at 247–48 (emphasis added).

Second, structure confirms the plain text. In Section 11 of the NFA, Congress sought to reach "interstate transportation," Pub. L. No. 73-474, 48 Stat. 1236 (Preamble), by making it "un-lawful" under certain conditions "to ship, carry, or deliver any firearm *in interstate commerce*," *id.* § 11, 48 Stat. at 1239 (emphasis added) (codified as amended at 26 U.S.C. § 5861(j)). "As this language shows, Congress kn[ew] how to" invoke its Commerce Clause authority, *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2235 (2025), but chose not to do so in any of the NFA provisions challenged in this litigation, *see Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts inten-tionally and purposely in the disparate inclusion or exclusion." (alterations accepted)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 107 ("negative-implication canon"); at 93 ("omitted-case canon").

Third, legislative history confirms this reading of the text and structure. As the Supreme Court held in *Sonzinsky*, the NFA's purpose was to serve "only [as] a taxing measure." *Sonzinsky*, 300 U.S. at 513. Indeed, Congress, on the advice of the United States Attorney General, enacted the NFA's registration provisions only as an "internal revenue measure," *The National Firearms Act of 1934: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means,* 73d Cong. 9 (1934),

under "the taxing power," *id.* at 6. The NFA was described as "follow[ing] the theory of taxation all the way through." *Id.* at 86–87. There was extended discussion of the proper tax rate and "estimate[s] of the revenue" that would be raised. *Id.* at 11–12. So, Congress's "legislative judgment"—its "motive and purpose"—was not to regulate interstate commerce but to tax. *Darby*, 312 U.S. at 115; *see Haynes*, 390 U.S. at 98 ("the registration requirement … is calculated merely to assure notice to the Treasury of all taxable firearms").

Because Congress was "explicit about invoking" the tax power—and there is no other discernible constitutional basis for the challenged NFA provisions—that "precludes consideration of" any other power. *Fla. Prepaid*, 527 U.S. at 642 n.7 (1999); *accord United States v. Giannini*, 455 F.2d 147, 148 (9th Cir. 1972) (holding that challenged NFA provisions "say[ ] nothing about interstate commerce" and courts should "not ascribe to Congress an intent to exercise its power under the commerce clause when it has invoked the taxing power").

### B. The Challenged NFA Provisions Are Unconstitutional As Applied To Intrastate Possession, Transfer, And Making Of Untaxed Firearms Because They Exceed Congress's Commerce Power

The Government may argue the challenged NFA provisions can be sustained under Congress's power to regulate interstate commerce. This Court need not reach that issue for the reasons just explained—the NFA is "only" an exercise of the taxing power, *Sonzinsky*, 300 U.S. at 513, and it is axiomatic that the taxing power cannot extend to untaxed items. But even if the Court entertains the possibility of a separate constitutional justification, the Commerce Clause cannot sustain the challenged provisions as applied to intrastate possession, transfer, and making.

### 1. The Challenged NFA Provisions Exceed Congress's Commerce Power Because They Do Not Regulate Interstate Commerce

The Commerce Clause allows Congress "[t]o regulate Commerce … among the several States." Art. I, § 8, cl. 3. The key word is "among." As the Supreme Court recognized early in

our Republic's history, "the word 'among'" means the Commerce Clause is "restricted to that commerce which concerns more States than one." *Gibbons v. Ogden*, 22 U.S. 1, 194 (1824). It cannot reach "commerce, which is completely internal, which is carried on between man and man in a State." *Lopez*, 514 U.S. at 553.

Because Congress's authority is limited to *interstate* commerce, the Supreme Court in *United States v. Lopez*, 514 U.S. 549 (1995), identified three "categories" of permissible Commerce Clause regulation: (i) "the channels of interstate commerce," (ii) "the instrumentalities of interstate commerce," and (iii) "activities that substantially affect interstate commerce." *Id.* at 558–59. Here, as in other Commerce Clause cases, "[t]he first two categories … may be quickly disposed of," *see id.* at 559, because the challenged NFA provisions do not purport to regulate the channels or instrumentalities of interstate commerce. *See, e.g.*, *United States v. Kebodeaux*, 687 F.3d 232, 246–51 (5th Cir. 2012) (en banc).[3] The intrastate possession, making, and transfer of NFA firearms are neither channels nor instrumentalities of interstate commerce.

For three independent reasons discussed below, the challenged NFA provisions also do not fall within *Lopez*'s third category: regulation of intrastate commerce with "substantial effects" on interstate commerce. *Lopez*, 514 U.S. at 558–59. *First*, the provisions were not enacted with "the purpose" of regulating interstate commerce, as required by *United States v. Bird*, 124 F.3d 667 (5th Cir. 1997), *as amended* 1997 U.S. App. LEXIS 33988. *Second*, the challenged provisions are not "part of a *comprehensive* regulation of 'quintessentially economic' activity." *Kebodeaux*, 687

_____

[3] The Supreme Court reversed the Fifth Circuit's opinion in *Kebodeaux* after finding that the statute there was constitutional under the "Military Regulation and Necessary and Proper Clauses," *United States v. Kebodeaux*, 570 U.S. 387, 395 (2013), and so did not opine on the Fifth Circuit's Commerce Clause analysis. Thus, the en banc Fifth Circuit's Commerce Clause holdings remain binding precedent, *Data Mktg. P'ship*, 45 F.4th at 856 n.2, and the only two Justices to reach them agreed with the Fifth Circuit, *Kebodeaux*, 570 U.S. at 411–12 (Thomas & Scalia, JJ., dissenting).

21

F.3d at 251–52 (emphasis added); *Hobby Distillers*, 740 F. Supp. at 532–33. And *third*, the challenged provisions do not pass muster under the five-prong analysis identified by the Supreme Court in *United States v. Morrison*, 529 U.S. 598 (2000).

### (a)    The Challenged Provisions Fail The Substantial-Effects Test Because They Were Not Enacted With The Purpose Of Regulating Interstate Commerce

As explained above, Congress must have both a legitimate "end" and a legitimate "means" for a statute to pass constitutional scrutiny. *M'Culloch*, 17 U.S. at 421. To the extent the NFA can be sustained under the Commerce Clause at all (it cannot), Congress's end—at minimum—was not to reach *intra*state commerce.

Consider first that Congress's "end"—or purpose—will often be obvious. For example, when it "proscrib[es] bribery" related to the expenditure of "federal funds," Congress plainly has invoked its "authority under the Spending Clause." *Sabri v. United States*, 541 U.S. 600, 602, 605 (2004). And when its regulations reach only objects "in interstate commerce," Congress has plainly invoked its authority "over interstate commerce." *Darby*, 312 U.S. at 105, 114. But Congress's end is not obvious when it seeks to regulate *intra*state commerce. That lack of an obvious constitutional hook for intrastate regulation requires an assessment of what Congress in fact intended to accomplish.

Thus, in *United States v. Bird*, 124 F.3d 667 (5th Cir. 1997), the Fifth Circuit held that where "Congress is regulating purely *intra*state, noncommercial activity because of its *substantial affect* on interstate commerce, *the purpose must in fact be to regulate interstate commerce*." *Id.* at 682 n.15 (last emphasis added). The reason, the court explained, was that "[t]he regulation of intrastate commerce *per se*, and for its own sake, and not as a means of regulating or affecting interstate commerce, is not an 'end … within the scope of the constitution.'" *Ibid.* If a court were to attribute to Congress a different end—a different "motive and purpose"—it would intrude upon

"matters for the legislative judgment … over which the courts are given no control." *Ibid.* (quoting *Darby*, 312 U.S. at 115). Thus, "it would be a perversion of congressional authority to uphold as constitutional a federal statute that purported to be an exercise of Commerce Clause power but was for the sole purpose of reaching intrastate activity without regard to whether or how that activity would actually affect interstate commerce." *Ibid.*[4]

The challenged NFA provisions flunk this requirement because their purpose was not "in fact" to "regulate interstate commerce." *Ibid.* As explained above, the challenged NFA provisions were enacted "only" as "a taxing measure," *Sonzinsky*, 300 U.S. at 513, and the taxing power is their "constitutional bedrock." *Ross*, 458 F.2d at 1145 n.3; *Parker*, 960 F.2d at 500. Thus, under *Bird*, the Government is forbidden from now relying on the Commerce Clause to reach purely *intra*state activity. *Bird*, 124 F.3d at 682 n.15.

