**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**San Angelo Division**

| | |
|---|---|
| SILENCER SHOP FOUNDATION; GUN OWNERS OF AMERICA, INC; FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC.; B&T USA, LLC; PALMETTO STATE ARMORY, LLC; SILENCERCO WEAPONS RESEARCH, LLC (d/b/a SILENCERCO); GUN OWNERS FOUNDATION; BRADY WETZ; STATE OF TEXAS; STATE OF ALASKA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WEST VIRGINIA; and STATE OF WYOMING, | Case No. 6:25-cv-56-H |
| *Plaintiffs*, | |
| v. | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in her Official Capacity as ATTORNEY GENERAL OF THE UNITED STATES; and DANIEL DRISCOLL, in his Official Capacity as ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | |
| *Defendants*. | |

**APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## APPENDIX TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Declaration of Brady Wetz ........................................................................Appx.001–010

Declaration of Erich M. Pratt...................................................................Appx.011–018

Declaration of Travis White......................................................................Appx.019–022

Declaration of Lauren Spivey ...................................................................Appx.023–027

Declaration of Deborah McCallum...........................................................Appx.028–031

Declaration of Ridley Key .........................................................................Appx.032–035

Declaration of Scott Clinger ....................................................................Appx.036–039

Supplemental Declaration of Erich M. Pratt............................................Appx.040–042

Declaration of Derek Prestridge...............................................................Appx.043–044

Dated: October 7, 2025

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
STEPHEN D. STAMBOULIEH

**STAMBOULIEH LAW, PLLC**
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorney for Plaintiffs Gun Owners of America, Inc., Gun Owners Foundation and Brady Wetz*

*/s/ Brandon W. Barnett*
BRANDON W. BARNETT
Texas Bar. No. 24053088

**BARNETT HOWARD & WILLIAMS PLLC**
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
Tel: (817) 993-9249
Fax: (817) 697-4388
barnett@bhwlawfirm.com

*Attorney for Private Plaintiffs*

*/s/ Michael D. Faucette*
MICHAEL D. FAUCETTE
Stephen J. Obermeier
Jeremy J. Broggi
Boyd Garriott
Isaac J. Wyant

**WILEY REIN LLP**
2050 M Street NW
Washington, D.C. 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
mfaucette@wiley.law
sobermeier@wiley.law
jbroggi@wiley.law
bgarriott@wiley.law
iwyant@wiley.law

*Attorneys for Plaintiffs Silencer Shop Foundation, Firearms Regulatory Accountability Coalition, Palmetto State Armory, LLC, B&T USA, LLC, and SilencerCo Weapons Research, LLC*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN WALTERS
Deputy Attorney General for Legal Strategy

*/s/ Munera Al-Fuhaid*
MUNERA AL-FUHAID
Special Counsel, Special Litigation Division
Texas Bar No. 24094501

CHRISTINA CELLA
Special Counsel, Legal Strategy Division
Texas Bar No. 240106199

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 461-6494
Munera.al-fuhaid@oag.texas.gov
christina.cella@oag.texas.gov

*Counsel for Plaintiff State of Texas*

STEPHEN J. COX
Attorney General of Alaska

*/s/ Aaron C. Peterson*
AARON C. PETERSON
(Alaska Bar No. 1011087)
Senior Assistant Attorney General

Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697

CHRISTOPHER M. CARR
Attorney General of Georgia

*/s/ Elijah J. O'Kelley*
ELIJAH J. O'KELLEY
Deputy Solicitor General

OFFICE OF THE GEORGIA ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

Email: aaron.peterson@alaska.gov

*Counsel for Plaintiff State of Alaska*

RAÚL R. LABRADOR
Attorney General of Idaho

*/s/ Michael A. Zarian*
MICHAEL A. ZARIAN
Deputy Solicitor General
Texas Bar No. 24115978

OFFICE OF THE IDAHO ATTORNEY GENERAL
700 W Jefferson St #210
Boise, ID 83720
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
michael.zarian@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KRIS W. KOBACH
Attorney General of Kansas

*/s/ James Rodriguez*
JAMES RODRIGUEZ
(KS Bar #29172)
Assistant Attorney General

OFFICE OF KANSAS ATTORNEY GENERAL
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597
Tel. (785) 368-8197
Jay.Rodriguez@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN*
Solicitor General

MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ James A. Barta*
JAMES A. BARTA
Solicitor General

INDIANA ATTORNEY GENERAL'S OFFICE
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for Plaintiff State of Indiana*

LIZ MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA*
Solicitor General

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
AguinagaB@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*
*motion for pro hac vice admission forthcoming*

DREW H. WRIGLEY
Attorney General of North Dakota

*/s/ Philip Axt*
PHILIP AXT
Solicitor General

OFFICE OF NORTH DAKOTA ATTORNEY GENERAL
600 E. Boulevard Ave., Dept. 125

Helena, Montana 59620-1401
(406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for Plaintiff State of Montana*
*motion for pro hac vice admission*
*forthcoming*

GENTNER DRUMMOND
Attorney General of Oklahoma

*/s/ Garry M. Gaskins, II*
GARRY M. GASKINS, II
Solicitor General

OFFICE OF THE ATTORNEY GENERAL OF
OKLAHOMA
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

MARTY J. JACKLEY
Attorney General of South Dakota

*/s/ Amanda Miiller*
AMANDA MIILLER
(SD Bar No. 4271)
Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL OF
SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
amanda.miiller@state.sd.us

*Counsel for Plaintiff State of South Dakota*

JOHN B. MCCUSKEY
Attorney General of West Virginia

Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

*Counsel for Plaintiff State of North Dakota*

ALAN WILSON
Attorney General of South Carolina

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
(SC Bar No. 103198)
Solicitor General

OFFICE OF THE ATTORNEY GENERAL OF SOUTH
CAROLINA
PO Box 11549
Columbia, South Carolina 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for Plaintiff State of South Carolina*

DEREK BROWN
Attorney General of Utah

*/s/ Andrew Dymek*
ANDREW DYMEK
Solicitor General

OFFICE OF THE UTAH ATTORNEY GENERAL
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111

*Counsel for Plaintiff State of Utah*

KEITH G. KAUTZ
Attorney General of Wyoming

/s/ Michael R. Williams
MICHAEL R. WILLIAMS
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvag.gov

*Counsel for Plaintiff State of West Virginia*

/s/ Ryan Schelhaas
RYAN SCHELHAAS
Chief Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL OF WYOMING
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
San Angelo Division

| | |
|---|---|
| SILENCER SHOP FOUNDATION; GUN OWNERS OF AMERICA, INC; FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC.; B&T USA, LLC; PALMETTO STATE ARMORY, LLC; SILENCERCO WEAPONS RESEARCH, LLC (d/b/a SILENCERCO); GUN OWNERS FOUNDATION; BRADY WETZ; STATE OF TEXAS; STATE OF ALASKA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WEST VIRGINIA; and STATE OF WYOMING, <br><br> *Plaintiffs*, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL DRISCOLL, in his Official Capacity as ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; and PAMELA BONDI, in her Official Capacity as ATTORNEY GENERAL OF THE UNITED STATES; <br><br> *Defendants*. | Case No. 6:25-cv-56-H |

## DECLARATION OF BRADY WETZ

APPX.001

1. My name is Brady Wetz.  I am an adult resident of San Angelo, Texas, within Tom Green County.  I am a citizen of the United States of America and a member of Gun Owners of America, Inc.

2. I am eligible under state and federal law to acquire and possess firearms, including firearm silencers, short-barreled rifles, short-barreled shotguns, and "Any Other Weapons" ("AOWs") regulated under the National Firearms Act ("NFA").  I am an avid gun owner and supporter of the Second Amendment right to keep and bear arms.  I possess a valid Texas License to Carry a handgun.

