**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION**

SILENCER SHOP FOUNDATION, *et al.*,

      *Plaintiffs*,

    v.                                                    No. 6:25-cv-56-H

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

      *Defendants.*

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.     The National Firearms Act ................................................................................ 2

    II.    The One Big Beautiful Bill Act ........................................................................ 5

    III.   This Lawsuit .......................................................................................................... 5

LEGAL STANDARDS ........................................................................................................ 5

ARGUMENT ........................................................................................................................ 7

    I.     The Constitution empowers Congress to adopt the challenged NFA
        requirements ...................................................................................................... 7

          a.     The challenged NFA requirements remain a valid exercise of Congress's
               taxing power ................................................................................................. 7

          b.     Congress's power under the Commerce Clause independently authorizes
               the challenged NFA requirements. ..................................................... 11

          c.     Congress's authority under the Necessary and Proper Clause further
               supports the challenged NFA requirements. ................................... 26

    II.    The challenged NFA requirements comport with the Second Amendment ..................... 27

    III.   Any relief should be no more burdensome than necessary to redress plaintiffs'
        actual injuries. ................................................................................................... 32

CONCLUSION ................................................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Am. Council of Life Ins. v. U.S. Dep't of Labor,*
  2024 WL 3572297 (N.D. Tex. July 26, 2024) .................................................................................29

*Andrews v. State,*
  50 Tenn. (3 Hesik.) 165 (1871) ...........................................................................................................31

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022)...............................................................................................................34

*Barr v. SEC,*
  114 F.4th 441 (5th Cir. 2024) .............................................................................................................22

*Bezet v. United States,*
  714 F. App'x 336 (5th Cir. 2017)..........................................................................................................9

*Blodgett v. Holden,*
  275 U.S. 142 (1927) ...............................................................................................................................6

*Book People, Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024)...............................................................................................................30

*Brown* v. *Maryland,*
  12 Wheat. 419 (1827) .............................................................................................................................6

*CASA, Inc. v. Trump,*
  763 F. Supp. 3d 723 (D. Md. 2025).....................................................................................................33

*Ctr. for Individual Freedom v. Carmouche,*
  449 F.3d 655 (5th Cir. 2006)................................................................................................................6

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ...........................................................................................2, 27, 28, 30

*Feds for Med. Freedom v. Biden,*
  63 F.4th 366 (5th Cir. 2023)...............................................................................................................32

*Fife* v. *State,*
  31 Ark. 455 (1876) ...............................................................................................................................31

*Georgia v. President of the U.S.,*
  46 F.4th 1283 (11th Cir. 2022)...........................................................................................................34

*Gill v. Whitford,*
  585 U.S. 48 (2018) ..................................................................................33

*Gonzales v. Raich,*
  545 U.S. 1 (2005) ..............................................................................*passim*

*Groome Res. Ltd. v. Parish of Jefferson,*
  234 F.3d 192 (5th Cir. 2000) ...........................................................11, 19

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) ..................................................................................33

*Heart of Atlanta Motel, Inc. v. United States,*
  379 U.S. 241 (1964) ..................................................................................15

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau,*
  740 F. Supp. 3d 509 (N.D. Tex. 2024) .....................................................23

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
  452 U.S. 264 (1981) ...........................................................................11, 15

*Hollis v. Lynch,*
  121 F. Supp. 3d 617 (N.D. Tex. 2015) .....................................................18

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ..................................................................................35

*Hunter v. United States,*
  73 F.3d 260 (9th Cir. 1996) ........................................................................9

*Johnson v. United States,*
  576 U.S. 591 (2015) ...........................................................................27, 31

*Legal Tender Cases,*
  79 U.S. (12 Wall) 457 (1870) ...................................................................21

*Lomont v. O'Neill,*
  285 F.3d 9 (D.C. Cir. 2002) ........................................................................2

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) .....................................................................34

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ..................................................................................33

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.,*
  11 F.4th 345 (5th Cir. 2021) .......................................................................5

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ...............................................................................21, 26

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024) ...............................................................................29

*Minor v. United States*,
  396 U.S. 87 (1969) ...............................................................................21

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ...............................................................................3, 31, 33

*Mock v. Garland*,
  697 F. Supp. 3d 564 (N.D. Tex. 2023) ...............................................................................34

*Mont. Shooting Sports Ass'n v. Holder*,
  2010 WL 3926029 (D. Mont. Aug. 31, 2010) ...............................................................................18

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ...............................................................................6

*Nat'l Ass'n for Gun Rights, Inc. v. Garland*,
  697 F. Supp. 3d 601, (N.D. Tex. 2023) ...............................................................................14

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ...............................................................................29, 30

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ...............................................................................11, 19, 20, 22

*Nigro v. United States*,
  276 U.S. 332 (1928) ...............................................................................21

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937) ...............................................................................11

*Perez v. United States*,
  402 U.S. 146 (1971) ...............................................................................15

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) ...............................................................................6

*Second Amend. Found., Inc v. ATF*,
  702 F. Supp. 3d 513 (N.D. Tex. 2023) ...............................................................................27, 31

*Sonzinsky v. United States*,
  300 U.S. 506 (1937) ...............................................................................*passim*

*State* v. *Kerner*,
   107 S.E. 222 ................................................................................................................................31

*Taylor v. United States*,
   579 U.S. 301 (2016) ..........................................................................................................24, 25

*Texas v. ATF*,
   700 F. Supp. 3d 556 (S.D. Tex. 2023) ............................................................................34

*Texas v. United States*,
   126 F.4th 392 (5th Cir. 2025) ...........................................................................................35

*Trump v. CASA*,
   606 U.S. 831 (2025) ..........................................................................................................32, 33

*Union Pac. R. Co. v. United States*,
   99 U.S. 700 (1878) ................................................................................................................6

*United States v. Aiken*,
   974 F.2d 446 (4th Cir. 1992) ..........................................................................................9, 21

*United States v. Ardoin*,
   19 F.3d 177 (5th Cir. 1994) ........................................................................................*passim*

*United States v. Beaty*,
   2023 WL 9853255 n.11 (M.D. Fla. Jan. 20, 2023) ....................................................32

*United States v. Bird*,
   124 F.3d 667 (5th Cir. 1997) ..........................................................................................22, 23

*United States v. Burns*,
   2025 WL 2076468 (S.D. Miss. July 23, 2025) .............................................................31

*United States v. Carmel*,
   548 F.3d 571 (7th Cir. 2008) ............................................................................................9

*United States v. Clay*,
   128 F.4th 163 (3d Cir. 2025) ...........................................................................................22

*United States v. Comstock*,
   560 U.S. 126 (2010) ..........................................................................................................21, 26

*United States v. Conner*,
   2025 WL 858030 (W.D. Tex. Sep. 19, 2025) .............................................................31

*United States v. Cox*,
   906 F.3d 1170 (10th Cir. 2018) .......................................................................................27

*United States v. Darby*,
    312 U.S. 100 (1941) ...........................................................................................................13

*United States v. Dodge*,
    61 F.3d 142 (2d Cir. 1995)..............................................................................................10

*United States v. Doremus*,
    249 U.S. 86 (1919)........................................................................................................8, 21

*United States v. Fisher*,
    353 F.2d 396 (5th Cir. 1965)...........................................................................................28

*United States v. Gresham*,
    118 F.3d 258 (5th Cir. 1997) .............................................................................................9

*United States v. Hale*,
    978 F.2d 1016 (8th Cir. 1992)..........................................................................................14

*United States v. Hall*,
    171 F.3d 1133 (8th Cir. 1999)............................................................................................9

*United States v. Ho*,
    311 F.3d 589 (5th Cir. 2002)...........................................................................................25

*United States v. Holder*,
    2024 WL 1599916 n.7 (N.D. Ga. Jan. 19, 2024) ............................................................31

*United States v. Houston*,
    103 F. App'x 346 (10th Cir. 2004) ..................................................................................14

*United States v. Jennings*,
    195 F.3d 795 (5th Cir. 1999)........................................................................................3, 31

*United States v. Jones*,
    976 F.2d 176 (4th Cir. 1992)...............................................................................9, 14, 20

*United States v. Kenney*,
    91 F.3d 884 (7th Cir. 1996) .............................................................................................18

*United States v. Kirk*,
    105 F.3d 997 (5th Cir. 1997) ...........................................................................................18

*United States v. Knutson*,
    113 F.3d 27 (5th Cir. 1997) ...............................................................................13, 17, 18

*United States v. Lara*,
    541 U.S. 193 (2004) .........................................................................................................21

v

*United States v. Lightner,*
    2024 WL 2882237 (M.D. Fla. June 7, 2024) ...................................................................31

*United States v. Lopez,*
    514 U.S. 549 (1995) .................................................................................................*passim*

*United States v. Luna,*
    165 F.3d 316 (5th Cir. 1999) ......................................................................................18

*United States v. Matthews,*
    438 F.2d 715 (5th Cir. 1971) ........................................................................................9

*United States v. Miller,*
    307 U.S. 174 (1939) ................................................................................................2, 27

*United States v. Miller,*
    2023 WL 6300581 (N.D. Tex. Sept. 27, 2023) .......................................................27, 31

*United States v. Morgan,*
    147 F.4th 522 (5th Cir. 2025) .................................................................................15, 31

*United States v. Morgan,*
    2024 WL 150340 (W.D. La. Jan. 12, 2024) ...............................................................31

*United States v. Morrison,*
    529 U.S. 598 (2000) .................................................................................................*passim*

*United States v. Park,*
    938 F.3d 354 (D.C. Cir. 2019) .........................................................................20, 22, 25

*United States v. Pearson,*
    8 F.3d 631, (8th Cir. 1993) .........................................................................................14

*United States v. Peterson,*
    150 F.4th 644 (5th Cir. 2025) .........................................................................2, 29, 30, 31

*United States v. Rahimi,*
    602 U.S. 680 (2024) .................................................................................................*passim*

*United States v. Rene E.,*
    583 F.3d 8 (1st Cir. 2009) ...........................................................................................18

*United States v. Ridlehuber,*
    11 F.3d 516 (5th Cir. 1993) ...........................................................................................8

*United States v. Robinson,*
    2025 WL 870981 (11th Cir. Mar. 20, 2025) .............................................................27, 31

*United States v. Rose,*
    522 F.3d 710 (6th Cir. 2008) ..............................................................................18

*United States v. Ross,*
    458 F.2d 1144 (5th Cir. 1972) .........................................................................8, 23

*United States v. Rush,*
    130 F.4th 633 (7th Cir. 2025) ...................................................................27, 31, 32

*United States v. Rybar,*
    103 F.3d 273 (3d Cir. 1996) .............................................................................18

