# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION**

| | |
|---|---|
| SILENCER SHOP FOUNDATION, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES, et al.<br><br>*Defendants*. | Case No. 6:25-cv-00056-H |

**<u>BRIEF OF CITY OF BALTIMORE, MARYLAND; CITY OF COLUMBUS, OHIO; AND
HARRIS COUNTY, TEXAS, AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ i

INTRODUCTION .................................................................................... 1

ARGUMENT ........................................................................................... 1

    I.    The National Firearms Act Protects Municipalities'
        Interests by Making Cities Safer .................................................. 1

    II.    The Challenged Provisions Are a Lawful Exercise of
        Congress's Enumerated Powers ................................................... 5

        A.    The National Firearms Act Is A Valid Exercise of
                Congress's Taxing Power ................................................ 6

        B.    The NFA Is a Valid Exercise of Congress's
                Commerce Clause Power ................................................ 11

        C.    The 2025 Amendments to the National Firearms
                Act Are Severable ........................................................... 14

    III.    The Challenged Provisions Are Consistent with the Second
        Amendment ................................................................................. 17

        A.    Recent Fifth Circuit Precedent Forecloses Plaintiffs'
                Challenge ........................................................................ 17

        B.    Short-Barreled Shotguns, Short-Barreled Rifles, and
                Silencers Are Not "Arms" Within the Meaning of
                the Second Amendment ................................................... 18

        C.    The Challenged Provisions Are Consistent with a
                Wide Range of Historical Regulations ........................... 22

CONCLUSION ........................................................................................ 25

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

**CASES**

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   591 U.S. 610 (2020) ............................................................................. 14, 15, 16

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023) ........................................................................ 20

*Bianchi v. Brown*,
   111 F.4th 438 (4th Cir. 2024) ........................................................................ 20

*California v. Texas*,
   593 U.S. 659 (2021) ........................................................................................ 8

*Demko v. United States*,
   216 F.3d 1049 (Fed. Cir. 2000) ...................................................................... 2

*Duncan v. Bonta*,
   695 F. Supp. 3d 1206 (S.D. Cal. 2023) ........................................................ 21

*Duncan v. Bonta*,
   133 F.4th, 852 (9th Cir. 2025) (en banc),
   *petition for cert. docketed*, No. 25-198 (Aug. 19, 2025). ........................ 20, 21

*Frost v. Corp. Comm'n of Okla.*,
   278 U.S. 515 (1929) ................................................................................. 15, 16

*GDF Realty Invs., Ltd. v. Norton*,
   326 F.3d 622 (5th Cir. 2003) ........................................................................ 13

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ............................................................................... 12, 13, 14

*District of Columbia v. Heller*,
   554 U.S. 581 ............................................................... 2, 18, 19, 20, 21

*Johnson v. United States*,
   576 U.S. 591 (2015) ...................................................................................... 19

*Marks v. United States*,
   430 U.S. 188 (1977) ...................................................................................... 15

i

*Med. Ctr. Pharmacy v. Mukasey*,
    536 F.3d 383 (5th Cir. 2008) ...................................................... 15

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ...................................................... 2, 25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)................................................................... 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).............................................................. *passim*

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020)........................................................... 15, 16

*Sonzinsky v. United States*,
    300 U.S. 506 (1937)....................................................... 6, 9, 10

*State v. Langford*,
    10 N.C. 381 (1824) .................................................................. 24

*Steel Co. v. Citizens for a Better Envt.*,
    523 U.S. 83 (1998)..................................................................... 8

*Taylor v. United States*,
    579 U.S. 301 (2016)................................................................. 13

*Teixeira v. Cnty. Alameda*,
    873 F.3d 670 (9th Cir. 2017) .................................................... 23

*Texas v. United States*,
    945 F.3d 391 ........................................................................ 8, 9

*Truax v. Corrigan*,
    257 U.S. 312 (1921)................................................................. 15

*United States v. Arce*,
    118 F.3d 335 (5th Cir. 1997) ................................................. 11, 12

*United States v. Ardoin*,
    19 F.3d 177 (5th Cir. 1994) ...................................... 7, 8, 9, 11, 12

*United States v. Berger*,
    715 F. Supp. 3d 676 (E.D. Pa. 2024) ......................................... 21

*United States v. Bird*,
124 F.3d 667 (5th Cir. 1997) ................................................................. 12

*United States v. Connelly*,
117 F.4th 269 (5th Cir. 2024) ....................................................... 22, 24

*United States v. Cox*,
906 F.3d 1170 (10th Cir. 2018) .................................................... 19, 21

*United States v. Dodge*,
61 F.3d 142 (2d Cir. 1995) ...................................................................... 7

*United States v. Fortes*,
141 F.3d 1 (1st Cir. 1998) .................................................................... 19

*United States v. Holton*,
639 F. Supp. 3d 704 (N.D. Tex. 2022) ................................................. 23

*United States v. Huffhines*,
967 F.2d 314 (9th Cir. 1992) ............................................................... 20

*United States v. Jackson*,
390 U.S. 570 (1968) .............................................................................. 16

*United States v. Jennings*,
195 F.3d 795 (5th Cir. 1999) ............................................................... 25

*United States v. Kenney*,
91 F.3d 884 (7th Cir. 1996) ................................................................. 12

*United States v. Knutson*,
113 F.3d 27 (5th Cir. 1997) ........................................................... 12, 14

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ................................................................... 19

*United States v. Miller*,
307 U.S. 174 (1939) .................................................................. 18, 19, 22

*United States v. Miller*,
2023 WL 6300481 (N.D. Tex. Sept. 27, 2023) .................................... 19

*United States v. Morrison*,
529 U.S. 598 (2000) .............................................................................. 13

*United States v. Peterson*,
    150 F.4th at 652 ................................................................................ 3, 17, 18, 21

*United States v. Rahimi*,
    602 U.S. 680 (2024) ........................................................................... 3, 22, 24

*United States v. Robinson*,
    2025 WL 870981 (11th Cir. 2025) ...................................................... 19

*United States v. Rush*,
    130 F.4th 633 (7th Cir. 2025) .......................................................... *passim*

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992) ........................................................................... 1, 19, 25

*United States v. Tribunella*,
    749 F.2d 104 (2d Cir. 1984) .............................................................. 2

**STATUTES**

26 U.S.C. § 4182 ........................................................................................... 9

26 U.S.C. § 5000A(c) ................................................................................... 10

26 U.S.C. § 5801 ........................................................................................... 6

26 U.S.C. § 5801(m) ..................................................................................... 6

26 U.S.C. § 5802 ........................................................................................... 13

26 U.S.C. § 5812 ........................................................................................... 2,3,13

26 U.S.C. § 5822 ........................................................................................... 2, 3, 13

26 U.S.C. § 5841(b) ...................................................................................... 13

26 U.S.C. § 5845 ........................................................................................... 2, 7

26 U.S.C. § 6012 ........................................................................................... 9

26 U.S.C. § 7801(a)(2) .................................................................................. 2

26 U.S.C. § 7852(a) ...................................................................................... 15

26 U.S.C. subtitle E, ch. 53, subchapter A note ........................................ 11

Coronavirus Aid, Relief, and Economic Security Act (CARES) Act, Pub. L. No. 116-136, § 4007, 134 Stat. 281 (2020) ...................................................................... 10

