## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### San Angelo Division

| | |
|---|---|
| SILENCER SHOP FOUNDATION; GUN OWNERS OF AMERICA, INC; FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC.; B&T USA, LLC; PALMETTO STATE ARMORY, LLC; SILENCERCO WEAPONS RESEARCH, LLC (d/b/a SILENCERCO); GUN OWNERS FOUNDATION; BRADY WETZ; STATE OF TEXAS; STATE OF ALASKA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WEST VIRGINIA; and STATE OF WYOMING, | |
| *Plaintiffs*, | |
| v. | Case No. 6:25-cv-56-H |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in her Official Capacity as ATTORNEY GENERAL OF THE UNITED STATES; and DANIEL DRISCOLL, in his Official Capacity as ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................3

    I.    The Government Misrepresents The Scope Of Plaintiffs' Challenge .................. 3

    II.    The Government Confirms The Challenged NFA Provisions Exceed Congress's Enumerated Powers........................................................................ 7

        A.    The Government Confirms The Taxing Power Cannot Sustain Application Of The Challenged NFA Provisions To Plaintiffs' Untaxed Firearms ........................................................................... 7

        B.    The Government Confirms The Commerce Power Cannot Sustain Application Of The Challenged NFA Provisions To Intrastate Possession, Transfer, And Making Of Untaxed Firearms ......................................................................................... 22

    III.    The Government Confirms The Challenged NFA Provisions Violate The Second Amendment As Applied To Untaxed Firearms ....................................... 35

        A.    Short-Barreled Shotguns And Short-Barreled Rifles Are Now In "Common Use," And The Government's Reliance On *Miller* And *Heller* Fails............................................................................... 36

        B.    Defendants' Attempt to Bootstrap "Any Other Weapons" With *Miller* Fails.......................................................................... 40

        C.    The Fifth Circuit's Most Recent *Peterson* Decision Does Not Foreclose Protection Of Silencers............................................. 41

        D.    The Government Fails to Bear Its Historical Burden. ............................. 44

    IV.    The Government Confirms Plaintiffs Are Entitled To The Relief Requested ....................................................................................... 46

CONCLUSION.......................................................................................................50

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of New Orleans*,
  38 F.4th 472 (5th Cir. 2022) ...................................................................................7

*Barr v. American Ass'n of Political Consultants, Inc.*,
  591 U.S. 610 (2020)...............................................................................................50

*Barrett v. United States*,
  423 U.S. 212 (1976)...............................................................................................20

*Bezet v. United States*,
  714 F. App'x 336 (5th Cir. 2017) .......................................................................9, 13

*Bond v. United States*,
  572 U.S. 844 (2014)..........................................................................................13, 30

*Bondi v. VanDerStok*,
  604 U.S. 458 (2025)...............................................................................................19

*Britto v. ATF*,
  2023 WL 7418291 (N.D. Tex. Nov. 8, 2023).........................................................47

*BST Holdings, L.L.C. v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) .............................................................................32, 33

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016)...............................................................................................38

*In re Cao*,
  619 F.3d 410 (5th Cir. 2010) ...................................................................................4

*Citizens United v. FEC*,
  558 U.S. 310 (2010).................................................................................................4

*City of Grants Pass, Oregon v. Johnson*,
  603 U.S. 520 (2024)...............................................................................................11

*Department of Commerce v. New York*,
  588 U.S. 752 (2019)...............................................................................................48

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................................36, 37, 40, 41, 43

*Feds for Medical Freedom v. Biden,*
    63 F.4th 366 (5th Cir. 2023) ...................................................................47

*Florida Prepaid Postsecondary Education Expense Board v. College Savings
    Bank,*
    527 U.S. 627 (1999)...............................................................................22

*GDF Realty Investments, Ltd. v. Norton,*
    326 F.3d 622 (5th Cir. 2003) ...................................................................33

*Gonzales v. Raich,*
    545 U.S. 1 (2005)..............................................................2, 6, 25, 26, 27, 30, 34

*Groome Resources Ltd. v. Parish of Jefferson,*
    234 F.3d 192 (5th Cir. 2000) ..............................................................30, 31

*Haynes v. United States,*
    390 U.S. 85 (1968)...............................................................................8, 14

*Heart of Atlanta Motel, Inc. v. United States,*
    379 U.S. 241 (1964)...............................................................................22

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ...............................................................44

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau,*
    740 F. Supp. 3d 509 (N.D. Tex. 2024) ..................................1, 8, 11, 12, 26, 27, 29, 31, 32, 34

*Mississippi ex rel. Hood v. AU Optronics Corp.,*
    571 U.S. 161 (2014)...............................................................................19

*Lane v. United States,*
    612 F. Supp. 3d 659 (N.D. Tex. 2020) .......................................................14

*Maloney v. Singas,*
    351 F. Supp. 3d 222 (E.D.N.Y. 2018) ........................................................38

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)...............................................................................14

*Medina v. Planned Parenthood South Atlantic,*
    606 U.S. 357 (2025)...............................................................................19

*Mock v. Garland,*
    697 F. Supp. 3d 564 (N.D. Tex. 2023) .......................................................47

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) .............................................................28, 46, 48

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024).................................................................4

*National Ass'n of Private Fund Managers v. SEC,*
    103 F.4th 1097 (5th Cir. 2024) ...........................................19

*National Automobile Dealers Ass'n v. FTC,*
    127 F.4th 549 (5th Cir. 2025) .........................................20, 21

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022).................................37, 38, 39, 41, 42, 43, 44, 45

*NFIB v. Sebelius,*
    567 U.S. 519 (2012)...................................7, 12, 13, 14, 22

*Reese v. BATFE,*
    127 F.4th 583 (5th Cir. 2025) ............................................45

*Rodriguez v. City of Corpus Christi,*
    129 F.4th 890 (5th Cir. 2025) ............................................31

*SAS Institute, Inc. v. Iancu,*
    584 U.S. 357 (2018)...........................................................21

*Second Amendment Foundation, Inc v. ATF,*
    702 F. Supp. 3d 513 (N.D. Tex. 2023) .............................39

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
    605 U.S. 280 (2025)......................................................39, 41

*Smith v. Department of the Treasury,*
    761 F. Supp. 3d 952 (E.D. Tex. 2025) ...........................34, 35

*Smith v. United States,*
    328 F.3d 760 (5th Cir. 2003) .............................................41

*Sonzinsky v. United States,*
    300 U.S. 506 (1937).........................................2, 8, 14, 15, 17, 22, 24

*Taylor v. United States,*
    579 U.S. 301 (2016)......................................................26, 30

*Terkel v. CDC,*
    521 F. Supp. 3d 662 (E.D. Tex. 2021)........................30, 31, 33

*Texas Top Cop Shop, Inc. v. Garland,*
    758 F. Supp. 3d 607 (E.D. Tex. 2024) .........................33, 34

*Texas v. ATF*,
    700 F. Supp. 3d 556 (S.D. Tex. 2023) ...................................................................48

*Texas v. ATF*,
    737 F. Supp. 3d 426 (N.D. Tex. 2024) .................................................................48

*Texas v. United States*,
    945 F.3d 355 (5th Cir. 2019) .........................................................................7, 13

*Torres v. Lynch*,
    578 U.S. 452 (2016) ....................................................................................24

*Trump v. Anderson*,
    601 U.S. 100 (2024) ....................................................................................13

*Trump v. CASA*,
    606 U.S. 831 (2025) ....................................................................................46

*United States v. Arce*,
    118 F.3d 335 (5th Cir. 1997) .........................................................................17

*United States v. Ardoin*,
    19 F.3d 177 (5th Cir. 1994) ....................................................................2, 15, 16

*United States v. Bird*,
    124 F.3d 667 (5th Cir. 1997) .....................................................................23, 24

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) .......................................................................39

*United States v. Freed*,
    401 U.S. 601 (1971) ....................................................................................13

*United States v. Gresham*,
    118 F.3d 258 (5th Cir. 1997) ........................................................................9, 13

*United States v. Hale*,
    978 F.2d 1016 (8th Cir. 1992) ........................................................................17

*United States v. Hall*,
    171 F.3d 1133 (8th Cir. 1999) ..........................................................17, 31, 33, 35

*United States v. Houston*,
    103 F. App'x 346 (10th Cir. 2004) ...................................................................17

*United States v. Jones*,
    976 F.2d 176 (4th Cir. 1992) .........................................................................17

*United States v. Kebodeaux*,
    687 F.3d 232 (5th Cir. 2012) ........................................................................31, 32

*United States v. Kenney*,
    91 F.3d 884 (7th Cir. 1996) ...............................................................................29

*United States v. Kirk*,
    105 F.3d 997 (5th Cir. 1997) ...........................................................15, 16, 29, 31

*United States v. Knutson*,
    113 F.3d 27 (5th Cir. 1997) ...............................................................................29

*United States v. Lopez*,
    2 F.3d 1342 (5th Cir. 1993) ...............................................................14, 20, 28

*United States v. Lopez*,
    514 U.S. 549 (1995)..................................17, 23, 24, 26, 27, 30, 33, 34, 35

*United States v. Luna*,
    165 F.3d 316 (5th Cir. 1999) ...........................................................................29

*United States v. Matthews*,
    438 F.2d 715 (5th Cir. 1971) .............................................................................9

*United States v. Miller*,
    2023 U.S. Dist. LEXIS 172594 (N.D. Tex. Sept. 27, 2023)..............................39

*United States v. Miller*,
    307 U.S. 174 (1939)........................................................................................36

*United States v. Morgan*,
    147 F.4th 522 (5th Cir. 2025) .............................................................................6

*United States v. Morrison*,
    529 U.S. 598 (2000).....................................................1, 24, 30, 33, 34, 35

*United States v. Oba*,
    448 F.2d 892 (9th Cir. 1971) ...........................................................................13

*United States v. Parker*,
    960 F.2d 498 (5th Cir. 1992) .......................................................2, 16, 17, 18, 19

*United States v. Pearson*,
    8 F.3d 631 (8th Cir. 1993) ...............................................................................17

*United States v. Peterson*,
    __ F.4th ____, 2025 WL 3537261 (5th Cir. Dec. 9, 2025)........................41, 42, 43

*United States v. Rahimi,*
    602 U.S. 680 (2024)..................................................................................38, 45

*United States v. Ridlehuber,*
    11 F.3d 516 (5th Cir. 1993) ....................................................................9

*United States v. Robinson,*
    2025 U.S. App. LEXIS 6544 (11th Cir. Mar. 20, 2025).........................39

*United States v. Ross,*
    458 F.2d 1144 (5th Cir. 1972) ..................................................9, 14, 16, 17

*United States v. Rush,*
    130 F.4th 633 (7th Cir. 2025) ...............................................................39

*United States v. Rybar,*
    103 F.3d 273 (3d Cir. 1996)...................................................................29

*United States v. Salerno,*
    481 U.S. 739 (1987)...............................................................................3

*United States v. Solis,*
    124 F.3d 192 (5th Cir. 1997) .................................................................16

*United States v. Stepp-Zafft,*
    733 F. App'x 327 (8th Cir. 2018) ..........................................................39

*United States v. Wilson,*
    440 F.2d 1068 (6th Cir. 1971) ...............................................................17

*Varsity Spirit LLC v. Varsity Tutors, LLC,*
    2021 U.S. Dist. LEXIS 217376 (N.D. Tex. Sept. 17, 2021)...................41

*Wickard v. Filburn,*
    317 U.S. 111 (1942)...............................................................................25

*Wilton v. Seven Falls Co.,*
    41 F.3d 934 (5th Cir. 1994) ...................................................................48

**Statutes, Rules, and Regulations**

27 C.F.R. § 478.125 ....................................................................................10

27 C.F.R. § 479.84 ......................................................................................25

26 U.S.C. § 5801 ..........................................................................................8

26 U.S.C. § 5802 ........................................................................................1, 8

26 U.S.C. § 5811 ................................................................................................18

26 U.S.C. § 5812 ..........................................................................................18, 25

26 U.S.C. § 5821 ................................................................................................18

26 U.S.C. § 5822 ................................................................................................18

26 U.S.C. § 5841 ..........................................................................................18, 25

26 U.S.C. § 5842 ................................................................................................25

26 U.S.C. § 5845 ..........................................................................................18, 38

26 U.S.C. § 5848 ................................................................................................12

26 U.S.C. § 5861 ....................................................................................21, 25, 32

26 U.S.C. § 7852 ................................................................................................50

Definition of "Engaged in the Business" as a Dealer in Firearms,
    89 Fed. Reg. 28968 (April 19, 2024) (final rule) ...................................10

Pub. L. No. 73-474, 48 Stat. 1236 (1934) ........................................................18

Pub. L. No. 75-785, 52 Stat. 1250 (1938) ........................................................19

Pub. L. No. 90-618, 82 Stat. 1213 (1968) ..................................................18, 20

Pub. L. No. 99-308, 100 Stat. 449 (1986) ........................................................15

Pub. L. No. 119-21, 139 Stat. 72 (2025) ..........................................................18

**Legislative Materials**

H.R. Rep. No. 90-1956 (1968) (Conf. Rep.)......................................................20

*The National Firearms Act of 1934: Hearings on H.R. 9066 Before the H. Comm.
    on Ways & Means*, 73d Cong. (1934)......................................................21

S. Rep. No. 73-1444 (1934) ..............................................................................21

S. Rep. No. 90-1097 (1968) ..............................................................................28

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* (2012) .............................................................................................38

ATF, Annual Firearms Manufacturing and Exportation Report,
https://tinyurl.com/k3n5z464 ................................................................................10

ATF, Firearms Commerce in the United States, Statistical Update 2024 (May
2024), tinyurl.com/mscuvayt ..............................................................................38

ATF, National Firearms Act Handbook § 5.2.6 (rev. Apr. 2009),
https://tinyurl.com/yrsuua9d ..........................................................................11, 20

ATF Resource Center, Data & Statistics, ATF, Bureau of Alcohol, Tobacco,
Firearms and Explosives (last reviewed Sept. 12, 2025),
https://www.atf.gov/resource-center/data-statistics ............................................38

ATF Tools & Services for Firearms Industry, National Firearms Act Division,
ATF, Bureau of Alcohol, Tobacco, Firearms and Explosives (last reviewed
April 11, 2025), https://www.atf.gov/firearms/national-firearms-act-division ......49

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms
Before 1900*, 50 J. Legis. 223 (2024)....................................................................45

*Dissent in 23-55805 Duncan v. Bonta (9th Cir.)*, YouTube (Mar. 20, 2025),
https://www.youtube.com/watch?v=DMC7Ntd4d4c .............................................40

FBI, Expanded Homicide Data Table 8 (2019), https://tinyurl.com/4bs445yu ............40

*Marble Arms Game Getter*, Rock Island Auction Company,
https://tinyurl.com/5n6s7v4h ...............................................................................40

**INTRODUCTION**

The Government's cross motion confirms that the challenged National Firearms Act provisions exceed Congress's enumerated powers.  After conceding (at 3) that the NFA is at bottom a scheme "to curtail armed crime," the Government says (at 4) it needs the statute to "stem the criminal misuse of [NFA] weapons" and (at 17) to help prevent "diversion" into "illicit channels" "weapons which are peculiarly susceptible of criminal use."  But however laudable these crime-fighting ends, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime."  *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The taxing power can no longer shield this criminal statute.  The Government agrees that the NFA's firearm registration requirements have always facilitated collection of the statute's firearm making and transfer taxes.  And it agrees that now that the firearm taxes are gone, the firearm registration requirements no longer serve that purpose.  So, it invents a new theory.  It claims that the firearm registration provisions instead facilitate a separate occupational tax.  That defies reality. The *firearm* registration requirements plainly supported the now-zeroed *firearm* taxes, while the *occupational* registration requirements, 26 U.S.C. § 5802, plainly support the *occupational* tax.

