No. 24-542

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

KIM RHODE, et al.,
Plaintiffs-Appellees

v.

ROB BONTA, Attorney General of the State of California,
Defendant-Appellant

_____

EN BANC REVIEW OF APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____

EN BANC BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS-APPELLEES AND SUPPORTING AFFIRMANCE

_____

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney General

R. JONAS GEISSLER
  Deputy Assistant Attorney General

ANDREW M. DARLINGTON
  Acting Chief, Second Amendment Section

GREGORY DOLIN
  Senior Counsel
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ..................................................1

INTRODUCTION ..........................................................................1

STATEMENT OF THE ISSUES.........................................................5

ARGUMENT

I.    California's background-check regime for ammunition
purchases implicates the plain text of the Second Amendment............6

    A.    Acquiring ammunition is conduct covered by the
Second Amendment's plain text. ................................................7

    B.    Regardless, California's background-check regime
for ammunition purchases imposes a "meaningful
constraint" on the right to bear arms.........................................11

II.    California's ammunition regulations are inconsistent
with this Nation's historical tradition...................................13

    A.    Firearms restrictions must advance a valid purpose.................14

    B.    Firearms restrictions that advance an illegitimate
purpose are unconstitutional, regardless of the size
of the burden imposed on the Second Amendment
right. ...................................................................................18

    C.    California's background-check regime for ammunition
purchases serves no valid purpose and thus violates
the Second Amendment. ..........................................................22

CONCLUSION...............................................................................29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **PAGE**

*Andrews v. State*, 50 Tenn. 165 (1871)..................................................................8

*B & L Prods.. Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024),
   *cert. denied*, 145 S. Ct. 1958 (2025)...............................................................12

*Child Labor Tax Case*, 259 U.S. 20 (1922)..........................................................23

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
   561 U.S. 661 (2010).........................................................................................22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993).........................................................................................17

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) .....................................23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... *passim*

*FEC v. Ted Cruz for Senate*, 596 U.S. 289 (2022) .................................................18

*Fletcher v. Peck*, 6 Cranch 87 (1810) .....................................................................18

*Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025).........................................8

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)................ 19, 22, 26

*Hertz v. Bennett*, 751 S.E.2d 90 (Ga. 2013)...........................................................16

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)...........8, 10

*Kelo v. City of New London*, 545 U.S. 469 (2005) ..................................................17

*Luis v. United States*, 578 U.S. 5 (2016)...................................................................8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..............................................16

**CASES (continued):**                                                          **PAGE**

*New York State Rifle & Pistol Ass'n Inc. (NYSRPA) v. Bruen*,
   597 U.S. 1 (2022)..................................................................................*passim*

*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025)...................................... 17-18, 20

*Nunn v. State*, 1 Ga. 243 (1846)..................................................................16

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)..............................19

*Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir.) (en banc),
   *cert. denied*, No. 24-1061, 2025 WL 2823711 ( Oct. 6, 2025) ....................17

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .................................................. 26-27

*Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020)............................. 1, 22, 27

*Rhode v. Bonta*, 145 F.4th 1090 (9th Cir.),
   *vacated*, 159 F.4th 1170 (9th Cir. 2025) ................................................ *passim*

*Rhode v. Bonta*, 713 F. Supp. 3d 865 (S.D. Cal. 2024).................................. *passim*

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) .....................................................17

*State v. Chandler*, 5 La. Ann. 489 (1850)..................................................................16

*State v. Reid*, 1 Ala. 612 (1840).................................................................................16

*Teixera v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)..................................12

*United States v. Miller*, 307 U.S. 174 (1939) .....................................................8, 15

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) ..............................21

*United States v. Rahimi*, 602 U.S. 680 (2024)................................................... *passim*

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...............................................21

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ...............................................................26

**CONSTITUTION:** **PAGE**

U.S. Const. Amend. II ................................................................................... 14-15

**STATUTES:**

18 U.S.C. 922(t) .................................................................................................25

Cal. Penal Code (West 2025)
    § 30370(e) ...............................................................................................25
    § 30370(c) ...............................................................................................25

N.Y. Penal Law § 400.02(2) (McKinney 2025) ......................................................23

**REGULATIONS:**

27 C.F.R. 478.102 ..............................................................................................24

28 C.F.R. 25.1 *et seq.* ..........................................................................................25

Cal. Code Regs. tit. 11 (2024)
    § 4282(b) ................................................................................................25
    § 4285(b) ................................................................................................25

Cal. Code Regs. tit. 11 (2025)
    § 4001(a) ................................................................................................25
    § 4038(b) ................................................................................................25
    § 4282(b) ................................................................................................25
    § 4283(b) ................................................................................................25
    § 4284(b) ................................................................................................25
    § 4285(b) ................................................................................................25

**RULE:**

9th Cir. Local R. 29-2(a). .......................................................................................1

**MISCELLANEOUS:**

1 St. George Tucker, *Blackstone's Commentaries* (1803) ........................................ 15

## MISCELLANEOUS (continued):           **PAGE**

1 William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787) ................................................. 15

1 William Blackstone, *Commentaries on the Laws of England* (13th ed. 1800) ................................................. 20

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ................................................. 16

Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381 (2025) ........................... 15, 20

D. Bellamy, M. Gordon, John Marchant et al., *New Complete English Dictionary* (1760) ......................................... 19-20

Samuel Johnson, *A Dictionary of the English Language* (1755) ........................... 19

Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason U. C.R. L.J. 67 (1991) ........................................... 16

William Rawle, *A View of the Constitution of the United States of America* (1825) ................................................. 15

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in the preservation of the right to keep and bear arms and in the proper interpretation of the Second Amendment. It is permitted to file this amicus brief without the consent of the parties or leave of the Court. 9th Cir. Local R. 29-2(a).

