# EXHIBIT A

--- S.Ct. ----
Only the Westlaw citation is currently available.
Supreme Court of the United States.

UNITED STATES, Petitioner

v.

Ali Danial HEMANI

No. 24–1234
|
Argued March 2, 2026
|
Decided June 18, 2026

**Synopsis**
**Background:** Defendant filed a motion to dismiss the indictment charging him under the statute prohibiting the possession of a firearm while being an unlawful user of a controlled substance, on the basis that he regularly used marijuana. The United States District Court for the Eastern District of Texas, Amos L. Mazzant, Chief Judge, 2024 WL 5375143, granted the motion, and the government appealed. The United States Court of Appeals for the Fifth Circuit, 2025 WL 354982, summarily affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Gorsuch, held that:

historical laws that targeted habitual drunkards because their drinking rendered them practically incapacitated and incapable of managing their affairs were not closely analogous to the statute;

statute was not analogous to historical vagrancy laws under which habitual drunkards and others could be confined in workhouse or jailed;

statute was not analogous to civil-commitment laws that allowed courts to appoint guardians for various individuals, including habitual drunkards, or authorized their commitment;

statute was not analogous to historical surety laws under which a judicial officer could impose a surety of good behavior on individuals who threatened a scandal;

way in which historical vagrancy, civil-commitment, and surety laws targeting habitual drunkards worked differed significantly from how the statute worked today;

it was far from obvious that the statute confined its reach to those who were categorically and unusually dangerous; and

prosecution of defendant under the statute, on the basis that he used marijuana a few times a week, did not comply with the Second Amendment.

Affirmed.

Chief Justice Roberts, and Justices Thomas, Sotomayor, Kavanaugh, Barrett, and Jackson joined.

Justice Thomas filed a concurring opinion.

Justice Jackson filed a concurring opinion, in which Justice Sotomayor joined.

Justice Alito filed an opinion concurring in the judgment, in which Justice Kagan joined.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

**West Codenotes**

**Unconstitutional as Applied**

18 U.S.C.A. § 922(g)(3)

*Syllabus*[*]

[*]     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1**  Ali Hemani is a dual citizen of the United States and Pakistan who was born in Texas. He has spent most of his life living in the Dallas area with his parents and working a stable job. Suspecting Mr. Hemani and his family members of terrorism-related activities, the government conducted a search of the family home in 2022. Throughout the process, Mr. Hemani proved cooperative: he surrendered a gun he kept in the house, pointed agents to some marijuana on the

property, and consented to an interview during which he told law enforcement agents that he used marijuana about every other day. More than six months after the search, and relying solely on Mr. Hemani's admitted use of marijuana, the government prosecuted Mr. Hemani under 🚩 18 U.S.C. § 922(g)(3) for knowingly possessing a gun in his home while being an unlawful user of a controlled substance. Mr. Hemani moved to dismiss the indictment, arguing that the government's effort to enforce 🚩 § 922(g)(3) against him violated the Second Amendment. The district court granted the motion, and after an unsuccessful appeal to the Fifth Circuit, the government asked this Court to review the case.

*Held*: The government's prosecution of Mr. Hemani under 🚩 § 922(g)(3)'s unlawful user provision is inconsistent with the Second Amendment. Pp. 3–19.

(a) The Second Amendment protects the right of "all Americans" to keep and bear firearms for self-defense, 🚩⚠️*District of Columbia v. Heller*, 554 U.S. 570, 581, 128 S.Ct. 2783, 171 L.Ed.2d 637, though like most individual rights it has its limits, 🚩⚠️*id.*, at 626, 128 S.Ct. 2783. To determine when the government infringes the Second Amendment, the Court begins by asking whether the Amendment's terms cover the conduct in question; if so, the Constitution "presumptively" protects it. 🚩*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 24, 142 S.Ct. 2111, 213 L.Ed.2d 387. To overcome that presumption, the government bears the burden of showing its regulatory efforts are "consistent with the Nation's historical tradition of firearm regulation." 🚩*Ibid*. The government need not point to a "historical twin" or "precis[e] ... historical precursors." 🚩*United States v. Rahimi*, 602 U.S. 680, 692, 144 S.Ct. 1889, 219 L.Ed.2d 351 (internal quotation marks omitted). Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," 🚩*ibid*., and the government may "reaso[n] by analogy," showing that its contemporary regulation is "relevantly similar" to ones "well-established" in the Nation's history. 🚩*Bruen*, 597 U.S. at 28–30, 142 S.Ct. 2111. Two features play a " 'central' " role in determining whether a modern law is "relevantly similar" to historical ones: the "why" and the "how"—the more closely a contemporary law mirrors a well-

established historical analogue in purpose and operation, the more likely it is to be upheld. 🚩*Id.*, at 29, 142 S.Ct. 2111.

The government accepts this framework and agrees that 🚩 § 922(g)(3)'s unlawful user provision burdens conduct presumptively protected by the Second Amendment because the statute bans a class of people, including Mr. Hemani, from possessing essentially any firearm for any purpose. The government construes 🚩 § 922(g)(3) to automatically ban an individual from possessing a gun from the moment he becomes an unlawful user of any controlled substance and remains in effect until he ceases being one, regardless of what controlled substance an individual uses, in what amounts, whether his drug use has ever made him a danger to himself or others, why he keeps a gun, or how safely he does so.

The government analogizes its construction of 🚩 § 922(g)(3) to what it calls "habitual drunkard" laws, which it submits enjoy deep roots in the country's history and are "relevantly similar" to the regulation it wishes to enforce, 🚩*Bruen*, 597 U.S. at 29, 142 S.Ct. 2111. These habitual drunkard laws fall into three general categories: vagrancy laws that allowed habitual drunkards to be confined in workhouses or jailed; civil-commitment statutes that allowed courts to appoint guardians for habitual drunkards or authorized their commitment to asylums; and surety laws under which judicial officers could compel habitual drunkards to post surety bonds to ensure their good behavior. Pp. —— – ——.

**\*2** (b) The government's analogy fails on every metric it invites the Court to consider. Taken cumulatively, these problems prove fatal to the government's prosecution of Mr. Hemani. Pp. —— – ——.

(1) The government's claim that historical laws targeted habitual drunkards for the same reason 🚩 § 922(g)(3) targets unlawful users—because they regularly use intoxicants—is difficult to square with the historical record. Around the time of the founding and for decades following it, a habitual drunkard was generally someone who "for any considerable part of his time [was] intoxicated to such a degree as to deprive him of his ordinary reasoning faculties," *In re Tracy*, 1 PaigeCh. 580, 582–583 (N. Y. Ch.); a regular or even frequent drinker did not usually fit the bill. Many statutes defined the term to require that someone drink to such excess that he was "incapable of conducting [his] own affairs," Ark. Rev. Stat., ch. 78, § 1; "mentally incompetent," Minn. Terr. Rev. Stat., ch. 67, § 12; or had "lost the power of self-control," 1874 Conn.

Pub. Acts 256. Given the "culture of copious drinking" in early America, 43 Law & Hist. Rev. 795, 800, historical laws targeted habitual drunkards not merely because they regularly used intoxicants, but because their drinking rendered them practically incapacitated and incapable of managing their affairs. By contrast, on the government's account, ⚑ § 922(g)(3) automatically disarms anyone who regularly uses any amount of any controlled substance for anything other than its prescribed purpose, without requiring a showing that a particular individual is regularly incapacitated, incapable of conducting his affairs, or a threat to himself or others. Pp. —— – ——.

(2) The government's claim that ⚑ § 922(g)(3) disarms unlawful drug users to protect the public from unusually dangerous individuals who will commit violent crimes, and that historical laws share a similar purpose, misapprehends the purposes animating those historical analogues. Vagrancy laws usually targeted those who "did not meet the societal expectation of work," 31 U. Rich. L. Rev. 111, 169, and sought to promote productivity and suppress various vices, not to protect the public from a category of unusually dangerous persons. Civil-commitment laws, by their own terms, generally did not seek to protect the public from violence so much as to protect habitual drunkards from themselves and to protect their families from financial devastation. And the surety-of-good-behavior laws the government invokes did not normally require a showing that an individual posed a threat of violence; instead, they sought to protect the community from scandals "against good morals," 5 N. Dane, A General Abridgment and Digest of American Law 301 (emphasis deleted). Pp. —— – ——.

