# EXHIBIT B

--- S.Ct. ----
Only the Westlaw citation is currently available.
Supreme Court of the United States.

Damon LANDOR, Petitioner

v.

LOUISIANA DEPARTMENT OF
CORRECTIONS AND PUBLIC SAFETY, et al.

No. 23–1197
|
Argued November 10, 2025
|
Decided June 23, 2026

**Synopsis**
**Background:** Former state prisoner, a Rastafarian whose religious convictions required him to leave his hair uncut, brought action under the Religious Land Use and Institutionalized Persons Act (RLUIPA) against the Louisiana Department of Corrections and Public Safety (LDOC) and prison officers in their individual capacities, seeking money damages for incident in which, upon his arrival at a new facility near the end of his sentence, officers shaved his head, causing him to violate his religious beliefs. The United States District Court for the Middle District of Louisiana, Shelly D. Dick, Chief Judge, 2022 WL 4593085, granted defendants' motion to dismiss, and former prisoner appealed. The United States Court of Appeals for the Fifth Circuit, Clement, Circuit Judge, 82 F.4th 337, affirmed, and subsequently the Court of Appeals, 93 F.4th 259, denied rehearing and rehearing en banc. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Gorsuch, held that:

prisoner did not have cause of action under RLUIPA against officers in their individual capacities, in absence of officers' consent to answer suits under RLUIPA;

officers could not be held personally liable under agency principles for violating RLUIPA;

officers could not be held personally liable under RLUIPA on basis they were indirect recipients of federal funds who thereby implicitly consented to RLUIPA liability; and

prisoner's RLUIPA action against the officers was not a necessary and proper incident to Congress's constitutionally enumerated power to spend money.

Affirmed.

Chief Justice Roberts and Justices Thomas, Alito, Kavanaugh, and Barrett joined.

Justice Jackson filed a dissenting opinion, in which Justices Sotomayor and Kagan joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Dismiss for Failure to State a Claim.

*Syllabus*[*]

[*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1** The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) was enacted pursuant to Congress's Spending Clause authority and imposes various conditions on federal funds distributed to state prison systems like the Louisiana Department of Corrections (LDOC). One condition requires state prison systems to agree to answer federal suits by private plaintiffs alleging certain substantial burdens on their religious exercises. See 42 U.S.C. §§ 2000cc–1(a), (b)(1). Relying on that provision, inmate Damon Landor brought this RLUIPA lawsuit against LDOC as well as some of the prison system's individual officers in their personal capacities, seeking damages from them. Mr. Landor is a Rastafarian whose religious convictions require him to leave his hair uncut. He claims that LDOC officers—despite being aware of his religious beliefs—forcibly shaved his head. The officers moved to dismiss, arguing that while their employer LDOC may have agreed to answer certain private suits under RLUIPA, they were not parties to any such agreement, and therefore Mr. Landor had no federal cause of action against them. The district court dismissed Mr. Landor's RLUIPA claims against both the officers and LDOC. On appeal, Mr. Landor challenged only the dismissal of his claim against the individual officers. The Fifth Circuit declined to revive that

portion of his suit, holding that RLUIPA does not permit suits against officers in their individual capacities.

*Held*: Individuals may not be held liable in their personal capacities under a Spending Clause statute unless those individuals have voluntarily and knowingly consented to answer lawsuits under the statute; because the individual defendants in this case did not voluntarily and knowingly consent to face RLUIPA liability in an agreement with the federal government, Mr. Landor's case cannot proceed against them. Pp. —— – ——.

(a) While the Constitution's "Spending Clause," Art. I, § 8, cl. 1, may confer on Congress the power to spend money for the general welfare, it does not "endow Congress with [any] power to regulate conduct." *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357, 370, 145 S.Ct. 2219, 222 L.Ed.2d 567. Congress may attach conditions to the funds it distributes, and if a recipient "violates those conditions," Congress typically may "terminate" its agreement to provide funds. *Id.*, at 365–366, 145 S.Ct. 2219 (internal quotation marks omitted). But Congress cannot dictate whatever other sanctions it might wish for violating conditions found in its Spending Clause legislation. Additional sanctions are permissible only with the "voluntar[y] and knowin[g]" consent of those who must bear them. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694. To sort out whether consent exists, the Court has traditionally employed a "contract analogy" that helps to ensure conditions attached to federal funds—including those prescribing exposure to potential sanctions—apply only to those who have knowingly and voluntarily agreed to them. Pp. —— – ——.

(b) These settled principles resolve this case. Before this Court, LDOC does not dispute that it is a recipient of federal funds and has agreed to answer certain RLUIPA suits as a condition of accepting those funds. But this case involves only claims against individual state employees in their personal capacities, and Mr. Landor does not allege that any of those individuals has entered any agreement with the federal government, let alone that any of them has voluntarily and knowingly consented to answer private suits under RLUIPA. Because they never agreed to answer suits like this one, Mr. Landor's case cannot proceed against them any more than a breach of contract action might proceed against a defendant who never formed a contract. P. ——.

**\*2** (c) Mr. Landor's arguments are all variations on the theme that the lack of voluntary and knowing consent does not matter. And they all fail for that reason. Under the Spending Clause and the Court's precedents, the consent requirement is key. Pp. —— – ——.

(1) Mr. Landor invokes agency law, arguing that LDOC employees may be held liable because they are LDOC's agents. But as a matter of blackletter law, when a principal enters a contract with a third party, the principal's agents do not become liable to the third party for their principal's nonperformance. LDOC might be subject to certain private suits under RLUIPA if it breaches its promises to the federal government, but it does not follow that LDOC's employees are as well. Pp. —— – ——.

(2) Mr. Landor next turns to *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171, arguing that his proposed cause of action satisfies *Dole*'s four requirements and therefore satisfies the Spending Clause too. But *Dole*'s requirements apply in addition to—not instead of—the rule that Congress may not use the Spending Clause to bind entities and individuals without their knowing and voluntary consent. *Dole* itself added a fifth rule barring compulsion and reaffirmed the clear-statement rule, both of which serve to ensure real consent exists. Mr. Landor also argues that RLUIPA's mere existence sufficed to alert the individual defendants that they could be held personally liable. This argument fares no better. A Spending Clause statute assumes binding effect only through "voluntar[y] and knowin[g]" agreement, which is lacking here. *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531. Pp. —— – ——.

(3) Mr. Landor next turns to the fungibility of money, contending that the individual defendants are indirect recipients of federal funds because they receive paychecks from LDOC. But this argument would mean that so long as a penny of federal spending makes its way to an individual, Congress could directly regulate his conduct based on the fiction that he has consented to regulation. This is inconsistent with the requirement of knowing and voluntary consent, and it would give Congress an effectively unbridled police power impossible to square with the Spending Clause's terms or our precedents. Pp. —— – ——.

(4) Mr. Landor's reliance on the Necessary and Proper Clause and *Sabri v. United States*, 541 U.S. 600, 124 S.Ct. 1941,

Case 6:25-cv-00056-H    Document 129-3    Filed 07/02/26    Page 4 of 25    PageID 1447

158 L.Ed.2d 891, is misplaced. In ⚑ *Sabri*, the Court held that Congress's criminal ban on theft, fraud, or bribery against a federal funding recipient is a necessary and proper incident to Congress's authority to spend money. ⚑ 541 U.S. at 605–606, 124 S.Ct. 1941. Mr. Landor contends that his proposed cause of action is likewise incidental to RLUIPA's policy protecting religious exercises. But Mr. Landor is answering the wrong question. The correct question is instead whether such a cause of action is a necessary and proper incident to Congress's enumerated power to spend money. Suits against nonconsenting parties like the individual officers here might advance RLUIPA's policy but do not safeguard federal funds from being "frittered away in graft." ⚑ *Id*., at 605, 124 S.Ct. 1941. Adopting Mr. Landor's proposed cause of action would allow Congress to evade the consent requirement inherent in its Spending Clause authority and regulate directly the conduct of countless nonconsenting individuals in spheres traditionally reserved to the States. Such a result would be inconsistent with principles of state sovereignty and a federal government of limited and enumerated regulatory powers. Pp. ––––  – ––––.

 **\*3**  82 F.4th 337, affirmed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAVANAUGH, and BARRETT, JJ., joined. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

**Attorneys and Law Firms**

Zachary D. Tripp, Washington, DC, for Petitioner

Libby A. Baird, for the United States, as amicus curiae, supporting petitioner.

General J. Benjamin Aguiñaga, Solicitor General, for Respondents.

Casey Denson, Casey Denson Law LLC, New Orleans, LA, Zachary D. Tripp, Counsel of Record, Joshua M. Wesneski, Rachael e. Jones, Laurel L. Zigerelli, Weil, Gotshal & Manges LLP, Washington, DC, Sarah M. Sternlieb, Natalie Howard, Tiffany Kim, Weil, Gotshal & Manges LLP, New York, NY, for Petitioner.

Elizabeth B. Murrill, Attorney General, Louisiana Department of Justice, Baton Rouge, LA, J. Benjamin Aguinaga, Solicitor General, Counsel of Record, Zachary

Faircloth, Principal Deputy, Solicitor General, Morgan Brungard Kelsey L. Smith, Deputy Solicitors General, Caitlin A. Huettemann Elizabeth Brown, Assistant Solicitors General, for Respondents.

**Opinion**

Justice GORSUCH delivered the opinion of the Court.

This case concerns whether the Religious Land Use and Institutionalized Persons Act of 2000 permits plaintiffs to sue nonconsenting state employees in their private capacities for damages.

I

Today, Congress offers financial support to all 50 States and many other entities. Much of that support comes with strings attached. So, for example, Congress has conditioned receipt of federal highway funds on a State's agreement to maintain laws setting a minimum drinking age of 21. See ⚑ *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). Likewise, Congress has conditioned federal Medicaid funds on a State's willingness to administer its healthcare programs consistent with various rules. See ⚑ *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357, 362–364, 145 S.Ct. 2219, 222 L.Ed.2d 567 (2025). In each of these contexts and many others, the penalty for noncompliance is straightforward: Congress may "terminate funds" if a recipient fails to abide by the conditions associated with its grants. ⚑ *Id*., at 365–366, 145 S.Ct. 2219 (internal quotation marks omitted).

The statute at issue before us, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), works similarly. As relevant here, RLUIPA imposes various conditions on federal funds distributed to state prison systems like the Louisiana Department of Corrections (LDOC). One condition requires prison systems to refrain from imposing "substantial burden[s] on the religious exercise[s]" of state prisoners outside exceptional circumstances. See ⚑ 42 U.S.C. §§ 2000cc–1(a), ⚑ (b)(1); see also Tr. of Oral Arg. 60. If a prison system fails to comply with that condition, Congress may cut off its funding.

But when enacting RLUIPA, Congress did something more: It included another, distinct remedy as part of the bargain.

As a condition of funding, Congress called on state prison systems to agree to answer suits by private plaintiffs alleging substantial burdens on their religious exercises. Specifically, the law asked those systems to consent to suit by any injured party "assert[ing] a violation of " RLUIPA and seeking "appropriate relief." § 2000cc–2(a).