Not only is this conclusion a faithful application of *Bird*, but also it is compelled by *Sonzinsky*. There, the Supreme Court squarely held that courts "*will not* undertake, by collateral inquiry as to the measure of the regulatory effect of [the NFA's] tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power." 300 U.S. at 514 (emphasis added). "Inquiry into the hidden motives" of Congress in enacting the NFA, the Court explained, "is beyond the competency of courts." *Id.* at 513–14. Courts "*are not free to speculate* as to the motives which moved Congress to impose" its taxing scheme under the NFA. *Id.* at 514 (emphasis added).

---

[4] To be sure, Congress "need not make particularized findings" about *how* and *the extent to which* "the activity in question substantially affected interstate commerce." *Lopez*, 514 U.S. at 562–63 (alterations accepted). But that goes to the "means"—which is "part of [the Judiciary's] independent evaluation" of the actual "effect on interstate commerce." *Ibid.* Without a valid "end," the Court need not reach "means." But even if the Court assumes a legitimate end (it should not), the challenged NFA provisions are still unconstitutional. *See infra* I.B.1.b–c.

Because Congress's regulation of "purely *intra*state, noncommercial activity" lacks a "purpose" to "in fact … regulate interstate commerce," it cannot be sustained under the Commerce Clause. *Bird*, 124 F.3d at 682 n.15.

> **(b)     The Challenged Provisions Fail The Substantial-Effects Test Because They Are Not Essential To A Comprehensive Regulatory Scheme**

Even if Congress enacted the challenged NFA provisions with the actual purpose of regulating interstate commerce (it did not), the provisions are not a permissible regulation of intrastate activity for an independent reason:  they are not "part of a *comprehensive* regulation of 'quintessentially economic' activity." *Kebodeaux*, 687 F.3d at 251–52 (emphasis added).  A recent decision from another court in this District illustrates this limitation.

In *Hobby Distillers Association v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509 (N.D. Tex. 2024), Judge Pittman considered a challenge to a provision of the Internal Revenue Code that restricted the "production of distilled spirits." *Id.* at 517.  The Government argued "that the Commerce Clause justifie[d]" the restriction "because distilling spirits at home for personal consumption is a commercial activity that substantially affects interstate commerce in the aggregate." *Id.* at 530–31.  The court disagreed.  While the restriction was part of a "statutory scheme that govern[ed] commerce"—i.e., "the interstate spirits market"—the scheme was "not the *comprehensive* kind that justifies Congressional regulation of local behavior." *Id.* at 532–33 (emphasis in original).  To satisfy that comprehensiveness requirement, the court explained, the larger economic scheme must "directly regulate the supply and demand of" the market, or "make Congress a production manager over each distillery to inflate prices," or effect "a federal directive to either promote or eliminate a national marketplace." *Id.* at 533.  Congress's regulation of spirits could not clear this hurdle because it left "many aspects of the alcohol industry untouched"—such

as "the quantity of spirits that a distillery may produce" or "how much market share a producer may obtain." *Ibid.*

Judge Pittman distinguished the non-comprehensive regulatory scheme for spirits with the comprehensive market regulations in *Wickard v. Filburn*, 317 U.S. 111 (1942), and *Gonzales v. Raich*, 545 U.S. 1 (2005). In *Wickard*, the Government asserted total "control" over "the volume" of wheat "in interstate and foreign commerce to avoid surpluses and shortages" and to set "wheat prices." 317 U.S. at 115. Because "greater than 20 per cent" of all wheat was consumed "on the farm where grown," regulation of intrastate production was essential for Congress to "limit[ ] the supply" and effect its price controls. *Id.* at 127. In *Raich*, Congress prohibited marijuana cultivation as part of a "comprehensive regime"—a "closed regulatory system" that broadly outlawed "any controlled substance" unless excepted by the federal government. 545 U.S. at 12–13. Just as in *Wickard*, Congress needed to regulate intrastate production "to control the supply and demand of controlled substances." *Id.* at 18–19. Federal regulation over spirits, Judge Pittman explained, was different in kind. "There is simply no similar degree of control over the 'production, distribution, and consumption' of alcohol as there was for wheat in *Wickard* or controlled substances in *Raich*." *Hobby Distillers*, 740 F. Supp. at 533. Thus, the regulatory scheme for spirits was "not a 'comprehensive' regulation of commerce of the kind that allows Congressional intervention in *every* related local activity." *Ibid.* (emphasis in original).

The challenged NFA provisions suffer the same defect. While the NFA imposes onerous restrictions and requirements for NFA firearms, the regulatory scheme "is not the *comprehensive* kind that justifies Congressional regulation of local behavior, like in *Wickard* and *Raich*." *Id.* at 532–33 (emphasis in original). For one, the NFA's scope is much too "under-…inclusive," *Mock*, 75 F.4th at 567, to be considered comprehensive. The statute excludes the most popular guns in

America: pistols and long rifles. *See* 26 U.S.C. § 5845(a). And even for the NFA firearms at issue here—short-barreled guns, silencers, and AOWs—the statute does "not mandate the quantity of" firearms a company may "produce" or sell. *Hobby Distillers*, 740 F. Supp. at 533. It simply imposes registration procedures on an otherwise-unfettered market. It "does not influence how much market share" companies dealing in NFA firearms "may obtain." *Ibid.* "It is silent on a [gun]'s design and aesthetics absent a required" serial number. *Ibid.* There is no federal mandate to "promote or eliminate a national marketplace for" NFA firearms. *Ibid.* Under the NFA's registration scheme, "[t]here is simply no similar degree of control over the 'production, distribution, and consumption' of [NFA firearms] as there was for wheat in *Wickard* or controlled substances in *Raich*." *Ibid.*[5]

Thus, the challenged NFA requirements cannot be sustained under the Commerce Clause because they flunk "the requirement that Congress must first have an established, comprehensive regulatory regime in place." *Id.* at 532; *see also Kebodeaux*, 687 F.3d at 251–52 ("third Commerce-Clause category" requires "that the statute" be "part of a comprehensive regulation of 'quintessentially economic' activity"). This alone forecloses any invocation of the Commerce Clause.

### (c)    The Challenged Provisions Fail The Substantial-Effects Test Under The Five-Factor Test Established By The Supreme Court

Because the previous two threshold issues foreclose sustaining the challenged NFA provisions under the Commerce Clause, this Court need not reach the five-factor substantial-effects

---

[5] The Government has appealed its loss in *Hobby Distillers*, but it seeks to uphold the challenged provisions only on standing grounds and as "a necessary and proper exercise of Congress's tax power." Opening Brief for Defendants-Appellants U.S. Department of Justice and Alcohol and Tobacco Tax and Trade Bureau at 14, *McNutt v. DOJ*, No. 24-10760 (5th Cir.) (capitalization altered). That apparent concession means Judge Pittman's Commerce Clause holding will remain persuasive precedent regardless of the outcome on appeal.

inquiry established by the Supreme Court. But even if it does, the challenged provisions fail that test.

The Supreme Court has identified five "significant considerations" that "govern[ ]" whether intrastate regulation substantially affects interstate commerce. *Morrison*, 529 U.S. at 609. *First* is whether the law is "economic" in "nature" or whether it is instead "a criminal statute." *Id.* at 610–11; *Lopez*, 514 U.S. at 561. *Second* is whether the statute contains an "express jurisdictional element" to "limit its reach to" activities with "an explicit connection with or effect on interstate commerce." *Morrison*, 529 U.S. at 611–12; *Lopez*, 514 U.S. at 561–62. *Third* is the existence of any "express congressional findings regarding the effects upon interstate commerce of" the regulated activity. *Morrison*, 529 U.S. at 612; *Lopez*, 514 U.S. at 562–63. *Fourth* is whether "the link between" the regulated activity "and a substantial effect on interstate commerce" is "attenuated." *Morrison*, 529 U.S. at 612; *Lopez*, 514 U.S. at 563–64. And *fifth* are the "implications of the Government's" claimed Commerce Clause power—and, in particular, whether they would effectively remove "any limitation on federal power." *Lopez*, 514 U.S. at 564; *Morrison*, 529 U.S. at 615–16; *accord Sebelius*, 567 U.S. at 536 ("the Constitution … must be read carefully to avoid creating a general federal authority akin to the police power").