3. I presently have a personal collection of firearms that I have accumulated over many years.  I believe that the widespread public ownership of firearms is, as the Second Amendment says, "necessary" for a "free State."

4. I am blessed to live in Texas where, not too long ago, the Texas legislature repealed all state regulations on silencers.  Thus, so long as my silencers are lawfully possessed under federal law, they are also lawfully possessed in Texas.

5. I currently do not own any short-barreled rifles or short-barreled shotguns.  However, I do currently own multiple silencers, which I acquired from a few places, such as The Outdoorsman, a local federally licensed dealer.

6. Each time I acquired a silencer, I was forced to complete a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Form 5320.4 application, known as a Form 4, and to provide fingerprints, photographs, and other personally identifying information, including my date of birth and home address.  I then was required to pass a background check and pay a $200 excise tax per

silencer.[1]  And aside from the obvious costs of purchase, sales tax, and excise tax, I also had to cover the cost of submitting my own fingerprints.

7.  Speaking from experience, the NFA registration process to exercise an enumerated constitutional right is invasive, onerous, and time-consuming.  No other constitutional right requires such burdens and hoops.

8.  Consider the invasiveness of NFA registration.  In order to federally register my silencers to comply with the NFA, I in the past have been required to divulge to the government my name, physical appearance and characteristics, date of birth, demographic information, fingerprints, and home address, and additionally to provide the make, model, caliber, physical dimensions, serial number, and physical location of each of my silencers.  Then, my name and address appear on a government registry alongside detailed information on what NFA-regulated firearms I own.

9.  Not only that, but ATF Forms have to be submitted "in duplicate," meaning that I must complete two sets of ATF Forms for each firearm or silencer I wish to acquire.  And then, after I complete the Forms, I am required to send a copy of my completed Forms to my local chief law enforcement officer, who is then asked to contact ATF "should [he] have information that may disqualify [me] from acquiring or possessing a firearm...."[2]

10. Thus, not only do I have to waive my privacy with respect to the federal government, but also I must waive my privacy with respect to local law enforcement, practically inviting the chief law enforcement officer to exercise veto power over my right to keep and bear arms.

---

[1] Although 26 U.S.C. § 5811(b) provides that the "tax imposed … shall be paid by the transferor," dealers simply pass the cost to the transferee – a standard practice for the industry.  Dealers either will prompt the transferee to enter their own payment information to pay the tax, or they will cover the cost of the tax but require the transferee to pay them an offsetting (or greater) fee.
[2] *See* https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204/download at 2.

11. This process remains substantially the same if I were to seek ATF permission to "make" my own NFA-regulated firearms, which I intend to do. Rather than filing an ATF Form 4, I would have to file an ATF Form 5320.1, known as a Form 1, and provide the same registration information. However, I would then face the additional requirement of *engraving* certain information onto the firearm I "make," which creates additional costs – *i.e.*, paying for a laser engraving service with NFA compliance expertise. *See* 26 U.S.C. § 5842(a); 27 C.F.R. § 479.102(a)(1).

12. Also consider the onerousness of the fingerprint and photograph requirement. I have never been arrested, but the onerous registration process I had to follow to acquire my NFA items certainly made it feel that way. In order to exercise my rights, I must have my fingerprints taken, supply my own mugshot, and have my personally identifying information entered into a government database. I should not have to go through arrest-like procedures simply to exercise an enumerated right that "shall not be infringed."

13. Finally, it takes considerable time to complete the registration process. Careful completion of an ATF Form 1 or Form 4 can take the better part of an hour if I am doing it myself. And then, notwithstanding all the paperwork that I had to complete to acquire my silencers, I have had to wait a significant amount of time for ATF to approve my paperwork before I could physically acquire my silencers from my dealer. For example, the *shortest* period that ATF has taken to approve one of my applications to obtain a silencer has been *three weeks*.

14. Even if ATF were to approve any given NFA application quickly, there is no predicting how long the waiting period will be at the outset. NFA approval times are wholly indeterminate, and there is no statutory or regulatory requirement that ATF take action on applications within a specified period of time.

15. In fact, in contrast to the 'first in, first out' background check procedure for typical National Instant Criminal Background Check System ("NICS") checks, under which a dealer with a still-pending NICS check may transfer a firearm three days after contacting NICS, the NFA contains no provision to expedite wait times. Historically, it would seem that NFA background checks have been 'first in, last out,' which has contributed to the utterly unpredictable nature of NFA approval times. My exercise of an enumerated constitutional right should not revolve around what is convenient for bureaucrats.

16. Now, with the passage of President Trump's "One Big Beautiful Bill," I understand that the tax on short-barreled rifles, short-barreled shotguns, AOWs,[3] and silencers has been reduced to zero, effective on January 1, 2026. I would like to acquire and make additional NFA-regulated items within 30 days of this effective date now that I do not have to pay the additional tax. Yet while this tax is now set at zero (an oxymoron), the process of obtaining "approval" from the ATF remains the same, because the registration requirements have not been repealed. Indeed, I am still required to obtain a photograph and fingerprints, provide my personal information all over again with each subsequent application, and then submit either an ATF Form 5320.1, were I to make an NFA firearm or silencer, or an ATF Form 5320.4, if I were to acquire one from a dealer.

17. Although I already have more than one silencer registered to me, I do not believe the government has any further business knowing the number or type of firearms I own, much less

---

[3] An AOW is "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire." 26 U.S.C. § 5845(e).

maintaining a registry of the exercise of my Second Amendment rights. I value those Second Amendment rights and my privacy.

18. As discussed in more detail below, I would, absent the NFA's registration requirements, acquire short-barreled rifles, short-barreled shotguns, AOWs, and additional silencers after the tax on these items is repealed. I would add these items to my existing firearms collection, which I have amassed over the years as an avid hobbyist. I would use these items for hunting, target practice, and to defend myself, my family, and my property. Some of these items I would acquire immediately, as I am eager to obtain them as quickly as possible. Others I would make myself, as I enjoy the process of building and modifying guns and gun accessories.

19. The onerous federal registration requirement that remains in place—backed by felony criminal penalties—deters me from making or acquiring any short-barreled rifles, short-barreled shotguns, AOWs, or additional silencers. Because the NFA's registration provisions require me to expend time and money on compliance and require me to hand over personal information to the Government that I do not want to provide, under present circumstances I will not acquire or make any short-barreled rifles, short-barreled shotguns, AOWs, or additional silencers while the registration requirement is in effect.

20. After the tax on silencers is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I would acquire a Lone Star Silencer silencer, Scoundrel model, a .22 caliber silencer, from Red Status Gunworks, a federally licensed firearm dealer. I would attach this silencer to one of my firearms that does not currently have one installed. This silencer satisfies the definition of "silencer" and "firearm" at 26 U.S.C. § 5845(a)(7) and 18 U.S.C. § 921(a)(25). I would not register the silencer. I would acquire this within 30 days. And if I were able to acquire a silencer without having to

APPX.006

comply with the NFA's registration requirements, I would be able to take possession of my firearm silencer immediately, because my Texas License to Carry serves as a "Brady alternate" which exempts me from the usual repetitive background check requirement for dealer transfers imposed by the Gun Control Act.[4]

21. Moreover, after the tax on silencers is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I also would make my own silencer within 30 days. Specifically, I would utilize materials available in my local community such as thread adapters, tubing, bottles, plumbing materials, washers, tape, automotive components, and/or mesh filling to construct a silencer. The silencer would satisfy the definition of "silencer" and "firearm" at 26 U.S.C. § 5845(a)(7) and 18 U.S.C. § 921(a)(25). I would not register the silencer.

22. And, after the tax on short-barreled shotguns is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I would make a short-barreled shotgun within 30 days. Specifically, I would acquire a Mossberg 500 featuring a buttstock from Red Status Gunworks. I would then use my bandsaw to shorten the shotgun barrel to 14 inches, rendering it a "short-barreled shotgun" and a "firearm" under 26 U.S.C. § 5845(a)(1)–(2). I would not register the short-barreled shotgun.