*United States v. Salerno,*
    481 U.S. 739 (1987) .................................................................................*passim*

*United States v. Serrano,*
    651 F. Supp. 3d 1192 (S.D. Cal. 2023) .............................................................31

*United States v. Shepherd,*
    2024 Wl 71724 (S.D. Miss. Jan. 5, 2024) ........................................................31

*United States v. Sredl,*
    2023 WL 3597715 (N.D. Ill. May 23, 2023) ....................................................28

*United States v. Stepp-Zafft,*
    733 F. App'x 327 (8th Cir. 2018) ....................................................................27

*United States v. Stewart,*
    451 F.3d 1071 (9th Cir. 2006) .....................................................................17, 18

*United States v. Texas,*
    599 U.S. 670 (2023) ......................................................................................34

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992) ...................................................................................3, 31

*United States v. Villalobos,*
    2023 WL 3044770 (D. Idaho Apr. 21, 2023) ...................................................31

*United States v. Wilson,*
    440 F.2d 1068 (6th Cir. 1971) .........................................................................14

*United Stats v. Wilks,*
    58 F.3d 1518 (10th Cir. 1995) .........................................................................13

*Wash. St. Grange v. Wash. St. Republican Party,*
    552 U.S. 442 (2008) ........................................................................................6

*Wickard v. Filburn,*
   317 U.S. 111 (1942) ..............................................................................................16

*Wilson* v. *State,*
   33 Ark. 557 (1878) ..............................................................................................31

*Woods v. Cloyd W. Miller Co.,*
   333 U.S. 138 (1948) ............................................................................................22

**Statutes**

18 U.S.C. § 921 ............................................................................................................3

18 U.S.C. § 922 ..........................................................................................................13

26 U.S.C. § 5811 .................................................................................................4, 5, 12

26 U.S.C. § 5812 ..........................................................................................................4

26 U.S.C. § 5821 ..........................................................................................................5

26 U.S.C. § 5822 ..........................................................................................................4

26 U.S.C. § 5841 ..........................................................................................................4

26 U.S.C. § 5842 .....................................................................................................4, 12

26 U.S.C. § 5845 .................................................................................................3, 4, 28

26 U.S.C. § 5861 ...................................................................................................*passim*

26 U.S.C. §§ 5801–5872 ........................................................................................*passim*

One Big Beautiful Bill Act,
   139 Stat. 72, Pub. L. 119-21 (2025) ...................................................................5

**Constitution**

U.S. Const. art. I, § 8, cl. 3 ...................................................................................11. 26

U.S. Const. art. I, § 8, cl. 18 ......................................................................................26

U.S. Const. art. I, § 8, cl. 1 ........................................................................................26

**Legislative Materials**

H.R. Rep. No. 73-1780 (1934) ..........................................................................3, 8, 21

H.R. Rep. No. 83-1337 (1954) ............................................................................3, 31

*National Firearms Act: Hearings on H.R. 9066 before the House Comm. On Ways and Means*,
 73d Cong., 2d Sess. (1934) .................................................................................................................. 2, 21, 22

S. Rep. No. 73-1444 (1934) ...................................................................................................... 3, 8, 21

## **Rules**

Federal Rule of Civil Procedure 5 ..................................................................................................... 37

Federal Rule of Civil Procedure 56 ................................................................................................... 5

## INTRODUCTION

The National Firearms Act ("NFA") has long regulated certain classes of weapons that Congress deemed particularly dangerous through taxation and other means, like registration requirements. But the question in this case is not about whether the NFA's requirements are good policy—a very reasonable question on which the government has no occasion to opine in this brief. The only questions in this case are whether Congress has exceeded its enumerated powers or violated a fundamental right in making those policy choices. It did not.

The NFA, including as it was recently amended in the One Big Beautiful Bill Act ("OBBB"), falls within Congress's constitutional authority under Congress's taxing power, the Commerce Clause, and the Necessary and Proper Clause. Plaintiffs' contrary arguments contravene binding Supreme Court and Fifth Circuit decisions, so they cannot carry the day in this Court.

Plaintiffs facially challenge certain NFA requirements principally on the ground that they are no longer supported by a sufficient constitutional source of congressional power. Their argument is that the Supreme Court's decision upholding the NFA under Congress's taxing power, *see Sonzinsky v. United States*, 300 U.S. 506 (1937), no longer controls this question because the OBBB recently zeroed out the NFA's taxes on the making and transfer of four classes of regulated firearms (*i.e.*, short-barreled rifles and shotguns, suppressors, and certain other concealable firearms labeled "any other weapons" (or "AOWs")). That argument fails for two independent reasons. First, the regulatory requirements that plaintiffs challenge support the collection and enforcement of another NFA tax that the OBBB left intact—the NFA's tax on businesses that manufacture, distribute, or deal in NFA firearms. Second, Congress's powers under the Commerce Clause and Necessary and Proper Clause independently authorize the NFA's regulatory requirements. *See, e.g.*, *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994). The NFA regulates, at its core, manufacturers, distributors, dealers, and purchasers as they participate in an interstate firearms market and the firearms that flow through that

1

market, and enforces its regulations through criminal prohibitions that are tied to economic activities and, in some cases, expressly to interstate commerce. *See* 26 U.S.C. 5861. That is the heartland of the Commerce Clause. *United States v. Lopez*, 514 U.S. 549, 558 (1995). But even the intrastate activities that are subject to the NFA are within Congress's power to regulate, as they are part of an economic class of activities that substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

As for plaintiffs' facial Second Amendment challenge, the Supreme Court made clear in *United States v. Miller*, 307 U.S. 174 (1939), and *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment does not guarantee the right to possess short-barreled shotguns, a holding that applies equally to short-barreled rifles and at least some AOWs. And the Fifth Circuit held in *United States v. Peterson*, 150 F.4th 644 (5th Cir. 2025), that the NFA's regulations are presumptively lawful— at least insofar as they apply to suppressors. *Id.* at 652–53 & n.5. Although the Second Amendment analysis would be different for similar restrictions made applicable to ordinary pistols and rifles, the Supreme Court and Fifth Circuit have, respectively, resolved the question as to short-barreled shotguns and suppressors.

For these reasons, the Court should grant summary judgment for defendants.

## BACKGROUND

### I.    The National Firearms Act

The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, was Congress's first major attempt at regulating firearms in the United States, a legislative effort animated by the emergence of armed crime as a major national problem. *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002). By the 1930s, armed crime had become a "serious national emergency," with criminal enterprises "organized … upon a Nation-wide basis" and armed criminals "pass[ing] rapidly from State to State." *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess., at 4–5 (1934), App.0009–10. With the NFA, Congress sought to design a "remedy" to the

"growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons." H.R. Rep. No. 73-1780 (1934), App.0173; S. Rep. No. 73-1444 (1934), App.0178.

Seeking to curtail armed crime, the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals." H.R. Rep. No. 83-1337, at A395 (1954); *see also United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes.");*Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023) (the NFA's regulation of short-barreled shotguns targets weapons "valued for their ability to be easily concealed and to unleash devastating damage at short range"); *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (the NFA regulates weapons that are "primarily weapons of war"). To that end, the NFA defines six categories of "firearms" that are subject to regulation, *see* 26 U.S.C. § 5845(a)(1)–(8):

- *Machineguns.* "[A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," including "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.* § 5845(a)(6), (b).

- *Short-barreled shotguns.* "[A] shotgun having a barrel or barrels of less than 18 inches in length" or "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." *Id.* § 5845(a)(1), (2); *see also id.* § 5845(d) (further defining "shotgun").

- *Short-barreled rifles.* "[A] rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *see also id.* § 5845(c) (further defining "rifle").

- *Suppressors.* "[A]ny device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." *Id.* § 5845(a)(7); 18 U.S.C. § 921(a)(25).

- *Destructive devices.* "(1) [A]ny explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an

explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled." 26 U.S.C. § 5845(a)(8), (f).

- *"Any other weapon."* "[A]ny weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire." *Id.* § 5845(a)(5), (e).

To stem the criminal misuse of these weapons, Congress imposed various requirements on their importation, manufacture, transfer, and possession, including:

- *Businesses.* Any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General, *id.* § 5802, pay a special occupational tax, *id.* § 5801, and keep records regarding the manufacture, transfer, and importation of such weapons, *id.* § 5843.

- *Manufacturing & making.* A manufacturer—*i.e.,* one "who is engaged in the business of manufacturing firearms," *id.* § 5845(m)—that is registered with the Attorney General and pays the special occupational tax must register and report to the Attorney General the NFA firearms that it has manufactured. *Id.* § 5841(b), (c). By contrast, a "maker" of an NFA firearm—*i.e.,* one who produces an NFA firearm but is *not* engaged in the business of manufacturing those firearms, *id.* §§ 5822, 5845(i)—must first submit a written application to the Attorney General, pay any applicable making tax, *id.* § 5821, and obtain the Attorney General's approval before making the firearm. *id.* § 5822. Each NFA firearm must bear a serial number and other requisite identifiers. *Id.* § 5842. The person who makes, manufactures, or imports an NFA firearm must register the weapon in the National Firearms Registration and Transfer Record ("NFRTR"). *Id.* § 5841(b).

- *Transfer & registration.* Before a person may transfer an NFA firearm, he or she must submit a written application with the Attorney General, pay any applicable transfer tax, *id.* § 5811, and obtain the Attorney General's approval to transfer the weapon, *id.* § 5812; *see also id.* § 5841(c). The transferor also must register the weapon to the transferee, who may take possession of the weapon once the transfer is approved and the firearm is appropriately registered. *Id.* § 5841(b). A person possessing an NFA firearm must retain proof of its registration. *Id.* § 5841(e).

4

To enforce these requirements, Congress made it unlawful to import, manufacture, transfer, receive, possess, or transport an NFA firearm in violation of the Act's provisions, *id.* § 5861, and permitted the imposition of criminal penalties for any such violation, *id.* § 5871.

## II.    The One Big Beautiful Bill Act

On July 4, 2025, President Trump signed into law the One Big Beautiful Bill Act ("OBBB"), 139 Stat. 72, Pub. L. 119-21 (2025). The OBBB, among other things, amended 26 U.S.C. §§ 5811 and 5821 to zero out the NFA's making and transfer taxes on short-barreled rifles and shotguns, suppressors, and the "any other weapons" class of firearms (hereafter "AOWs"). *See* Pub. L. 119-21 § 70436; *see also* 26 U.S.C. §§ 5811(a) (setting the transfer tax at "$0"), 5821(a) (same for the making tax). Congress did not change the NFA's $200 making or transfer tax on machineguns and destructive devices, *see* 26 U.S.C. §§ 5811(a)(1), 5821(a)(1), the special occupational tax on importers, manufacturers, and dealers in NFA firearms, *see id.* § 5801(a), or any other NFA requirement.