One Big Beautiful Bill Act, Pub. L. No. 119-21, § 70436, 139 Stat. 72 (2025) .................. 6, 7, 14

Gun Control Act, Pub. L. No. 90-618, tit. II, 82 Stat. 1213 (1968) ............................................. 11

## REGULATIONS

27 C.F.R. § 479.62 ........................................................................................................................ 2, 3

27 C.F.R. § 479.64 ............................................................................................................................ 2

27 C.F.R. § 479.65 ............................................................................................................................ 3

27 C.F.R. § 479.84 ............................................................................................................................ 2

27 C.F.R. § 479.86 ............................................................................................................................ 2

81 Fed. Reg. 2658, 2682 (Jan. 15, 2016) ......................................................................................... 4

90 Fed. Reg. 48,900, (Oct. 30, 2025) ............................................................................................... 3

90 Fed. Reg. 48,901 (Oct. 30, 2025) ................................................................................................ 3

90 Fed. Reg. 48,902 (Oct. 30, 2025) ................................................................................................ 3

## OTHER AUTHORITIES

4 William Blackstone, Commentaries on the Laws of England 148–49 ...................................... 24

An Act for Establishing and Regulating Courts of Public Justice Within this Province (1759), in Acts and Laws of His Majesty's Province of New Hampshire, in New England 1–2 (1761) ........................................................................................... 23

Black's Law Dictionary 263 (7th ed. 1999) ................................................................................... 13

H.R. Rep. No. 90-1956, at 34–35 ................................................................................................... 12

Hearings Before the H. Comm. on Ways and Means on H.R. 9066, 73d Cong., 2d Sess. 6 (1934) ....................................................................................................................... 11

Mecklenburg County:  A List of Men under Captain Alexander, North Carolina Digital Collections, https://perma.cc/JUM2-ZL7N ....................................................... 23

Off. of the State's Attorney for Baltimore City, *Multi-Jurisdictional Law Enforcement Collaborative Dismantles Four Criminal Organizations Operating Throughout Southwestern Baltimore* (Nov. 25, 2024), https://perma.cc/S6RH-ACTP ........................................................................................................... 4

References to the Internal Revenue Code, Title VII, Subtitle A. Sec. 70001(1986), https://perma.cc/MVA6-RPU4 ...................................................................... 16

Return of Arms and Accoutrements in Jeremiah Olney's Company, June 10, 1776, The Rhode Island Historical Society, https://perma.cc/TT6U-5UFB.............................. 23

Robert Spitzer*, Gun Law History in the United States and the Second Amendment, 80 Law & Contemp. Probs. 55, 76–77 (2017)* ...................................................... 23

S. Rep. No. 90-1501, at 23–24............................................................... 1, 2, 12, 14, 25

Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 27-28 (2006)............................................................... 23

SoundThinking, Inc., *ShotSpotter FAQ* (June 2019), https://perma.cc/2W6V-79XD.................. 5

SoundThinking, Inc., ShotSpotter® (last visited Oct. 31, 2025), https://perma.cc/9Y53-J9GN .......................................................................... 5

Virginia Act of Feb. 27, 1631, Act LVI....................................................................... 23

## INTRODUCTION

Through this suit, Plaintiffs seek to invalidate a nearly 90-year-old federal statute regulating certain especially dangerous firearms. The National Firearms Act (NFA or the Act) imposes taxation and registration requirements on machine guns, short-barreled shotguns, short-barrel rifles, silencers, "destructive devices," and certain other weapons that Congress has deemed particularly susceptible to criminal misuse. These requirements help ensure that such weapons are not made or possessed by individuals who might use them in ways that pose acute threats to public safety.

The law's public-safety function is particularly important to municipalities, which often play a leading role in deterring, detecting, investigating, and prosecuting violent crime. Recognizing that role, Congress explained that one of the law's principal purposes is "to assist law enforcement authorities in the States and their subdivisions in combating" gun crimes. S. Rep. No. 90-1501, at 22 (1968). Amici curiae—the City of Baltimore, Maryland; the City of Columbus, Ohio; and Harris County, Texas—therefore have an important interest in seeing that the Act is upheld against Plaintiffs' meritless constitutional challenges. Amici respectfully submit this brief to explain the ways in which the NFA promotes their public-safety and law-enforcement interests and to underscore the deficiencies in Plaintiffs' legal theories. Amici urge the Court to deny Plaintiffs' motion for summary judgment, grant Defendants' cross-motion for summary judgment, and uphold the National Firearms Act's constitutionality.

## ARGUMENT

### I.    The National Firearms Act Protects Municipalities' Interests by Making Cities Safer

The NFA imposes regulatory requirements on individuals who want to manufacture, import, make, or transfer certain especially dangerous firearms. These provisions were adopted to regulate "weapons likely to be used for criminal purposes." *United States v. Thompson/Center*

1

*Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *see also Demko v. United States*, 216 F.3d 1049, 1052–53 (Fed. Cir. 2000) (explaining that the NFA was adopted "to achieve greater control and regulation of weapons that can be used in violent crimes" (quoting *United States v. Tribunella*, 749 F.2d 104, 109 (2d Cir. 1984)). As particularly relevant here, NFA-regulated weapons include short-barreled rifles, short-barreled shotguns, and silencers. *See* 26 U.S.C. § 5845(a); *see also District of Columbia v. Heller*, 554 U.S. 570, 625 (2008) (observing that weapons "such as short-barreled shotguns" are "not typically possessed by law-abiding citizens for lawful purposes"); *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023) (discussing Congress's concern with easily concealed weapons that could be used for criminal purposes).

These provisions help promote municipalities' public-safety and law-enforcement functions. When Congress comprehensively revised and reenacted the Act in 1968, it explained that one of the law's principal purposes is "to assist law enforcement authorities in the States and their subdivisions in combating" violent crime. S. Rep. No. 90-1501, at 22. It achieves that goal through several different mechanisms.

First, and most importantly, the NFA helps keep dangerous weapons out of the hands of those who would misuse them for unlawful purposes. A person intending to make or transfer an NFA-regulated firearm must file an application with the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) prior to making or transferring the weapon. 26 U.S.C. §§ 5812(a), 5822; *see also* 27 C.F.R. §§ 479.62, 479.64, 479.84, 479.86.[1] If the applicant is an individual, the application must include the applicant's fingerprints and photograph. *Id.* §§ 5812(a), 5821. ATF will deny an application to make or transfer a firearm if the making, transfer, receipt, or possession of the firearm would place the relevant individual in violation of

---

[1] The statutory text refers to the Secretary of the Treasury, but the relevant functions have been transferred to the Department of Justice. *See* 26 U.S.C. § 7801(a)(2).

federal, state, or local law. 26 U.S.C. §§ 5812(a), 5822; 27 C.F.R. § 479.65. The NFA's application procedure thus prevents individuals who are legally barred from firearms ownership because of the danger that they pose from making or acquiring NFA-regulated weapons. *See, e.g.*, *United States v. Peterson*, 150 F.4th 644, 652 (5th Cir. 2025) ("[W]e have no reason to doubt that the NFA's fingerprint, photograph, and background-check requirements are 'designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.'" (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (some quotation marks omitted)) *petition for reh'g filed* (Sept. 10, 2025). That important function both fits comfortably in a long historical tradition of firearms regulations and helps protect municipalities and their citizens from gun violence. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 690 (2024) ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms.").