The Government's counterarguments confirm the firearm registration requirements are not "needful and 'plainly adapted' to executing Congress's" occupational tax.  *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 527 (N.D. Tex. 2024).  And they reveal a stunning theory of federal power:  according to the Government, if it imposes an annual tax on *any* business, it has the authority to track every customer and good that could ever potentially touch that business with a fingerprint mandate and registration in a federal law-enforcement database as prophylactic measures that in no way support the collection of any actual revenue. That limitless theory is anathema to our constitutional system.

1

The Government's failure to ground the NFA in the taxing power ends this case. The challenged NFA provisions are "*only* a taxing measure." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) (emphasis added). Their "constitutional bedrock … is 'the power to tax' *rather than 'the commerce power.*'" *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992) (emphasis added) (quoting *United States v. Ross*, 458 F.2d 1144, 1145 n.3 (5th Cir. 1972)). The text, structure, and purpose of the challenged NFA show that no other power can sustain them.

The Government tries to reconceptualize the NFA as an interstate-commerce regulation by selectively quoting a single sentence from *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994). But that case upheld an NFA provision under the taxing power and observed that "the regulation *of machineguns* could … be upheld under Congress's power to regulate interstate commerce." *Id.* at 180 (emphasis added). But machineguns, unlike the untaxed firearms at issue here, are subject to a total-market freeze—a unique scheme that courts have used to ground machinegun regulation in the Commerce Clause. Dictum about machineguns cannot salvage the Government's case.

Nor could the Commerce Clause sustain application of the challenged NFA provisions to intrastate activity. The Government fails to explain why *intra*state possession, transfer, and making of untaxed firearms has any connection to *inter*state commerce. And the reason for that omission is obvious: the purpose of the challenged NFA provisions was never to reach interstate commerce. The Government's attempt to analogize the NFA to the Controlled Substances Act, at issue in *Gonzales v. Raich*, 545 U.S. 1 (2005), only crystallizes the problem. The CSA is a comprehensive effort "to control the supply and demand" of an "interstate market." *Id.* at 18–19. That is about as commerce-based as it gets and is nothing like the NFA's crime-control regulations. The Government's failure to tie the challenged NFA provisions to any interstate-market regulation dooms its case and underscores its unbounded view of federal power.

Even if Congress had enumerated authority to enact the challenged NFA provisions (it did not), those provisions violate the Second Amendment. The Government does not dispute that *all* of the NFA firearms at issue in this case are in common use. Nor does it offer *even one* relevant historical analogue that looks anything like the NFA's federal database, law-enforcement notification, and fingerprinting requirements. Those omissions are dispositive, and the Government's resort to inapposite precedent and law-review articles cannot remedy that deficiency.

The Government's grab-bag of remaining arguments is similarly unpersuasive. Relying on the mistaken idea that Plaintiffs have brought only a facial challenge to every possible application of the NFA, the Government tries to water down the standard of review. But the very first page of Plaintiffs' summary-judgment motion shows why that is wrong. It explains that "the NFA is unconstitutional *as applied* to firearms it does not tax." ECF No. 49 ("MSJ") at 1 (emphasis added). Every heading in Plaintiffs' motion makes the same point. The Government also protests that Plaintiffs seek a broad injunction but cannot dispute that Plaintiffs' broad harms warrant broad relief. And the Government and its putative *amici* raise public-safety concerns, but these fall flat. Even if the NFA disappeared tomorrow, all NFA firearms would remain subject to comprehensive Gun Control Act regulations, including background-check, recordkeeping, and other procedures, as well as numerous laws enacted by state and local governments.

The Court should reject the Government's unprecedented theory of federal power.

## ARGUMENT

## I.    The Government Misrepresents The Scope Of Plaintiffs' Challenge

The Government badly wants to litigate this case solely as a facial challenge to every conceivable application of the NFA so that Plaintiffs "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Government prefers the *Salerno* standard so that it can point to applications of the NFA not

at issue here to avoid shouldering its constitutional burden.  *See, e.g.*, ECF No. 60 ("XMSJ") at 14 (defending application of NFA to "persons and things in interstate commerce").

This argument falls flat.  To start, "the distinction between facial and as-applied challenges … goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."  *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).  Thus, "[f]ederal courts are free to consider challenged statutes as applied to the plaintiff" even when a suit is "style[d] … as a facial challenge."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 757 n.1 (2024) (Thomas, J., concurring); *see also In re Cao*, 619 F.3d 410, 442 (5th Cir. 2010) (Jones, J., concurring in part and dissenting in part).  Thus, even if Plaintiffs had brought only a facial challenge, the Court could still grant as-applied relief.

But Plaintiffs have clearly sought both facial *and* as-applied relief.  Start with the operative complaint where, for both substantive counts, Plaintiffs asked for relief "both facially and/or *as applied* to Plaintiffs."  Am. Compl., ECF No. 15 ¶¶ 70, 75 (emphasis added).  Next, Plaintiffs' motion for summary judgment styles the taxing power argument primarily as a request for as-applied relief: "the NFA is unconstitutional *as applied to firearms it does not tax*."  MSJ 1 (emphasis added).  The same is true for the Commerce Clause argument: "the NFA cannot be sustained under the Commerce Clause *as applied to the purely intrastate possession, transfer, and making of NFA firearms*."  *Id.* at 2 (emphasis added).  Then, there are the section headings.  *See id.* at 14 ("The Challenged NFA Provisions Are Unconstitutional *As Applied To Untaxed Firearms* Because They Exceed Congress's Taxing Power."), 20 ("The Challenged NFA Provisions Are Unconstitutional *As Applied To Intrastate Possession, Transfer, And Making Of Untaxed Firearms* Because They Exceed Congress's Commerce Power."), 36 ("The Challenged NFA Provisions Violate The Second Amendment *As Applied To Untaxed Firearms*.") (emphases added).  And Plaintiffs'

proposed order could not be any clearer. It asks that the Court declare unlawful the challenged NFA provisions "*as applied to* … the Untaxed Firearms." ECF No. 48-1 at 1 (emphasis added). And it asks the Court to declare unlawful the "*application of* the Challenged Provisions to intrastate activity involving the Untaxed Firearms." *Id.* at 2 (emphasis added).

Not even the Government believes that Plaintiffs challenge the NFA in all of its applications. The Government concedes on the very first page of its brief that Plaintiffs challenge application of the NFA provisions only to "four classes of regulated firearms," not all "six categories of 'firearms' that are subject to" the NFA. XMSJ 1, 3; *see id.* at 7 ("Plaintiffs [challenge] … the NFA's requirements on manufacturing, transferring, or possessing short-barreled rifles and shotguns, suppressors, and AOWs, because those firearms are now 'untaxed'"), 14 ("plaintiffs contend that the NFA's requirements … are beyond Congress's authority insofar as they regulate 'purely intrastate' activities"). The Government's facial-challenge strawman is easily toppled.

As are the Government's arguments built on out-of-context quotations. The Government claims (at 15 n.3) it is "apparent from plaintiffs' arguments" that they "are not asserting an as-applied challenge," and it purports to quote page 3 of Plaintiff's summary-judgment motion as seeking a declaration that "the challenged provisions of the NFA are unconstitutional." But Plaintiffs' sentence does not end there. It continues: "that the challenged provisions of the NFA are unconstitutional *as applied to the untaxed firearms*." MSJ 3 (emphasis added). Contrary to the Government's claim, Plaintiffs seek as-applied declaratory relief.

The same is true for injunctive relief. The Government purports to quote page 48 of Plaintiffs' motion as asking for "a blanket ban on the[ir] enforcement," XMSJ 15 n.3 (alterations added by the Government)—i.e., on the enforcement of the challenged NFA provisions. But that request seeks to afford "complete relief *for the parties*." MSJ 48 (emphasis added) (quotations omitted).

That is plainly as-applied relief, which Plaintiffs say explicitly in their motion, *id.* at 50 ("enjoin the Defendants … *as to the untaxed firearms*." (emphasis added)), and their proposed order, ECF No. 48-1 at 2 ("permanently enjoin[ ] Defendants … *as to any Untaxed Firearms*." (emphasis altered)).  As Plaintiffs explained, *see* MSJ 48–49, relief as to all untaxed firearms is necessary to afford complete relief to the organizational, commercial, and state plaintiffs.

The Government also says that as-applied challenges must be made in reference "to the challenger's activity."  XMSJ 15 n.3 (alterations accepted; emphasis omitted).  But that only confirms Plaintiffs' as-applied challenge.  Plaintiffs supplied uncontested declarations establishing that they (i) possess, transfer, and make untaxed firearms generally, MSJ 9–13 (citing declarations), and (ii) also engage in "purely *intra*state" possession, transfers, and making, *id.* at 13 (citing declarations) (emphasis in original).  Those activities align perfectly with Plaintiffs' constitutional challenge to the NFA (i) as applied to untaxed firearms, and (ii) to the extent the Court reaches the Commerce Clause, as applied to the intrastate possession, making, and transfer of untaxed firearms.  *Accord Gonzales v. Raich*, 545 U.S. 1, 15 (2005) (considering Commerce Clause "challenge … as applied to … intrastate" activities).  Plaintiffs have expressly brought an "'as-applied' challenge" by reference to their own activities, and that is obviously sufficient to "preserve [an] as-applied challenge."  *United States v. Morgan*, 147 F.4th 522, 527 (5th Cir. 2025).

Finally, even if the Court were to construe Plaintiffs' challenge solely as a facial one, the Government still loses.  That is because, regardless of labels, all applications within the scope of Plaintiffs' challenge—for purposes of the Tax Clause and the Second Amendment, to untaxed firearms and, for purposes of the Commerce Clause, to *intra*state activities involving untaxed firearms—are categorically beyond Congress's authority.

II.    **The Government Confirms The Challenged NFA Provisions Exceed Congress's Enumerated Powers**

    A.    **The Government Confirms The Taxing Power Cannot Sustain Application Of The Challenged NFA Provisions To Plaintiffs' Untaxed Firearms**

        1.    **Only The Now-Zeroed Firearm Making And Transfer Taxes Supported The Challenged Provisions**

The Government concedes (at 7) that Congress enacted the NFA pursuant to its taxing power and that the One Big Beautiful Bill Act zeroed the making and transfer taxes for many NFA firearms. "Now that the [tax] amount is set at zero," *Texas v. United States*, 945 F.3d 355, 390 (5th Cir. 2019) *rev'd and remanded sub nom. on other grounds*, *California v. Texas*, 593 U.S. 659 (2021), the NFA's firearm registration requirements cannot "be justified under Congress's taxing power," *id.* at 389. Therefore, as Plaintiffs' opening brief explains, the NFA's registration requirements are unconstitutional as applied to the now untaxed classes of NFA firearms.

The Government does not dispute Plaintiffs' core argument.[1] Instead, the Government contends (at 7–11, 26–27) that the NFA's firearm registration requirements remain a valid exercise of Congress's taxing power because the NFA also authorizes collection of a "special occupational tax" ("SOT") from businesses. But the firearm registration requirements do not support collection of the special occupational tax; they instead supported the now-zeroed firearm making and transfer taxes. That means the firearm registration requirements cannot be upheld as an exercise of Congress's power to tax nor as regulations incidental to the imposition of an occupational tax.

Start with the basics. "The taxing power does not give Congress the same degree of control over individual behavior" as does "its power to regulate commerce." *NFIB v. Sebelius*, 567 U.S.

---

[1] For this reason, the Court need not consider Baltimore's contention (*see* ECF No. 62-1) that Congress can retain regulations to support zeroed taxes. *See Anderson v. City of New Orleans*, 38 F.4th 472, 481 (5th Cir. 2022) ("an issue waived by appellant cannot be raised by amicus curiae" (cleaned up)). In all events, the Fifth Circuit *Texas* Court persuasively explains why that is wrong.

519, 573 (2012).  "So, it follows that Congress cannot rely on a 'reasonable' or 'rational' connection to an existing tax to regulate every individual behavior occurring before that tax obligation becomes effective."  *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 529 (N.D. Tex. 2024).  Rather, when Congress enacts regulations to support its taxes, "the applicable standard is not whether [the regulations] have a 'reasonable connection' to revenue, but whether they are needful and 'plainly adapted' to executing Congress's taxes."  *Ibid.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 324–25 (1819)).  They are not.

*First*, the challenged firearm registration requirements are not plainly adapted to collecting the special occupational tax because they are designed to collect only the firearm making and transfer taxes.  Section 5801 requires "every importer, manufacturer, and dealer in firearms" "engaging in business" to pay annually a "special (occupational) tax."  26 U.S.C. § 5801(a).  Collection of the occupational tax is supported by an occupational registration requirement (unchallenged here) which requires "each importer, manufacturer, and dealer in firearms" to "register with" ATF. 26 U.S.C. § 5802.  The Supreme Court has held that this occupational registration requirement "obviously" supports "the annual tax."  *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937).