## INTRODUCTION

This case concerns California's novel point-of-sale background-check regime for ammunition purchases. The district court and panel below ascribed several monikers to that regime: "unnecessarily complicated," "onerous and convoluted," "cumbersome and byzantine," "extensive and ungainly," "first-of-its-kind." *Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020); *Rhode v. Bonta*, 713 F. Supp. 3d 865 (S.D. Cal. 2024); *Rhode v. Bonta*, 145 F.4th 1090 (9th Cir. 2025). It has earned every one. California is the first State in this country's history to require an in-person background check before every ammunition transaction. Its regime provides four different avenues to complete that background check—each involving a fee (from $5 to $31), each involving their own inherent and unpredictable delays (from minutes, to days, to more), and each being one-time-use only. The most common method—the so-called standard check—only clears a purchaser to acquire ammunition in an 18-hour window. In the end, only a fraction of a fraction of a small percentage of applicants turn out to be on the Armed Prohibited Person list.

That is how California designed its regime; how California has implemented it has introduced barriers to ammunition acquisition as well. Tens of thousands of lawful gun owners seeking to purchase ammunition are rejected annually in the background-check process. Those rejections are not because these citizens are a danger to society or because they are on the prohibited list; rather, they are often because of simple address mismatches or difficulty in retrieving the gun owner's record. Fixing those issues—which could involve contacting the State to access and ultimately correct the record on file—can take months. California's burdensome barriers have achieved their goal: Over a third of the law-abiding citizens rejected in January 2022 still had not purchased ammunition six months later. *Rhode*, 713 F. Supp. 3d at 876-877. And that does not even take into account those citizens who have been discouraged from even attempting a purchase in the first place. *Id.* at 877 n.17.

The district court held that these novel obstacles to simply buying ammunition "have no historical pedigree" and "violate the Second Amendment right of citizens to keep and bear arms." *Rhode*, 713 F. Supp. 3d at 887-888. It accordingly permanently enjoined the California Attorney General from enforcing the ammunition background-check requirements. *Id.* at 888. And a panel of this Court agreed, concluding that "California's ammunition background check regime infringes on the fundamental right to keep and bear arms." *Rhode*, 145 F.4th at 1121.

Those holdings were correct, and this Court should affirm the judgment below. California insists that its restriction of ammunition purchases does not implicate the plain text of the Second Amendment at all. *See* Pet. for Reh'g 10. That is wrong. The Supreme Court has made clear that the Second Amendment's right to "bear Arms" refers to the right to "bear" firearms "for the purpose of being armed and ready for offensive or defensive action." *New York State Rifle & Pistol Ass'n Inc. (NYSRPA) v. Bruen*, 597 U.S. 1, 32 (2022) (alteration and citation omitted). In other words, the Second Amendment's plain text protects the right to "operable" arms. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Both firearms *and* ammunition are necessary to that right, as is the ability to acquire either. California's requirement that gun owners undergo background checks each time they seek to purchase ammunition plainly implicates the Second Amendment's right to "bear Arms."

And under Second Amendment review, California's background-check regime for ammunition purchases is straightforwardly unconstitutional. Its purpose—the hindrance of law-abiding citizens' exercise of their Second Amendment rights—finds no analogue among valid regulatory schemes of the past. That is unsurprising. The history and tradition surrounding the Second Amendment establish that firearms regulations must serve legitimate objectives and may not be designed simply to inhibit the ability to possess or carry operable protected firearms.

- 3 -

When firearms regulations are designed to thwart the right to bear arms, they are unconstitutional, no matter the size or characteristics of the burden they impose.

Any clear-eyed analysis of the challenged law must conclude that California designed its novel regime to infringe the exercise of the right to bear arms. The panel accepted California's representations in litigation that its ammunition background check serves the purpose of "ensur[ing] that prohibited persons cannot access operable firearms." *Rhode*, 145 F.4th at 1114. But those representations are hard to credit. Every State has confronted that same problem for generations, yet virtually none of them has adopted anything like California's approach. On the other hand, California's regime is perfectly well-suited to thwart its residents' exercise of their Second Amendment rights. If the costs and maze-like features of California's background-check system at the front end do not discourage would-be ammunition purchasers from embarking on the journey, the complications experienced by thousands of Californians on the back end surely do. The delay and confusion of California's regime is the point, all to frustrate the Second Amendment right.

That is unconstitutional, regardless of whether California achieved great or limited success in its goal. There is thus no need for this Court to compare California's background-check regime's requirements to those imposed by historical licensing rules, surety laws, or loyalty oaths—though even if it were to do so, California's law would not pass muster. A law designed to antagonize the Second

Amendment definitionally does not "comport with [its] principles." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). This Court should affirm the judgment below.