(3) The way habitual drunkard statutes worked in the past differs significantly from how ⚑ § 922(g)(3)'s unlawful user provision works today. The historical laws the government identifies usually provided some form of process before an individual lost any of his liberties, even temporarily: a vagrant could be sent to a workhouse or jail generally only upon a conviction; a habitual drunkard could be assigned a guardian or committed to an asylum usually only after proceedings before something like a probate court; and surety statutes typically required a proceeding before a justice of the peace or a comparable officer before a bond could be ordered. By contrast, on the government's account, ⚑ § 922(g)(3) automatically divests an individual of his constitutional right to bear arms the moment he becomes an unlawful user and until he ends his drug use—all without any pre-deprivation process. Pp. —— – ——.

*3 (4) There are reasons to doubt that the government has established ⚑ § 922(g)(3) even serves the purpose the government claims, of disarming categorically violent and unusually dangerous persons. ⚑ Section 922(g)(3)'s reliance on the Controlled Substances Act—a statute adopted to protect "the health and general welfare of the American people," 21 U.S.C. § 801(2), and under which drugs can be added to schedules for reasons having little or nothing to do with their potential to induce violence—makes it far from obvious that ⚑ 18 U.S.C. § 922(g)(3) confines its reach to those who are categorically and unusually dangerous. Additionally, the government's own regulatory actions undercut its position: the Department of Justice has directed federal prosecutors to curtail enforcement efforts against marijuana users, most States have legalized marijuana use to some degree, and the government recently moved some marijuana products from Schedule I to Schedule III, 91 Fed. Reg. 22714. Affording the government "broad power to designate any group as dangerous and thereby disqualify its members from having a gun" would risk allowing it to "quickly swallow" the Second Amendment. ⚑ *Kanter v. Barr*, 919 F.3d 437, 465 (Barrett, J., dissenting). Pp. —— – ——.

(c) The Court's decision is narrow. It does not address efforts to ban addicts or those presently intoxicated from possessing a firearm; other prophylactic laws Congress might adopt after determining that users of a particular drug pose a special risk of misusing firearms; ⚑ § 922(g)(1)'s provision disarming individuals convicted of felonies; or whether the government could bring a prosecution under ⚑ § 922(g)(3) accompanied by individualized proof that the defendant's drug use renders him a danger to himself or others, or proof that a certain drug always renders its users dangerous. Pp. —— – ——.

Affirmed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, SOTOMAYOR, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. THOMAS, J., filed a concurring opinion. JACKSON, J., filed a concurring opinion, in which SOTOMAYOR, J., joined. ALITO, J., filed an opinion concurring in the judgment, in which KAGAN, J., joined.

**Attorneys and Law Firms**

Sarah M. Harris, Principal Deputy Solicitor General, for Petitioner.

Erin E. Murphy, Alexandria, VA, for Respondent.

Evelyn R. Danforth-Scott, Cecillia D. Wang, Zoe Brennan-Krohn, American Civil Liberties Union, Foundation, San Francisco, CA, Arijeet Sensharma, Louise Melling, Brandon Buskey, Yasmin Cader, American Civil Liberties Union, Foundation, New York, NY, Joseph Longley, American Civil Liberties Union Foundation, Washington, DC, Adriana Piñon, American Civil Liberties Union, Foundation of Texas, Inc., Houston, TX, Naz Ahmad, Counsel of Record, Mudassar Toppa, Clear Project, Main Street Legal Services, Inc., City University of New York, School of Law, Long Island City, NY, Zachary L. Newland, David C. Boyer, Newland Legal, PLLC, Evergreen, CO, Erin E. Murphy, Matthew D. Rowen, Nicholas A. Aquart, Mitchell K. Pallaki, Clement & Murphy, PLLC, Alexandria, VA, for Respondent.

D. John Sauer, Solicitor General, Counsel of Record, Matthew R. Galeotti, Acting Assistant Attorney General, Sarah M. Harris, Deputy Solicitor General, Vivek Suri, Max E. Schulman, Assistants to the Solicitor General, William A. Glaser, Attorney, Department of Justice, Washington, DC, for Petitioner.

**Opinion**

Justice GORSUCH delivered the opinion of the Court.

Ali Hemani uses marijuana a few times a week. That fact alone, the government says, means he is automatically banned from possessing a firearm under federal law. And because Mr. Hemani admits he owns a gun despite this ban, the government now seeks to prosecute him, imprison him for up to 15 years, and disarm him for life. This case poses the question whether the government's prosecution of Mr. Hemani is consistent with the Second Amendment.

I

The federal Gun Control Act prohibits various categories of people from possessing guns. These categories, listed in 🚩 18 U.S.C. § 922(g), include individuals convicted of crimes "punishable by imprisonment for a term exceeding one year,"

🚩 § 922(g)(1), fugitives from justice, 🚩 § 922(g)(2), and those convicted of domestic violence crimes, 🚩 § 922(g)(9). This case concerns another of the statute's provisions— 🚩 § 922(g)(3). Under its terms, anyone who is an "unlawful user of" or "addicted to" a "controlled substance" is automatically banned from possessing a gun. And for defying this ban, an individual can face up to 15 years in federal prison, § 924(a)(8), and disarmament for life, 🚩 § 922(g)(1). [1]

[1]    Because Congress adopted 🚩 § 922(g) pursuant to the Commerce Clause, the statute requires the government to show that a firearm possessed in violation of the statute's terms "has been shipped or transported in interstate or foreign commerce." As that element is not in dispute here, we do not discuss it further.

To define the term "controlled substance," 🚩 § 922(g)(3) relies on the Controlled Substances Act (CSA). Enacted to protect "the health and general welfare of the American people," 21 U.S.C. § 801(2), the CSA sets forth five schedules of "controlled substances" subject to varying degrees of regulation, § 802. They range from Schedule I drugs with a high potential for abuse and no currently accepted medical uses (like heroin) to Schedule V drugs with the lowest potential for abuse and many accepted medical uses (like Tylenol with codeine). §§ 802, 812. By incorporating the CSA definition of the term "controlled substance," 🚩 18 U.S.C. § 922(g)(3) makes it illegal for anyone who unlawfully uses any drug found on any of the CSA's schedules to possess a firearm for any reason, upon threat of imprisonment and permanent disarmament.

**\*4** Convictions for violations of 🚩 § 922(g)(3) account for only about 5% of all 🚩 § 922(g) convictions. Congressional Research Service, Guns and Drugs: A Brief History of 🚩 18 U.S.C. § 922(g)(3) (2026). But, the government insists, a conviction is warranted in this case, and the facts giving rise to it unfolded this way.

Mr. Hemani is a dual citizen of the United States and Pakistan who was born in Texas and has spent most of his life there. In recent years, he has lived in the Dallas area with his parents and worked a stable job. But, suspecting Mr. Hemani and his family members of terrorism-related

activities, the government conducted a search of the family home in 2022. Throughout the process, Mr. Hemani proved cooperative. He surrendered a gun he kept in the house and pointed agents to some marijuana on the property. He also consented to an interview, telling law enforcement agents that he used marijuana "about every other day." Record on Appeal 381. After the agents found cocaine in his parents' closet, Mr. Hemani claimed ownership of that as well, though he maintained that his mother had hidden it from him and that he had not used any recently.

More than six months after the search, the government brought a single-charge indictment against Mr. Hemani. The charge had nothing to do with terrorism—the reason for the search in the first place. Nor did the charge involve possession of cocaine, drug trafficking, or anything like that. Instead, relying solely on his admitted use of marijuana about every other day, the government prosecuted Mr. Hemani for knowingly possessing a gun in his home while being an "unlawful user" of a controlled substance. *Id.*, at 12. For that alone, the government claimed, Mr. Hemani faced up to 15 years in prison and disarmament for life. No matter that the government did not assert Mr. Hemani was a drug addict.[2] No matter that it did not contend his drug use had ever led him to pose a danger to himself or others. No matter, too, that the government did not claim Mr. Hemani had done anything with his gun other than possess it in his home.

2
    For this reason, § 922(g)(3)'s disarmament of drug "addict[s]" is not before us and we have no occasion to pass on it.

Mr. Hemani moved to dismiss the indictment, arguing that the government's effort to enforce § 922(g)(3) against him violated the Second Amendment. The district court granted the motion and, after an unsuccessful appeal to the Fifth Circuit, the government asked us to review the case. We agreed to do so. 607 U. S. 992 (2025).

II

The Second Amendment protects the right of "all Americans" to keep and bear firearms for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 581, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Of course, like most individual rights, the Second Amendment has its limits. *Id.*, at 626, 128

S.Ct. 2783. American legislatures have long regulated the possession and use of firearms to some degree. See *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 17, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). But when the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them—no less in the Second Amendment context than in any other. See *ibid*.; *Heller*, 554 U.S. at 606, 128 S.Ct. 2783.