This case concerns that provision. Damon Landor is a Rastafarian whose religious convictions require him to leave his hair uncut. In 2020, after a conviction in Louisiana state court, Mr. Landor spent a few months in custody. Near the end of his sentence, as officers transferred him from one facility to another, Mr. Landor grew concerned that the new facility's intake officers might cut his hair pursuant to standard LDOC grooming policies. To avoid that possibility, he provided the officers with a copy of *Ware* v. *LDOC*, 866 F.3d 263 (CA5 2017), which held that RLUIPA generally bars prisons from cutting Rastafarians' hair. See *id*., at 266, 274. But, Mr. Landor says, the LDOC officers in the new facility responded by throwing his copy of *Ware* in the trash and proceeding to shave his head, causing him to violate his religious beliefs.

 **\*4**  After that transpired, Mr. Landor brought this lawsuit under RLUIPA seeking money damages. He sued not only LDOC, but also some of the prison system's individual officers in their personal capacities. The officers responded by asking the district court to dismiss Mr. Landor's complaint. As they saw it, their employer, LDOC, may have struck a bargain with the federal government to answer certain private suits by prisoners like Mr. Landor. But, they argued, they were not parties to that or any other agreement to answer private suits under RLUIPA. Accordingly, they continued, Mr. Landor had no federal cause of action against them. Ultimately, the court dismissed Mr. Landor's RLUIPA claims against both LDOC and the officers.

On appeal to the Fifth Circuit, Mr. Landor did not challenge the district court's dismissal of his RLUIPA claim against LDOC. Instead, he focused on his claim against the individual officers, asking the Court of Appeals to revive only that portion of his suit. The Fifth Circuit declined to do so. It did not question that RLUIPA may permit certain claims against funding recipients like LDOC. But, the court held, RLUIPA "does not permit suits against officers in their individual capacities." 82 F.4th 337, 341 (2023). We granted Mr. Landor's petition for a writ of certiorari. 606 U. S. 916, 145 S.Ct. 2814, —— L.Ed.2d —— (2025).

II

Before us, the parties dispute two questions. One is whether, by authorizing private lawsuits seeking "appropriate relief," RLUIPA ever permits suits for money damages—or whether the statute instead limits plaintiffs like Mr. Landor to other remedies, like injunctions or declaratory judgments. Brief for Petitioner 2–3, 18–19; Brief for Respondents 4. The other question the parties spar over is whether, consistent with the Constitution, a plaintiff may bring an RLUIPA suit against individuals, like the officers in this case, who have not formed any agreement with the federal government. Brief for Petitioner 38–46; Brief for Respondents 28–30, 45–46. To resolve this case, we need answer only the second question. [1]

[1]  The dissent says we give "short shrift" to the principle that constitutional questions are to be avoided " 'if there is some other ground upon which to dispose of the case.' " *Post*, at —— (opinion of JACKSON, J.) (quoting *Bond v. United States*, 572 U.S. 844, 855, 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014)). But this is a "prudential rule," *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 8, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), not a "mechanica[l]" one, *Almendarez-Torres v. United States*, 523 U.S. 224, 239, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). And for reasons we outline, the constitutional question here is readily resolved by our precedents. It is also narrower than the statutory question in an important respect: It does not require us to address whether RLUIPA *ever* authorizes money damages.

Article I of the Constitution grants Congress certain limited and enumerated powers. Congress, for example, may "regulate Commerce ... among the several States." Art. I, § 8, cl. 3. It may "establish a uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies." Cl. 4. It may "coin Money" and "provide for the Punishment of counterfeiting." Cls. 5–6. These provisions and others allow Congress to regulate the behavior of the American people in specific fields. And each allows Congress to back up its regulations "with a sanction" enforced either "by the COERTION of the magistracy, or by the COERTION of arms." The Federalist No. 15, p. 95 (J. Cooke ed. 1961) (A. Hamilton). So, for example, federal statutes require airlines operating in interstate commerce to hold certificates and

comply with federal requirements. See 49 U.S.C. §§ 41101, 41102, 41109. The Bankruptcy Code allows a court to alter a creditor's rights and a debtor's responsibilities. See Title 11. And Title 18, Chapter 25, criminalizes counterfeiting. See, *e.g.*, 18 U.S.C. § 473. Each of these regulations finds its footing in a provision of Article I that empowers Congress to do just that: regulate.

 **\*5**  The terms of RLUIPA before us rest on a different foundation. As the parties agree, Congress enacted them pursuant to what is sometimes called the Constitution's Spending Clause. See *Sossamon v. Texas*, 563 U.S. 277, 290, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011); Brief for Petitioner 3; Brief for Respondents 2. That provision of Article I gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, § 8, cl. 1. At the founding, some argued this language conferred on Congress the power to regulate on nearly any topic it wishes, backed by practically any sanction it chooses, so long as it does so in service of the "general Welfare." See *Medina*, 606 U.S. at 370, 145 S.Ct. 2219. It appears that Gouverneur Morris, a leading advocate of this reading and a member of the Committee on Style, even tried to replace one of the draft Clause's commas with a semicolon with the hope of making his reading more plausible. See W. Treanor, The Case of the Dishonest Scrivener: Gouverneur Morris and the Creation of the Federalist Constitution, 120 Mich. L. Rev. 1, 20–24 (2021). But a careful proofreader —Roger Sherman—noticed the surreptitious edit, and the Convention rejected it. See *ibid*.

In the end, the founding generation rejected Morris's reading of the Clause just as it had his semicolon. See *Medina*, 606 U.S. at 370–371, 145 S.Ct. 2219. While the Clause may allow Congress to raise and spend money in support of the "general Welfare," early authorities concluded, it did not "endow Congress with [any] power to regulate conduct." *Ibid*. (internal quotation marks omitted). Were it otherwise, they recognized, "the 'enumeration of specific powers' elsewhere in Article I would be rendered largely pointless, and the Nation would trade a limited federal government for 'an unlimited' one." *Id*., at 371, 145 S.Ct. 2219 (quoting 2 J. Story, Commentaries on the Constitution of the United States §§ 904, 906, pp. 367, 369 (1833)). This Court's precedents have long respected that founding-era consensus. See *Medina*, 606 U.S. at 371, 145 S.Ct. 2219; accord,

*Cummings v. Premier Rehab Keller*, 596 U.S. 212, 219, 142 S.Ct. 1562, 212 L.Ed.2d 552 (2022).

It is an understanding that gives rise to important limitations on spending legislation. Often, Congress attaches conditions to the funds it distributes. And typically, if a recipient "violates those conditions," Congress may "terminate" its agreement to provide funds. *Medina*, 606 U.S. at 365–366, 145 S.Ct. 2219 (internal quotation marks omitted). But because the Spending Clause confers no authority to "regulate directly," *Dole*, 483 U.S. at 209, 107 S.Ct. 2793, Congress cannot just dictate whatever other sanctions it might wish for violating conditions found in its Spending Clause legislation.

Instead, additional sanctions are permissible only with the "voluntar[y] and knowin[g]" consent of those who must bear them. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Put simply, without independent regulatory authority, Congress must rely on consent. It must ask and others must agree to face liability should they violate a funding condition. Time and time again, from at least 1845 to the present, our precedents have stressed the centrality of consent in this field. Compare *Searight v. Stokes*, 3 How. 151, 169, 44 U.S. 151, 11 L.Ed. 537 (1845) (calling spending legislation a "compact ... to which the state assented"), with *Medina*, 606 U.S. at 372, 145 S.Ct. 2219 (describing spending statutes as "federal-state agreements"). [2]

2      See also, *e.g.*, *Neil, Moore & Co. v. Ohio*, 3 How. 720, 742, 44 U.S. 720, 11 L.Ed. 800 (1845) (calling spending legislation "an agreement ... between the United States and a state"); *McGee v. Mathis*, 4 Wall. 143, 155, 71 U.S. 143, 18 L.Ed. 314 (1866) ("It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract" founded on "consent of minds"); *Steward Machine Co. v. Davis*, 301 U.S. 548, 597–598, 57 S.Ct. 883, 81 L.Ed. 1279 (1937) (Spending legislation is an "agreemen[t] ... with Congress"); *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531 ("[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree

to comply with federally imposed conditions"); *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (discussing the "contractual nature" of Title IX); *Barnes v. Gorman*, 536 U.S. 181, 186, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) ("We have repeatedly characterized ... Spending Clause legislation as much in the nature of a *contract*" (internal quotation marks omitted)); *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 577, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (opinion of ROBERTS, C. J.) ("The legitimacy of Congress's exercise of the spending power ... rests on whether the State voluntarily and knowingly accepts the terms of the contract" (internal quotation marks omitted)); *Cummings v. Premier Rehab Keller*, 596 U.S. 212, 219, 142 S.Ct. 1562, 212 L.Ed.2d 552 (2022) ("Spending Clause legislation operates based on consent: in return for federal funds, the recipients agree to comply with federally imposed conditions" (internal quotation marks and alteration omitted)).

**\*6** To sort out whether consent exists—and thus whether a condition associated with spending legislation is enforceable—we have traditionally turned to contract principles for guidance. See *Sossamon*, 563 U.S. at 290, 131 S.Ct. 1651 (The contract analogy represents "a ... limitation on" the "liability" Spending Clause statutes may impose (emphasis deleted)). Consider some examples. At common law, coerced assent to a contract is invalid. See Restatement (Second) of Contracts § 175(1) (1979). Likewise, we have held, coerced assent to a spending condition—by way of an economic "gun to the head"—is invalid. *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 581–582, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (opinion of ROBERTS, C. J.); see also *id.*, at 676–677, 132 S.Ct. 2566 (joint dissent of Scalia, Kennedy, THOMAS, and ALITO, JJ.); *Dole*, 483 U.S. at 211, 107 S.Ct. 2793. At common law, ambiguous contractual language is construed against its drafter. See *C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.*, 532 U.S. 411, 423, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001). Similarly, we have concluded, Congress must clearly and unambiguously alert a grant recipient to any condition on federal funds. *Pennhurst*,

451 U.S. at 17, 101 S.Ct. 1531. In these ways and others, our "contract analogy" helps safeguard against conflating Congress's spending power with a regulatory power. It does so by ensuring that conditions attached to federal funds—including those prescribing exposure to potential sanctions—apply only to those who have knowingly and voluntarily agreed to them. See *Cummings*, 596 U.S. at 220, 142 S.Ct. 1562; cf. *Medina*, 606 U.S. at 371–372, 145 S.Ct. 2219 (noting that an analogy to treaties, another consensual instrument, may also be appropriate). [3]

[3]   The contract analogy operates "only as a potential *limitation* on liability," *Cummings*, 596 U.S. at 225, 142 S.Ct. 1562 (internal quotation marks omitted), meaning that consent is a necessary but not sufficient condition for constitutionality. As we have explained, "the exercise of the spending power must [also] be in pursuit of the general welfare," spending conditions must be "german[e] ... to federal purposes," and still "other constitutional provisions may provide an independent bar." *Dole*, 483 U.S. at 207–208, 107 S.Ct. 2793 (internal quotation marks omitted). A spending agreement that violates one of these requirements is invalid, just like "an illegal contract" at common law is invalid, even if freely assented to. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) (internal quotation marks omitted).

These settled principles resolve this case. Before us, LDOC does not dispute that it is a recipient of federal funds. It does not question that it has agreed to answer certain RLUIPA suits as a condition of accepting those funds. But as it comes to us, this case does not involve claims against LDOC. It involves only claims against individuals in their personal capacities. And Mr. Landor does not allege that any of those individuals has entered any agreement with the federal government, let alone that any of them has voluntarily and knowingly consented to answer private suits under RLUIPA.

To know that is enough to know the Court of Appeals was correct. Mr. Landor does not have a federal RLUIPA cause of action against the officers. Under the Spending Clause, Congress lacks regulatory authority to impose liability on them directly and must depend instead on consent. And because they never agreed to answer suits like this one, Mr.