Each factor cuts sharply against the Government here. At least one court—the Eighth Circuit—has already held as much in declaring that application of the NFA to intrastate activity is unconstitutional. *See, e.g.*, *United States v. Hall*, 171 F.3d 1133, 1138 (8th Cir. 1999) (holding that application of the NFA to "possession of an unregistered silencer" with no "direct connection [to] interstate commerce" failed each of the Supreme Court's substantial-effect "inquiries"). And, as explained below, the Eighth Circuit is correct.

27

**Economic Activity.**  The possession, transfer, and making of NFA firearms is "noneco-nomic" activity under the Commerce Clause.  *Morrison*, 529 U.S. at 610.  "To be sure, the market for" NFA firearms "consists of economic" activities.  *Terkel v. CDC*, 521 F. Supp. 3d 662, 672 (E.D. Tex. 2021).[6]  But "in analyzing the effect on interstate commerce, courts look only to the *expressly regulated activity*."  *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 634 (5th Cir. 2003) (emphasis added).  Here, the expressly regulated activities are "possession" and "receipt," 26 U.S.C. §§ 5841(e), 5812(b), 5861(b)–(d), "transfers," 26 U.S.C. §§ 5812(a), 5861(e); 27 C.F.R. §§ 479.84(a)–(d), and "manufacturing" and "making," 26 U.S.C. §§ 5841(a)–(c), 5861(f); 27 C.F.R. §§ 479.62(a)–(d).

These activities are noneconomic in nature.  The Supreme Court has already held that fire-arm possession "has nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561, even though someone may have previously purchased the firearm.  *See also Hall*, 171 F.3d at 1139 ("possession of a silencer solely within one state has nothing to do with com-merce or any sort of economic enterprise" (quotations omitted)).  And the same is true of firearm transfer and making.  If Silencer Shop Foundation transfers a silencer to a member of the public for educational purposes, App. 024 (Spivey Decl. ¶ 9), that "transfer" and "receipt" are not eco-nomic activity.  If Mr. Wetz saws down the barrel on his standard-length shotgun for personal use, App. 007 (Wetz Decl. ¶ 22), that "making" of a short-barreled shotgun is not an economic activity.  To be sure, if Silencer Shop Foundation *billed* the recipient or if Mr. Wetz sawed down the shotgun *on commission*, that might be economic activity.  But adding a hypothetical commercial qualifica-tion to every instance of "transfer" and "make" would require "look[ing] … beyond the regulated

---

[6]  *See Terkel v. CDC*, 15 F.4th 683, 685 (5th Cir. 2021) (dismissing appeal and holding that dis-missal did "not abrogate the district court's judgment or opinion, both of which remain in full force").

conduct." *Contra GDF Realty*, 326 F.3d at 634; *Terkel*, 521 F. Supp. at 672. Thus, although the challenged provisions reach some activity that happens to be economic, that reach is incidental to the core conduct being expressly regulated. *See, e.g.*, *Tex. Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 652–53 (E.D. Tex. 2024) ("compel[ling] disclosure of information" by commercial businesses did "not facially regulate commerce") (emphasis omitted)).

*Raich* is not to the contrary. There, the Court held that the "production" and "distribution" of marijuana were economic activities, 545 U.S. at 25, but only in the context of "comprehensive legislation to regulate the interstate market in a fungible commodity" *id.* at 22. In the context of that comprehensive market control, any interaction with that commodity was necessarily commercial; the interaction with the closed commodities market *was* the "expressly regulated activity." *GDF Realty*, 326 F.3d at 634. But in the absence of such comprehensive market legislation, possession, transfer, and making are not economic activities. The Court itself made this distinction in *Raich*. It reaffirmed *Lopez*'s holding that "possession of a gun" does "not regulate any economic activity," 545 U.S. at 23, but nevertheless held that "possession" of marijuana *was* "economic, commercial activity," *id.* at 26. Those holdings were not in conflict, the Court explained, because "the statutory scheme" regulating marijuana was "at the opposite end of the regulatory spectrum" as *Lopez*'s firearms restriction. *Id.* at 24. The key was that the Controlled Substances Act, unlike the NFA, "creat[ed] a *comprehensive framework*" that sought to exercise total market control over "the production, distribution, and possession" of marijuana. *Ibid.* (emphasis added). Because the challenged NFA provisions are not part of a statute that comprehensively "regulates some issue of supply and demand" for a "fungible good," they are controlled by *Lopez*, not *Raich*. *Tex. Top Cop Shop*, 758 F. Supp. at 652–53 (distinguishing *Raich* and *Wickard*); *see also Hobby Distillers*, 740 F. Supp. at 533; *supra* Argument I.B.1.c.

At bottom, the challenged NFA provisions are criminal laws. "The law at issue in *Lopez* criminalized the possession of one's handgun" under certain conditions. *Terkel*, 521 F. Supp. at 672 (citing *Lopez*, 514 U.S. at 551). Likewise, "[t]he [law] at issue here criminalizes the possession," transfer, and making of firearms under certain conditions. *Ibid.* And that criminality is not some small part of the NFA: violators can expect to spend "*ten years*" in prison. 26 U.S.C. § 5871 (emphasis added). This too cuts against the Government under the first factor, as "[u]nder our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n.3; *accord Bond v. United States*, 572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public good—what we have often called a 'police power.' The Federal Government, by contrast, has no such authority[.]" (citing *Lopez*)). And here, the issue is more acute as Congress's criminalization of NFA weapons "displaces state policy choices." *Lopez*, 514 U.S. at 561 n.3 (alteration accepted). For example, Congress has deemed it a felony for a Texan living in Texas to own an unregistered silencer—while the State itself has deemed it perfectly legal for its citizens to own silencers. *See* Tex. Gov't Code §§ 2.052, 2.102.

This factor cuts sharply against the Government because the NFA "is a criminal statute that by its terms has nothing to do with 'commerce.'" *Lopez*, 514 U.S. at 561; *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (finding Commerce Clause violation where regulation touched subject matter "traditionally within the States' police power.").

**Jurisdictional Element.** None of the challenged NFA provisions contain a "jurisdictional element which would ensure, through case-by-case inquiry that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at 561; *see Hall*, 171 F.3d at 1138–39. That the Government failed to comply with this "standard operating procedure for Commerce Clause legislation" further "indicates that the" challenged NFA provisions were not intended as and are "not

a proper exercise of Congress's commerce power." *Smith v. Dep't of the Treasury*, 761 F. Supp. 3d 952, 967 (E.D. Tex. 2025), *appeal held in abeyance*, No. 25-40071, 2025 WL 1824826 (5th Cir. May 20, 2025); *see Hall*, 171 F.3d at 1138–39; *Terkel*, 521 F. Supp. at 672–73; *United States v. Kagama*, 118 U.S. 375, 378–79 (1886) (rejecting argument "that the statute under consideration is a regulation of commerce" where it criminalized actions "without any reference to their relation to any kind of commerce").

**Congressional Findings.** Congress made no "findings regarding the effects upon inter-state commerce of gun possession," transfer, or making. *See Lopez*, 514 U.S. at 562. Indeed, in *United States v. Hall*, 171 F.3d 1133 (8th Cir. 1999), the Eighth Circuit conducted an exhaustive review of the NFA's legislative history and identified "no findings" "with respect to the effect on interstate commerce of … intrastate activity" related to NFA firearms. *Id.* at 1139–40. And again, that is no surprise. Congress enacted the NFA "only" as a "taxing measure," *Sonzinsky*, 300 U.S. at 513, and so would not have made any findings about any sort of substantial effect on interstate commerce. Because "no such substantial effect [i]s visible to the naked eye" under Congress's "federal firearms legislation," this factor cuts sharply against the Government. *Lopez*, 514 U.S. at 563; *Hall*, 171 F.3d at 1139–40; *Smith*, 761 F. Supp. at 967–68; *Terkel*, 521 F. Supp. at 673–74; *see also Hughes v. Oklahoma*, 441 U.S. 322, 338 n.20 (1979) ("The late appearance of this argu-ment and the total absence of any record support for the questionable factual assumptions that underlie it give it the flavor of a post hoc rationalization."); *id.* at 338 (striking down state statute under Commerce Clause); *Bird*, 124 F.3d at 678 n.14 ("Use of legislative history in this manner is entirely consistent with our responsibility to gauge the regulated activity's effect on interstate com-merce.").