23. Likewise, after the tax on short-barreled rifles is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I also would make a short-barreled rifle within 30 days. Specifically, I would acquire a Red Status Gunworks brand AR-15 upper receiver featuring a barrel length of 14.5 inches from

---

[4] See https://www.atf.gov/rules-and-regulations/laws-alcohol-tobacco-firearms-and-explosives/gun-control-act/brady-law/brady-permit-chart.

APPX.007

Red Status Gunworks. I would then install that short-barreled upper receiver on a made in Texas, Red Status Gunworks AR-15-style lower receiver with buttstock such that it would become a "short-barreled rifle" and a "firearm" under 26 U.S.C. § 5845(a)(3)–(5). I would not register the short-barreled rifle.

24. After the tax on AOWs is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I also would make an AOW within 30 days. Specifically, I would acquire a Bond Arms derringer, "The Texan" model with 6 inch barrel, handgun chambered in .45LC / .410ga from my local FFL, The Outdoorsman, and upon receiving the firearm, I would remove the barrel and take the barrel to Red Status Gunworks to have the barrel rifling removed, rendering the barrel smoothbore, and then I would reinstall the smoothbore barrel on the Bond Arms derringer receiver, rendering the weapon an "AOW" under 26 U.S.C. § 5845(e) and a "firearm" under 26 U.S.C. § 5845(a)(5). I would not register the AOW.

25. After the tax on silencers is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I also would acquire a silencer within 30 days. I would acquire a Lone Star Silencer brand silencer, model Scoundrel, a .22 caliber silencer, which is manufactured in Texas, from Red Status Gunworks. That silencer satisfies the definition of "silencer" and "firearm" at 26 U.S.C. § 5845(a)(7) and 18 U.S.C. § 921(a)(25). I would not register the silencer.

26. After the tax on short-barreled rifles is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I also would acquire a short-barreled rifle within 30 days. I would acquire a short-barreled AR-15 pattern rifle in 5.56mm featuring a barrel of 11.5 inches in length from Red Status Gunworks,

which is manufactured in Texas, from Red Status Gunworks. That rifle satisfies the definition of "short-barreled rifle" and a "firearm" under 26 U.S.C. § 5845(a)(3)–(5). I would not register the short-barreled rifle.

27. After the tax on short-barreled shotguns is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I would acquire a short-barreled shotgun within 30 days. I would acquire a short-barreled Mossberg 590 shotgun, with the barrel being 14 inches in length, from Red Status Gunworks, which is manufactured in Texas, from Red Status Gunworks. That shotgun satisfies the definition of a "short-barreled shotgun" and a "firearm" under 26 U.S.C. § 5845(a)(1)–(2). I would not register the short-barreled shotgun.

28. After the tax on AOWs is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I would acquire an AOW within 30 days. I would acquire an AR-15 pattern firearm in 5.56mm, made in Texas by Red Status Gunworks, featuring an overall length of under 26 inches, a barrel length of 10.5 inches, and a vertical foregrip, and not featuring a buttstock, from Red Status Gunworks, which is manufactured in Texas, from Red Status Gunworks. That firearm satisfies the definition of a "any other weapon" and a "firearm" under 26 U.S.C. § 5845(a)(5). I would not register the any other weapon.

29. After the tax on silencers is set to $0, if I were not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval, I also would, within 30 days, sell and transfer through a private transaction a silencer from my collection that no longer suits my needs. Although under the Gun Control Act and Texas law, it would be

APPX.009

permissible for me to sell this silencer to another law-abiding Texas resident, the NFA deters me from doing so.

30. In addition to these immediate plans following the zeroing out of taxes on NFA firearms—if not required by law to comply with all the NFA registration requirements and then wait days, weeks, or months for ATF approval—I would continue to make my own NFA firearms, and would continue to acquire them from Texas-based federally licensed firearm dealers and from other Texas residents over the coming years, to add to my collection.  I would also sell NFA firearms through private sales to other Texas residents, when various firearms no longer suit my needs.  I would not register the NFA firearms when engaging in these activities.

31. In sum, I would make, acquire, and possess unregistered short-barreled rifles, unregistered short-barreled shotguns, unregistered AOWs, and unregistered silencers, and otherwise transfer and dispose of such items that I no longer have use for, both in the near future and also repetitively in the coming months and years after the NFA tax is reduced to $0, but for the federal registration requirement and my fear of arrest and prosecution thereunder for noncompliance.

I, Brady Wetz, certify under penalty of perjury that the foregoing is true and correct.



_____    _____
DATE                                          BRADY WETZ

APPX.010

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
San Angelo Division

SILENCER SHOP FOUNDATION; GUN
OWNERS OF AMERICA; FIREARMS
REGULATORY ACCOUNTABILITY
COALITION; B&T USA, LLC; PALMETTO
STATE ARMORY, LLC; SILENCERCO
WEAPONS RESEARCH, LLC (d/b/a
SILENCERCO); GUN OWNERS
FOUNDATION; and BRADY WETZ,

   *Plaintiffs*,

  v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES; DANIEL
DRISCOLL, in his Official Capacity as ACTING
DIRECTOR OF THE BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND EXPLOSIVES;
and PAMELA BONDI, in her Official Capacity as
ATTORNEY GENERAL OF THE UNITED
STATES;

   *Defendants*.

Case No. _____

---

## DECLARATION OF ERICH M. PRATT

---

1. My name is Erich M. Pratt.  I am a U.S. citizen and resident of Virginia.  I make this declaration in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief.  Unless otherwise stated, I make this declaration based on personal knowledge.  If called as a witness, I can testify to the truth of the statements contained herein.

2. I am the Senior Vice President of Gun Owners of America, Inc. ("GOA"), and the Senior Vice President of Gun Owners Foundation ("GOF").

1

3.   In that capacity, I oversee staff that is in daily contact with members and supporters regarding their concerns, questions, requests, and suggestions on how GOA and GOF can best represent their interests.

4.   Gun Owners of America, Inc. is a California non-stock corporation with its principal place of business in Springfield, Virginia.  GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.  GOA has more than 2 million members and supporters across the country, including residents of this district, many of whom will be irreparably harmed by the provisions of the National Firearms Act ("NFA") requiring the registration of certain firearms with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

5.   Gun Owners Foundation is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia.  GOF is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code.  GOF is supported by gun owners across the country, including Texas residents, many of whom are and will be irreparably harmed by the provisions of the National Firearms Act ("NFA") requiring the registration of certain firearms with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").   Donations by supporters of GOF fund the organization's activities, including litigation such as this to defend their right to keep and bear arms.

6.   GOF funds its litigation efforts, in part, by way of individual contributions, along with contributions received from individuals through the Combined Federal Campaign.   GOF's supporters provide the funds directly used to support GOF's litigation efforts, which efforts would

2

be impossible without contributions from our supporters. Our supporters contribute to GOF specifically so that we can bring litigation like this. As part of keeping its supporters up to date on this and other litigation, and various other Second Amendment topics, GOF provides its supporters with a newsletter which provides updates directly to them, keeping them advised of what GOF is doing.

7. GOA's members and GOF's supporters overwhelmingly desire that GOA and GOF be involved in this case, as it directly impacts wide swaths of protected Second Amendment conduct.

8. As soon as the "One Big Beautiful Bill" ("OBBB") began working its way through the House, GOA and GOF worked to have Congress eliminate entirely the registration requirements and associated tax for NFA weapons. Language repealing the registration requirements was ultimately included in the version of the OBBB passed by the House.

9. However, after the Senate began to debate the House version of the OBBB, the Senate Parliamentarian "ruled" that the House's NFA language did not satisfy the "Byrd Rule," and thus stripped that language from the bill.