## III.    This Lawsuit

The same day the OBBB became law, a coalition of four firearms advocacy groups, three businesses that import, manufacture, or deal in firearms, and one individual filed this lawsuit, claiming that various NFA requirements on short-barreled rifles and shotguns, suppressors, and AOWs exceed Congress's constitutional authority. *See* Compl., ECF No. 1. Plaintiffs amended their complaint a month later, adding fifteen states as plaintiffs and further challenging the NFA's regulation of these four classes of firearms under the Second Amendment. *See* Am. Compl. ("Compl."), ECF No. 15. Plaintiffs then moved for summary judgment. *See* Pls.' Mot. for Summ. J., ECF No. 48; Memo. in Supp. of Pls.' Mot. for Summ. J. ("Mot."), ECF No. 49.

## LEGAL STANDARDS

Where, as here, the parties dispute no material facts and agree that "the only issues before the court are pure questions of law," summary judgment under Federal Rule of Civil Procedure 56(a) is

the proper mechanism for resolving the case. *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) ("[A] facial challenge to the constitutionality of a statute presents a pure question of law ….").

Plaintiffs *facially* challenge the constitutionality of certain NFA requirements. To succeed, plaintiffs must overcome the "presumption of constitutionality" that attaches to every Act of Congress. *United States v. Morrison*, 529 U.S. 598, 607 (2000). Judging the constitutionality of an Act of Congress is "the gravest and most delicate duty that this Court is called on to perform." *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.). In performing that duty, this Court must accord "great weight" to Congress's judgment that a statute is constitutional. *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (citation omitted). "Every possible presumption is [thus] in favor of the validity of a statute," *Sinking-Fund Cases*, 99 U.S. 700, 718 (1878), and "the whole burthen of proof lies on him who denies its constitutionality," *Brown v. Maryland*, 12 Wheat. 419, 436 (1827) (Marshall, C.J.).

Moreover, facial challenges are "the most difficult challenge to mount successfully," *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (citation omitted), and for "a host of good reasons," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (cleaned up). "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement"; they "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways," *id.* (cleaned up); and they "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied," *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 450–51 (2008). Therefore, to succeed on either of their facial challenges, plaintiffs must "establish that no set of circumstances exists under which" the challenged NFA requirements "would be valid," *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))—"*i.e.*, that the law is unconstitutional in all

of its applications," *Wash. St. Grange*, 552 U.S. at 449. That any specific requirement "might operate unconstitutionally under some conceivable set of circumstances" would be "insufficient to render it wholly invalid." *Salerno*, 481 U.S. at 745. Rather, in analyzing plaintiffs' claims, this Court should "consider the circumstances in which" the challenged NFA requirements are "most likely to be constitutional" instead of "focus[ing] on hypothetical scenarios where [a requirement] might raise constitutional concerns" *Rahimi*, 602 U.S. at 701.

## ARGUMENT

### I.    The Constitution empowers Congress to adopt the challenged NFA requirements.

#### A.    The challenged NFA requirements remain a valid exercise of Congress's taxing power.

Plaintiffs claim that Congress's taxing power can no longer serve as the constitutional source of the NFA's requirements on manufacturing, transferring, or possessing short-barreled rifles and shotguns, suppressors, and AOWs, because those firearms are now "untaxed" after the OBBB's enactment and therefore produce no revenue. *See* Mot. at 1. But that claim suffers from an obvious flaw: Contrary to what plaintiffs contend, business in these firearms is not "untaxed." While the OBBB zeroed out the NFA's making and transfer taxes on short-barreled rifles and shotguns, suppressors, and AOWs, the NFA still imposes a tax—namely, the special occupational tax—on businesses that import, manufacture, or deal in these firearms. *See* 26 U.S.C. § 5801. These firearms thus *do* produce federal tax revenue, *contra* Mot. at 1, and the challenged NFA's requirements support the collection of that revenue. That's a valid exercise of Congress's taxing power.

It's long been settled that the NFA's requirements aid in the assessment, collection, and enforcement of the Act's taxes and are thus justified under Congress's taxing power. Shortly after the NFA's enactment, in *United States v. Sonzinsky*, 300 U.S. 506 (1937), the Supreme Court rejected a constitutional challenge to the NFA's special occupational tax on firearm dealers, holding that Congress had the power to impose the tax even if it was intended to "restrict or suppress the thing

taxed"—*i.e.*, the manufacture and transfer of NFA firearms. *Id.* at 513–14. With the NFA imposing a tax, the Court further held that the Act's "registration provisions" for those who do business in NFA firearms (now codified at 26 U.S.C. § 5802) were likewise an exercise of Congress's taxing power because they "are obviously supportable as in aid of a revenue purpose," *id.* at 513.

    *Sonzinsky* was consistent with earlier decisions—also instructive here—upholding similar regulatory requirements that were part of a taxing scheme, like the Supreme Court's decision in *United States v. Doremus*, 249 U.S. 86 (1919). There, the Court upheld under Congress's taxing power the taxation-and-regulation scheme of the Harrison Anti–Narcotics Control Act of 1914, *id.* at 93–95, which Congress used as a template for designing the NFA. *See* H.R. Rep. No. 73-1780, App.0174; S. Rep. No. 73-1444, App.0179 ("[T]his bill follows the plan of the Harrison Anti-Narcotic Act …."). Regarding the Act's regulations—*e.g.*, allowing sales of certain drugs only by registered dealers and only to patients who had valid prescriptions—the Court explained that they served a revenue-raising purpose because they kept "the traffic" in the regulated drugs "aboveboard and subject to inspection by those authorized to collect the revenue," and "diminish[ed] the opportunity of unauthorized persons to obtain the drugs and sell them clandestinely without paying the tax imposed by" the Act. *Doremus*, 249 U.S. at 94.

    Since *Sonzinsky* and *Doremus*, the Fifth Circuit has consistently upheld the NFA's requirements under Congress's taxing power. For example, in *United States v. Ross*, 458 F.2d 1144 (5th Cir. 1972), the Fifth Circuit rejected a challenge to 26 U.S.C. § 5861(d), which prohibits possession of an unregistered weapon. The court explained that § 5861(d) and the registration requirement it enforces are "part of the web of regulation aiding enforcement" of the NFA's transfer tax, as "a penalty imposed on transferees ultimately discourages the transferor on whom the tax is levied from transferring a firearm without paying the tax." *Id.* at 1145. The Fifth Circuit has followed similar reasoning in rejecting other challenges to the NFA's requirements and prohibitions. *See United States v. Ridlehuber*, 11 F.3d 516, 527

8

(5th Cir. 1993) ("The requirement that a transferee must refuse to accept possession of an unregistered firearm is rationally designed to aid in the collection of taxes imposed by other provisions of the Act." (cleaned up)); *United States v. Matthews*, 438 F.2d 715, 716–17 (5th Cir. 1971) (explaining that the NFA's registration requirement serves a revenue-raising purpose even when it regulates activities that do not give rise to a "concurrent tax");*United States v. Gresham*, 118 F.3d 258, 262 (5th Cir. 1997); *Bezet v. United States*, 714 F. App'x 336, 342 (5th Cir. 2017); *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1995).

Other courts have described the revenue-raising purposes of the NFA's requirements similarly. In *Hunter v. United States*, 73 F.3d 260 (9th Cir. 1996), for example, the Ninth Circuit addressed whether the NFA's requirements were still justified under the taxing power "even if the government no longer taxes possession" because of a separate federal statute that generally banned possession of post-1986 machineguns. *Id.* at 262. The court held that they were, given that "[t]he manufacture of machine guns continues to be taxed, and knowing the chain of possession of a firearm would help the government determine who made it; thus, requiring registration for possession still facilitates taxation." *Id.* Similar reasoning is mirrored in other cases, wherein courts have found that the NFA's requirements and prohibitions on the end purchaser or possessor allow the government to determine who was further up the chain of possession—and thus who owed taxes—and thereby incentivize manufacturers, distributors, and dealers of NFA firearms to pay their applicable tax. *See, e.g.*, *United States v. Aiken*, 974 F.2d 446, 448 (4th Cir. 1992) ("By not allowing transferees to register the guns, and thus prohibiting lawful acceptance of unregistered guns, Congress has made the guns contraband. For this reason, if makers do not register the weapons originally, they face the possibility of being unable to sell the guns to anyone. This fact makes it more likely that makers will pay the tax in the first place." (citation omitted)); *United States v. Jones*, 976 F.2d 176, 183–84 (4th Cir. 1992) ("[C]learly, knowing the chain of possession and transfer assists in determining who made the firearm and hence is 'supportable as in aid of a revenue purpose.'"); *United States v. Carmel*, 548 F.3d 571 (7th

Cir. 2008) (adopting *Jones* reasoning); *United States v. Hall*, 171 F.3d 1133, 1142 (8th Cir. 1999) (agreeing with courts that have held "that § 5861(d) is in aid of a revenue purpose by virtue of the fact that [it] helps the government to learn the chain of possession of a firearm and thus to identify the maker liable for the tax" (cleaned up)); *United States v. Dodge*, 61 F.3d 142, 146 (2d Cir. 1995) ("The registration of the transfer of firearms when there is no tax immediately due assists the government in the collection of taxes by creating a record to track the firearms from one party to another ….").

The challenged NFA requirements continue to serve these same revenue-raising purposes. As ATF explains, the agency reviews every application to make or transfer an NFA firearm to ensure, among many things, that any qualified manufacturer, distributor, or dealer that is associated with the relevant firearm has paid their special occupational tax. *See* Decl. of Stephen Albro ¶¶ 27–28, App.0187–188. Additionally, these requirements provide ATF with necessary information to determine whether an individual should be licensed and paying the special occupational tax—for example, if the individual is repetitively making certain NFA firearms or is consistently transferring a meaningful number of firearms. *See id.* In that way, the NFA's registration and approval requirements "aid in preventing the circumvention of the NFA," including its requirement that those who are engaged in the business of NFA firearms pay the special occupational tax. *Id.* And, for reasons courts have repeatedly explained, *see supra* 8–10, the NFA's prohibitions support the special occupational tax's enforcement by making it unlawful to circumvent these requirements, *see* 26 U.S.C. § 5861, including making it unlawful to engage in the business of NFA firearms without registering or paying the special occupational tax, *id.* § 5861(a), to make or transfer a firearm in violation of the NFA's requirements or to receive or possess such a violative firearm, *id.* § 5861(b)–(i), or to make a false entry on an application or record, *id.* § 5861(l). Therefore, because the challenged NFA requirements and prohibitions form a "web of regulation aiding" the collection and enforcement of the NFA's special

occupational tax, they are justified under Congress's taxing power.[1]

>    **B.    Congress's power under the Commerce Clause independently authorizes the challenged NFA requirements.**

Apart from the taxing power, Congress has the authority to enact the challenged NFA requirements under the Commerce Clause. Plaintiffs' arguments to the contrary rest on a cramped view of Congress's authority that cannot be squared with binding precedent, and a view of the NFA that denies the reality that the NFA directly regulates interstate commerce in firearms.