The NFA's current implementing regulations also require all applicants to forward a copy of the application form to the "chief law enforcement officer [(CLEO)] of the locality in which the applicant or responsible person is located" before the application may be submitted to ATF. 27 C.F.R. § 479.62(c) (application to make); *id.* § 479.84(c) (application to transfer). [2] The notification requirements serve important law enforcement and public safety protection purposes. As ATF explained in adopting these provisions, the notification provides local law-enforcement officials with "awareness that a resident of the [officer's] jurisdiction has applied to make or obtain a [specified] weapon and affords the CLEO an opportunity to provide input to the ATF of any information that may not be available during a Federal background check indicating the applicant

---

[2] ATF has indicated that it is revising the relevant forms "in anticipation of upcoming regulatory changes" to "remov[e] the CLEO notification requirement." 90 Fed. Reg. 48,900, 48,901 (Oct. 30, 2025); 90 Fed. Reg. 48,901, 48,902 (Oct. 30, 2025). The Federal Register notices do not make clear what the justification for removing that requirement would be.

is prohibited from possessing firearms." Machineguns, Destructive Devices, and Certain Other Firearms, 81 Fed. Reg. 2658, 2682 (Jan. 15, 2016). Although the federally-run National Instant Criminal Background Check Systems (NICS) "provides access to a substantial number of records to verify if an individual is prohibited from possessing firearms, CLEOs often have access to records or information that has not been made available to NICS." *Id.* Providing notice to them of a "prospective NFA transfer with instructions on how to relay relevant information to ATF will help fill possible information gaps in NICS by affording the CLEO a reasonable opportunity to provide relevant information to ATF." *Id.* Municipalities thus play a cooperative role in ensuring that NFA-regulated weapons are not made or possessed by persons legally prohibited from having them.

The NFA's registration records also promote the safety of municipal police officers. Municipal police departments conduct join investigations and raids with federal ATF officials. *See, e.g.*, Off. of the State's Attorney for Baltimore City, *Multi-Jurisdictional Law Enforcement Collaborative Dismantles Four Criminal Organizations Operating Throughout Southwestern Baltimore* (Nov. 25, 2024), https://perma.cc/S6RH-ACTP (noting that ATF and Baltimore City Police cooperated in investigating the charged drug trafficking and firearms offenses). Before conducting a raid, ATF can search a database containing NFA registration information, known as the National Firearms Registration and Transfer Record, to determine if individuals involved possess any dangerous NFA-regulated firearms. ATF can use that information to inform its operational plans and ensure officer safety. To the extent that ATF does so, its local law-enforcement partners engaging in those joint raids also benefit from operational plans that incorporate important security precautions.

4

Municipalities also have particular interests in limiting the proliferation of NFA-regulated silencers, which can make gun crimes more difficult to detect and investigate. The Baltimore City Police Department, for example, currently uses SpotShotter technology, which alerts police when a gun is fired so that they can be quickly dispatched to the scene. *See generally* SoundThinking, Inc., *ShotSpotter*® (last visited Oct. 31, 2025), https://perma.cc/9Y53-J9GN (describing the technology). But the use of silencers makes it more difficult for ShotSpotter to accurately detect gunshots and alert police departments. *See, e.g.*, SoundThinking, Inc., *ShotSpotter FAQ* (June 2019), https://perma.cc/2W6V-79XD ("'Silencers' . . . suppress the impulsive sound of gunfire . . . . The ShotSpotter sensors are designed to pick up the sound of [suppressed gunfire], but it does make it more challenging."). If the NFA's regulations of silencers were invalidated, it is highly likely that more silencers would be made, acquired, and used in crimes nationwide. Indeed, one of the plaintiffs in this case has said that, absent the NFA's requirements, he would make silencers. Pls.' App. 006 (Wetz Decl. ¶ 18). The increase in use of silencers predictably will make Baltimore's and other cities' investments in ShotSpotter technology less effective in deterring and investigating crimes.

For these reasons, amici have strong interests in seeing that the National Firearms Act's constitutionality is reaffirmed. Defendants' memorandum in support of their cross-motion for summary judgment, Dkt. No. 60, sets forth the reasons why the Act is a valid exercise of Congress's Article I authority and does not violate the Second Amendment. Amici concur in Defendants' arguments, and offer the following additional points that underscore why Defendants' position is correct.

## II.    The Challenged Provisions Are a Lawful Exercise of Congress's Enumerated Powers

The Court should uphold the National Firearms Act as a valid exercise of Congress's enumerated powers. The Supreme Court has previously upheld the Act based on Congress's taxing

authority, *Sonzinsky v. United States*, 300 U.S. 506 (1937), and as Defendants have explained (Dkt. No. 60, at 10–11), nothing in recent changes to the NFA's tax rates alters that conclusion. Alternatively, the Commerce Clause provides ample authority to uphold the law. Plaintiffs' claims that the NFA exceeds Congress's powers must therefore be rejected.

### A.    The National Firearms Act Is A Valid Exercise of Congress's Taxing Power

Plaintiffs hinge their principal argument on the fact that earlier this year, Congress set the tax rates for making and transferring certain NFA-regulated firearms to $0 effective January 1, 2026. *See* Pub. L. No. 119-21, § 70436(d), 139 Stat. 72, 248 (2025). That amendment does not affect the constitutionality of the statute for two main reasons. First, the challenged provisions requiring the registration of firearms continue to aid the collection of revenue because they are rationally related to other taxes that Congress maintained at their preexisting levels. Second, even for those taxes now set to $0, Congress permissibly maintained the Act's tax architecture.

**1.** The registration provisions continue to serve revenue purposes. Notably, Congress maintained the special (occupational) taxes on importers, manufacturers, and dealers of firearms. *See* 26 U.S.C. § 5801 (generally setting the tax rate at $1,000 or $500 for each place of business). Because Congress kept short-barreled rifles, short-barreled shotguns, and silencers within the NFA's definition of "firearm," *id.* § 5845(a), entities that import, manufacture, or deal in those items remain subject to the occupational tax, *id.* § 5845(k)–(m). Plaintiffs do not dispute the continued validity of those taxes.

The statutory requirements Plaintiffs do challenge—requiring the registration of firearms when they are made and transferred, *see* Dkt. No. 49, at 7—continue to operate as measures that Congress deemed necessary and proper to serve the occupational tax. Requiring the registration of firearms when they are made and transferred ensures that they can be linked to any importer, manufacturer, or dealer required to register and pay the occupational tax. Indeed, those registration

requirements remain vitally important, as the transfer records could help demonstrate, for example, that a person qualifies as a firearms "dealer" by being "engaged in the business of selling, renting, leasing, or loaning firearms," 26 U.S.C. § 5845(k); *see* Defs.' App. 187–188 (Albro Decl. ¶ 28). The fact that any particular transaction has a $0 tax is irrelevant.