In addition to the annual occupational tax, "[s]eparate taxes are imposed on the making and transfer of [NFA] firearms by persons *other than those obliged to pay the occupational taxes*." *Haynes v. United States*, 390 U.S. 85, 88 (1968) (emphasis added).  Collection of these taxes— taxes which are imposed on makings and transfers by sections 5821 and 5811, respectively—is supported by the firearm registration requirements codified in section 5841.  Those firearm registration requirements ensure that the making and/or transfer taxes are paid whenever an NFA firearm is acquired by someone outside the occupational tax regime.  As the Government's affiant explains, businesses that pay the special occupational tax are statutorily "exempt" from paying the

making tax and from paying the transfer tax on transfers to other businesses that pay the special occupational tax.  Def. App.0187 (Albro Decl. ¶ 25 (citing 26 U.S.C. § 5852(c), (d))).

Despite this obvious statutory design—where *occupational* registration facilitates collection of an *occupational* tax and *firearm* registration facilitates the collection of a *firearm* making and transfer tax—the Government now claims that *firearm* registration facilitates the *occupational* tax.  But that contention makes no sense, as the occupational tax is a flat rate that does not depend on the number of firearms made or sold.  And the cases the Government cites for its illogical proposition only confirm what Plaintiffs have said all along: that the challenged firearm registration requirements support collection of the firearm making and transfer taxes.  *See, e.g.*, *United States v. Gresham*, 118 F.3d 258, 263 (5th Cir. 1997) ("the registration requirement … 'is part of the web of regulation aiding enforcement of the transfer tax'"); *United States v. Ridlehuber*, 11 F.3d 516, 526 (5th Cir. 1993) ("a transfer tax and registration as an aid in collection of that tax"); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) (same); *United States v. Matthews*, 438 F.2d 715, 717 (5th Cir. 1971) ("the registration requirement was … designed to aid the collection of tax on any future transfer of the registered item"); *Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017) ("Section 5821 taxes the making" and "§ 5822 establishes registration and application requirements for making").  Not one of the Government's cases so much as *suggests*—much less *holds*—that *firearm* registration requirements further collection of the *occupational* tax.

Nor do the Government's explanations add up.  Its brief claims (at 10) that "the agency reviews every application to make or transfer an NFA firearm to ensure" that any business "associated with the relevant firearm has paid their special occupational tax."  But even if that provided some justification *historically*, it provides no justification *presently*—i.e., following the enactment of the One Big Beautiful Bill Act eliminating the making and transfer taxes.  Prior to the Act,

checking whether a business had paid its annual special occupational tax might plausibly bear on its qualification to receive the statutory exemption from also paying the making or transfer taxes. But now that there are no making or transfer taxes on most classes of NFA firearms (and thus no exemption to qualify for), whether a business has paid its special occupational tax has zero relevance to a transaction involving those firearms.

The Government theorizes (at 10) that the firearm registration requirements might help it prevent "circumvention" of the occupational tax. According to its affiant, a "sustained increase" in applications "may indicate that an individual is engaged in the business of dealing in firearms and should be licensed and paying the SOT." Def. App.0187 (Albro Decl. ¶ 28). But "[t]he vast majority of NFA firearms" are made and transferred by "qualified manufacturers" already within the occupational tax regime. Def. App.0188 (Albro Decl. ¶ 29); *see also ibid.* (98.5% of short-barreled shotguns; 97% of AOWs; 88% of short-barreled rifles; 87.5% of silencers). And just last year, ATF rejected the proposition that any "minimum standard of how many firearms" transacted would make someone a firearms dealer. *See* Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28968, 28990 (April 19, 2024) (final rule); *see also id.* at 29091 ("whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances"; "even a single firearm transaction … may require a license").[2] Indeed, ATF has long warned firearms collectors (who often purchase large numbers of firearms) *against paying* the occupational tax when they are not engaged in any firearms business, stating that this

---

[2] To be sure, the rule acknowledges that selling large numbers of firearms "may be" indicative of business activity. 89 Fed. Reg. at 28990. But that just underscores the mismatch. A registration regime designed to collect information about a single, non-dispositive fact is not well suited to assessing "the totality of the circumstances." *Ibid.* In any event, the same figures are already available from separate recordkeeping requirements. 27 C.F.R. § 478.125(e); *see* ATF, Annual Firearms Manufacturing and Exportation Report, https://tinyurl.com/k3n5z464.

"circumvents [NFA] requirements" and "commit[s] Federal felonies." ATF, National Firearms Act Handbook § 5.2.6 (rev. Apr. 2009), https://tinyurl.com/yrsuua9d (citing 1976 ATF Ruling).  In short, the Government's anticircumvention theory is that the firearm registration requirements might help support collection of the special occupational tax by gathering information it concedes is irrelevant in 88 to 99 percent of NFA transactions and is non-dispositive in the others.  And, in fact, ATF has warned that it may prosecute someone who pays the special occupational tax based on volume alone.  It is difficult to imagine a regulation that is less plainly adapted to its supposed tax collection purpose.

*Second*, the challenged firearm registration requirements are not plainly adapted to collecting the special occupational tax because they regulate persons who are not subject to that tax.  Again, the Government concedes that 88 to 99 percent of NFA transactions are made by businesses already occupationally registered and taxed.  That means the firearm registration requirements' only potential revenue effect is in the 1 to 12 percent of transactions occurring outside the occupational tax regime.  Yet, despite sifting "every application to make or transfer," Def. App.0187 (Albro Decl. ¶ 27), the Government cannot claim to have ever found even a single occupational tax evader.  Indeed, the Government does not even claim that it has ever launched an *investigation* based on this information, *see* Def. App.0187–88 (Albro Decl. ¶ 28), positing nothing more than "speculation" about a "remote" compliance risk, *cf. City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 563 (2024) (Thomas, J., concurring).  In short, the challenged firearm registration requirements appear, in relation to their supposed anticircumvention purposes, to exclusively regulate only persons who are not actually subject to the occupational tax.

Another court in this District recently explained why this sort of mismatch exceeds Congress's taxing power.  That decision, *Hobby Distillers*, involved two federal statutes purporting to

regulate the location of distilled spirits plants, or "stills."  Just like here, the agency there asserted an anticircumvention rationale, claiming "that the provisions at issue are valid uses of the taxing power because they ensure protection of, and reduce fraud upon, the tax revenue generated."  740 F. Supp. 3d at 523.  The court rejected that argument.  "Congress has the power to lay and collect taxes" and "to punish those who defraud the government in the process of paying them."  *Id.* at 529 (cleaned up).  But because some stills might not ever be obliged to pay the federal tax on distilled spirits and the statutes regulated the location of those stills, the statutes were "not needful nor proper to carry the taxing power into execution."  *Ibid.* (cleaned up).  "Congress cannot criminalize the conduct of a person to whom its enumerated taxing power does not yet apply."  *Ibid.*; *see also Sebelius*, 567 U.S. at 557 ("The proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds no support in our precedent.").  That reasoning applies with even stronger force here, where ATF cannot identify even a single NFA transaction outside the occupational tax regime that should be subject to the occupational tax.

*Third*, the challenged firearm registration requirements are not plainly adapted to collecting the special occupational tax because the NFA bars use of firearms registration information in criminal prosecutions.  Specifically, the statute provides, "No information or evidence obtained from an application, registration, or records required to be submitted or retained … shall … be used, directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the records containing the information or evidence."  26 U.S.C. § 5848(a).[3]  That means the Government is barred from using the information collected through the firearm registration requirements for the very purpose the Government's affiant asserts here—i.e., "the assessment, collection, and *enforcement* of the SOT."

---

[3]  The elided text refers to an exception not relevant here.  *See* 26 U.S.C. § 5848(b).

Def. App.0187 (Albro Decl. ¶ 27) (emphasis added). "[T]he prophylactic language of 26 U.S.C. § 5848(a)" "reject[s] the contention ... that compliance with the transfer provision ... is an open invitation to the prosecutorial agencies of government." *United States v. Oba*, 448 F.2d 892, 895 (9th Cir. 1971); *see also United States v. Freed*, 401 U.S. 601, 606 (1971) (describing section 5848 as a "statutory barrier against us[ing]" NFA registration information "in a prosecution for prior or concurrent offenses"). Indeed, that likely explains why the Government's carefully worded affidavit never claims ATF has *actually* used firearms registration information to investigate or prosecute anyone who failed to pay the occupational tax. The statute does not allow that.

*Fourth*, the Government's theory is unbounded. "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Trump v. Anderson*, 601 U.S. 100, 110 (2024) (citation omitted). "The States have broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014). "The Federal Government, by contrast, has no such authority and 'can exercise only the powers granted to it.'" *Ibid.* (quoting *McCulloch*, 4 Wheat. at 405). Under our Constitution, "the 'police power'"—the "general power of governing"—is "possessed by the States but not by the Federal Government." *Sebelius*, 567 U.S. at 536.

The Government's position in this case would effectively transfer the general police power from the States to the Federal Government. As explained, Congress enacted the firearm registration requirements as "regulation[s] aiding enforcement of the *transfer* tax," *Gresham*, 118 F.3d at 263 (emphasis added), and the "*making*" tax, *Bezet*, 714 F. App'x at 341 (emphasis added). The One Big Beautiful Bill Act eliminated both taxes. If Congress could expand its regulatory power "through a two-step process of first taxing [an activity] and then eliminating the tax while retaining the prohibition," *Texas*, 945 F.3d at 391, the Framers' purpose in establishing "a national

13

government of limited and enumerated powers" would be destroyed. *See United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995).

Nor does the Government's pivot to the occupational tax solve that problem. Under that rationale, Congress need only tax a business to engage in invasive monitoring of every customer and item that could ever theoretically be connected to such businesses. For example, if Congress imposed a $1 annual tax on grocery stores, anyone wishing to possess broccoli could be compelled to seek Government permission, notify law enforcement, and forfeit their fingerprints for inclusion in a federal database—all to make sure they are not unlawfully "engaged in the business" of being a grocer. For "cars and broccoli," *Sebelius*, 567 U.S. at 558, "from Frisbees to flatulence," *Massachusetts v. EPA*, 549 U.S. 497, 558 n.2 (2007) (Scalia, J., dissenting), Congress's regulatory power would be virtually unlimited. Such federal "police power" defies "the Tenth Amendment and the structure of the Constitution." *Lane v. United States*, 612 F. Supp. 3d 659, 660 (N.D. Tex. 2020).

### 2. The Government Confirms Precedent Forecloses Reliance On Any Other Enumerated Power To Sustain The Challenged NFA Provisions

Plaintiffs showed that under binding precedent, this case begins and ends with the taxing power. *See* MSJ 17. In *Sonzinsky*, the Supreme Court held that the NFA was "*only* a taxing measure," 300 U.S. at 513 (emphasis added), and the Supreme Court and the Fifth Circuit have repeatedly reaffirmed that conclusion, *Haynes*, 390 U.S. at 98 ("the registration requirement is a valid exercise of the taxing powers"); *Sebelius*, 567 U.S. at 567 ("valid exercise of the taxing power"); *Ross*, 458 F.2d at 1145 (holding "power to tax" is NFA's "constitutional bedrock"). Thus, because the Government loses on the taxing power, *see supra* II.A.1, it loses the case.

Because the Government cannot escape this precedent, it misconstrues it. First, the Government says (at 20) that "*Sonzinsky* does not stand for the proposition that the NFA is *solely* an

14

exercise of Congress's taxing power." The Supreme Court disagrees. "On its face," *Sonzinsky* explained, a section of the NFA containing a tax and "registration provisions … is **only** a taxing measure." *Sonzinsky*, 300 U.S. at 513 (emphasis added). And indeed, the Government's brief elsewhere cites *Sonzinsky* (at 7) for the proposition that "[i]t's long been settled that the NFA's requirements … are thus justified under Congress's taxing power."

Next, the Government selectively quotes out-of-context snippets from a single sentence in *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994). In that case, the Fifth Circuit upheld a machinegun-registration conviction against an argument that a ban on machineguns manufactured after 1986 "implicitly repealed portions of the NFA." *Id.* at 179. The court rejected that argument under "the taxing power." *Id.* at 180. It then opined, "no one could seriously contend that the regulation of machineguns could not also be upheld under Congress's power to regulate interstate commerce." *Ibid.* The Government latches on to this single sentence and cites it five times (at 1, 9, 14, 20, 22) for the proposition that "the Fifth Circuit has already rejected" that *Sonzinsky* held "that the NFA is *solely* an exercise of Congress's taxing power." XMSJ 20 (emphasis in original).

The Government misreads *Ardoin* twice over. *First*, it conveniently omits that *Ardoin*'s statement about the Commerce Clause pertained only to "the regulation *of machineguns*." 19 F.3d at 180 (emphasis added). And the Commerce Clause analysis for those weapons is fundamentally different. That is because, nearly 50 years after the enactment of the NFA, Congress banned private possession of machineguns manufactured after 1986. *See* Pub. L. No. 99-308, § 102, 100 Stat. 449, 453 (1986) (codified at 18 U.S.C. § 922(o)). Courts have thus found that machinegun regulation has a Commerce Clause hook: to help "fr[ee]ze in place the" entire national "market in machine guns." *United States v. Kirk*, 105 F.3d 997, 1001 (5th Cir. 1997) (Higginbotham, J.); *id.* at 1014 (Jones, J.) ("enforce a freeze on the number of available machineguns"). In that way,

"post-1986 machinegun" regulation is analogous "to the farmer's harvest of excessive wheat in *Wickard v. Filburn*." *Id.* at 1014 (Jones, J.). Both policies regulate "the supply-and-demand." *Id.* at 1013–14. Therefore, courts have found that "the Commerce Clause" can be the "basis for restricting the market in machineguns." *Id.* at 1002 (Higginbotham, J.).

*Ardoin* made no such finding for non-machinegun firearms.[4] NFA "registration" *outside* the machinegun market freeze is an exercise of "the taxing power." *Ibid.* As the Fifth Circuit has squarely held in applications of the NFA to non-machinegun firearms, "the constitutional bedrock … is the power to tax *rather than the commerce power*." *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992) (emphasis added) (quotations omitted) (citing, *inter alia*, *Sonzinsky*); *see also Ross*, 458 F.2d at 1145 n.3.

*Second*, *Ardoin*'s statement about Commerce Clause machinegun regulation is also dicta. It is phrased hypothetically: "regulation of machineguns *could* … be upheld under Congress's power to regulate interstate commerce." *Ardoin*, 19 F.3d at 180 (emphasis added); *see also ibid.* ("can be upheld"). Even if the NFA "could" be sustained under the Commerce Clause, the panel had no need to rule definitely on the issue because it had just concluded (in unambiguous, non-conditional terms) that "ATF has the authority to tax now-illegal machineguns." *Ibid.* Indeed, just three years later, the Fifth Circuit treated as open the issue of whether the NFA could be sustained under the Commerce Clause: "the statute is a legitimate exercise of the taxing power" and thus "infirmities in the commerce power are beside the point." *United States v. Solis*, 124 F.3d 192 (5th Cir. 1997). Avoiding the question of whether the Commerce Clause could sustain the

---

[4] *Ardoin* made that limitation even clearer by ending its sentence with a footnote recognizing that the Commerce Clause is not carte blanche authority over all firearms in all contexts. *See* 19 F.3d at 180 n.5 ("Congress's power to regulate firearms under the Commerce Clause is not unlimited.").