## STATEMENT OF THE ISSUES

In this brief, the United States addresses these issues:

1. Whether a restriction on acquiring ammunition—without which the right to bear arms would be meaningless—implicates the plain text of the Second Amendment.

2. Whether a firearm restriction whose design, operation, and enforcement evinces a bare desire to frustrate the exercise of the right to bear arms violates the Constitution.

## ARGUMENT

*Bruen* announced a two-step framework for applying the Second Amendment. At step one, a reviewing court considers whether "the Second Amendment's plain text covers an individual's conduct." *NYSRPA v. Bruen*, 597 U.S. 1, 24 (2022). If it does, "the Constitution presumptively protects that conduct," and the court proceeds to step two, where "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid.* "Only" if the government can carry that burden may the court "conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Ibid.* (citation and internal quotation marks omitted).

- 5 -

California's novel point-of-sale background-check regime for ammunition purchases cannot survive under the *Bruen* framework.  Acquiring ammunition is plainly protected conduct under the Second Amendment because without ammunition the right to bear arms would be meaningless.  And the Second Amendment does not countenance firearms restrictions borne out of a bare desire to suppress the right—a principle that flows from Supreme Court precedent, the plain constitutional text, and this Nation's traditions of firearm regulation.  California's challenged background-check regime is unconstitutional, and this Court should affirm the district court's permanent injunction.

## I.     California's background-check regime for ammunition purchases implicates the plain text of the Second Amendment.

At step one of the *Bruen* framework, the panel below inquired—and the parties currently debate—whether California's background-check regime for ammunition purchases "meaningfully constrains the right to keep and bear arms." *Rhode v. Bonta*, 145 F.4th 1090, 1106 (9th Cir.), *vacated*, 159 F.4th 1170 (9th Cir. 2025).  That debate is unnecessary under a proper understanding of the *Bruen* framework.  The Second Amendment's plain text protects the right to armed self-defense, which necessarily includes the right to acquire ammunition.  Whether a regulation places a "meaningful" burden on that right might be relevant at step two of the *Bruen* framework, at least in answering part of the inquiry into whether the restriction falls within this Nation's tradition of firearms regulation—namely, to

- 6 -

address *how* the current law burdens the right and whether that burden is comparable to prior, analogous restrictions.  But the degree of burden is irrelevant at step one, which simply asks whether the restriction implicates the Second Amendment at all.

Regardless, the panel correctly concluded that California's point-of-purchase background-check regime—which governs every in-state ammunition transaction and restricts access even to ammunition sourced from outside the State—imposes a meaningful constraint on the right to bear arms.  The current en banc proceeding offers a prime opportunity for this Court to align its precedent with Supreme Court's guidance.  But even under current Ninth Circuit case law, the challenged ammunition regulations implicate the Second Amendment and thus step one of the *Bruen* framework is satisfied.

### A.    Acquiring ammunition is conduct covered by the Second Amendment's plain text.

The right to acquire ammunition is part and parcel of the right to bear arms. As *Bruen* explained, the right to "bear arms" refers to the right to wield a firearm "for the purpose of being armed and ready for offensive or defensive action." *NYSRPA v. Bruen*, 597 U.S. 1, 32 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008)).  In other words, the Second Amendment does not protect the right to carry a firearm merely as an ornament; it safeguards the right to an "*operable*" firearm "for the purpose of immediate self-defense." *Heller*, 554 U.S. at 635 (emphasis added).  That requires ammunition.

- 7 -

Common sense and logic dictate that the Second Amendment right to bear arms includes the right also to *acquire* the ammunition to make those arms effective. "No axiom is more clearly established in law" or "reason" than that the "general power to do a thing" includes "every particular power necessary for doing it." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 478 (2025) (citation omitted). By a similar token, constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). As this Court has recognized, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *overruled on other grounds by NYSRPA v. Bruen*, 597 U.S. 1 (2022). That means "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Ibid.* (internal quotations marks omitted); *see United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition." (citation omitted)); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms.").

Accordingly, in this case, step one of *Bruen* is straightforward. The Supreme Court had "little difficulty" concluding that New York's proper-cause requirement to publicly carry firearms implicated the Second Amendment's plain text. *Bruen*,

- 8 -

597 U.S. at 32-33. Neither should this Court have any difficulty concluding the same for California's point-of-sale background-check regime for ammunition purchases. A law requiring state approval before carrying a firearm and a law requiring state approval before obtaining ammunition equally affects the right to bear arms for self-defense. Both restrictions must be justified by showing an established history and tradition of comparable regulation if they are to stand.