To determine when the government infringes the Second Amendment, we begin by asking whether the Amendment's terms cover the conduct in question. *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. If so, the Constitution "presumptively" protects it. *Ibid.* To overcome that presumption, the government then bears the burden of showing its regulatory efforts are "consistent with the Nation's historical tradition of firearm regulation." *Ibid.*

**\*5** Our cases demand this attention to history, we have said, because the Second Amendment was designed to codify a "pre-existing" individual right and guard against its later erosion by majoritarian legislation or judicial fiat. *Id.*, at 25, 142 S.Ct. 2111 (emphasis deleted). At the same time, we have recognized that "[t]he regulatory challenges posed by firearms today are not always the same" as those earlier generations faced. *Id.*, at 27, 142 S.Ct. 2111. Accordingly, to show that a contemporary regulation is consistent with this Nation's historical tradition of firearm regulation, we do not require the government to point to a "historical twin" or "precis[e] ... historical precursors." *United States v. Rahimi*, 602 U.S. 680, 692, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (internal quotation marks omitted). Instead, we have said, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Ibid.* And, to that end, the government may "reaso[n] by analogy," showing that its contemporary regulation is "relevantly similar" to ones "well-established" in the Nation's history. *Bruen*, 597 U.S. at 28–30, 142 S.Ct. 2111.

While we have not yet had cause to "exhaustive[ly] survey" the features that may render a modern law "relevantly similar" to historical ones, we have said two play a " 'central' " role. *Id.*, at 29, 142 S.Ct. 2111. Call them the "why" and

"how." ⚑*Ibid.*; see also ⚑*Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889. The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld. Conversely, the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review. See ⚑*Bruen*, 597 U.S. at 29, 142 S.Ct. 2111; ⚑*Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889.

The government accepts all this. It agrees, too, that ⚑ § 922(g)(3)'s unlawful user provision burdens conduct presumptively protected by the Second Amendment. After all, that statute bans a class of people including Mr. Hemani from possessing essentially any firearm for any purpose. As a result, the government acknowledges, it has a burden to carry.

The burden the government sets for itself in this case is a considerable one. As the government construes ⚑ § 922(g)(3) and seeks to apply it here, the law automatically bans an individual from possessing a gun from the moment he becomes an unlawful user of any controlled substance until he ceases being one. The law, says the government, doesn't require anything more. It doesn't matter what controlled substance an individual uses, in what amounts he does so, or whether his drug use has ever made him a danger to himself or others. It doesn't even matter why he keeps a gun or how safely he does so. And for violating this automatic ban, the government insists, an individual like Mr. Hemani may be sent to prison for up to 15 years and disarmed for life.

To meet its burden of showing a law like that is consistent with the Nation's tradition of firearm regulation, the government relies on an analogy to what it calls "habitual drunkard" laws. These laws, the government submits, enjoy deep roots in the country's history and are "relevantly similar" to the regulation it wishes to enforce against Mr. Hemani. ⚑*Bruen*, 597 U.S. at 29, 142 S.Ct. 2111.

In truth, the habitual drunkard laws the government invokes fall into three general categories. First are vagrancy laws. Both at the founding and in the decades following it, vagrants —a group that sometimes included habitual drunkards— could be "confine[d] in a workhouse" or "jail[ed]." Brief for United States 19. Second are civil-commitment statutes. Around the same time, many States allowed courts to appoint guardians for various individuals, including habitual drunkards, or authorized their "commit[ment] to asylums."

*Id.*, at 21. Third are surety laws. Under them, judicial officers, again in the founding era and later, could compel habitual drunkards and others to post surety bonds to ensure their good behavior. "A person who failed to post bond," the government explains, "would be jailed, while a person who posted bond and then misbehaved would forfeit the bond." *Id.*, at 22.

**\*6**  These laws, the government insists, mirror ⚑ § 922(g)(3)'s unlawful user provision in three important respects. Two might be said to concern the "why" associated with these laws, the last their "how." First, the government says, historical laws targeted habitual drunkards for the same reason ⚑ § 922(g)(3) targets unlawful users—because they regularly use intoxicants. See *id.*, at 17 (calling habitual drunkards and unlawful users "closely analogous"). Second, the government submits, habitual drunkard laws restricted the liberties of people to the same end ⚑ § 922(g)(3) does— to protect the public from "unusually dangerous" individuals who commit "violent crime[s]." *Id.*, at 11, 13–14, 22, 34. Finally, the government argues, the historical laws it cites operated in practice much like ⚑ § 922(g)(3) works—the former allowed governments to detain people in places where they could not bear arms while ⚑ § 922(g)(3) temporarily disarms unlawful users. All told, the government contends, because historical habitual drunkard laws resemble ⚑ § 922(g)(3)'s unlawful user provision in so many pertinent respects, that provision must be constitutional as applied in this case and others.

We disagree. We appreciate that drugs and guns can sometimes make for a dangerous mix. We appreciate, too, that the government's effort to analogize a modern statute addressing drug use to historical laws must be approached with a sensitivity to the fact that many drugs well known today were unknown in early America. As we have put it, the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." ⚑*Bruen*, 597 U.S. at 28, 142 S.Ct. 2111. But, even taking all that into account, the government cannot carry the burden it has set for itself. We decide cases "based on the historical record" and arguments "compiled by the parties" before us. ⚑*Id.*, at 26, n. 6, 142 S.Ct. 2111. And the habitual drunkard laws on which the government relies here differ dramatically from ⚑ § 922(g)(3)'s unlawful user provision on every single metric the government invites us to

consider: They targeted different kinds of people, did so for different purposes, and operated in different ways. Whether any one of these problems taken in isolation would prove fatal to the government's cause, we need not decide. Taken cumulatively, we hold, they certainly do. And, apart from pointing to habitual drunkard laws, the government has not even attempted to prove that any other specific historical principle might justify its prosecution in this case.[3]

3

As in 🚩*Bruen*, we need not decide today "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791. 🚩*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 37–38, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). For reasons explored below, the government cannot establish that the Second Amendment at either point in time permitted anything like its prosecution here.

### A

Start with the government's first point of comparison. In its view, the reason why vagrancy, civil-commitment, and surety laws targeted habitual drunkards is "closely analogous" to the reason why 🚩§ 922(g)(3)'s unlawful user provision targets unlawful users: Both groups regularly use intoxicants. Brief for United States 17. It's a claim difficult to square with the historical record.

Around the time of the founding and for decades following it, a habitual drunkard was, as one court put it, someone who "for any considerable part of his time [was] intoxicated to such a degree as to deprive him of his ordinary reasoning faculties." *In re Tracy*, 1 PaigeCh. 580, 582–583 (N. Y. Ch. 1829). A regular or even frequent drinker did not usually fit the bill. A "man who [was] intoxicated or drunk one-half his time" was more like it. See *Ludwick v. Commonwealth*, 18 Pa. 172, 175 (1851). In an early American medical treatise, Dr. Benjamin Rush, a signer of the Declaration of Independence, offered this description from a habitual drunkard about the depths of his condition: " 'Were a keg of rum in one corner of a room, and were a cannon constantly discharging balls between me and it, I could not refrain from passing before that cannon, in order to get at the rum.' " Medical Inquiries and Observations, Upon the Diseases of the Mind 266 (1812).

**\*7**  Just consider how some of the statutes the government relies on defined the term. To qualify as a habitual drunkard under an early Arkansas law, someone had to drink to such excess that he was "incapable of conducting [his] own affairs." Ark. Rev. Stat., ch. 78, § 1 (1838) (W. Ball & S. Roane eds.) (Ball & Roane). A statute in the Minnesota Territory required an individual to be "mentally incompetent." Minn. Terr. Rev. Stat., ch. 67, § 12 (1851). A Connecticut law spoke of a person who had "lost the power of self-control." Act of July 25, 1874, § 1, in 1874 Conn. Pub. Acts 256. And in a statute governing the District of Columbia, Congress defined a habitual drunkard as "any person who, by the use of intoxicating liquors ... has lost self-control, or become incapable of proper attention to the care and management of his affairs, or habitually or periodically neglectful thereof, or dangerous to himself or others." Act of Mar. 30, 1876, § 9, 19 Stat. 10–11.