Landor's case cannot proceed against them any more than a breach of contract action might proceed against a defendant who never formed a contract.

## III

Seeking to avoid this conclusion, Mr. Landor and the dissent advance many arguments. But each is a variation on the same theme. In different ways, Mr. Landor and the dissent submit, the lack of voluntary and knowing consent does not matter. And each of their arguments fails for exactly that reason. Under the Spending Clause and our precedents, voluntary and knowing consent is key.

## A

Mr. Landor begins by invoking agency and contract law. As LDOC's agents, he contends, the individual defendants have a "duty to obey all reasonable directions" from their principal. Restatement (Second) of Agency § 385(1) (1957). And, he adds, an agent's actions can sometimes "bin[d] his principal" to a contract when he acts "within the scope of his authority."

*United States v. Gooding*, 12 Wheat. 460, 469, 25 U.S. 460, 6 L.Ed. 693 (1827); see also Restatement (Second) of Agency § 140. From these common law principles, Mr. Landor reasons, it follows that the individual defendants in this case may be held personally liable under RLUIPA. Brief for Petitioner 31–33; see also *post*, at —— – ——, ——, n. 10 (opinion of JACKSON, J.).

**\*7** That much does not follow even from the precepts Mr. Landor cites. Certainly, an agent usually must obey his principal's directions and sometimes may bind his principal. But when a principal (here, LDOC) enters a contract with a third party (here, the federal government), as a matter of blackletter contract law the principal's agents do not become "liable" to the third party for their principal's "non-performance." Restatement (Second) of Agency § 328 (bold-face deleted); see also, *e.g.*, 12 R. Lord, Williston on Contracts § 35:34, p. 502 (4th ed. 2012) ("The agent cannot enforce the [principal's] contract, nor is the agent bound by it" (footnote omitted)); *Hodgson v. Dexter*, 1 Cranch 345, 363, 2 L.Ed. 130 (1803) (Marshall, C. J., for the Court) ("It is too clear to be controverted, that ... contracts made on account of the government ... are obligatory on the government; not the [government's] officer"). So, yes, LDOC might be subject to

certain private suits under RLUIPA for breaching its promises to the federal government. But under normal principles of agency and contract law, that does not mean LDOC's employees are as well.

To be sure, Mr. Landor and the dissent identify ways in which Congress *could have* lawfully imposed personal liability on the individual defendants. For example, Congress could have said that, as a condition of federal funding to LDOC, its officers had to agree to enter separate contracts with the federal government consenting to answer suits under RLUIPA. Or Congress might have conditioned its funds on Louisiana's agreement to exercise its own regulatory powers to adopt a state law cause of action enforceable against LDOC officers who violate RLUIPA. Brief for Petitioner 47; cf. *post*, at —— – ——. But these untapped possibilities only underscore Mr. Landor's bind. The first hypothetical has what this case does not, namely, an agreement between the federal government and the defendants. And in the second hypothetical, again unlike this case, the State would have exercised its own regulatory powers. See *Randolph v. Donaldson*, 9 Cranch 76, 84–85, 3 L.Ed. 662 (1815) (Story, J., for the Court) (describing a Virginia statute that did essentially that in response to a federal request). [4]

[4]    Nor, of course, does anything prevent Louisiana from acting on its own initiative to adopt a state law permitting damages in cases like this one. Indeed, counsel for the individual officers before us indicated that just such a claim may be available to Mr. Landor under state law in state court. Tr. of Oral Arg. 113–114.

## B

Next, Mr. Landor points to *Dole*. That case, he says, set out just four requirements for Spending Clause legislation —and consent is not among them. As he reads *Dole*, a condition on the grant of federal funds need only be "(1) in pursuit of the general welfare; (2) unambiguously expressed; (3) related to the federal interest in particular national projects or programs; and (4) not in violation of other constitutional provisions." Brief for Petitioner 33 (citing 483 U.S. at 207–208, 107 S.Ct. 2793; internal quotation marks omitted). And because a condition requiring nonconsenting individuals to answer RLUIPA suits satisfies all these requirements, Mr.

Landor concludes, his case may proceed. The dissent appears to agree, suggesting that the voluntary and knowing consent requirement finds no support in "any of ⚑*Dole*'s prongs." *Post*, at ——.

That is incorrect. The four rules Mr. Landor extracts from ⚑*Dole* apply in addition to—not instead of—the rule that Congress may not use the Spending Clause to bind entities and individuals without their knowing and voluntary consent. That much is evident from ⚑*Dole* itself. As the dissent admits, ⚑*Dole* proceeds to add a fifth rule for Spending Clause legislation shortly after the passage Mr. Landor cites: Funding conditions may not "pass the point at which pressure turns into compulsion." ⚑483 U.S. at 211, 107 S.Ct. 2793 (internal quotation marks omitted); *post*, at —— – ——. And that bar on compulsion, as we have seen, serves to help ensure real consent exists. See Part II, *supra*. The same holds true of the clear-statement rule that ⚑*Dole* reaffirmed. Congress must impose spending conditions "unambiguously," not for no reason, but so that participants in federally funded programs may "exercise their choice knowingly, cognizant of the consequences of their participation." ⚑483 U.S. at 207, 107 S.Ct. 2793 (internal quotation marks omitted). Had ⚑*Dole* meant to bulldoze the consent requirement and condone consent-free regulation under the Spending Clause, *post*, at —— – ——, it would have had no occasion to emphasize any of this. Nor does Mr. Landor's and the dissent's consent-free gloss on ⚑*Dole* merely overlook important qualifications in ⚑*Dole* itself. Worse still, their misreading would pit that decision against nearly two centuries' worth of cases recognizing the consent requirement, see n. 2, *supra*— hardly a sensible way to construe our precedents.

**\*8**  Responding to these problems, Mr. Landor and the dissent submit that RLUIPA's mere existence sufficed to alert the individual defendants, or at least their employer, that they could be held personally liable. See Brief for Petitioner 35; *post*, at ——. But, just like the attempt to rewrite ⚑*Dole*, this argument misses the point. A Spending Clause statute does not carry independent regulatory force. It assumes binding effect only through "voluntar[y] and knowin[g]" agreement. ⚑*Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531. If someone has not agreed to be bound, it does not matter that he may be aware of the existence of a contract between other parties.

And if someone has not agreed to be bound, it does not matter whether other contracting parties might wish to bind him. Either way, he has not agreed to be bound, so he cannot be. [5]

[5]    The dissent also attempts a factual analogy to ⚑*Dole*, suggesting that, because Congress "use[d] its spending power to regulate ... drinking habits" there, it is free to regulate the individual officers' conduct here. *Post*, at ——. But this analogy fails for reasons we have seen. Under the spending legislation at issue in ⚑*Dole*, Congress conditioned federal highway funds on an agreement by the States to exercise their regulatory powers to raise their drinking ages to 21. See ⚑483 U.S. at 205, 211, 107 S.Ct. 2793. Congress did not purport to regulate "drinking habits" directly, let alone create a federal cause of action against underage drinkers.

### C

Seeking still another way around the consent requirement, Mr. Landor turns next to the fungibility of money. The individual defendants, he observes, receive paychecks from LDOC, and some of that entity's funding comes from the federal government. As a result, Mr. Landor submits, the individual defendants are *indirect* recipients of federal funds and, for that reason, should be deemed to have *implicitly* consented to RLUIPA liability.

This submission fails as well. Mr. Landor would have us hold, for the first time, that so long as a penny of federal spending makes its way to an individual, however indirectly, Congress can regulate his conduct directly based on the fiction that he has consented to regulation. None of that is consistent with our precedents holding that funding conditions in Spending Clause legislation lack independent regulatory force but instead derive their effect from "voluntar[y] and knowin[g]" assent. ⚑*Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531.

Notice too where Mr. Landor's theory would lead. Given the "explo[sion]" of Spending Clause legislation in recent decades, ⚑*Medina*, 606 U.S. at 373, 145 S.Ct. 2219, Congress would enjoy an effectively unbridled police power. Federal authorities would have no need to show that their regulations represent proper exercises of Congress's limited

and enumerated powers found in the Commerce Clause, the Bankruptcy Clause, or any other. All they would have to show is that a recipient who consented to a funding condition spent some formerly federal money in transactions with a third party. Just like that, the federal government could directly regulate the third party's conduct. Take some examples. On Mr. Landor's theory, Congress could require coaches at universities that receive federal funds to permit transgender athletes to play women's sports—or face personal liability in suits for damages. Likewise, Congress could bar doctors at medical practices that accept federal funds from administering certain vaccines to children—again on pain of damages. See Tr. of Oral Arg. 37–43. None of that fits with our system of limited and enumerated federal powers where all others are reserved to the States and the people.

The dissent criticizes us for "trot[ting] out" this "parade of horribles." *Post*, at ——. But if this is a parade, the dissent marches right along, embracing these hypotheticals and more. See *post*, at —— – —— In fact, as the dissent sees it, we should not engage in "hairsplitting" over any "strict direct-consent-to-liability ... requirement" or "ill-formed" contract analogy. *Post*, at ——, ——. On its view, these things are all just "empt[y] ... formalism[s]." *Post,* at ——. If Congress can ask individuals to consent to funding conditions—or ask States to enact laws in order to receive federal funds—Congress might as well be allowed to regulate private behavior directly. *Ibid.* Likely enough, that vision would have delighted Gouverneur Morris. But it is one at war with the terms of the Spending Clause, how that Clause has been widely understood since the founding, and a long line of this Court's precedents. Nor is there anything "empty" about insisting that Congress operate within the limited and enumerated powers the Constitution provides. This Court has rejected views like the dissent's many times before. See Part II, *supra*. And we do so again today.

 **\*9**  Faced with that problem, Mr. Landor and the dissent search for some foothold in our precedents to support their view that the Spending Clause grants Congress direct regulatory authority. Perhaps the best they can muster is a line snipped from *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), where we said that an individual employed in a federally funded program must "perform [his] duties in accordance with the ... restrictions" specified by Congress. *Id.*, at 198, 111 S.Ct. 1759; Brief for Petitioner 32; *post*, at ——. But even that is of no help. *Rust* did not involve an attempt to impose personal

liability on the program's employees. The only consequence for violating Congress's funding conditions fell on the federal funding recipient itself and amounted to no more than a loss of funding. See 500 U.S. at 178–179, 111 S.Ct. 1759. And that is exactly the "typical remedy" for noncompliance our cases have long described. *Medina*, 606 U.S. at 373, 145 S.Ct. 2219 (internal quotation marks omitted).