**Attenuation.**  Here, the challenged NFA provisions—in form, function, and purpose—simply do not concern interstate commerce at all.  *See, e.g.*, *Hall*, 171 F.3d at 1140 (holding no "proof of a connection between interstate commerce" and intrastate possession of a "silencer"). The Government and the courts have agreed with that characterization for nearly a century, stressing that the statute was "*only* a taxing measure."  *See Sonzinsky*, 300 U.S. at 513 (emphasis added). Thus, the effect of the regulated intrastate activity on interstate commerce is not merely "attenuated," it is *nonexistent*.  Because regulating intrastate activity with no substantial effect on interstate commerce cannot possibly be an exercise of the Commerce Clause, this deficiency alone is dispositive.  *See Kebodeaux*, 687 F.3d at 252–53; *United States v. Mann*, 493 F.3d 484, 496 (5th Cir. 2007) (holding unconstitutional statute as applied to activity that lacked "substantial effect on interstate commerce") *Hobby Distillers*, 740 F. Supp. at 533–34 ("Beginning and ending with the text, neither of these provisions connect the prohibited behavior to interstate commerce. … Accordingly, the Commerce Clause does not authorize [them].").

**Implications For Federal Power.**  Finally, were this Court "to accept the Government's" exercise of authority here, it would be "hard pressed to posit any activity by an individual that Congress is without power to regulate." *Lopez*, 514 U.S. at 564.  The Government asserts authority to, *inter alia*, require law-abiding citizens to register certain lawfully-owned firearms in a federal database, to submit their fingerprints as a precondition to own NFA firearms, and to notify local law enforcement before they make or transfer NFA firearms.  *See supra* Background II.B.  Yet the *only* apparent link to interstate commerce is that perhaps someday an NFA firearm might cross state lines.  Indeed, NFA firearms have no special link to commerce that other firearms do not. Accepting the Government's logic would open the door to universal registration in a federal database of every firearm in the country.

32

That logic does not end at firearms.  Consider that "[e]veryone will likely participate in the markets for food, clothing, transportation, shelter, or energy."  *Sebelius*, 567 U.S. at 557.  So accepting the Government's theory here would allow it to require federal registration, fingerprinting, and law-enforcement notification every time a consumer bought groceries, clothes, a bicycle, an RV, or gasoline—as any one of these things "might someday travel interstate."  *Kebodeaux*, 687 F.3d at 248 (rejecting this theory).  As another court observed, accepting this kind of theory "could, for example, require all homeowners to register their homes in a federal database to prevent their properties from being used as stash houses for drug trafficking organizations" or "require all mask owners to register their ownership and submit a mask photo to ensure they cannot conceal their involvement in a federal crime."  *Smith*, 761 F. Supp. at 969.  The Court should not accept an assertion of authority that would "knight Congress with supreme power to regulate [Americans] in all aspects," *Tex. Top Cop Shop*, 758 F. Supp. at 652, and provide it "general license to regulate an individual from cradle to grave, simply because he" or his property may cross State lines, *Sebelius*, 567 U.S. at 557.

Because the Government asserts authority that would allow it to erase any "distinction between what is truly national and what is truly local"—reserving to itself "a plenary police power"—it cannot be sustained under the Commerce Clause.  *Morrison*, 529 U.S. at 617–19.  This factor alone is dispositive: as the Fifth Circuit has explained, "the courts *always* have rejected readings of the Commerce Clause … that would permit Congress to exercise a police power." *BST Holdings*, 17 F.4th at 617 (emphasis in original).

### 2.    The Challenged NFA Possession Provisions Exceed Congress's Commerce Power Because They Do Not Regulate Commerce At All

The challenged NFA *possession* provisions are unconstitutional for an additional reason—simple possession is not commercial "activity."  In *NFIB v. Sebelius*, 567 U.S. 519 (2012), the

Supreme Court explained that "[t]he power to *regulate* commerce presupposes the existence of commercial activity to be regulated." *Id.* at 550 (emphasis in original). The Court noted that "all" of its commerce cases "uniformly describe the power as reaching 'activity.'" *Id.* at 551. Thus, the Court explained, a law that "does not regulate existing commercial activity" cannot be sustained under the Commerce Clause. *Id.* at 552; *see also BST Holdings*, 17 F.4th at 617.

Another court in this Circuit recently applied this principle to declare a law in excess of Congress's Commerce Clause authority. In *Texas Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607 (E.D. Tex. 2024), Judge Mazzant assessed the constitutionality of a statute that imposed disclosure requirements on all companies registered with a state or foreign government. He held that the statute could not pass constitutional muster because a company's mere "existence" is "not an activity." *Id.* at 643 (emphasis omitted). Rather, it is "the natural, idle state" of "any entity formed" under state law—"akin to a person simply being alive." *Ibid.* And the court rejected the notion that a business's "operation" could provide the requisite "activity" because the statute did not "regulate operation at all." *Id.* at 642. It "d[id] not forbid a company from doing anything except" not "fil[ing]" paperwork pursuant to a requirement created by the statute itself. *Id.* at 642–43. "Because the [statute] d[id] not regulate a pre-existing activity, but instead compel[led] a new one," the Court explained, the statute "exceed[ed] Congress's commerce power." *Id.* at 644.

Mere possession of an NFA firearm suffers from the same defect. Post-making or transfer of an NFA firearm, possession is simply the "natural state of being"—an "idle state that any" person necessarily "takes on by virtue of" having previously obtained a firearm. *Id.* at 643. "That is not an activity." *Ibid.* And it would be no answer to claim that the NFA regulates actions bound up with possession—for example, use or storing the firearm. That was akin to the Government's argument in *Texas Top Cop Shop* that the registration requirement regulated a business's

"operation." And just like in that case, the problem is that the NFA, "by its text, does not …

regulate" use, storage, or any other activity—"except insofar as it" compels certain registration

and maintenance requirements created by the statute itself. *Id.* at 642–43. Thus, just like in *Sebe-*

*lius* and *Texas Top Cop Shop*, the challenged NFA possession provisions are unconstitutional be-

cause they "do[ ] not regulate a pre-existing activity, but instead compel[ ] a new one." *Id.* at 644;

*see Sebelius*, 567 U.S. at 555 ("The Framers gave Congress the power to *regulate* commerce, not

to *compel* it" (emphasis in original)); *BST Holdings*, 17 F.4th at 617.

### 3. Although Not Necessary To Prevail, Plaintiffs Preserve A Challenge That *Wickard* And Its Progeny Are Wrongly Decided

For the reasons explained above, the challenged NFA provisions are unconstitutional under

settled Commerce Clause doctrine. However, Plaintiffs do not concede the correctness of *Wickard*

*v. Filburn*, 317 U.S. 111 (1942), *Gonzales v. Raich*, 545 U.S. 1 (2005), and other cases that allow

the Government to regulate purely intrastate activity. Such an "expansive reading of the Interstate

Commerce Clause would be foreign to the Framers." *Texas*, 945 F.3d at 388. As the Supreme

Court itself has recognized, the Commerce Clause was originally understood to sweep much nar-

rower—excluding things like "production" and intrastate activity with only limited or "indirect"

interstate effect. *Lopez*, 514 U.S. at 552–56 (agreeing that twentieth-century precedents "greatly

expanded the previously defined authority of Congress under [the Commerce] Clause"). Plaintiffs

reserve the right to challenge on appeal precedents that are at odds with the text and original un-

derstanding of the Commerce Clause.