10. Ultimately, the Senate version of the OBBB was amended, adding language that set the NFA tax at $0 (zero dollars), down from $200, which satisfied the Parliamentarian and was ultimately passed by the Senate. However, even though reducing the "tax" to zero, the Senate version of the OBBB did not repeal the NFA registration provisions, which are ancillary to proving the payment of NFA taxes. Thus, the vestigial registration provisions for short-barreled firearms and silencers now remain, even though there is no making or transfer tax for the registration provisions to 'prove.'

11. The Senate transmitted its version of the OBBB back to the House, which then agreed with the Senate version on July 3, 2025, and transmitted it to the President for signature.

APPX.013

12. President Trump then signed the OBBB on July 4, 2025.

13. The relevant provisions of the OBBB – those reducing the tax for many NFA firearms from $200 to $0 – take effect on January 1, 2026.

14. Traditionally, law-abiding Americans have been able to manufacture, acquire, and possess firearms largely without government oversight, and certainly without permission, registration, or taxation.

15. GOA and GOF's members and supporters desire and overwhelmingly support our involvement in litigation to protect their right to acquire firearms easily and unimpeded by government, a right that is being unconstitutionally infringed by the ongoing registration requirements of the NFA.

16. As noted, GOA and GOF together have more than two million members and supporters nationwide, including many within this district.  In addition to the multitudes of individual gun owners who are our members, GOA and GOF also represent countless FFLs (both as entities and as individuals), along with numerous GOA Industry Partners within the firearms industry and community, representing manufacturers, suppliers, distributors, and retailers of firearms, including NFA "firearms."

17. Throughout the OBBB debate, and ultimately its passage into law, GOA and GOF have heard from members and supporters who will be directly impacted, because in the past they have bought and also made NFA-regulated weapons, and wish to do so again in the future after January 1, 2026.  However, our members and supporters do not wish to comply with the invasive registration requirement of the NFA.  Indeed, now that there is no tax associated with such registration, there is no reason for the weapons to be registered at all.

18. But for the hefty criminal penalties in the NFA (10 years for unregistered ownership,

APPX.014

transfer, receipt, or simple possession), and the accompanying serious risk of armed confrontation by federal agents, arrest, prosecution, and imprisonment, our members and supporters would manufacture, purchase, acquire, and possess NFA firearms – including silencers, short-barreled shotguns, and short-barreled rifles – without complying with the NFA's registration provisions.

19. Indeed, these invasive registration requirements infringe on the constitutional rights of our members and supporters and are wholly unsupported by any constitutional power granted to the federal government.

20. The current process of purchasing an NFA-regulated weapon is complicated and burdensome.

21. First, a person must decide if they will buy an already manufactured NFA weapon, or if they will make it themselves. If they decide to purchase one already manufactured, they must fill out an ATF Form 5320.4 ("Form 4") and must provide fingerprints, photographs, and other personally identifying information such as a birth date and home address. If they wish to make their own NFA-regulated weapon, then that person will fill out an ATF Form 5320.1 ("Form 1"). Both of these forms require substantially the same information, but one is used for "making" (Form 1) and the other for transferring (Form 4). These Forms must be completed in duplicate.

22. Second, prior to the OBBB, the person was required to pay a $200 tax to the ATF, payment of which was evidenced by a "tax stamp" which ATF affixed to an approved Form 1 or Form 4.

23. Third, a person attempting to acquire an NFA firearm must submit the Form 1 to the ATF (or in the case of a Form 4, the dealer will submit it to the ATF). Separately, the Form 1 or Form 4 must be provided to the person's local chief law enforcement officer, offering that official the opportunity to object to the NFA firearm's manufacture or transfer.

24. Then, the wait begins.

5

25. Since there is no timeframe for the ATF to process the Forms, the time for approval varies widely depending on the type of Form at issue.  Historically, the process for various ATF forms has taken anywhere from 9 to 14 months.  Recently, the ATF has improved the processing times for some forms, and for some types of entities (such as individuals versus trusts), but not for others.  Regardless, there is no set timeframe for the ATF to act.

26. GOA and GOF have been in contact with members and supporters nationwide who no longer wish to submit these Forms to the ATF for registration of their weapons since there is now no tax-related requirement for registration.  Nor do these members and supporters want the federal government keeping a record – a registry – of the firearms that they possess.

27. First, some of our members and supporters object to the invasive and complicated process of filing Forms with the ATF, but also having to send them to their local chief law enforcement officers who hold a veto power over their Forms being approved by the ATF.

28. The ATF itself states that the "estimated average burden associated with" filling out a Form 4 "is 3.78 hours per respondent...."[1]  This means that, for every weapon a person either makes or purchases, approximately 3.78 hours of that person's life is wasted on a government form.  And after enactment of the OBBB provisions, there is not even an arguably taxing power reason for these requirements.

29. Second, other members and supporters have never before either made or purchased an NFA-regulated weapon, and will not make or purchase one until the required registration is eliminated.

30. Third, some of our members and supporters have purchased and made multiple NFA-

---

[1] *See* https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204/download at 4.

APPX.016

regulated weapons when the $200 tax was required but, going forward, will not make or purchase any NFA item until the effective date of the OBBB's provision eliminating the $200 tax.

31.    For example, GOA spoke to one member who has never filed a Form 1 or a Form 4 due to the onerous, invasive, and complicated registration process.  This member would acquire short-barreled rifles, short-barreled shotguns, and silencers, but for the paperwork and registration requirements of the NFA.

32.    Another of GOA's members, Plaintiff Brady Wetz, explains that the ATF's registration process for NFA items is an "arrest-like procedure[]," comparing being photographed, fingerprinted, and divulging "personally identifying information entered into a government database" to being arrested for a crime.

33.    GOA spoke to another member who said that they have manufactured a Form 1 suppressor and paid the $200 tax to the ATF, but will never submit another registration form for a firearm, until the registration and paperwork provisions of the NFA are struck down.

34.    Another GOA member stated that they desire to use their 3D printer to print a silencer, and also a lower receiver for an AR-15 which this member then intends to build into a short-barreled rifle with parts that the member already possesses, without having to go through the NFA's required registration and paperwork process.

35.    Finally, another GOA member stated that they are concerned that their local chief of police, who is required to receive a copy of the Form they file with the ATF, may not have the same privacy standards with respect to tax information that the federal government is subjected to, and worries that their personal information – including records of their gun ownership – may fall into the wrong hands.

APPX.017

I, Erich M. Pratt, declare under penalty of perjury that the foregoing is true and correct.


 7/4/2025
**DATE**                                              **ERICH M. PRATT**

APPX.018

## DECLARATION OF TRAVIS WHITE

I, Travis R. White, hereby declare as follows under the penalty of perjury.

1.    I am Travis R. White, President & Chief Executive Officer of the Firearms Regulatory Accountability Coalition, Inc. ("FRAC").  I have held this position since January 2021. Unless otherwise stated, this declaration is based on my personal knowledge and belief, my review of business records of FRAC, and my conversations with FRAC's member companies.  If called as a witness, I could and would testify competently to the contents of this declaration.

2.    I am over 18 years of age, a citizen of the United States, and of sound mind.

3.    FRAC is a non-profit association working and advocating to improve business conditions for the firearm industry by ensuring the industry receives fair and consistent treatment from firearms regulatory agencies.

4.    FRAC is committed to holding the government accountable for unlawful policies and rules and ensuring that the government's regulation of the industry is conducted in a lawful, open, and transparent manner.

5.    FRAC serves as the premiere national trade association representing U.S. firearms, ammunition, and accessories manufacturers, retailers, importers, and innovators on regulatory and legislative issues impacting the industry in the United States.