The Constitution grants Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. This constitutional provision endows Congress with "broad authority." *NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (lead opinion). "[T]he power to regulate commerce is the power to enact all appropriate legislation for its protection and advancement; to adopt measures to promote its growth and insure its safety; [and] to foster, protect, control and restrain." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36–37 (1937). With that power, Congress may regulate the "channels of interstate commerce," the "instrumentalities of interstate commerce" and the "persons or things in interstate commerce," and "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). A court's task in reviewing whether an Act of Congress is a valid exercise of this authority is a "modest one," *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005), requiring only that it determine whether "Congress acted rationally in adopting a particular regulatory scheme," *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981); *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 203 (5th Cir. 2000) ("In reviewing an act of Congress passed under its Commerce Clause authority, we apply the rational basis test….").

Measured by these principles, the challenged NFA requirements fit comfortably within

---

[1] That there may be "some conceivable set of circumstances" where an NFA firearm has been made and possessed by a person who is not subject to the special occupational tax is immaterial in resolving plaintiffs' facial challenge. *See Salerno*, 481 U.S. at 745; *Rahimi*, 602 U.S. at 701.

11

Congress's power under the Commerce Clause.

Start with the fact that, in most applications, the challenged NFA requirements and prohibitions directly regulate manufacturers, distributors, dealers, and purchasers (*i.e.*, "the persons") as they participate in an interstate firearms market and the firearms (*i.e.*, "the things") that flow through that market. *See Lopez*, 514 U.S. at 558. A large majority of the short-barreled rifles and shotguns, suppressors, and AOWs produced in the United States are produced by federally licensed manufacturers, *see* Albro Decl. ¶ 29, App.0188, and then distributed and sold interstate as commodities by federally licensed distributors and dealers, like plaintiffs,[2] *id.* ¶¶ 30–32, App.0188–189 (of the NFA firearms transferred in 2025, nearly 2 million (or 91%) were transferred interstate). The NFA regulates every step of that interstate commercial process: *first*, by requiring that the federally licensed manufacturer, distributor, and dealer register with the Attorney General and pay the NFA's special occupational tax, 26 U.S.C. § 5801–5802; *second*, by requiring that the manufacturer report the manufactured firearm to the Attorney General and register it, *id.* § 5841(b), (c), and comply with certain requirements governing the firearm's manufacture, *id.* § 5842; *third*, by requiring that the manufacturer apply and receive approval to transfer the firearm to the federally licensed distributor and to register the firearm to the distributor, *id.* §§ 5821, 5822, 5841(b); *fourth*, by requiring that the distributor apply

---

[2] Plaintiffs' own operations illustrate this point. *See, e.g.*, Decl. of Ridley Key ¶ 5 ("B&T manufactures and sells short-barreled rifles, suppressors, and accessories to the public and other companies across the country."), ECF No. 50; B&T, *Dealer*, https://bt-usa.com/support/dealers/?radius=100 (last visited Nov. 20, 2025) (showing dealers of B&T's products in nearly every state in the United States); Decl. of SilencerCo Weapons Research, LLC ¶ 5 ("SilencerCo manufactures and sells silencers, firearms parts, and accessories to the public and other companies across the country."), ECF No. 50; SilencerCo, *Dealer Locator*, https://silencerco.com/find-a-dealer/ (last visited Nov. 20, 2025) (showing dealers of SilencerCo's products in six states); Decl. of Deborah McCallum ¶ 5 ("PSA currently manufactures and sells some short-barreled rifles to the public and other companies across the country."), ECF No. 50; Silencer Shop, *Why Silencer Shop?*, https://perma.cc/FMQ3-FMTR (claiming to be "the nation's largest suppressor distributor," "partnered with 6,000+ hometown dealers"); *see also* Decl. of Travis White ¶¶ 9–10 (explaining that its manufacturing and retail members sell NFA firearms "across state lines"), ECF No. 50.

and receive approval to transfer the firearm to the federally licensed dealer and to register the firearm to the dealer, *id.* §§ 5821, 5822, 5841(b); *fifth*, by requiring that the dealer apply and receive approval to transfer the firearm to the end purchaser and to register the firearm to the purchaser, *id.* §§ 5821, 5822, 5841(b); and *sixth*, by requiring that the purchaser maintain proof that the firearm has been registered since its manufacture, *id.* § 5841(e).

And to enforce these requirements, the NFA prohibits participants in this interstate firearms market from violating any NFA requirement. *See id.* § 5861(a)–(l). Indeed, the NFA's enforcement regime contains explicit references to activities in foreign or interstate commerce. For example, the NFA makes it unlawful "to transport, deliver, or receive any firearm *in interstate commerce* which has not been registered." *Id.* § 5861(j) (emphasis added); *see also id.* § 5861(k) (making it unlawful "to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844"). Additionally, the Gun Control Act makes it unlawful for non-licensed persons "to transport *in interstate or foreign commerce*" a subset of NFA firearms, including short-barreled rifles and shotguns, without the Attorney General's authorization. *See* 18 U.S.C. § 922(a)(4). Therefore, in many cases, the NFA's requirements will be enforced through criminal prohibitions that expressly regulate activities in interstate commerce, separately from any regulation of intrastate activities, *see infra*.

In these ways, the NFA regulates the "ingredients of interstate commerce itself." *See Raich*, 545 U.S. at 34 (Scalia, J., concurring in the judgment); *see also United States v. Darby*, 312 U.S. 100, 113 (1941) ("[T]he shipment of manufactured goods interstate *is* [interstate] commerce and the prohibition of such shipment by Congress is indubitably a regulation of [that] commerce." (emphasis added)). Indeed, that is how courts have understood the regulation of the manufacture, distribution, and possession of firearms that flow through interstate commerce. *See, e.g., United States v. Wilks*, 58 F.3d 1518, 1521 (10th Cir. 1995) ("The interstate flow" of firearms "*is* interstate commerce."); *United States v. Knutson*, 113 F.3d 27, 29–30 (5th Cir. 1997) (the GCA's regulation of machinegun transfers and

possession targets, in most cases, activities that are part of "interstate commercial transactions" and "an item bound up with interstate attributes"); *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 697 F. Supp. 3d 601, (N.D. Tex. 2023) ("The [NFA] regulates certain firearms in interstate commerce."). Courts have thus had no trouble finding that the NFA's regulation of these activities is within Congress's authority to regulate interstate commerce. *See, e.g.*, *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994) ("[N]o one could seriously contend" that the NFA cannot "be upheld under Congress's power to regulate interstate commerce."); *United States v. Jones*, 976 F.2d 176, 184 (4th Cir. 1992) ("[T]here can be no serious contention that [the NFA's] application in this case to two machine guns which were transported between two states for sale exceeds Congress' power to regulate interstate commerce."); *United States v. Wilson*, 440 F.2d 1068 (6th Cir. 1971); *United States v. Pearson*, 8 F.3d 631, (8th Cir. 1993); *United States v. Hale*, 978 F.2d 1016, 1018 (8th Cir. 1992); *United States v. Houston*, 103 F. App'x 346, 349–50 (10th Cir. 2004).

The fact that the challenged NFA requirements directly regulate, in most instances, the persons and things in interstate commerce, *see Lopez*, 514 U.S. at 558, should be the end of plaintiffs' facial challenge. *See Salerno*, 481 U.S. at 745 (there must be "no set of circumstances" in which a facially challenged law "would be valid"). Still, plaintiffs contend that the NFA's requirements on the making, transfer, and possession of short-barreled rifles and shotguns, suppressors, and AOWs are beyond Congress's authority insofar as they regulate "purely intrastate" activities. *See* Mot. at 1. But even if that were true, it would do nothing to advance plaintiffs' *facial* challenge to those NFA requirements. *See, e.g.*, Compl., Count I (claiming that the NFA's requirements regarding short-barreled rifles and shotguns, suppressors, and AOWs categorically exceed Congress's enumerated powers and seeking declaratory relief to that effect); Mot. at 3 (requesting "a declaratory judgment that the challenged

provisions of the NFA are unconstitutional and unenforceable as to the untaxed firearms").[3] As the Supreme Court explained in *Rahimi*, in analyzing a facial constitutional challenge to a federal statute, a court should "consider the circumstances in which" the statute is "most likely to be constitutional" instead of "focus[ing] on hypothetical scenarios where" the statute "might raise constitutional concerns." 602 U.S. at 701; *see also Salerno*, 481 U.S. at 745 (there is no "overbreadth doctrine" outside the First Amendment). So even if plaintiffs were correct that a subset of NFA-regulated activities were beyond Congress's reach under the Commerce Clause, that would not call into doubt the *facial* validity of the NFA requirements that plaintiffs seek to topple.

At any rate, Congress *does*, under existing precedent, have the power to regulate the intrastate manufacture, making, distribution, sale, transfer, and possession of NFA firearms. In addition to the "persons" and "things" in interstate commerce, the Commerce Clause authorizes Congress "to regulate activities that substantially affect interstate commerce." *Raich*, 545 U.S. at 17. That includes the power "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* "When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the *entire* class," including activities that are intrastate or non-commercial. *Id.* (citation omitted and emphasis added). Applying that principle, the Supreme Court has held that Congress may regulate activities like the growing and consumption of marijuana, *see id.* at 15–33; mining, *see Hodel*, 452 U.S. at 275–283; loan sharking, *see Perez v. United States*, 402 U.S. 146, 150–157 (1971); the operation of hotels, *see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 253–262 (1964); and the growing and consumption of homegrown wheat,

---

[3] As is apparent from plaintiffs' arguments and the relief they request (*i.e.*, a declaration "that the challenged provisions of the NFA are unconstitutional" and "a blanket ban on the[ir] enforcement," *see* Mot. at 3, 48, plaintiffs are not asserting an as-applied challenge to any of the NFA's requirements. *See United States v. Morgan*, 147 F.4th 522, 526 (5th Cir. 2025) ("An as-applied challenge asks whether a law—though constitutional in some circumstances—is nonetheless unconstitutional as applied to *[the challenger's] activity*." (cleaned up)).