Ongoing registration requirements serve revenue purposes in another way, too. The 2025 amendments made only prospective changes to the making and transfer tax rates. *See* Pub. L. No. 119-21, § 70436(d), 139 Stat. at 248. As a result, makers and transferors of short-barreled rifles, short-barreled shotguns, and silencers still must pay the prior rate of $200 on those items made or transferred prior to the amendments' effective date. To prevent evasion of those tax obligations, Congress rationally could have determined that it was necessary to maintain registration records documenting the chain of sales. *Cf. United States v. Dodge*, 61 F.3d 142, 146 (2d Cir. 1995) ("The registration of the transfer of firearms when there is no tax immediately due assists the government in the collection of taxes by creating a record to track the firearms from one party to another . . . .").

**2.** Were that insufficient, the challenged provisions also "can be upheld on the preserved, but unused, power to tax." *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994). The Fifth Circuit's decision in *Ardoin* is controlling. There, Congress had imposed a tax on "machineguns" under the National Firearms Act but subsequently outlawed possession of those weapons altogether. *Id.* at 179. As a result, the tax ceased raising revenue; the ATF did not even "allow tax payments or registration." *Id.* at 180. But the Fifth Circuit rejected the idea that the National Firearms Act was rendered unconstitutional as beyond the taxing power. It reasoned that the constitutional basis to "regulate—the taxing power—still exist[ed]; it [was] merely not exercised." *Id.*

The same result obtains here. Congress has retained the tax architecture of the National Firearms Act with respect to the making and transfer of short-barreled rifles, short-barreled shotguns, and silencers. By lowering the rate to $0, it chose to confer a new tax benefit on the makers and transferors of certain firearms. Plaintiffs benefit from that change because they will no longer have to pay the $200 tax each time they make or transfer those firearms. But Congress did not abolish the taxation and registration provisions altogether. Congress rationally could have selected that mechanism for many legitimate reasons, including allowing a future Congress to reinstate a tax easily, should it choose to do so. *Ardoin* permits Congress to preserve the tax architecture because the underlying authority still exists even while individuals currently subject to the tax pay only $0.

Plaintiffs relegate the binding precedent embodied in *Ardoin* to a footnote. *See* Dkt. No. 49, at 15 n.2. Instead, they principally rely on *Texas v. United States*, 945 F.3d 355 (5th Cir. 2019), which had invalidated the Affordable Care Act's tax penalty for not maintaining health insurance after Congress set the amount of that tax penalty to $0. That decision was reversed by the Supreme Court because the plaintiffs lacked standing. *California v. Texas*, 593 U.S. 659 (2021). Because the Supreme Court reversed the Fifth Circuit's judgment for lack of jurisdiction, the *Texas* opinion is not binding precedent.[3] And that opinion's discussion of the taxing power is not persuasive.

---

[3] Plaintiffs suggest that the Supreme Court's reversal of the judgment "cast[ ] no doubt" on the validity of *Texas*'s merits discussion. Dkt. No. 49, at 15-16 n.2. But the Supreme Court's holding—that the plaintiffs lacked Article III standing—prevented it from reaching any merits disposition. It also made clear that the Fifth Circuit had no power to issue a merits judgment. *See Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 94 (1998) (explaining that if a court lacks jurisdiction, "the only function remaining to the court is that of announcing the fact and dismissing the cause") (citation omitted). Because the Fifth Circuit's merits opinion was issued without jurisdiction and therefore "ultra vires," *id.* at 102, *Texas* cannot be precedent binding on this Court.

*Texas* sought to distinguish between the tax upheld in *Ardoin*, which it characterized as "non-revenue producing only in practice," and one that was "$0.00 as written on the books," which it deemed unconstitutional. *Texas v. United States,* 945 F.3d at 391. That distinction is without foundation. The tax code is littered with provisions that impose no tax burden. For example, taxpayers may be required to file a tax return even if their tax liability is $0. *See, e.g.*, 26 U.S.C. § 6012 (requiring returns from some individual taxpayers with no tax liability); *id.* § 6033 (requiring tax-exempt organizations to file annual returns). Or Congress may offer taxpayers an exemption from certain taxes, provided that they can offer the appropriate documentation. Indeed, several parts of the National Firearms Act do just that, *see id.* § 5852 (exemption for firearms made for or transferred to the United States government); *id.* § 5853 (similar exemption for other governmental entities). Those legislative choices are not unconstitutional merely because the tax rate is statutorily set at $0 for certain transactions or persons. After all, "[i]n the exercise of its constitutional power to lay taxes, Congress may select the subjects of taxation, choosing some and omitting others." *Sonzinsky*, 300 U.S. at 512.

In substance, setting the tax rate at $0 for a category of transactions—making and transferring certain firearms—is no different than offering an exemption from the tax for items falling within that category. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 565 (2012) (focusing on "substance" over "designation" in assessing a tax statute's constitutionality). That is evident even from the language Congress chose, as it "deemed" the relevant tax "paid" in another section of the National Firearms Act. 26 U.S.C. § 4182. There are various other linguistic formulations Congress might have used to obtain that same result, such as by offering an offsetting tax credit or exemption. The fact that it chose to express its intent by setting a statutory rate of "$0" should not result in the statute's unconstitutionality.

9

Another oddity of this line of argument is that the constitutionality of various statutes would blink on or off depending on how Congress set tax rates. Congress sometimes grants temporary relief from a tax to stimulate an economic sector. *See, e.g.*, Coronavirus Aid, Relief, and Economic Security Act (CARES) Act, Pub. L. No. 116-136, § 4007, 134 Stat. 281, 477 (2020). It makes little sense that any attendant recordkeeping requirements would become unconstitutional during the tax holiday. And Congress may have good reasons for maintaining associated recordkeeping or regulatory provisions "in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513. For example, it would be critical to keep track of when various transactions occurred so the government can determine whether they fell within the tax holiday. That logic applies here. The government will still need to use the NFA's recordkeeping procedures to determine whether taxes are owed for transactions occurring during the period when the tax was $200. And, although Congress recently set certain NFA taxes to $0, nothing prevents Congress from increasing those rates just as quickly as it lowered them. Were that to happen, it appears that, under Plaintiffs' legal theory, the challenged provisions would spring back to life. Different Congresses may have different views on how much firearms should be taxed, but the constitutional status of the entire law should not flicker when Congress adjusts the rates.

Ultimately, even if *Texas* were persuasive on its own facts, it is distinguishable here. The amendments at issue in that statute set the tax penalty—effectively, the tax rate—at $0 for all taxpayers. *See* 26 U.S.C. § 5000A(c). As a result, it appeared impossible for that tax to raise any revenue whatsoever. By contrast, even after recent amendments, the National Firearms Act continues to generate revenue through the special occupational tax. As explained above, the challenged provisions serve that revenue function. That provides ample basis for upholding the Act under the taxing power.