NFA would have made little sense if *Ardoin* had just resolved that issue.[5]  Thus, not only is *Ardoin*'s lone sentence inapplicable outside of machinegun regulation, it is also not even a holding.[6]

At bottom, the Government cannot overcome *Sonzinsky*'s holding that the NFA "is **only** a taxing measure," 300 U.S. at 513 (emphasis added), and the Fifth Circuit's holding that, outside of the machinegun context, "the constitutional bedrock for the" challenged NFA provisions "is the power to tax rather than the commerce power." *Parker*, 960 F.2d at 500 (cleaned up); *Ross*, 458 F.2d at 1143 n.3.

### 3.    The Government Confirms The NFA Itself Forecloses Reliance On Any Other Enumerated Power To Sustain The Challenged NFA Provisions

While the precedent is dispositive, Plaintiffs also showed that the NFA itself independently confirms that the taxing power is the only discernable constitutional basis for the challenged provisions.  MSJ 17–20.  The Government's attempts to avoid that result flunk basic principles of statutory interpretation and only confirm that the NFA lives or dies with the taxing power.

---

[5]  The Fifth Circuit's decision in *United States v. Arce*, 118 F.3d 335 (5th Cir. 1997), also fails to move the needle.  *Arce* concerned an upward departure for convictions related to, *inter alia*, "machine guns" and thus falls within *Ardoin*'s machinegun-limited scope.  *Id.* at 337.  *Arce* also offered conditional language about the Commerce Clause—i.e., observing that *Ardoin* concerned how "the NFA *can be* upheld," *id.* at 342 (emphasis added), and immediately pivoting to why the enhancement would be valid "[e]ven if the NFA were based solely on the taxing power," *ibid.*  None of this hedging would have been necessary if *Ardoin* had resolved the Commerce Clause issue.

[6]  The Government's non-binding, out-of-circuit cases (at 14, 20) fare no better.  In *United States v. Jones*, 976 F.2d 176 (4th Cir. 1992), the Fourth Circuit opined that the Commerce Clause could sustain the NFA's "application … to two machine guns which were transported between two states."  *Id.* at 184.  This interstate-machinegun case is even further afield then *Ardoin*.  The two Eighth Circuit cases—*United States v. Pearson*, 8 F.3d 631 (8th Cir. 1993) and *United States v. Hale*, 978 F.2d 1016, 1018 (8th Cir. 1992)—both involved machineguns and predated the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995).  After *Lopez*, the Eighth Circuit changed course and held that a conviction for the unregistered possession of a silencer "cannot be sustained under the commerce clause."  *United States v. Hall*, 171 F.3d 1133, 1140 (8th Cir. 1999).  Next, *United States v. Wilson*, 440 F.2d 1068 (6th Cir. 1971) (per curiam), is pre-*Lopez* and relied primarily on "the taxing power."  *Id.* at 1069.  Finally, the Tenth Circuit's unpublished decision in *United States v. Houston*, 103 F. App'x 346, 350 (10th Cir. 2004), carefully worded its holding to invoke the taxing power and avoid a definitive ruling on the Commerce Clause.  *See id.* at 350.

*First*, the Government agrees (at 22) that "the statute's text" is the "best guide" to discern a statute's constitutional basis. But it misconstrues that text, claiming (at 12–13 and 22) that the NFA regulates "commodities" that can be sold "interstate" and thus each provision "regulates" a "step of th[e] interstate commercial process." But that is simply not what the statute's text says. Instead, that text has always described the statute as a scheme "*to tax* the sale or other disposal of" firearms. Pub. L. No. 73-474, 48 Stat. 1236 (1934) (Preamble) (emphasis added). And indeed, pre-One Big Beautiful Bill Act, the NFA imposed requirements on those who "receive," "possess," or "transfer[ ]," firearms, 26 U.S.C. §§ 5812, 5841, in order to facilitate "a tax" on "each firearm transferred," *id.* § 5811(a); *accord Parker*, 960 F.2d at 500 ("making possession of an unregistered weapon unlawful is part of the web of regulation aiding enforcement of the transfer tax provision"). Likewise, it imposed requirements on those who "make a firearm," 26 U.S.C. § 5822, in order to facilitate "a tax" on "the making of a firearm," *id.* § 5821(a). And even post-One Big Beautiful Bill Act, the NFA retains this structure—the only change being that the "*tax*" is set at $0. *See* Pub. L. No. 119-21, § 70436, 139 Stat. 72, 247–48 (2025) (emphasis added).

The Government's attempt to divorce the NFA's regulatory requirements from their companion taxes falls flat. The Government says that 26 U.S.C. § 5812 is an interstate-commerce regulation because it reaches "transfers," which is defined to include sales, *see id.* § 5845(j). But § 5812, entitled "Transfers," is directly preceded by § 5811, entitled "Transfer tax." And both provisions are codified as part of the Internal Revenue Code under "Part II—Tax on Transferring Firearms." Pub. L. No. 90-618, § 201, 82 Stat. 1213, 1228 (1968); *see id.* § 201, 82 Stat. at 1228–29 (codified at 26 U.S.C. §§ 5821–22) (same structure for making provisions). To treat these provisions as an attempt "to regulate commercial actors and commodities" separate and apart from a tax, XMSJ 22, defies the "fundamental canon of statutory construction that the words of a statute

must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1111 (5th Cir. 2024).

*Second*, the Government's resort to the only provisions of the NFA that *do* regulate interstate or foreign commerce only proves the point. The Government observes (at 13) that two discrete provisions of the NFA "contain[ ] explicit references to activities in foreign or interstate commerce" and thus the rest of the statute must be concerned with such commerce. But that gets things exactly backwards. These provisions show that "Congress kn[ew] how to" invoke the Commerce Clause, *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 378 (2025), and thus "act[ed] intentionally and purposely" when it "omit[ted]" such an invocation in other provisions "of the same Act," *Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014).

*Third*, the Government goes even further afield with its resort to the Gun Control Act ("GCA"). Arguing that Congress intended the *NFA* as an exercise of the commerce power, the Government (at 13) and Baltimore (at 11–12) cite references to interstate commerce in the *GCA*. But "the NFA and the GCA are different statutes passed at different times to address different problems using different language." *Bondi v. VanDerStok*, 604 U.S. 458, 483 (2025); *accord Parker*, 960 F.2d at 500 (explaining NFA and GCA are "clearly distinct" "statutes contained in wholly different titles of the United States Code").

Congress's dual 1930s-era firearms statutes show why. As explained, Congress enacted the NFA in 1934 as a taxing statute. *See supra*. But four years later, Congress enacted the Federal Firearms Act ("FFA")—"an act to *regulate commerce in firearms*." *See* Pub. L. No. 75-785, 52 Stat. 1250 (1938) (preamble) (emphasis added). Unlike the NFA, every substantive provision of the FFA contained an interstate-commerce hook. *See id.* §§ 2 (prohibiting activities "in interstate or foreign commerce"), 3 (requiring licensure by businesses "in interstate or foreign commerce").

19

The GCA is a direct descendant of the commerce-based FFA—not the tax-based NFA.  In both the GCA and the "Omnibus Crime Control and Safe Streets Act of 1968," Congress "enlarged and extended the Federal Firearms Act."  *Barrett v. United States*, 423 U.S. 212, 220 (1976).  Although the 1968 enactment made a handful of minor edits to the NFA, it maintained the dichotomy between the NFA and the FFA.  It kept the amended FFA—now called the GCA[7]—codified in Title 18 ("Crimes and Criminal Procedure") with its interstate-commerce jurisdictional hooks, while leaving the NFA codified in Title 26 ("Internal Revenue Code") with its taxation jurisdictional hooks.  *See* Pub. L. No. 90-618, Tit. I (Title 18), Tit. II (Title 26); *see also* H.R. Rep. No. 90-1956, at 34–35 (1968) (Conf. Rep.) (explaining distinct "Amendments to Internal Revenue Code of 1954 (National Firearms Act)").  As the Fifth Circuit explained, the GCA "has no roots or antecedent in the National Firearms Act" and "is in no way related or tied to taxation or any character of registration or reporting" required by the NFA.  *Lopez*, 2 F.3d at 1349.  For this reason, the "history and development" of the GCA is "essentially irrelevant" to the NFA.  *Ibid.*[8]

If anything, the GCA's text confirms that the NFA "is grounded on Congress' taxing power."  *Id.* at 1348–49.  "Comparing the statutory text of" the NFA and the GCA "shows that Congress knows how to" draft a firearms regulatory scheme grounded in its Commerce Clause authority.  *Nat'l Auto. Dealers Ass'n v. FTC*, 127 F.4th 549, 557–58 (5th Cir. 2025).  The omission

---

[7] *See, e.g.*, XMSJ 13 (distinguishing "Gun Control Act" provision in Title 18 from "the NFA" in Title 26); ATF, National Firearms Act Handbook § 1.2.8 (rev. Apr. 2009), https://tinyurl.com/yr-suua9d ("'GCA' means the Gun Control Act of 1968, *18 U.S.C. Chapter 44*." (emphasis added)); *id.* § 1.2.9 ("'NFA' means the National Firearms Act, *26 U.S.C. Chapter 53*." (emphasis added)).

[8] Baltimore misrepresents the GCA to argue otherwise.  It cites (at 12) the GCA's purpose as "provid[ing] for better control of the interstate traffic in firearms."  But it omits the preceding clause: "*To amend title 18, United States Code*, to provide for better control of the interstate traffic in firearms."  Pub. L. No. 90-618 (Preamble) (emphasis added), 82 Stat. at 2113; *see also* H.R. Rep. No. 90-1956, at 27 (same phrasing).  The Title 18 amendments codify the GCA, not the NFA.

of any interstate-commerce hook in the challenged NFA provisions thus "confirms that Congress chose a different path" for their constitutional basis:  the taxing power.  *Id.* at 558.

*Fourth*, the Government contorts the legislative history.  The NFA's legislative history confirms that Congress "[i]n general" relied on the "taxation of firearms" as the NFA's constitutional basis.  S. Rep. No. 73-1444, at 2 (1934) (Def. App.179).  There are two exceptions to that "general" approach.  Congress "employ[ed] the interstate and foreign commerce power to regulate *interstate shipment* of firearms and to prohibit and regulate *the shipment of firearms into the United States*."  *Ibid.* (emphasis added).  That matches up perfectly with the only two provisions of the NFA that invoke the Commerce Clause—neither of which are at issue in this litigation.  *See* 26 U.S.C. §§ 5861(j), (k).  Once again, under standard interpretive principles, those discrete exceptions prove the rule: "[i]f Congress had wanted to" employ the Commerce Clause in support of the challenged NFA provisions, "it knew exactly how to do so."  *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).  Outside of the interstate- and foreign-shipment provisions, the NFA "follows the theory of taxation all the way through."  *The National Firearms Act of 1934: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 86–87 (1934) (Def. App.91–92); *see id.* at 9 (Def. App.14) (explaining bill as an "internal revenue measure" except for the "provision, which makes it an offense to carry in interstate commerce"), 23–24 (Def. App.28–29) (explaining that where statute reaches activity that is all "within the same State," the NFA relies on "the taxing provision" and not "the regulation of interstate commerce").

*Fifth*, the Government turns to a strawman:  "Congress may legislate under more than one enumerated power."  XMSJ 20 (quotations omitted).  Perhaps it can.  But the question is *which* power is discernable here.  As explained, the text, structure, and history reveal that the taxing power is the only such basis to support the challenged NFA provisions.

21

*Sixth*, the Government says Congress need not "expressly state in the NFA that it was exercising its authority under the Commerce Clause." XMSJ 21–22.  That is true but irrelevant.  As the Government concedes, a "court must be able to discern a basis for Congress's exercise of an enumerated power." *Id.* at 22; *see* MSJ 18.[9]  Here, the statutory text, structure, and history make clear that the taxing power is the only discernable constitutional basis for the challenged NFA provisions.  With regard to those provisions, the NFA is "only a taxing measure," *Sonzinsky*, 300 U.S. at 513, and this Court should not "ascribe to Congress an attempt, under the guise of taxation, to exercise another power," *id.* at 514; *see also Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 n.7 (1999) ("Since Congress was so explicit about invoking its authority under" specific provisions of the Constitution, "we think this omission precludes consideration of [another constitutional provision] as a basis for the [statute]."); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252 (1964) (noting prior case's rejection of "commerce power" as basis to enact statute where it "was not relied on by the Government").

**B.    The Government Confirms The Commerce Power Cannot Sustain Application Of The Challenged NFA Provisions To Intrastate Possession, Transfer, And Making Of Untaxed Firearms**

For the reasons explained, the Court should not reach the Commerce Clause.  *See supra* II.A.2–3; MSJ 17–20.  But if it does, that power cannot sustain the challenged NFA provisions as applied to intrastate possession, transfer, and making of untaxed firearms.  *See* MSJ 20–36.

---

[9]  The Government cites *Sebelius* for the proposition that, "[s]o long as Congress 'had the power' to act, '[t]hat is sufficient to sustain the action.'" XMSJ 22 (cleaned up).  But there, the Supreme Court found that Congress had the power to act only after analyzing the text, structure, and history of the statute to determine that the taxing power was a discernible constitutional basis.  *See Sebelius*, 567 U.S. at 563 (quoting text requiring payment "into the Treasury by 'taxpayer[s]'"); *ibid.* (citing exemption for "individuals who do not pay federal income taxes"); *ibid.* (noting provision was "in the Internal Revenue Code and enforced by the IRS"); *id.* at 564 (citing report showing that statute "is expected to raise about $4 billion per year").  That analysis only confirms that the taxing power is the only discernable (albeit meritless) constitutional basis here.

The Government spends the first five pages of its Commerce Clause argument attacking a strawman. It claims (at 11–15) that because many activities regulated by the NFA occur interstate, Plaintiffs cannot prevail. But again, Plaintiffs' argument is that "the Commerce Clause cannot sustain the challenged provisions *as applied to intrastate possession, transfer, and making*." MSJ 20 (emphasis added); *id.* at 13 ("All plaintiffs are injured by the application of the challenged NFA requirements to purely *intra*state activity." (emphasis altered)); *see also supra* I. The Government does not dispute that the purely intrastate activities actually at issue in this litigation are neither channels nor instrumentalities of interstate commerce. *See* MSJ 21. Thus, the Government can only prevail if it shows that the challenged NFA provisions regulate "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995).