In its rehearing petition, California insists that the "acquisition of firearms" and ammunition only "implicates the Second Amendment" if the challenged restriction "*meaningfully* constrains the right to keep and bear arms." Pet. for Reh'g 1 (emphasis added; citation and internal quotation marks omitted). That is wrong. Laws that directly regulate ammunition acquisition satisfy step one of the *Bruen* framework, regardless of whether the regulation "meaningfully constrains" the right. All step one asks is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If that plain text "guarantee[s] the individual right to possess and carry weapons in case of confrontation" (as held in *Heller*, 554 U.S. at 592) and if "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them" (as this Court has explained), it follows that the Second Amendment's plain text covers the acquisition of ammunition. *See Jackson*, 746 F.3d at 968 (concluding after a "historical review" that "prohibitions on the sale of ammunition do not fall outside the historical

understanding of the scope of the Second Amendment right" (alteration, citation and internal quotation marks omitted)).    There is no occasion to import a "meaningfulness" requirement into this step.

To be sure, whether the burden on a citizen's ability to procure ammunition is great, small, or "meaningful" might be relevant to whether a law aligns with this Nation's historical tradition of firearm regulation (*i.e.*, step two).  *Bruen* itself emphasized that, when comparing a challenged law to historical regulations, courts should ask "how and why th[ose] regulations *burden* a law-abiding citizen's right to armed self-defense."  597 U.S. at 29 (emphasis added).  And in *United States v. Rahimi*, the Supreme Court upheld the challenged law after concluding that "[t]he burden [it] imposes on the right to bear arms" "fits within our regulatory tradition." 602 U.S. 680, 698 (2024).  The nature of the burden imposed by a given regulation on the ability to procure ammunition may thus be relevant to whether that regulation can ultimately withstand Second Amendment review, but only as part of an inquiry into whether there is a tradition of comparably burdensome regulation.  It simply cannot be the case that a direct regulation of conduct necessary to the right to bear arms can be exempted from Second Amendment review altogether so long as it is not "meaningful."

**B.    Regardless, California's background-check regime for ammunition purchases imposes a "meaningful constraint" on the right to bear arms.**

In any event, the panel correctly applied this Court's precedents when it concluded that California's background-check regime for ammunition purchases "meaningful constrain[s]" the right to keep and bear arms.

As further explained below, *see* pp. 13-22, *infra*, taken as a whole, California's background-check regime has no historical analogue at the state or federal level. Before California enacted its current laws, no other State had required background checks at the point of sale for ammunition, let alone compliance with the many other innovative regulatory hurdles California has. California's novel and burdensome regime, from its fees with no apparent justification to its 18-hour time limits on purchase authorization, clearly evince a mere design to burden the Second Amendment right. As the district court's findings demonstrated, California's design has achieved its intended effect. Tens of thousands of law-abiding gun owners are rejected annually based on technical errors in California's "extensive and ungainly" background-check system. *Rhode v. Bonta*, 713 F. Supp. 3d 865, 876 (S.D. Cal. 2024). Even aside from those instances, the system's byzantine rules "inherently cause some amount of delay." *Rhode*, 145 F.4th at 1107. And as the panel explained, unlike other burdens this Court has blessed as not "meaningful," California's background-check regime cannot be avoided by simply walking "down

- 11 -

the street"; rather, it applies "to all ammunition transactions," even ones "that occur in another state." *Id.* at 1108-1109 (citation omitted).

In its petition, California fixates on that last point, claiming that the geographical burden placed by its background-check system is irrelevant. Pet. for Reh'g 12. As the panel below explained, that is wrong under this Court's precedents. In *Teixera v. County of Alameda*, this Court upheld a zoning restriction on firearm dealers because it would have "little or no impact on the ability of individuals to exercise their Second Amendment right" given "the number of gun stores in the County" and its geography. 873 F.3d 670, 687 (9th Cir. 2017). And in *B & L Productions, Inc. v. Newsom*, this Court upheld a ban on the sale of firearms on state property because—given that there were "six licensed firearm dealers in the same zipcode" and any individual could "acquire the [desired] firearms down the street"— "the record suggests that no individual's access to firearms would be limited" at all. 104 F.4th 108, 119 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025). Here, by contrast, California's restrictions on purchasing ammunition follows its residents down the street, outside their zip code, and even beyond the State's borders. That— along with all its other burdensome features—renders California's regime a "meaningful constraint," and it must therefore be consistent with the history and tradition of firearm regulation in this Nation.

## II.   California's ammunition regulations are inconsistent with this Nation's historical tradition.

Because its background-check regime for ammunition purchases implicates Second Amendment-protected conduct, California bears a heavy burden to show that the law is "consistent with the Nation's historical tradition of firearm regulation." *NYSRPA v. Bruen*, 597 U.S. 1, 24 (2022). This historical inquiry turns on "whether a historical regulation" (which California must identify) is a proper analogue for "a distinctly modern firearm regulation" (which California's regime undoubtedly is). *Id.* at 28-29. And the Supreme Court has further explained that "[w]hy and how the [modern] regulation burdens the right are central to this inquiry," *United States v. Rahimi*, 602 U.S. 680, 692 (2024), and that these are the "metrics" for determining whether the modern regulation is "relevantly similar" to the historical one, *Bruen*, 597 U.S. at 29.

California cannot meet its burden. The Second Amendment prohibits governments from restricting firearms out of a bare desire to suppress the right. And there is no other plausible explanation of the design, operation, and enforcement of California's novel potpourri of restrictions on ammunition purchases. Because the challenged background-check regime violates the Second Amendment in "why" it regulates firearms, there is no need to consider "how" it burdens the right; any burden is an unconstitutional infringement on the right to bear arms.