Had habitual drunkard laws applied to those who simply drank regularly, many notable early Americans could have faced trouble. John Adams took "a tankard of hard cider" with his "daily breakfast." W. Rorabaugh, The Alcoholic Republic 6 (1979) (Rorabaugh). Some say James Madison "consumed a pint of whiskey daily." D. Okrent, Last Call: The Rise and Fall of Prohibition 8 (2010); but see M. Will-Weber, Mint Juleps with Teddy Roosevelt: The Complete History of Presidential Drinking 29 (2014) (arguing Madison "championed wine ... as a healthier and more respectable choice"). George Washington often drank three glasses of madeira in the evening—"not enough to be considered a heavy drinker in his day." *Id*., at 5. Thomas Jefferson enjoyed "3 or 4 glasses [of wine] at dinner." J. Gabler, Passions: The Wines and Travels of Thomas Jefferson 223 (1995). In fact, just a few days before the framers signed the Constitution, a farewell party gathered for General Washington at Philadelphia's City Tavern where 55 guests are said to have ordered 54 bottles of madeira, 60 bottles of wine, 8 bottles of "Old stock," 22 bottles of porter, 8 bottles of cider, 12 bottles of beer, and 7 large bowls of punch. National Park Service, C. Hershey, Historic Furnishings Plan: City Tavern 64–65 (1974).

There was, in short, a "culture of copious drinking" in early America. D. Korostyshevsky, Incapable of Managing His Estate: Habitual Drunkards and the Expansion of Guardianship in the Nineteenth-Century United States, 43 Law & Hist. Rev. 795, 800 (2025). Indeed, in 1829 the "secretary of war estimated that three-quarters of the nation's

laborers drank ... at least 4 ounces of distilled spirits" every day. Rorabaugh 15. Even the American Temperance Society called those who drank 12 ounces of hard liquor daily mere " 'occasional drunkards.' " *Id*., at 11. As the Society saw things, it took 24 ounces to qualify as a " 'confirmed drunkar[d].' " *Ibid*.

Given all this, it seems the government's historical laws targeted habitual drunkards not merely because they regularly used intoxicants, or even sometimes used them to excess. Instead, those laws focused on habitual drunkards because their drinking rendered them practically incapacitated and incapable of managing their affairs. And that hardly compares to whom ⚑ § 922(g)(3)'s unlawful user provision targets on the government's account. To be sure, the government construes the term "unlawful user" to embrace only "habitual or regular" users, not those who use drugs irregularly. Brief for United States 23–25. But even on that understanding, ⚑ § 922(g)(3) automatically disarms anyone who regularly uses any amount of any controlled substance for anything other than its "prescribed purpose." Tr. of Oral Arg. 57. The law, the government insists, does not require it to show that a particular individual is regularly incapacitated, much less incapable of conducting his affairs or a threat to himself or others. Put simply, on the government's telling, ⚑ § 922(g)(3) sweeps in large numbers of people without regard to whether their substance use has the kind of incapacitating effect on them that historical habitual drunkard laws normally required.

**\*8**  This case illustrates the disconnect. The government considers Mr. Hemani an unlawful user of a controlled substance because he admits to using marijuana about every other day. But how much marijuana does Mr. Hemani use, in what potency, and to what effect? Is he routinely unable to manage his affairs, a risk to himself or his family? Or does he use a mild gummy as a sleep aid a few times a week? We do not know and, the government says, it doesn't matter. The government asks us to analogize him to a habitual drunkard all the same.

Nor does the government's theory stop at Mr. Hemani. It extends equally to a husband who regularly takes his wife's prescription Ambien to sleep and a college student who routinely uses a friend's Adderall to cram for exams. *Id*., at 56–58. The drug involved makes no difference. Nor, again, does it matter how much an individual uses or the effects it has on him. That someone regularly uses any substance found on any of the CSA's five schedules for anything other than its

"prescribed purpose" is enough. *Id*., at 57. Without more, the government asks us to analogize all such persons to habitual drunkards. To state the analogy is to expose its deficiency.

B

This divergence is not the government's only problem. The government faces more trouble yet when it comes to its next argument. It contends that ⚑ § 922(g)(3) disarms unlawful drug users to protect the public from "unusually dangerous" individuals who will "misuse ... firearms" to commit "violent crime[s]." Brief for United States 11, 13–14, 22, 34. And, the government submits, early American vagrancy, civil-commitment, and surety laws shared a similar purpose. But even spotting the government its assertion about ⚑ § 922(g)(3)'s aims (something we will return to later), the government misapprehends the purposes animating the historical analogues it invokes. Usually, they had little to do with protecting the public from categorically violent and unusually dangerous persons.

Begin with the vagrancy laws. As a rule, they targeted individuals who "did not meet the societal expectation of work." W. Quigley, Reluctant Charity: Poor Laws in the Original Thirteen States, 31 U. Rich. L. Rev. 111, 169 (1997) (Quigley). Routinely, that category included not just habitual drunkards but also "Vagabonds, Common Beggars," "pipers, fidlers, ... stubborn servants or children, [and] common nightwalkers." Act of Oct. 1727, 7 Public Records of the Colony of Connecticut from May, 1726, to May, 1735, Inclusive 127–128 (C. Hoadly ed. 1873) (Hoadly).[4] Add to that list perhaps any others who would not "provide for themselves or the support of their families." *Id*., at 128. Some laws confined vagrants to workhouses where they could be "se[t] to work." *Ibid*.; see also Quigley 156–157, 168–169. Other statutes authorized short jail terms. See, *e.g*., Hittell 1288. Either way, laws like these might have sought to promote productivity and suppress any number of real or perceived vices. But they scarcely focused on protecting the public from a "categor[y]" of "unusually dangerous" persons. Brief for United States 10–11.

4      See also, *e.g*., Act of June 29, 1700, § 2, in 1 Acts and Resolves of the Province of the Mass. Bay 378 (1869) (including "stubborn children or servants"); Act of May 14, 1718, in 2 Laws of N. H. 266 (A. Batchellor ed. 1913) (including "such as neglect

their Callings, Mispend what they earn, and do not provide for themselves"); Act of June 10, 1799, §§ 1, 3, in Laws of the State of N. J. 473–474 (1821) (including those who did "not give a good account of themselves," who "leave their families to be maintained by the city," or who "pretend to use ... crafty science"); 2 Codes and Statutes of the State of Cal. 1288 (T. Hittell ed. 1876) (Hittell) (including "idle or dissolute person[s] ... who lodg[e] in any barn, shed, shop, outhouse, [or] vessel").

**\*9** A similar story unfolds when it comes to what the government describes as civil-commitment laws. Consider the first such law the government cites: an 1827 Act in the Michigan Territory. Act of Apr. 12, 1827, in 1827 Mich. Terr. Laws 60. Worried that habitual drunkards "oftentimes ... waste[d] their estates by excessive drinking ... and thereby involve[d] themselves and [their] families in distress, misery, and ruin," that law permitted a probate judge to assign a guardian to a habitual drunkard to "take care of such person, and [his] estate." *Id.*, at 58, 60. Or consider a law the government cites from later in the 19th century. It authorized courts to confine habitual drunkards to asylums in order to "preven[t them] from using intoxicating liquors" and "refor[m]" them. Act of May 1, 1890, § 2, in 1890 Iowa Acts 67. By their own terms, laws like these did not seek to protect the public from violence so much as to protect habitual drunkards from themselves and their families from financial devastation. [5]

[5] See also, *e.g.*, Ball & Roane 456 (permitting probate courts to appoint guardians for habitual drunkards and others "incapable of conducting their own affairs ... to provide for the safe keeping of such persons, the maintenance of themselves and their families, and the education of their children"); Minn. Terr. Rev. Stat., ch. 67, § 12, p. 278 (allowing a probate judge to appoint guardians for those "mentally incompetent to have the care and management of their own property"); Ga. Code § 1803 (1861) (similar); Act of Feb. 21, 1872, § 1, in 1872 Ill. Laws 477 (similar); Act of Apr. 1, 1870, § 1, in 1869–1870 Cal. Stat. 585 (providing that "[t]he Home for the care of the Inebriate of San Francisco shall always be kept open for the reception and care of inebriates"); Act of Apr. 17, 1873, § 3, in 1873 Miss. Laws 62 (explaining that the object of civil confinement was

"reformation and recovery from such pernicious habit of drunkenness"); Act of Mar. 5, 1860, § 7, in 1860 Md. Laws ch. 386 (permitting confinement of a habitual drunkard as "necessary for his or her complete reformation"); 19 Stat. 10–11 (similar).

Last, turn to the surety laws. In *Rahimi*, we rejected a facial challenge to § 922(g)(8), a provision that prohibits firearm possession by certain individuals subject to domestic violence restraining orders. In reaching that decision, we analogized the modern statute in part to historical surety-of-the-peace laws. 602 U.S. at 695–696, 144 S.Ct. 1889. Those laws generally required an individual shown to pose a specific threat of violence to post a bond and pledge to "keep the peace." *Id.*, at 695–697, 144 S.Ct. 1889 (internal quotation marks omitted); see also J. Parker, Conductor Generalis 397 (1788) (Parker) (sureties of the peace applied to those who posed "some present or future danger"). Failure to post a bond meant jail, and disturbing the peace after posting a bond meant forfeiting it. *Rahimi*, 602 U.S. at 695, 144 S.Ct. 1889. Some surety-of-the-peace laws, we held, were designed to prevent "violence" and "targeted the misuse of firearms," much as § 922(g)(8) seeks to do. *Id.*, at 695–696, 144 S.Ct. 1889.