Mr. Landor and the dissent also point to *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), a Title IX case. Brief for Petitioner 32–33; *post*, at —— – ——, n. 7. But there, too, the only penalty was the traditional one—the "terminati[on]" of federal funding. See *Grove City College*, 465 U.S. at 561, 104 S.Ct. 1211. Subsequent events illustrate as much: After losing the case, the college decided "to exit the federal [funding] programs rather than surrender its autonomy," a choice it was free to make because Title IX binds only those who have freely elected to accept federal funds. Grove City College, Forty Years Ago, Supreme Court Case Changed GCC Forever (Feb. 26, 2024) (archived at https://perma.cc/2AQU-3PME). Pretty plainly, neither *Rust* nor *Grove City College* purported to reimagine the Spending Clause's terms or to rewrite our precedents construing them. [6]

6    The dissent also resorts to a supposed concession. Respondents, the dissent says, concede " 'that Louisiana prison officials must comply with RLUIPA's substantive protections.' " *Post*, at —— (quoting Brief for Respondents 46). But the dissent omits the rest of the sentence, which clarifies that respondents concede only the possibility of "injunctive relief" against them "*in their official capacities*" for RLUIPA violations. Brief for Respondents 46 (emphasis added). And, of course, an "official capacity" suit is "no different from a suit against the State itself." *Printz v. United States*, 521 U.S. 898, 931, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (internal quotation marks omitted). Contrary to the dissent, respondents have clearly maintained all along that they cannot "be held *personally* liable for an alleged RLUIPA violation." Brief for Respondents 46. The dissent is also wrong to suggest that any LDOC official who might be sued in his official capacity can for that reason be sued in his personal capacity. See *post*, at

——. The whole point of an official-capacity suit is that it "is not a suit against the official but rather is a suit against the official's office." *Printz*, 521 U.S. at 930–931, 117 S.Ct. 2365 (internal quotation marks omitted).

### D

Finding our precedents under the Spending Clause unavailing, Mr. Landor and the dissent appeal to ones construing the Necessary and Proper Clause. In *Sabri v. United States*, 541 U.S. 600, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004), we held that Congress's criminal ban on theft, fraud, or bribery against a federal funding recipient, 18 U.S.C. § 666, is a necessary and proper incident to Congress's authority under the Spending Clause. See 541 U.S. at 605–606, 124 S.Ct. 1941; see also *Salinas v. United States*, 522 U.S. 52, 60–61, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). Mr. Landor and the dissent contend this case is no different because personal liability for nonconsenting defendants is likewise a necessary and proper incident to RLUIPA's policy protecting religious exercises. Brief for Petitioner 36–39; *post*, at —— – ——.

Much as the other arguments we have encountered misconceive the Spending Clause, this one misunderstands the Necessary and Proper Clause. The latter provision authorizes Congress to employ "necessary and proper" means for "carrying into Execution" its other enumerated powers. Art. I, § 8, cl. 18. Put another way, the Clause allows Congress to enact laws "incidental to those powers which are expressly given." *McCulloch v. Maryland*, 4 Wheat. 316, 411, 4 L.Ed. 579 (1819). So the question is not, as Mr. Landor and the dissent would have it, whether a personal-capacity cause of action is incidental to RLUIPA's policy protecting religious exercises. The question, instead, is whether their proposed cause of action is a necessary and proper incident to Congress's constitutionally enumerated power to spend money.

**\*10** With the question correctly framed, the distinction between this case and *Sabri* becomes unmistakable. Section 666 addresses thieves, fraudsters, bribers, and others who threaten to "fritte[r] away in graft" the funds Congress distributes pursuant to the Spending Clause. 541

U.S. at 605, 124 S.Ct. 1941. The thief steals allocated money; the fraudster extracts it under false pretenses; the briber obtains it by greasing palms. "Congress," *Sabri* held, "does not have to sit by and accept the risk" actors of that sort pose to its constitutionally enumerated spending power. *Ibid.* Instead, as a necessary and proper incident to that power, Congress may punish people who seek to sap federal funds from their intended beneficiaries. See *ibid*. And Congress may do so, *Sabri* concluded, even where not every misappropriated dollar may be " 'traceabl[e]' " to " 'specific federal payments.' " *United States v. Comstock*, 560 U.S. 126, 147, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (quoting *Sabri*, 541 U.S. at 605–606, 124 S.Ct. 1941).

Nothing similar can be said for the cause of action Mr. Landor and the dissent propose. Suits against nonconsenting parties, like the individual officers here, might advance RLUIPA's laudable policy of protecting religious exercises. But they do not safeguard from graft the federal funds Congress distributes pursuant to its spending power. Recognizing as much, seemingly every Court of Appeals to address the question has concluded that *Sabri* does not begin to command the result Mr. Landor and the dissent seek. See *Tripathy v. McKoy*, 103 F.4th 106, 115 (CA2 2024) ("*Sabri* is easily distinguishable"); *Sharp v. Johnson*, 669 F.3d 144, 155, n. 15 (CA3 2012) ("*Sabri* is inapposite"); *Haight v. Thompson*, 763 F.3d 554, 570 (CA6 2014) ("RLUIPA is nothing like the *Sabri* statute"); *Barnett v. Short*, 129 F.4th 534, 543 (CA8 2025) ("*Sabri* "is too dissimilar"); *Wood v. Yordy*, 753 F.3d 899, 903 (CA9 2014) (reliance on *Sabri* is "not ... sensible").

Nor, with *Sabri* out of the picture, can Mr. Landor and the dissent explain how their proposed cause of action would help "carr[y] into execution" Congress's enumerated power to spend money. *McCulloch*, 4 Wheat. at 434. In truth, they don't even try. Instead, they suggest, the Necessary and Proper Clause ought to be elastic enough to allow the "extraction of money damages" from virtually anyone who violates virtually any condition found in Spending Clause legislation. *Post*, at —— – ——, ——. But while the Necessary and Proper Clause may allow Congress to enact

provisions actually incidental to its spending power, like those protecting federal money against graft, it does not tolerate outcomes that would "undermine the structure of [the federal] government established by the Constitution." *Sebelius*, 567 U.S. at 559, 132 S.Ct. 2566 (opinion of ROBERTS, C. J.). Nor does the Clause tolerate results that would "violat[e] the principle of state sovereignty." *Printz v. United States*, 521 U.S. 898, 924, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). And adopting the expansive approach Mr. Landor and the dissent propose would require us to violate both rules.

Just consider what they would have us say. On their view, Congress may evade the consent requirement inherent in its Spending Clause authority simply by invoking the Necessary and Proper Clause. *Post*, at —— – ——. With even a modest federal expenditure somewhere nearby, Congress could then proceed to regulate directly the conduct of countless nonconsenting individuals—not just the individual officers here, but also others like the coaches and physicians we discussed above. See Part III–C, *supra*. Congress could regulate directly, too, in innumerable spheres, including ones traditionally reserved to the States. Really, under Mr. Landor's and the dissent's logic, we would be "hard pressed to posit any activity ... that Congress [would be] without power to regulate." *United States v. Lopez*, 514 U.S. 549, 564, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). And as inconsistent as all that is with both principles of state sovereignty and a federal government of limited and enumerated regulatory powers, it hardly represents a "*proper* means for carrying into [e]xecution" Congress's spending power. *Sebelius*, 567 U.S. at 559, 132 S.Ct. 2566 (opinion of ROBERTS, C. J.) (internal quotation marks and some alterations omitted).

\*

 **\*11** Under the Spending Clause, Congress's power to spend money does not include the power to regulate. Spending Clause statutes can bind only those who voluntarily and knowingly undertake obligations by agreement with the federal government. Because that essential element is missing here, we affirm the judgment of the Fifth Circuit.

*It is so ordered.*

Justice JACKSON, with whom Justice SOTOMAYOR and Justice KAGAN join, dissenting.

Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to ensure that state and local prisons respect prisoners' right to religious exercise. Congress might have opted to accomplish this through contracts with the prisons it funds. Instead, it passed a law.

RLUIPA requires state and local prisons that accept federal funding to accommodate prisoners' religious exercise more generously than the Constitution mandates. Like many, this law comes with an enforcement mechanism: To ensure compliance, RLUIPA authorizes an impacted prisoner to sue any prison employee who violates the statute. Such suits, the statute provides, may proceed against the employee in the employee's individual capacity and may yield "appropriate relief." 42 U.S.C. §§ 2000cc–2(a), 2000cc–5(4)(A).

Neither respondents nor the Court contests Congress's power to impose RLUIPA's substantive directive accommodating religious freedom. The majority nevertheless adopts the peculiar position that Congress is powerless to create, and a State is powerless to accept, the natural next step: a damages remedy against officials who violate that directive.

This severance of rights and remedies is a sleight of hand; it comes by way of the majority's full-throated endorsement of a contract analogy even though what secures the rights at issue is not a contract but a law. Today's decision magically transforms a federal statute into an invitation to be accepted or declined, deemed binding only if each particular defendant has explicitly agreed to be penalized. No matter that laws, as opposed to contracts, don't ordinarily work this way. The trick here is the majority's effortless conflation of *law making* and *agreement making*—two different sources of binding authority.

The majority's analysis is spellbindingly straightforward: Spending Clause statutes are contracts, and contracts bind only those who consent. *Ante,* at —— – ——. But pulling this rabbit out of the hat requires misconstruing the Spending Clause and the Necessary and Proper Clause, and ignoring decades of precedent affirming Congress's authority to use the power of the purse to govern. In the end, the Court reduces some of Congress's greatest legislative achievements —federal laws that secure civil rights, environmental stability, healthcare, and more—to nothing more than the wheelings-and-dealings of an especially wealthy private party. Because I would not so trivialize a federal statute or the constitutional powers pursuant to which it was passed, I respectfully dissent.

I

It is not often that a real-life incident so clearly illustrates Congress's reasons for adopting legislation, or the Constitution's wisdom in enabling it.

Damon Landor's Rastafarian faith requires him to "let the locks of the hair of his head grow." The Holy Bible, Numbers 6:5 (King James Version). For a Rastafari like Landor, locks are "the physical embodiment of ... spiritual identity and connection to God." See Brief for Rastafari Scholars as *Amici Curiae* 3. Landor preserved this connection—through what is known as the Nazarite Vow—for two decades, allowing his hair to grow to his knees. And he continued for most of a brief stint in Louisiana jails in 2020: At the two facilities that housed Landor for the bulk of his prison time, officials accommodated his vow without incident.

 **\*12**  They did so not just because it was the right thing to do but also because federal law required it. This Court's decision in *Holt v. Hobbs*, 574 U.S. 352, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015), held that RLUIPA mandated an accommodation for prisoners' religiously motivated beards, *id*., at 369–370, 135 S.Ct. 853, and thus strongly suggested that Landor was entitled to a similar accommodation. Even more on point, the Fifth Circuit—which covers Louisiana—had precedent specifically requiring accommodation of the Nazarite Vow. See *Ware v. Louisiana Dept. of Corrections*, 866 F.3d 263 (2017).

Landor knew of *Ware*. He also knew of the threat that jails posed to his hair (and faith) despite it. So when he was transferred to a third jail with three weeks remaining in his sentence, he came prepared. He carried with him a copy—a physical, printed copy—of *Ware*. Upon arrival, Landor presented the case to the intake guard. "Unmoved," the guard "threw Landor's papers in the trash." 82 F.4th 337, 340 (CA5 2023) (case below). The guard summoned the warden, who demanded documentation from Landor's sentencing judge corroborating his religious beliefs. "When Landor couldn't instantly meet that demand, two guards carried him into another room, handcuffed him to a chair, held him down, and shaved his head." *Ibid*.

After serving his time, Landor sued the Louisiana Department of Corrections (LDOC), the jail, the warden, the department's secretary, and John Doe officers 1–10 in their individual and official capacities. In addition to state-law claims, he brought claims under RLUIPA as well as under 42 U.S.C. § 1983 for violations of his First, Eighth, and Fourteenth Amendment rights, seeking both injunctive relief and damages.

Respondents successfully moved to dismiss Landor's complaint. Landor's release from prison, the District Court explained, mooted his bid for injunctive relief. Landor's RLUIPA claim thus remained only by dint of his request for damages against the defendants in their individual capacities. But Fifth Circuit precedent held that RLUIPA does not permit individual-capacity suits. See *Sossamon v. Texas*, 560 F.3d 316, 327–329 (2009). With Landor's remaining claims failing for other reasons not relevant here, the District Court dismissed his complaint.