At minimum, the Court should decide this "case faithful to the text and original under-

standing of the Constitution, to the maximum extent permitted by a faithful reading of binding

precedent." *Williams v. Homeland Ins. Co. of New York*, 18 F.4th 806, 818 (5th Cir. 2021) (Ho,

J., concurring); *accord Smith*, 761 F. Supp. at 970 (employing this principle to reject reading of

35

the Foreign Commerce Clause that "does not regulate foreign trade or commerce itself" or "the channels or instrumentalities of foreign commerce").

## II.    The Challenged NFA Provisions Violate The Second Amendment As Applied To Untaxed Firearms

In addition to being unauthorized by Congress's enumerated powers, the challenged NFA provisions violate the limitations placed on those powers by the Second Amendment, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

When "the Government regulates arms-bearing conduct, … it bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024).  Thus, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government … must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17.  And because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634–35, "founding-era laws are far more probative of what 'the people' meant when the Second Amendment was ratified."  *Reese*, 127 F.4th at 594.

Applying these precedents, the challenged NFA provisions clearly violate the Second Amendment.  First, NFA-regulated weapons are "Arms" under the Second Amendment's plain text, as originally understood.  They also are "in common use" today, and so their constitutional protection is secured without further analysis.  Second, the Founders *never* required "the people" to register their firearms—or even a subset of those arms—on pain of felony prosecution, lifetime

disarmament, or financial penalties of up to three years' average household wages. To the contrary, the Founders envisioned widespread citizen ownership of arms.

Finally, the Fifth Circuit's flawed decision in *United States v. Peterson*, 2025 U.S. App. LEXIS 22106 (5th Cir. Aug. 27, 2025), does not compel a contrary result. Even if the NFA were a so-called "shall-issue" licensing regime (it is not) that is purportedly immune from historical analysis on that basis alone (it is not), it has been "put toward abusive ends." *Bruen*, 597 U.S. at 38 n.9. Thus, "a[ ] litigant" still "may successfully challenge the NFA's requirements," and Plaintiffs do so here. *Peterson*, 2025 U.S. App. LEXIS 22106, at *19.

### A.    NFA Firearms Are "Arms" As Originally Understood, And The Second Amendment Covers Plaintiffs' Proposed Course of Conduct

#### 1.    NFA Firearms Are Presumptively Protected

In *Heller*, the Supreme Court held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. And as *Heller* explained, the term "Arms" means "'[w]eapons of offence, or armour of defence,'" "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" which obviously includes "all firearms." *Id.* at 581. Thus, so long as an instrument is "bearable"—meaning one can "'wear, bear, or carry [it] … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action'"—then it is presumptively protected under the Second Amendment. *Id.* at 584 (internal quotations omitted); *see Snope v. Brown*, 145 S. Ct. 1534, 1535 (2025) (Thomas, J., dissenting from denial of certiorari) ("AR-15s are clearly 'Arms' under the Second Amendment's plain text."). This broad "general definition" of "Arms" also "covers modern instruments that" so much as "*facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added).

37

Plaintiffs' untaxed firearms and silencers plainly fall within that definition. Short-barreled rifles, short-barreled shotguns, and so-called "any other weapons" are all "firearms" and therefore "Arms." *See Heller*, 554 U.S. at 581 ("all firearms constituted 'arms'"). Moreover, these weapons—and the silencers that attach to them—are all bearable instruments for the purpose of offensive or defensive action. And it is indisputable that silencers facilitate armed self-defense. *See also Peterson*, 2025 U.S. App. LEXIS 22106, at *9 ("The government agrees that the Second Amendment protects suppressors").

### 2.    NFA Firearms Are In Common Use

These various types of NFA weapons all are also indisputably "in common use," and so the Second Amendment necessarily "protects the[ir] possession and use." *Bruen*, 597 U.S. at 21. In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Supreme Court held stun guns to be protected with evidence of only "approximately 200,000" examples in circulation at the time. *Id.* at 420 (Alito & Thomas, JJ., concurring in the judgment); *see also Maloney v. Singas*, 351 F. Supp. 3d 222, 238, 237 (E.D.N.Y. 2018) ("Defendant has failed to establish that nunchaku are not in common use" with "*at least* 64,890" known examples in circulation). Here, the Government notes 3,536,623 silencers,[7] 870,286 short-barreled rifles, 165,180 short-barreled shotguns, and 88,149 "any other weapons" registered nationwide as of May 2024. *See* ATF, Firearms Commerce in the United States, Statistical Update 2024 at 12 (May 2024), tinyurl.com/mscuvayt. These weapons are unquestionably popular, and would be *more* popular if the NFA did not heavily regulate them. Americans have "overwhelmingly chosen," *Heller*, 554 U.S. at 628, these arms for lawful

---

[7] *Cf. Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., respecting the denial of certiorari) ("Given that millions of Americans own AR-15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR-15s are in 'common use' by law-abiding citizens and therefore are protected by the Second Amendment under *Heller*.").

purposes, and so "the[se] traditions of the American people … demand[ ] [the Court's] unqualified deference," *Bruen*, 597 U.S. at 26.

### 3.    The Second Amendment Covers Plaintiffs' Proposed Conduct

Finally, being law-abiding, adult citizens, the individual plaintiff and the associational plaintiffs' members unquestionably belong to "the people" the Second Amendment protects. *See Bruen*, 597 U.S. at 31–32. The same is true of the commercial and organizational plaintiffs. *See, e.g.*, *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. at 937. And Plaintiffs seek to acquire, possess, carry, make, and transfer the NFA weapons at issue. All of these activities are covered by the Second Amendment's plain text. *See id.* at 32 (possession and carry); *see also Reese*, 127 F.4th at 589–90 ("Of course, the words 'purchase,' 'sale,' or similar terms describing a transaction do not appear in the Second Amendment. But the right to 'keep and bear arms' surely implies the right to purchase them."); *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) (constitutional rights "implicitly protect those closely related acts necessary to their exercise"); *Griswold v. Connecticut*, 381 U.S. 479, 482–83 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read … and freedom of inquiry, freedom of thought, and freedom to teach" because "[w]ithout those peripheral rights the specific rights would be less secure."); *Bruen*, 597 U.S. at 70 ("The [Second Amendment] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

### B.    The Government Cannot Satisfy Its Burden To Show A Founding-Era Historical Tradition Of Similar Regulation

Because Plaintiffs' weapons are "Arms," the challenged provisions burdening the right to keep and bear those arms are "presumptively" unconstitutional. *Bruen*, 597 U.S. at 17. Thus, the "burden falls on [the Government]" to show that the regulations are "consistent with this Nation's

historical tradition of firearm regulation." *Id.* at 33–34.  To do so, the Government must "identify a well-established and representative" Founding-era historical analogue, not a historical "out-lier[ ]." *Id.* at 30, 65.

Moreover, because crime with concealable weapons is "a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amend-ment." *Id.* at 26.  Thus, this Court need not analogize.  If the Founders never imposed registration requirements for short-barreled and concealable firearms and accessories, that should end the anal-ysis.  But even if this Court were to analogize, historical and modern regulations are "relevantly similar" only when both share a similar "how and why" for their "burden [on] a law-abiding citi-zen's right to armed self-defense." *Id.* at 29.  Importantly here, "the penalty" is "a[ ] relevant aspect of the burden." *Rahimi*, 602 U.S. at 699.