6.    As part of its mission to aggressively advocate for and defend firearms, ammunition, and accessories manufacturers, retailers, and importers from government overreach, FRAC regularly files comments with firearms regulatory agencies and litigates firearms issues at all levels of the federal judicial system.  *See, e.g.*, *FRAC v. Garland*, 112 F.4th 507 (8th Cir. 2024); *FRAC v. Garland*, No. 1:23-CV-00003, 2025 WL 1780570 (D.N.D. Feb. 18, 2025).

7.    FRAC membership includes U.S. firearms, ammunition, and accessories manufacturers, retailers, and importers across the country who are adversely impacted by

1

provisions of the National Firearms Act ("NFA") and its implementing regulations that are challenged in this litigation.

8.    Plaintiffs B&T USA, LLC, Palmetto State Armory, and SilencerCo are members of FRAC and, as explained more fully in their own declarations, these companies are among FRAC's members that are adversely affected by the NFA provisions challenged in this litigation.

9.    FRAC's firearms-manufacturer members are companies that manufacture, possess, and sell firearms—including untaxed NFA firearms[1]—to the public and to other companies. These members manufacture some untaxed NFA firearms within a single State. These members sell some untaxed NFA firearms within a single state; they sell others across state lines.

10.    FRAC's firearms-retailer members are companies that possess and sell firearms—including NFA firearms—to the public. These members sell some untaxed NFA firearms within a single state; they sell others across state lines.

11.    FRAC's members are adversely affected because they must comply with NFA's requirements and restrictions when they manufacture, possess, and transfer untaxed NFA firearms. When manufacturing NFA firearms, I understand that these members are required to, *inter alia*, (i) register each NFA firearm they manufacture, and (ii) maintain records of the manufacture of NFA firearms. When possessing NFA firearms, I understand that these members must (i) maintain records relating to the receipt of NFA firearms, (ii) retain proof of NFA firearms registration, and (iii) ensure that their NFA firearms are properly identified with a serial number as. When selling NFA firearms, I understand that these members (i) must comply with the transfer-application requirements, and (ii) are forbidden from completing the transfer until (a) the transferee abides by

---

[1]  When used in this declaration, "untaxed firearms" refers to weapons within the NFA's definition of "firearm" and that are subject to a $0 tax rate under the One Big Beautiful Bill Act.

2

identification and notification requirements, and (b) ATF has approved the applications mandated by that provision.

12.    FRAC members subject to the NFA's requirements have no feasible choice but to comply with them.  I understand that the statute makes it "unlawful" to violate those requirements, 26 U.S.C. § 5861, and that the penalties for noncompliance are severe.  I also understand that ATF actively enforces these provisions against firearms businesses.  Last year ATF reported that it pursued thousands of criminal prosecutions, conducted "9,696 firearms compliance inspections in FY 2024," and engaged in more than 1,000 enforcement actions, such as "warning letters," "warning conference[s]," or "revocations" of businesses' federal firearms licenses (effectively putting them out of business).  *See* ATF, Fact Sheet – Facts and Figures for Fiscal Year 2024 (Mar. 2025), https://tinyurl.com/msvn8u3n.

13.    FRAC members' compliance with these provisions requires the expenditure of members' limited time, personnel, and resources that can never be recovered.

14.    But for the criminal penalties attendant to the NFA, FRAC's members would manufacture, sell, purchase, distribute, acquire, and possess untaxed NFA firearms without complying with the NFA provisions challenged in this litigation.

15.    FRAC members are also harmed by the challenged restrictions that the NFA places on their customers.  Prospective customers are deterred from purchasing FRAC members' products when they have to register themselves, their fingerprints, and their firearms in a federal database— all pursuant to statutory provisions challenged as unconstitutional in this litigation.  That deterrence leads to lost profits.  FRAC's firearms-manufacturer members and firearms-retailer members lose profits because fewer customers want to purchase their NFA firearms.  FRAC's firearms-accessory and firearms-ammunition manufacturers and retailers likewise suffer harm, as

3

demand for their products is downstream from demand for firearms.  In other words, if fewer NFA firearms are sold, then consumers will buy less ammunition and accessories for NFA firearms.

16.    Declaring unlawful and enjoining enforcement of the challenged NFA provisions applicable to untaxed firearms would redress the harm to FRAC's members caused by the statute. FRAC's members could safely forego the burdensome registration obligations the NFA places on them, saving compliance costs and other company resources.  And FRAC members' products would no longer be subject to the regulatory burden that has made their products less valuable and more difficult to sell, alleviating the economic injury caused by the challenged provisions.

17.    For these reasons, FRAC's members, as reflected by an action of FRAC's Board of Directors, unanimously gave me a vote of confidence in support of this litigation and believe that a successful outcome in this case will be impactful on the firearms industry and its customers, and is germane to the firearms industry, FRAC, and FRAC members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2025

Travis R. White
President & CEO, Firearms Regulatory
Accountability Coalition, Inc.

4

## DECLARATION OF LAUREN SPIVEY

I, Lauren Spivey, hereby declare as follows under the penalty of perjury.

1.     I am the Chief Executive Officer of Silencer Shop Foundation ("SSF").  I have held this position since May 22, 2025.  Unless otherwise stated, this declaration is based on my personal knowledge and belief, my review of business records of SSF, and my conversations with SSF donors and stakeholders.  If called as a witness, I could and would testify competently to the contents of this declaration.

2.     I am over 18 years of age, a citizen of the United States, and of sound mind.

3.     SSF is a Texas-based nonprofit organization dedicated to defending and restoring Second Amendment rights.

4.     SSF achieves these goals through, among other things, public education regarding the benefits and advantages of utilizing firearm silencers and other firearms regulated under the National Firearms Act ("NFA") when engaging in conduct protected by the Second Amendment.

5.     For example, SSF maintains a website and blog located at ssf.org to publish educational materials and news relating to firearm silencers, the NFA, and the Second Amendment.  SSF also conducts outreach and public education efforts at firearm industry events, both at the local level and nationwide.

6.     Now that the One Big Beautiful Bill Act has set the tax on most NFA firearms at $0, SSF wishes to make and acquire silencers, short-barreled rifles, and short-barreled shotguns—as those terms are defined in the NFA—for demonstration and educational purposes, among other reasons.  It also wishes to transfer these types of firearms within Texas to other persons and entities.

7.     Specifically, SSF would like to acquire an Outrider .30 caliber silencer manufactured by Lone Star Silencer in Midlothian, Texas, an MK1 CAR 11.5" short-barreled rifle from Sons of

Liberty Gun Works in San Antonio, Texas, and a 590A1 Class III Pump-Action short-barreled shotgun manufactured by Mossberg in Eagle Pass, Texas.

8.    SSF would use each of these NFA firearms for demonstration and educational purposes by taking them to public events and explaining to the public the utility of the items. For example, SSF would demonstrate the utility of silencers at events and conferences such as the Annual NASGW Expo in Grapevine, Texas, the American Suppressor Association Industry Summit in Austin, Texas, and Kalash Bash TX in Eagle Lake, Texas. At events such as the Kalash Bash TX event, which include safe, live-fire facilities, SSF would demonstrate the benefits of these items through live-fire demonstration, such as by firing a gun with and without a silencer. This would allow attendees to understand the hearing-protection benefits of using silencers, and it would dispel the Hollywood fiction that a silenced gun makes no sound. SSF would similarly demonstrate the utility of short-barreled rifles and short-barreled shotguns at Kalash Bash TX by firing these guns and exhibiting their maneuverability and weight-reduction benefits. This would allow attendees to understand the utility these more compact weapons offer in home defense, hunting, and other armed activities where space and portability are relevant factors. All of these demonstration and educational efforts would also drive home the importance of vigorously protecting the right to keep and bear arms.