*see Wickard v. Filburn*, 317 U.S. 111, 119–129 (1942).

*Raich* is particularly instructive here. In that case, the Supreme Court rejected a Commerce Clause challenge to the Controlled Substances Act's ("CSA") prohibition on homegrown, home-consumed marijuana, holding that Congress had the power to regulate those activities as part of the CSA's broader regulation of an economic class of activities—namely, marijuana manufacturing, distribution, and possession. As the Court explained, Congress could rationally believe "that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA," given "the likelihood that" the demand for marijuana "in the interstate market" would "draw [homegrown] marijuana into that market," thus "frustrat[ing] the federal interest" in "control[ling] the supply and demand" of that regulated commodity. *Raich*, 545 U.S. at 19–22. That the CSA "ensnare[d]" plaintiffs' "purely intrastate activity" was immaterial, as the Court found no basis for "excis[ing] individual components" of a broader regulatory scheme that Congress itself did not excise. *See id.* at 22, 28–29; *see also id.* at 17 ("[W]hen a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." (cleaned up)).

Those same principles amply support the NFA requirements challenged here. The NFA regulates a class of activities that are "quintessentially economic": the manufacture, distribution, sale, and possession of weapons that, in Congress's judgment, are particularly susceptible to criminal misuse. *See id.* at 25 ("'Economics' refers to 'the production, distribution, and consumption of commodities.'" (citation omitted)). As explained, *see supra* 12, these regulated activities occur most often as part of an interstate market in NFA firearms. To think that failing to regulate the *intrastate* manufacture, distribution, sale, and possession of these same weapons "would leave a gaping hole" in the NFA by creating an unregulated sub-market in unregistered NFA firearms is more than simply rationale, it's "visible to the naked eye." *See Raich*, 545 U.S. at 22, 28–29 (quoting *Lopez*, 514 U.S. at

16

563). Indeed, regulating "the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id.* at 26. Given that many NFA firearm owners wish to avoid the NFA's registration requirement,[4] "[o]ne need not have a degree in economics to understand" that a sub-market of unregistered, untraced NFA firearms would substantially affect "the supply and demand in the national market" for those weapons and increase the risk of their diversion into illicit channels, *see id.* at 19, 28; *see also id.* at 40 (Scalia, J., concurring in the judgment) ("fungible commodities" are "never more than an instant from the interstate market"); *United States v. Stewart*, 451 F.3d 1071, 1078 (9th Cir. 2006) ("Homemade guns, even those with a unique design, can enter the interstate market and affect supply and demand.")— the very concern that the NFA was designed to address, *see supra* 2–3; *see also* S. Rep. No. 90-1097 (1968) ("The [NFA] … has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use ….."). Because failure to regulate intrastate manufacturing, distribution, sale, and possession of NFA firearms would thus clearly "undercut" the NFA's regulation of the interstate market in those weapons, it was (at the very least) rational for Congress not to exempt those intrastate activities from the NFA's broader regulatory scheme. *See Raich*, 545 U.S. at 18.

Applying similar reasoning, courts have consistently upheld federal firearms laws against Commerce Clause challenges. In *Knutson*, for example, the Fifth Circuit upheld a federal statute that generally prohibits the transfer or possession of pre-1986 machineguns. 113 F.3d at 29–31. Though

---

[4] *See, e.g.,* Decl. of Erich M. Pratt ¶¶ 17, 31–35 (stating that GOA's "members and supporters do not wish to comply with" the NFA's "registration requirement," and claim that several members would make or acquire NFA firearms if they did not have to register the weapons), ECF No. 50; Key Decl. ¶ 15 ("[P]rospective customers are deterred from purchasing NFA firearms when they have to register … their firearms in a federal database—all pursuant to the NFA provisions challenged in this litigation. This deterrence translates to diminished sales …."); SilencerCo Decl. ¶ 15 (same); McCallum Decl. ¶ 15 (same); Decl. of Brady Wetz ¶¶ 20–28 (listing nine specific NFA firearms that he would "immediately" purchase or personally make "as quickly as possible" if not for the NFA's registration requirement), ECF No. 50.

the court observed that, like the NFA, "much of the conduct covered by § 922(o) fits comfortably" within Congress's authority to regulate "an item bound up with interstate attributes," it held that it also is "'obvious to the naked eye' that the transfer and possession of machineguns," "including those that might conceivably be characterized as exclusively intrastate or noncommercial," "has a substantial effect on interstate commerce." *Id.* at 30. The Court reasoned that the extensive legislative history of federal firearms regulations, beginning with the NFA, showed that Congress could rationally conclude that the regulation of intrastate machinegun transfers and possession is "necessary to address the serious problems associated with interstate trafficking" in those firearms (*e.g.*, violent crime) and thus is squarely within Congress's power under the Commerce Clause. *Id.* at 30–31. Other courts have reached similar conclusions regarding federal firearms laws, including the NFA. *See, e.g., United States v. Kenney*, 91 F.3d 884, 890–91 (7th Cir. 1996) ("Permitting unregulated intrastate possessions and transfers of machine guns ... indirectly undermines, via a market theory, the effectiveness of the federal attempt to regulate interstate commerce in machine guns."); *United States v. Rybar*, 103 F.3d 273, 283 (3d Cir. 1996) (sustaining firearms law "because it targets the possession of machine guns as a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns"); *Stewart*, 451 F.3d at 1074–78 ("[L]ike the marijuana possession ban in the CSA, ... Congress could have rationally concluded that homemade machineguns would affect the national market."); *United States v. Luna*, 165 F.3d 316, 321–22 (5th Cir. 1999); *United States v. Rose*, 522 F.3d 710, 717–719 (6th Cir. 2008); *United States v. Rene E.*, 583 F.3d 8, 16–18 (1st Cir. 2009); *Hollis v. Lynch*, 121 F. Supp. 3d 617, 639–41 (N.D. Tex. 2015); *Mont. Shooting Sports Ass'n v. Holder*, 2010 WL 3926029, at *14–22 (D. Mont. Aug. 31, 2010), *aff'd* 727 F.3d 975 (9th Cir. 2013); *see also United States v. Kirk*, 105 F.3d 997, 998 (5th Cir. 1997) (Parker, J.); *id.* at 998–1005 (Higginbotham, J.).

The NFA thus bears no resemblance to the laws that the Supreme Court has held exceed Congress's authority under the Commerce Clause—namely, those in *Lopez* and *Morrison*. *Contra* Mot.

at 29. Unlike the NFA, the laws in *Lopez* and *Morrison* had no connection to commerce. In *Lopez*, the Supreme Court observed that the challenged law "ha[d] nothing to do with 'commerce' or any sort of economic enterprise." 514 U.S. at 561. And in *Morrison*, the Court reasoned that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." 529 U.S. at 613. While the Court would have needed "to pile inference upon inference" to connect those laws with commerce, *Lopez*, 514 U.S. at 57, no such series of inferences is necessary with the NFA, which directly regulates the manufacturing, distribution, sale, and purchase of a commodity. *See supra* 12–14. Moreover, unlike this case, neither *Lopez* nor *Morrison* "involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation; *Lopez* expressly disclaimed that it was such a case, and *Morrison* did not even discuss the possibility that it was." *Raich*, 545 U.S. at 39 (Scalia, J., concurring in the judgment) (citation omitted); *see also Lopez*, 514 U.S. at 561 ("Section 922(q) is not an essential part of a larger regulation of economic activity …."). Given that the NFA regulates activities that are "quintessentially economic" (*i.e.*, "production, distribution, and consumption of commodities"), *see Raich*, 545 U.S. at 25–26, this case "presents a very different situation than cases," like *Lopez* and *Morrison*, that "challenge non-economic and non-commercial regulatory acts," *Groome Res.*, 234 F.3d at 211.

Nor is this case like *NFIB*, *contra* Mot. at 33–34, where the Court considered the constitutionality of the Affordable Care Act's ("ACA") individual mandate, which required "that individuals purchase health care." *NFIB*, 567 U.S. at 548. In declining to uphold that statutory provision under the Commerce Clause, the Court emphasized that the individual mandate "primarily affects healthy, often young adults who are less likely to need significant health care," and thus targets "a class whose commercial inactivity rather than activity is its defining feature." *Id.* at 556 (lead opinion); *see also id.* at 652–53 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("If Congress can reach out and command even those furthest removed from an interstate market to participate in the

19

market, then the Commerce Clause becomes a font of unlimited power ….”). The Court’s primary concern with that scheme was that Congress was seeking to compel economic activity by regulating inactivity. *Id.* at 552 (lead opinion). That concern is absent here. The NFA’s possession requirements apply, in most cases, to individuals that have purchased an NFA firearm from a firearm dealer. *See supra* 12; *see also, e.g.*, Wetz Decl. ¶¶ 20, 22–28 (listing numerous NFA firearms he intends to purchase from firearm dealers). The NFA’s possession requirements thus do not target a class of individuals whose “defining feature” is their “commercial inactivity,” *see NFIB*, 567 U.S. at 556, nor does it compel any sort of commercial activity, *see id.* at 552. It merely imposes modest requirements, in most cases, on those individuals that have voluntarily engaged in commercial activity to purchase a commodity that has flowed through interstate commerce. And the NFA enforces those requirements through criminal prohibitions that expressly regulate economic activity. *See, e.g.*, 26 U.S.C. § 5861(b)–(d), (h), (i) (making it unlawful to “*receive or possess*” a firearm made, transferred, or otherwise in violation of the NFA’s requirements); *id.* § 5861(e)–(f) (making it unlawful to “*make*” or “*transfer*” a firearm in violation of the NFA’s requirements). Those requirements and prohibitions fall within the heartland of existing Commerce Clause precedent. *See supra* 12–14.

Plaintiffs’ remaining arguments are unpersuasive.