**B.      The NFA Is a Valid Exercise of Congress's Commerce Clause Power**

Even if the challenged portions of the NFA were not within Congress's taxing power, they could be sustained as an exercise of Congress's power to regulate interstate commerce. The Fifth Circuit has indicated as much. *See Ardoin*, 19 F.3d at 180 ("[N]o one could seriously contend that the regulation of machineguns could not also be upheld under Congress's power to regulate interstate commerce."); *United States v. Arce*, 118 F.3d 335, 342 (5th Cir. 1997) ("[T]his court has recently held that the constitutionality of the NFA can be upheld based on either the taxing power or on the interstate commerce power."). That conclusion is binding on this Court and, as Defendants explain (Dkt. No. 60, at 11–20), it is also correct under recent Supreme Court decisions regarding the extent of Congress's authority to regulate interstate commerce.

**1.** As an initial matter, the Interstate Commerce Clause is properly considered as a basis to uphold the National Firearms Act. Plaintiffs incorrectly presume that Congress disclaimed the use of its commerce power when it enacted the National Firearms Act. To the contrary, the legislative record shows that Congress viewed the measure as an exercise of both its taxing power and its commerce power. *See, e.g.*, Hearings Before the H. Comm. on Ways and Means on H.R. 9066, 73d Cong., 2d Sess. 6 (1934) (statement of Attorney General Cummings) ("Now we proceed in this bill generally under two powers—one, the taxing power, and the other, the power to regulate interstate commerce.").

In any event, even if Plaintiffs were correct that the National Firearms Act was originally enacted solely as a taxing measure, that would not advance their argument. Congress reenacted and revised the National Firearms Act as part of the Gun Control Act of 1968. *See* Pub. L. No. 90-618, tit. II, 82 Stat. 1213, 1227–1236; *see also* 26 U.S.C. subtitle E, ch. 53, subchapter A note (memorializing "the general revision" of the statute in 1968). In the Gun Control Act, Congress explicitly invoked Congress's power to regulate interstate commerce. *See* 82 Stat. at 1213

(describing the law as "an act . . . to provide for better control of the interstate traffic in firearms" (capitalization altered)). The Gun Control Act also reflected Congress's determination "that federal control over firearms licensing for dealers, even for intrastate activity, was necessary to address the serious problems associated with interstate trafficking in firearms generally." *United States v. Knutson*, 113 F.3d 27, 31 (5th Cir. 1997) (quoting *United States v. Kenney*, 91 F.3d 884, 890 (7th Cir. 1996)). Because "existing Federal controls over interstate and foreign commerce in firearms [were] not sufficient," the Gun Control Act's amendments were intended to provide "adequate Federal controls over interstate and foreign commerce in firearms." S. Rep. No. 90-1501, at 22; *see also* H.R. Rep. No. 90-1956, at 34–35 (1968) (Conf. Rep.) (approving the Senate's version of the bill, which amended the National Firearms Act).

Whatever constitutional powers Congress might have relied on in 1934, in the 1968 amendments Congress could hardly have been clearer that its express "purpose" was "in fact . . . to regulate interstate commerce." *United States v. Bird*, 124 F.3d 667, 682 n.15 (5th Cir. 1997). Plaintiffs therefore offer no valid basis for disregarding the Commerce Clause as a basis on which to sustain the National Firearms Act's constitutionality.

**2.** The Commerce Clause empowered Congress to enact the challenged provisions of the National Firearms Act. As noted, the Fifth Circuit has already concluded as much. *See Ardoin*, 19 F.3d at 180; *Arce*, 118 F.3d at 342. In addition to being binding precedent, that conclusion is correct under the Commerce Clause principles articulated by the Supreme Court, which has "firmly establishe[d] Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). Amici wish to emphasize the correctness of Defendants' arguments on this score.

12

The National Firearms Act appropriately and directly regulates "some sort of economic endeavor." *United States v. Morrison*, 529 U.S. 598, 611 (2000). The challenged registration requirements operate on those who make, buy, sell, or otherwise transfer items that fall within the law's ambit. *See, e.g.*, 26 U.S.C. §§ 5802, 5812, 5822, 5841(b). Making, buying, and selling goods are "quintessentially economic" activities. *Raich*, 545 U.S. at 25–26 (upholding a statute "that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market"); *see also GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 629 (5th Cir. 2003) ("[C]ommerce is 'the exchange of goods and services' or 'trade and other business activities.'" (quoting Black's Law Dictionary 263 (7th ed. 1999)).

Plaintiffs identify some situations in which a person could make or transfer a firearm without money changing hands. *See* Dkt. No. 49, at 28–29. And they suggest that possession is inherently noneconomic activity. *Id.* But these observations do not advance their case. Indeed, Plaintiffs' position simply mirrors the arguments rejected in *Raich*, where one of the plaintiffs "cultivate[d] her own marijuana" rather than buying it. 545 U.S. at 7. Growing marijuana for home use did not involve buying or selling goods, but the Supreme Court explained that Congress could regulate it under the Commerce Clause because it was part of a "class of activity [that] would undercut the regulation of the interstate market." *Id.* at 18. And because "the Commerce Clause gives Congress authority to regulate the national market," Congress also has the "authority to proscribe the purely intrastate production, possession, and sale" of goods within that market. *Taylor v. United States*, 579 U.S. 301, 303 (2016). The National Firearms Act regulates the national market for certain firearms, so it does not matter that one could produce or possess a firearm without tendering money to another person.

13

Congressional findings regarding effects on interstate commerce—which are not necessary, but which may be "helpful" to the judicial inquiry—suffice here to show that Congress has more than met its "modest" burden. *Raich*, 545 U.S. at 21–22. As explained above, the Gun Control Act was born from Congress's concerns about inadequate controls over the interstate market in firearms. *Knutson*, 113 F.3d at 31. Accordingly, Congress found it necessary and proper to impose direct regulation on the interstate market. *See, e.g.*, S. Rep. No. 90-1501, at 23–24. It simultaneously reenacted and amended the National Firearms Act's provisions reaching intrastate manufacturing and transfers as well. The reason is not hard to discern: absent those provisions, federal law would contain a "gaping hole" by "fail[ing] to regulate the intrastate manufacture and possession of" firearms. *Raich*, 545 U.S. at 22. That is particularly true because there would be inevitable "enforcement difficulties" in distinguishing locally produced and transferred firearms from those moving in interstate commerce. *Id.* Given that, Congress certainly had a "rational basis" for regulating intrastate commerce in firearms. *Id.*

### C.     The 2025 Amendments to the National Firearms Act Are Severable

If Plaintiffs were correct that the recent amendments to the National Firearms Act made the law constitutionally defective by setting the making and transfer taxes to $0, the correct remedy would be to invalidate those amendments and leave the remainder of the statute intact. In other words, the Court should limit any remedy to those provisions of the recent amendments—specifically, Section 70436(a) and (b) of Public Law No. 119-21—to the extent that they changed the making and transfer tax rates. *See* 139 Stat. at 247. That result obtains for several reasons.