It cannot meet that burden for the three independent reasons identified in Plaintiffs' motion for summary judgment. *First*, Congress did not apply the challenged NFA provisions to intrastate commerce with the purpose of regulating interstate commerce. MSJ 22–24. *Second*, the challenged NFA provisions are not part of a comprehensive market regulation. *Id.* at 24–26. *Third*, the challenged NFA provisions fail the Supreme Court's substantial-effects test. *Id.* at 26–33.

### 1. The Government Confirms The Challenged NFA Provisions Were Not Enacted With The Purpose Of Regulating Interstate Commerce

Plaintiffs showed (at 22–24) that the challenged NFA provisions cannot reach "purely *intra*state" possession, transfer, and making because "the purpose" of those provisions was not "in fact … to regulate interstate commerce." *United States v. Bird*, 124 F.3d 667, 682 n.15 (5th Cir. 1997). And the Government agrees that it loses if the NFA does not in fact reach "intrastate commerce … as a means of regulating or affecting interstate commerce." XMSJ 23 (cleaned up). Thus, even if the Court finds the Commerce Clause to be a discernable basis to sustain the

challenged NFA provisions (it is not, *see supra* II.A.2–3), that power, at minimum, cannot sustain the "purely *intra*state" applications of the law at issue here. *Bird*, 124 F.3d at 682 n.15.

**2.    The Government Confirms That Intrastate Application Of The Challenged NFA Provisions Does Not Support Interstate Market Regulation**

Plaintiffs showed (at 24–26) the challenged NFA provisions are not part of a comprehensive interstate-commerce regulation. The Government's response all but concedes that point. It admits that the statute seeks "to curtail armed crime," XMSJ 3, to "stem the criminal misuse of [NFA] weapons," *id.* at 4, and to avoid the "diversion" of "weapons which are peculiarly susceptible of criminal use" "into illicit channels," *id.* at 17. While these aims might be laudable, they have nothing to do with interstate commerce—or any of Congress's enumerated powers. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime." *Morrison*, 529 U.S. at 618; *accord Torres v. Lynch*, 578 U.S. 452, 457 (2016) (explaining that Congress lacks freestanding authority to "enact … criminal laws"). That is of course the entire reason Congress added firearm making and transfer taxes to what would have otherwise been an unconstitutional exercise of police power "denied by the Federal Constitution." *Sonzinsky*, 300 U.S. at 514. Without those taxes, the challenged NFA provisions form "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." *Lopez*, 514 U.S. at 561.

The Government tries (at 16–17) to evade this fundamental flaw by observing that its crime-control statute regulates firearms, and firearms are part of a market. This sleight of hand does not work: the NFA imposes discrete requirements on firearm-related activities without any broader regulation of the firearms *market*. Thus, intrastate possession, making, and transfer of NFA firearms does not "substantially affect interstate commerce." *Morrison*, 529 U.S. at 609.

The Government's principal authority, *Gonzales v. Raich*, 545 U.S. 1 (2005), shows why. In that case, Congress considered a challenge to the Controlled Substance Act's ("CSA") ban on "the manufacture, distribution, or possession of marijuana" by the public. *Id.* at 14. The Court held the CSA constitutional as applied to those intrastate activities because the statute sought "to control the supply and demand of controlled substances in both lawful and unlawful drug markets" by "eliminating commercial transactions in the interstate market in their entirety." *Id.* at 19. Intrastate regulation was necessary to accomplish that goal because "leaving home-consumed marijuana outside federal control" would "affect price and market conditions" and thus exert "a substantial effect on supply and demand in the national market for" marijuana. *Ibid.*

The result in *Raich* was directly controlled by *Wickard v. Filburn*, 317 U.S. 111 (1942). That case sustained Congress's effort "to increase the market price of wheat and to that end to limit the volume thereof that could affect the market." *Id.* at 128. That supply-side effort "to regulate the prices at which commodities" were sold necessitated intrastate regulation. *Ibid.* "It can hardly be denied," the Supreme Court explained, "that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions." *Ibid.*

This case is nothing like *Raich* or *Wickard*. Regulating "supply and demand"—as Congress did under the statutes in those cases—is about as commerce-based as it gets. But that is not what the NFA does. The NFA instead requires registration of firearms when they are made, 26 U.S.C. §§ 5841(a)–(c), 5842, 5861(f), transferred, *id.* §§ 5812, 5861(e), or possessed, *id.* §§ 5841(e), 5812(b), 5861(b)–(d). And they require a would-be maker or transferor to notify local law enforcement. *Id.* §§ 5861(e)–(f); 27 C.F.R. § 479.84(c). None of this regulates the interstate firearms *market*. Those who comply with the NFA may buy and sell as many NFA firearms as they wish, at whatever price they wish, and on whatever terms they wish. The statute does not

25

seek to alter NFA firearms' price (other than through now-defunct taxes), restrict their supply, or otherwise change any "market conditions." *Raich*, 545 U.S. at 19.

That distinction matters. Congress does not have free-floating power to regulate "commodities." *Contra* XMSJ 16–17. To the contrary, the Commerce Clause limits Congress to the "regulation *of the interstate market* in that commodity." *Raich*, 545 U.S. at 18 (emphasis added); *accord Taylor v. United States*, 579 U.S. 301, 303 (2016) ("Congress [has] authority to regulate the national market for marijuana"). Congress was not regulating wheat or marijuana *per se* in *Wickard* and *Raich*. It was regulating *the markets* for wheat and marijuana, restricting their supply to reach a desired market outcome: a market *price* in *Wickard* and a market *elimination* in *Raich*. Without regulation of an underlying interstate *market*, the challenged NFA provisions cannot "substantially affect interstate commerce." *Lopez*, 514 U.S. at 559.

That was the exact point Judge Pittman made in *Hobby Distillers*. There, the court observed that federal control over intrastate activity can survive constitutional scrutiny only where it "serves a *comprehensive market regulation* and is needed to make that regulation effective."[10] 740 F. Supp. 3d at 532 (emphasis added). The statutory scheme there, also codified in the Internal Revenue Code, reached many "facet[s] of the interstate alcohol market"—for example, requiring business permits and imposing labeling requirements. *Id.* at 533 (emphasis omitted). But the scheme was not a comprehensive regulation of the underlying market itself. *See ibid.* It did "not directly regulate the supply and demand of alcohol" or seek to "promote or eliminate a national

---

[10] The Government (at 23–24) quibbles with the word "comprehensive," but fails to engage with the substantive point. To avail itself of the substantial-effects doctrine, the Government must regulate the broader underlying market and not discrete "facet[s]" of it. *Hobby Distillers*, 740 F. Supp. 3d at 533. It matters not whether the Government calls that a "comprehensive" regulation, a "general regulation of interstate commerce," or a "larger regulation of economic activity." XMSJ 23–24 (quoting *Raich*). What matters is the requirement to show regulation of the underlying market as opposed to, here, discrete activities in that market.

marketplace for alcohol." *Ibid.* There was no "degree of control over the 'production, distribution, and consumption' of alcohol as there was for wheat in *Wickard* or controlled substances in *Raich*." *Ibid.* The same is true here.

The Government's unconvincing response boils down to a facile analogy to *Raich*. As the Government sees it (at 16–17), "failing to regulate the *intrastate*" possession, transfer and making of NFA weapons "'would leave a gaping hole in' the NFA by creating an unregulated sub-market" of unregistered NFA firearms that could be "diver[ted] into illicit channels." (quoting *Raich*). But that ignores that what the *Raich* Court called the "gaping hole in the CSA," 545 U.S. at 22, was about the "impact *on the market*," *id.* at 21 (emphasis added). Here, by contrast, the Government is asserting a gaping hole not in its ability to effectively regulate interstate commerce (a power Congress does have) but to police criminal activity (a power Congress does not have). Because the NFA does not seek to alter the supply, demand, price, or other economic conditions of NFA weapons in the interstate market, the existence of an unregulated class of intrastate NFA firearms does not substantially affect interstate commerce.

Without a market-based hook, the Government's argument is both circular and without limit. Federal law, by definition, reaches nationwide. The omission of intrastate activity from federal reach thus, by definition, leaves a "gaping hole" in the federal law and "an unregulated submarket" of "illicit" (i.e., not federally regulated) subject matter on an intrastate basis. If that were enough to satisfy the Commerce Clause, then Congress would be able to regulate *anything* on an intrastate basis. *Contra Lopez*, 514 U.S. at 564 (rejecting "Government's arguments" that would leave the court "hard pressed to posit any activity by an individual that Congress is without power to regulate"). Consider a concrete example. If Congress passed a law that made it unlawful to possess a firearm in a school zone in all 50 states, failing to apply that prohibition to purely

intrastate possession would create a "gaping hole" in the statute and "an unregulated sub-[class]" of firearms in "illicit" areas (school zones). That would, under the Government's theory, satisfy the Commerce Clause. And that is why it is wrong. *See generally Lopez.*

Perhaps recognizing that the lack of a market hook dooms its case, the Government pays passing lip service to market principles. It says (at 17) the NFA "affect[s] … supply and demand." Perhaps. But even if true, the statute does not purport to *regulate* supply and demand. If marginal, incidental effects were enough, then *Lopez* should have come out the other way. After all, limiting the conditions under which firearms may be possessed (for example, in school zones) might make it more inconvenient to own a firearm and thus marginally drive down the demand for them. Indeed, every federal criminal law has *some* conceivable effect on the supply and demand for *something* (*e.g.*, a prohibition on kidnapping might drive down the demand for duct tape). But that effect only matters if the law regulates the underlying market in the first place. Here, it does not.

The Government next claims (at 17) to discover a commerce hook in a single sentence in the legislative history for the GCA—a different statute that postdates the NFA by three decades. *See supra* II.A.3. Worse still, it mischaracterizes that sentence. The committee report cited by the Government says that the NFA "has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use." S. Rep. No. 90-1097, at 255 (1968). But it said that to *distinguish* the tax-based NFA from *the FFA*'s "regulation of commerce in firearms." *Ibid.* That is because the NFA's means of gun control was its now-dead firearms **tax**. *Mock v. Garland*, 75 F.4th 563, 569 (5th Cir. 2023) ("Although th[e] financial burden is not particularly onerous today, in 1934, when the NFA was enacted, the tax was explicitly intended to tax these weapons out of existence. In today's dollars, $200 in 1934 is approximately $4,500."). Without the

prohibitive tax, the NFA does not "remov[e]" NFA weapons "from commerce" and instead imposes requirements untethered from any comprehensive market regulation.

The Government's continued resort (at 17–18) to machinegun cases crystalizes the defect in its theory. As explained, machineguns are regulated differently than the untaxed firearms: in 1986, "Congress froze in place *the market in machine guns*." *Kirk*, 105 F.3d at 1001 (Higginbotham, J.) (emphasis added). That, courts have found, makes machinegun regulation just like the comprehensive market regulations in *Raich* and *Wickard*. As the Government's lead authority, *United States v. Knutson*, 113 F.3d 27 (5th Cir. 1997), explains, the machinegun ban is "a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns" that "effectuates" the total market "freez[e]" on "the number of legally possessed machine guns." *Id.* at 30. Congress's statutes thus regulate *the market* for machineguns; they "directly regulate the supply and demand" and are "part of a federal directive to" freeze in place "a national marketplace for" machineguns. *Hobby Distillers*, 740 F. Supp. 3d at 533. That only confirms the lack of a comprehensive market regulation of the untaxed firearms at issue here.[11]

Finally, striking out on precedent, the Government turns to policy. It claims (at 24 n.5) that requiring comprehensive regulation of an interstate market "perversely disincentivize[s] Congress from enacting measured regulations." But "the Framers[ ]" made a "careful decision to divide power between the States and the National Government as a means of preserving liberty."

---

[11] The Government's other cases also spell out clearly what is lacking here: a *market* regulation. *See, e.g.*, *United States v. Kenney*, 91 F.3d 884, 890 (7th Cir. 1996) (regulating "possession of a machine gun is much like the possession of wheat in *Wickard*" because it helped "freez[e] the number of legally possessed machineguns machine guns at 1986 levels"); *United States v. Rybar*, 103 F.3d 273, 283 (3d Cir. 1996) ("demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns"); *United States v. Luna*, 165 F.3d 316, 319–22 (5th Cir. 1999) (upholding stolen-firearm prohibition that was limited to firearms "shipped or transported in, interstate or foreign commerce" and noting it was part of "larger regulation of economic activity," i.e., "eradicating" market for "stolen firearms").

*Bond*, 572 U.S. at 855.  If Congress wants to regulate—measured or otherwise—it must act within the scope of its enumerated powers.

> **3.    The Government Confirms The Challenged Provisions Fail The Five-Factor Substantial-Effects Test Established By The Supreme Court**

Even if the Court spots the Government a comprehensive interstate-market regulation, it still loses.  That is because Plaintiffs showed (at 26–33) that, under the five-factor test established in *Lopez* and *Morrison*, the challenged NFA provisions do not "regulat[e] … an activity that substantially affects interstate commerce."  *Lopez*, 514 U.S. at 559; *Morrison*, 529 U.S. at 609–13.

Perhaps recognizing that it cannot satisfy any of the five factors, the Government's primary response is to pretend they do not exist.  It says (at 24) that the factors are not a "test" but instead "'considerations' applicable to those laws."  Semantics aside, *Morrison* explained that the considerations "clarif[y] [the Supreme Court's] case law governing" the substantial-effects doctrine, 529 U.S. at 609, and thus provide "the proper framework for conducting the required analysis of" laws that purportedly "substantially affect[ ] interstate commerce."  *Ibid.*; *accord Terkel v. CDC*, 521 F. Supp. 3d 662, 670–76 (E.D. Tex. 2021) (applying the *Lopez-Morrison* factors).[12]  Thus, the Government can call the *Lopez-Morrison* factors whatever it wants—a test or otherwise—but the point is that they are the means to analyze whether the challenged NFA provisions substantially affect interstate commerce.

The Government similarly misleads with its claim of rational-basis review.  It quotes *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192 (5th Cir. 2000), for the proposition that,

---

[12]  The Government says (at 24) "the Supreme Court applied no such test in *Raich* or other recent cases."  But *Raich* was directly controlled by *Wickard* because both were supply-and-demand controls.  *See Raich*, 545 U.S. at 18–19.  And *Taylor v. United States*, 579 U.S. 301 (2016) was, in turn controlled by *Raich*.  *Taylor*, 579 U.S. at 303 ("The answer to this question is straightforward and dictated by our precedent." (citing *Raich*)).