### A.     Firearms restrictions must advance a valid purpose.

As the United States argues, U.S. Amicus Br. at 11-18, *Wolford v. Lopez*, No. 24-1046 (Nov. 24, 2025), a firearms regulation that seeks to frustrate the exercise of the right to keep and bear arms is a per se violation of the Second Amendment. Though States may enact firearm laws that pursue legitimate objectives in ways permitted by history, they may not restrict firearms based on the bare desire to make it harder for people to exercise Second Amendment rights.

That principle flows from *Bruen* and *Rahimi*, which recognized that a law's constitutionality turns on "why" it regulates arms-bearing. *Rahimi*, 602 U.S. at 698; *Bruen*, 597 U.S. at 29. *Rahimi* explained that a law complies with the Second Amendment only if it "regulates arms-bearing for a permissible reason." 602 U.S. at 692. And *Bruen* explained that a regulation is constitutional only if properly "justified." 597 U.S. at 29. *Bruen* also stated that, although States may adopt licensing schemes "designed to ensure" that only qualified individuals possess arms, they may not pursue "abusive ends" by using long wait times or exorbitant fees to thwart the public-carry right. *Id.* at 38 n.9.

That principle reflects the original meaning of the Second Amendment's command that the right to bear arms "shall not be infringed." U.S. Const. Amend. II. The Founding generation distinguished between legitimate regulation and illegitimate "infringement." *See* Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist.

381, 415-441 (2025). Whether a restriction was an "infringement" could hinge on the purpose it served. A regulation was "legitimate" when it "sought the public good genuinely"; it was an infringement when it "serve[d] a pretextual repressive purpose." *Id.* at 404, 441.

Commentators accordingly cited English game laws—which disarmed most subjects on the pretext of preventing poaching—as a paradigmatic example of infringement that would "violat[e] the right codified in the Second Amendment." *District of Columbia v. Heller*, 554 U.S. 570, 606-607 (2008). For instance:

- Blackstone described "every wanton and causeless restraint," adopted "without any good end in view," as "tyranny." 1 William Blackstone, *Commentaries on the Laws of England* 126 (10th ed. 1787). He also warned that "disarming the bulk of the people" "is a reason oftner meant, than avowed, by the makers of forest or game laws." 2 *id.* at 412.

- St. George Tucker, a Virginia judge and scholar, wrote that when arms-bearing is prohibited on a "pretext," "liberty, if not already annihilated, is on the brink of destruction." 1 St. George Tucker, *Blackstone's Commentaries* App. 300 (1803). He added that English game laws, enacted under the "specious pretext" or "mask" of "preserving the game," were "calculated" to "confine th[e] right within the narrowest limits." *Ibid.*

- Pennsylvania lawyer William Rawle warned that an attempt to "disarm the people" "under some general pretence" would violate the Second Amendment. William Rawle, *A View of the Constitution of the United States of America* 122 (1825). He also viewed English game laws as an infringement because they sought to prevent "resistance to government by disarming the people." *Id.* at 122-123.

- Justice Story wrote that English laws had "greatly narrowed" the right to bear arms under "various pretences," so that the right was "more nominal than real, as a defensive privilege." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1891, at 747 (1833).

Consistent with that history, American courts in the early 19th century recognized that firearms regulations designed to frustrate the right violate the Constitution. Alabama's and Georgia's Supreme Courts explained that a law that, "under the pretence of regulating," seeks "a destruction of the right," "would be clearly unconstitutional." *State v. Reid*, 1 Ala. 612, 616-617 (1840); *see Nunn v. State*, 1 Ga. 243, 249 (1846), *overruled in part on other grounds by Hertz v. Bennett*, 751 S.E.2d 90 (Ga. 2013). And when courts upheld state laws requiring arms to be carried openly rather than concealed, they emphasized that the laws served legitimate purposes such as "prevent[ing] bloodshed and assassinations." *State v. Chandler*, 5 La. Ann. 489, 490 (1850).

The understanding that pretextual restrictions infringe the right persisted after the Civil War, when the former Confederate States made "systematic efforts" to disarm black people. *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010). While some States "formally prohibited" black people from possessing arms, others resorted to subtler measures. *Ibid.* For example, States banned "cheap handguns, which were the only firearms the poverty-stricken freedmen could afford," and levied exorbitant taxes "to price handguns out of the reach of blacks." Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason U. C.R. L.J. 67, 73, 75 (1991). Those who opposed such pretextual restrictions "frequently stated that they infringed blacks' constitutional right to keep and bear arms." *Heller*, 554 U.S. at 614.