Notably, the government doesn't rely on surety-of-the-peace statutes in this case. And that makes sense. To warrant the imposition of a surety of the peace, just being a habitual drunkard wasn't usually enough. So in this case the government directs us to a different kind of surety statute—one that required certain individuals to post sureties of "good behavior." Brief for United States 22 (internal quotation marks omitted). Under those laws, a judicial officer could impose a surety of good behavior on individuals who threatened a "scandal." Parker 410. And a scandal could include anything from "haunting bawdy houses" to "evesdropp[ing]" to, yes, being a "common drunkar[d]." *Ibid*. In fact, one surety statute targeted those who had "a common practice of getting drunk, and prophane cursing and swearing, and blasphemy, to the great dishonour of Almighty God." 1 Del. Laws 173 (1797). But what does any of this prove? To impose a surety of good behavior did not normally require a showing that an individual posed a threat of violence. Instead, these laws usually sought to protect the community from scandals "against good morals." 5 N. Dane, A General Abridgment and Digest of American Law 301 (1824) (emphasis deleted); see also Parker 410. And that

is nothing like the purpose the government ascribes to 🚩 § 922(g)(3)'s unlawful user provision.

### C

**\*10** The government's difficulties do not end with the "why" comparisons it invites us to make. They also extend to the "how." "Even when a law regulates arms-bearing for a permissible reason," we have said, "it may not be compatible with the [Second Amendment] if it does so to an extent beyond what was done at the founding." 🚩*Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889. And the way habitual drunkard statutes worked in the past differs significantly from how 🚩 § 922(g)(3)'s unlawful user provision works today.

The historical laws the government identifies usually provided some form of process before an individual lost any of his liberties, even temporarily. Normally, a vagrant could be sent to a workhouse or jail only upon a "conviction." *E.g.*, Hoadly 128–129. Generally, a habitual drunkard could be assigned a guardian or committed to an asylum only after proceedings before a probate court or something like it. See, *e.g.*, Ball & Roane 456. And, typically, surety statutes required a proceeding before a justice of the peace or a comparable officer before a bond could be ordered (or, if a bond wasn't posted, before a jail sentence could be imposed). *E.g.*, Acts and Laws of the State of Conn. 189 (E. Babcock ed. 1786); see also 🚩*Rahimi*, 602 U.S. at 699, 144 S.Ct. 1889.

None of that holds true for 🚩 § 922(g)(3). On the government's account, the statute automatically divests an individual of his constitutional right to bear arms the moment he becomes an unlawful user and until he ends his drug use —all without any pre-deprivation process. To be sure, and as the government highlights, an unlawful user who violates this ban is entitled to "a full-dress criminal trial" before he can be imprisoned or permanently disarmed. Brief for United States 26. But be that as it may, 🚩 § 922(g)(3) offers an unlawful user no pre-deprivation process before his " 'temporary disarmament,' " the very burden the government says is akin to the burden vagrancy, civil-commitment, and surety laws imposed on habitual drunkards. *Ibid*. [6]

6

Certain other provisions of 🚩 § 922, such as subsections (g)(1) (disarming convicted felons) and (g)(4) (disarming any person "adjudicated as a mental defective" or "committed to a mental institution"), involve some manner of pre-deprivation process before an individual's Second Amendment rights are lost. For that reason, they differ from subsection (g)(3) and "nothing in our opinion should be taken to cast doubt" on them. 🚩⚠️*District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Likewise, our conclusion today should not be taken to suggest "that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 🚩*United States v. Rahimi*, 602 U.S. 680, 698, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024). The problem in this case is simply that the historical evidence the government presents does not support the categorical restriction it urges.

### D

We see one more problem yet with the government's submission. Recall its claim about 🚩 § 922(g)(3)'s "why." The government argues that, consistent with historical laws, 🚩 § 922(g)(3)'s unlawful user provision disarms individuals who are, as a "category," "violen[t]" and "unusually dangerous." Brief for United States 4, 10–11. So far, we have spotted the government its assertion about 🚩 § 922(g)(3)'s purpose. But there are at least two reasons to doubt it has established even that much.

The first has to do with 🚩 § 922(g)(3)'s reliance on the CSA. The former does not define its own category of people to disarm. Instead, according to the government, it disarms anyone who regularly uses any drug found on any CSA schedule for something other than its "prescribed purpose." Tr. of Oral Arg. 57. The CSA, in turn, was adopted to protect "the health and general welfare of the American people." 21 U.S.C. § 801(2). Drugs can be added to its schedules for a variety of reasons having little or nothing to do with their potential to induce violence—reasons that include "[t]he state of current scientific knowledge" about a substance,

whether that substance "is an immediate precursor" to another controlled substance, and the risk to "public health." § 811(c). Without question, some unlawful users of controlled substances can pose a risk of violence. But, by defining its scope through the CSA—a statute animated by a variety of other concerns—it is far from obvious that ⚑18 U.S.C. § 922(g)(3) confines its reach to those who are categorically and unusually dangerous.

**\*11**  The second reason has to do with the government's approach to the drug at issue here. As this case came to us, marijuana was listed on Schedule I—a schedule reserved for drugs with "a high potential for abuse" with "no currently accepted medical use." ⚑21 U.S.C. § 812(b)(1). But after we heard oral argument, the government moved some marijuana products to Schedule III, 91 Fed. Reg. 22714 (2026), a schedule that applies to drugs with a lower potential for dependence and abuse and for which a "currently accepted medical use" exists, ⚑ § 812(b)(3). Years before that, too, the Department of Justice issued a memorandum directing federal prosecutors nationwide to curtail their enforcement efforts against marijuana users even while all marijuana products remained on Schedule I. Attorney General Memo (Aug. 29, 2013).

Seismic changes followed that memorandum. While marijuana use largely remained unlawful under federal law, the number of federal offenders sentenced for possession of marijuana dwindled. See United States Sentencing Commission, Interactive Data Analyzer. And most States responded by legalizing marijuana use to one degree or another as a matter of state law. See Nat. Conf. of State Legislatures, State Medical Cannabis Laws (June 27, 2025) ("Forty states, three territories and the District of Columbia" have legalized some marijuana use). As a result, some surveys suggest there now may be more adults in this country who regularly use marijuana than consume alcohol. See, *e.g.*, J. Caulkins, Changes in Self-Reported Cannabis Use in the United States from 1979 to 2022, 119 Addiction 1648 (2024) (finding, for the first time in 2022, more individuals who self-report daily or near-daily marijuana use than alcohol use). Whatever one thinks of these developments, the federal government has not just tolerated them; it helped fuel them. All of which leaves it awkwardly positioned to suggest that the millions of Americans who now regularly use marijuana are categorically and unusually dangerous.

In saying this much, we do not question that sometimes an individual's unlawful use of marijuana (or any other controlled substance) may render him a danger to others. But, again, the government disclaims the need to show anything like that in this case. Instead, it asks us to conclude that anyone who regularly uses marijuana is categorically violent and dangerous without any further showing. All based on little more than its current say-so, one at odds with its own regulatory actions. And affording the government that kind of "broad power to designate any group as dangerous and thereby disqualify its members from having a gun" would risk allowing it to "quickly swallow" the Second Amendment. ⚑*Kanter v. Barr*, 919 F.3d 437, 465 (CA7 2019) (Barrett, J., dissenting).

\*

In many respects, this case is a narrow one. We do not address efforts to ban addicts, see n. 2, *supra*, or those presently intoxicated, from possessing a firearm. We do not address other prophylactic laws Congress might adopt after determining that users of a particular drug pose a special risk of misusing firearms. See n. 6, *supra*. We do not address ⚑18 U.S.C. § 922(g)(1)'s provision disarming individuals convicted of felonies (often including drug-related ones). *Ibid.* We do not even address whether the government could bring a prosecution under ⚑ § 922(g)(3) accompanied by individualized proof that the defendant's use of marijuana (or any other drug) renders him a danger to himself or others. Or proof that a certain drug always renders its users dangerous because of its potency or for some other reason. None of those issues is before us and we do not pass on them either way.