Landor had federal law on his side. And he did everything he could do in real time to ensure that prison officials knew that. We took this case to address whether Landor can seek money damages from the officials who ignored the law, held him down, and "uncrowned him before God." Brief for Rastafari Scholars as *Amici Curiae* 12.

II

Before us, respondents offer two reasons why Landor cannot obtain damages—one statutory and the other constitutional. First, they posit that RLUIPA's provision for "appropriate relief " against a "person acting under color of State law," 42 U.S.C. §§ 2000cc–2(a), 2000cc–5(4)(A), authorizes only injunctive relief. Second, they assert that, if RLUIPA purports to authorize individual-capacity damages lawsuits against prison officials, Congress will have exceeded the Constitution's limits on its spending power.

The majority addresses only the constitutional argument, giving short shrift to the "well-established principle ... that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Bond v. United States*, 572 U.S. 844, 855, 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014) (internal quotation marks omitted); see *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Spector*

*Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (calling this principle "more deeply rooted than any other in the process of constitutional adjudication"). The majority is of course correct that the practice is prudential, not inexorable. *Ante,* at ——, n. 1. But there is prudence behind a prudential rule. The reasons for this one include "the delicacy" and "comparative finality" "of [the] function" of invalidating a congressional enactment, and "the consideration due to the judgment of other repositories of constitutional power concerning the scope of their authority." *Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 571, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). [1]

[1] I have no quarrel with the premise that a court may prioritize a constitutional question that is "readily resolved by our precedents" and "narrower" than the statutory alternative. *Ante,* at ——, n. 1. But the majority's approach has neither virtue. As I will explain, if our precedents "readily resolv[e]" this case, they do so in Landor's favor. And, while the consequences for RLUIPA are indeed narrower, the consequences for other Spending Clause statutes—not to mention congressional power more generally—are substantial.

**\*13**  So I begin by rejecting respondents' statutory argument. RLUIPA plainly authorizes individual-capacity lawsuits for money damages. We have already interpreted identical language in RLUIPA's sister statute, the Religious Freedom Restoration Act of 1993 (RFRA), to allow for individual-capacity damages lawsuits. See *Tanzin v. Tanvir*, 592 U.S. 43, 141 S.Ct. 486, 208 L.Ed.2d 295 (2020). And RLUIPA's Spending Clause underpinning does not rob the statute's text of its plain meaning. Understanding this is necessary background for Part III, *infra*, my response to the majority's constitutional analysis.

A

RLUIPA is Congress's latest contribution to a long-running religious-liberty dialogue between Congress and this Court. That dialogue began, for our purposes, with *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *Smith* is a seminal case in which the Court held that the First Amendment does not carve out religious exemptions from

neutral and generally applicable laws. *Id.*, at 878–882, 110 S.Ct. 1595. *Smith* "recognized, however, that the political branches could shield religious exercise through legislative accommodation." *Cutter v. Wilkinson*, 544 U.S. 709, 714, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Taking up the invitation, Congress sought to "restore" via statute what *Smith* left unprotected by the Constitution. *Tanzin*, 592 U.S. at 45, 141 S.Ct. 486. The result was RFRA, which forbade States and the Federal Government alike from substantially burdening religious exercise without compelling interest and narrow tailoring. See 42 U.S.C. § 2000bb *et seq*.

Importantly, RFRA was not meant to be merely advisory; like the constitutional rights it sought to imitate, RFRA needed bite. Thus, "RFRA made clear that it was reinstating both the pre-*Smith* substantive protections of the First Amendment *and* the right to vindicate those protections by a claim." *Tanzin*, 592 U.S. at 50, 141 S.Ct. 486. It did so by authorizing "appropriate relief" for violations of its terms. § 2000bb–1(c).

As enacted, RFRA applied to State and Federal Governments and their officials. *Tanzin*, 592 U.S. at 50, 141 S.Ct. 486. But RFRA's application to States and state officials was short lived: This Court would soon invalidate RFRA's application to the States as exceeding Congress's power under Section 5 of the Fourteenth Amendment. See *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

Partially rebuffed, Congress tried again, enacting RLUIPA, 42 U.S.C. § 2000cc *et seq*. In contrast to RFRA's "sweeping" scope, RLUIPA focused in narrowly on two discrete "areas of state and local action" in which Congress thought religious freedom faced particular threat: land-use regulation and institutionalized persons. *Sossamon v. Texas*, 563 U.S. 277, 281, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011).

Other than the narrower coverage, RLUIPA practically mirrors RFRA, its "sister statute." *Ramirez v. Collier*, 595 U.S. 411, 424, 142 S.Ct. 1264, 212 L.Ed.2d 262 (2022). Like RFRA, RLUIPA aims to "secure redress" for "undue

barriers" to religious exercise. 🚩*Cutter*, 544 U.S. at 716–717, 125 S.Ct. 2113. Like RFRA, RLUIPA features "an express private cause of action" (indeed, one "that is taken from RFRA"). 🚩*Sossamon*, 563 U.S. at 282, 131 S.Ct. 1651. And like RFRA's, RLUIPA's express cause of action allows "[a] person" who suffers a violation of the statute to "assert" the violation "as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 🚩§§ 2000cc–2(a), 🚩2000bb–1(c).

Though neither statute elaborates on *what* a plaintiff can get, both specify *from whom* they can get it. Neither statute, that is, defines "appropriate relief." But both define "government" to mean, among other things, an "official" of the relevant sovereign and any "other person acting under color of" the relevant sovereign's law. 🚩§§ 2000cc–5(4)(A), 🚩2000bb–2(1). Thus, like RFRA, RLUIPA creates "a claim" for "appropriate relief against" an "official" or "other person acting under color of" law. 🚩§§ 2000cc–2(a), 🚩2000cc–5(4)(A), 🚩2000bb–1(c), 🚩2000bb–2(1).

### B

**\*14** As a matter of text, the question whether RLUIPA authorizes a claim for money damages is controlled by a unanimous holding this Court issued just six Terms ago. In 🚩*Tanzin*, 592 U.S. 43, 141 S.Ct. 486, 208 L.Ed.2d 295, we held that RFRA's materially identical terms authorize a damages claim. Our analysis was straightforward. First, we ascertained the *who*. We identified the potential defendants in a RFRA lawsuit, asking whether "injured parties can sue Government officials in their personal capacities." 🚩*Id.*, at 47, 141 S.Ct. 486. And to that question, we said that "RFRA's text provides a clear answer: They can." 🚩*Ibid.* RFRA authorizes lawsuits not just against a "government" as colloquially understood, but also against government "official[s]" and "other person[s] acting under color of law." 🚩§§ 2000bb–1(c), 🚩2000bb–2(1). This language, we noted, echoes "one of the most well-known civil rights statutes: 🚩42 U.S.C. § 1983," which authorizes individual-capacity lawsuits against " 'person[s]' " acting " 'under color of any statute.' " 🚩*Tanzin*, 592 U.S. at 48, 141 S.Ct. 486.

With that answer in hand, we had no trouble discerning the *what*: "what 'appropriate relief ' entails." 🚩*Ibid.* We acknowledged that the term is " 'open-ended' " and " 'inherently context dependent.' " 🚩*Id.*, at 49, 141 S.Ct. 486 (quoting 🚩*Sossamon*, 563 U.S. at 286, 131 S.Ct. 1651). But given the *who*, the term had an obvious meaning: "In the context of suits against Government officials, damages have long been awarded as appropriate relief." 🚩*Tanzin,* 592 U.S. at 49, 141 S.Ct. 486.

So too here. Indeed, 🚩*Tanzin*'s reasoning applies with even more force to RLUIPA. RLUIPA's prison context redoubles 🚩*Tanzin*'s observation that damages will often be not only an appropriate form of relief but "the *only* form of relief " available. 🚩*Id.*, at 51, 141 S.Ct. 486. The Prison Litigation Reform Act's exhaustion requirement and strict limitations on injunctive relief in prisons, coupled with States' ability to transfer prisoners and thereby moot claims for injunctive relief, mean that withholding a damages remedy will often leave prisoners with no remedy at all.[2]

[2]     See Brief for Rights Behind Bars et al. as *Amici Curiae*; Brief for the National Police Accountability Project as *Amicus Curiae* 17–21. Congress was aware of the interaction between the Prison Litigation Reform Act (PLRA) and RLUIPA, as it expressly preserved the PLRA in RLUIPA. See 🚩42 U.S.C. § 2000cc–2(e).

Accordingly, if RFRA's text authorizes individual-capacity lawsuits for money damages, RLUIPA's must do so as well.

### C

It is true, though, that while the relevant statutory text is the same, the two statutes' fonts of power are not. It is on this observation that respondents rest their statutory argument. Unlike RFRA, RLUIPA relies on (as relevant here) the Spending Clause. Any divergence between the statutes' meanings, then, would have to come not from text but from constitutional inference—something particular to the Spending Clause compelling us *not* to adopt the same reading of that same statutory language. When interpreting Spending Clause legislation, we have used a contract analogy to require that Congress express its intent to impose conditions on

the receipt of federal funds "unambiguously." 🚩*Barnes v. Gorman*, 536 U.S. 181, 186, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) (internal quotation marks omitted). Under our precedent, this is where contract-law principles should come into play—not as a substantive limitation on Congress's power (as the majority uses it today) but as a demand for statutory clarity.

But RLUIPA's authorization of an individual-capacity damages remedy is unambiguous for Spending Clause purposes. Our cases foreclose any argument to the contrary. Eight years before Congress passed RLUIPA, we considered the remedies available under Title IX, another Spending Clause statute—but one far less clear about remedies. See 🚩*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 64–65, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Where RLUIPA is strident, Title IX is coy: That statute has *no* express private right of action and, accordingly, *no* relevant remedial language. 🚩*Id.*, at 65–66, 71, 112 S.Ct. 1028. Yet we still concluded that it authorized damages. We explained that, even absent explicit statutory language, "we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." 🚩*Id.*, at 66, 112 S.Ct. 1028. And we flatly rejected the notion "that the normal presumption in favor of all appropriate remedies"—including damages—"should not apply because Title IX was enacted pursuant to Congress' Spending Clause power." 🚩*Id.*, at 74, 112 S.Ct. 1028; see also 🚩*id.*, at 69, 112 S.Ct. 1028 (explaining that the available "appropriate relief " encompassed damages). [3]

[3] 🚩*Franklin* is not alone in suggesting that monetary damages are "appropriate relief " for the violation of a spending statute. Take, for example, 🚩*Barnes v. Gorman*, 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). There we observed that, because of the contract analogy, "a remedy is 'appropriate relief ' " under a spending statute "only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature." 🚩*Id.*, at 187, 122 S.Ct. 2097. But we went on to explain that "[a] funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those

remedies traditionally available in suits for breach of contract"—including "compensatory damages." 🚩*Ibid.*

**\*15**   Against 🚩*Franklin*, respondents point to 🚩*Sossamon*. But 🚩*Sossamon* cannot bear anything close to the weight respondents place on it. There, we held that the same RLUIPA provision at issue today does not authorize damages in one very particular context, one with a different *who*: "where the defendant is a sovereign." 🚩*Sossamon*, 563 U.S. at 286, 131 S.Ct. 1651. Sovereigns enjoy sovereign immunity, and "[t]he essence of sovereign immunity ... is that remedies against the government differ from 'general remedies principles' applicable to private litigants." 🚩*Id.*, at 291, n. 8, 131 S.Ct. 1651. We did not question the obvious meaning of "appropriate relief " in lawsuits against individuals. See 🚩*ibid.* [4]

[4] 🚩*Sossamon* thus teaches that the term "appropriate relief " is " 'inherently context dependent.' " 🚩*Tanzin*, 592 U.S. at 49, 141 S.Ct. 486 (quoting 🚩*Sossamon*, 563 U.S. at 286, 131 S.Ct. 1651). And the relevant lesson from 🚩*Tanzin* is that, in the context of a suit against an individual, "appropriate relief " plainly includes monetary damages. 🚩592 U.S. at 49, 141 S.Ct. 486. Indeed, it can hardly mean anything else; as damages often are not available in official-capacity lawsuits, the prospect of damages is *the* reason to sue officers individually. See, *e.g.*, 🚩*Hafer v. Melo*, 502 U.S. 21, 25, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Thus 🚩*Tanzin* (interpreting RFRA) disposed easily of 🚩*Sossamon* (interpreting RLUIPA), invoking not the different congressional powers involved but the different defendants sued. See 🚩592 U.S. at 51–52, 141 S.Ct. 486 ("🚩*Sossamon* held that a State's acceptance of federal funding did not waive sovereign immunity to suits for damages under a related statute—[RLUIPA]—which also permits 'appropriate relief.' The obvious difference is that

this case features a suit against individuals, who do not enjoy sovereign immunity" (citation omitted)).