Here, there can be no serious claim that registration with the federal government, manda-tory background checks, fingerprinting, photo submission, potentially multi-month approval de-lays, and felony criminal penalties for noncompliance, *see* 26 U.S.C. § 5861(d), form part of any relevant historical tradition.  The Founders did not require registration of privately owned arms.  This is unsurprising—the right to keep and bear arms necessarily implies a corresponding right *not* to be tracked by the sovereign for exercising it.  Had King George III required the colonists to register their firearms with the crown, that undoubtedly would have "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594.  As Justice Kavanaugh has explained, registration requirements "do not meaningfully serve the pur-pose of ensuring that owners know how to operate guns safely in the way certain licensing require-ments can," and they therefore "are often seen as half-a-loaf measures aimed at deterring gun

ownership." *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

Should the Government rely on Founding-era militia musters to support the NFA's registration provisions, that analogy will fail. Militia inspections were episodic, localized, and concerned with readiness, not control. They did not require individuals to register their arms with a centralized authority, provide biometric data, submit to background checks, await approval, or face criminal penalties for prior possession of uninspected weapons. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 232–34 (2018) (Founding-era laws assumed lawful private possession and did not authorize government preapproval). Indeed, militia inspections presupposed a preexisting right to privately possess arms— they were not a mechanism for gatekeeping or disarmament. Even *Heller* skeptics recognize that such laws had an entirely different "why" than the NFA: "government policy in the era of the Second Amendment aimed to encourage Americans to buy weapons they did not desire, not discourage them from purchasing guns they did desire." Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L.J. 25, 44 (2023). The NFA's registry, by contrast, is a tool of exclusion and criminal enforcement, backed by felony penalties. No Founding-era law imposed comparable burdens or conditions.[8]

The NFA's felony penalties bear emphasis. The NFA punishes noncompliance with up to ten years' imprisonment, a fine of up to $250,000 for individuals (26 U.S.C. § 5871; 18 U.S.C. §§ 3559(a), 3571(b)(3)), confiscation of noncompliant firearms (26 U.S.C. § 5872), and lifetime

---

[8] To the contrary, blunderbusses, a form of short-barreled shotgun, were common founding-era civilian weapons that often had a twelve- or fourteen-inch barrel. Joseph G.S. Greenlee, *The Tradition of Short-Barreled Rifle Use and Regulation in America*, 25 Wyo. L. Rev. 111, 118 (2025).

disarmament for good measure (18 U.S.C. § 922(g)(1)).  Plaintiffs are aware of no Founding-era firearm regulation that "impose[d] a comparable burden on the right of armed self-defense," *Bruen*, 597 U.S. at 29—not even close.  Consider the financial penalty alone.  For the median American household, a $250,000 fine is the equivalent of three years' wages.  *See* U.S. Census Bureau, Median Household Income (Sept. 9, 2025), tinyurl.com/mt8byxzr (reporting a median household income of $83,730).  It seems unlikely that the same Founders who objected to modest British taxes on tea would have garnished years of wages for failure to register a firearm.  The NFA's provisions are historically unprecedented, and no analogue can justify them.

Because the Government cannot rebut the presumption that the challenged provisions are unconstitutional under the Second Amendment, the Court should hold them unconstitutional.

### C.    *United States v. Peterson* Does Not Compel A Contrary Result

Recently in *United States v. Peterson*, 2025 U.S. App. LEXIS 22106 (5th Cir. Aug. 27, 2025), a panel of the Fifth Circuit[9] upheld the NFA's taxation and registration requirements for silencers under the Second Amendment, but "d[id] not foreclose the possibility that another litigant may successfully challenge the NFA's requirements" under different facts. *Id.* at *19.  There, the Fifth Circuit construed the NFA as a "shall-issue licensing regime" based on a "conce[ssion] at oral argument." *Id.* at *15.  And as a purportedly "shall-issue licensing regime," the Fifth Circuit subjected the NFA to a "presumption of constitutionality" under *Bruen*'s footnote nine. *Id.* at *19.  Thus, absent a factual showing of "abusive ends" such as "lengthy wait times in processing license applications" as *Bruen* had discussed, the Fifth Circuit rejected the appellant's as-applied challenge. *Id.* at *17.

---

[9]  This opinion has been petitioned for rehearing en banc.  *See* Defendant-Appellant's Petition for Rehearing En Banc, *United States v. Peterson*, No. 24-30043, Doc. 156 (5th Cir. Sept. 10, 2025); *see also* Doc. 159 (calling for a response).

Importantly here, Plaintiffs do not concede that the NFA is a "shall-issue" regime. To the contrary, the NFA provides only that "[a]pplications *shall be denied* if the transfer, receipt, or possession of the firearm would place the transferee in violation of law." 26 U.S.C. § 5812(a) (emphasis added); *see also id.* § 5822 (similar). That is a far cry from containing any directive that applications "*shall be approved*" if an applicant meets the statutory criteria. Rather, the NFA simply directs ATF examiners regarding what *must* happen if an applicant is *ineligible*, and it says nothing more. For this reason, the D.C. Circuit has explained that "[b]oth sections provide that applications 'shall be denied[,]' … but neither restricts the Secretary's *broad power to grant or deny applications in any other respect*." *Lomont v. O'Neill*, 285 F.3d 9, 17 (D.C. Cir. 2002) (emphasis added). This sort of "broad power to grant or deny," *ibid.*, is irreconcilable with the "'narrow, objective, and definite standards' guiding licensing officials" in the quintessentially "shall-issue" licensing regimes that *Bruen* discussed. *Bruen*, 597 U.S. at 38 n.9.

Nor does the NFA operate as a "shall-issue" regime in practice. For starters, NFA applications are not processed during government shutdowns—including now. *See* How the Government Shutdown Could Affect Gun Owners, GunBroker, tinyurl.com/223c55rb (last visited Oct. 2, 2025). That places an indefinite delay on application approvals that Plaintiffs *actually* have suffered and continue to suffer now. *See, e.g.*, App. 004 (Wetz Decl. ¶¶ 13–14); App. 016 (Pratt Decl. ¶ 25); App. 41–42 (Supp. Pratt Decl. ¶¶ 6–12, 14); App. 24–25 (Spivey Decl. ¶ 10) ("unpredictable delays"). A right contingent on government funding is no "right" at all. During this time, the NFA is a *no-issue* regime. Yet constitutional rights are not conditioned on congressional funding.

There are also common instances where eligible applicants are denied while the government *is* operating. ATF has publicly stated that, if an application-related background check simply takes *too long* for the FBI to process, ATF will automatically deny the pending application—after

43

88 days, to be precise. *See ATF Comments on 88-Day Automatic Denial of Pistol Brace Tax Stamps*, AmmoLand (Jan. 29, 2023), tinyurl.com/mvd22zvr. Plaintiffs have suffered *these* 88-day denials, through no fault of their own and despite being perfectly eligible to possess firearms under state and federal law. App. 41–42 (Supp. Pratt Decl. ¶¶ 6–10). Automatic denials based on waiting periods out of the applicant's control are not the hallmarks of a "shall-issue" regime.

The NFA also allows the Government to approve (or not) applications on whatever timeframe it desires, in stark contrast to *actual* "shall-issue" regimes. Currently, approval times for some NFA forms are on the order of several days. *See* ATF, Current Processing Times (Sept. 19, 2025), tinyurl.com/3zeznpcv.[10] Yet other forms—such as the popular "Form 4 Trust" application to transfer NFA weapons—take on average 23 days for approval, if filed electronically, or a full 45 days, if filed on paper, as is required for transfers between non-licensees. *See id.*; *cf. McRorey v. Garland*, 99 F.4th 831, 840 (5th Cir. 2024) (deciding "a period of 10 days does not qualify" as "abusive ends"); *Ortega v. Grisham*, 148 F.4th 1134, 1139 (10th Cir. 2025) (holding "likely … unconstitutional" a "seven-day 'cooling-off' period").[11] But even ATF's comparatively quicker, multi-day processing times for *some* forms have not been the historical norm. Indeed, NFA application determinations historically have taken *months* to *well over a year* to issue[12]—all because the statute says nothing about *when* they must issue, or *whether* they must issue at all. Plaintiffs have suffered these arbitrary delays, too. *See, e.g.*, App. *See, e.g.*, App. 004 (Wetz

---

[10]  The approval times discussed here are those ATF has published at the time of writing. But they are subject to change at any time, as the statute does not require otherwise, and ATF simply over-writes old approval times with the newest averages on this webpage.

[11]  At present, Plaintiff Brady Wetz would expect a 35-day wait to transfer a silencer to another person, as individual-to-individual transfer applications must be submitted on paper. *See* Current Processing Times, *supra* ("Form 4 Individual"); App. 009–10 (Wetz Dec. ¶ 29).

[12]  *See* NSSF, NSSF Successfully Leads Effort to Dramatically Reduce ATF NFA Form Wait Times, New Data Shows (Apr. 9, 2024), tinyurl.com/jp456ycx.