9.    SSF would also transfer these NFA firearms for demonstration and educational purposes. For example, SSF would—free of charge—temporarily loan its own silencers, short-barreled rifles, and short-barreled shotguns to qualified members of the public, within the State of Texas, so they could gain firsthand experience with these items. As with the public demonstrations, these transfers would help the public understand the utility of these firearms and the importance of preserving Second Amendment protections for these weapons.

10.    However, if SSF were to move forward with these plans, it would have to comply

APPX.024

with the NFA's burdensome registration requirements and incur unpredictable delays that prevent nimble short-term planning. For example, SSF would have to complete burdensome, privacy-invasive applications to make or purchase the untaxed NFA firearms and then wait indefinite periods for ATF's approval. While NFA wait times are significantly shorter than they have been historically, they still cause delays of days, weeks, or longer—or in the case of a government shutdown, such as the country is currently experiencing, indefinite delays. Currently, during the present government shutdown, SSF is unable to acquire any NFA-regulated firearms, and SSF has no way of predicting when it will be able to acquire NFA-regulated firearms in the future, or what delays will occur when the government resumes processing NFA transfer applications. SSF is burdened both by the delays, themselves, and by the unpredictability of the delays, which stifle SSF's ability to plan and manage its operations. When SSF is able to comply with NFA registration requirements in the future, SSF will then have to maintain proof of registration and ensure SSF personnel maintain such proof while in possession of regulated company assets. This creates not only compliance costs but also compliance risks. The registration requirements also restrict SSF's ability to work with independent contractors, due to transfer and possession restrictions related to NFA-regulated firearms. Also, when SSF wants to transfer the firearm, it would have to again complete a burdensome, privacy-invasive application and wait for ATF's approval.

11. SSF objects to these burdensome requirements. SSF objects to subjecting itself, its employees, or members of the public to burdensome NFA procedures that require registration in a federal database. And those burdens make SSF's plans to transfer NFA firearms for educational and demonstrative purposes impractical by (i) imposing substantial compliance costs in the form of organizational resources and personnel time that can never be recouped, (ii) creating compliance risks; (iii) subjecting SSF to lengthy wait times whenever it seeks to acquire or transfer an NFA

3

firearm; (iv) hindering immediate, nimble decision-making regarding use of NFA-regulated company assets; and (v) inserting timing unpredictability into SSF's operations.

12.    Yet SSF would have no feasible choice but to comply with these burdensome NFA provisions if it moved forward with these plans.  SSF knows that the penalties for noncompliance with the NFA are severe and understands that the federal government vigorously prosecutes violations.  SSF will not risk subjecting itself, its employees, or members of the public to felony criminal prosecution for failure to comply with the NFA.

13.    For these reasons, SSF will necessarily forego certain of its educational and demonstrative plans.

14.    SSF would take these actions immediately upon the effective date of the $0 tax rate but for the NFA's paperwork and registration requirements.

15.    That is, but for the criminal penalties attendant to the NFA, SSF would make, purchase, acquire, possess, and transfer certain untaxed NFA firearms—including silencers, short-barreled rifles and short-barreled shotguns—without complying with the NFA provisions challenged in this litigation.

16.    Declaring unlawful and enjoining enforcement of the challenged NFA provisions would redress the harm to SSF caused by the statute.  SSF could safely forego the burdensome registration obligations the NFA places on it, allowing it to pursue all of its planned educational and demonstration activities without incurring unrecoverable compliance costs, wait times, and incursions into its privacy.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 3, 2025


4

Lauren Spivey
CEO, Silencer Shop Foundation

5

## DECLARATION OF DEBORAH MCCALLUM

I, Deborah McCallum, hereby declare as follows under the penalty of perjury.

1.    I am the Chief Compliance Officer of Palmetto State Armory, LLC ("PSA").  Unless otherwise stated, this declaration is based on my personal knowledge and belief, my experience managing a federal firearms license, my conversations with customers, and my review of PSA's business records.  If called as a witness, I could and would testify competently to the contents of this declaration.

2.    I am over 18 years of age, a citizen of the United States, and of sound mind.

3.    PSA was founded in 2008 to manufacture firearms, firearms accessories, and ammunition.

4.    PSA is a member of the Firearms Regulatory Accountability Coalition ("FRAC"), another plaintiff in this case.

5.    PSA is a federally licensed firearms importer, manufacturer, and dealer. PSA currently manufactures and sells some short-barreled rifles to the public and other companies across the country. For example, PSA manufactures and markets the DPMS DP-15 10.5" 5.56 NATO 9" M-LOK Magpul CTR SBR, a short-barreled rifle that is chambered for 5.56 NATO cartridges.

6.    PSA also sells third-party silencers through its online retail website. For instance, PSA markets, amongst many others, the Sig SLH762TIC-QD, a next-generation quick-detach titanium suppressor designed for 7.62 caliber rifles. PSA plans to soon manufacture and sell its own silencers.

7.    Some of PSA's manufacturing occurs entirely in a single State.  For example, PSA manufactures most of its short-barreled rifles entirely in the State of South Carolina.

8.    Similarly, some of PSA's sales occur entirely within a single state.  PSA is based in

South Carolina and so PSA sells short-barreled firearms and silencers to South Carolinians without PSA employees, customers, or products ever crossing state lines.

9.    In fact, sometimes everything from manufacture to transfer all occurs in one State. For example, PSA sells a significant share of its South Carolina-manufactured short-barreled rifles in South Carolina. This means that the short-barreled rifle is created, possessed, and transferred in South Carolina without ever crossing state lines.

10.    PSA respects the rule of law and takes its compliance obligations seriously. This includes its compliance obligations under the National Firearms Act ("NFA").

11.    The registration provisions of the NFA are—and have always been—a burden on PSA. Specifically, when manufacturing firearms, PSA is required to (i) register each firearm it manufactures, and (ii) maintain records of the manufacture of firearms. PSA must also (i) maintain records relating to the receipt of NFA firearms, (ii) retain proof of NFA firearms registration, and (iii) ensure that its NFA firearms are properly identified with a serial number. When selling NFA firearms, PSA (i) must comply with the NFA's transfer-application requirements, and (ii) is forbidden from completing the transfer until (a) the transferee abides by the NFA's identification and notification requirements, and (b) ATF has approved the applications.

12.    These efforts cost PSA substantial personnel hours and resources, which directly reduces the company's profits. Indeed, but for these compliance obligations, PSA personnel could spend time on other productive activities that would directly increase PSA's bottom line (e.g., sales and operations).

13.    Given the statute's criminal penalties, PSA has no other option but to comply with the NFA's requirements. ATF aggressively enforces these provisions against firearms businesses, and, based on my knowledge and long experience in the industry, I anticipate that PSA would face

2

a business-ending enforcement action if PSA stopped complying with the NFA. Thus, PSA will continue to comply with the NFA's requirements even though they are burdensome.

14.    PSA would also face immediate economic consequences if it were to fail to comply with the NFA. Indeed, PSA's upstream and downstream business partners would almost certainly end their relationships with PSA for fear of being subjected to criminal enforcement if PSA were to start dealing in unregistered, unmarked firearms. That would devastate PSA's business and, for that reason too, PSA will continue to comply with the NFA's burdensome requirements.

15.    The NFA also burdens PSA customers, who routinely complain about the NFA's cumbersome requirements. Specifically, prospective customers are deterred from purchasing NFA firearms when they have to register themselves, their fingerprints, and their firearms in a federal database—all pursuant to the NFA provisions challenged in this litigation. This deterrence translates to diminished sales and lost profits for PSA—losses which I expect will become even more substantial once the tax on most NFA firearms is set to $0.

16.    But for the criminal penalties attendant to the NFA's registration procedures, PSA would manufacture, purchase, distribute, acquire, and possess NFA firearms—including silencers, short-barreled rifles, and short-barreled shotguns—without complying with the NFA provisions challenged in this litigation.