*First*, *Sonzinsky* does not stand for the proposition that the NFA is *solely* an exercise of Congress’s taxing power, as plaintiffs assert repeatedly throughout their brief. *See* Mot. at 1, 2, 14, 16, 17, 19, 20, 23, 31, 32. In fact, the Fifth Circuit has already rejected that view of *Sonzinsky*, holding that, “although the NFA was originally upheld under Congress’s taxing power, no one could seriously contend” that the Act “could not also be upheld under Congress’s power to regulate interstate commerce.” *Ardoin*, 19 F.3d at 180. And other courts have agreed. *See, e.g.*, *Jones*, 976 F.2d at 184; *supra* 14 (citing cases). Those cases reflect the well-established principle that Congress may legislate under “more than one enumerated power,” as it did with the NFA. *United States v. Park*, 938 F.3d 354, 363

20

(D.C. Cir. 2019); *accord Morrison*, 529 U.S. at 607 ("Every law enacted by Congress must be based on one *or more* of its powers enumerated in the Constitution." (emphasis added)); *Legal Tender Cases*, 79 U.S. (12 Wall) 457, 534 (1870) (Congress is permitted to "group together any number of [constitutional powers] and infer from them all that the power claimed has been conferred"). And it often does. *See, e.g., McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819) (several of Congress's powers supported creation of a national bank); *United States v. Lara*, 541 U.S. 193, 20001 (2004) (Congress's power to legislate with respect to Indian tribes derives from both the Indian Commerce Clause and the power to implement treaties); *United States v. Comstock*, 560 U.S. 126, 136 (2010) (several of Congress's powers support the enactment of federal criminal laws). Therefore, the fact that courts have upheld an Act of Congress under one enumerated power does not preclude a court from later upholding the statute under another power. Indeed, that's exactly what the Supreme Court did with the Harrison Anti-Narcotics Control Act of 1914—which Congress used as a template for designing the NFA, *see* H.R. Rep. No. 73-1780, App.0174; S. Rep. No. 73-1444, App.0179 ("[T]his bill follows the plan of the Harrison Anti-Narcotic Act and adopts the constitutional principle supporting that act…."); *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess. at 6 (1934), App.0011 ("[W]e have followed the Harrison Anti-Narcotic-Act in language so as to get the benefit of any possible interpretation that the courts may have made of that act.")—initially upholding the statute under Congress's taxing power, *United States v. Doremus*, 249 U.S. 86 (1919); *Nigro v. United States*, 276 U.S. 332 (1928), and later upholding it as a valid exercise of Congress's authority under the Commerce Clause, *Minor v. United States*, 396 U.S. 87, 98 n.13 (1969); *see also United States v. Aiken*, 974 F.2d 446 (4th Cir. 1992) (explaining that *Minor* upheld the Harrison Anti-Narcotics Control Act under the Commerce Clause).

Nor did Congress need to expressly state in the NFA that it was exercising its authority under the Commerce Clause for the Court to uphold it on those grounds. Indeed, the courts that have upheld

the NFA under the Commerce Clause have not required such an expression. *See, e.g.*, *Ardoin*, 19 F.3d at 180; *supra* 14 (citing cases). That's because the constitutionality of an Act of Congress "does not depend on recitals of the power which it undertakes to exercise." *NFIB*, 567 U.S. at 570 (quoting *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144 (1948)); *accord Park*, 938 F.3d at 363 ("A court must be able to discern a basis for Congress's exercise of an enumerated power, but that does not mean that a law must be struck down because Congress … failed to identify the source of its power." (quoting *NFIB*, 567 U.S. at 569–70)); *United States v. Clay*, 128 F.4th 163, 183 (3d Cir. 2025). So long as Congress "had the power" to act, "[t]hat is sufficient to sustain" the action. *NFIB*, 567 U.S. at 570.

    *Second*, plaintiffs' argument that the NFA's "purpose" is not to regulate interstate commerce, *see* Mot. at 22–24, cannot be squared with the Act's text and operation. "The best guide to what Congress intends in a statute is … the statute's text." *Barr v. SEC*, 114 F.4th 441, 452 (5th Cir. 2024). Here, as explained, *see supra* 12, the statutory text plainly indicates that Congress sought to regulate commercial actors and commodities that are often part of interstate commerce. *See, e.g.*, 26 U.S.C. §§ 5802, 5843 (requiring "each importer, manufacturer, and dealer in firearms" to register with the Attorney General and keep records of "the importation, manufacture, making, receipt, and sale, or other disposition, of firearms"); *id.* §§ 5812, 5845(j) (requiring the Attorney General's approval to "transfer" a firearm, which includes "selling" and "leasing"). The legislative history supports this understanding. *See, e.g.*, H.R. Rep. No. 73-1780, App.0174; S. Rep. No. 73-1444, App.0179 ("[T]his bill … provid[es] for the taxation of firearms and … also employs the interstate and foreign commerce power to regulate interstate shipment of firearms and to prohibit and regulate the shipment of firearms into the United States."); *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess. at 6, 19, 23 (1934), App.0011, App.0024, App.0028 ("Now we proceed in this bill generally under two powers—one, the taxing power, and the other, the power to regulate interstate commerce."). And nothing in *United States v. Bird*, 124 F.3d 667 (5th Cir. 1997), or *Sonzinsky*

22

compels a contrary conclusion. *Contra* Mot. at 22–23. In the footnote that plaintiffs cite from *Bird*, the Fifth Circuit merely explained that Congress has no authority under the Commerce Clause to regulate intrastate commerce "for its own sake[] and not as a means of regulating or affecting interstate commerce." *Bird,* 124 F.3d at 682 n.15. But that is not what the NFA does, *see supra* 12, 16–17, and neither side is arguing that Congress has such power. Plaintiffs' reliance on *Sonzinsky* is equally misplaced, as the language they cite simply establishes that Congress's motives in enacting a taxing scheme are irrelevant to whether that scheme is within Congress' taxing power. *See* 300 U.S. at 513–14 ("We are not free to speculate as to the motives which moved Congress to impose [the NFA's special occupational tax."); *see also Ross*, 458 F.2d at 1145 (citing *Sonzinsky* for the proposition that "[t]he motives that move Congress to impose a tax are no concern of the courts").

> *Third*, the weight of the Supreme Court's Commerce Clause jurisprudence does not support plaintiffs' argument that Congress can reach intrastate activities only pursuant to a regulatory scheme that is sufficiently "comprehensive." Relying on *Hobby Distillers Association v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509 (N.D. Tex. 2024), plaintiffs derive this supposed requirement from language in *Raich*, where the Supreme Court described the CSA as a "comprehensive statutory scheme." *Id.* at 509, 532–33 (citing *Raich*, 545 U.S. at 3). But the Court's use of the term "comprehensive" to describe the CSA served only to distinguish that statute from the "brief, single-subject" regulation of intrastate, noncommercial activity that the Court struck down in *Lopez. See Raich*, 545 U.S. at 23–24. Nowhere did the Court suggest that it was imposing a "comprehensiveness" requirement on Congress, as plaintiffs contend; indeed, it used different language elsewhere to make the same point. *See, e.g., id.* at 24–25 (the CSA's regulation of marijuana was "merely one of many 'essential parts of a *larger* regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated'" (emphasis added) (quoting *Lopez*, 514 U.S. at 561)); *id.* at 17 ("When a *general* regulatory statute bears a substantial relation to commerce, the *de*

23

*minimis* character of individual instances arising under that statute is of no consequence." (emphasis added) (quoting *Lopez* 514 U.S. at 558)); *see also id.* at 37 (Scalia, J., concurring in the judgment) ("Congress may regulate even noneconomic local activity if that regulation is a necessary part of a *more general* regulation of interstate commerce." (emphasis added)). There is thus no suggestion in *Raich* or *Lopez* that courts should be engaging in a standardless assessment of whether an Act of Congress is "comprehensive" enough to justify reaching intrastate activity under the Commerce Clause, as plaintiffs encourage this Court to do. Indeed, if the contrary were true, one would expect courts to have developed standards for assessing the comprehensiveness of a federal statute in the last 20 years since *Raich*. But plaintiffs cite no such caselaw, save a single, unpersuasive district court decision.[5] In any event, as explained, *supra* 16–17, the NFA is a comprehensive scheme for regulating the uniquely dangerous weapons that it covers, and Congress had a rational basis to think that exempting intrastate activities from the NFA's regulations would severely disrupt the effectiveness of that overall scheme.

*And finally*, plaintiffs' suggestion that this case is anything like *Lopez* or *Morrison* can be easily dismissed, for reasons already explained. *See supra* 18–19. But moreover, plaintiffs' description of the legal analysis in those cases is flawed. Contrary to what plaintiffs argue, neither *Lopez* nor *Morrison* set out a five-factor "test" that "govern[s]" whether a federal statute regulates intrastate activities substantially affecting interstate commerce. *Contra* Mot. at 26–27. Indeed, the Supreme Court applied no such test in *Raich* or other recent cases on that score. *See, e.g., Taylor v. United States*, 579 U.S. 301 (2016). Instead, rather than set out a "test," the Supreme Court concluded that the laws at issue in *Lopez* and *Morrison* were beyond Congress's authority based merely on certain "considerations" applicable to those laws. *Morrison*, 529 U.S. at 609.

---

[5] Moreover, such a rule would perversely disincentivize Congress from enacting measured regulations under the Commerce Clause, and would instead incentivize it to regulate as broadly as possible so as not to be susceptible to constitutional attack.

Making matters worse, plaintiffs' inaccurately describe those considerations. Take the first one, which plaintiffs claim is whether the challenged law is "economic" or "is instead a criminal statute." *See* Mot. at 27 (cleaned up). But that's not what either *Lopez* or *Morrison* say. Instead, both cases considered whether the regulated intrastate activity had anything "to do with commerce or any sort of economic enterprise." *Morrison*, 529 U.S. at 610 (citation omitted); *see also United States v. Ho*, 311 F.3d 589, 599 (5th Cir. 2002) ("The first consideration is the economic or commercial nature of the regulated intrastate activity."). As *Raich* makes clear, if a challenged law regulates economic activity, it's irrelevant whether it is a criminal law. *See* 545 U.S. at 26 ("Because the CSA"—a *criminal* statute— "is a statute that directly regulates economic, commercial activity, … *Morrison* casts no doubt on its constitutionality."); *see also Taylor*, 579 U.S. at 306–310 (upholding the Hobbs Act, a *criminal* statute, against a Commerce Clause challenge).

Plaintiffs also suggest that the lack of a "jurisdictional element" limiting the reach of a federal statute indicates that it is not an exercise of Commerce Clause authority. *See* Mot. at 30–31. But that's not what *Lopez* or *Morrison* say; rather, as *Morrison* explains, "a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce," 529 U.S. at 611–12, but the absence of one does not indicate the opposite. *See, e.g., Raich*, 545 U.S. at 23–29 (upholding under the Commerce Clause a statute with no jurisdictional element); *Ho*, 311 F.3d at 600 (same).