First, longstanding severability principles require limiting any remedy to the amendment that renders a law unconstitutional. As Justice Kavanaugh recently explained, "where Congress added an unconstitutional amendment to a prior law . . . the Court has treated the original, pre-amendment statute as the 'valid expression of the legislative intent.'" *Barr v. Am. Ass'n of Pol.*

14

*Consultants, Inc.*, 591 U.S. 610, 630 (2020) (plurality opinion) (quoting *Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 526–27 (1929)).[4] Applying that principle here, it would be appropriate to sever the "exception" to the National Firearms Act's longstanding taxation scheme "'introduced by amendment,' so that 'the original law stands without the amendatory exception.'" *Id.* (quoting *Truax v. Corrigan*, 257 U.S. 312, 342 (1921)). There is no question that the pre-amendment National Firearms Act was a valid exercise of Congress's taxing power; the Supreme Court has held as much. If Plaintiffs were correct that the 2025 amendments introduced a constitutional defect into the NFA, then the Court should permit the valid version of the law to remain in place.

Second, the Internal Revenue Code's express severability clause reinforces that conclusion. 26 U.S.C. § 7852(a). That clause provides that if "any provision of this title" is held invalid "the remainder of the title . . . shall not be affected thereby." *Id.* Such clause applies equally to a statute designed amending provisions of the Internal Revenue Code. *See, e.g.*, *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 402 (5th Cir. 2008). The severability clause thus makes "clear that Congress would prefer that [the court] use a scalpel rather than a bulldozer in curing the constitutional defect" that Plaintiffs allegedly identify. *Seila L. LLC v. CFPB*, 591 U.S. 197, 237 (2020). Invalidating an amendment that introduced a constitutional flaw—thereby reverting the statute to its undoubtedly constitutional form—would leave the statute "fully operative" to the maximum extent possible, respecting Congress's role in crafting legislation. *Id.* at 235.

---

[4] Although Justice Kavanaugh's opinion did not garner a majority, the portion of his opinion discussing severability is controlling. Seven Justices agreed with Justice Kavanaugh's severability analysis. *See Am. Ass'n of Pol. Consultants*, 591 U.S. at 637 (Sotomayor, J., concurring in the judgment) (agreeing with the plurality as to severability); *id.* at 648 (Breyer, J., joined by Ginsburg and Kagan, JJ., concurring in the judgment) (agreeing with the plurality's severability conclusion). It therefore is the holding of the Court under *Marks v. United States*, 430 U.S. 188 (1977).

15

Third, that Congress recently amended the National Firearms Act but left the registration provisions "substantially unchanged" confirms that severance is required. *See United States v. Jackson*, 390 U.S. 570, 586–87 (1968) (describing as "inconceivable" the idea that Congress "would have chosen to discard the entire statute" if an amendment were invalidated on constitutional grounds). Efforts to remove silencers, short-barreled rifles, and short-barreled shotguns from the Act's requirements were considered and rejected during the debate on the 2025 reconciliation bill. *See* Pls.' App. 013 (Pratt Decl. ¶ 8) (acknowledging that "[l]anguage repealing the registration requirements" was considered by Congress but was not enacted). The Senate Finance Committee, for example, released draft legislation that would have amended the Act's definition of "firearm" to exclude short-barreled rifles, short-barreled shotguns, and silencers. *See* References to the Internal Revenue Code, Title VII, Subtitle A. Sec. 70001(1986), https://perma.cc/MVA6-RPU4. But Congress omitted those provisions from the final legislative text. Plaintiffs' position thus seeks to obtain through this lawsuit what Congress recently declined to enact through the legislative process. That would not be a proper exercise of the judicial power. Instead, this Court should sever the amendment because the prior version of the law has undergone bicameralism and presentment, which makes it "the 'valid expression of the legislative intent.'" *Am. Ass'n of Pol. Consultants*, 591 U.S. at 630 (quoting *Frost*, 278 U.S. at 526–27).

Finally, severing the amendment would leave the statute "fully operative" and "capable of functioning." *Seila L.*, 591 U.S. at 235. The National Firearms Act successfully operated for nearly ninety years before Congress adjusted the tax rates earlier this year. There can be no doubt that the statute would be equally operative if the recent amendments were severed.

### III.    The Challenged Provisions Are Consistent with the Second Amendment

### A.    Recent Fifth Circuit Precedent Forecloses Plaintiffs' Challenge

As Defendants explain (Dkt. No. 60, at 27–32), the National Firearms Act comports with Second Amendment. That conclusion follows directly from the Fifth Circuit's decision in *United States v. Peterson*, 150 F.4th 644, which held that the NFA's taxing and registration requirements for silencers constitute a lawful shall-issue licensing regime. *Id.* at 654; *see Bruen*, 597 U.S. at 38 n.9 (indicating that shall-issue regimes are presumptively lawful).

Although the only provision at issue in *Peterson* was the NFA's rules governing silencers, nothing about *Peterson*'s analysis suggests that the outcome would be any different with respect to the NFA's rules governing short-barreled shotguns and short-barreled rifles. Plaintiffs resist that conclusion by arguing (in a footnote) that short-barreled shotguns and short-barreled rifles "impose a more serve burden on the right to keep and bear arms than regulations on useful but non-essential accessories such as suppressors." Dkt. No. 49, at 46 n.13. But the legality of shall-issue regimes does not depend on the weapon being regulated. Instead, they are focused on ensuring that the *persons* who seek to keep or bear those weapons are, "in fact, law-abiding, responsible citizens." *Peterson*, 150 F.4th at 652 (quoting *Bruen*, 597 U.S. at 38 n.9). So long as the regime sets forth "objective and definite" criteria for making that determination, and the licensing officials do not put the regime to "abusive ends," *Bruen*, 597 U.S. at 38 n.9, it is lawful—regardless of the weapon regulated. *Accord United States v. Rush*, 130 F.4th 633, 640 (7th Cir. 2025) (the NFA's registration requirement for short-barreled rifles "can be read as a condition of lawful possession").

17

B.    **Short-Barreled Shotguns, Short-Barreled Rifles, and Silencers Are Not "Arms" Within the Meaning of the Second Amendment**

1.    *Short-Barreled Shotguns, Short-Barreled Rifles, and Silencers Are Not Commonly Used for Self Defense*

Even putting *Peterson* aside, Plaintiffs' Second Amendment challenge also fails because short-barreled shotguns, short-barreled rifles, and silencers are not arms commonly used for self-defense. In *Heller*, the Supreme Court held that the Second Amendment protects only those weapons "in common use at the time' for lawful purposes like self defense." 554 U.S. at 624; *see also Bruen*, 597 U.S. at 21 (the Second Amendment only "protects the possession and use of weapons that are in common use at the time" (quotation marks omitted)).