"[i]n reviewing an act of Congress passed under its Commerce Clause authority, we apply the rational basis test…." XMSJ 11. But that strategically placed ellipses omits, "the rational basis test *as interpreted by the Lopez court.*" *Groome*, 234 F.3d at 203 (emphasis added); *see also id.* at 205 ("rational basis, *as defined by Lopez-Morrison*" (emphasis added)). Rational basis under *Lopez* and *Morrison*, the Fifth Circuit has explained, is more rigorous than a "traditional rational basis inquiry." *Kirk*, 105 F.3d at 999 (Higginbotham, J.); *see id.* at 1007 (Jones, J.) ("As *Lopez* demonstrates, exercise of this duty requires independent judicial scrutiny of the reasons advanced to explain why the regulation is necessary to protect interstate commerce"). As *Groome* itself explains, the proper way to apply that test is the "*Morrison* factors." *Groome*, 234 F.3d at 205; *see id.* at 205–16 (applying each factor "[u]nder *Lopez-Morrison*"); *see also Terkel*, 521 F. Supp. 3d at 670–76 (same); *United States v. Hall*, 171 F.3d 1133, 1138 (8th Cir. 1999) (rejecting constitutionality of intrastate application of NFA using *Lopez* factors).

**Attenuation & Implications For Federal Power.** The Court can decide this case on the two factors that the Government does not even bother to contest: attenuation and implications for federal power. *See* XMSJ 25 (not mentioning these factors in *Lopez-Morrison* analysis); *accord Rodriguez v. City of Corpus Christi*, 129 F.4th 890, 897 (5th Cir. 2025) ("A party forfeits an argument by failing to adequately brief the argument" (alteration accepted)).

Under binding precedent, failure to satisfy either factor is dispositive. Where the Government cannot show that "regulation of *intra*state activity" is "a necessary and proper means of enforcing [a statutory scheme]'s regulation of *inter*state" conduct, that alone means it cannot prevail. *United States v. Kebodeaux*, 687 F.3d 232, 252 (5th Cir. 2012) (emphasis in original), *rev'd on other grounds*, 570 U.S. 387 (2013); *Hobby Distillers*, 740 F. Supp. 3d at 534 ("Beginning and ending with the text, neither of these provisions connect the prohibited behavior to interstate

31

commerce."). And, independently, the Fifth Circuit has "*always* rejected readings of the Commerce Clause that would permit Congress to exercise a police power." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (emphasis in original; alterations accepted).

First, the Government loses on attenuation. That is because "[e]ven if" the challenged NFA provisions were part of a comprehensive interstate-market regulation, they are "not necessary to effectuate it." *Hobby Distillers*, 740 F. Supp. 3d at 533. Again, the Government's theory (at 16–17) is that it must "regulate[ ]" the making, transfer, and possession of NFA firearms because they "are particularly susceptible to criminal misuse" and are "part of an interstate market." But *intra*state making, transfer, and possession are, by definition, not "part of" that "*inter*state market." Nor do the challenged NFA "provisions connect the prohibited behavior to interstate commerce." *Hobby Distillers*, 740 F. Supp. 3d at 534. The Government offers nothing to bridge this gap.

The NFA itself confirms that *intra*state application of the challenged NFA provisions is unnecessary to police the *inter*state market. Consider what would happen if the Government could not apply the challenged provisions intrastate: ATF would not know when an individual possesses, makes, or transfers an NFA firearm *within* a single State. Maybe the Government would find that intrastate information useful, but it is in no way a "means of enforcing [the NFA]'s regulation of *inter*state" activity. *Kebodeaux*, 687 F.3d at 252 (emphasis in original). And if a firearm *does* cross state (or national) lines, the NFA *would* reach that activity. Under 26 U.S.C. § 5861(j), nobody can introduce "any firearm in interstate commerce *which has not been registered as required by*" the NFA. As explained, Congress added that provision in 1934 as its sole interstate-commerce hook. The Government offers no reason why, contrary to Congress's judgment, *intra*state registration is necessary to enforce any *inter*state regulation.

For similar reasons, the Government loses because any theory of effect on interstate commerce that it could articulate would necessarily be so attenuated as to "permit Congress to exercise a police power." *Contra BST Holdings*, 17 F.4th at 617. As Plaintiffs explained (at 32–33) and the Government does not dispute, any such theory would allow for "federal registration, fingerprinting, and law-enforcement notification every time a consumer bought groceries, clothes, a bicycle, an RV, or gasoline." Because that would erase any "distinction between what is truly national and what is truly local," *Morrison*, 529 U.S. at 617–19, the breadth of the Government's legal theory alone forecloses its argument.

**Economic Activity.** The Government fares no better on the factors it does address. Plaintiffs explained (at 28–30) that "courts look only to the *expressly regulated activity*" to decide whether it is economic. *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 634 (5th Cir. 2003) (emphasis added); *see also Terkel*, 521 F. Supp. at 672. The expressly regulated activities here—firearms possession, receipt, transfer, manufacturing, and making—are noneconomic. While those activities *can* be commercial (e.g., sales), that is incidental. The *expressly regulated* conduct, by its terms, requires no connection to commerce to fall within the NFA's ambit. *See, e.g.*, *Tex. Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 652–53 (E.D. Tex. 2024).

The Government offers two unpersuasive responses. First, citing *Raich*, it says (at 16) the "manufacture, distribution, sale, and possession of weapons" is economic activity. But as Plaintiffs explained (and the Government ignores), those activities are not *inherently* commercial. Otherwise, *Lopez* would have come out differently because there, the Court held that firearm possession "has nothing to do with 'commerce' or any sort of economic enterprise." *Lopez*, 514 U.S. at 561; *see also Hall*, 171 F.3d at 1139 (reaching same conclusion for possession of NFA firearm). *Raich* found that marijuana "possession" and other intrastate activities were commercial only

because they undergirded "a comprehensive framework" to control the "supply and demand" of marijuana, such that *any* interaction with the underlying commodity was necessarily commercial. *See* 545 U.S. at 19, 24.  As explained, that is not the case here.  *See supra* II.B.2; *accord Tex. Top Cop Shop*, 758 F. Supp. 3d at 652–53; *Hobby Distillers*, 740 F. Supp. 3d at 533.

Next, the Government disputes (at 25) Plaintiffs' claim that the criminal-law nature of the challenged NFA provisions undermines the Government's assertion of "economic" regulation. But *Lopez* and *Morrison* made that very point.  *See Lopez*, 514 U.S. at 561 & n.3 (distinguishing "economic" regulation from a "criminal statute" and explaining that the distinction matters because, "[w]hen Congress criminalizes conduct," that "effects a change in the sensitive relation between federal and state criminal jurisdiction" (cleaned up)); *Morrison*, 529 U.S. at 610 ("a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision").  To be sure, Congress can criminalize activity where necessary and proper to exercise its commerce power.  But where, as here, the Government "acknowledges that [its law] displaces state policy choices" over criminal law, *Lopez*, 514 U.S. at 561 n.3 (alterations accepted), and in fact "[s]eek[s] to curtail armed crime," XMSJ 3, it helps confirm that the expressly regulated activity is noneconomic in nature.

**<u>Jurisdictional Element.</u>**  The Government agrees that none of the challenged NFA provisions have an interstate-commerce jurisdictional statement, flouting "standard operating procedure for Commerce Clause legislation."  *Smith v. Dep't of the Treasury*, 761 F. Supp. 3d 952, 967 (E.D. Tex. 2025); MSJ 30–31.  The Government says (at 25) that "the absence" of a provision limiting a statute's application to interstate commerce "does not indicate" that the statue is not an exercise of interstate-commerce authority.  To explain the contention is to reveal its absurdity.  And again, *Lopez* and *Morrison* directly contradict the Government's claim.  *Lopez* highlighted that the gun-

34

control statute before it "contain[ed] no jurisdictional element," 514 U.S. at 561–62, as one of the "significant considerations" that "contributed to [its] decision," *Morrison*, 529 U.S. at 609; *see id.* at 613 (highlighting "no jurisdictional element"); *accord Hall*, 171 F.3d at 1140 ("absence of a jurisdictional element" in NFA, among other *Lopez-Morrison* factors, showed indictment for firearm possession "cannot be sustained under the commerce clause"); *Smith*, 761 F. Supp. 3d at 967 (lack of jurisdictional element "indicates that [a statute] is not a proper exercise of Congress's commerce power").  Thus, this factor cuts against the Government.

      **Congressional Findings.**  The Government does not dispute (at 25) "the lack of findings in the NFA regarding the effects of intrastate activities on interstate commerce."  But it again incorrectly demurs (at 25) that the absence of such findings is not probative to the Commerce Clause analysis.  Once again, precedent forecloses that argument.  *Lopez*, 514 U.S. at 562–63 (considering as one of several factors "Government conce[ssion] that neither the statute nor its legislative history contains express congressional findings regarding effects upon interstate commerce" (alterations accepted)); *Hall*, 171 F.3d at 1140 (citing "absence of [legislative] findings" in the NFA as probative factor); *accord Morrison*, 529 U.S. at 614–15 (citing weakness in legislative findings' "reasoning"); *Smith*, 761 F. Supp. 3d at 967–68.

      All five factors cut sharply against the Government and thus show that intrastate application of the challenged NFA provisions does not substantially affect interstate commerce.

## III.  The Government Confirms The Challenged NFA Provisions Violate The Second Amendment As Applied To Untaxed Firearms

      The Government claims the Second Amendment has *nothing* to say about a system of compelled registration of firearms, or the historically unprecedented felony penalties that await those who refuse to comply with that system.  But rather than grapple with the Second Amendment's

plain text or its Founding-era historical context, the Government obfuscates, offering four arguments against constitutional protection of these popular firearms. None is availing.

### A. Short-Barreled Shotguns And Short-Barreled Rifles Are Now In "Common Use," And The Government's Reliance On *Miller* And *Heller* Fails

The Government first claims that *United States v. Miller*, 307 U.S. 174 (1939), and *District of Columbia v. Heller*, 554 U.S. 570 (2008), "foreclose plaintiffs' Second Amendment claim insofar as it pertains to short-barreled shotguns and rifles," on the theory that *Miller* previously "upheld the NFA's regulation of short-barreled shotguns," and that *Heller* "did not disturb" this "holding." XMSJ 27. And, to square the circle of these cases' silence as to short-barreled *rifles* ("SBRs"), the Government simply declares that these weapons are "materially [in]distinguishable" from short-barreled shotguns ("SBSs"). *Ibid.* But this argument cherry-picks the Supreme Court's pronouncements, fails to rebut these weapons' modern-day popularity, and ultimately reverts to the "judge-empowering interest-balancing" that *Heller* and *Bruen* repudiated.

Consider *Miller*'s expressly stated limitations. Rather than definitively holding SBSs unprotected, the Court decided *Miller* on far narrower grounds: "it is not within *judicial notice* that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." *Miller*, 307 U.S. at 178 (emphasis added). Indeed, as *Heller* later recounted, "[t]he defendants made no appearance in [*Miller*], neither filing a brief nor appearing at oral argument; the Court heard from no one but the Government." 554 U.S. at 623. And unsurprisingly, the Government's "brief … provided scant discussion of the history of the Second Amendment—and the Court was presented with no counterdiscussion." *Id.* at 623–24. Given *Miller*'s unusual *ex parte* nature and paltry historical record,[13] *Heller* cautioned the lower courts on *Miller*'s limited

---

[13] The historical record actually contains many "examples of short-barreled rifles and short-barreled shotguns with which the Founders were familiar," and which the Founders did not restrict.

*(Cont'd on next page)*

scope: "[i]t is particularly wrongheaded to read *Miller* for more than what it said." *Id.* at 623; *see also id.* ("*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons."). But the Government flouts that instruction, reading *Miller* to broadly "foreclose" Plaintiffs' challenge as to SBSs and SBRs.[14]

In addition to ignoring the explicit boundaries of *Miller* and *Heller*, the Government also ignores the Court's subsequent pronouncements in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). In *Bruen*, the Court explained that "*we use history* to determine which modern 'arms' are protected by the Second Amendment"—not judicial opinions of weapons' purported dangerousness, or those weapons' tangential similarities to other "dangerous" weapons. 597 U.S. at 28 (emphasis added); *cf.* XMSJ 27 (claiming, without evidence, that SBSs and SBRs are "equal[ ]"). And critically here, *Bruen* explained that even a historical tradition of regulating a particular weapon "provide[s] no justification for laws restricting" that weapon if it is "unquestionably in common use today." 597 U.S. at 47 (discussing early handgun prohibitions). In other words, on the question of protected "Arms," the *people's preferences prevail* because "the traditions of the American people … demand[ ]" "unqualified deference." *Id.* at 26.

Unsurprisingly then, the Government does not even acknowledge—much less offer anything to rebut—the modern popularity of SBSs and SBRs. Nor does it acknowledge the Court's "common use" standard anywhere in its brief. But as Plaintiffs explained, there were "3,536,623 silencers, 870,286 short-barreled rifles, 165,180 short-barreled shotguns, and 88,149 'any other

---

*See* Brief *Amicus Curiae* of Gun Owners of America et al. at 18, *Robinson v. United States*, No. 25-5150 (U.S. Sept. 19, 2025), https://tinyurl.com/2p8xub2z.

[14] Since *Miller* was predicated on an admittedly limited record, it seems unlikely that *Heller*'s record on *handguns* would have extended *Miller* any further, and certainly not to SBRs or other firearms that were several steps removed from the issue in that case. In other words, *Heller* cannot provide more cover for Defendants' infringement than *Miller* itself provides. Which is none.

weapons' registered nationwide as of May 2024." MSJ 38 (citing ATF statistics). Those numbers, which continue to increase,[15] fit comfortably among the recent cases that have found Second Amendment protection based on weapons' popularity. *See, e.g.*, *Maloney v. Singas*, 351 F. Supp. 3d 222, 238, 237 (E.D.N.Y. 2018) (finding "common use" with 64,890 known examples in circulation); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito & Thomas, JJ., concurring in the judgment) (finding "common use" with "approximately 200,000" known examples in circulation). Plaintiffs are not aware of any case finding that *3.5 million examples* is not "common use."