That history is unsurprising.  Similar inquiries into statutory design recur throughout constitutional law, and the right to bear arms is not "a second-class right, subject to an entirely different body of rules."  *Bruen*, 597 U.S. at 70 (citation omitted).  For example, the Free Exercise Clause forbids laws whose "object or purpose" is the "suppression of religion." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  The Free Speech Clause forbids restrictions whose "purpose" is "to suppress [protected] speech."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011); *see Project Veritas v. Schmidt*, 125 F.4th 929, 947 (9th Cir.) (en banc) (noting that "the government's purpose in regulating speech is the controlling consideration in determining content neutrality" (citation modified)), *cert. denied*, No. 24-1061, 2025 WL 2823711 (Oct. 6, 2025).  And the Takings Clause bars the government from taking property "under the mere pretext of a public purpose, when its actual purpose [i]s to bestow a private benefit."  *Kelo v. City of New London*, 545 U.S. 469, 478 (2005).

This Court's Second Amendment precedents have also reflected this principle.  In *Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025), this Court concluded that California's law prohibiting people from purchasing more than one firearm in a 30-day period violated the Second Amendment.  In reaching that conclusion, the panel contrasted California's one-gun-a-month law with a federal statute that permitted firearms dealers to delay a sale for ten days.  The federal statute "served a

- 17 -

presumptively valid purpose"—namely, it gave dealers time to "conduct a Congressionally-mandated background check" "not put to abusive means." *Id.* at 1243. By contrast, the one-gun-a-month law had an improper purpose: "delay *itself.*" *Ibid.* That improper purpose meant that California was "infringing on citizens' exercise of their Second Amendment rights." *Ibid.*

None of this is to suggest that courts should examine legislators' subjective motives or invalidate laws based on motives alone. Courts generally do not probe lawmakers' mental states, *see Fletcher v. Peck*, 6 Cranch 87, 130 (1810), and Second Amendment analysis is no exception. Rather, courts routinely examine a law's design, operation, and enforcement to judge whether it actually serves "a legitimate objective." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022). That familiar inquiry governs Second Amendment cases as well.

### B. Firearms restrictions that advance an illegitimate purpose are unconstitutional, regardless of the size of the burden imposed on the Second Amendment right.

A firearm restriction need not completely disable the citizenry from engaging in self-defense to "infringe" upon the right to bear arms. Of course, total nullification of the right is a particularly egregious form of unconstitutional infringement. *See, e.g.*, *Bruen*, 597 U.S. at 31, 38 (finding no historical "tradition of broadly prohibiting" public carry). But that is no quantitative limit to "how" a State

can violate the Second Amendment.  A State can infringe the right to bear arms in increments as well.

Even before *Heller*, courts considered it "frivolous" to argue that a "prohibition does not implicate the Second Amendment" simply "because it does not threaten total disarmament." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007).  And *Heller* itself confirmed the principle.  It was "no answer" to suggest that banning handguns was permissible "so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller*, 554 U.S. at 629.  To claim that the Second Amendment only guards against complete nullification of the right would be akin to asserting that the First Amendment allows "books [to] be banned because people can always read newspapers." *Heller v. District of Columbia*, 670 F.3d 1244, 1289 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).  In either context, a law that is only a partial encumbrance is still a "direct[] infringe[ment]" of "an enumerated constitutional right." *Ibid.*

This principle tracks the original meaning of the verb "infringe" in the Second Amendment.  *See generally* Slate 424-429.  Founding-era dictionaries defined "infringe" to mean "hinder" or impede, not just "destroy." *See* Samuel Johnson, *A Dictionary of the English Language* (1755) (s.v. *infringe*).  Similarly, contemporary sources defined "infringement" to mean "encroachment." *See* D. Bellamy, M. Gordon, John Marchant et al., *New Complete English Dictionary* (1760) (s.v.

- 19 -

*infringement*); *accord Nguyen*, 140 F.4th at 1243 (defining "infringement" as an "encroachment" (citation omitted)). And "encroachment," in turn, could be accomplished by "a gradual advance into the rights and territories of another." Bellamy, *supra* (s.v. *encroachment*).

Commentators adhered to the understanding that infringements of a right could be incremental. Blackstone viewed English law as imposing a "sentence of excommunication" to any who "in any degree infringe[d]" the rights declared in Magna Carta. 1 William Blackstone, *Commentaries on the Laws of England* 127 (13th ed. 1800). That was consistent with "contemporaneous constitutional-law usage that held infringements occurred even when violations of rights were only partial or fractional and not total usurpations or deprivations." Slate 412.

And during ratification, Federalists and Antifederalists routinely objected to "[i]nfringement-by-degrees, through diminution or partial deprivation." Slate 430. Noah Webster opposed "any infringement of his rights"—by which he meant any "abridge[ment] or endanger[ment]" of "liberty." *Ibid.* (citation omitted). Another Federalist warned in the *Petersburg Virginia Gazette* that "[g]radual and imperceptible encroachments"—not "open and great usurpations"—are "the usual modes of infringing liberty." *Ibid.* (citation omitted). And a Virginia Antifederalist had nearly identical concerns, writing that "the least infringement, or appearance of

infringement on our liberty" "ought . . . to rouse our fears and awaken our jealousy." *Ibid.* (citation omitted).

In sum, an infringement of the Second Amendment right can be accomplished both by complete nullification of the right as well as by a partial restriction of the right. In the free-speech context, the Supreme Court has explained that the "distinction between laws burdening and laws banning speech is but a matter of degree," and "content-based burdens must satisfy the same rigorous scrutiny" as "content-based bans." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). In other words, a content-based speech restriction must satisfy strict scrutiny even if it is not "a complete prohibition" of speech. *Ibid.* Just so for the Second Amendment. The right to bear arms can be "infringed" well short of being completely eviscerated.