All that is before us is one, if surely ambitious, theory. The government maintains that it may automatically strip Mr. Hemani of his Second Amendment right to possess a firearm because he uses marijuana a few times a week. More than that, because he possessed a gun despite this prohibition, the government insists it may imprison him for up to 15 years and disarm him for life. According to the government, none of this turns on how much marijuana Mr. Hemani uses or what effect it has on him. It makes no difference either if he keeps a firearm only in his home for self-defense, never misuses a gun while intoxicated, and never poses a danger to himself or others as a result of his marijuana use. The only thing the government must show, it says, is that an individual like Mr. Hemani regularly uses any amount of any controlled substance.

**\*12** To square that expansive theory with the Second Amendment, the government invites us to draw an analogy between its present regulation and historical laws addressing habitual drunkards. Those laws, the government contends, demonstrate a tradition of firearm regulation consistent with its effort to disarm any regular user of any controlled substance without any further showing. But the government's analogy fails under every measure it asks us to consider: The historical laws on which it relies targeted different kinds of people, did so for different reasons, and operated in different ways. And faced with all these shortcomings in the government's submission, we cannot say it has carried its conceded burden of showing its prosecution of Mr. Hemani complies with the Second Amendment.

The judgment of the Fifth Circuit is affirmed.

*It is so ordered.*

Justice THOMAS, concurring.

I agree with the Court that § 922(g)(3) violates the Second Amendment as applied to respondent Ali Hemani, and I join its opinion in full. I write separately to call attention to another issue: As a matter of both original meaning and this Court's precedents, § 922(g)(3) appears to exceed Congress's enumerated power to regulate interstate commerce. The statute makes it a federal crime for unlawful drug users to possess any firearm or ammunition "in or affecting commerce." 18 U.S.C. § 922(g)(3). Under the prevailing interpretation of § 922(g)(3), the Government can secure a conviction for unlawful firearm possession "if the firearm possessed" by the drug user "had previously traveled in interstate commerce." *United States v. Rawls*, 85 F.3d 240, 242 (CA5 1996) (*per curiam*). The Commerce Clause does not authorize Congress to "regulate or ban possession of any item that has ever been offered for sale or crossed state lines." *Alderman v. United States*, 562 U.S. 1163, 1167, 131 S.Ct. 700, 178 L.Ed.2d 799 (2011) (THOMAS, J., dissenting from denial of certiorari). Such an understanding would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *United States v. Lopez*, 514 U.S. 549, 567, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). So, while the issue was not presented in this case, the Court, and lower courts, should revisit the constitutionality of § 922(g).

I

Section 922(g) criminalizes intrastate gun possession. It makes it a felony for enumerated categories of people to, as relevant here, "possess in or affecting commerce, any firearm or ammunition." § 922(g). In *Scarborough v. United States*, 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), this Court held that materially identical language required—as a matter of statutory interpretation—only that "the possessed firearm previously traveled in interstate commerce." *Id.*, at 564, 578, 97 S.Ct. 1963. The courts of appeals have interpreted § 922(g)'s "in or affecting commerce" element to likewise require only that same "minimal nexus" to interstate commerce. *Rawls*, 85 F.3d at 242–243 (citing *Scarborough*, 431 U.S. at 575, 97 S.Ct. 1963). In Hemani's indictment, for example, the Government alleged only that the firearm that he possessed had "been shipped and transported in interstate and foreign commerce" in the past—even though Hemani was indicted for possessing it in his home in Texas. See No. 4:23–cr–00018 (ED Tex.), ECF Doc. 1, p. 1; *ante,* at —— – —— (majority opinion). The Government did not have to allege, nor would it have had to prove at trial, that Hemani bought the firearm from someone in another State or even carried it across state lines himself at any point. See, *e.g.*, *United States v. Ervin*, 131 F.4th 253, 256, 260 (CA4 2025) (upholding conviction of a North Carolina defendant for unlawfully possessing a firearm manufactured in North Carolina because someone else brought it to another State and back to North Carolina).

II

Section 922(g) appears to exceed Congress's powers under the Commerce Clause. Congress has the power to "regulate Commerce ... among the several States." U. S. Const., Art. I, § 8, cl. 3. As a matter of both original meaning and this Court's precedents, Congress lacks the power to regulate the possession of firearms solely on the ground that they crossed state lines at some point in the past.

A

**\*13**  As an original matter, the Commerce Clause authorizes Congress only "to regulate the buying and selling of goods and services trafficked across state lines." *Gonzales v. Raich*, 545 U.S. 1, 58, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (THOMAS, J., dissenting). It gives Congress no power to regulate "activities wholly separated from business, such as gun possession." *Lopez*, 514 U.S. at 599, 115 S.Ct. 1624 (THOMAS, J., concurring). "[T]he power to regulate 'commerce' can by no means encompass authority over mere gun possession, any more than it empowers the Federal Government to regulate marriage, littering, or cruelty to animals, throughout the 50 States." *Id.*, at 585, 115 S.Ct. 1624.

Because § 922(g) criminalizes possession of firearms apart from any purchase or sale of goods and services across state lines, I doubt that it could be an exercise of Congress's Commerce Clause powers as an original matter.

B

Section 922(g), it seems, also "cannot be reconciled" with this Court's modern Commerce Clause doctrine. *Alderman*, 562 U.S. at 1166, 131 S.Ct. 700 (opinion of THOMAS, J.). Under that doctrine, § 922(g) must fall within one of three categories to be constitutional: It must either regulate "the use of the channels of interstate commerce," "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce," or regulate "activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558–559, 115 S.Ct. 1624.

Section 922(g) does not seem to fall within either of the first two categories. It does not, as far as I can tell, regulate the "use of the channels of interstate commerce" because it criminalizes possession of a firearm within a State long after any use of those channels. Nor does it "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce" because it requires no showing that the possession in question poses any risk to interstate buying, selling, shipping, or transportation.

I also doubt that § 922(g) can fall within the third and broadest category for regulations of "activities that substantially affect interstate commerce." *Id.*, at 559, 115 S.Ct. 1624. The mere possession of a firearm that long ago crossed state lines is not "economic activity" in any sense, and the Court has never upheld regulation of intrastate activity that is not "economic in nature" under this category. *United States v. Morrison*, 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Moreover, our precedents suggest that merely possessing a gun does not have a "substantial effect" on interstate commerce. Section 922(g) targets classes of people that the Government thinks "threaten the safety of the community" if they have weapons. Brief for United States 10. But, the Court has emphatically rejected "the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Morrison*, 529 U.S. at 617, 120 S.Ct. 1740. Accordingly, in *Lopez*, the Court concluded that "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." 514 U.S. at 567, 115 S.Ct. 1624. Like the gun-possession statute at issue in *Lopez,* § 922(g) is not a regulation of economic activity, but a law to combat "crime and violence," even at the local level. Gun Control Act of 1968, Pub. L. 90–618, § 101, 82 Stat. 1213. *

*    *Gonzales v. Raich*, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005), cannot save § 922(g), either. That decision recognized a further category of a law forming an "essential par[t] of a larger regulation of economic activity." *Id.*, at 24, 125 S.Ct. 2195 (internal quotation marks omitted). Section 922(g) is not an effort to "regulate purely intrastate activity" on the basis that "failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.*, at 18, 125 S.Ct. 2195. Preventing gun "possession by certain categories of dangerous persons" does not bear any rational relationship to the interstate market for guns, drugs, or anything else, nor does it purport to do so. Brief for United States 5 (describing the purpose of § 922(g)). Section 922(g) is what the Government

has always said it is: a regulation to further "public safety" by preventing local gun crime. See Gun Control Act, Pub. L. 90–618, § 101, 82 Stat. 1213 (stating that its purpose is to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence"); accord, Brief for United States 32; Brief for Firearms Policy Coalition as *Amicus Curiae* 12.

**\*14** For these reasons, lower court judges have for decades concluded that under this Court's precedents, § 922(g) exceeds Congress's power to regulate interstate commerce. See, *e.g.*, *United States v. Chesney*, 86 F.3d 564, 574–575 (CA6 1996) (Batchelder, J., concurring); *United States v. Kuban*, 94 F.3d 971, 977 (CA5 1996) (DeMoss, J., dissenting); *United States v. Storey*, 571 F.Supp.3d 1296, 1298 (MD Fla. 2021) (Mizelle, J.); *United States v. Seekins*, 52 F.4th 988, 991 (CA5 2022) (Ho, J., dissenting from denial of rehearing en banc); *United States v. Bonner*, 159 F.4th 338, 343 (CA5 2025) (Willett, J., concurring); see also *United States v. Patton*, 451 F.3d 615, 634 (CA10 2006) (McConnell, J.) (regarding an analogous restriction on possessing body armor); *United States v. Alderman*, 565 F.3d 641, 648 (CA9 2009) (Paez, J., dissenting) (same); *United States v. Alderman*, 593 F.3d 1141 (CA9 2010) (O'Scannlain, J., dissenting from denial of rehearing en banc) (same).