In short, RLUIPA leaves no need to "wonder ... what sort of penalties might be on the table" for a violation of its terms. *Cummings v. Premier Rehab Keller*, 596 U.S. 212, 220, 142 S.Ct. 1562, 212 L.Ed.2d 552 (2022). Like RFRA, RLUIPA "reinstat[ed] both the pre-*Smith* substantive protections of the First Amendment *and* the right to vindicate those protections by a claim," *Tanzin*, 592 U.S. at 50, 141 S.Ct. 486—with an individual damages remedy where appropriate. [5]

[5]    Because our Spending Clause precedent requires Congress to translate its intent unambiguously into the statute, I do not rely heavily on RLUIPA's legislative history. But make no mistake: Congress indisputably intended RLUIPA to authorize individual-capacity lawsuits for money damages. See, *e.g*., H. R. Rep. No. 106–219, p. 29 (1999) (RLUIPA "track[s] RFRA, creating a private cause of action for damages, injunction, and declaratory judgment"); 146 Cong. Rec. 19123 (2000) (statement of Rep. Canady) (same); Religious Liberty: Hearing before the Senate Committee on the Judiciary, 106th Cong., 1st Sess., p. 91 (1999) (statement of Douglas Laycock) ("Appropriate relief includes declaratory judgments, injunctions, and damages").

### III

At long last, I arrive where today's majority starts. On the majority's view, no matter how clearly Congress speaks, all that matters is the response it elicits: Spending Clause legislation may not make anybody liable without their express consent. And because prison officials (as opposed to their state-prison employers) have not directly accepted federal funds, they have not consented to being sanctioned for their failure to follow federal law. *Ante,* at —— – ——.

The majority's reasoning requires it to diminish two congressional powers and contort many more precedents of this Court. Stated simply, the Spending Clause contains no direct-consent requirement. The power it grants Congress "is of course not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). But neither

is it so cramped as the majority imagines. Most important, it is a power to *legislate*, not merely to *negotiate*. And if the Spending Clause falls short, the Necessary and Proper Clause supplies the additional power Congress needs to bind prison officials—state agents whose compliance is critical to RLUIPA's effective implementation.

### A

**\*16** The Spending Clause is embedded within Congress's first enumerated power. It gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U. S. Const., Art. I, § 8, cl. 1.

The authority to spend money for the "general Welfare" naturally includes the power to determine the general welfare and to ensure that expenditures further it. See, *e.g*., *Helvering v. Davis*, 301 U.S. 619, 645, 57 S.Ct. 904, 81 L.Ed. 1307 (1937). Thus, "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings*, 596 U.S. at 216, 142 S.Ct. 1562. To exercise that spending power, Congress passes laws conditioning federal funding on compliance.

The product is, of course, federal law like any other—enacted via bicameralism and presentment, and constituting "the supreme Law of the Land." U. S. Const., Art. VI, cl. 2; see *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015); *Health and Hospital Corporation of Marion Cty. v. Talevski*, 599 U.S. 166, 171–172, 143 S.Ct. 1444, 216 L.Ed.2d 183 (2023). And such law may further not only Congress's other enumerated powers but also ends otherwise beyond Congress's reach. See *United States v. Butler*, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936).

For decades, the Court has used a consistent yardstick to measure the constitutionality of Spending Clause legislation. We crystallized that metric in *Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171. Funding conditions in laws enacted pursuant to the Spending Clause must be in pursuit of the general welfare; unambiguously expressed; related to the federal interest; and not in violation of other constitutional

Case 6:25-cv-00056-H    Document 129-3    Filed 07/02/26    Page 18 of 25    PageID 1461

provisions. ⚑*Id.*, at 207–208, 107 S.Ct. 2793. The "financial inducement offered by Congress" also may not be "so coercive as to pass the point at which 'pressure turns into compulsion.' " ⚑*Id.*, at 211, 107 S.Ct. 2793.

When Congress "exercise[s] its Spending Power," we have long understood, "⚑*Dole* provides the appropriate framework for assessing ... constitutionality." ⚑*United States v. American Library Assn., Inc.*, 539 U.S. 194, 203, n. 2, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (opinion of Rehnquist, C. J.). But neither respondents nor the majority attempts to invalidate RLUIPA under any of ⚑*Dole*'s prongs. Instead, they devise a new one: Spending Clause legislation can make liable only those who have directly and expressly consented to be made liable. See *ante,* at ——.

This new rule starts from a kernel of truth. Spending Clause legislation does not take effect of its own accord. It requires a funding recipient to accept funds, and thereby to consent to the accompanying conditions. In this way, spending legislation differs from other federal law, which may command without offering.

From that kernel, though, the majority sprouts a dramatic innovation. The conditions prescribed in Spending Clause legislation, the majority insists, may not bind anybody but the funding recipient itself, no matter the recipient's relationship to the nonrecipient (*i.e.*, sovereign, employer, or, as here, both), and no matter how essential the conditions are to Congress's spending program.

### B

This novel consent requirement discards decades of Spending Clause and Necessary and Proper Clause precedent. This Court has upheld spending statutes that make RLUIPA look modest in its reach.

**\*17** Recall that the individuals RLUIPA exposes to liability are state prison officials. These are agents of the State who voluntarily seek the State's employ and wield its power. The State—the funding recipient—thus exercises authority over them in two ways. As their employer, the State can place conditions on their employment. And as a sovereign, the State can govern their behavior. Under our precedents, either should have sufficed. With both, this is an easy case.

Start with ⚑*Dole* itself. ⚑*Dole* upheld a federal law conditioning highway funding on States raising the legal age for purchasing or publicly possessing alcohol—that is, on States forbidding a category of behavior for young adults. ⚑483 U.S. at 205, 107 S.Ct. 2793. Underage drinkers are not the Federal Government's contracting partners. Cf. ⚑*id.*, at 218, 107 S.Ct. 2793 (O'Connor, J., dissenting) (arguing that the law was unconstitutional because it was not "a condition determining how federal highway money shall be expended" but rather "a regulation determining who shall be able to drink liquor"). But we held that Congress could nonetheless use its spending power to regulate their drinking habits in this fashion.

Thus, one need look no further than this Court's most canonical Spending Clause case to cast doubt on the majority's insistence on individual consent. "If South Dakota can agree to criminalize the behavior of its 19-year-old bourbon enthusiasts, it's unclear why Louisiana cannot agree to make its prison officials liable for forcibly shaving Damon Landor's head." 93 F.4th 259, 265 (CA5 2024) (Oldham, J., dissenting from denial of rehearing en banc). [6]

---

[6] See also ⚑*Haight v. Thompson*, 763 F.3d 554, 570 (CA6 2014) (Sutton, J.) (pointing out that the position the majority embraces today "is not consistent with ⚑*Dole*" or multiple other precedents of this Court).

The majority maintains that this is not ⚑*Dole*. RLUIPA is different, the majority says, because Congress has bound individual prison officials *directly* whereas the federal law in ⚑*Dole* did not act directly upon nonrecipients. Instead, that law "influence[d] a State's legislative choices," causing *the State* to regulate young drinkers. ⚑*New York v. United States*, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (discussing ⚑*Dole*); *ante,* at ——, n. 5. But that distinction makes no relevant difference. Either way, Congress has used its spending power to regulate individuals without their express consent. In ⚑*Dole*, the State exposed the individual to liability in exchange for federal funds. So too here.

Regardless, in subsequent cases, we have not been squeamish about recognizing Congress's authority to regulate nonrecipients directly in service of protecting "the integrity and proper operation of the federal program." 🚩*Salinas v. United States*, 522 U.S. 52, 61, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). In 🚩*Salinas*, for instance, we harbored "no serious doubt about the constitutionality" of an anti-bribery statute that regulated individuals situated identically to the prison officials here—*i.e.*, "state and local officials employed by agencies receiving federal funds." See 🚩*id.*, at 58, 60, 118 S.Ct. 469. (🚩*Salinas* thus checked both the "employer" and "sovereign" boxes.) And in 🚩*Sabri v. United States*, 541 U.S. 600, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004), we went further still, explaining that the Spending Clause, buttressed by the Necessary and Proper Clause, empowered Congress to criminalize private individuals' bribery of state and local officials employed by entities receiving federal funds, see 🚩*id.*, at 605, 124 S.Ct. 1941. The private individuals were complete strangers to the funding relationship between the Federal Government and the funded entities. No matter. Congress, we explained, can "bring federal power to bear directly on individuals" where necessary "to see to it that taxpayer dollars appropriated under [the Spending Clause] are in fact spent for the general welfare." 🚩*Id.*, at 605, 608, 124 S.Ct. 1941. [7]

---

[7]     Our statutory-interpretation cases teach the same lesson. Take 🚩*Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), where we held that Title IX—a Spending Clause statute forbidding sex discrimination by recipients of federal funds—regulates a college that "accepts no direct [federal] assistance but enrolls students who receive federal grants," 🚩*id.*, at 558, 104 S.Ct. 1211. We reasoned that the language of the statute "contain[ed] no hint that Congress perceived a substantive difference between direct institutional assistance and aid received by a school through its students." 🚩*Id.*, at 564, 104 S.Ct. 1211; see also 🚩*National Collegiate Athletic Assn. v. Smith*, 525 U.S. 459, 468, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999) ("Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of

Title IX"). We never suggested, much less held, that such a statutory scheme raised constitutional concerns. In fact, the college, lacking the gumption of today's Court, argued only that Congress *had not* bound indirect recipients through Title IX, not that it *could not*. The more extreme position (the one the majority adopts now) occurred to nobody.

The majority makes hay of the college's subsequent decision to stop welcoming students who received federal financial aid and therefore to escape Title IX. *Ante,* at —— – ——. Of course, this same option is available to prison officials, who may likewise "exit the federal [funding] progra[m]" by seeking alternative employment. *Ante,* at —— (internal quotation marks omitted).