Decl. ¶¶ 13–14); App. 016 (Pratt Decl. ¶ 25); App. 41–42 (Supp. Pratt Decl. ¶¶ 6–12, 14).  In other words, NFA approval time is entirely within the Government's discretion.  And there is no law stopping the Government from reverting to its old ways, and refusing to approve NFA forms for weeks, months, or years.  That sort of open-ended discretion is in no way "shall issue."

And therein lies the problem.  In the actual "shall-issue" regimes that *Bruen* discussed, statutory issuance timelines abound.  For example, Pennsylvania requires carry licenses to "be issued … after an investigation not to exceed 45 days."  18 Pa.C.S. § 6109(e)(1).  And in Nevada, the other bookend, licensing authorities "shall grant or deny the application" "[w]ithin 120 days after a complete application for a permit is submitted."  Nev. Rev. Stat. § 202.366(3); *see Bruen*, 597 U.S. at 13 n.1 (collecting these and other seemingly "shall-issue" jurisdictions).  The NFA does not share any of these "shall-issue" characteristics.

But even if this Court were to conclude otherwise—that the NFA nevertheless is a "shall-issue" regime—nowhere does *Bruen* (or its follow-up, *Rahimi*) endorse a "presumption of consti-tutionality," *Peterson*, 2025 U.S. App. LEXIS 22106, at *19, for dicta that immunizes a "firearm regulation" from historical analysis.  To the contrary, *Bruen* instructed that "[o]nly if" the Gov-ernment bears its historical burden "may a court conclude that the individual's conduct falls out-side the Second Amendment's 'unqualified command.'"  597 U.S. at 17.  This was a *holding*.  *Ibid.* ("we hold").  *Rahimi* was similarly unequivocal: "*when* the Government regulates arms-bearing conduct, … *it bears the burden* to 'justify its regulation.'"  602 U.S. at 691 (emphases added).  Properly understood, *all* "firearm regulation[s]" are subject to *Bruen*'s textual and historical test.  *See* 597 U.S. at 17.  *Bruen*'s footnote nine simply contrasted the "may-issue" regime *at issue* with other regimes *not at issue*, remarking only that "it appear[ed]" certain other regimes operated in a "shall-issue" manner.  597 U.S. at 38 n.9.

45

Because *Peterson*'s analysis turned on different facts and a concession not present here, it does not control.[13]  And, in any event, Plaintiffs respectfully submit that the *Peterson* panel mis-applied Supreme Court precedent and preserve the issue for appeal.

## III.    The Court Should Enjoin Enforcement Of The Challenged NFA Provisions

The Court should declare the challenged NFA provisions unconstitutional.  It should also permanently enjoin the Government from enforcing them (i) as to untaxed firearms, and (ii) as to intrastate activities involving untaxed firearms.  *See, e.g.*, *Hobby Distillers*, 740 F. Supp. at 534–36 (granting permanent injunction against enforcement of unconstitutional statutory provisions).

### A.    Injunction Factors

A permanent injunction is warranted where a plaintiff shows "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The third and fourth factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  All factors are satisfied here.

Plaintiffs are irreparably harmed for three reasons.  *First*, "[t]he loss of" constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *BST Holdings*, 17 F.4th at 618.  As explained above, continued

---

[13]    *Peterson* is at minimum distinguishable with respect to short-barreled rifles, short-barreled shotguns, and "any other weapons."  There, the Government argued that "a law regulating or taxing the firearm itself would impose a more severe burden on the right to keep and bear arms than regulations on useful but non-essential accessories such as suppressors."  Government's Supplemental Response to Defendant-Appellant's Petition for Rehearing En Banc 8 n.9, *United States v. Peterson*, No. 24-30043, Doc. 135 (5th Cir. May 23, 2025).  In other words, the Government itself believes *Peterson* to be distinguishable here.

enforcement of the challenged NFA provisions deprives Plaintiffs of their Second Amendment rights and their right to be free from "enforcement of a federal law that Congress had no power to enact." *Hobby Distillers*, 740 F. Supp. at 535; *see also BST Holdings*, 17 F.4th at 617–18 (finding "irreparable harm" from "loss of constitutional freedoms" after holding regulation "likely exceed[ed] the federal government's authority under the Commerce Clause"). *Second*, Plaintiffs will incur "nonrecoverable compliance costs" absent an injunction because they will be forced to spend time and money to comply with the unconstitutional possession, transfer and making requirements. *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 677 (5th Cir. 2024); *see* App. 024–26 (Spivey Decl. ¶¶ 10–11, 16); App. 003–4, 006 (Wetz Decl. ¶¶ 7–13, 19); App. 033 (Key Decl. ¶¶ 11–12), 029 (McCallum Decl. ¶¶ 11–12), 037 (Clinger Decl. ¶¶ 11–12); App. 014, 016–17 (Pratt Decl. ¶¶ 17, 26–35), 020–21 (White Decl. ¶¶ 11, 13); App. 43–44 (Prestridge Decl. ¶¶ 3–4). *Third*, the commercial plaintiffs will incur "economic costs" in the form of lost profits that "cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr. v. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *see* App. 034 (Key Decl. ¶ 15), 030 (McCallum Decl. ¶ 15), 038 (Clinger Decl. ¶ 15); 021–22 (White Decl. ¶ 15).

None of these injuries can be remedied at law through monetary damages or other relief. There is plainly "no adequate monetary standard" to redress "Plaintiffs' damages" from having their constitutional rights violated. *Hobby Distillers*, 740 F. Supp. at 535. And Plaintiffs' compliance costs and lost profits likewise lack a legal remedy because the Government "enjoy[s] sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). That is why they are "unrecoverable." *See, e.g.*, *ibid.*; *Airlines for America*, 110 F.4th at 677; *Rest. L. Ctr.*, 66 F.4th at 597.

The final two public-interest factors also favor relief. "Any interest" the Government "may claim in enforcing an … unconstitutional" law "is illegitimate." *BST Holdings*, 17 F.4th at 618. And it is blackletter law in this Circuit that "there is generally no public interest in the perpetuation of unlawful [government] action." *Airlines for America*, 110 F.4th at 677; *see also Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021) ("our system does not permit [the Government] to act unlawfully even in pursuit of desirable ends").

### B.    Scope Of Relief

The Court's injunction should impose "a blanket ban on the enforcement of the" challenged NFA provisions. *Trump v. CASA, Inc.*, 606 U.S. 831, 853 (2025). Although the Supreme Court recently held that district courts may not issue universal injunctions, it reiterated two important principles relevant here. *First*, it "agree[d] that" a district court "may fashion a remedy that awards complete relief" for "the parties." *Id.* at 850–51. *Second*, it found that "party-specific injunctions" can "incidentally" "advantage nonparties." *Id.* at 851 (alterations accepted). Applying those principles, the Court did not rule out that plaintiffs may obtain "a blanket ban on the enforcement of" federal law where, for example, a party-specific injunction would be "unworkable" to provide complete relief. *Id.* at 853; *see id.* at 854 ("leav[ing]" for "[t]he lower courts" to "determine" the scope of the "injunction").

A blanket ban on enforcement is necessary in this case, given the nature of the party-specific relief. First, consider scope. The organizational plaintiffs bring this case on behalf of their members and supporters—millions of individuals and businesses spanning the entire country. *See* App. 012, 014 (Pratt Decl. ¶ 4–5, 16), 019–20 (White Decl. ¶¶ 5, 7). The commercial plaintiffs bring this case on behalf of their customers, which are likewise numerous and span the entire country. *See* App. 032, 034 (Key Decl. ¶¶ 5, 15), 028, 030 (McCallum Decl. ¶¶ 5, 15), 036, 038 (Clinger Decl. ¶¶ 5, 15). And the States bring this case to remedy the harm inflicted on untold

scores of their officers across the nation. *See, e.g.*, App. 43–44 (Prestridge Decl. ¶¶ 2–5). Apply-ing a party-specific injunction in these circumstances would be "unworkable." *CASA*, 606 U.S. at 853. Indeed, the Fifth Circuit upheld a "nationwide injunction" where "the lead plaintiff … ha[d] over 6,000 members spread across every State in the Nation," such that party-specific relief "would prove unwieldy and would only cause more confusion." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir. 2023).[14] Such injunctions, the Fifth Circuit has explained may be "appropriate" and "necessary" to "provide complete relief to the plaintiffs." *Mock*, 75 F.4th at 587; *accord Health Freedom Defense Fund, Inc. v. Biden*, 599 F. Supp. 3d 1144, 1176–78 (M.D. Fla. 2022) (granting blanket injunction given "[t]he difficulty of distinguishing the named Plaintiffs from millions of other" parties subject to unlawful action), *vacated as moot* 71 F.4th 888 (11th Cir. 2023).