17.    Declaring unlawful and enjoining enforcement of the NFA's registration provisions would redress the harms to PSA caused by the statute. PSA could safely forego the burdensome registration obligations the NFA places on it, saving compliance costs and other company resources. And PSA's products would no longer be subject to the regulatory burden that has made them less valuable and more difficult to sell, alleviating the economic injury caused by the challenged provisions.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October _3_, 2025

_Deborah McCallum_

Deborah McCallum
Chief Compliance Officer
Palmetto State Armory, LLC

APPX.031

## DECLARATION OF RIDLEY KEY

I, Ridley Key, hereby declare as follows under the penalty of perjury.

1.    I am the Chief Executive Officer of B&T USA, LLC ("B&T").  Unless otherwise stated, this declaration is based on my personal knowledge and belief, my experience managing a federal firearms licensee, my conversations with customers, and my review of B&T's business records.  If called as a witness, I could and would testify competently to the contents of this declaration.

2.    I am over 18 years of age, a citizen of the United States, and of sound mind.

3.    B&T was founded in 2014 to import and manufacture firearms and other accessories under license from B&T AG in Switzerland.

4.    B&T is a member of the Firearms Regulatory Accountability Coalition ("FRAC"), another plaintiff in this case.

5.    B&T is a federally licensed firearms manufacturer.  B&T manufactures and sells short-barreled rifles, silencers, and accessories to the public and other companies across the country.  For instance, B&T manufactures and markets the SMG-M suppressor, which features innovative disconnect technology that allows for rapid attachment. B&T also manufactures and markets the SPC10 G, a fully ambidextrous short-barreled rifle designed for law enforcement that is chambered for 10mm cartridges.

6.    A substantial portion of B&T's business consists of manufacturing and selling short-barreled firearms, silencers, and accessories.

7.    Some of B&T's manufacturing occurs entirely in a single State.  For example, B&T manufactures its SPC10 G entirely in the State of Florida.

8.    Similarly, some of B&T's sales occur entirely within a single state.  B&T is based in Tampa, Florida and so B&T sells short-barreled firearms and silencers to Floridians without B&T

employees, customers, or products ever crossing state lines.

9.      In fact, sometimes everything from manufacture to transfer all occurs in one State. For example, B&T sells a significant share of its Florida-manufactured APC300SD-TMRM in Florida.  This means that the APC300SD-TMRM is created, possessed, and transferred in Florida without ever crossing state lines.

10.     B&T respects the rule of law and takes its compliance obligations seriously.  This includes its compliance obligations under the National Firearms Act ("NFA").

11.     The registration provisions of the NFA are—and have always been—a burden on B&T.  Specifically, when manufacturing firearms, B&T is required to (i) register each firearm it manufactures, and (ii) maintain records of the manufacture of firearms.  B&T must also (i) maintain records relating to the receipt of NFA firearms, (ii) retain proof of NFA firearms registration, and (iii) ensure that its NFA firearms are properly identified with a serial number. When selling NFA firearms, B&T (i) must comply with the NFA's transfer-application requirements, and (ii) is forbidden from completing the transfer until (a) the transferee abides by the NFA's identification and notification requirements, and (b) ATF has approved the applications.

12.     These efforts cost B&T substantial personnel hours and resources, which directly reduces the company's profits.  Indeed, but for these compliance obligations, B&T personnel could spend time on other productive activities that would directly increase B&T's bottom line (e.g., sales and operations).

13.     Given the statute's criminal penalties, B&T has no other option but to comply with the NFA's requirements.  ATF aggressively enforces these provisions against firearms businesses, and, based on my knowledge and long experience in the industry, I anticipate that B&T would face a business-ending enforcement action if B&T stopped complying with the NFA.  Thus, B&T will continue to comply with the NFA's requirements even though they are burdensome.

14.    B&T would also face immediate economic consequences if it were to fail to comply with the NFA.  Indeed, B&T's upstream and downstream business partners would almost certainly end their relationships with B&T for fear of being subjected to criminal enforcement if B&T were to start dealing in unregistered, unmarked firearms.  That would devastate B&T's business and, for that reason too, B&T will continue to comply with the NFA's burdensome requirements.

15.    The NFA also burdens B&T customers, who routinely cite to myself and other B&T employees the NFA's cumbersome requirements as their reason for not purchasing B&T's NFA firearms and accessories for those firearms.  Specifically, prospective customers are deterred from purchasing NFA firearms when they have to register themselves, their fingerprints, and their firearms in a federal database—all pursuant to the NFA provisions challenged in this litigation.  This deterrence translates to diminished sales and lost profits for B&T—losses which I expect will become even more substantial once the tax on most NFA firearms is set to $0.

16.    But for the criminal penalties attendant to the NFA's registration procedures, B&T would manufacture, purchase, distribute, acquire, and possess NFA firearms—including silencers, short-barreled rifles, and short-barreled shotguns—without complying with the NFA provisions challenged in this litigation.

17.    Declaring unlawful and enjoining enforcement of the NFA's registration provisions would redress the harms to B&T caused by the statute.  B&T could safely forego the burdensome registration obligations the NFA places on it, saving compliance costs and other company resources.  And B&T's products would no longer be subject to the regulatory burden that has made them less valuable and more difficult to sell, alleviating the economic injury caused by the challenged provisions.


I declare under penalty of perjury that the foregoing is true and correct.

3

Executed on October 2, 2025

Ridley Key
Chief Executive Officer, B&T USA, LLC

4

## DECLARATION OF SILENCERCO WEAPONS RESEARCH, LLC

I, Scott Clinger, hereby declare as follows under the penalty of perjury.

1.    I am the President of SilencerCo Weapons Research, LLC ("SilencerCo").  Unless otherwise stated, this declaration is based on my personal knowledge and belief, my experience managing a federal firearms licensee, my conversations with customers, and my review of SilencerCo's business records.  If called as a witness, I could and would testify competently to the contents of this declaration.

2.    I am over 18 years of age, a citizen of the United States, and of sound mind.

3.    SilencerCo was founded in 2008 to manufacture silencers and firearms parts and accessories.

4.    SilencerCo is a member of the Firearms Regulatory Accountability Coalition ("FRAC"), another plaintiff in this case.

5.    SilencerCo is a federally licensed firearms manufacturer and dealer.  SilencerCo manufactures and sells silencers, firearms parts, and accessories to the public and other companies across the country.  For instance, SilencerCo manufactures and markets the Scythe Series Ti, a premium silencer designed to maximize suppression for .30 caliber rifles.

6.    A substantial portion of SilencerCo's business consists of manufacturing and selling silencers.

7.    Some of SilencerCo's manufacturing occurs entirely in a single State.  For example, SilencerCo manufactures its Scythe® Ti suppressor entirely in the State of Utah.

8.    Similarly, some of SilencerCo's sales occur entirely within a single state.  SilencerCo is based in Utah and so SilencerCo sells silencers to Utah residents without SilencerCo employees, customers, or products ever crossing state lines.

9.    In fact, sometimes everything from manufacture to transfer all occurs in one State.

For example, SilencerCo sells a significant share of its Utah-manufactured Scythe® Ti in Utah. This means that in many instances the Scythe® Ti is created, possessed, and transferred in Utah without ever crossing state lines.

10. SilencerCo respects the rule of law and takes its compliance obligations seriously. This includes its compliance obligations under the National Firearms Act ("NFA").

11. The registration provisions of the NFA are—and have always been—a burden on SilencerCo. Specifically, when manufacturing silencers, SilencerCo is required to (i) register each silencer it manufactures, and (ii) maintain records of the manufacture of silencers. SilencerCo must also (i) maintain records relating to the receipt of silencers, (ii) retain proof of silencer registration, and (iii) ensure that its silencers are properly identified with a serial number. When selling silencers, SilencerCo (i) must comply with the NFA's transfer-application requirements, and (ii) is forbidden from completing the transfer until (a) the transferee abides by the NFA's identification and notification requirements, and (b) ATF has approved the applications.