Similarly, plaintiffs suggest that, under *Lopez* and *Morrison*, the lack of findings in the NFA regarding the effects of intrastate activities on interstate commerce "cuts sharply against" the Act's constitutionality. *See* Mot. at 31. But Congress need not "make particularized findings in order to legislate" pursuant to the Commerce Clause, and the absence of such findings do not undermine the constitutionality of a federal statute. *Raich*, 545 U.S. at 20–21; *accord Morrison*, 529 U.S. at 612; *Ho*, 311 F.3d at 600; *Park*, 938 F.3d at 363.

*    *    *

In sum, the challenged NFA's requirements are a valid exercise of Congress's power under the Commerce Clause, even insofar as they regulate intrastate activity.

> ### c.  Congress's authority under the Necessary and Proper Clause further supports the challenged NFA requirements.

Buttressing Congress's power to tax and regulate interstate commerce, the Necessary and Proper Clause authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" the federal government's powers. U.S. Const. Art. I, § 8, Cl. 18. That constitutional provision "grants Congress broad authority to enact federal legislation." *Comstock*, 560 U.S. at 133. While the federal government is one of enumerated powers, "'a government, entrusted with such' powers 'must also be entrusted with ample means for their execution.'" *Id.* (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 408). "Accordingly, the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *Id.* at 133–34 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 413, 418). It is therefore sufficient if "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

The challenged NFA requirements help effectuate multiple enumerated powers. These requirements assist in collecting and enforcing the NFA's special occupational tax, *supra* 7–11, thus effectuating Congress's power to "lay and collect Taxes," U.S. Const. Art. I, § 8, Cl. 1. They also help counter the proliferation of unregistered NFA firearms and illicit traffic in those firearms, *supra* 2–4, 12, 16–17, thus effectuating Congress's power to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. Art. I, § 8, Cl. 3. And for reasons already explained, *supra* 7–11, 12, 16–17, these requirements are both necessary for implementing these enumerated powers and fall within the bounds of what is constitutionally proper. *Sonzinsky*, 300 U.S. at 513; *Raich*, 545 U.S. at 19–29; *id.* at 33–42 (Scalia, J., concurring in the judgment) (regulation of intrastate activities was necessary

26

and proper to effectuate Congress's regulation of interstate commerce.)

## II.    The challenged NFA requirements comport with the Second Amendment.

Plaintiffs also claim that the NFA's requirements on the making, transfer, and possession of short-barreled shotguns and rifles, suppressors, and AOWs violate the Second Amendment on their face. *See* Mot. at 36. That facial challenge fails for at least four reasons.

*First*, the Supreme Court's decisions in *United States v. Miller*, 307 U.S. 174 (1939), and *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008), foreclose plaintiffs' Second Amendment claim insofar as it pertains to short-barreled shotguns and rifles. In *Miller*—which plaintiffs fail to cite—the Supreme Court upheld the NFA's regulation of short-barreled shotguns, holding that the Second Amendment does not guarantee the right to possess such weapons. 307 U.S. at 178. The Supreme Court did not disturb *Miller*'s holding in *Heller*, explaining that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," and that this limitation is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 625, 627; *see also Johnson* v. *United States*, 576 U.S. 591, 640 (2015) (Alito, J., dissenting) (short-barreled shotguns "are not typically possessed for lawful purposes"). That principle applies equally to short-barreled rifles, which plaintiffs do not contend are materially distinguishable from the short-barreled shotguns addressed in *Miller* and *Heller*, nor have courts found any such distinction. *See United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025) (finding no constitutional distinction between the two classes of firearms); *accord, e.g.*, *United States v. Robinson*, 2025 WL 870981, at *5 (11th Cir. Mar. 20, 2025); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018); *United States v. Cox*, 906 F.3d 1170, 1185–86 (10th Cir. 2018); *Second Amend. Found., Inc v. ATF*, 702 F. Supp. 3d 513, 536–37 (N.D. Tex. 2023); *United States v. Miller*, 2023 WL 6300581, at *1–3 (N.D. Tex. Sept. 27, 2023).

*Second*, if the Second Amendment does not protect the right to possess short-barreled shotguns

and rifles because those weapons are "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, then the same conclusion applies *a fortiori* to at least some AOWs. As explained, *supra* 4, AOWs are a class of concealable firearms that include weapons "from which a shot can be discharged through the energy of an explosive," "a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell," or "weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading." 26 U.S.C. § 5845(a)(5), (e). That definition captures, among other things,[6] weapons that are similar to short-barreled shotguns and possess the same characteristics that make short-barreled shotguns uniquely susceptible to criminal misuse. *See, e.g.*, ATF, *Firearms—Guides—Importation & Verification of Firearms—National Firearms Act Definitions—Any Other Weapon*, https://perma.cc/68BY-2HK2 (providing two examples of concealable, short-barreled AOWs that fire shotgun shells); *United States v. Fisher*, 353 F.2d 396, 398 (5th Cir. 1965) (holding that a short-barreled "gun with the handle of a pistol," "a smooth bore designed for firing a .410 gauge shotgun shell," "a shotgun sigh[t]," and a stamp "by the manufacturer" that read "For .410 gauge only" was an AOW). Given these similarities, it would be unsound to draw a constitutional distinction between short-barreled, smooth-bored AOWs that fire shotguns shells and the short-barreled shotguns addressed in *Miller*. That example alone is fatal to plaintiffs' facial challenge, which, to succeed, requires a showing that the challenged NFA's requirements for AOWs violate the Second Amendment in *all* applications. *Rahimi*, 602 U.S. at 693. Given *Miller* and *Heller*, they plainly do not.

---

[6] AOWs also capture extremely strange weapons, like cane, wallet, pen, and knife guns, *see* ATF, *Firearms – Guides – Importation & Verification of Firearms – National Firearms Act Definitions – Any Other Weapon*, https://perma.cc/68BY-2HK2, and even a homemade slam-fire gun that looks more like a curtain rod than a firearm, *see United States v. Sredl*, No. 3:22-cr-71 (N.D. Ill.), ECF No. 37 (providing a photograph); *United States v. Sredl*, 2023 WL 3597715, at *1–3 (N.D. Ill. May 23, 2023). These weapons are hardly the stuff of law-abiding citizens intending to engage in lawful activities.

*Third*, even aside from *Miller* and *Heller*, the Fifth Circuit's decision in *United States v. Peterson*, 150 F.4th 644 (5th Cir. 2025), forecloses plaintiffs' Second Amendment claim, at least insofar as it pertains to suppressors. There, the Fifth Circuit held that, even assuming suppressors enjoy Second Amendment protections, the NFA's regulation of suppressors is "presumptively lawful," like the shall-issue licensing schemes that the Supreme Court addressed in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *Peterson*, 150 F.4th at 652–53 (quoting *McRorey v. Garland*, 99 F.4th 831, 838–39 (5th Cir. 2024)). Given this presumption, the court explained that the NFA's requirements will be subject to the second step of *Bruen*'s analysis—*i.e.*, whether the law comports with the Nation's historical tradition of firearms regulation—only if a challenger can show that the requirements have "been 'put toward abusive ends' through 'exorbitant fees' or 'lengthy wait times'" for application approval. *Id.* at 653 & n.5 (quoting *Bruen*, 597 U.S. at 38 n.9).

Plaintiffs spend pages upon pages explaining why they believe *Peterson* was wrongly decided and suggesting that this Court brush it aside. *See* Mot. at 37, 42–46.[7] Whatever the merits of those criticisms, this Court is bound by *Peterson* unless and until an en banc panel of the Fifth Circuit or the Supreme Court overturns it. *See Am. Council of Life Ins. v. U.S. Dep't of Labor*, 2024 WL 3572297, at \*5 (N.D. Tex. July 26, 2024) ("[S]uch arguments are appropriately raised to the en banc Fifth Circuit or the Supreme Court—not in a district court bound by Fifth Circuit precedent."). And applying *Peterson*, plaintiffs have not shown that the challenged NFA requirements have "been put towards abusive ends." *See Peterson*, 150 F.4th at 653 (cleaned up). Though they cite ATF's average approval times for NFA making and transfer applications, *see* Mot. at 44; *see also* ATF, *Current Processing Times*,

---

[7] Plaintiffs also suggest that the Fifth Circuit in *Peterson* treated the NFA like a shall-issue licensing scheme only because of a concession at oral argument. *See* Mot. at 42. But that's not what *Peterson* says. Though the opinion notes that the defendant's counsel conceded the point, it explains at length how the NFA's requirements share "precisely" the same relevant attributes as the shall-issue licensing schemes discussed in *Bruen*. *Peterson*, 150 F.4th at 652.

https://perma.cc/UGD9-ZZ2U, these average times are not "abusive." *See Peterson*, 150 F.4th at 653. Indeed, plaintiffs concede that ATF approves most applications within days, on average. *See* Mot. at 44. And while plaintiffs point to the slightly longer average approval times for "Form 4 Trust" transfer applications, those applications implicate additional considerations that necessarily prolong the review period, including requiring ATF to review the relevant trust instrument, identify and conduct background checks of all responsible individuals, and resolve any legal concerns regarding the trust instrument or transfers as part of the estate. At any rate, these average approval times are beside the point in analyzing plaintiffs' *facial* challenge to the NFA's requirements, as averages cannot demonstrate that those requirements result in abusively lengthy approval times in all instances. *See Rahimi*, 602 U.S. at 701.[8]

*Finally*, setting these threshold issues aside, the NFA's regulation of short-barreled shotguns and rifles, suppressors, and AOWs is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As the Supreme Court has consistently observed, American legislatures have long "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47 (citation omitted); *Rahimi*, 602 U.S. at 691; *Heller*, 554 U.S. at 627. Laws dating back to the Founding Era targeted, through outright bans or lesser regulation, particularly dangerous weapons that were uniquely susceptible to criminal misuse. *See* David B. Kopel, Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 293–328 (2024). Similarly, many states have long regulated the size of firearms. *See id.* at 288–289, 324 (collecting examples of states banning or taxing pocket pistols).[9] The NFA fits within that historical tradition by targeting particularly dangerous

---

[8] Plaintiffs also complain about "historical" average approval times for NFA applications. *See* Mot. at 44. But whatever may have happened in the past cannot support the issuance of the *prospective* relief that plaintiffs seek. *See Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024).