That conclusion followed from the Court's earlier decision in *United States v. Miller*, 307 U.S. 174 (1939). The defendants there were charged with unlawfully transporting a shotgun with a barrel less than 18 inches in length in violation of the NFA. *Id.* at 175. After examining early colonial laws regulating musket length, *id.* at 178–82, the Court upheld this provision against a Second Amendment challenge, *id.* at 178. It reasoned that because short-barreled shotguns did not have any "reasonable relationship to the preservation or efficiency of a well regulated militia," it could not say that the "Second Amendment guarantees the right to keep and bear such an instrument." *Id.* It further noted that there was no evidence in the record or anything "within judicial notice" that might establish that short-barreled shotguns were "part of the ordinary military equipment or that its use could contribute to the common defense." *Id. Heller* would later explain that *Miller* stands for the proposition that "the *type of weapon at issue*"—a short-barreled shotgun—"was not eligible for Second Amendment protection." 554 U.S. at 622.

*Miller* and *Heller* foreclose Plaintiffs' challenge with respect to the weapons at issue here. As explained, *Miller* upheld the predecessor to the very provision that Plaintiffs ask this Court to hold unconstitutional, *see* 307 U.S. at 178, and *Heller* reiterated that the Second Amendment "does

18

not protect . . . short-barreled shotguns," 554 U.S. at 625. And like short-barreled shotguns, short-barreled rifles are "dangerous because they are more powerful than traditional handguns yet are easier to conceal." *Rush*, 130 F.4th at 637. Both "involve a characteristic that makes the firearm especially attractive to criminals while adding little—if any—functionality to the firearm for lawful use." *Id.*; *see also id.* at 637-38 (applying *Miller* to short-barreled rifles); *United States v. Robinson*, 2025 WL 870981, at *5 (11th Cir. 2025), *petition for cert. docketed*, No. 25-5150 (July 18, 2025) (concluding there is "'no meaningful distinction'" between short-barreled shotguns and short-barreled rifles); *United States v. Miller*, 2023 WL 6300581, at *1–3 (N.D. Tex. Sept. 27, 2023) (similar).

In any event, even absent *Miller* and *Heller*, Plaintiffs have not shown that any of the weapons at issue here—short-barreled shotguns, short-barreled rifles, and silencers—are commonly used for any lawful purposes, much less self-defense. Indeed, Plaintiffs have introduced *no* evidence that these weapons are commonly used for such purposes. On the contrary, the NFA regulates these weapons precisely because they are "likely to be used for criminal purposes." *Thompson/Center Arms*, 504 U.S. at 517 (plurality opinion). Long guns with shortened barrels are attractive to criminals because their "concealability fosters [their] use in illicit activity" and because of their "heightened capability to cause damage." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010)); *see also Johnson v. United States*, 576 U.S. 591, 640 (2015) (Alito, J., dissenting) (short-barreled shotguns are "uniquely attractive to violent criminals" because they are "[m]uch easier to conceal than long-barreled shotguns used for hunting and other lawful purposes"). And courts have long recognized that "a silencer is practically of no use except for a criminal purpose." *United States v.*

*Fortes*, 141 F.3d 1, 7 (1st Cir. 1998) (quoting *United States v. Huffhines*, 967 F.2d 314, 321 (9th Cir. 1992)).

Plaintiffs argue that these weapons are commonly used for self-defense purposes by pointing to the number of silencers, short-barreled rifles, and short-barreled shotguns that have been registered, and noting that these weapons would be "*more* popular if the NFA did not heavily regulate them." Dkt. No. 49, at 38. But courts have routinely refused to ground their assessment of whether a weapon is commonly *used* for self-defense based on "on numbers alone." *Bevis v. City of Naperville*, 85 F.4th 1175, 1198–99 (7th Cir. 2023). Such an analysis would be at odds with *Heller*'s "choice of the phrase common *use* instead of common *possession*." *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc). It would also lead to absurd consequences. For example, it would allow any weapon—including machine guns, short-barreled shotguns, and even portable nuclear weapons—to become constitutionally protected "merely because it becomes popular before the government can sufficiently regulate it." *Id.* That is not the law.

### 2.   *Silencers Are Accoutrements, Not Arms*

Silencers are not protected by the plain text of the Second Amendment for an independent reason: they are not "Arms" at all. As noted, *Heller* held that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the Founding." 554 U.S. at 582. It follows that, for this right to have meaning, the Second Amendment must "carry an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm," such as ammunition or triggers. *Duncan v. Bonta*, 133 F.4th 852, 866–67 (9th Cir. 2025) (en banc), *petition for cert. docketed*, No. 25-198 (Aug. 19, 2025). "But the text of the Second Amendment also reveals an important limit on the scope of the right": it extends only to the "right to bear Arms." *Id.* at 867. And at the time of ratification of the Second Amendment, there was a clear distinction between "weapons themselves,

referred to as 'arms,' and accessories of weaponry, referred to as 'accoutrements.'" *Id.* The two were distinct: "For example, the Continental Congress promised to pay States for 'every horse and all arms <u>and</u> accoutrements, which shall be taken, by the enemy in action.'" *Id.* (quoting 2 Public Papers of George Clinton 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900 (brackets omitted)). Indeed, "[h]undreds of examples from the Founding era describe arms and accoutrements as separate, distinct items of military gear, and the phrase 'arms and accoutrements' was common." *Id.*; *see also* Declaration of Dennis Baron, *Duncan v. Bonta*, 695 F. Supp. 3d 1206 (S.D. Cal. 2023) (3:17-cv-01017), Dkt. No. 118-2 (expert declaration collecting examples). And by "choosing to protect the right to bear 'arms,' not 'arms and accoutrements,' the Founders constrained the scope of the Second Amendment." *Duncan*, 133 F.4th at 867.

Consistent with this understanding, every "federal court to squarely address" the issue has held that silencers are "firearm accessor[ies]" unprotected by the Second Amendment. *United States v. Berger*, 715 F. Supp. 3d 676, 698 (E.D. Pa. 2024); *see also id.* at 698–99 (collecting cases); *Cox*, 906 F.3d at 1186 (a silencer is a "firearm accessory; it's not a weapon in itself"). By themselves, silencers cannot "reasonably be described as an item that a person 'takes into his hands, or useth in wrath to cast at or strike another.'" *Duncan*, 133 F.4th at 867 (quoting *Heller*, 554 U.S. at 581). And they are not "necessary for the ordinary operations of a protected weapon." *Id.* at 868. It makes no difference that silencers attach to a firearm, *see id.* or that they can have some benefit to users, such as "avoid[ing] spooking game" or "reduc[ing] noise pollution," *Peterson*, 150 F.4th at 648. Rather, the relevant test is whether "the component or accessory is necessary to the ordinary operation of the weapon." *Duncan*, 133 F.4th at 868. Silencers are not. As a result, the "Second Amendment's plain text" does not protect an individual's right to keep or bear silencers. *Bruen*, 597 U.S. at 24.

**C.      The Challenged Provisions Are Consistent with a Wide Range of Historical Regulations**

The challenged provisions are also "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. At this second step of the analysis, the court "ask[s] 'whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.'" *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) (quoting *Rahimi*, 602 U.S. at 692). This analysis does not mean that the Second Amendment is "trapped in amber." *Rahimi*, 602 U.S. at 691. Rather, the court must ascertain whether the challenged laws are "'relatively similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29 (brackets omitted)).

In this case, there are a wide range of regulations that are "relevantly similar" to the challenged provisions. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 697 U.S. at 29). As the Seventh Circuit concluded in rejecting a Second Amendment challenge to the NFA's regulations of short-barreled rifles, there are "numerous historical regulations on barrel length, regulations on firearms trade, registration and taxation requirements, and regulations on dangerous and unusual weapons." *Rush*, 130 F.4th at 641. With respect to barrel length, in 1649, Massachusetts adopted a law that required musketeers to carry a "good fixed musket not less than three feet, nine inches, nor more than four feet, three inches in length." *Miller*, 307 U.S. at 180. In 1785, Virginia adopted a law regulating the length of militia members' firearms, providing that "[e]very non-commissioned officer and private' shall be equipped 'with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel." *Id.* at 181. Although these laws are specific to militia members, they are "relevant because the traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes." *Rush*, 130 F.4th at 641.

In addition—and contrary to Plaintiffs' claim, *see* Dkt. No. 49, at 40—there are many "colonial and post-colonial laws akin to modern-day registration and taxation requirements." *Rush*, 130 F.4th at 641. In 1631, Virginia required the recording of "arms and munitions." Virginia Act of Feb. 27, 1631, Act LVI. The Founders "implemented mandatory musters which required individuals with a gun to show up and register their firearm." *United States v. Holton*, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022) (quotation marks omitted); *see* Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 27-28 (2006) (collecting these laws).[5] In addition, States imposed taxes on personally held firearms "well into the 1800s." *Holton*, 639 F. Supp. 3d at 711; *see* Robert Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76–77 (2017) (collecting laws from North Carolina, Georgia, Mississippi, and Rhode Island from between 1851 and 1867). More generally, "colonial governments substantially controlled the firearms trade," including by restricting where and to whom individuals could sell guns. *Holton*, 639 F. Supp. 3d at 711 (quoting *Teixeira v. Cnty. Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc)); *see also Teixeira*, 873 F.3d at 685 (collecting laws from Massachusetts, Connecticut, Maryland, and Virginia).

Also relevant are laws "enacted around the time of the founding, which prescribed fines, taxes, or sureties on gun possession or use for violence prevention purposes." *Rush*, 130 F.4th at 642. Included among these are a "1759 New Hampshire law that called for the arrest and fine of those who 'go armed offensively' and allowed justices of the peace to 'commit the offender to prison, until he or she finds such sureties for the peace and good behavior.'" *Id.* (quoting An Act

---

[5] Various colonies and early States also recorded the weapons individuals reporting to a muster brought with them. *See, e.g.*, Mecklenburg County: A List of Men under Captain Alexander, North Carolina Digital Collections, https://perma.cc/JUM2-ZL7N; Return of Arms and Accoutrements in Jeremiah Olney's Company, June 10, 1776, The Rhode Island Historical Society, https://perma.cc/TT6U-5UFB.

for Establishing and Regulating Courts of Public Justice Within this Province (1759), *in* ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW HAMPSHIRE, IN NEW ENGLAND 1–2 (1761)). A 1763 New York law "condemned carrying or shooting any 'Musket, Fowling-Piece, or other Fire-Arm whatsoever' in certain areas of 'New York City or the Liberties thereof, without a Licensing Writing first and he, she, or they so offending, shall forfeit and pay the Sum of Twenty Shillings' per offense." *Id.* at 642–43 (citations omitted). Southwark (today, Philadelphia) also passed laws in 1774 and 1794 that imposed fines "for discharging a firearm within a certain distance of any building, and later 'within the regulated parts of the district, without the permission of the president of the board of commissioners,' respectively." *Id.* at 643 (citations omitted).

Furthermore, there are several historical analogues for "regulating dangerous and unusual weapons." *Id.* Under English common law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone, *Commentaries on the Laws of England* 148–49. Similarly, under the common law of the United States a person was "prohibited from 'arming himself with dangerous and unusual weapons, in such a manner as would naturally cause a terror to the people.'" *Rush*, 130 F.4th at 643 (quoting *State v. Langford*, 10 N.C. 381, 383 (1824) (alterations omitted)); *see also Bruen*, 597 U.S. at 46 (identifying similar laws from colonial times).

These laws are "relevantly similar" to the challenged provisions. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 697 U.S. at 29). They place a "comparable burden on the right holder." *Connelly*, 117 F.4th at 274. With the making and transfer taxes reduced, the only burden is the requirement to register a firearm and, for manufacturers, makers, and importers, inscribe a serial number. Such minimal requirements have "little impact on lawful possession for armed self-defense." *Rush*, 130

F.4th at 643. Indeed, it is far less of a burden than regulations that prohibit individuals from possessing dangerous and unusual weapons altogether.

The rationales underlying the NFA and these historical laws are also relevantly similar. Throughout our history, "there has stood an unbroken line of common sense regulations permitting our duly elected representatives to limit weapons where the likely use of the weapon is a violent breach of the peace." *Rush*, 130 F.4th at 643. "Such is the unmistakable purpose of surety laws, riding while armed limitations, and the long-recognized need to place dangerous and unusual weapons in a category of their own." *Id.* And that is why Congress regulated NFA firearms: because they are "likely to be used for criminal purposes," *Thompson/Center Arms*, 504 U.S. at 517 (plurality opinion); *see also Mock*, 75 F.4th at 567 (the NFA "was designed to target 'gangster-type weapons' that are 'especially dangerous and unusual'"); *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (Congress regulated short-barreled shotguns and short-barreled rifles based on its conclusion that they are "primarily weapons of war and have no appropriate sporting use or use for personal protection" (quoting S. Rep. No. 90-1501, at 28).

## CONCLUSION

The Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.

December 2, 2025

Respectfully submitted,

/s/ Caitlyn Silhan

Simon C. Brewer[†]* (CT Bar No. 441889)
Ryan Cooper[†] (TX Bar No. 24097531)
Joel McElvain[†] (DC Bar No. 448431)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
(202) 796-4426 (fax)
sbrewer@democracyforward.org
rcooper@democracyforward.org
jmcelvain@democracyforward.org

Caitlyn Silhan (TX Bar No. 24072879)
WATERS KRAUS PAUL & SIEGEL
3141 Hood Street, Suite 700
Dallas, TX 75219
(214) 357-6244
(214) 357-7252 (fax)
csilhan@waterskraus.com

Samuel P. Siegel[†] (DC Bar No. 90035964)
Rupa Bhattacharyya[†] (DC Bar No. 1631262)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
AND PROTECTION
GEORGETOWN LAW
600 New Jersey Ave. NW
Washington, DC 20001
(202) 662-4048
(202) 661-6730 (fax)
ss5427@georgetown.edu
rupa.bhattacharyya@georgetown.edu

*Counsel for Amici Curiae City of Baltimore, MD;
City of Columbus, OH; and Harris County, TX*

[†] *Motion for admission pro hac vice forthcoming.*

* *Not admitted in the District of Columbia; practicing under the supervision of Democracy Forward lawyers who are members of the D.C. Bar.*