Thus, even if *Heller* foreclosed protection for SBSs and SBRs in 2008 (and it did not), the record has changed. These firearms are now in "common use," so the Second Amendment necessarily "protects the[ir] possession and use." *Bruen*, 597 U.S. at 21. To hold otherwise—to deny that modern weapons can become popular among modern Americans—would leave Second Amendment rights "trapped in amber," and "would be as mistaken as applying the protections of the right only to muskets and sabers." *United States v. Rahimi*, 602 U.S. 680, 691, 692 (2024).

Moreover, the Government is simply wrong that SBSs and SBRs are "materially [in]distinguishable." XMSJ 27. For starters, the NFA itself distinguishes between them and sets different minimum barrel lengths for each. *See* 26 U.S.C. § 5845(a). Clearly, Congress thought SBSs and SBRs were different enough to warrant disparate treatment. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("a material variation in terms suggests a variation in meaning"). And in any case, SBRs are more than five times more common than SBSs, which are already in "common use." *See* ATF, Firearms Commerce in the United States, Statistical Update 2024 at 12 (May 2024), tinyurl.com/mscuvayt. The ubiquity of SBRs is

---

[15] *See* ATF Resource Center, Data & Statistics, ATF, Bureau of Alcohol, Tobacco, Firearms and Explosives (last reviewed Sept. 12, 2025), https://www.atf.gov/resource-center/data-statistics (depicting year-over-year increases in NFA firearms and forms processed by ATF).

due in no small part to the popularity of the AR-15 rifle, a modular platform whose cornucopia of long- and short-barreled variants are "widely legal and bought by many ordinary consumers." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025) (unanimous opinion); *see also id.* ("The AR-15 is the most popular rifle in the country.").

Finally, the Government's reliance on courts that have not "found any … distinction" between SBSs and SBRs likewise fails. XMSJ 27. Contrary to *Bruen*'s textual and historical framework, these courts simply interest-balanced SBRs out of the Second Amendment, appealing to amorphous notions of 'dangerousness' and deciding what weapons the people ought to prefer.[16] But these decisions smack of the same "judge-empowering interest-balancing" that *Heller* and *Bruen* repudiated. *Bruen*, 597 U.S. at 22 (cleaned up). As the Court explained, judges are ill-equipped "to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise' in the field." *Id.* at 25; *cf. United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025) (purporting to have enough firearm expertise to decide that SBSs and SBRs have "little – if any … lawful use," despite their widespread use by police for *law enforcement*). These uninformed decisions demonstrate *nothing* about how the Founders

---

[16] *See United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025) (opining that SBSs and SBRs have "little – if any … lawful use"); *United States v. Robinson*, 2025 U.S. App. LEXIS 6544, at *12 (11th Cir. Mar. 20, 2025) (finding the supposed "dangerousness" of these weapons constitutionally significant); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (declining to "agree or disagree with the[ ] decisions of other courts" but claiming the distinction between SBSs and SBRs "is at least subject to reasonable dispute"); *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018) (opining SBSs and SBRs are "dangerous," "concealab[le]," and "unusual"); *Second Amend. Found., Inc v. ATF*, 702 F. Supp. 3d 513, 536-37 (N.D. Tex. 2023) (opining SBRs are "dangerous and unusual"); *United States v. Miller*, 2023 U.S. Dist. LEXIS 172594, at *8 (N.D. Tex. Sept. 27, 2023) (same).

treated short-barreled firearms—only what a handful of modern judges think of these firearms today.[17]  Not only are these cases nonbinding, but also they are unpersuasive.

**B.    Defendants' Attempt to Bootstrap "Any Other Weapons" With *Miller* Fails**

The Government next posits that, if SBSs are unprotected, "then the same conclusion applies *a fortiori* to at least some AOWs" that "are similar to [SBSs] and possess the same characteristics that make [SBSs] uniquely susceptible to criminal misuse."  XMSJ 28.  This argument fails for the reasons already discussed.

What is more, the Government acknowledges that there are *other* AOWs in existence that are *not* "similar to short-barreled shotguns."  XMSJ 28.  Even so, the Government makes *no argument* against Second Amendment protection of these non-shotgun AOWs,[18] which are precisely the sorts of AOWs that Plaintiff Brady Wetz wishes to obtain.  Indeed, as Plaintiff Wetz explained, he "would acquire a Bond Arms derringer … *handgun*," and "would … have the barrel rifling removed, rendering the barrel smoothbore, and then … reinstall the smoothbore barrel on the Bond

---

[17]  In a widely reported "video dissent" believed to be the first of its kind, Ninth Circuit Judge Lawrence VanDyke recently took his colleagues to task on their irrational fear of firearms, explaining that many judges often lack even a "basic familiarity with firearms," which inevitably leads their Second Amendment decisions not only to be analytically faulty, but also technically incoherent. *Dissent in 23-55805 Duncan v. Bonta (9th Cir.)*, YouTube, at 0:18 (Mar. 20, 2025), https://www.youtube.com/watch?v=DMC7Ntd4d4c.

[18]  Citing no authority, Defendants vilify "other" AOWs as "extremely strange weapons" that "are hardly the stuff of law-abiding citizens intending to engage in lawful activities."  XMSJ 28 n.6. But that is just Defendants' unsupported opinion—and a wrong one at that.  No modern criminal holds up a gas station clerk with a "homemade slam-fire gun" or a "knife gun[ ]." *Ibid.*  Contrary to Defendants' claim, the common criminal is in all likelihood carrying a *handgun* which, in addition to being "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629, is also the most commonly used firearm in crime.  *See* FBI, Expanded Homicide Data Table 8 (2019), https://tinyurl.com/4bs445yu (reporting 6,000-7,000 annual uses of handguns in homicides, an order of magnitude greater than other firearm types).  Ironically, AOWs are probably *the most lawfully* owned firearms in existence, being the stuff of collectors and enthusiasts, not common criminals. *See, e.g.*, *Ibid.*; *Marble Arms Game Getter*, Rock Island Auction Company, https://tinyurl.com/5n6s7v4h (auctioning historic handgun-style AOW).

Arms derringer receiver, rendering the weapon an 'AOW.'"  Pl. App.008 (Wetz Decl. ¶ 24) (emphasis added).  This AOW would have the form factor of a *handgun*, "the most popular weapon chosen by Americans for self-defense," *Heller*, 554 U.S. at 629, which is "unquestionably in common use today," *Bruen*, 597 U.S. at 47.  It would be nothing like a short-barreled shotgun.

The same is true for Plaintiff Wetz's other desired AOW.  He "would acquire an *AR-15 pattern firearm in 5.56mm* … featuring an overall length of under 26 inches, a barrel length of 10.5 inches, and a vertical foregrip, and not featuring a buttstock."  Pl. App.009 (Wetz Decl. ¶ 28) (emphasis added).  Of course, "[t]he AR-15 is the most popular rifle in the country."  *Smith & Wesson*, 605 U.S. at 297.  That is the *opposite* of being "not typically possessed by law-abiding citizens for lawful purposes," XMSJ 28, and so the Government's singular reliance on its SBS argument fails with respect to Plaintiff Wetz's desired AR-15.

Accordingly, the Government *concedes the NFA's unconstitutionality* as applied to the sorts of AOWs that Plaintiff Wetz wishes to acquire.  Plaintiffs are entitled to summary judgment on that ground at minimum.  *See Smith v. United States*, 328 F.3d 760, 770 (5th Cir. 2003) ("This motion [for summary judgment] … did not provide any argument on the two issues.… A party's concession of an issue means the issue is waived and may not be revived."); *Varsity Spirit LLC v. Varsity Tutors, LLC*, 2021 U.S. Dist. LEXIS 217376, at *10 (N.D. Tex. Sept. 17, 2021) (similar); *accord supra* I (noting preservation of as-applied challenge).

### C.  The Fifth Circuit's Most Recent *Peterson* Decision Does Not Foreclose Protection Of Silencers

Next, apparently unable to rely on *Miller* to do the heavy lifting for silencers, the Government claims that the Fifth Circuit's *Peterson* decision "forecloses plaintiffs' Second Amendment claim, at least insofar as it pertains to suppressors."  XMSJ 29.  But after the Government filed its motion, the Fifth Circuit vacated that decision and substituted it with a new opinion.  *See United*

*States v. Peterson*, ___ F.4th ____, 2025 WL 3537261 (5th Cir. Dec. 9, 2025). Accordingly, Plaintiffs address the Fifth Circuit's latest opinion here.

In *Peterson*, the Fifth Circuit rejected an as-applied challenge to the NFA's registration requirement for silencers but—much like the Supreme Court in *Miller*—"decide[d] *only* that Peterson has failed to 'develop any argument' or record to show that the NFA is unconstitutional as applied to him." 2025 WL 3537261, at *7 (emphasis added), 1 ("as-applied challenge fails on this record"), 6 ("Peterson's failure to make any showing … is dispositive"; "record is … devoid of any facts"). The Fifth Circuit "d[id] not foreclose the possibility that another litigant may successfully challenge the NFA's requirements" as applied. *Id.* at *7.

The Fifth Circuit's methodology bears emphasis. For Second Amendment purposes, *Peterson* labeled the NFA a "presumptively constitutional" "shall-issue regime."[19] 2025 WL 3537261, at *6. Thus, under *Peterson*, an as-applied challenger must show that "the NFA has been 'put toward abusive ends' through 'exorbitant fees' or 'lengthy wait times in processing license applications.'" *Id.* at *6. Peterson himself failed to make this showing; "the record d[id] not reveal how long applicants must wait for the ATF to process their NFA applications." *Id.* at *7. Indeed, despite asserting that "NFA license approval can be upwards of eight months," Peterson ultimately "cite[d] nothing to support his claim." *Ibid.* That sort of "unsupported claim" was "insufficient" to overcome the presumption of constitutionality. *Ibid.*

In contrast here, Plaintiffs have demonstrated in sworn declarations that their NFA approvals have taken upwards of a year to issue. *See* Pl. App.042 (Pratt Decl. ¶ 11) ("several of our

---

[19] Plaintiffs previously disputed that the NFA is "shall-issue" under its plain terms and in practice. *See* MSJ 43–45. Plaintiffs also disputed that dicta from *Bruen*'s footnote 9 can be used to avoid the historical analysis that the Court instructs must be conducted in every case. *See* MSJ 45; *Bruen*, 597 U.S. at 17. Plaintiffs maintain these positions and respectfully preserve these issues for appeal.

members and supporters … intolerably were required to wait several months to *over a year* to receive approvals"); *id.* ¶ 12 ("one of GOA's members, John Crump, … was required to wait almost eleven months before approval"); *id.* ¶ 14 (members "face[d] delays … during the government shutdown," when "ATF d[id] not process applications" at all); *see also* Pl. App.004 (Wetz Decl. ¶ 13) (for whom "the *shortest* period … has been *three weeks*"). The Government does not engage with these declarations at all,[20] claiming only that "'historical' average approval times … cannot support the issuance of the *prospective* relief that plaintiffs seek." XMSJ 30 n.8. But Plaintiffs also sought *declaratory* relief, which can apply retrospectively. *See* ECF No. 15 ¶ 75. And in any event, the Government offers no reason to believe its future performance will be faster than the averages shown by the record here.

Like *Miller*, it would be "particularly wrongheaded to read [*Peterson*] for more than what it said." *Heller*, 554 U.S. at 623. The record there was "devoid of any facts" relevant to the court's "abusive ends" inquiry. *Peterson*, 2025 WL 3537261, at *6. Moreover, Peterson's "merits brief … d[id] not cite *Bruen* at all." *Id.* at *6. Instead, Peterson argued an interest-balancing standard "that *Bruen* overruled almost two years before his appeal was lodged." *Ibid.* And when offered the opportunity "to file a supplemental letter brief" to develop the factual record, Peterson "never d[id] so." *Id.* at *7. And on the merits, Peterson presented no data on—and the Fifth Circuit had no occasion to pass upon—silencers' "common use." That data here obviates any need for *Peterson*'s "abusive ends" analysis, as the Second Amendment "protects the possession and use" of common weapons. *Bruen*, 597 U.S. at 21.

---

[20] The Government admits that approval times for transfers to trusts are "longer," but demurs that they have good reason to be, given trusts' increased complexity. XMSJ 30. But the question under *Peterson* is whether "the NFA has effectively 'den[ied]' … Second Amendment rights," 2025 WL 3537261, at *7, not whether the Government has a good reason for its infringement.

### D.    The Government Fails to Bear Its Historical Burden.

Finally, the Government attempts to justify the challenged provisions historically.  But at no point does the Government proffer a *single* historical analogue.  *See* XMSJ 30–32.  Instead, it vaguely references "examples" in one law review article before citing court opinions, which the Government claims "alone demonstrates that the NFA comports with the Second Amendment." *Id.* at 30–31.  But modern journal articles and recent case citations do not establish a "historical tradition of firearm regulation" dating to the Founding.  *Bruen*, 597 U.S. at 17.  Actual examples of historical firearm regulations are needed, and courts "are not obliged to sift the historical materials for evidence to sustain [the] statute.  That is [Defendants'] burden." *Id.* at 60.  Under "the principle of party presentation," this Court is "entitled to decide [the] case based on the historical record compiled by the parties." *Id.* at 25 n.6.  On this nonexistent historical record, Plaintiffs are entitled to summary judgment.[21]

The anemic historical record that Defendants obliquely reference confirms as much.  *First*, the Government posits that "American legislatures have long prohibited the carrying of dangerous and unusual weapons."  XMSJ 30 (cleaned up).  But those regulations have no relevance here.  As *Bruen* clarified, regulations of "dangerous and unusual weapons" reached public *carry only*, not the acquisition, ownership, or simple possession of firearms at issue here.  *See Bruen*, 597 U.S. at 47 ("Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large'").

---

[21] *Accord Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("[R]egistration of lawfully possessed guns is not 'longstanding.'  Registration … has not been traditionally required in the United States and, indeed, remains highly unusual today.… [R]egistration requirements are often seen as half-a-loaf measures aimed at deterring gun ownership.").

*Second*, the Government claims that history supports banning "particularly dangerous weapons that [a]re uniquely susceptible to criminal misuse," XMSJ 30, a vague standard so squishy that constitutional protection would fall to the eye of the beholder. Not even the Government's law review article stands for that proposition. The first span of pages Defendants cite (293–328) discusses Bowie knives, which States began to regulate only "[s]tarting in 1837," decades after the Founding. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 293 (2024); *cf. Reese v. BATFE*, 127 F.4th 583, 594 (5th Cir. 2025) ("founding-era laws are far more probative of what 'the people' meant when the Second Amendment was ratified"). The next span of pages (288–89, 324) discusses mid-to-late 19th-century bans on handguns, including by "the white supremacist legislature of Tennessee," that belligerent States enacted to "disadvantage[ ] black people" before, during, and after the Civil War. Kopel & Greenlee, *supra*, at 288–89; *accord Bruen*, 597 U.S. at 60 ("exercise of this [Second Amendment] right by freed slaves was systematically thwarted"). In other words, the Government seeks to justify the NFA using racist history that is "probative of what the Constitution does *not* mean." *Rahimi*, 602 U.S. at 720 (Kavanaugh, J., concurring).

*Finally*, the Government's amalgamation of cases appealing to the "why" behind the NFA fares no better. *See* XMSJ 31. Just because a weapon is "concealable," purportedly desirable for "criminal purposes," or useful in "war" does not "demonstrate[ ] that the NFA comports with the Second Amendment." *Ibid.* Rather, that logic would justify NFA regulation of every handgun—the most concealable and most criminally misused firearm of all. And it would mean that the people's Second Amendment rights rise and fall on the actions of criminals. This Court should reject such boundless logic.

## IV.    The Government Confirms Plaintiffs Are Entitled To The Relief Requested

**Blanket Ban On Enforcement.**  Plaintiffs showed (at 48–50) that success on their as-applied challenge entitles them to a blanket ban on enforcement of the challenged NFA provisions as to untaxed firearms because case-by-case relief would be unworkable.  The Government offers several erroneous objections.

It primarily argues (at 32) that *Trump v. CASA*, 606 U.S. 831 (2025), forecloses any request for a blanket ban on enforcement even where necessary to provide the plaintiffs with complete relief.  But that case held the opposite.  There, as here, the plaintiffs asked for "a blanket ban on the enforcement" of a challenged federal action because a 'patchwork injunction' would prove unworkable" based on practical implementation issues.  *CASA*, 606 U.S. at 853.  The Court "de-cline[d] to take up these arguments" and "le[ft] it to" the "lower courts" to decide the scope of the injunction "in the first instance."  *Id.* at 854.  Plaintiffs make the same workability arguments here based on the nature of their harms, and *CASA* confirms that this Court may "weigh the facts and fashion the most appropriate" injunction, *Mock*, 75 F.4th at 588, to "provide complete relief to each plaintiff," *CASA*, 606 U.S. at 861.[22]

The Government next disagrees (at 33) that a party-specific injunction would be "unwork-able."  But Plaintiffs showed (at 48–49) with sworn declarations that the organizational plaintiffs' members, commercial plaintiffs' customers, and state plaintiffs' officers number in the millions and span the entire country.  And they pointed out that where, as here, an injunction will cover many parties "spread across every State in the nation," party-specific relief "would prove unwieldy

---

[22]  The Government also observes (at 33) that "complete relief is not a guarantee." (alterations accepted; emphasis omitted).  While true, Plaintiffs have shown constitutional violations that go to the core of our federalist system—a serious disease that requires strong medicine.  *See CASA*, 606 U.S. at 854 ("the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be").  The Court can and should "provide complete relief."  *Id.* at 861.

and would only cause more confusion." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir. 2023), *vacated as moot*, 144 S. Ct. 480 (2023).  The Government complains about scope, but it does not question Plaintiffs' sworn testimony or offer any workable solution for case-by-case enforcement of the challenged NFA provisions.

Ironically, the Government's citation (at 33–34) to *Mock v. Garland*, 697 F. Supp. 3d 564 (N.D. Tex. 2023) underscores Plaintiffs' point.  To be sure, the court there, on that record, limited its preliminary injunction against a federal rule to the named plaintiffs, the organizational plaintiffs' customers, and the business plaintiffs' "downstream customers."  *Id.* at 591–92.[23]  But the Government subsequently told the Eighth Circuit that it stopped enforcing the rule "after it was enjoined from enforcing the Rule against … membership organizations because ATF did not know" who was a member.  Brief for Government at 11 n.1, *FRAC v. Garland*, 112 F.4th 507 (8th Cir. 2024) (No. 23-3230), 2023 WL 9006183.  That same problem exists as to the membership organization plaintiffs in this case.  (As do similar problems with respect to the customers of the manufacturer plaintiffs and of the trade associations' corporate members.)  The Government has not disputed these practical points that it has itself previously conceded.

**Party-Specific Injunction.**  At minimum, Plaintiffs showed (at 50) entitlement to a party-specific injunction reaching the (i) plaintiffs, (ii) company plaintiffs' customers, (iii) association plaintiffs' members and supporters, (iv) customers of the associational plaintiffs' company members, and (v) family members that live in the same house as those covered by the injunction.

The Government says (at 35) that the Court cannot offer relief for the customers of businesses covered by the injunction.  *But see Mock*, 697 F. Supp. 3d at 592 (enjoining enforcement

---

[23] That *Mock* was a record-based decision is confirmed by *Britto v. ATF*, No. 2:23-CV-019-Z, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023), where another court preliminarily enjoined the same rule "in its entirety" to address manufacturer concerns about "sales."  *Id.* at *5.

against "any downstream customers"). But the Government does not dispute that the company plaintiffs properly bring this case "on behalf of th[eir] customers."[24] MSJ 11. Nor does it dispute that the associational Plaintiffs properly bring this case "on behalf of their members." *Id.* at 12. Those concessions answer the objection. Relief for businesses will be ineffectual if those members are allowed to sell their firearms but no one is allowed to buy them free from unconstitutional restrictions. In order to provide "complete relief to the plaintiffs," *Mock*, 75 F.4th at 587, injunctive relief must extend to customers.

The Government also disputes (at 35) this Court's authority to reach plaintiffs' "resident family members" and the organizational plaintiffs' "supporters" but offers nothing in response to the caselaw. *See Texas v. ATF*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024) (authorizing suit on behalf of GOF's "supporters" under "indicia of membership" analysis); *Texas v. ATF*, 700 F. Supp. 3d 556, 573 (S.D. Tex. 2023) (Tipton, J.) ("resident family members").

Finally, the Government contests (at 35) extending injunctive relief to the State plaintiffs, other than Texas, contending that they "left the record empty of any evidence." But even the Government does not dispute that these States are entitled to declaratory relief, which they plainly are. *See Wilton v. Seven Falls Co.*, 41 F.3d 934, 935 (5th Cir. 1994) ("The district court has broad discretion to grant … declaratory judgment"). Such a judgment here would promote judicial

---

[24] The Government says in passing (at 34) that the commercial plaintiffs' claims of lost customers "rest entirely on speculation about how third parties will behave in the marketplace." That is wrong on two fronts. First, sworn declarations are not speculation. *See, e.g.*, Pl. App.034 (Key Decl. ¶ 15); Pl. App.038 (Clinger Decl. ¶ 15); Pl. App.030 (McCallum Decl. ¶ 15); Pl. App.021–22 (White Decl. ¶ 15); Pl. App.006 (Wetz Decl. ¶ 19); Pl. App.017 (Pratt Decl. ¶¶ 31–33). Second, it is not "speculation" to "rel[y] on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

efficiency by limiting the need for additional evidence from the other Plaintiff States at this juncture in the litigation.[25]

Furthermore, every Plaintiff State suffers ongoing and future injuries as a result of the challenged NFA provisions. For example, this Court may take judicial notice that each Plaintiff State is injured in the same way that Texas is injured. That is, each State, their agencies, and their employees possess and transfer NFA firearms and are not exempted from the reach of the challenged NFA requirements. The States will continue such activities, as they are necessary to carry out their law-enforcement responsibilities. The States are injured by the operational and compliance burdens imposed by those provisions. In fact, Defendant ATF has an entire division dedicated to the NFA; and within that division is the Government Support Branch, which "processes all NFA applications from local, *state*, and federal law enforcement and government organizations."[26] These injuries, which are within the Court's power to notice, justify injunctive as well as declaratory relief for the other Plaintiff States.

**Severability.** Baltimore suggests (at 14–16) the Court should hold unconstitutional Congress's decision to zero out the NFA's making and transfer taxes, rather than the firearm registration requirements that supported those taxes. But setting the NFA's making and transfer taxes to zero is *not* unconstitutional—Congress is not constitutionally required to tax firearms—and nobody has argued (much less shown) otherwise. What *is* unconstitutional are regulatory requirements untethered from any of Congress's enumerated powers.

---

[25] Plaintiff States' preference for the comparative efficiency of declaratory relief should not be read as an admission that new evidence would somehow be inappropriate. Plaintiff States request that the Court permit the non-Texas Plaintiff States to demonstrate ongoing and future harm with additional evidence in the event the Court believes it necessary.

[26] ATF Tools & Services for Firearms Industry, National Firearms Act Division, ATF, Bureau of Alcohol, Tobacco, Firearms and Explosives (last reviewed April 11, 2025), https://www.atf.gov/firearms/national-firearms-act-division.

That forecloses Baltimore's proposed remedy.  Under severability doctrine, "the Court invalidates and severs *unconstitutional provisions* from the remainder of the law."  *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020) (plurality) (emphasis added).  The Internal Revenue Code's severability clause is in accord:  "If any provision of this title … *is held invalid* … the remainder of the title, and the application of such provision to other persons or circumstances, shall not be affected thereby."  26 U.S.C. § 7852(a) (emphasis added).  Because all agree that setting a tax at $0 is constitutional and valid, declaring that provision unconstitutional and invalid is not even an option on the table—much less one compelled by caselaw.

## CONCLUSION

For these reasons, Plaintiffs hereby request that the Court grant Plaintiffs' motion for summary judgment and deny the Government's cross-motion for summary judgment.

Dated: December 15, 2025

Respectfully submitted,

/s/ Stephen D. Stamboulieh
STEPHEN D. STAMBOULIEH

**STAMBOULIEH LAW, PLLC**
NDTX#: 102784MS
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorney for Plaintiffs Gun Owners of America, Inc., Gun Owners Foundation and Brady Wetz*

/s/ Brandon W. Barnett
BRANDON W. BARNETT
Texas Bar. No. 24053088

**BARNETT HOWARD & WILLIAMS PLLC**
930 W. 1st St., Suite 202
Fort Worth, Texas 76102
Tel: (817) 993-9249
Fax: (817) 697-4388
barnett@bhwlawfirm.com

*Attorney for Private Plaintiffs*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN WALTERS
Deputy Attorney General for Legal Strategy

/s/ Munera Al-Fuhaid
MUNERA AL-FUHAID
Special Counsel, Special Litigation Division

/s/ Michael D. Faucette
MICHAEL D. FAUCETTE
Stephen J. Obermeier
Jeremy J. Broggi
Boyd Garriott
Isaac J. Wyant

**WILEY REIN LLP**
2050 M Street NW
Washington, D.C. 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
mfaucette@wiley.law
sobermeier @wiley.law
jbroggi@wiley.law
bgarriott@wiley.law
iwyant@wiley.law

*Attorneys for Plaintiffs Silencer Shop Foundation, Firearms Regulatory Accountability Coalition, Palmetto State Armory, LLC, B&T USA, LLC, and SilencerCo Weapons Research, LLC*

Texas Bar No. 24094501

CHRISTINA CELLA
Special Counsel, Legal Strategy Division
Texas Bar No. 240106199

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 461-6494
Munera.al-fuhaid@oag.texas.gov
christina.cella@oag.texas.gov

*Counsel for Plaintiff State of Texas*

STEPHEN J. COX
Attorney General of Alaska

*/s/ Aaron C. Peterson*
AARON C. PETERSON
(Alaska Bar No. 1011087)
Senior Assistant Attorney General

Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov

*Counsel for Plaintiff State of Alaska*

RAÚL R. LABRADOR
Attorney General of Idaho

*/s/ Michael A. Zarian*
MICHAEL A. ZARIAN
Deputy Solicitor General
Texas Bar No. 24115978

OFFICE OF THE IDAHO ATTORNEY GENERAL
700 W Jefferson St #210
Boise, ID 83720
Telephone: (208) 334-2400
Facsimile: (208) 854-8073

CHRISTOPHER M. CARR
Attorney General of Georgia

*/s/ Elijah J. O'Kelley*
ELIJAH J. O'KELLEY
Deputy Solicitor General

OFFICE OF THE GEORGIA ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ James A. Barta*
James A. Barta
SOLICITOR GENERAL

INDIANA ATTORNEY GENERAL'S OFFICE
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

michael.zarian@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KRIS W. KOBACH
Attorney General of Kansas

*/s/ James Rodriguez*
JAMES RODRIGUEZ
(KS Bar #29172)
Assistant Attorney General

OFFICE OF KANSAS ATTORNEY GENERAL
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597
Tel. (785) 368-8197
Jay.Rodriguez@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN*
Solicitor General

MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for Plaintiff State of Montana
*motion for pro hac vice admission forthcoming*

GENTNER DRUMMOND
Attorney General of Oklahoma

*/s/ Garry M. Gaskins, II*
GARRY M. GASKINS, II
Solicitor General

OFFICE OF THE ATTORNEY GENERAL OF
OKLAHOMA

*Counsel for Plaintiff State of Indiana*

LIZ MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA*
Solicitor General

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
AguinagaB@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana
*motion for pro hac vice admission forthcoming*

DREW H. WRIGLEY
Attorney General of North Dakota

*/s/ Philip Axt*
PHILIP AXT
Solicitor General

OFFICE OF NORTH DAKOTA ATTORNEY GENERAL
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

*Counsel for Plaintiff State of North Dakota*

ALAN WILSON
Attorney General of South Carolina

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
(SC Bar No. 103098)
Assistant Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL OF SOUTH

313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*


MARTY J. JACKLEY
Attorney General of South Dakota

*/s/ Grant Flynn*
GRANT FLYNN
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL OF
SOUTH DAKOTA
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
grant.flynn@state.sd.us

*Counsel for Plaintiff State of South Dakota*


JOHN B. MCCUSKEY
Attorney General of West Virginia

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvag.gov

*Counsel for Plaintiff State of West Virginia*


CAROLINA
PO Box 11549
Columbia, South Carolina 29201
(803) 734-3765
benmcgrey@scag.gov

*Counsel for Plaintiff State of South Carolina*


DEREK BROWN
Attorney General of Utah

*/s/ Andrew Dymek*
ANDREW DYMEK
Solicitor General

OFFICE OF THE UTAH ATTORNEY GENERAL
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111

*Counsel for Plaintiff State of Utah*


KEITH G. KAUTZ
Attorney General of Wyoming

*/s/ Ryan Schelhaas*
RYAN SCHELHAAS
Chief Deputy Attorney General

OFFICE OF THE ATTORNEY GENERAL OF WYOMING
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*