Further, the magnitude of the burden is especially nondeterminative of the legal outcome when the challenged law reflects an illegitimate purpose. That, too, finds an echo in First Amendment precedent. Whether there are "alternative avenues of [communication]" may be relevant when a court reviews a time, place, and manner restriction that "serves purposes unrelated to the content of expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 789, 791 (1989) (citation omitted). But when such restrictions directly discriminate based on viewpoint, the existence of alternative avenues of expression does "not cure the constitutional shortcoming."

- 21 -

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 690 (2010). The same principle applies in the Second Amendment context. It is "not . . . persuasive or legitimate" to excuse a "law that directly infringes an enumerated constitutional right" merely because it does not eviscerate the right entirely. *Heller*, 670 F.3d at 1289 (Kavanaugh, J., dissenting). A "partial restriction" of the right to bear arms that "serves a pretextual repressive purpose" is just as much an infringement as a complete destruction of the right. Slate 441.

## C. California's background-check regime for ammunition purchases serves no valid purpose and thus violates the Second Amendment.

Under these principles, California's point-of-sale background-check regime for ammunition purchases violates the Second Amendment. Under the challenged law, a Californian who desires to buy ammunition must undergo a background check before every transaction. Each transaction, that resident must pay a fee—for the two most-discussed options, $1 (the "standard" check) or $19 (the "basic" check) per purchase. *See Rhode v. Bonta*, 145 F.4th 1090, 1099-1102 (9th Cir. 2025). And each background check has its own associated delays. When the process is working, the background check can take minutes or days; when, as for tens of thousands of gun owners, the system rejects the would-be purchaser for technical reasons, it could be months. *See Rhode v. Bonta*, 713 F. Supp. 3d 865, 876-877 (S.D. Cal. 2024); *Rhode v. Becerra*, 445 F. Supp. 3d 902, 920 (S.D. Cal. 2020). On its face, California's background-check regime serves only to place obstacles in the way of

- 22 -

citizens seeking to exercise their Second Amendment rights, not to promote any legitimate objective. That is per se unconstitutional.

In this litigation, California has insisted that the purpose of these background-check laws is "to prevent dangerous prohibited persons from acquiring bullets for their guns." *Rhode*, 713 F. Supp. 3d at 877. But courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 122 (2025) (citation omitted). And they need not be "blind" to the "palpable" "regulatory effect and purpose" of a statute that "[a]ll others can see and understand," regardless of how the State chooses to defend it in litigation. *Child Labor Tax Case*, 259 U.S. 20, 36-37 (1922). In the abstract, perhaps each provision of California's regime could somehow be rationalized as a sincere attempt to keep ammunition in lawful hands. But reality is not a vacuum. Taken together, the design and operation of California's background-check regime evinces not a legitimate attempt to keep ammunition away from dangerous prohibited persons but rather a bare desire to curtail the Second Amendment right.

Start with design. When California enacted the challenged regime in 2019, it was the first State to require a background check at the point-of-sale for ammunition purchases. (Since then, only New York has followed suit. *See* N.Y. Penal Law § 400.02(2) (McKinney 2025)). Unlike its purported solution, however, the problem California identifies is longstanding and commonplace. "From the earliest days of

- 23 -

the common law," jurisdictions have sought to "bar[] people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693. Every State has grappled—some for centuries—with the "general societal problem" of prohibiting certain prohibited persons from possessing operable firearms. *Bruen*, 597 U.S. at 26. Never—until California—has a State concluded that this problem justifies a point-of-sale background check for every single ammunition purchase. That is ample reason to doubt that public safety is "why" California's regime has adopted this tack. *Id.* at 29.

The details are just as much of an outlier, and equally unjustifiable. California's requirement that an ammunition purchase must be made within 18 hours of a standard check is an oddity. *See Rhode*, 145 F.4th at 1100 (noting this limitation stems from the California Department of Justice's policy). That stands in stark contrast with the federal background-check system (run by the Federal Bureau of Investigation), which allows firearms vendor to rely on a background check for a transaction within 30 calendar days after contacting the agency. 27 C.F.R. 478.102. In this litigation, California has never explained—presumably because it cannot explain—why the reliability of its standard check lapses after less than a day.

The prices California charges per ammunition transaction, too, are hard to explain except as an intentional burden. For the two most-discussed background checks, the fees are $5 (standard check) and $19 (basic check) per transaction. Cal.

Code Regs. tit. 11, §§ 4282(b), 4283(b (2025)).  The fee associated with purchasing ammunition via a certificate of eligibility is $5 per transaction, but maintaining a certificate requires an initial $22 application fee and an annual $22 renewal fee thereafter.  *Id.* §§ 4038(b), 4285(b) (2025).  The only other way to acquire ammunition is to purchase it in the same transaction as a firearm purchase—which itself requires a $31.19 fee.  *Id.* §§ 4001(a), 4284(b) (2025).  California has not explained why ammunition purchasers must undergo two background checks: one to obtain the certificate of eligibility and the second at point of sale.

Ostensibly, fees associated with background checks must "not to exceed the reasonable regulatory and enforcement costs for operating the" background-check system.  Cal. Penal Code § 30370(e) (West 2025); *id.* § 30370(c) (standard check fee must "not . . .exceed the department's reasonable costs").  The decision to charge a fee at all puts California out of step (again) with the federal system for background checks, which charges nothing to the vendors who must screen customers through it.  *See* 18 U.S.C. 922(t); 28 C.F.R. 25.1 *et seq.*  And California has made no serious effort to show in this litigation that the fees it charges accurately reflect its costs, or that costs are the driving consideration in the amount of fees.  Indeed, if anything, the record suggests otherwise.  Until this year, the transaction fee for ammunition purchases bought under the standard check and the certificate for eligibility was $1.  *See* Cal. Code Regs. tit. 11, §§ 4282(b), 4285(b) (2024).  It beggars belief that the

costs of California's background check system justifies a sudden 400% increase—to say nothing of the continued unexplained discrepancy with the $19 basic check fee.

The operation of California's background-check regime further shows that it is not justified by a legitimate interest in disarming prohibited persons. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (inferring illegitimate purpose from a law's practical operation). The actual number of instances in which California's background-check regime prevents dangerous prohibited persons from acquiring ammunition is vanishingly small. In the first half of 2023, only 141 individuals were correctly rejected by the mandated background check—a total of 0.03% of would-be purchasers. *Rhode*, 713 F. Supp. 3d at 877. That number pales in comparison to the 58,087 individuals (11%) who were *incorrectly* rejected in the same process. *Id.* at 876. California's background-check system is thus far more effective at keeping operable firearms out of the hands of law-abiding citizens than it is at withholding ammunition from dangerous prohibited persons.

All told, California's Rube Goldberg background-check regime "do[es] not meaningfully serve" any legitimate purpose. *Heller*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). Measured against the State's purported justification of preventing dangerous prohibited persons from acquiring ammunition, California's challenged laws do not pass even the "laugh test." *Reed v. Town of Gilbert*, 576 U.S. 155, 184

- 26 -

(2015) (Kagan, J., concurring in the judgment). Its system of point-of-sale restrictions on ammunition purchases evokes a convoluted board game, not a serious attempt to further a legitimate purpose.

California's regime thus can only be understood as a series of measures designed to burden the exercise of the right to bear arms. *Bruen* warned of state "scheme[s]" whose "exorbitant fees" and "lengthy wait times" reveal an "abusive end[]" to "deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9. That describes California's ammunition background checks to a tee. Every year, as a natural and foreseeable consequence of California's labyrinthine system, tens of thousands of law-abiding Californians fail the standard check for insignificant errors in their firearms records. *Rhode*, 713 F. Supp. 3d at 876-877. Correcting those errors (indeed, even obtaining access to their records) can take hours, days, or months. *Rhode*, 445 F. Supp. 3d at 920. And delays aside, California's regime has made it a costly endeavor each time a firearms owner tries to buy ammunition. The fees California charges are substantial—especially when considering the eligibility check for the firearm itself is $31.19 (only roughly $12 more than the basic check fee), and that those fees must be paid for *every* ammunition purchase.

As explained, this scheme does little to withhold ammunition from unlawful actors. It is effective, however, at discouraging California residents from bothering to exercise their Second Amendment rights. *See Rhode*, 713 F. Supp. 3d at 876-877

(noting that 37% of persons who failed the standard check still had not purchased ammunition six months later). That there have been roughly 12 million fewer background checks per year than expected since California's regime took effect demonstrates just how potent it is at realizing its true aim. *Id.* at 877 n.17.

A law must "regulate[] arms-bearing for a permissible reason" to comport with the Second Amendment; only then does a court even consider whether the burden the law places on the right fits within historical tradition. *Rahimi*, 602 U.S. at 692. In other words, without a permissible "why," this Court need not even address the "how." The manifest purpose of California's background-check regime for ammunition purchases is to antagonize the Second Amendment right. It matters not the degree to which California's regime succeeded in its goal; any burden, great or small, is an infringement violating the Second Amendment.

Affirming the district court's judgment would not, contra California's petition, "threaten" every background check under the sun. Pet. for Reh'g 18. States can (and frequently do) enact background-check requirements to serve traditional purposes such as disarming dangerous prohibited persons. They can (and frequently do) pursue such purposes through traditional means. But what States cannot do is what California did, which is design a firearm regulation to place roadblocks before gun owners solely to frustrate their ability to bear arms. In no other context is pure

- 28 -

distaste for a constitutional right considered a legitimate government purpose that can justify a regulation.  This Court should say the same for the Second Amendment.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney General

R. JONAS GEISSLER
  Deputy Assistant Attorney General

ANDREW M. DARLINGTON
  Acting Chief, Second Amendment Section

s/ Gregory Dolin
GREGORY DOLIN
  Senior Counsel
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-542

I am the attorney or self-represented party.

**This brief contains** 6,666 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Gregory Dolin    **Date** January 5, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                          *Rev. 12/01/22*