### C

In upholding § 922(g) under the Commerce Clause, the courts of appeals have misapprehended our precedents in two ways. Some have thought that *Scarborough*'s statutory holding required them to uphold § 922(g)'s constitutionality. Others have concluded that the presence of a so-called "jurisdictional hook" in § 922(g) renders the statute constitutional under *Lopez* and *Morrison*. Neither rationale establishes that § 922(g) is constitutional.

Several courts have upheld § 922(g) based on this Court's decision in *Scarborough* alone. They have understood *Scarborough*'s interpretation of the statutory "in" or "affecting commerce" requirement to establish, as a matter of Supreme Court precedent, that § 922(g) is a valid

exercise of Congress's Commerce Clause powers in all its applications. Some have even suggested that they would otherwise find § 922(g) unconstitutional. See, *e.g.*, *Rawls*, 85 F.3d at 243 (Garwood, J., concurring) (writing for the full panel and explaining that *Scarborough* "bind[s]" the court to uphold § 922(g)'s constitutionality even though "one might well wonder how it could rationally be concluded that mere possession of a firearm in any meaningful way concerns interstate commerce"); *United States v. Gateward*, 84 F.3d 670, 671 (CA3 1996) (upholding the statute on the ground that *Lopez* did not abrogate *Scarborough*); *Patton*, 451 F.3d at 636 ("[W]e see considerable tension between *Scarborough*" and later decisions, but "we are bound by *Scarborough*").

Those courts misread *Scarborough*. The Court has never held that § 922(g) is constitutional whenever the *Scarborough* test is satisfied. See *Alderman*, 562 U.S. at 1168, 131 S.Ct. 700 (opinion of THOMAS, J.). *Scarborough*'s holding "was statutory, not constitutional." *Seekins*, 52 F.4th at 991 (opinion of Ho, J.); accord, *Bonner*, 159 F.4th at 342 (Willett, J., concurring); Brief for Firearms Policy Coalition as *Amicus Curiae* 13–14. *Scarborough* addressed only whether "Congress intended no more than a minimal nexus requirement" in its statutory requirement that the firearm in question was received, possessed, or transported "in commerce or affecting commerce." 431 U.S. at 564, 577, 97 S.Ct. 1963 (internal quotation marks omitted). It based its holding on the statute's "language" and "legislative history," not constitutional law. *Id.*, at 575, 97 S.Ct. 1963. *Scarborough* cannot be taken, by this Court or the courts of appeals, as purporting to settle the question of § 922(g)'s constitutionality. See *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (explaining that holdings of this Court cannot be gleaned from issues not "discussed in the opinion of the Court").

**\*15** Other courts have upheld § 922(g)'s constitutionality solely on the ground that it has a "jurisdictional hook" purporting to connect the offense to interstate commerce. *E.g.*, *United States v. McAllister*, 77 F.3d 387, 389–390

Case 6:25-cv-00056-H   Document 129-2   Filed 07/02/26   Page 16 of 19   PageID 1440

(CA11 1996); *United States v. Dorris*, 236 F.3d 582, 585–586 (CA10 2000); *United States v. Lemons*, 302 F.3d 769, 772 (CA7 2002); *United States v. Smith*, 101 F.3d 202, 215 (CA1 1996); *United States v. Hanna*, 55 F.3d 1456, 1462, n. 2 (CA9 1995); *United States v. Singletary*, 268 F.3d 196, 204 (CA3 2001). Under *Scarborough*, § 922(g) requires that the firearm at some point traveled across state lines. This jurisdictional element, these courts say, itself shows a sufficient "nexus with interstate commerce." *United States v. Bell*, 70 F.3d 495, 498 (CA7 1995); accord, *e.g.*, *Rawls*, 85 F.3d at 242–243; *United States v. Bolton*, 68 F.3d 396, 400 (CA10 1995). And, on this view, the "jurisdictional element" in § 922(g) "distinguishes it from the statutes considered in *Lopez* and *Morrison*," which lacked such a hook. *Singletary*, 268 F.3d at 204.

This justification, too, appears to conflict with our precedents. Congress cannot regulate the possession of every thing that ever traveled across state lines. *Alderman*, 562 U.S. at 1167, 131 S.Ct. 700 (opinion of THOMAS, J.). As a statutory matter, Congress required no more. But, treating Congress's "jurisdictional element" as dispositive "could very well remove any limit on the commerce power" and "would trespass on traditional state police powers." *Ibid.* It would also render meaningless this Court's decisions requiring that exercises of the commerce power fit within defined categories. *Morrison*, 529 U.S. at 608–609, 120 S.Ct. 1740.

Nothing in *Lopez* or *Morrison* suggests anything to the contrary. *Lopez* considered a jurisdictional hook helpful only if it "would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." 514 U.S. at 561, 115 S.Ct. 1624. But, as explained, § 922(g)'s bare requirement that the firearm previously traveled across state lines does not ensure that the firearm possession in question affects interstate commerce: Mere possession of a firearm does not necessarily affect commerce at all. *Morrison* also said that a jurisdictional hook could help show that the statute "is in pursuance of Congress' power to regulate interstate commerce." 529 U.S. at 613, 120 S.Ct. 1740. But, the fact that § 922(g) purports to be an exercise of Congress's Commerce Clause

powers does not mean that it falls within the legitimate scope of those powers.

III

Under our Constitution, "[t]he powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176, 5 U.S. 137, 2 L.Ed. 60 (1803). It has now been 26 years since a party has received relief in this Court based on a Commerce Clause challenge. Such relief has also been hard to come by in the lower courts, as the decisions concerning § 922(g) show. This question merits a closer look in an appropriate case. For, like Judge Batchelder, "I ... am unprepared to reduce the Supreme Court's *Lopez* decision to an anachronism to be noted in passing but ignored. Congress's enumerated powers, like Supreme Court opinions setting forth their limits, are, in my view, to be taken seriously." *Chesney*, 86 F.3d at 580 (concurring opinion).

Justice JACKSON, with whom Justice SOTOMAYOR joins, concurring.

I join the Court's opinion in full because it correctly applies our decisions in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), and *United States v. Rahimi*, 602 U.S. 680, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024). But I continue to believe that we veered off course in *Bruen*. See *Rahimi*, 602 U.S. at 741, 144 S.Ct. 1889 (concurring opinion). I write separately to emphasize that means-end scrutiny— the approach courts applied before we adopted *Bruen*'s "history and tradition" metric—offers a more rational way of assessing the constitutionality of firearm regulations.

**\*16** As I and others have elsewhere explained, *Bruen* is unworkable. It imposes on judges the unfamiliar and difficult tasks of sifting through centuries-old evidence in order to answer "contested historical questions," and "applying those answers to resolve contemporary problems." 597 U.S. at 107, 142 S.Ct. 2111 (Breyer, J., dissenting). Given those challenges, it is unsurprising that *Bruen*'s test is vulnerable to inconsistent and arbitrary application, as judges

draw different conclusions from the same historical evidence and reach divergent assessments of the same laws. See *Rahimi*, 602 U.S. at 743, 144 S.Ct. 1889 (JACKSON, J., concurring). [1]

[1]  Lower court cases addressing the constitutionality of the federal ban on firearm possession by felons, see 18 U.S.C. § 922(g)(1), provide a stark example of this inconsistency. Compare, *e.g.*, *United States v. Cockerham*, 162 F.4th 500, 504 (CA5 2025) (holding that § 922(g)(1) is unconstitutional as applied to a defendant whose prior conviction was for failing to pay child support), and *Range v. Atty. Gen.*, 124 F.4th 218, 232 (CA3 2024) (en banc) (same, where the prior conviction was for making a false statement to obtain food stamps), with *United States v. Duarte*, 137 F.4th 743, 761–762 (CA9 2025) (categorically affirming the constitutionality of § 922(g)(1) as applied to nonviolent felons), and *United States v. Jackson*, 110 F.4th 1120, 1125, 1129 (CA8 2024) (similar).

Perhaps worst of all, *Bruen* leaves no room to consider "the real and present stakes of the problems facing our society today." *Rahimi*, 602 U.S. at 706, 144 S.Ct. 1889 (SOTOMAYOR, J., concurring). Instead, to pass a new firearm regulation, legislatures and their lawyers are, as a practical matter, forced to trawl through inconclusive and incomplete historical records in search of evidence they can only hope will satisfy this Court. See *id.*, at 747, 144 S.Ct. 1889 (JACKSON, J., concurring).

The difficulties *Bruen* has created are all the more striking when compared to the test it abolished: means-end scrutiny. Under that framework, courts measured the strength of the government's justification for the firearm restriction against the burden that restriction imposed on Second Amendment rights. See *Bruen*, 597 U.S. at 18–19, 142 S.Ct. 2111 (majority opinion). Courts applied "strict scrutiny if the burden" on Second Amendment rights was "severe" and "intermediate scrutiny" if it was not. *Id.*, at 103, 142 S.Ct. 2111 (Breyer, J., dissenting). The means-end scrutiny assessment did not bind governments to the policy judgments of legislatures of yore, but neither did it operate as a blank check that allowed governments to trample on a constitutional right. See, *e.g.*, *New York State Rifle & Pistol Assn., Inc. v. Cuomo*, 804 F.3d 242, 264 (CA2 2015) (holding that a state ban on magazines loaded with more than seven rounds of ammunition violated the Second Amendment), abrogated on other grounds by *Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387; *Ezell v. Chicago*, 651 F.3d 684, 708–709, 711 (CA7 2011) (preliminarily enjoining, under the Second Amendment, a city ordinance banning firing ranges).

Constitutional adjudication through means-ends scrutiny is squarely within the competence of courts. Indeed, for other constitutional rights, courts regularly assess whether the government's justification for a law is legitimate and whether the law's operation is sufficiently tailored to promote that justification. See, *e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 164, 171–172, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) (applying strict scrutiny, under the First Amendment, to a content-based restriction on speech); *City of Austin v. Reagan Nat. Advertising of Austin, LLC*, 596 U.S. 61, 69, 76–77, 142 S.Ct. 1464, 212 L.Ed.2d 418 (2022) (holding that intermediate scrutiny, under the First Amendment, applied to a content-neutral law); *Sessions v. Morales-Santana*, 582 U.S. 47, 58, 137 S.Ct. 1678, 198 L.Ed.2d 150 (2017) (applying heightened scrutiny, under the Fifth Amendment, to a gender-based immigration law); *Johnson v. California*, 543 U.S. 499, 509, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) (applying strict scrutiny, under the Fourteenth Amendment, to a racial classification). There is no reason why an approach that has worked well enough in these other contexts would pose a problem only for Second Amendment adjudication.

**\*17**  Best of all, applying means-end scrutiny to firearm restrictions like the 18 U.S.C. § 922(g)(3) prosecution before us would be straightforward. [2] We would be tasked with answering familiar questions: How severe is the law's burden on Second Amendment rights? Does the government have a strong interest in preventing firearm possession by those "who pose a special danger of misuse"? Brief for United States 12. And is § 922(g)(3)'s ban on firearm possession by unlawful users of marijuana sufficiently tailored to that interest?

2    I opine only on the mechanics of the means-ends test; what result that test would produce here is not before us, since neither party asks us to overturn 🚩*Bruen* and apply means-ends scrutiny.

Notably, even as the government and the Court endorse the 🚩*Bruen* framework, both seem to acknowledge the relevance of these questions. For example, the government emphasizes that the purpose (the "end") of 🚩§ 922(g)(3) is to restrict possession of firearms by people who pose a special risk of misuse. See Brief for United States 12. And, it claims, 🚩§ 922(g)(3) furthers that purpose by targeting people who, in Congress's judgment, pose an increased risk of firearm misuse because they "regularly and routinely us[e]" illegal drugs (the "means"). Tr. of Oral Arg. 17–18; see *id.*, at 59–60. This argument boils down to the idea that 🚩§ 922(g)(3) is sufficiently tailored to Congress's legitimate purpose of preventing firearm misuse.

In response, this Court speaks in the same register. It rejects the government's means-end calculus by suggesting that the government has not established that the actual purpose of 🚩§ 922(g)(3) is to disarm "unusually dangerous" people. *Ante,* at —— (internal quotation marks omitted). Using the substances that trigger application of 🚩§ 922(g)(3) even regularly does not, in the Court's view, necessarily make users dangerous, violent, or otherwise susceptible to misusing firearms. See *ante,* at —— – ——. In other words, the Court's discussion implies that 🚩§ 922(g)(3)'s operation is not sufficiently tailored to the government's stated purpose—precisely the issue to which means-end scrutiny would direct our focus.

Adding to *Bruen*'s weaknesses is the fact that its framework provides no clear role for this kind of tailoring discussion. But such analysis is key. Scrutinizing the fit between a challenged law's justification and its operation is an essential part of any sensible framework for Second Amendment adjudication. In a future case that squarely presents the question, we should consider whether to retire the failed 🚩*Bruen* experiment and return to an explicit assessment of Congress's ends and means when deciding the constitutionality of firearm restrictions.

Justice ALITO, with whom Justice KAGAN joins, concurring in the judgment.

I agree with the Court that the historical analogues that the Government cites are not "relevantly similar" to 🚩18 U.S.C. § 922(g)(3) as applied to respondent. 🚩*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 29, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). I therefore agree that we should affirm the judgment of the Fifth Circuit. I also agree that nothing in the opinion of the Court should be read to cast doubt on the constitutionality of other provisions of 🚩§ 922(g), such as 🚩§§ 922(g)(1) and (4), the "prohibitions on the possession of firearms by felons and the mentally ill," 🚩⚠*District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), which we have repeatedly said are " 'presumptively lawful,' " 🚩*United States v. Rahimi*, 602 U.S. 680, 699, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (quoting 🚩⚠*Heller*, 554 U.S. at 627, n. 26, 128 S.Ct. 2783). See *ante*, at —— – ——, n. 6 (quoting 🚩⚠*Heller*, 554 U.S. at 626, 128 S.Ct. 2783).

**\*18** Although I agree with the Court on these points, I would affirm on a different ground from those on which the majority relies. As the opinion of the Court explains, the habitual-drunkard laws that the Government cites did not allow officials to disarm all those who "regularly used intoxicants," or even just those who "sometimes used them to excess." *Ante*, at ——. These laws instead threatened disarmament only for those whose use of an intoxicant "rendered them practically incapacitated and incapable of managing their affairs." *Ibid*. Those persons drank so much, so often, that they were incapacitated not only during bouts of drunkenness but also in a more persistent and pervasive manner. Yet the Government argues that these historical analogues establish a regulatory tradition that allows it to disarm "anyone" who regularly uses "any amount" of marijuana unlawfully. *Ibid*.

The mismatch between the Government's historical analogues and the theory on which the Government defends the constitutionality of 🚩§ 922(g)(3) as applied to respondent is clear. All that we know about respondent's marijuana use is that he used the drug about every other day. We do not know how much he used, the strength of the marijuana he used, how many times he used it on the days in question, the time of day when he used it, where he used it, or the degree to which this use affected his ability to exercise judgment and perform daily tasks responsibly. As a result, the Government has failed to show that a marijuana user like respondent is

incapacitated in a way analogous to the habitual drunkards that the Government's analogues regulated.

Marijuana consumption is increasingly common in this country. Many States have legalized its use and sale, and although possession of the drug remains a federal crime, very few persons are convicted of that offense each year. The Government has largely tolerated the production and sale of marijuana when done in accord with state law, and it has allowed a multi-billion-dollar marijuana business to develop. [1] For its part, Congress has restricted the use of appropriated funds to prevent States from implementing laws that allow the use, distribution, possession, or cultivation of medical marijuana, or to prosecute certain parties that produce, distribute, or possess marijuana in compliance with state law. [2]

[1]    See Congressional Research Service, L. Sacco & J. Lampe, The Federal Status of Marijuana and the Policy Gap With States 2 (2026).

[2]    *Ibid*.

In these circumstances, marijuana use today is like alcohol use at the founding. It is widespread and increasingly considered socially acceptable in many quarters. And from a practical standpoint, law enforcement widely tolerates the use of marijuana.

These similarities underscore the deficiency of the Government's analogues. To succeed, the Government would need to identify a regulatory principle that justified disarmament of persons who are relevantly similar to the occasional marijuana user. But whereas the Government's analogues allowed disarmament only of those whose extreme use of an intoxicant (alcohol) incapacitated them habitually, § 922(g)(3) as applied to respondent allows disarmament of those who do no more than "regularly us[e]" a similar intoxicant (marijuana) unlawfully.

In attempting to rebuff a Second Amendment challenge, the Government need not identify a historical twin or precise precursor. *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889. Still, the Government must cite analogues that are "relevantly similar" and that therefore furnish a basis for inferring that a challenged law is consistent with the historical understanding of the right that the Second Amendment codified. Here, the Government's analogues are too far afield to justify the application of § 922(g) to a marijuana user like respondent.

We need not say more to decide this case, and I would for that reason say no more. I accordingly would affirm on this ground alone.

**All Citations**

608 U.S. ----, --- S.Ct. ----, 2026 WL 1751710

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.