 **\*18**  So it is not I but the majority that jettisons "a long line of this Court's precedents." *Ante,* at ——. We have lived for decades in a world in which Congress has been able to use its spending power to reach beyond direct recipients of federal funds. And it has done so repeatedly. In the Federal Nursing Home Reform Act, for instance, Congress authorized civil penalties against individual employees of federally funded nursing homes who falsify resident assessments. See 🚩42 U.S.C. § 1396r(b)(3)(B)(ii). In the Emergency Medical Treatment and Active Labor Act, Congress authorized civil penalties against doctors in federally funded hospitals who negligently violate the law's requirements. See 🚩42 U.S.C. § 1395dd(d)(1)(B). And in Title X of the Public Health Service Act, Congress authorized fines and imprisonment for state officers and employees who coerce abortion or sterilization by threatening the loss of federally funded benefits. See 42 U.S.C. § 300a–8.

These are important measures, for obvious reasons. They are also required if these laws' intended ends are to be accomplished, for a "State can act only through its officials," and an institution only through its employees. 🚩⚠️*Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 114, n. 25, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); cf. 🚩*Printz v. United States*, 521 U.S. 898, 931, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("To say that the Federal Government cannot control the State, but can control all of its officers, is to say nothing of significance"). Congress reasonably seeks to ensure compliance with its directives by giving individual actors imbued with state authority a personal stake in the matter. Nothing in the Constitution

prevents Congress from designing Spending Clause statutes in this fashion.

C

That should spell the end of this dispute. The Spending Clause has no strict direct-consent-to-liability requirement, and respondents offer no reason to think RLUIPA fails the traditional *Dole* test. But Congress has still more reservoirs of power from which to draw. The Necessary and Proper Clause "empowers Congress to enact laws in effectuation of its enumerated powers"—including the spending power —"that are not within its authority to enact in isolation." *Gonzales v. Raich*, 545 U.S. 1, 39, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (Scalia, J., concurring in judgment); see *Sabri*, 541 U.S. at 605, 124 S.Ct. 1941. Should RLUIPA's individual-capacity remedy require more power than the Spending Clause provides, the Necessary and Proper Clause supplies it.

This conclusion flows from a concession respondents make without reservation: "[T]here is no dispute that Louisiana prison officials must comply with RLUIPA's substantive protections." Brief for Respondents 46. Respondents, in other words, do not place prison officials beyond RLUIPA's substantive reach; accepting that RLUIPA imposes a duty on prison officials, they just seek to "exempt" those officials "from any of its liability provisions." *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42, 62, 144 S.Ct. 457, 217 L.Ed.2d 361 (2024).

There is "no proper place in our jurisprudence" for this "wholly artificial" distinction. *Ibid.* (internal quotation marks omitted). [8] The Necessary and Proper Clause makes sure of it. That Clause enables "Congress to provide, by suitable penalties, for the enforcement of all legislation necessary or proper to the execution of powers with which it is intrusted." *United States v. Fox*, 95 U.S. 670, 672, 24 L.Ed. 538 (1878). So where an enumerated power enables Congress to prescribe rules, the Necessary and Proper Clause empowers Congress to "give those rules force by imposing consequences on [those] who disobey them." *United States v. Kebodeaux*, 570 U.S. 387, 400, 133 S.Ct. 2496, 186 L.Ed.2d 540 (2013) (ROBERTS, C. J., concurring in judgment); *McCulloch v. Maryland*, 4 Wheat. 316, 416, 4 L.Ed. 579

(1819) (attributing to the Necessary and Proper Clause the government's ability to "punish any violation of its laws");

*Ex parte Yarbrough*, 110 U.S. 651, 658–659, 4 S.Ct. 152, 28 L.Ed. 274 (1884). That is all RLUIPA's cause of action does. It authorizes the extraction of money damages for behavior Congress concededly may proscribe.

8    What two years ago was "wholly artificial" today becomes the crux of the majority's decision, which depends entirely on divorcing law from liability, right from remedy. See, *e.g., ante,* at —— – ——, and n. 6 (distinguishing precedents of this Court and respondents' concession on the grounds that they "did not involve an attempt to impose personal liability").

**\*19** Notably, the majority does not contest the premise that Louisiana's prison officials must abide by RLUIPA. And it admits, as it must, that a court may order prison officials in their official capacities to comply with RLUIPA. See *ante,* at ——, n. 6. But this leaves the majority in an odd spot. In the majority's view, the prison official's relationship to the State is close enough that "the actions of " the official are "the actions of the [State] itself " such that the official may stand in for the State in litigation, *Brandon v. Holt*, 469 U.S. 464, 472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985), but distant enough that the State's consent to damages liability on the official's behalf means nothing at all. There is no rational basis for that distinction.

Battling uphill, the majority reworks the Necessary and Proper Clause. The majority contends that, rather than allow Congress to enforce *statutes* passed pursuant to other enumerated powers, the Necessary and Proper Clause must facilitate the *enumerated power* itself. *Ante,* at ——. Only if a regulation is "a necessary and proper incident to Congress's constitutionally enumerated power," the majority insists, does the Necessary and Proper Clause justify it. *Ibid.*

This is a deft maneuver but not a successful one, as it diverts our focus to the wrong relationship. "The relevant question is simply whether the means chosen are 'reasonably adapted' to the attainment of *a legitimate end*" sought under an enumerated power, not whether the means chosen are incidental to the power itself. *Gonzales*, 545 U.S. at 37, 125 S.Ct. 2195 (Scalia, J., concurring in judgment) (quoting *United States v. Darby*, 312 U.S. 100, 121, 61 S.Ct. 451, 85 L.Ed. 609 (1941); emphasis added); see also *Kebodeaux*,

570 U.S. at 406, 133 S.Ct. 2496 (Scalia, J., dissenting) ("[W]hat is necessary and proper to enforce a statute validly enacted pursuant to an enumerated power is ... itself necessary and proper to the execution of an enumerated power").

Said otherwise, "we look to see whether the statute constitutes a means that is rationally related to the *implementation* of a constitutionally enumerated power." ⚑*United States v. Comstock*, 560 U.S. 126, 134, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (emphasis added). This is why "the Necessary and Proper Clause ... authorizes Congress, in the implementation of other explicit powers, to create federal crimes, to confine offenders to prison" and more, *Kebodeaux*, 570 U.S. at 394–395, 133 S.Ct. 2496—not because the power to imprison is incidental to the power to, say, regulate commerce, but because the power to imprison gives Congress the ability to " 'make [its] regulation[s] effective,' " ⚑*Gonzales,* 545 U.S. at 36, 125 S.Ct. 2195 (Scalia, J., concurring in judgment) (quoting ⚑*United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942)). [9]

[9]    Even viewed from a first-principles standpoint, the majority's framing makes little sense. The majority gives the Necessary and Proper Clause no independent work to do, rendering it superfluous rather than treating it as the adjunct the Framers envisioned. See, *e.g.*, ⚑*McCulloch v. Maryland*, 4 Wheat. 316, 417, 4 L.Ed. 579 (1819) (commenting that, although "the right to carry the mail, and to punish those who rob it, is not indispensably necessary to" the power " 'to establish post offices and post roads,' " the Necessary and Proper Clause affords Congress the power to take those steps); see also Letter from A. Hamilton to G. Washington, Opinion on the Constitutionality of an Act To Establish a Bank (Feb. 23, 1791), in 8 Papers of Alexander Hamilton 70 (H. Syrett & J. Cooke eds. 1965) ("The clause ... is evidently designed to place on an unequivocal footing the power of the government to employ all the means *fairly relative* to the execution of its specified powers and to the fulfilment of the objects entrusted to its direction").

**\*20**  The majority resorts finally to abstraction, retorting that the Necessary and Proper Clause does not permit Congress to "undermine the structure of [the federal] government established by the Constitution" or "violat[e] the principle of state sovereignty." *Ante,* at —— (alterations in original; internal quotation marks omitted). I do not contest these assertions. It is the Court's application of them here that is baffling, since exposing state officials to damages liability does nothing so dramatic. That state officials might be vulnerable to federally imposed money judgments for unlawful conduct is a common feature of our federal system. See, *e.g.*, ⚑42 U.S.C. § 1983. RLUIPA's imposition of damages liability for state officials comes as no surprise to States or their agents and by no means offends state sovereignty. The State chose to accept the funds with full knowledge of RLUIPA's command, and the officials in turn chose to accept state employment with full knowledge of federal law.

That the Necessary and Proper Clause may extend the reach of the Spending Clause (as we have long recognized) does not, of course, mean that congressional power is unbounded. Contra, *ante,* at ——. But it does mean (as again we have long recognized) that where Congress may require compliance via law it may also secure compliance via imposition of liability, including damages.

IV

I do not doubt that difficult questions about the limits of Congress's spending power exist. But, as I have explained thus far, this case offered no opportunity to resolve them. Respondents seek to limit the Spending Clause in a manner directly contrary to our precedents. And when it comes to enforcement of a concededly proper exercise of congressional power, the Necessary and Proper Clause supplies any authority that the Spending Clause cannot.

Let us, then, step back and examine the origin and consequences of the majority's unprecedented invocation of a "categorical font-of-power condition" limiting Congress's reach under the Spending Clause. ⚑*Talevski*, 599 U.S. at 192, 143 S.Ct. 1444 (rejecting a similar effort). This limitation is not located in the Constitution's text; "[i]t is hard to imagine a broader statement of the scope of Congress's power" than the Spending Clause. E. Chemerinsky, Protecting the Spending Power, 4 Chapman L. Rev. 89, 93 (2001). And it is not in our precedents either—today's Court cannot successfully explain the decisions of yesterday's. Rather, it appears that the seeds of the majority's dramatic weakening of the spending power were first planted some time ago, and are rooted in a loose contract analogy the Court has repeatedly

cautioned against taking as anything more. The majority supercharges that analogy here and now, ensuring that it comes to full flower. This may prove to be a consequential choice.

### A

The contract analogy derives from the insight that Spending Clause legislation requires acceptance of federal funds before it can take hold, making it "much in the nature of a contract." 🚩*Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Until today, we have used that insight in two relatively modest ways, both as interpretive aids. First, the contract analogy gives rise to a clear-notice requirement. See, *e.g.*, 🚩*id.*, at 24–25, 101 S.Ct. 1531; Part II–C, *supra*. Second, the analogy offers background principles to fill in gaps where a statute falls short of the required clarity. See, *e.g.*, 🚩*Cummings*, 596 U.S. at 220, 221, 142 S.Ct. 1562 (explaining that a Spending Clause statute that is "silent as to available remedies" presumptively authorizes "the usual contract remedies" (emphasis deleted)); 🚩*Barnes*, 536 U.S. at 187, 122 S.Ct. 2097 ("A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract").

But even when using the analogy for those purposes, the Court has always viewed it cautiously. We have consistently refused to "imply ... that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise." 🚩*Id.,* at 189, n. 2, 122 S.Ct. 2097; see also 🚩*Sossamon*, 563 U.S. at 290, 131 S.Ct. 1651 (same); 🚩*Cummings*, 596 U.S. at 226, 142 S.Ct. 1562 (declining to "incorporat[e] the law of contract remedies wholesale"). Some Justices have warily accepted the contract analogy in certain contexts while cautioning that it "may fail" elsewhere. 🚩*Barnes*, 536 U.S. at 191, 122 S.Ct. 2097 (Souter, J., concurring). Others have protested its use as "novel." 🚩*Id.*, at 192, 122 S.Ct. 2097 (Stevens, J., concurring in judgment); 🚩*Talevski*, 599 U.S. at 193, 143 S.Ct. 1444 (BARRETT, J., joined by ROBERTS, C. J., concurring). Still others have cast doubt on it as "an imperfect way" to interpret

Spending Clause legislation. 🚩*Cummings*, 596 U.S. at 230, 142 S.Ct. 1562 (KAVANAUGH, J., joined by GORSUCH, J., concurring). In all events, the Court has always rejected the idea—though pressed with vigor in dissent—that Spending Clause legislation "is nothing more than a contractual offer." 🚩*Talevski*, 599 U.S. at 196, 143 S.Ct. 1444 (THOMAS, J., dissenting); see also 🚩*id.*, at 229, 143 S.Ct. 1444 (criticizing the Court for "holding that spending conditions are not merely contractual").

**\*21**  At most, the Court has accepted that Spending Clause legislation has "a contractual aspect" while steadfastly insisting that such laws nonetheless "cannot be viewed in the same manner as a bilateral contract governing a concrete transaction." 🚩*Bennett v. Kentucky Dept. of Ed.*, 470 U.S. 656, 669, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985); accord, B. Fahey, Federalism by Contract, 129 Yale L. J. 2326, 2330 (2020) (noting spending statutes' "dual character" as "both contract-like instruments and public lawmaking instruments"). After all, "[u]nlike normal contractual undertakings," Spending Clause laws are "statut[es] ... expressing the judgment of Congress concerning desirable public policy." 🚩*Bennett*, 470 U.S. at 669, 105 S.Ct. 1544. Having undergone bicameralism and presentment, Spending Clause legislation "is legislation, in the end, not a buy-sell transaction." T. Seligmann, Muddy Waters: The Supreme Court and the Clear Statement Rule for Spending Clause Legislation, 84 Tulane L. Rev. 1067, 1120 (2010).

Today the Court abandons its warranted caution. An interpretive guide becomes a *substantive* limitation on Congress's authority, as the Court takes a step toward embracing what one scholar has criticized as the "strong contract theory": the radical notion that Spending Clause legislation is not just " 'in the nature of ' a contract," but is in fact "*nothing but* a contract." S. Bagenstos, Spending Clause Litigation in the Roberts Court, 58 Duke L. J. 345, 385 (2008) (quoting 🚩*Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531).

Strange as it seems, today's majority appears to mean it. One indication is the majority's concession that "Congress *could have* lawfully imposed personal liability on the individual defendants" *if* it had tweaked RLUIPA to better conform to the Court's understanding of the limits of contract law. *Ante,* at ——. "For example," the majority allows, "Congress could have said that, as a condition of federal funding to

LDOC, its officers had to agree to enter separate contracts with the federal government consenting to answer suits under RLUIPA." *Ibid*. "Or," the majority posits, "Congress might have conditioned its funds on Louisiana's agreement to exercise its own regulatory powers to adopt a state law cause of action enforceable against LDOC officers who violate RLUIPA." *Ibid*. Those arrangements, the majority assures us, would have sufficed for Spending Clause purposes. But the one Congress chose fails because it hews insufficiently to the tenets of binding contractual relationships.

Of course, the arrangement Congress chose is not far off from the "untapped possibilities" the Court prefers. *Ibid*. RLUIPA is no secret. Prison officials know when they sign up to work at a state prison that they must obey the law or face the consequences the law prescribes; this is simply "a consequence of their decision to accept employment." 🚩⚠️*Rust v. Sullivan*, 500 U.S. 173, 199, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); Brief for Former Correctional Officials as *Amici Curiae* 13–16. What meaningful difference would it make to have them sign a contract attesting to that knowledge? [10] Similarly, it makes no meaningful difference for Congress to require a State to flex its own legislative power to bind state officials rather than allow the Federal Government to make state officials liable directly, as federal law so often does. The majority, in other words, deals in form, not substance.

[10]    Such attestation would likely be unnecessary even if this were a true contract case. Under the doctrine of implied consent, courts may recognize an agreement "which, although not embodied in an express contract, is inferred ... from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923). "[A] reasonably competent public official should know the law governing his conduct." 🚩*Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see also 🚩*Heckler v. Community Health Services of Crawford Cty., Inc.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (noting "the general rule that those who deal with the Government," and especially "those who seek public funds," "are expected to know the law"). And prison officials

manifest their assent to RLUIPA by showing up to work each day.

**\*22**  The emptiness of the majority's formalism is further illustrated by the parade of horribles it trots out. The majority warns that, if RLUIPA's individual-capacity damages provision is constitutional, Congress could subject college coaches to liability if they refuse "to permit transgender athletes to play women's sports," or make doctors personally liable if they "administe[r] certain vaccines to children." *Ante,* at ——. What the majority intends by these examples is not clear. Congress could of course impose these conditions on the colleges and medical practices themselves, assuming they receive federal funds and the laws are otherwise constitutional and not coercive. [11] Congress's reach thus remains the same either way; all that changes is whether noncompliant coaches and doctors lose their jobs (in the majority's world) or become liable in damages (in Congress's, and therefore mine).

[11]    A Title IX case currently pending before us asks whether Congress imposed the majority's first "hypothetical" condition on federally funded educational institutions. See *West Virginia* v. *B. P. J.*, No. 24–43.

So the Court's ruling apparently boils down to dissatisfaction with the precise way Congress structured RLUIPA. Such hairsplitting undervalues Congress's lawmaking prerogative; we ought not substitute our rigid contract-based preferences for Congress's considered statutory design. "Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. R. Co. v. May*, 194 U.S. 267, 270, 24 S.Ct. 638, 48 L.Ed. 971 (1904). Taking this wisdom to heart, the Court usually exhibits a well-founded "reticence to invalidate the acts of the Nation's elected leaders." 🚩⚠️*National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 537–538, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (opinion of ROBERTS, C. J.). In my view, an ill-formed analogy to contract law is a regrettable basis on which to turn reticence into enthusiasm.

### B

Ultimately, I fear that the majority has now conjured an apparition to replace a once-efficacious vision of Congress's spending power—a constitutional grant of authority that is

central to the design and functioning of our federal system. History demonstrates that power's significance.

Under the Articles of Confederation, the power to tax remained with the States. See Art. VIII; see also Art. II. This arrangement left the Federal Government largely dependent upon the States, eager for their cooperation but struggling to secure it. D. Spencer, Sanctuary Cities and the Power of the Purse: An Executive *Dole* Test, 106 Iowa L. Rev. 1209, 1218 (2021). Thus, one major motivation for the new Constitution was to give the Federal Government the tools "to better incentivize states to work collectively for the good of the entire Union." *Ibid.* Granting Congress the power to tax allowed the Federal Government to amass the resources it needed to dangle those incentives. And granting Congress the power to spend allowed the Federal Government to follow through.

Follow through it has. We owe to the Spending Clause, for example, Title VI of the Civil Rights Act of 1964—a law with which "few pieces of federal legislation rank in significance." *Bostock v. Clayton County*, 590 U.S. 644, 649, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020); see *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 308, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023) (GORSUCH, J., concurring). We owe to the Spending Clause, too, the relative cleanliness of our Nation's air, see 42 U.S.C. § 7401 *et seq*. (Clean Air Act), and the relative health of our Nation's populace, 42 U.S.C. § 1395 *et seq*.; § 1396 *et seq*. (Medicare and Medicaid Acts). "Other examples, spanning virtually every domain of national and state policy, abound." *Talevski*, 599 U.S. at 198, 143 S.Ct. 1444 (THOMAS, J., dissenting).

While today's decision does not endanger those laws directly, the majority's reasoning casts a shadow that will not easily be escaped. No one knows what changes lie at the end of a strict contract-law construction of the spending power. But, as Members of this Court have long recognized, importing contract principles wholesale could have "potentially far-reaching consequences." *Barnes*, 536 U.S. at 192, 122 S.Ct. 2097 (Stevens, J., concurring in judgment).

**\*23** Indeed, it is our rejection of the strict contract analogy that renders Spending Clause rights enforceable under § 1983. See *Talevski*, 599 U.S. at 229, 143 S.Ct. 1444

(THOMAS, J., dissenting); accord, D. Engdahl, The Contract Thesis of the Federal Spending Power, 52 S. D. L. Rev. 496, 510 (2007). Similarly, contracts presumably may not preempt state law, yet Spending Clause legislation can do so. See, *e.g.*, *Dalton v. Little Rock Family Planning Services*, 516 U.S. 474, 476, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996) (*per curiam*); *Bennett v. Arkansas*, 485 U.S. 395, 396, 108 S.Ct. 1204, 99 L.Ed.2d 455 (1988) (*per curiam*); *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 417, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973); *Townsend v. Swank*, 404 U.S. 282, 286, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971). And Congress likely could not hitch its Necessary and Proper power to a mere contract, either, see Engdahl, 52 S. D. L. Rev., at 532, but we have blessed just this cocktail of enumerated powers, see *Sabri*, 541 U.S. at 605, 124 S.Ct. 1941.

This means that today's decision might well land a serious blow to Congress's effectiveness. Or it could end up merely a bothersome statutory drafting guide: If Congress adapts its Spending Clause legislation to fit the Court's newly prescribed formulas—and if the Court lets it do so—then the majority's robotic importation of contract principles will have little real-world effect. Either way, though, "[t]he suggestion that [Spending Clause] statutes are not 'law' on the same level as other pieces of legislation makes little sense." See A. Gluck, Our [National] Federalism, 123 Yale L. J. 1996, 2031 (2014). And it makes even less sense of the jurisprudence that has developed for decades around those laws, to the great benefit of the American people.

As for RLUIPA itself, the consequences are more predictable. Prisoners like Landor who suffer violations of their religious freedom in state prisons—no matter how blatant—will often be left remediless. And encroachments on prisoners' statutory rights are likely to happen with fair frequency, as state-empowered prison officials will have little incentive to abide by federal law, even if it is handed to them on a piece of paper.

\* \* \*

When *Sossamon* concluded that RLUIPA did not expose States and their institutions to damages liability, Justice SOTOMAYOR lamented that the Court's holding left RLUIPA plaintiffs "to seek enforcement of [their] rights with one hand tied behind their backs." 563 U.S. at 303, 131 S.Ct. 1651 (dissenting opinion). Today the Court ties the other hand.

Case 6:25-cv-00056-H    Document 129-3    Filed 07/02/26    Page 25 of 25    PageID 1468

To be clear, the Court's decision does not eliminate all damages liability from RLUIPA. See *ante,* at ——, n. 1. A prisoner who happens to be housed in a local rather than state jail may recover damages from the municipality, which neither enjoys sovereign immunity, see *Jinks v. Richland County*, 538 U.S. 456, 466, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003), nor suffers from the indirect-recipient defect the Court identifies, see *Barnett v. Short*, 129 F.4th 534, 542 (CA8 2025). Furthermore, RLUIPA channels the commerce power, rather than the spending power, in some of its applications. See 42 U.S.C. § 2000cc–1(b)(2). So the rare RLUIPA plaintiff who finds a Commerce Clause hook may recover damages, too. See *Tripathy v. McKoy*, 103 F.4th 106, 115, n. 6 (CA2 2024). But Congress did not enact such a patchwork scheme, and the Constitution does not demand it.

Yet the Court imposes such a scheme today. The Court does so by concluding that, even where Congress can legislate under the Spending Clause, it may be left powerless to enforce that legislation in the way it chooses. This development is as new as it is peculiar, and it devalues precedent and congressional authority alike.

**All Citations**

609 U.S. ----, --- S.Ct. ----, 2026 WL 1791277

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.