Next, consider the nature of the harms. One of the ways that the commercial plaintiffs are injured by the challenged NFA provisions is lost profits. *See* App. 034 (Key Decl. ¶ 15), 030 (McCallum Decl. ¶ 15), 038 (Clinger Decl. ¶ 15); 021–22 (White Decl. ¶ 15). The reason is not only the burden on themselves but also the burden on *their customers*. *See ibid.* In particular, prospective customers are deterred from purchasing the commercial plaintiffs' products when they have to, *inter alia*, register themselves, their fingerprints, and their firearms in a federal database— all pursuant to unconstitutional statutory provisions. *See ibid.* Further, the commercial plaintiffs' upstream and downstream business partners will balk at doing business with the commercial plain-tiffs if they, *inter alia*, produce unregistered NFA firearms or otherwise forgo NFA compliance. *See* App. 034 (Key Decl. ¶ 14), 030 (McCallum Decl. ¶ 14), 038 (Clinger Decl. ¶ 14). These harms

---

[14] Because the case became moot on appeal, *Feds for Medical Freedom* was vacated under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), without any derogation on its scope-of-relief holding. *See Biden v. Feds for Med. Freedom*, 144 S. Ct. 480 (2023).

would not be fully remedied by a party-specific injunction.  Thus, for this reason too, a blanket ban on the enforcement of the challenged NFA provisions is "necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 608 U.S. at 861; *see also Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (upholding broad equitable relief because a more "limited injunction would be ineffective").

Finally, if the Court declines to impose a blanket injunction, it should at minimum impose a party-specific injunction that reaches (i) each of the plaintiffs, including agencies and political subdivisions of each Plaintiff State, (ii) the company plaintiffs' customers, (iii) the associational plaintiffs' individual and company members and supporters, (iv) the customers of the associational plaintiffs' company members, and (v) the "resident family members" who live in the same household as those covered by the injunction, *see Texas v. ATF*, 700 F. Supp. 3d 556, 573 (S.D. Tex. 2023) (Tipton, J.).

## CONCLUSION

For these reasons, Plaintiffs hereby request that the Court enter summary judgment on all of Plaintiffs' claims, enter a declaratory judgment that the challenged provisions of the NFA are unconstitutional and unenforceable as to the untaxed firearms, and enjoin the Defendants from enforcing the challenged provisions as to the untaxed firearms.

Dated: October 7, 2025

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
STEPHEN D. STAMBOULIEH

**STAMBOULIEH LAW, PLLC**
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorney for Plaintiffs Gun Owners of America, Inc., Gun Owners Foundation and Brady Wetz*

*/s/ Brandon W. Barnett*
BRANDON W. BARNETT
Texas Bar. No. 24053088

**BARNETT HOWARD & WILLIAMS PLLC**
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
Tel: (817) 993-9249
Fax: (817) 697-4388
barnett@bhwlawfirm.com

*Attorney for Private Plaintiffs*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN WALTERS
Deputy Attorney General for Legal Strategy

*/s/ Munera Al-Fuhaid*
MUNERA AL-FUHAID
Special Counsel, Special Litigation Division

*/s/ Michael D. Faucette*
MICHAEL D. FAUCETTE
Stephen J. Obermeier
Jeremy J. Broggi
Boyd Garriott
Isaac J. Wyant

**WILEY REIN LLP**
2050 M Street NW
Washington, D.C. 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
mfaucette@wiley.law
sobermeier @wiley.law
jbroggi@wiley.law
bgarriott@wiley.law
iwyant@wiley.law

*Attorneys for Plaintiffs Silencer Shop Foundation, Firearms Regulatory Accountability Coalition, Palmetto State Armory, LLC, B&T USA, LLC, and SilencerCo Weapons Research, LLC*

Texas Bar No. 24094501

CHRISTINA CELLA
Special Counsel, Legal Strategy Division
Texas Bar No. 240106199

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 461-6494
Munera.al-fuhaid@oag.texas.gov
christina.cella@oag.texas.gov

*Counsel for Plaintiff State of Texas*

STEPHEN J. COX
Attorney General of Alaska

*/s/ Aaron C. Peterson*
AARON C. PETERSON
(Alaska Bar No. 1011087)
Senior Assistant Attorney General

Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov

*Counsel for Plaintiff State of Alaska*

RAÚL R. LABRADOR
Attorney General of Idaho

*/s/ Michael A. Zarian*
MICHAEL A. ZARIAN
Deputy Solicitor General
Texas Bar No. 24115978

OFFICE OF THE IDAHO ATTORNEY GENERAL
700 W Jefferson St #210
Boise, ID 83720
Telephone: (208) 334-2400
Facsimile: (208) 854-8073

CHRISTOPHER M. CARR
Attorney General of Georgia

*/s/ Elijah J. O'Kelley*
ELIJAH J. O'KELLEY
Deputy Solicitor General

OFFICE OF THE GEORGIA ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ James A. Barta*
James A. Barta
SOLICITOR GENERAL

INDIANA ATTORNEY GENERAL'S OFFICE
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

michael.zarian@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KRIS W. KOBACH
Attorney General of Kansas

*/s/ James Rodriguez*
JAMES RODRIGUEZ
(KS Bar #29172)
Assistant Attorney General

OFFICE OF KANSAS ATTORNEY GENERAL
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597
Tel. (785) 368-8197
Jay.Rodriguez@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN*
Solicitor General

MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for Plaintiff State of Montana*
*\*motion for pro hac vice admission forthcoming*

GENTNER DRUMMOND
Attorney General of Oklahoma

*/s/ Garry M. Gaskins, II*
GARRY M. GASKINS, II
Solicitor General

OFFICE OF THE ATTORNEY GENERAL OF
OKLAHOMA

*Counsel for Plaintiff State of Indiana*

LIZ MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA*
Solicitor General

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
AguinagaB@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*
*\*motion for pro hac vice admission forthcoming*

DREW H. WRIGLEY
Attorney General of North Dakota

*/s/ Philip Axt*
PHILIP AXT
Solicitor General

OFFICE OF NORTH DAKOTA ATTORNEY GENERAL
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

*Counsel for Plaintiff State of North Dakota*

ALAN WILSON
Attorney General of South Carolina

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
(SC Bar No. 103098)
Assistant Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL OF SOUTH

313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*


MARTY J. JACKLEY
Attorney General of South Dakota

*/s/ Amanda Miiller*
AMANDA MIILLER
(SD Bar No. 4271)
Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL OF
SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
amanda.miiller@state.sd.us

*Counsel for Plaintiff State of South Dakota*


JOHN B. MCCUSKEY
Attorney General of West Virginia

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvag.gov

*Counsel for Plaintiff State of West Virginia*

CAROLINA
PO Box 11549
Columbia, South Carolina 29201
(803) 734-3765
benmcgrey@scag.gov

*Counsel for Plaintiff State of South Carolina*


DEREK BROWN
Attorney General of Utah

*/s/ Andrew Dymek*
ANDREW DYMEK
Solicitor General

OFFICE OF THE UTAH ATTORNEY GENERAL
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111

*Counsel for Plaintiff State of Utah*


KEITH G. KAUTZ
Attorney General of Wyoming

*/s/ Ryan Schelhaas*
RYAN SCHELHAAS
Chief Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL OF WYOMING
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 7, 2025, I filed the foregoing document using the Court's ECF system.  Service on all counsel of record for all parties was accomplished electronically using the Court's CM/ECF system.

*/s/ Stephen D. Stamboulieh*