12. These efforts cost SilencerCo substantial personnel hours and resources, which directly reduces the company's profits. Indeed, but for these compliance obligations, SilencerCo personnel could spend time on other productive activities that would directly increase SilencerCo's bottom line (e.g., sales and operations).

13. Given the statute's criminal penalties, SilencerCo has no other option but to comply with the NFA's requirements. ATF aggressively enforces these provisions against firearms businesses, and, based on my knowledge and long experience in the industry, I anticipate that SilencerCo would face a business-ending enforcement action if SilencerCo stopped complying with the NFA. Thus, SilencerCo will continue to comply with the NFA's requirements even though they are burdensome.

14.    SilencerCo would also face immediate economic consequences if it were to fail to comply with the NFA.  Indeed, SilencerCo's upstream and downstream business partners would almost certainly end their relationships with SilencerCo for fear of being subjected to criminal enforcement if SilencerCo were to start dealing in unregistered, unmarked silencers.  That would devastate SilencerCo's business and, for that reason too, SilencerCo will continue to comply with the NFA's burdensome requirements.

15.    The NFA also burdens SilencerCo's customers, who routinely cite to myself and other SilencerCo employees the NFA's cumbersome requirements as their reason for not purchasing SilencerCo's silencers and firearms accessories.  Specifically, prospective customers are deterred from purchasing silencers when they have to register themselves, their fingerprints, and their silencers in a federal database—all pursuant to the NFA provisions challenged in this litigation.  This deterrence translates to diminished sales and lost profits for SilencerCo—losses which I expect will become even more substantial once the tax on silencers is set to $0.

16.    But for the criminal penalties attendant to the NFA's registration procedures, SilencerCo would manufacture, purchase, distribute, acquire, and possess silencers without complying with the NFA provisions challenged in this litigation.

17.    Declaring unlawful and enjoining enforcement of the NFA's registration provisions would redress the harms to SilencerCo caused by the statute.  SilencerCo could safely forego the burdensome registration obligations the NFA places on it, saving compliance costs and other company resources.  And SilencerCo's products would no longer be subject to the regulatory burden that has made them less valuable and more difficult to sell, alleviating the economic injury caused by the challenged provisions.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 3, 2025

Scott Clinger
President, SilencerCo Weapons Research,
LLC

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
San Angelo Division**

| | |
|---|---|
| SILENCER SHOP FOUNDATION, et al. <br><br> *Plaintiffs*, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al. <br><br> *Defendants*. | <br><br><br><br><br> Case No. 6:25-cv-56-H |

## SUPPLEMENTAL DECLARATION OF ERICH M. PRATT

1.  My name is Erich M. Pratt. I am a U.S. citizen and resident of Virginia. I make this Supplemental Declaration in support of Plaintiffs' Motion for Summary Judgment. Unless otherwise stated, I make this supplemental declaration based on personal knowledge. If called as a witness, I can testify to the truth of the statements contained herein.

2.  I previously submitted a declaration in this matter in support of Plaintiffs' Complaint for Declaratory and Injunctive Relief. *See* ECF # 1-2.

3.  As stated previously, I am the Senior Vice President of Gun Owners of America, Inc. ("GOA"), and the Senior Vice President of Gun Owners Foundation ("GOF").

4.  In that capacity, I oversee staff that is in daily contact with members and supporters regarding their concerns, questions, requests, and suggestions on how GOA and GOF can best represent their interests.

1

5. GOA and GOF routinely hear from their members and supporters regarding the problems inherent in the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") approval process for National Firearms Act ("NFA") regulated weapons.

6. For instance, one of our members, Juan Carlos Michel, contacted us after he was caught in a bureaucratic paradox: he faced an indefinite background check-related "delay" in ATF processing of his Form 4 application for a silencer, which effectively constituted a denial of his application.

7. In Mr. Michel's case, a previous arrest – although non-prohibitory – delayed processing of his FBI-administered background check. Thus, after one Form 4 had been pending with ATF for six months, and another for eleven months, both applications eventually led to a "delayed background" check denial by ATF. In other words, the government placed the burden on Mr. Michel to prove that his previous arrest was not prohibitory, rather than the government having to affirmatively demonstrate that it was.

8. After suffering this indefinite delay and repeated NFA denials, despite his being a non-prohibited person, Mr. Michel hired a lawyer to assist him in exercising his Second Amendment rights. He then applied for and received a Unique Personal Identification Number ("UPIN") through the Federal Bureau of Investigation's ("FBI") Voluntary Appeal File. He then submitted another Form 4 to the ATF, and was finally approved.

9. But without Mr. Michel expending significant funds on legal counsel to fix the government's problem, it is all but guaranteed that Mr. Michel would not have had his Form 4 approved and would remain in a "delayed background" denial status.

10. GOA and GOF have heard from other members and supporters who also have suffered these sorts of background check-related delay-denials. In fact, some otherwise-eligible members

and supporters have reported receiving automatic application denials from ATF simply because their pending FBI background checks took longer than 88 days to complete.

11. We also have heard from several of our members and supporters who filed Form 4 applications with the ATF to obtain short-barreled rifles, short-barreled shotguns, silencers, and "any other weapons," but who intolerably were required to wait several months to *over a year* to receive approvals from the ATF.

12. For instance, one of GOA's members, John Crump, submitted a Form 4 application to obtain a silencer, but was required to wait almost eleven months before approval.

13. The NFA's text allows for these delays, as the statute contains no directive that government officials "shall issue" determinations within a certain timeframe, or any requirement that they "shall issue" approvals at all. Thus, these sorts of delays appear to be baked into the ATF cake, where ATF can take however long it wants to approve forms, leading to inherently arbitrary, excessive, and therefore unconstitutional delays.

14. Finally, GOA and GOF's members and supporters presently face delays in receiving NFA application approvals during the government shutdown. During this time, ATF does not process applications, relegating the exercise of Second Amendment rights to an act of legislative grace.

I, Erich M. Pratt, declare under penalty of perjury that the foregoing is true and correct.

  10/7/2025
**DATE**

*Erich Pratt*

**ERICH M. PRATT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
San Angelo Division

SILENCER SHOP FOUNDATION, *ET AL.*,

      *PLAINTIFFS,*

V.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES, *ET AL.*,

      *DEFENDANTS.*

            CASE NO. 6:25-CV-56-H

### DECLARATION OF DEREK PRESTRIDGE

1.  My name is Derek Prestridge. I serve as the Chief of the Training Operations Division of the Texas Department of Public Safety ("DPS"). DPS is an agency of the State of Texas that enforces the laws protecting the public safety and provides for the prevention and detection of crime. Tex. Gov't Code § 411.002(a). The following is my understanding based on information and belief and based upon my conversations with other DPS employees.

2.  DPS acquires, possesses, and transfers firearms for agency use. Acquiring, possessing, and transferring firearms is essential to carrying out its duties to protect the public safety, prevent crime, and detect crime.

3.  The firearms DPS acquires, possesses, and transfers include firearm silencers, short-barreled rifles, and short-barreled shotguns. DPS complies with all state and federal law applicable to its acquisition, possession, and transfer of firearms.

4.  I am familiar with the functions of DPS as they pertain to complying with the registration requirements mandated by the National Firearms Act ("the Act" or "the NFA"). When DPS acquires a silencer, short-barreled rifle, or short-barreled shotgun, my understanding



is that a Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 10 must be completed and submitted by the DPS vendor.

5.      If DPS does not complete the process mandated by the Act, it will be unable to acquire silencers, short-barreled rifles, and short-barreled shotguns.  DPS will continue to acquire, possess, and transfer NFA-regulated firearms because those activities are necessary to fulfilling its law enforcement obligations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge pursuant to 28 U.S.C. § 1746.

_____
Derek Prestridge

APPX.044