[9] *See also, e.g., State v. Kerner*, 107 S.E. 222, 225 (N.C. 1921) (describing such "reasonable regulation[s]" that applied to "pistols of small size which are not borne as arms but which are easily

weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, though its requirements are much more modest than the categorical bans of the past. *See Rush*, 130 F.4th at 643 ("These historic laws" regulating dangerous and unusual weapons "mirror the NFA in their purpose."); *see also Thompson/Ctr. Arms*, 504 U.S. at 517 ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes."); *Mock*, 75 F.4th at 570 (the NFA's regulation of short-barreled shotguns targets weapons "valued for their ability to be easily concealed and to unleash devastating damage at short range"); *Jennings*, 195 F.3d at 799 n.4 (the NFA regulates weapons that are "primarily weapons of war"); *Johnson*, 576 U.S. at 640, 642 (Alito, J., dissenting) (short-barreled shotguns are "notoriously dangerous" and are "uniquely attractive to violent criminals" because they "combine the deadly characteristics of conventional shotguns with the more convenient handling of handguns"). That alone demonstrates that the NFA comports with the Second Amendment.

Courts have routinely rejected Second Amendment challenges to the NFA's requirements given their comparability to traditional firearms regulations.[10] *See, e.g.*, *United States v. Conner*, 2025 WL 858030, at *5 (W.D. Tex. Sep. 19, 2025) (short-barreled rifles); *United States v. Lightner*, 2024 WL 2882237, at *3 (M.D. Fla. June 7, 2024) (suppressors); *United States v. Holder*, 2024 WL 1599916, at *7 n.7 (N.D. Ga. Jan. 19, 2024) (short-barreled rifles); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211–13 (S.D. Cal. 2023) (suppressors); *United States v. Villalobos*, 2023 WL 3044770, at *13 (D. Idaho Apr. 21, 2023) (suppressors); *United States v. Beaty*, 2023 WL 9853255, at *8

---

and ordinarily carried concealed"); *Andrews* v. *State*, 50 Tenn. (3 Hesik.) 165, 186–187 (1871); *Fife* v. *State*, 31 Ark. 455, 461 (1876); *Wilson* v. *State*, 33 Ark. 557, 559 (1878).

[10] But most courts reject Second Amendment challenges to the NFA on threshold grounds, like those asserted above, *see supra* 27–30, and thus never conduct a historical analysis. *See, e.g.*, *Peterson*, 150 F.4th at 652–53; *Robinson*, 2025 WL 870981, at *5; *Second Amend. Found.*, 702 F. Supp. 3d at 536–37; *Miller*, 2023 WL 6300581, at *1–3; *United States v. Burns*, 2025 WL 2076468, at *5–6 (S.D. Miss. July 23, 2025); *United States v. Shepherd*, 2024 Wl 71724, at **4–6 (S.D. Miss. Jan. 5, 2024); *United States v. Morgan*, 2024 WL 150340, at *5–6 (W.D. La. Jan. 12, 2024), *aff'd* 147 F.4th 522 (5th Cir. 2025).

n.11 (M.D. Fla. Jan. 20, 2023) (suppressors); *see also Rush*, 130 F.4th at 641–45 (finding that the NFA's regulation of short-barreled rifles is "likely" consistent with the Nation's traditional of firearms regulation after an extensive historical analysis, but resolving the case on threshold grounds). Plaintiffs cite no case in which a court has reached a contrary conclusion, and this Court should not be the first.

## III.    Any relief should be no more burdensome than necessary to redress plaintiffs' actual injuries.

Even if plaintiffs succeed on their claims, the sweeping relief they request is unjustified and contrary to the constitutional and equitable constraints on this Court's remedial authority.

<u>*Universal injunction.*</u> To state the obvious, plaintiffs' request for a universal injunction should be dead on arrival in light of *Trump v. CASA*, 606 U.S. 831 (2025), where the Supreme Court held that federal courts lack authority to issue such relief. *Id.* at 841, 856. Plaintiffs nonetheless suggest that *CASA* left open the possibility that a universal injunction may be justified where it is necessary to provide a plaintiff with complete relief, as they contend is the case here. *See* Mot. at 48. But what the Supreme Court left open in *CASA* was the possibility that a lower court, on remand in *that* case, might find that a universal injunction was necessary to provide the state plaintiffs with complete relief, given the unique harms they alleged. *See* 606 U.S. at 853–54. That narrow, case-specific observation has no applicability here, and it would be the thinnest of reeds upon which to rely in ignoring the Supreme Court's determination that "federal courts lack authority to issue [universal injunctions]." *Id.* at 856.

But even if the Supreme Court *had* left open the possibility that a universal injunction may be justified in a case like this, plaintiffs have not shown that one would be necessary to provide them with complete relief. *See id.*; *see also See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023) ("[At the merits stage], the plaintiffs will have to *prove* that whatever [relief] they request is broad enough to protect against their proven injuries and no broader."), *judgment vacated on other grounds*, 144 S. Ct. 480 (2023). Where (as here) party-specific remedies can provide plaintiffs with complete relief, any broader relief would contradict constitutional and equitable limitations on this Court's remedial

32

authority. *See CASA*, 606 U.S. 853–54 ("Complete relief … is the maximum a court can provide.").[11]
Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people
appearing before it," any "remedy must be tailored to redress" plaintiffs' "particular injury." *Gill v.
Whitford*, 585 U.S. 48, 72–73 (2018). Traditional principles of equity reinforce that constitutional
limitation, *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999),
instructing that a remedy "be no more burdensome" to defendants "than necessary to provide
complete relief" to plaintiffs, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation
omitted); *accord CASA*, 606 U.S. at 852.

Plaintiffs principally contend that anything less than a universal injunction would be
"unworkable," because the organizational plaintiffs have large memberships, the commercial plaintiffs
have many potential customers, and the states comprise numerous officers. *See* Mot. at 48–49. But by
that logic, virtually all sizeable organizations and businesses would be entitled as a matter of course to
a universal injunction of any law that they successfully challenge. That cannot be squared with *CASA*,
which involved several large membership organizations as plaintiffs. *See* 606 U.S. at 852–53 (rejecting
associational plaintiffs' argument that a universal injunction was necessary to provide complete relief);
*see also CASA, Inc. v. Trump*, 763 F. Supp. 3d 723, 729 (D. Md. 2025) (two organizational plaintiffs, one
with 680,000 members and the other with 175,000 members). Nor have other courts found it
"unworkable" in similar contexts to limit injunctive relief to the members of large organizations (one
of whom is a plaintiff here) or the customers of large businesses. *See, e.g., Mock v. Garland*, 697 F. Supp.

---

[11] Contrary to what plaintiffs seems to suggest, the Court made clear that "[c]omplete relief is
*not* a guarantee." *CASA*, 606 U.S. 853–54 (emphasis added); *id.* at 863 (Thomas, J., concurring, joined
by Gorsuch, J.) ("Courts therefore err insofar as they treat complete relief as a mandate." (citing *Mock
v. Garland*, 75 F.4th 563 (5th Cir. 2023), as an example)). And just because "a court *can* award complete
relief is not to say that it *should*." *Id.*; *accord id.* at 863–64 (Thomas, J., concurring, joined by Gorsuch,
J.) (sometimes "a court *cannot* award complete relief," and sometimes "traditional equitable limits will
require courts and plaintiffs to make do with less than complete relief").

3d 564, 592–93 (N.D. Tex. 2023); *Texas v. ATF*, 700 F. Supp. 3d 556, 573 (S.D. Tex. 2023). Plaintiffs also claim that, absent a universal injunction, the commercial plaintiffs may lose customers who do not want to register their own firearms or business partners who do not want to deal in unregistered NFA firearms. *See* Mot. at 49. But putting aside that this argument rests entirely on speculation about how third parties will behave in the marketplace, the mere fact that three plaintiffs may suffer harm to their businesses cannot possibly justify banning the NFA's enforcement against anyone anywhere, particularly where most individuals and businesses that would be protected under that injunction will never interact with the commercial plaintiffs.

A universal injunction would not only be unnecessary, but would also trench on the review of similar challenges to the NFA that are pending in other courts. *See Brown v. ATF*, No. 4:25-cv-1162 (E.D. Mo.); *Jensen v. ATF*, No. 2:25-cv-223 (N.D. Tex.). Granting such a remedy in this case would thus not only contravene traditional limitations on this Court's remedial authority, but would also undermine basic principles of comity by providing other plaintiffs not before this Court with the very relief they are seeking from sister courts, regardless of whether those courts—including another within this District—believe those plaintiffs are entitled to any relief. *See, e.g., Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) ("[Where] [o]ther courts are considering [the] same issues" at the same time, "[p]rinciples of judicial restraint control" and counsel against universal remedies.); *United States v. Texas*, 599 U.S. 670, 702–03 (2023) (Gorsuch, J., concurring in the judgment) (recounting the well-known systemic issues created by universal remedies that courts should, at the very least, "carefully consider … before granting such sweeping relief," including that they "stymie the orderly [judicial] review of important questions" (cleaned up)); *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) ("[Universal remedies] short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top."); *accord Georgia v. President of the U.S.*, 46 F.4th 1283, 1305 (11th Cir. 2022).

In sum, plaintiffs have offered no persuasive reason why this Court should universally enjoin enforcement of the challenged NFA requirements. The Court should therefore, at a minimum, decline to enter a universal injunction.

*Narrower injunction.* Plaintiffs alternatively propose a narrower injunction that would cover (i) themselves; (ii) the commercial plaintiffs' customers; (iii) members and supporters of the associational plaintiffs; (iv) customers of the commercial members of the associational plaintiffs; and (v) resident family members living in the same household of anyone covered by the injunction. *See* Mot. at 50. But again, they have not justified such unnecessarily broad relief.

*First*, plaintiffs' proposed injunction would apply to fourteen states—Alaska, Georgia, Idaho, Indiana, Kansas, Louisiana, Montana, North Dakota, Oklahoma, South Carolina, South Dakota, Utah, West Virgina, and Wyoming—that submitted *no* evidence in support of their motion. These states have thus left the record empty of any evidence whatsoever upon which the Court could find that they are entitled to injunctive relief. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 421 (5th Cir. 2025) (narrowing injunction to apply only to the state plaintiff that demonstrated an actual injury).

*And second*, plaintiffs cite no case—and defendants are aware of none—permitting an organization to seek and obtain relief on behalf of non-member "supporters" or its members' customers. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977) ("Even in the absence of injury to itself, an association may," under certain circumstances, "have standing solely as the representative of its *members*." (emphasis added)). Similarly, plaintiffs never explain why plaintiffs' nonparty "resident family members" are entitled to injunctive relief, much less how, *e.g.*, the resident family members *of* a customer *of* a commercial member *of* an associational plaintiff fall within the scope of this Court's remedial authority.

## CONCLUSION

The Court should grant summary judgment in defendants' favor on all of plaintiffs' claims.

Dated: November 20, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN
Mont. Bar No. 55816869
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Attorneys for Defendants*

36

**CERTIFICATE OF SERVICE**

On November 20, 2025, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Jody D. Lowenstein
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice