# EXHIBIT C

--- S.Ct. ----
Only the Westlaw citation is currently available.
Supreme Court of the United States.

Jason WOLFORD, et al., Petitioners
v.
Anne E. LOPEZ, Attorney General of Hawaii

No. 24–1046
|
Argued January 20, 2026
|
Decided June 25, 2026

**Synopsis**
**Background:** Holders of concealed-carry permits and an organizational plaintiff with members who had such permits brought action for injunctive relief against the Attorney General of Hawaiʻi, alleging Hawaiʻi law prohibiting licensed concealed-carry permit holders from carrying handguns on private property open to the public unless the property owner gave express permission was unconstitutional. The United States District Court for the District of Hawaiʻi, Leslie E. Kobayashi, J., 686 F.Supp.3d 1034, granted plaintiffs' motion for a temporary restraining order (TRO) enjoining the enforcement of the law. Attorney General appealed. The United States Court of Appeals for the Ninth Circuit, Graber, Circuit Judge, 116 F.4th 959, reversed, and subsequently the Court of Appeals, 125 F.4th 1230 and 125 F.4th 1246, denied rehearing and rehearing en banc. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:

the restrictions imposed by the Hawaiʻi law fell within plain text of the Second Amendment, and thus, the law was presumptively unconstitutional;

Hawaiʻi's history of antipathy to private possession of firearms and prohibitions on public carry did not show that the law was consistent with right codified by Second Amendment;

Second Amendment has same meaning in all parts of United States, and it cannot give way to "the spirit of Aloha" in Hawaiʻi; abrogating *State v. Wilson*, 154 Hawaiʻi 8, 27, 543 P. 3d 440;

colonial and early state laws prohibiting unauthorized hunting of deer or small game on someone else's private property were not historical analogues that supported the Hawaiʻi law;

Oregon law that prohibited anyone other than an officer on lawful business from being armed or trespassing upon enclosed premises or lands without owner's consent shed little if any light on meaning of the Second Amendment right;

provision of Louisiana's Black Code that provided tool for disarming Black persons had no probative value for purposes of determining whether the Hawaiʻi law was consistent with the right the Second Amendment codified; and

the Hawaiʻi law violates the constitutional right to keep and bear arms.

Reversed and remanded.

Chief Justice Roberts, and Justices Thomas, Gorsuch, Kavanaugh, and Barrett, joined.

Justice Barrett filed a concurring opinion, in which Justices Thomas and Gorsuch joined in part.

Justice Kagan filed a dissenting opinion.

Justice Jackson filed a dissenting opinion, in which Justice Sotomayor joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion for Temporary Restraining Order (TRO).

**West Codenotes**

**Prior Version Recognized as Unconstitutional**
Haw. Rev. Stat. §§ 134-2, 134–9(a)

**Held Unconstitutional**
N.J. Stat. Ann. § 2C:58-4.6(a)(24); Cal. Penal Code § 26230(a)(26); Haw. Rev. Stat. § 134-9.5(a); Md. Code Ann., Crim. Law § 6-411(d); N.Y. Penal Law § 265.01-d(1)

*Syllabus* *

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

***1** For years, the State of Hawaii made it almost impossible to obtain a license to carry a firearm. Four years ago, however, this Court held in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387, that the Second and Fourteenth Amendments protect the right to carry handguns outside the home for self-defense. Hawaii responded by replacing its old law on carry permits with new laws that achieved a similar result. At issue in this case is a Hawaii law that prohibits firearms on private property open to the public without the express and affirmative consent of the property owner. Hawaii's new rule imposes severe restrictions on the daily activities of residents who have satisfied the State's rigorous requirements for the issuance of a carry permit. When these permit holders leave home, not only must they take care to avoid all the territory where the possession of a gun is prohibited outright, but they may also be barred from entering many places that people routinely visit in the course of their daily routines, such as gas stations, restaurants, and stores. This law flips the default rule at common law, under which anyone has an implied license to enter property held open to the public unless the property owner withdraws consent.

In *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637, this Court held that the Second Amendment protects an individual right to keep and bear arms, with the Amendment's "central" concern being the fundamental right of self-defense. *Id.,* at 577, 128 S.Ct. 2783. *Heller* instructed courts to ascertain the scope of the right by looking to history and emphatically rejected an ahistorical "judge-empowering 'interest-balancing inquiry.' " *Id.*, at 634, 128 S.Ct. 2783. The Court later held in *McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894, that the Second Amendment right applies equally to the Federal Government and the States through the Fourteenth Amendment, settling the question whether the Second Amendment embodies a uniform national standard or one that varies from one locale to another.

In *Bruen*, the Court fleshed out the process of historical analysis required in a Second Amendment case, holding that the analysis involves two steps. First, a court must determine whether the challenged law falls within the plain text of the Amendment's language by asking whether the law applies to "the people" (*i.e.*, all members of the political community) and restricts the "keep[ing]" (*i.e.*, possession) or "bear[ing]" (*i.e.*, carrying) of "Arms" (*i.e.*, weapons customarily used for offensive or defensive purposes). If a challenged law falls within the plain text, it is presumptively unconstitutional—which means that it *may* violate the preexisting right that the Amendment codified. But the government may show that its challenged law did not infringe the historical understanding of the codified right. While a variety of sources may aid this inquiry, the best evidence is often what *Bruen* called historical analogues—old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right. *Bruen* identified three important inquiries for evaluating proffered historical analogues: the number of jurisdictions in which they were adopted, the extent to which they were well-accepted, and whether any analogue or collection of analogues is "relevantly similar" to the modern law in terms of "how" and "why" it restricted the keeping or bearing of arms. 597 U.S. at 29, 142 S.Ct. 2111.

***2** Petitioners—three residents of Maui County who possess concealed-carry permits and an organizational plaintiff with members who have such permits—filed suit in federal court seeking temporary and permanent injunctive relief, contending that the law at issue violates their constitutional rights. The District Court enjoined enforcement of the law as applied to private property open to the public, but the Ninth Circuit reversed that injunction.

*Held*: Hawaii's law prohibiting licensed concealed-carry permit holders from carrying handguns on private property open to the public without the property owner's express authorization violates the Second and Fourteenth Amendments. Pp. ——– – ——.

(a) The restrictions imposed by Hawaii's challenged law fall within the plain text of the Second Amendment, so the law is presumptively unconstitutional. No party disputes that petitioners are among "the people" protected by the

Second Amendment or that they seek to "bear" "Arms." Therefore, "the plain text of the Second Amendment protects" what petitioners want to do: carry handguns for self-defense. *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111. To be sure, owners of establishments that are open to the public can admit or exclude persons who are carrying guns for self-defense under either the common-law rule or Hawaii's law. But Hawaii's shift from the common-law rule unquestionably imposes a new and significant burden on the exercise of the right recognized in *Bruen*. For example, proprietors who do not object to entry by carry-permit holders may be reluctant to post welcoming signs for fear of alienating customers. So under Hawaii's new default rule, a proprietor in this category may only be willing to consent discreetly to the entry of permit holders who make the effort to inquire. This arrangement imposes a new burden on permit holders who will have to somehow obtain permission to carry a firearm on the property before stepping foot on it. The law severely hampers the ability of law-abiding citizens to exercise the right *Bruen* recognized as they go about their daily lives. Pp. –––– – ––––.

(b) Hawaii's proffered historical analogues do not support the constitutionality of its new default rule. Pp. –––– – ––––.

(1) Hawaii's argument that its "particular customs and laws," Brief for Respondent 24, support the new default rule fails because the Second Amendment has the same meaning in all parts of the United States. The Second Amendment cannot give way to "the spirit of Aloha" in Hawaii, contra, *State v. Wilson*, 154 Haw. 8, 27, 543 P.3d 440, 459, any more than it can yield to the spirit of the Big Apple (*Bruen*) or the Windy City (*McDonald*). Merely local attitudes can neither shrink nor inflate the meaning of fundamental Bill of Rights guarantees that apply to the States through the Fourteenth Amendment. Pp. –––– – ––––.

(2) The State's colonial and early state law analogues consist almost entirely of laws that prohibited unauthorized hunting of deer or small game on someone else's private property. These laws—including a 1721 Pennsylvania law, 1722 New Jersey statute, 1728 Maryland statute, 1763 New York law, and 1771 New Jersey law—targeted unauthorized hunting and applied to land where game could be found, not retail establishments that residents frequent as part of their daily routines. Those laws had little if any impact on the Second Amendment's central objective of protecting the fundamental right to self-defense, and their obvious aim was to prevent the distinctive harms and risks associated with unauthorized hunting. The gap between the State's anti-poaching analogues and its new rule is too wide. Pp. –––– – ––––.

***3** (3) The State's remaining analogues are even weaker. An 1893 Oregon law prohibited armed trespass on "enclosed premises," but it is unclear whether such premises included commercial establishments open to the public. Regardless, a lone statute adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment sheds little if any light on the meaning of the Second Amendment right.

Hawaii also relies on an 1865 Louisiana statute enacted as part of the notorious Black Codes to disarm blacks and leave them defenseless against attacks. As the Court laid out in *McDonald*, the right to keep and bear arms was crucially important for vulnerable blacks during this period. See 561 U.S. at 757, 771, 776–779, 130 S.Ct. 3020; *id.*, at 843–846, 130 S.Ct. 3020 (THOMAS, J., concurring in part and concurring in judgment). This was well-understood by the Republicans in Congress who were responsible for drafting, approving, and securing the ratification of the Fourteenth Amendment. Against this history, Hawaii's claim that this tainted artifact from Louisiana's Black Code illuminates the original understanding of the right to keep and bear arms cannot be taken seriously. And even setting aside this statute's pedigree, it carries no weight because it was neither widespread nor widely accepted. Pp. –––– – ––––.

116 F.4th 959, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. BARRETT, J., filed a concurring opinion, in which THOMAS and GORSUCH, JJ., joined as to Part II–B. KAGAN, J., filed a dissenting opinion. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

**Attorneys and Law Firms**

Alan A. Beck, San Diego, CA, for Petitioners.

Sarah M. Harris, Principal Deputy Solicitor General, for United States, as amicus curiae, supporting petitioners.

Neal K. Katyal, Washington, DC, for Respondent.

Kevin O'Grady, Attorney at law, Honolulu, HI, Alan Alexander Beck, Counsel of record, Attorney at Law, San Diego, CA, Mark W. Pennak, Maryland Shall Issue, Inc., Baltimore, MD, for Petitioners.

Anne E. Lopez, Kaliko‘onĀlani D. Fernandes, State of Hawai'i, Department of the Attorney, General, Honolulu, HI, Mary B. McCord, Alexandra Lichtenstein, William Powell, Samuel P. Siegel, Institute for Constitutional, Advocacy and Protection, Georgetown Law, Washington, DC, Neal Kumar Katyal, Counsel of Record, Colleen E. Roh Sinzdak, William E. Havemann, Kristina Alekseyeva, Jessica C. Huang, Samantha K.I Lagan, Zois H. Manaris, Milbank LLP, Washington, DC, for Respondent.

**Opinion**

Justice ALITO delivered the opinion of the Court.

For years, the State of Hawaii made it almost impossible to obtain a license to carry a firearm. Four years ago, however, this Court held in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), that the Second and Fourteenth Amendments protect the right to carry handguns outside the home for self-defense. Hawaii responded by replacing its old law on carry permits with new laws that achieved a similar result. On a large portion of the land within the State's boundaries, possession of a firearm is now flatly prohibited. And the law now before us severely burdens the ability to carry a firearm in much of the rest of the State by prohibiting firearms on private property without the express and affirmative consent of the property owner.

This law departs sharply from the standard common-law rule on access to private property held open to the public. Under that rule, *everyone*, including those lawfully carrying firearms, may enter unless expressly prohibited from doing so. By contrast, under the new Hawaii law, *no one* carrying a firearm may enter without the property owner's express authorization. The effect of this new rule is to impose severe restrictions on the daily activities of residents who have satisfied the State's rigorous requirements for the issuance of a carry permit. When these permit holders leave home in the morning, not only must they take care to avoid all the territory where the possession of a gun is prohibited outright, but they may also be barred from entering many places that people routinely visit in the course of their daily routines, such as gas stations, convenience stores, restaurants, coffee shops, drug stores, grocery stores, “big box” stores, home improvement stores, barber shops or hair salons, dry cleaners, and laundromats.

***4** This regime hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives. We hold that the law is unconstitutional.

I

When Hawaii adopted the law now before us, it did so against the backdrop of this Court's Second Amendment decisions, and many of the arguments that the State[1] now advances were addressed in those decisions. We therefore begin with an overview of that body of law.

1 For simplicity, we refer to respondent as “the State.”

A

1

The Second Amendment provides: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” For more than two centuries after the ratification of the Second Amendment, this Court had few occasions to examine its meaning. Such an occasion arose in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

The case was brought by Dick Heller, a resident of the District of Columbia whose story highlighted the reason why the right to keep and bear arms for self-defense was included in the Bill of Rights. *Id.*, at 575, 128 S.Ct. 2783. In light of the exceptionally high rate of violent crime in Washington, D. C.,[2] Heller wanted to keep a firearm in his home to defend himself in case of a burglary or home invasion. *Id.*, at 575–576, 128 S.Ct. 2783. He had all the hallmarks of a citizen who would handle a firearm safely and responsibly. He was a special D. C. police officer who provided security at the Thurgood Marshall Judiciary Building and was authorized

under D. C. law to carry a handgun while on duty. *Ibid*. But the District, which made it virtually impossible for a resident to keep a handgun at home for self-defense, denied his application for a permit. *Ibid*. Unwilling to accept this plight, Heller sued in federal court to vindicate his Second Amendment right. *Ibid*.

2 See, *e.g.*, Brief for Buckeye Firearms Foundation et al. as *Amici Curiae* 8–11, Brief for Criminologists et al. as *Amici Curiae* 6–17, and Brief for Academics as *Amicus Curiae* 5–17, in *District of Columbia* v. *Heller*, O. T. 2007, No. 07–290.

When his case reached this Court, we provided our first thorough exploration of the Second Amendment's meaning. We rejected the argument that the Second Amendment right extends only to members of a state militia and held instead that the Second Amendment, like other provisions of the Bill of Rights, protects an individual right enjoyed by " 'the people.' " *Id*., at 579–581. Our opinion went on to explain the meaning of the Second Amendment's other key terms. The phrase "to keep and bear Arms," we held, signifies what its terms mean in ordinary usage—that is, to "have" and "carry Arms." *Id*., at 583–585. And "Arms," we explained, refers to implements used for offense or defense. *Id*., at 581. We added that handguns, which are "overwhelmingly chosen by American society" for self-defense, fall squarely into this category. *Id*., at 628.

We also identified the Amendment's "central" concern: securing the fundamental right of self-defense. *Id*., at 577, 581, 599, 628, 635. In late 18th century America, the need for firearms for self-defense was acute. There were no police forces, and most Americans lived in rural areas, often in homes located miles from the closest neighbor.[3] If these homes were attacked, the residents were on their own, and their survival might well depend on the availability of a firearm to ward off assailants. In light of this reality, it is not surprising that the right to keep and bear arms was included among the other treasured liberties protected by the Bill of Rights.[4]

3 See, *e.g.*, C. Cramer, Armed in America: The Remarkable Story of How and Why Guns Became as American as Apple Pie 3 (2006).

4 As *Heller* noted, most Americans in the late 18th century also "undoubtedly thought" that the codified Second Amendment was "important for hunting," 554 U.S. at 599, 128 S.Ct. 2783, which, particularly for those moving west, was an important source of sustenance.

***5** But while the founding generation cherished the Second Amendment right, they did not think it was absolute. *Heller* explained—and later cases have reiterated—that the Second Amendment "codified a *pre-existing* right." *Id*., at 592, 128 S.Ct. 2783. And this right, as understood at the time, was not an "unlimited" right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*., at 592, 626, 128 S.Ct. 2783. Similarly, *Heller* warned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*., at 626, 128 S.Ct. 2783; see also *McDonald v. Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (opinion of ALITO, J.); *United States v. Rahimi*, 602 U.S. 680, 699, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024).

2

Because the Second Amendment protects a right that already existed when the Amendment was adopted, *Heller* instructed courts to ascertain the scope of the right by looking to history. And to emphasize the point, *Heller* emphatically rejected the ahistorical and "judge-empowering 'interest-balancing inquiry' " suggested in the dissent. 554 U.S. at 634, 128 S.Ct. 2783. *Heller* acknowledged that the history-based analysis it prescribed would not always be easy, but it found that mode of analysis necessary to prevent judges from balancing away the right that the Second Amendment was adopted to protect, *id*., at 635, 128 S.Ct. 2783—which is precisely what the dissent did.[5]

5 That dissent assumed for the sake of argument that the Second Amendment protects a private

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

citizen's right to keep a firearm in the home for self-defense, but then concluded that D. C. law, which made it virtually impossible to have a gun for that purpose, was nevertheless constitutional because it was adequately tailored to serve the District's interest in protecting public safety. See *Heller*, 554 U.S. at 692–693, 128 S.Ct. 2783 (opinion of Breyer, J.).

B

*Heller* concerned an ordinance adopted by the District of Columbia, and therefore the decision did not govern the States. But since virtually all the provisions of the Bill of Rights had been held to apply equally to the Federal Government and the States, it was inevitable that the Court would have to decide whether the Second Amendment right merited similar treatment. Two years after *Heller*, that question came before us in *McDonald*.

The case was brought by residents of Chicago, a city, like Washington, D. C., with a high rate of violent crime. [6] The lead plaintiff, Otis McDonald, was a man in his late seventies who lived in a dangerous neighborhood and had been subjected to violent threats from drug dealers. *McDonald*, 561 U.S. at 751, 130 S.Ct. 3020. A city ordinance effectively barred McDonald and the other plaintiffs from possessing guns in their homes for self-defense, and they contended that the fundamental right recognized in *Heller* should apply throughout the country. 561 U.S. at 752–753, 130 S.Ct. 3020.

6 See Brief for Heartland Institute as *Amicus Curiae* 6–10, and Brief for Buckeye Firearms Foundation et al. as *Amici Curiae* 8–15, in *McDonald* v. *Chicago*, O. T. 2008, No. 08–1521.

The city of Chicago opposed nationwide application of *Heller*, arguing that law enforcement needs and public attitudes about guns varied from State to State and city to city and that States and cities should have leeway to regulate gun possession as their lawmakers saw fit. See Brief for Respondent in *McDonald* v. *Chicago*, O. T. 2009, No. 08–1521, pp. 24–31. The Court, however, disagreed. The plurality opinion, joined by four Justices, concluded that the Second Amendment right, like nearly all the rights protected by the First, Fourth, Fifth, Sixth, and Eighth Amendments, should apply equally to the Federal Government and the States. *McDonald*, 561 U.S. at 750, 130 S.Ct. 3020. Following a body of precedent dating back more than a century, the plurality concluded that the provision of the Fourteenth Amendment that did this work was the Due Process Clause. *Id.*, at 767–787, 130 S.Ct. 3020. Justice THOMAS, who provided the decisive fifth vote, reached a similar result based on the Fourteenth Amendment's Privileges or Immunities Clause. *Id.*, at 805–806, 130 S.Ct. 3020 (opinion concurring in part and concurring in judgment). But either way, *McDonald* settled the question whether the Second Amendment embodies a uniform national standard or one that varies from one locale to another.

C

***6** After *McDonald*, 12 years elapsed before the Court's next major Second Amendment decision: *Bruen*. In the interim, lower courts rejected nearly all Second Amendment claims based on reasoning that resembled that in Justice Breyer's *Heller* dissent. See *Bruen*, 597 U.S. at 18–19, 26, 142 S.Ct. 2111.

In *Bruen*, we considered one such decision, which upheld a New York law that severely restricted the right to carry a handgun outside the home for self-defense. In doing so, we fleshed out the process of historical analysis required in a Second Amendment case. See *id.*, at 10, 142 S.Ct. 2111.

That analysis, we held, involves two steps. First, a court must determine whether the law before it clashes with the "plain text" of the Amendment's language. *Id.*, at 24, 142 S.Ct. 2111. This inquiry entails three subsidiary questions. First, does the law apply to "the people"—which is to say, to "all members of the political community"? *Heller*, 554 U.S. at 580, 128 S.Ct. 2783. Second, does it concern any form of "Arms," *i.e.*, any weapon customarily used for offensive or defensive purposes? See *id.*, at 584, 128 S.Ct. 2783. Third, does the law place any restrictions on either the "keep[ing]" (*i.e.,* possession) or the "bear[ing]" (*i.e.*,


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

carrying) of arms? See *Bruen*, 597 U.S. at 32–33, 142 S.Ct. 2111.

If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional, *id.*, at 24, 142 S.Ct. 2111—which means that it *may* violate the preexisting right that the Amendment codified. But because that right was not in every way coterminous with the Amendment's literal language, further analysis may be needed. Specifically, the relevant government—federal, state, or local—may be able to show that its challenged law did not infringe the historical understanding of the codified right. See *ibid.*

A variety of sources, including scholarship, may aid this inquiry. See *id.*, at 34–60, 142 S.Ct. 2111. But often, the best evidence may be what *Bruen* called historical analogues. *Id.*, at 28, 142 S.Ct. 2111. These are old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right. A party defending against a Second Amendment claim may rely on a single analogue or a group of analogues. *Bruen* identified three important inquiries that courts should undertake in evaluating proffered analogues. The first is the number of jurisdictions in which they were adopted. See *id.*, at 67, 142 S.Ct. 2111 ("[W]e will not stake our interpretation ... upon a law in effect in a single State, or a single city" (citing *Heller,* 554 U.S. at 632, 128 S.Ct. 2783)). The second is the extent to which they were well-accepted. This acceptance may be express, as when judicial decisions explicitly acknowledged the rule's legality. Or the acceptance may be tacit, as when a restriction on the keeping or carrying of arms was "open, widespread, and unchallenged." *Bruen*, 597 U.S. at 36, 142 S.Ct. 2111 (internal quotation marks omitted).

The third is whether any analogue or collection of analogues is "relevantly similar" to the modern law. *Id.*, at 29, 142 S.Ct. 2111. Determining whether this condition is met requires consideration of "how" the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. *Ibid.* And a court must also consider "why" the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law. *Ibid.* In order to be sufficiently similar to the modern law being challenged, a putative analogue need not be a "dead ringer" or "historical *twin*." *Id.*, at 30, 142 S.Ct. 2111. Particularly when the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted, it is too much to demand such a close match. But the "how" and "why" of the historical analogue and modern regulation must be close enough to enable a court to say: "Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right." Making this determination is far more disciplined than the "interest-balancing," "judge-empowering" standard that *Heller* emphatically rejected, but it is not mechanical. *Bruen*, 597 U.S. at 22, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 634, 128 S.Ct. 2783; internal quotation marks omitted). It undeniably necessitates an exercise of judgment.

***7** Applying this framework, *Bruen* held that the challenged New York law, which broadly prohibited law-abiding citizens from carrying commonly used firearms in public for self-defense, violated the Second and Fourteenth Amendments. 597 U.S. at 38, 142 S.Ct. 2111. We found that the State's proffered analogues were critically different from the challenged law and that the "overwhelming weight" of historical evidence supported the "right of the public to peaceably carry handguns for self-defense." *Id.*, at 62, 66, 142 S.Ct. 2111.

In addition to holding that New York's law violated the Second Amendment, we pointed out that six other jurisdictions had adopted statutory provisions like New York's. See *id.*, at 15, n. 2, 142 S.Ct. 2111. One of those jurisdictions was Hawaii. [7]

7 The other five were California, the District of Columbia, Maryland, Massachusetts, and New Jersey. *Bruen*, 597 U.S. at 15, n. 2, 142 S.Ct. 2111.

D

In *Bruen*, the law at issue concerned conduct that could have occurred when the Second and Fourteenth Amendments were adopted—carrying a handgun outside the home for self-defense. By contrast, in our most recent Second Amendment case, *United States v. Rahimi*, 602 U.S. 680, 144 S.Ct. 1889, 219 L.Ed.2d 351, the law in question, 18 U.S.C. § 922(g)(8), involved conduct that was distinctively modern: the possession of a firearm by a person against whom a domestic violence restraining order had been issued, see *Rahimi*, 602 U.S. at 684–685, 144 S.Ct. 1889. Accordingly, application of step two of the *Bruen* framework called for a more difficult exercise of judgment. In the end, however, the majority was satisfied that the two analogues identified by the Federal Government, though not "dead ringers" of § 922(g)(8), were sufficiently similar to support the provision's constitutionality because the challenged regulation was "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 698–699, 144 S.Ct. 1889.

The dissent applied the same test but came to the opposite conclusion, see *id.*, at 747, 144 S.Ct. 1889 (opinion of THOMAS, J.), exhibiting how *Heller*'s history-based methodology—true to the warning contained in that ground-breaking decision—is not mechanical, see 554 U.S. at 626–628, 635, 128 S.Ct. 2783.

## II

### A

With this background in mind, we turn to the Hawaii law challenged in this case. Before *Bruen*, Hawaii issued firearms carry licenses only in "exceptional case[s]." Haw. Rev. Stat. §§ 134–2 (Cum. Supp. 2018), 134–9(a) (2011). Indeed, it appears that from 2000 to 2018, only four such licenses were issued. See *Young v. Hawaii*, 896 F.3d 1044, 1071, n. 21 (CA9 2018), reh'g en banc, 992 F.3d 765 (2021), cert. granted, judgt. vacated, 597 U. S. 916, 142 S.Ct. 2895, 213 L.Ed.2d 1108 (2022). After *Bruen*, Hawaii and four of the other five States called out by our decision adopted a new method of restricting law-abiding citizens from carrying firearms for self-defense by flipping the default rule on private property open to the public.

At common law, opening up private property to the general public implies a "license to all persons to enter," meaning that "no person is a trespasser by merely entering therein" unless the property owner has given "due notice" that such a person is banned. *Commonwealth v. Power*, 48 Mass. 596, 602 (1844); see also, *e.g.*, *State v. Steele*, 106 N.C. 766, 780–783, 11 S.E. 478, 484–485 (1890); *Barney v. Oyster Bay & Huntington Steamboat Co.*, 67 N.Y. 301, 302–303 (1876); *Jencks v. Coleman*, 13 F.Cas. 442, 443–444 (No. 7,258), (CC RI 1835) (Story, J.).

After *Bruen*, Hawaii and four other States singled out in that decision flipped this default rule. Rather than allowing *all* to enter private property open to the public unless specifically prohibited, these new laws provided that *no one* carrying a firearm may enter without express authorization. See Cal. Penal Code Ann. § 26230(a)(26) (West Supp. 2026); Haw. Rev. Stat. § 134–9.5(a) (2023); Md. Crim. Law Code Ann. § 6–411(d) (Supp. 2025); N. J. Stat. Ann. § 2C:58–4.6(a)(24) (West 2024); N. Y. Penal Law Ann. § 265.01–d(1) (West 2025).

### B

***8** Hawaii's new default rule is part of a tight web of laws that severely restricts the carrying of firearms for self-defense. To start, carrying a handgun for self-defense requires a special license, and obtaining that license is a rigorous process. Haw. Rev. Stat. § 134–9. Applicants must first complete a detailed application that requires the disclosure of medical information. § 134–9(g).[8] They must then successfully complete an extensive training course in which they demonstrate competency in firearm safety and live-fire shooting, as well as an understanding of the law and available mental-health resources. §§ 134–9(d), (e). And they must demonstrate the "essential character or temperament necessary to be entrusted with a firearm." § 134–9(h).

8 See Hawai'i Police Dept., Firearm Servs., https://www.hawaiipolice.gov/services/

firearm-services/#license-to-carry (archived at https://perma.cc/A4G8-AEYB); License to Carry (Concealed and Unconcealed) Application Processing, https://www.hawaiipolice.gov/wpcontent/uploads/PM-12.3-License-to-Carry-Concealed-and-Unconcealed-Application.pdf (archived at https://perma.cc/MX8Z-3DMC); Authorization for Use or Disclosure of Protected Health Information (PHI), https://www.hawaiipolice.gov/wp-content/uploads/Authorization-for-Use-or-Disclosure-of-PHI.pdf (archived at https://perma.cc/H7AL-C8ED).

But even for those who fulfill these stringent requirements, Hawaii imposes two additional restrictions on carrying firearms. The first bans the possession of a firearm in significant categories of places: "[a]ny [state-owned] building" or "adjacent grounds and parking areas"; "[a]ny public or private hospital" or "other place at which medical or health services are customarily provided"; any "restaurant serving alcohol"; any "stadium, movie theater, or concert hall"; any "public library property"; "any public or private" college or university; "any public school, charter school," or private school; any "beach, playground," or park; "any bank or financial institution"; any "amusement park, aquarium, carnival, circus, fair, museum, water park, or zoo"; and any "public gathering, public assembly, or special event conducted on property open to the public." § 134–9.1(a).[9] Some of these places are owned by the State, but many of the categories include privately owned property. So even if the owner of such a place wanted to admit individuals who are carrying a gun for self-defense, the owner could not do so.

9 In the decision below, six judges stated that "Hawaii's law prohibits, presumptively or outright, the carrying of a handgun on 96.4% of the publicly accessible land in Maui County." 125 F.4th 1230, 1233 (CA9 2025) (VanDyke, J., dissenting from denial of reh'g en banc). The State challenges this figure, arguing that it includes "sensitive-place" restrictions, such as those for public parks, beaches, and schools. Brief for Respondent 41.

The second restriction—the one at issue in this case—generally prohibits licensed individuals from carrying a firearm, even if unloaded or inoperable, "on private property of another." § 134–9.5(a). Certain categories of individuals, such as police officers, are exempt, §§ 134–9.5(d), 134–11(a), but the ban otherwise applies unless "express authorization" has been given "by the owner, lessee, operator, or manager of the property," § 134–9.5(a). Such authorization must take one of two forms: "clear and conspicuous signage" that confers such consent or "[u]nambiguous written or verbal authorization" to carry a firearm on the premises from "the owner, lessee, operator, or manager of the property" or an agent of such a person. § 134–9.5(b).

## III

Petitioners—three residents of Maui County who possess concealed-carry permits and an organizational plaintiff with members who have such permits—contend that these restrictions violate their rights under the U. S. Constitution, and they filed suit in federal court, seeking both temporary and permanent injunctive relief. The District Court declined such relief with respect to private property that is *closed* to the public, but it enjoined enforcement of the new default rule as applied to private property that is *open* to the public.

***9** A panel of the Ninth Circuit reversed that injunction, and the full Ninth Circuit denied rehearing en banc. Judge VanDyke, joined by five other judges, issued an opinion dissenting from the denial of rehearing en banc. 125 F.4th 1230, 1231 (2025). Judge Collins, joined by Judge Bress, likewise filed a dissent. *Ibid*. We granted certiorari to decide whether Hawaii may prohibit licensed concealed-carry permit holders from carrying handguns on private property open to the public unless the property owner gives express permission. 606 U. S. 1066, 146 S.Ct. 79, 222 L.Ed.2d 1241 (2025).

## IV

### A

As with any Second Amendment challenge, we began by asking whether the restrictions imposed by the challenged law fall within the plain text of the Second Amendment, see *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111, and we find that this requirement is easily met.

No party disputes that petitioners are among "the people" protected by the Second Amendment or that they seek to "bear," *i.e.*, to carry, "arms." Therefore, "the plain text of the Second Amendment protects" what petitioners want to do: carry handguns for self-defense. *Id.,* at 32, 142 S.Ct. 2111.

Petitioners and the United States argue that the new default rule was enacted to undermine our decision in *Bruen*, but whatever the purpose of the new law, the shift from the old common-law rule unquestionably imposed a new and significant burden on the exercise of the right that this Court recognized in *Bruen*. To be sure, owners of establishments that are open to the public can admit or exclude persons who are carrying guns for self-defense under either the common-law rule or Hawaii's substitute. As a practical matter, however, the choice between these two default rules is often outcome-determinative with respect to Hawaiians' Second Amendment rights. For establishments where the owner either pays no attention or does not care about such issues, the choice of default rule will determine where carry-permit holders may lawfully carry firearms.

More broadly, Hawaii's new default rule burdens those wishing to exercise their Second Amendment right. Some proprietors who do not themselves object to entry by carry-permit holders may be reluctant to post a sign welcoming such individuals for fear of alienating other customers. So under Hawaii's new default rule, a proprietor in this category may only be willing to consent discreetly to the entry of permit holders who make the effort to inquire. This arrangement imposes a new burden on permit holders who will have to somehow obtain permission to carry a firearm on the property before stepping foot on it.

To see what Hawaii's new default rule means in practice, consider its impact on a resident of Hawaii whose situation is like that of Jaime Caetano, a young Boston woman who wanted to carry a weapon to defend herself from a violent ex-boyfriend but was criminally prosecuted when she used a non-lethal weapon to fend him off. See *Caetano v. Massachusetts*, 577 U.S. 411, 412–413, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (ALITO, J., concurring in judgment). Suppose our hypothetical young woman, after clearing all the hurdles needed to get a Hawaiian carry permit, leaves her home on a weekday morning and carries a handgun on her person or in a purse. On the way to work, she intends to fill up her car at a gas station. During her lunch break, she plans to walk to a fast-food restaurant and then buy some items at a large drug store. After work, she wants to pick up clothes at a dry cleaner and then shop for groceries. Unless each of these establishments has posted a sign saying "Guns Welcome" or something to that effect, each visit could expose her to criminal liability.

***10** Imagine what our hypothetical young woman will have to do when she drives to the supermarket after work. When she arrives, she will violate the literal terms of the Hawaii law merely by pulling into the parking lot while having her handgun concealed on her person. She can minimize the length of her violation by disarming as soon as she arrives. But in removing the handgun from her person, she must take care not to let anyone see it for even a moment. Otherwise, she could be charged with "recklessly caus[ing] alarm to another person by failing to conceal the firearm, even briefly." Haw. Rev. Stat. § 134–9.7. Once she has removed the handgun from her person, she cannot leave it in her car without locking it in what amounts to a safe. See § 134–9.3.

Instead of going through all this, she may choose to remain armed when she enters the supermarket and promptly search for someone who is authorized to provide the consent that the law demands. This will prolong the violation of the terms of the Hawaii law, and finding someone who can provide consent may not be easy. For example, it is most unlikely that the supermarket employee who is gathering up shopping carts in the parking lot or the employee who is restocking shelves will possess that authority. During all the time this search goes on, our hypothetical young woman will be violating the terms of the statute, and if that is brought to the attention of the police (say, by a store employee or customer who hears her ask for permission to enter), she may be charged with a criminal offense or lose her license. § 134–9.7. And in the end, she may be unable to shop because she cannot find anyone who has been authorized by management to consent.

When our hypothetical young woman visits the restaurant at lunch, her situation may be even more difficult. Unless her place of employment has a gun locker where she can store her gun, she may be unable to leave it behind when she leaves the building. See § 134–10.5. And if she disarms before leaving work, she will be vulnerable for that period of time. Even this short period of vulnerability can be deadly: Ms. Caetano was approached by her abusive boyfriend right after leaving work. See *Caetano*, 577 U.S. at 413, 136 S.Ct. 1027 (ALITO, J., concurring in judgment).

If our hypothetical young woman remains armed during the lunch break, she will violate the terms of the law if she sets foot inside any establishment without a "Guns Welcome" sign, even if she immediately seeks someone who can provide authorization to stay. And as was the case with the supermarket, finding such a person may not be easy. Thus, by the end of an ordinary day, our hypothetical young woman could be a criminal at least six times over. In short, Hawaii's law severely hampers the ability of a law-abiding citizen to exercise the right *Bruen* recognized.

Hawaii nonetheless argues that petitioners' challenge fails at the first step of *Bruen*'s two-step framework because "the right to bear arms did not encompass the right to armed entry onto private property without the owner's consent." Brief for Respondent 9. The State then launches into a lengthy discussion of historical materials and precedents that, it contends, supports this argument. *Id.*, at 9–27, 142 S.Ct. 2111.

We will discuss all these authorities, but they are out of place at *Bruen*'s first step. At that stage, as we have explained, the question is simply whether a challenged law falls within the Second Amendment's "plain text." 597 U.S. at 24, 142 S.Ct. 2111. We therefore move on to the second step.

B

At this second step, the inquiry mandated by *Heller* and *Bruen* turns to an exploration of the historical understanding of the scope of the right the Constitution codified. Hawaii's first argument on this score is based on "Hawai'i's particular customs and laws." Brief for Respondent 24. The State starts with the undisputed principle that the owner of private property is generally free to exclude anyone from entering without consent. See *Florida v. Jardines*, 569 U.S. 1, 7–8, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). It acknowledges that an owner's consent need not always be express and that there are circumstances in which consent may be inferred. See *id.*, at 8, 133 S.Ct. 1409. But the State contends that, whatever the situation in other parts of the country, *in Hawaii*, opening private property to the public does not implicitly include any armed individuals among those who may enter.[10]

10 The State curiously suggests that the concept of private property that is open to the public is too fuzzy for use in ascertaining implied consent. Brief for Respondent 20–21. But Hawaiian law uses that familiar concept in a variety of contexts. See, *e.g.*, Haw. Rev. Stat. §§ 708–813, 708–814 (2025) (definition of criminal trespass); § 489–2 (2019) (public accommodations law).

***11** In support of this argument, the State recounts its long history of antipathy to the private possession of firearms. It tells us that one of the very first written laws of the Kingdom of Hawaii, issued in 1833 by King Kamehameha III, prohibited the possession of all deadly weapons.[11] Later laws adopted before and after Hawaii became part of the United States continued to heavily restrict the possession and carriage of firearms. See, *e.g.*, Act of May 25, 1852, § 1, 1852 Haw. Sess. Laws 19 (limiting the right to carry any deadly weapon in public); Haw. Rev. Laws, ch. 209, § 3089 (1905), as amended by Act of Mar. 19, 1913, § 1, 1913 Haw. Sess. Laws 25. And prior to *Bruen*, Hawaii permitted public carry only in "exceptional" cases "when an applicant show[ed] reason to fear injury to the applicant's person or property." Haw. Rev. Stat. § 134–9(a) (2022). Then, in the wake of *Bruen*, Hawaii passed the statute at issue in this case, and the State contends that this law continues a Hawaiian tradition and shows that Hawaiians disfavor the carrying of guns in their midst. Accordingly, the State maintains, its new default rule merely expresses the circumstances under which implied consent may be reasonably inferred in Hawaii.

11 See Translation of the Constitution and Laws of the Hawaiian Islands, Established in the Reign of Kamehameha III, in Hawaiian Laws 1841–1842, ch. 42, p. 98 (1842).

This argument is little different from the central argument offered by the city of Chicago in *McDonald*, and Hawaii's version fares no better. As the plurality explained in *McDonald*, the Second Amendment has the same meaning in all parts of the United States. 561 U.S. at 784–785, 130 S.Ct. 3020. It cannot give way to "the spirit of Aloha" in Hawaii, contra, *State v. Wilson*, 154 Haw. 8, 27, 543 P.3d 440, 459 (2024), any more than it can yield to the spirit of the Big Apple (*Bruen*) or the Windy City (*McDonald*).

It applies in the same way to our 50th State (where about 8% of adults possess guns) and our 49th State (where the figure is roughly 59%). [12] Merely local attitudes can neither shrink nor inflate the meaning of fundamental Bill of Rights guarantees that apply to the States through the Fourteenth Amendment. [13]

12 RAND, Gun Ownership in America, https://www.rand.org/research/gun-policy/gun-ownership.html (archived at https://perma.cc/WR9W-YCSN).

13 The principal dissent's main argument is that "[t]his case is about property rights, not gun rights." *Post*, at —— (opinion of JACKSON, J.). Because a State is generally free to alter traditional property-law principles as it chooses, the dissent contends that Hawaii's alteration of the traditional rule on access to private property open to the public does not infringe Second Amendment rights. This argument fails because States may not adopt property-law rules that violate constitutional rights. For example, a State may not adopt property-law rules that violate the freedom of speech. See, *e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 159, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) (ordinance regulating signs on private property); *City of Ladue v. Gilleo*, 512 U.S. 43, 45, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (similar). Nor may a State adopt zoning rules that violate the equal protection of the laws. See, *e.g.*, *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). Likewise, a State may not " 'sidestep the Takings Clause' " by enacting a law purporting to extinguish a property interest. *Tyler v. Hennepin County*, 598 U.S. 631, 638–639, 143 S.Ct. 1369, 215 L.Ed.2d 564 (2023). The right protected by the Second Amendment is entitled to no less protection than other constitutional rights.

When we assess whether a challenged law is consistent with the right the Second Amendment codified, we seek the general understanding of that codified right at the relevant point in time. An outlier legal rule adopted in a few locales is not enough. See *supra,* at —— – ——; *Bruen*, 597 U.S. at 39, 142 S.Ct. 2111 (" '[T]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted' " (emphasis deleted)). And as we have explained, "overwhelming evidence" shows an "enduring American tradition permitting public carry." *Id.*, at 67, 142 S.Ct. 2111. Hawaii's prohibitions on public carry represent a distinct outlier. [14]

14 The State also argues that *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), and *McKee v. Gratz*, 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167 (1922), support its argument that the scope of the constitutional right to keep and bear arms may vary from place to place, but that is incorrect. *Jardines*, a Fourth Amendment case, had nothing to do with variations in property norms across different localities. And *McKee* addressed common-law trespass, not any constitutional question.

### C

#### 1

***12** With this preliminary question out of the way, we turn to Hawaii's main argument: that analogous colonial and early state laws support the constitutionality of the State's new law. These old laws, however, are vastly different from Hawaii's new default rule. They consist almost entirely of laws that prohibited unauthorized hunting of deer or small game on someone else's private property. [15]

15 Some of these laws applied only to "enclosed" land, and petitioners and some of their *amici* argue that such property was not open to the public. See Brief for Petitioners 31; Brief for United States as *Amicus Curiae* 30. On the other hand, the State and some of its *amici* contend that the term "enclosed land" was understood at the time to include some property that was generally open to the public. See Brief for Respondent 31; M. Brady, Property v. Guns: The Level-of-Generality Problem in *Wolford*, Stan. L. Rev. Online (forthcoming 2026) (last revised Feb. 27, 2026) https://www.stanfordlawreview.org/online/property-v-guns-the-level-of-generality-problem-

in-wolford/ (archived at https://perma.cc/J7Y3-WC5G). For the sake of argument, we will assume that the latter interpretation is correct and that the State's analogues were well-known and accepted. Even so, they are far too different from Hawaii's default rule to permit us to infer that the default rule is consistent with the codified Second Amendment right. See *infra*, this page and 21–22.

The State's earliest analogue is a 1721 Pennsylvania law entitled "An Act to Prevent the Killing of Deer *Out of Season, and Against* Carrying of Guns and Hunting By Persons Not Qualified." This statute made it unlawful to "carry any gun or hunt on the improved or inclosed lands of any plantation, other than his own," without securing "license or permission from the owner of such lands or plantation." 1721 Pa. Laws, ch. 246, § 3, in 3 The Statutes at Large of Pennsylvania From 1682 to 1801, pp. 254–225 (J. Mitchell & H. Flanders eds. 1896). The law's stated purpose was to prevent "divers[e] Abuses, Damages and Inconveniences" that "ha[d] ar[i]se[n] by Persons carrying Guns, and presuming to hunt on other people's lands." § 2, at 255. As the Third Circuit observed, that law "appears to be primarily focused on preventing Pennsylvanians from hunting on their neighbors' land, not on restricting the right to publicly carry a gun." *Lara v. Commissioner Pa. State Police*, 125 F.4th 428, 443 (2025).

A 1722 New Jersey statute contains nearly identical language. See An Act to Prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not Qualified, 1722 N. J. Laws pp. 100–101 (no person shall "carry any [g]un, or [h]unt on the [i]mproved or [i]nclosed [l]ands in any [p]lantatio[n] ... other than his own"). And a 1728 Maryland statute and a 1763 New York law fall into the same category. The Maryland law, titled "An Act to Encourage the Destroying of Wolves, Crows, and Squirrels," made it unlawful to "come to hunt with Guns or Dogs, within any Inclosed Grounds, Islands, Peninsula's, or Necks fenced across from Water to Water, without Leave or Licence from the Proprietors thereof, first had and obtained." 1728 Md. Laws p. 13. And the New York law, titled "An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof," made it unlawful to "carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through any Orchard, Garden, CornField, or other inclosed Land whatsoever." 1763 N. Y. Laws ch. 1233, § 1. All these laws targeted unauthorized hunting and focused on land where game could be found.

***13** A 1771 New Jersey law followed this tradition. Titled "An act for the preservation of deer, and other game, and to prevent trespassing with guns," this law provided that a person could not "carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner or owners, or legal possessor." 1771 N. J. Laws pp. 25–26. [16]

16 And because New Jersey taxed only "improved land" at the time, the prohibition on carrying guns on taxed land was in effect a prohibition against armed trespass on "improved land" closed to the public. B. Sawers, Keeping Up With the *Joneses*, 111 Mich. L. Rev. First Impressions 21, 25–26 (2013). Indeed, the very text of the statute targets "trespass[ers]," so its regulation of improved land naturally referred to private property closed to the public. 1771 N. J. Laws § 1, pp. 26–27. This inference becomes even clearer from the fact that a separate provision of the statute targeted hunting on "unimproved" lands not closed to the public. § 6.

In sum, the State's analogues principally targeted unauthorized hunting. Their coverage differed sharply from that of the Hawaii law now before us. They applied to land where game could be found, not retail establishments that residents of cities and suburbs frequent as part of their daily routines. They had little if any impact on the Second Amendment's central objective: protecting the fundamental right to self-defense. And their obvious aim was to prevent the distinctive harms and risks associated with unauthorized hunting. That conduct often entailed the theft of private property: The poacher took game that the property owner might have otherwise harvested. It involved the firing of guns, which created a risk of inadvertently inflicting death or serious injury on the owner of the property, others who were authorized to use the property, and livestock. At a minimum, the sound of the gunshots could surprise, alarm, or disturb the tranquility of others on the property.

The conduct restricted by the Hawaii law has none of these effects. Others on the premises will not even notice a person peacefully carrying a concealed weapon in the manner demanded by Hawaiian law.

To test whether these analogues are "relevantly similar" to the challenged Hawaii law, we may ask the question set out earlier: "Because it was accepted that prohibiting unauthorized hunting on private land was consistent with

the Second Amendment right, can we infer that it is also consistent with that right to ban a person who is lawfully carrying a concealed handgun for self-defense from entering a gas station, coffee shop, grocery store, or other private property open to the public without express and unambiguous consent?" The question answers itself. The gap between the State's anti-poaching analogues and its new rule is just too wide.

2

The State's two remaining analogues are even weaker. The first is an 1893 Oregon law that prohibited anyone "other than an officer on lawful business, [from] being armed ... or trespass[ing] upon any enclosed premises or lands without the consent of the owner." 1893 Ore. Laws p. 79. On its face, it is not clear that this statute is relevant to the issue before us. For one thing, even if commercial establishments that are open to the public were considered "enclosed" at the time of the adoption of the Bill of Rights, see n. 13, *supra*, no Oregon authority shows that the Oregon statute used the term to refer to such establishments. To the contrary, Oregon courts have interpreted the phrase "enclosed land" as outdoor land surrounded by a "visible or distinctive line that demonstrates its separation from contiguous properties," such that a hunter would know to seek permission before hunting. See *State v. Kimble*, 236 Ore.App. 613, 619–620, 237 P.3d 871 (2010). It is thus unlikely that the 1893 Oregon law used the term "enclosed" to refer to businesses open to the public rather than to private lands on which poaching was a problem. Moreover, the statute does not demand that consent be express. But even if this provision is read as Hawaii would have it, a lone statute adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment sheds little if any light on the meaning of the Second Amendment right.

***14** Finally, we come to the State's most remarkable analogue, an 1865 Louisiana statute that made it unlawful "for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order." 1865 La. Acts No. 10, § 1, p. 14. Regardless of this provision's pedigree, it has no probative value for present purposes. As we have said, in considering the probative value of a historical analogue, we must consider whether it was widespread, well-known, and widely accepted. See *Bruen*, 597 U.S. at 35, 142 S.Ct. 2111. Because this statute was neither widespread nor widely accepted, it carries no weight.

We could stop there, but there is another reason for rejecting Hawaii's reliance on this statute. It was adopted by the Louisiana Legislature between the end of the Civil War and the beginning of Reconstruction. When the war ended, the legislatures in defeated Confederate States quickly enacted so-called Black Codes that aimed to perpetuate the subjugation of blacks. [17] The statute Hawaii cites was part of Louisiana's Black Code, and it provided a tool for disarming blacks and thus leaving them defenseless against attacks. See 125 F.4th at 1239 (VanDyke, J., dissenting from denial of reh'g en banc).

17 See, *e.g.*, E. Foner, The Second Founding: How the Civil War and Reconstruction Remade the Constitution 47–49 (2019).

As we laid out in *McDonald*, the right to keep and bear arms was crucially important for vulnerable blacks during this period. See 561 U.S. at 757, 771, 776–779, 130 S.Ct. 3020; *id.*, at 843–846, 130 S.Ct. 3020 (opinion of THOMAS, J.). And this was well-understood by the Republicans in Congress who were responsible for drafting, approving, and securing the ratification of the Fourteenth Amendment. The Republican Party Platforms of 1856 and 1860 called for protection of the right to keep and bear arms for self-defense. Unless we put history entirely out of our minds, Hawaii's claim that this tainted artifact illuminates the original understanding of the right to keep and bear arms cannot be taken seriously.

* * *

The Hawaii law at issue here violates the constitutional right to keep and bear arms. Therefore, the judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice BARRETT, with whom Justice THOMAS and Justice GORSUCH join as to Part II–B, concurring.

I join the Court's opinion in full. I write to add a few points about why Hawaii's law triggers—and fails—Second Amendment scrutiny.

I

Hawaii and the principal dissent insist that this is a case about property law, not the Second Amendment. The argument goes like this: No one has the right to enter private property—let alone to bring firearms onto it—without the owner's consent. Brief for Respondent 14–15. Whether consent can be implied or must be express depends on local custom and property rules, which States have always had authority to modify. *Id*., at 15–16. By requiring express consent, Hawaii has simply modified a default rule of property law. And because the " '*pre-existing* [Second Amendment] right' " did not require any particular default rule, Hawaii's law does not even implicate the Second Amendment. *Id*., at 13 (quoting *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 20, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022)); see *post*, at —— – —— (JACKSON, J., dissenting). No further analysis is necessary.

This argument misunderstands the role of historical evidence in a Second Amendment challenge. *Bruen* establishes a two-part test for assessing whether a modern law is consistent with the Second Amendment. See 597 U.S. at 24, 142 S.Ct. 2111. Each step requires a court to look at different evidence—plain text at the first, tradition at the second—but together, the two steps illuminate the original scope of the right. See *ibid.* While history is relevant to both steps, it plays a different "rol[e]" at each one. *United States v. Rahimi*, 602 U.S. 680, 738, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (BARRETT, J., concurring). We look to history that "elucidates how contemporaries understood the text—for example, the meaning of the phrase 'bear Arms' "—at *Bruen*'s first step. 602 U.S. at 738–739, 144 S.Ct. 1889. We save "historical gun regulations," however, for *Bruen*'s second step. 602 U.S. at 739, 144 S.Ct. 1889. [1]

1 The principal dissent erroneously claims that this division leaves judges "free to insert any meaning they desire into the text of the Second Amendment." *Post*, at —— (opinion of JACKSON, J.). No one disputes that the Second Amendment's text has a fixed meaning that must be satisfied before a law is deemed presumptively unconstitutional. See *ante*, at —— (identifying "three subsidiary questions" that must be answered at *Bruen*'s first step). The disagreement is instead whether courts can smuggle additional limits, drawn from our regulatory tradition, into the plain-text stage of the inquiry. The answer is and always has been no.

***15** In this case, *Bruen*'s first step is easily satisfied. Petitioners are members of "the people" and wish to "bear" "Arms" onto private property held open to the public. U. S. Const., Amdt. 2. Hawaii's law makes it a crime for

> "A [licensed] person carrying a firearm [to] intentionally, knowingly, or recklessly enter or remain on private property of another person while carrying a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, unless the person has been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property." Haw. Rev. Stat. § 134–9.5(a) (2023).

This is obviously a "regulat[ion]" of "arms-bearing conduct," so it falls within the Second Amendment's plain text. *Rahimi*, 602 U.S. at 691, 144 S.Ct. 1889. Whether the law nevertheless comports with our historical tradition of firearm regulation—including the traditional property laws that Hawaii invokes today—is a question for *Bruen*'s second step, not its first.

It is irrelevant, for purposes of the Amendment's plain text, that a property owner has the right to exclude anyone who wishes to enter her property with firearms. No one doubts that all property owners in Hawaii could bar the carry of arms on their respective premises, if they wanted to. But the Second Amendment does not apply to private parties. It does apply to the States. See U. S. Const., Amdt. 14, § 1. And when a State enacts a property law that regulates arms-bearing conduct, that law implicates the Second Amendment. [2]

2 If Hawaii and the principal dissent were right that the Second Amendment does not kick in until a property owner gives consent, one wonders: Could a State simply prohibit its citizens from authorizing

the carry of firearms onto their property? This would certainly interfere with the liberty of property owners, but it is hard to see how, on Hawaii and the principal dissent's logic, the Second Amendment would come into play.

Consider how Hawaii and the principal dissent's argument would play out in another context. What if a State made it a crime to wear religious head garb (say, a hijab) onto private property open to the public without obtaining express authorization? Could that statute evade constitutional scrutiny? On Hawaii and the principal dissent's logic, the answer is apparently yes: No one has the right to enter another's property without permission, and the State has merely adjusted the default to require permission to be clear. But that is plainly wrong. Because the law regulates religious and expressive conduct, its enactment is state action that triggers First Amendment scrutiny. Cf. *Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (municipal ordinance prohibiting door-to-door solicitation violates the First Amendment).

The same goes for a default rule, like Hawaii's, that targets the right to bear arms. Property laws, no less than other laws, are subject to constitutional limits. See *ante*, at ––––, n. 13. So when a property law "restrict[s]" the bearing of arms, *ante*, at ––––, the State must prove that the law abides by the limits of the Second Amendment.

II

The Second Amendment secures the pre-existing right of the people to have and carry weapons for their defense. But that right was not unlimited at the founding, and it is not unlimited today. See *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Now, as then, States may regulate the keeping and bearing of arms so long as they do not "infring[e]" the right, as originally understood. U. S. Const., Amdt. 2. To determine when a modern regulation crosses the line, we assess whether it comports with "the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. By asking "why" and "how" States historically regulated the right, we can identify the range of permissible regulatory goals and how far States may go to achieve them. *Id.*, at 29, 142 S.Ct. 2111. Both the end pursued and means deployed must be "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889.

***16** Under Hawaii's new default rule, no licensed individual (with narrow exceptions) can carry a gun onto someone else's property, even if it is held open to the public, without express and unambiguous authorization. Haw. Rev. Stat. § 134–9.5(a) (2023). Hawaii explains that this law reflects Hawaiians' aversion to the public carry of weapons—an attitude reinforced by almost two centuries of restrictive gun laws. See 2023 Haw. Sess. Laws 114 (explaining that the default rule was enacted "based on the legislature's assessment of public sentiment and broadly shared preferences within the State"); Brief for Respondent 6–7, 21–22. The State represents that Hawaiians do not think that people should be able to carry guns onto private property —even if it is held open to the public—unless they obtain express consent. See *id.*, at 6. In fact, the overwhelming majority of Hawaiians agree that "loaded, concealed firearms should not be allowed into businesses *at all*." *Id.*, at 7 (emphasis in original). These attitudes appear to reflect the State's "Aloha Spirit," which, as explained by the Supreme Court of Hawaii, "clashes with a federally-mandated life-style that lets citizens walk around with deadly weapons during day-to-day activities." *State v. Wilson*, 154 Haw. 8, 27, 543 P.3d 440, 459 (2024).

To satisfy *Bruen*, Hawaii must identify historical laws that pursued an analogous goal in an analogous way. Hawaii draws two analogies: one to 18th-century antipoaching laws and the other to 19th-century laws that were mostly designed to suppress newly freed blacks. Unsurprisingly, the analogies fail.[3]

3 Hawaii and the principal dissent also claim that the new law merely "codifie[s]" the State's customary implied license. *Post*, at ––––; see Brief for Respondent 21–22. The Court rightly rejects this argument. See *ante*, at –––– – ––––. I will add only that Hawaii and the principal dissent offer no evidence that, before the new default rule, Hawaiians had a custom of requiring express consent before an individual could carry firearms onto property held open to the public. See I. Ayres & S. Jonnalagadda, Guests With Guns: Public Support for "No Carry" Defaults on Private Land, 48 J. Law, Med. & Ethics 183, 184, App. 2 (2020)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(Table A1) (explaining that Hawaii previously lacked a "no carry" default for private property and retail establishments); cf. *post*, at —— (conceding that the common law implied license "might generally include the ability to enter armed"). So when Hawaii and the principal dissent invoke Hawaii's unique "custom," *post*, at ——; Brief for Respondent 22, they are really invoking the State's longstanding prohibition on public carry—a regime that we held unconstitutional in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 15, n. 2, 39, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).

A

Hawaii first points to several 18th-century laws that, broadly speaking, prohibited the carry of firearms onto certain property without the owner's consent. See *ante*, at —— – ——. Hawaii argues that these laws stand for the principle that a State may "vindicate a property owner's right to control whether and under what conditions the public enters his property" by "condition[ing] ... entry on obtaining the property owner's consent." Brief for Respondent 28. But that is pitched at too high a level of generality. Because Hawaii's law applies only to the carry of *firearms* onto property held open to the public, the State must offer a justification for singling out firearms for disfavored treatment. Cf. *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111 (asking "how and why the regulations burden *a law-abiding citizen's right to armed self-defense*" (emphasis added)). On that score, the reason is clear: Hawaiians disapprove of people carrying guns in public. The problem for Hawaii, however, is that the 18th-century laws support neither the end that Hawaii pursues nor the means that it deploys, so they cannot justify Hawaii's default rule.

Start with the "why" of the 18th-century laws. As the Court explains, *ante*, at —— – ——, they were enacted in response to the various "abuses, damages and inconveniences" caused "by persons carrying guns and presuming to hunt on other people's lands," 1721 Pa. Laws ch. 246, § 3 (preamble), in 3 The Statutes at Large of Pennsylvania From 1682 to 1801, p. 255 (J. Mitchell & H. Flanders eds. 1896). Perhaps chief among these was significant damage to property. One colony complained that "great Numbers of idle and disorderly Persons" would "hunt with Fire-Arms" and "tread down the Grass, and Corn and other Grain standing and growing in the Fields and Inclosures" in the process, causing "Ruin and Destruction [to] the most valuable Improvements." Act of Dec. 20, 1763, ch. 1233, preamble, in Laws of New-York from the Year 1691, to 1773 inclusive, p. 441 (1774). Another lamented that wandering poachers often left deer carcasses to rot, attracting "wolves and other beasts of prey," and frequently destroyed cattle. 1769 S. C. Laws no. 988, in 4 The Statutes at Large of South Carolina 310 (T. Cooper & D. McCord eds. 1838); see 1 J. Logan, A History of the Upper Country of South Carolina 28–29 (1859). Besides damaging property, poachers also deprived the landowner of game that was rightfully his. See M. Brady, Property v. Guns: The Level-of-Generality Problem in *Wolford*, 78 Stan. L. Rev. Online 156, 165 (2026) (Brady). Finally, fellow hunters and innocent bystanders were often put in harm's way; founding-era newspapers were replete with stories of injuries or deaths caused by inadvertent gunfire. See T. Lund, American Wildlife Law 32 (1980); Brady 167–168. Poaching and its associated harms were thus a common problem throughout the 18th century. By requiring hunters to obtain permission before carrying firearms onto another's property, legislatures aimed to minimize the risk of incidental harm to persons and property.

***17** Yet the 18th-century laws were targeted in "how" they combated the dangers of poaching: They imposed a default rule rather than a flat prohibition, and they generally confined it to places where poaching was likely to occur.[4] For example, Pennsylvania's 1721 law and New Jersey's 1722 law each applied only to "improved or inclosed lands of any plantation." 1721 Pa. Laws ch. 246, § 3, at 255; see 1722 N. J. Laws ch. 35, § 4, in Acts of the General Assembly of the Province of New-Jersey 101 (S. Nevill ed. 1752) ("improved or inclosed Lands in any Plantation"). In other words, they covered fenced or developed areas of a "cultivated estate" or "farm." 2 N. Webster, An American Dictionary of the English Language (1828) (defining "plantation"); see Brady 173 ("'Enclosure' and 'improvement' were visible ways a party could claim possession"); see also, *e.g.*, 1763 N. Y. Laws ch. 1233, § 1, at 442 (covering "any Orchard, Garden, CornField, or other inclosed Land"). Similarly, Massachusetts's 1790 law applied to several small islands where "great numbers of sheep and deer" had been killed and "other damages sustained," and where "the few persons residing on said islands [could] not give proper security." Act of Jan. 30, preamble, 1790 Mass. Laws 259. In this way, legislatures confined the default rule to places where poaching was rampant, while leaving individuals free to carry arms across other kinds of property—including property customarily open to the public. See *McKee v. Gratz*, 260 U.S. 127, 136, 43

S.Ct. 16, 67 L.Ed. 167 (1922) (explaining that it was then "customary to wander, shoot and fish at will" across "the large expanses of unenclosed and uncultivated land" "until the owner s[aw] fit to prohibit it"). They did not broadly restrict the carry of firearms in public.

4 The principal dissent claims that New Jersey's 1771 law was more sweeping and covered property that was open to the public. *Post*, at ——; see 1771 N. J. Laws ch. 540, § 1, in Acts of the General Assembly of the Province of New-Jersey 344 (S. Allinson ed. 1776) (covering "any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession"). As the Court explains, there are reasons to doubt this claim. See *ante*, at ——, n. 16. But even if the principal dissent were correct, New Jersey's rule would have been an "outlie[r]" for the period. *Bruen*, 597 U.S. at 65, 142 S.Ct. 2111.

What, then, is the regulatory principle that justified these laws? Some might zero in on the fact that they targeted poaching and conclude that a modern law is not "relevantly similar" if it addresses something other than hunting. Cf. Brief for Petitioners 33–34. That focus, however, is too narrow.[5] Colonial legislatures targeted poaching because that was the particular misconduct that they happened to confront. But "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" earlier generations. *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111. Today, the right to bear arms is misused in other ways that were unknown to our forebears but pose an equivalent risk to persons or property. The antipoaching laws support the principle that when a State identifies specific places that are prone to particular "abuse[s]" of the right, W. Rawle, View of the Constitution of the United States of America 123 (1825), it can respond with "focused regulations" to address the threat, *Rahimi*, 602 U.S. at 700, 144 S.Ct. 1889.

5 On this much, I agree with the principal dissent: "[T]o set the principle of Hawaii's analogues at 'poaching' is to demand a historical twin." *Post*, at ——.

So the problem with Hawaii's default rule is not that it targets a regulatory problem besides poaching. It is that the rule does not target any particular abuse of firearms at all. Rather than identifying a specific threat to public peace and safety, Hawaii admits that it enacted the rule because many of its citizens oppose the public carry of guns. In other words, Hawaii is responding to the general danger associated with the presence of firearms, not to any specific, heightened risk of their misuse. See 2023 Haw. Sess. Laws 114 (invoking general "risks to public health, safety, and welfare associated with firearms and gun violence"). And rather than confining the rule to specific places where firearms are likely to be misused, Hawaii applies it to *all* private property, even property held open to the public. From the hardware store, to the gas station, to the fast-food restaurant—individuals cannot carry weapons for self-defense unless they obtain express consent.[6]

6 Hawaii already prohibits the carry of firearms in places that it deems sensitive, including schools, banks, and establishments serving alcohol. See Haw. Rev. Stat. §§ 134–9.1(a)(8), (12), (4). So Hawaii cannot credibly say that the separate default rule, which applies to all private property, targets anything more specific than the general risk associated with the carry of firearms.

***18** The 18th-century hunting regulations do not support such a rule. Mere disapproval of protected conduct is not a valid reason to severely restrict it.

B

Hawaii also notes that several States enacted similar default rules in the mid-to-late 19th-century.[7] These laws get Hawaii nowhere.

7 The Court has consistently reserved whether the relevant timeframe for assessing the Second Amendment's original meaning, as applied to the States, is 1791 or 1868. See *United States* v. *Hemani*, 608 U. S. ——, ——, n. 3, —— S.Ct. ——, —— L.Ed.2d ——, 2026 WL 1751710 (2026) (slip op., at 7, n. 3). Today's opinion rightly declines to resolve this question.

Once again, look to their "why." Hawaii offers no evidence that these laws were designed to vindicate the community's aversion to people carrying guns in public. Nor is it plausible that they rested on such a basis. At the time, guns were commonly owned for self-defense and hunting, and that trend only increased when many Civil War veterans brought their weapons home. See T. Lansford, The Early History of

Guns: From Colonial Times to the Civil War, in 1 Guns and Contemporary Society 28 (G. Utter ed. 2016). And while state courts often upheld gun regulations during this period, they did so because the States were pursuing specific regulatory ends, not because they were hostile to gun rights. See, *e.g.*, *State v. Chandler*, 5 La.Ann. 489, 489–490 (1850); *Cockrum v. State*, 24 Tex. 394, 401–402 (1859); *Sutton v. State*, 12 Fla. 135, 136–137 (1867).

In fact, Hawaii does not dispute that most of the 19th-century laws were understood not to address the carry of guns in general but to curtail the freedom of blacks in particular.[8] After the Civil War, the labor market in the South was a source of "considerable irritation" to the white landowning class. J. Taylor, Louisiana Reconstructed, 1863–1877, p. 90 (1974) (Taylor). Newly emancipated slaves were "prone to test [their] freedom by coming and going as [they] pleased," *ibid*., and their liberty to forage, hunt, and fish for food reduced their incentive to work on plantations, see B. Sawers, Race and Property After the Civil War: Creating the Right To Exclude, 87 Miss. L. J. 703, 741–743 (2018) (Sawers). Now forced to compete for black labor, white landowners "resented" how blacks could provide for themselves, E. Foner, Reconstruction: America's Unfinished Revolution, 1863–1877, p. 203 (updated ed. 2014) (Foner), and concluded that they would not work on plantations unless compelled to do so, Taylor 90–91. So Southern States enacted a series of harsh laws, known as the Black Codes, to " 'stabilize the black work force and limit its economic options apart from plantation labor.' " *Timbs v. Indiana*, 586 U.S. 146, 168, 139 S.Ct. 682, 203 L.Ed.2d 11 (2019) (THOMAS, J., concurring in judgment); see *post*, at ––––  – –––– (JACKSON, J., dissenting).

8 The exception is Oregon's 1893 law, which appears to have been a hunting regulation. See The Eugene Guard, May 15, 1893, p. 2, col. 2, https://www.newspapers.com/image/131045758 (archived at https://perma.cc/7MHJ-QC4A) ("The last legislature passed a very stringent hunting law"); Albany Weekly Herald, Sept. 28, 1893, p. 3, col. 4, https://www.newspapers.com/image/565701266 (archived at https://perma.cc/H5AC-ENC8) ("THE TRESPASS LAW. Hunters Will Find Its Provisions Rather Stringent"). As the Court explains, this law is distinguishable on other grounds. See *ante*, at –––– – ––––.

***19** Louisiana was one of those States. In 1865, three of its local governments enacted sweeping measures that one observer described as restoring "slavery in substance." S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 96 (1865). Among other things, these ordinances prohibited blacks from renting or keeping a house within town limits, barred them from entering the town without permission of their employers, and forbade them from carrying weapons without authorization. *Id*., at 92–96. Fearing backlash from Congress, the state government opted for a subtler approach. See W. Caskey, Secession and Restoration of Louisiana 187 (1938). In the fall of that same year, the Democratic-controlled legislature convened a special session and tasked a joint committee with proposing legislation " 'to make [freedmen's] labor available to the agricultural interests of the State.' " T. Wilson, The Black Codes of the South 78 (1965). The resulting package of laws was facially neutral, *id*., at 78–79, but no one was under any illusions about its true aims. As the eventual mayor of New Orleans remarked, the " 'whole thought and time' " of the special session was " 'given to plans for getting things back as near to slavery as possible.' " Foner 199; see Taylor 101 ("It was understood when [Louisiana's vagrancy law] was passed that it was to be used against blacks but not against whites"). Ostensibly neutral measures like these, we have recognized, were really "consciously conceived methods of resurrecting the incidents of slavery." *General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 387, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

One provision of Louisiana's Black Code was the default rule that Hawaii invokes today. At the time, Louisiana apparently did not restrict by statute where individuals could hunt for game. See Sawers 746, 748; see Fur, Fin, and Feather: Containing the Game Laws of the Principal States of the United States, and Canada 52 (4th ed. 1868). But under the State's 1865 law, no one was permitted to carry firearms "on the premises or plantations" of another without his permission. 1865 La. Acts No. 10, § 1, p. 14. Like the other components of Louisiana's Black Code, this law was designed to control black labor: It "restricted the ability of blacks to feed themselves on open land," thus "pushing [them] into the agricultural labor market." Sawers 748; cf. Foner 203 (explaining that "by limiting hunting," Southern States "made it more difficult for blacks to obtain food or income without working on plantations"). In addition, by presumptively banning the carry of firearms on private property, the law put blacks "at a further disadvantage in protecting themselves" against private violence. B. Crouch, "All the Vile Passions": The Texas Black Code of 1866,

97 S. W. Hist. Q. 12, 29 (1993); see 3 Cong. Rec. 1648 (1875) (Report of Rep. Hoar) (describing Louisiana's law as "depriving the great mass of the colored laborers of the State of the right to keep and bear arms").[9]

9 Two of Hawaii's other laws from 1866—one from Texas and the other from Florida—were similarly part of their respective State's Black Code. See Crouch, 97 S. W. Hist. Q., at 12, 22–23, 28–29; J. Richardson, Florida Black Codes, 47 Fla. Hist. Q. 365, 375, n. 34 (1968). Florida's Black Code was notoriously aggressive, even for its time. See T. Wilson, The Black Codes of the South 96 (1965). For instance, the committee that proposed the laws described slavery as a "benign" and "greatly misunderstood" institution that had ensured a "well regulated labor system," and believed its task was to "devis[e] a plan to make the labor of the emancipated slave available" again. Fla. Senate J. 56 (1865).

It is beyond me why Hawaii would claim that these vile laws can justify its present-day restriction. We can put aside the question whether they are legitimate evidence of the Second Amendment's scope, *post*, at ––––– – ––––– (opinion of JACKSON, J.), because regardless, they do not help Hawaii. The State seems to think *Bruen* is a matching game: Southern States enacted broad default rules, Hawaii reasons, so it can do the same today. But even if Hawaii is right that the *how* is analogous, it also must identify an analogous *why*. The Black Codes were enacted to subordinate newly freed slaves.[10] Hawaii obviously does not contend that its law promotes an analogous interest. So its law and the default rules in the Black Codes are not " 'relevantly similar.' " *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111. Most would take that as a compliment.

10 The principal dissent contends that the Black Codes shared a "why" with the 18th-century laws because all "were enacted to prevent poaching and other related harms." *Post*, at –––––, n. 17. But the relevant question under *Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387, is not simply whether two laws targeted similar conduct. It is instead *why* they targeted that conduct—that is, what "reason" justified the restriction. *United States v. Rahimi*, 602 U.S. 680, 692, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024). For the 18th-century laws, it was the risk of harm to persons and property caused by hunting. For the Black Codes, it was the ability of blacks to provide for themselves without working on plantations. Because the two sets of laws did not share an analogous justification, they do not stand for the same regulatory principle.

* * *

***20** Applying old principles to new circumstances is not always easy. This case, however, is not hard. While most Hawaiians might prefer that no one carry firearms in public places, a majority's opposition to a constitutional right is not a permissible basis for restricting it. After all, "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy" and "to place them beyond the reach of majorities and officials." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Justice KAGAN, dissenting.

I would uphold the challenged Hawaii law because, as Justice JACKSON shows in Part III of her opinion, it is a modern-day analogue of colonial and founding era laws that similarly prohibited carrying firearms onto private property without the owner's affirmative consent. See *post*, at ––––– – –––––. The "how" is identical: The new law, just like the old ones, sets a default rule against gun carry that a private landowner may reverse. The "why" is sufficiently close. Both sets of laws respond to the dangers and harms that someone with a gun can cause on another person's property. That the old laws had a special (though by no means exclusive) concern with poaching does not matter. "The regulatory challenges posed by firearms today are not always the same as those that preoccupied" earlier generations. *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 27, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). The key question is whether the challenged regulation is "consistent with the *principles* that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (emphasis added). Here, the challenged law is consistent with those principles because it reflects, as the old laws did, the perceived "abuses, damages and inconveniences" that can be caused by persons carrying guns "on other people's lands." 1721 Pa. Laws ch. 246, § 3 (preamble), in 3 The Statutes at Large of Pennsylvania From

1682 to 1801, p. 255 (J. Mitchell & H. Flanders eds. 1896). That conclusion is enough for me to resolve this case, without addressing *Bruen*'s step-one inquiry or the use at step two of Louisiana's Black Code. I therefore respectfully dissent.

Justice JACKSON, with whom Justice SOTOMAYOR joins, dissenting.

Today the Court declares unconstitutional Hawaii's efforts to protect the rights of its residents—both those who wish to carry guns and those who prefer that guns are not carried on their private property without their express permission. To hear the majority tell it, Hawaii's law is a blatant attempt to end-run our Second Amendment precedents. But the statute at issue does no such thing. Instead, it fairly applies a first principle of property law—the right to exclude—and does no harm to the Second Amendment.

The majority thinks otherwise; it reaches today's result by purporting to apply the test we established in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). But the majority gets both the *Bruen* test and its application wrong. Hawaii's law does not implicate the Second Amendment because there is no right to carry a gun onto private property without consent (as all agree), and the Constitution does not dictate the form of that required consent. And even if the Second Amendment were implicated here, Hawaii has proffered ample analogues demonstrating a history and tradition of States protecting their residents' property rights by requiring those wishing to carry guns onto private property to get express consent from the property owner before doing so.

***21** For what it is worth, I think *Bruen* was wrongly decided. But if it is going to be our precedent, the majority should at least endeavor to apply it faithfully. I respectfully dissent because the majority has failed to do so here, and its analysis and conclusion only further bind the hands of modern legislatures attempting to balance and protect their residents' interests. With this decision, the Court has now manipulated *Bruen* into a free-for-all that lets the Judiciary thwart the will of legislatures by privileging access to firearms above all else. Today's decision makes one thing clear: The Court's objective is protecting guns, not consistently preserving any principle of law.

I

Since its time as a sovereign kingdom, Hawaii has never permitted the widespread carrying of firearms in its territory. In 1833, King Kamehameha III of the Kingdom of Hawaii prohibited the possession of "dangerous weapon[s]." Translation of the Constitution and Laws of the Hawaiian Islands, Established in the Reign of Kamehameha III 163 (1842) (reprint 1934) (targeting possession of any "knife, sword-cane, or any other dangerous weapon"). Hawaii maintained this tradition of strictly regulating weapons both before and after it was annexed as a U. S. territory in 1898. See, *e.g.*, Act of May 25, 1852, § 1, 1852 Haw. Sess. Laws 19 (expanding definition of deadly weapons); Haw. Rev. Laws, ch. 209, § 3089 (1905), as amended by Act of Mar. 19, 1913, § 1, 1913 Haw. Sess. Laws 25.

In 1927, Hawaii began regulating firearms in particular by carefully controlling who may carry them. Act 206, § 5, 1927 Haw. Sess. Laws 209–211. Such regulation continued even after statehood in 1959, when Hawaii began allowing private gun ownership but only if the applicant could show an "exceptional case." Act 163, § 1, 1961 Haw. Sess. Laws 215. Thus, "[t]he history of the Hawaiian Islands does not include a society where armed people move about the community." *State v. Wilson*, 154 Haw. 8, 27, 543 P.3d 440, 459 (2024).

That custom continued until very recently. Prior to this Court's decision in *Bruen*, Hawaii issued concealed-carry permits only in "exceptional case[s]," which required "an applicant [to] sho[w] reason to fear injury to the applicant's person or property." Haw. Rev. Stat. § 134–9(a) (2011). The result? Hawaiians have rarely carried (or encountered others carrying) guns.

Following *Bruen*'s rejection of licensing schemes like Hawaii's, the State was forced to alter its long-standing tradition. To accomplish this, it enacted Act 52, which allowed for concealed-carry permits to issue after applicants passed a background check and underwent a training process. See 2023 Haw. Sess. Laws 113–136. Act 52 also restricted where and how license holders could carry their guns. See § 2, *id.*, at 114–119 (codified at Haw. Rev. Stat. §§ 134–9 to 134–9.5 (2023)).

One problem that Hawaii confronted as it undertook to implement Act 52 was how best to protect Hawaiians who, accustomed to the traditional practice, might not be aware that gun laws were changing to allow for armed—and concealed—carry in everyday life. In particular, given Hawaii's history, private property owners were unlikely to expect guns to be carried onto their property or to know that they needed to take steps if they did not wish to permit armed entry. See *Wilson*, 154 Haw. at 27, 543 P.3d at 459 (noting lack of custom of armed carry). The community was up in arms about this (so to speak). Hawaii's Legislature held hearings and received testimony from residents and the business community indicating that private property owners did not want people carrying guns onto their property without their express consent. [1]

1 See, *e.g.*, Hawaii House of Representatives Committee on Finance, Public Hearing on Senate Bill HI SB 1230, at 3:32:24 to 3:32:38 (Apr. 5, 2023), youtube.com/watch?v=nwDy5fqtzTg (archived at https://perma.cc/62GZ-YJJ8) (testimony of G. Abrena-Agas) ("We support allowing owners of private property to choose whether they want to opt in to authorizing concealed carry on their properties and also choose to opt in to providing signage on their properties for that").

***22** This input from Hawaii's residents mirrored evidence from around the country. One nationwide study revealed widespread public misunderstanding about whether it was lawful to bring a gun onto private property. See I. Ayres & S. Jonnalagadda, Guests With Guns: Public Support for "No Carry" Defaults on Private Land, 48 J. Law Med. & Ethics 183, App. 8, Table A5 (2020). Not only that, but the study's respondents generally had preferences *against* armed carry in certain spaces, even spaces open to the public. See *id.*, at 186 ("Only about one-quarter of respondents (25.1%) expressed support for a default right of employees to bring guns into their places of employment .... A larger, but still minority proportion of respondents (44.2%), believe customers, by default, should be allowed to carry into retail establishments"); *id.*, at 185, Table 1.

A straightforward solution emerged: Act 52 would require gun owners to get affirmative consent from the property owner before carrying a firearm onto private property. See *id.*, at 188–189 (suggesting this approach). Hawaii codified this affirmative-consent solution in § 134–9.5, prohibiting a concealed-carry permit holder from carrying a handgun onto private property unless the permit holder has "been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property," or agent thereof. § 134–9.5. Under § 134–9.5(b), such express authorization could be either by "[u]nambiguous written or verbal authorization" or by "[t]he posting of clear and conspicuous signage at the entrance of the building or on the premises."

Section 134–9.5 thus helped narrow the informational asymmetry caused by the potential sea change in Hawaii's gun-possession rates. Indeed, the enacted law stated that the legislature had adopted the rule to "respec[t] the right of private individuals and entities to choose for themselves whether to allow or restrict the carrying of firearms on their property" and to promote "public health, safety, and welfare." 2023 Haw. Sess. Laws 114. By enacting § 134–9.5, Hawaii chose to protect the unaware property owner while leaving open to gun owners the opportunity to carry firearms where consent has been provided.

Notably, in making this choice, Hawaii was not alone. It joined four other States that had similar laws. See Cal. Penal Code Ann. § 26230(a)(26) (West Cum. Supp. 2025); N. J. Stat. Ann. § 2C:58–4.6(a)(24) (West 2024); Md. Crim. Law Code Ann. § 6–411 (Supp. 2025); N. Y. Penal Law Ann. § 265.01–d(1) (West 2025).

## II

Petitioners believe that having to ask for permission to carry a firearm onto private property open to the public is an unconstitutional burden on their Second Amendment rights. But their bid to invoke the Constitution stumbles out of the gate—at step one of this Court's *Bruen* test. [2] There is no constitutional right to enter private property without the owner's permission, let alone with a firearm. So the question this case presents is merely how a property owner must communicate his decision to exclude or to invite armed carry, including whether a State may alter the background property-law rules that set the default as one or the other. The Second Amendment has nothing to say about that. Petitioners'

constitutional rights are thus not implicated here, and their claim should meet its end at *Bruen*'s first step.

2 The Court's decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), prescribed a two-step inquiry for assessing Second Amendment challenges to government regulation. The first step asks whether the challengers have shown that the plain text of the Second Amendment, which codified a pre-existing right to carry, covers an individual's conduct. *Id*., at 24, 142 S.Ct. 2111. If it does, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid*.

***23** To avoid this obvious outcome, the majority has to reconceptualize *Bruen*. Instead of applying a threshold criterion asking whether the challengers have shown that the plain text of the Second Amendment—which codified a preexisting right to carry—covers conduct that the challenged law restricts, the majority essentially directs courts to start by simply asking whether a gun owner cannot do what she wants with her firearm. *Ante*, at ——— – ———. The majority thereby eliminates step one's effectiveness as a means of identifying gun-related laws that impinge on rights secured by the Second Amendment. This move represents a significant expansion that, as applied here, obscures what *Bruen*'s actual step-one analysis reveals: This case is about property rights, not gun rights.

A

" '[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave.' " *Florida v. Jardines*, 569 U.S. 1, 8, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (quoting *Entick* v. *Carrington*, 2 Wils. K. B. 275, 291, 95 Eng. Rep. 807, 817 (K. B. 1765)). This principle, called the right to exclude, is the "*sine qua non*" of property. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150, 141 S.Ct. 2063, 210 L.Ed.2d 369 (2021) (internal quotation marks omitted). It is "one of the most essential sticks in the bundle of rights that are commonly characterized as property" and is "universally held to be a fundamental element of the property right." *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179–180, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

Stated simply, the right to exclude means that members of the public may not enter privately owned property without the consent of the owner. To do so would be a trespass. 4 M. Wolf, Powell on Real Property § 34.25, p. 34–222 (2026) (Powell on Property); see *ante*, at ——. Consent to enter property is often referred to as a "license." Powell on Property § 34.25, at 34–220. And a license is a *privilege*, revocable at the will of the property owner. 8 D. Thomas, Thompson on Real Property § 64.03 (2016); Powell on Property § 34.25, at 34–223 ("A license is revocable by any manifestation of the licensor's intent to end it").

The consent establishing a license to enter someone else's property can be explicit or implicit. *Id.*, at 34–220. The form of consent typically depends on the nature of the private property at issue. In many places, private property owners welcome visitors (think shops, gas stations, and the like). Thus, as the majority notes, the public generally enjoys an implied license to enter this sort of property—that is, private property open to the public. *Ante*, at ——. The operation of the implied license in this context means that the public can enter such property without seeking the owner's affirmative consent; such entry is not considered a trespass. *Ibid*.; Powell on Property § 34.25, at 34–222. Of course, the owner retains the option to revoke that implied license in whole or in part, even when operating private property open to the public. *Id*., at 34–221.[3]

3 Dogs in restaurants provide one modern example. In the absence of a regulation saying that dogs are not permitted in restaurants, the implied license for a human customer to enter a restaurant might extend to a pet, or it might not. But either way, a property owner has the option to put up a "No Dogs Allowed" sign to make clear that dogs are not welcome. See Brief for City of Baltimore et al. as *Amici Curiae* 16.

The scope of any license to enter can vary in ways that are relevant here. First, as courts have traditionally recognized, local custom can provide a baseline. Consider, for instance, *McKee v. Gratz*, 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167 (1922), a case involving button makers who had entered the plaintiff 's private land in search of mussel shells, *id*., at

134, 43 S.Ct. 16. In many places, that entry might have been a trespass—"[t]he strict rule of the English common law" required affirmative consent before entry. *Id.*, at 136, 43 S.Ct. 16. But in Missouri, where the mussel hunting took place, "[t]here was evidence that the practice" of permitting people to enter private lands to hunt "had prevailed." *Ibid.* And that local custom mattered: The Court explained that the English common law "must be taken to be mitigated" by "the practice [that] had prevailed in [the] region" where the suit originated. *Ibid.* In other words, there was evidence that local custom had developed such that the mussel hunters might have had an implied license to enter the land. The rules governing licenses to enter, therefore, are not universal. Rather, " '[a] license may be implied from the habits' " of a particular location. *Jardines*, 569 U.S. at 8, 133 S.Ct. 1409 (quoting *McKee*, 260 U.S. at 136, 43 S.Ct. 16).

***24** Second, because States have the power to set default consent rules, state law can alter the scope of a license to enter private property. For example, the English rule was that the public had to obtain the owner's express permission to hunt or fish on "unenclosed" private property. M. Brady, Property v. Guns: The Level-of-Generality Problem in *Wolford*, 78 Stan. L. Rev. Online 156, 165 (2026). But some States altered this rule via positive law. See, *e.g.*, Pa. Const., § 43 (1776) ("[I]nhabitants of this state shall have liberty to fowl and hunt ... on all ... lands ... not inclosed"); Vt. Const., ch. 2, § 39 (1777) (similar). Others retained it or variations on it. See Act of Aug. 23, 1769, 1790 S. C. Pub. L. § 3, 276 (prohibiting hunting without license if more than seven miles from home).

In all events, uniformity with respect to the scope of licenses to enter private property was never thought necessary or even desirable. Instead, local inhabitants molded licenses to fit local needs, both by custom and by positive law.

B

All this makes clear that Hawaii's law does not restrict the right to carry a gun at all. Instead, its law vindicates its resident's property rights by operating on the scope of the implied license to enter. And it does so by requiring gun owners to seek express consent, rather than assume implied consent. See § 134–9.5(b). Consequently, Hawaii's law simply does not implicate the Second Amendment, as *Bruen*'s first step requires.

*Bruen* instructs that courts must start by asking whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24, 142 S.Ct. 2111. But "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The Second Amendment "codified a pre-existing right, and preexisting limits on that right are part and parcel of it." *United States v. Rahimi*, 602 U.S. 680, 737, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (BARRETT, J., concurring). So, at *Bruen*'s first step, courts must determine whether the activity asserted is part of this pre-existing right.

Here, those pre-existing limits doom petitioners' case. Petitioners wish to carry guns onto private property without seeking express consent. See Brief for Petitioners 24 (arguing that the Second Amendment allows them to "carr[y] firearms on private property open to the public without first getting express permission from the proprietor"). Yet everyone agrees that consent is a precondition to exercising any right to carry on private property.[4] That concession gives the game away: Section 134–9.5 does not burden petitioners' rights under the Second Amendment because there is no right to carry a gun onto private property without the permission of the owner. The right to exclude is a long-recognized (and presently accepted) limitation on "the pre-existing right" to carry.

4 Both petitioners and the United States, as *amicus curiae*, acknowledge this crucial point. See Brief for Petitioners 17 ("To be sure, a private property owner has the unquestioned right to exclude others, including those bearing arms. Petitioners have no quarrel with that principle" (internal quotation marks and citation omitted)); Brief for United States as *Amicus Curiae* 26 ("[A]n owner may revoke [any] license" to enter private property with guns).

To be sure, the public might well have an implied license to enter private property open to the public, and such permission might generally include the ability to enter armed. See *ante*, at ——. But as I have explained, any such license is not

a matter of right—a license is a creature of state law and custom, and it can vary accordingly. See *supra*, at ——– ——. Unsurprisingly, then, there are multiple historical examples of States altering the scope of implied licenses through legislation. Under the common law of England, there was no implied license for a person's livestock to enter another person's unfenced land. But the Colonies reversed that rule through legislation, requiring landowners to fence out roaming livestock that they did not want on their property. See B. Sawers, The Right To Exclude From Unimproved Land, 83 Temp. L. Rev. 665, 679–684 (2011).

***25** And it's not just livestock. States have also historically altered the scope of implied licenses *to carry firearms* onto private property—the subject of today's case. During the founding and Reconstruction eras, multiple States passed laws that operated on the interaction between armed carry and the right to exclude. These laws, like Hawaii's, required affirmative consent for armed entry onto private property. See Act of Dec. 21, 1771, § 1, Laws of the State of New-Jersey 26 (1821) (1771 N. J. Laws) (barring visitors from "carry[ing] any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner"); 1721 Pa. Laws, ch. 246, § 3, in 3 The Statutes at Large of Pennsylvania From 1682 to 1801, pp. 254–255 (J. Mitchell & H. Flanders eds. 1896) (1721 Pa. Acts) (making it unlawful for a person to "carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner"); Act of Dec. 20, 1865, No. 10, § 1, 1865 La. Acts 14 (1865 La. Acts) ("[I]t shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor"); Act of Nov. 6, 1866, 2 Tex. Laws 1321 (G. Paschal ed., 4th ed. 1874) (1866 Tex. Laws) (similar).

Thus, at presumably relevant historical time periods, it was commonly understood that the right enshrined in the Second Amendment yields to property rights where private property is concerned. [5] Entry was, in the first instance, subject to the right to exclude. And because state law and custom set the bounds of the right to exclude, the scope of one's ability to carry firearms onto private property open to the public, and the form of the consent required, were likewise changeable by custom or state law.

5 The Court has declined to decide the relevance of Reconstruction-era laws to the *Bruen* inquiry. See *United States v. Hemani,* 608 U. S. ——, ——, n. 3, —— S.Ct. ——, —— L.Ed.2d ——, 2026 WL 1751710 (2026) (slip op., at 7, n. 3) *(citing* *Bruen*, 597 U.S. at 37–38, 142 S.Ct. 2111). I find no need to answer that open question now because, in this case, I view both the founding-era and Reconstruction-era laws as pointing in the same direction: toward upholding Hawaii's law as consistent with the Second Amendment.

*This* was the backdrop against which the Second Amendment came into being (and which the Fourteenth Amendment incorporated); the right it enshrined did not protect an unyielding liberty to carry a gun onto private property via implied consent. In other words, the conduct here—carrying a gun onto private property without securing the property owner's express consent—is not part of the pre-existing right protected by the Second Amendment.

Conceptualizing Hawaii's law as "flipping the default," *ante*, at ——, misses the point: *State law* supplies the default. Yes, the historical custom in most States set the consent rule to be implicit in most circumstances. But that custom was by no means universal—as I have explained, some States decided that consent to carry firearms onto private property must be explicit. And in every instance, the States retained the power to determine whether the required consent could be implied or had to be explicit. See *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law" (citing *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 370, 65 S.Ct. 405, 89 L.Ed. 305 (1945))); *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 484, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) (noting the "general proposition [that] the law of real property is, under our Constitution, left to the individual States to develop and administer" (internal quotation marks omitted; alteration in original)).

Recognizing state autonomy in this respect is especially appropriate here, since Hawaii has *never* had a custom of armed carry. *Wilson*, 154 Haw. at 27, 543 P.3d at 459. In this way, Hawaii's use of its prerogative to protect the interests of its residents is consistent with its own traditions. Although the relevant principle—that the State can choose whether an

implied license exists—applies nationwide, Hawaii's footing is especially strong because it has *always* effectively set its default rule in the same direction: In the absence of the widespread availability of guns, those who sought to carry guns onto private property open to the public in Hawaii never had an implied license to do so. Section 134–9.5 merely codified that existing norm.

***26** The majority chastises Hawaii for seeming to argue that the meaning of the Second Amendment should change State-to-State. *Ante*, at –––– – ––––. But the majority misunderstands Hawaii's argument. The *meaning* of the Second Amendment does not vary by location. Its meaning remains fixed: The right to carry firearms onto private property is subject to consent. It is the form of that consent that may vary by custom or state law.[6]

6 This is not abnormal. When federal constitutional law is applied to the States, there are times when choices about state law may cause it to appear that "constitutional protections ... vary based on how each State has chosen to" legislate. *Lange v. California*, 594 U.S. 295, 332, 141 S.Ct. 2011, 210 L.Ed.2d 486 (2021) (ROBERTS, C. J., joined by ALITO, J., concurring in judgment) (emphasis added). But in such circumstances, what differs is the application; the meaning of the constitutional provision itself does not vary by location. See, *e.g.*, *id.*, at 303–308, 314, 141 S.Ct. 2011 (defining the scope of an exception to the Fourth Amendment's warrant requirement).

The majority's contrary conclusion means that, despite yielding to property law when it comes to the *fact* of consent, the Second Amendment dictates its *form*. That disconnect is both puzzling and unfounded. The form of consent is simply not of constitutional dimension.

C

Rather than respond to Hawaii's evidence that the right to exclude resolves this case at the first step of *Bruen*, the majority moves the goal posts. It announces that, at step one, courts must look *only* to the "plain text" of the Second Amendment devoid of any historical understanding. *Ante*, at ––––, ––––. And it rejects Hawaii's attempts to clarify the meaning of the plain text as it relates to the relevant conduct: carrying a firearm onto private property without express consent. History, according to the majority, is "out of place at *Bruen*'s first step." *Ante*, at ––––. Instead, the majority seeks to confine history to *Bruen*'s second step—when the government must identify a history and tradition that relevantly limits the scope of the Second Amendment right. *Ante*, at –––– – ––––; see 597 U.S. at 19, 142 S.Ct. 2111. This shift is surprising, not only as a matter of precedent but also in light of the majority's chosen methodology.

First of all, step one of *Bruen* is supposed to be an interpretive exercise focused on the text of the Constitution. 597 U.S. at 17, 142 S.Ct. 2111. As such, our cases *require* that history play a role. True, *Bruen* holds for step-one purposes that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Ibid*. But its analysis demonstrates that "plain text" means text supported by historical understanding.

Specifically, *Bruen* relied heavily on *Heller*, which "demand[ed] a test rooted in the Second Amendment's text, *as informed by history*." 597 U.S. at 19, 142 S.Ct. 2111 (emphasis added).[7] According to *Bruen*, *Heller* had "relied on text *and history*" for "defining the character of the right ..., suggesting the outer limits of the right, [*and*] assessing the constitutionality of a particular regulation." *Bruen*, 597 U.S. at 22, 142 S.Ct. 2111 (emphasis added). This characterization of *Heller* made sense, as the main point of *Heller*'s analysis was to explain that the text of the Second Amendment codified a pre-existing right. 554 U.S. at 592, 128 S.Ct. 2783. History, then, was necessary for interpreting the text.

7 *Bruen*'s many citations to *Heller* support this reading. When *Heller* "turn[ed] first to the meaning of the Second Amendment," 554 U.S. at 576, 128 S.Ct. 2783, it looked to history. See *Bruen*, 597 U.S. at 20, 142 S.Ct. 2111 ("In *Heller*, we began with a 'textual

analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language," and, "[f]rom there, we assessed whether our initial conclusion was 'confirmed by the historical background of the Second Amendment' " (quoting *Heller*, 554 U.S. at 576, 578, 592, 128 S.Ct. 2783)). History mattered for interpreting the plain text of the Second Amendment because " 'it has always been widely understood that the Second Amendment ... codified a *pre-existing* right.' " *Bruen*, 597 U.S. at 20, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 592, 128 S.Ct. 2783).

***27** *Bruen* then derived its first step from the "test ... set forth in *Heller*." 597 U.S. at 26, 142 S.Ct. 2111. *Heller* indicated that it is appropriate to consider history in ascertaining the scope of the Second Amendment right —what *Bruen* later adopted as step one. 554 U.S. at 592, 128 S.Ct. 2783. And step one is supposed to have a function: It operates as a check to make sure that Second Amendment challengers demonstrate that the Amendment actually implicates their desired conduct. *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111 (analyzing whether the "plain text of the Second Amendment protects [the] proposed course of conduct"). In so doing, *Bruen*'s first step requires "defining the character of the right," which, again, *Heller* instructs involves consideration of history. *Bruen*, 597 U.S. at 22, 142 S.Ct. 2111.

Although *Bruen* did not conduct a historical analysis itself, that was because *Bruen*'s step-one "plain text" determination was obvious after *Heller*. In other words, the interpretive question the *Bruen* Court was asked to answer required no interpretation of the text of the Amendment beyond what *Heller* had done. 597 U.S. at 32, 142 S.Ct. 2111. *Heller* had already reviewed the historical record and had essentially concluded that the proposed course of conduct at issue in *Bruen*—"carrying handguns publicly for self-defense"—was covered by the text of the Second Amendment. *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111 (citing *Heller*, 554 U.S. at 592, 128 S.Ct. 2783). Indeed, the parties in *Bruen* did not dispute this point. 597 U.S. at 33, 142 S.Ct. 2111.

Here, the parties do not agree about the meaning of the Second Amendment, nor have our past cases established the meaning of the Second Amendment applicable to petitioners' proposed conduct—namely, "carrying firearms on private property open to the public without first getting express permission from the proprietor." Brief for Petitioners 24. So today's step-one question is whether the Second Amendment protects armed carry onto private property open to the public without express consent. And that inquiry demands additional interpretation of the pre-existing limits baked into the Second Amendment. See *Heller*, 554 U.S. at 576–578, 592–595, 128 S.Ct. 2783.[8]

8 Justice BARRETT thinks otherwise. She asserts that the only role of history at step one is to "elucidat[e] how contemporaries understood the text—for example, the meaning of the phrase 'bear Arms.' " *Ante,* at —— (concurring opinion) (quoting *United States v. Rahimi*, 602 U.S. 680, 738–739, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (BARRETT, J., concurring)). And she insists that my reasoning both misunderstands the *Bruen* inquiry and would lead to the disruption of other constitutional rights. *Ante*, at —— – —— (BARRETT, J., concurring). But this Court has said repeatedly that the Second Amendment in particular enshrined a *pre-existing* right. *Bruen*, 597 U.S. at 20, 142 S.Ct. 2111 (citing *Heller*, 554 U.S. at 592, 128 S.Ct. 2783); see also *Rahimi*, 602 U.S. at 737, 144 S.Ct. 1889 (BARRETT, J., concurring). So, understanding any pre-existing limits on that right as codified by the Amendment's text *is* an interpretive inquiry. Cf. L. Solum, Originalism and Constitutional Construction, 82 Ford. L. Rev. 453, 457 (2013) (noting the distinction in originalist theory between interpreting the words of the Constitution and construing those words to decide a legal question). Our past cases do not answer the question of how the right to exclude—which the Framers were aware of—interacted with the Second Amendment's pre-existing right to carry. History is

needed to "elucidat[e]" (*ante,* at —— (BARRETT, J., concurring) (internal quotation marks omitted)) whether the Second Amendment protects the ability to presume implied consent to carry firearms onto private property. *Bruen*'s second step, by contrast, uses history to address a different question: whether, if the modern regulation does impinge upon the constitutionally protected right to carry firearms, that challenged law "is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24, 142 S.Ct. 2111.

***28** Thus, under *Bruen* and *Heller*, the Court must consult the historical record to determine whether the plain text of the Second Amendment was originally understood to guarantee armed carry onto private property with presumed implied consent as the default, impervious to state regulation altering the form of that consent—*i.e.*, the constitutional right petitioners claim. For the reasons I have already explained in Part II–B, *supra*, history clearly demonstrates that the Second Amendment has never been understood to protect such conduct.

The Court's sudden aversion to consulting history to inform the scope of the Second Amendment right at *Bruen*'s step one is strange, to say the least. Several Members of the majority have elsewhere opined that interpreting the Second Amendment requires understanding the original meaning of its text.[9] Yet the majority's newfound understanding of the first step of *Bruen* obliterates any need for reference back to original meaning. All that step one now requires is a 21st-century judge to read the text of the Second Amendment and ask herself what she thinks the words mean. *Ante*, at —— – ——. If she decides that the words cover the conduct before her (perhaps by conjuring up lengthy hypotheticals chronicling imagined indignities, *e.g.*, *ante*, at —— – ——), then the conduct is presumptively protected by the Second Amendment. Forget about "keep[ing] judges in their proper lane" by "[d]iscerning ... the original meaning of the Constitution." *Rahimi*, 602 U.S. at 711, 144 S.Ct. 1889 (GORSUCH, J., concurring). Judges are now free to insert any meaning they desire into the text of the Second Amendment and then demand the government provide analogues to fit that interpretation. In light of the methodological choice to rely on originalism, however, it should be insufficient to simply point to the text and say that the Second Amendment covers any firearm-related conduct. *Ante*, at —— – ——.[10]

9 See *Rahimi*, 602 U.S. at 737, 144 S.Ct. 1889 (BARRETT, J., concurring) ("Because the Court has taken an originalist approach to the Second Amendment, it is worth pausing to identify the basic premises of originalism. The theory is built on two core principles: that the meaning of constitutional text is fixed at the time of its ratification and that the discoverable historical meaning has legal significance and is authoritative in most circumstances" (internal quotation marks and alteration omitted)); *id.*, at 716, 144 S.Ct. 1889 (KAVANAUGH, J., concurring) ("Read literally, those Amendments might seem to grant *absolute* protection, meaning that the government could never regulate speech or guns in any way. But American law has long recognized, as a matter of original understanding and original meaning, that constitutional rights generally come with exceptions"); *id.*, at 711, 144 S.Ct. 1889 (GORSUCH, J., concurring) ("Discerning what the original meaning of the Constitution requires in this or that case may sometimes be difficult. Asking that question, however, at least keeps judges in their proper lane, seeking to honor the supreme law the people have ordained rather than substituting our will for theirs"); cf. *McDonald v. Chicago*, 561 U.S. 742, 828, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment) ("When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted").

10 This is not to say that more originalism is the antidote to an unconstrained Judiciary. I am doubtful that originalism can be done right in any event because it is too easy for judges to selectively oversimplify the past, either when choosing examples or when drawing inferences from the historical record. Indeed, a "flawed" "historical account" is what started the doctrinal mess we find ourselves in today. See *McDonald*, 561 U.S. at 914, 130 S.Ct. 3020 (Breyer, J.,

dissenting) (suggesting that *Heller* was wrongly decided in part based on poorly conceived historical analysis). The plot now thickens, for even selectivity when reviewing the historical record cannot get the majority to its desired result at step one. So the majority jettisons history here, confining its use to step two and freeing courts from the constraints that even an oversimplified understanding of the history might provide when interpreting the "plain text" of the Second Amendment.

***29** Worse, the majority's new methodology is a one-way ratchet: It inevitably works only to the benefit of armed carry by removing any real burden of proof on gun owners at step one. The majority simply equates the *ability* to carry a gun with the *right* to carry anywhere and everywhere. *Ante*, at ––––. Because of that, it then assumes that any impediment to carrying qualifies as a burden on the right. *Ante*, at ––––, ––––. The upshot of the majority's view of *Bruen*'s first step is thus that any law that regulates the carrying of firearms is presumptively unconstitutional. But under this Court's precedents, assessing whether conduct falls within the right protected by the Second Amendment requires more than breezily asserting that the restricted conduct involves carrying a firearm.

Ultimately, the majority spills much ink arguing that the *Bruen* test is "disciplined" but, conveniently, "not mechanical." *Ante*, at ––––. As it turns out, "not mechanical" is a gross understatement. *Bruen* becomes boundless once the majority abandons its chosen methodology, and the Court ends up with a more protective Second Amendment than the Framers understood themselves to be adopting. If originalist principles and our Second Amendment case law were consistently applied, however, there would be little doubt that Hawaii prevails at step one. The Second Amendment's plain text, informed by history, simply does not protect a right to go armed onto private property without the property owner's express consent. [11]

11 The majority maintains that this framing is incorrect "because States may not adopt property-law rules that violate constitutional rights." *Ante*, at ––––, n. 13. I agree, of course, that States cannot alter constitutional rights. But today's dispute is not a matter of *Hawaii* altering the Constitution. Rather, the scope of the right to carry per the Second Amendment is and always has been limited by property interests (the right to exclude). *Heller* was crystal clear that the Second Amendment adopted a pre-existing right, 554 U.S. at 592, 128 S.Ct. 2783, and that right was limited by a similarly pre-existing, well-established, and currently accepted property right —not the other way around.

## III

Even if the majority were correct about how step one cashes out, Hawaii has carried the step-two burden of showing that its regulation is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. *Bruen*'s second step requires courts to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889 (quoting *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111). "Why and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889. There is no requirement that a State produce a " 'dead ringer' " or a " 'historical twin.' " *Ibid.* (quoting *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111). Instead, " 'the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition.' " *United States v. Hemani,* 608 U. S. ––––, ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2026 WL 1751710 (2026) (slip op., at 4) *(quoting* *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889; emphasis added).

The analogues cited by Hawaii clearly establish that legislatures historically required affirmative consent for carrying a firearm onto private property—the same "how" as § 134–9.5. And they did so to protect property owners' interests in response to concerns related to unauthorized armed entry—the same "why" as § 134–9.5.

### A

Hawaii cites a combination of founding-era and Reconstruction-era laws. From those analogues, a principle plainly emerges: States routinely required affirmative consent for armed carry onto private property to vindicate the rights of property owners, including the right to exclude, and to prevent real-world harms arising from unauthorized armed carry.

***30** To start, the "how" maps on perfectly to Hawaii's law: Hawaii's historical analogues operated by requiring those wishing to carry a gun onto private property to get express consent from the owner. For example, a 1771 New Jersey law provided that a person could not "carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he *hath license or permission in writing from the owner or owners*, or legal possessor." 1771 N. J. Laws 26 (emphasis added). And New Jersey was not alone in requiring express consent: Multiple other States likewise required affirmative consent before visitors could carry firearms onto the private property of another, both at the time of the founding and during Reconstruction. See, *e.g.*, 1721 Pa. Acts, § 3, at 255 (requiring "license or permission from the owner" to "carry any gun or hunt on the improved or inclosed lands of any plantation other than his own"); Act of Dec. 20, 1763, ch. 1233, § 1, in 1 Laws of New-York, from the Year 1691, to 1773 inclusive, p. 442 (1774) (1763 NY Act) (criminalizing "carry[ing] ... any Musket, Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or through" certain enclosed lands "without Licence in Writing"); 1865 La. Acts, No. 10, § 1, at 14 ("[I]t shall not be lawful for any person or persons to carry firearms on the premises or plantations of any citizen, without the consent of the owner or proprietor"); 1866 Tex. Laws 1321, § 1 (same); Act of Jan. 15, 1866, 1865 Fla. Acts and Resolutions § 19, p. 27 (1865 Fla. Acts) (making it unlawful "for any person to hunt or range with a gun within the enclosed land or premises of another without the permission of the owner").

Some of those laws did not extend to all private property in the State. But a significant number applied to the type of property at issue here: private property open to the public. The New Jersey law, for example, applied to "any lands not [the trespasser's] own, and for which the owner pays taxes, or is in his lawful possession." 1771 N. J. Laws 26. That would necessarily have encompassed private property open to the public, including the type of locations to which Hawaii's law applies. See Decl. of H. Hartog ¶¶ 32, 34 in *Koons* v. *Platkin*, No. 1:22–cv–7464 (D NJ, Feb. 13, 2023), ECF No. 84 (noting that New Jersey's law would have applied to "all varieties of real property, including the typical 'businesses' of the times": "taverns, leathersmiths and blacksmiths, pharmacies, seed stores, and merchants who bought and sold livestock").

Even laws that do not appear on their face to apply to private property open to the public are, after some inquiry, akin to Hawaii's regulation. Pennsylvania's law applied to "the improved or inclosed lands of any plantation other than [the trespasser's] own." 1721 Pa. Acts, § 3, at 255. And several Reconstruction-era laws applied to "the premises or plantations of any citizen." 1865 La. Acts, No. 10, § 1, at 14; see 1866 Tex. Laws 1321, § 1; 1865 Fla. Acts, § 19, at 27. As Hawaii explains, "improv'd or inclosed Lands" and "premises or plantations" exempted undeveloped and unfenced land but still included much of the private property open to the public. Brief for Respondent 31, 33–35 (internal quotation marks omitted); see also Brief for Professors of Property Law as *Amici Curiae* 26.

As for the "why": These historical analogues were intended to vindicate property rights and to address a range of concerns associated with violations of those rights by armed individuals on private land. The laws protected property owners' right to exclude by requiring that visitors seek "license or permission" before they were permitted to carry a gun onto private property. 1771 N. J. Laws 26; 1721 Pa. Acts, § 3, at 255. And even an anti-poaching focus aimed to protect property rights by preserving the game on the property for the owner or the owner's licensees. See Brady, 78 Stan. L. Rev. Online, at 165.

Beyond property rights, the broader animating regulatory principles included limiting armed trespass, property theft or damage, and gun violence, whether intentional or accidental. See 1721 Pa. Acts, § 3 (preamble), at 255 (targeting "divers[e] abuses, damages and inconveniencies" related to unauthorized armed carry, *i.e.*, "*carrying guns* and presuming to hunt on other people's lands" (emphasis added)); 1722 N. J. Laws 101 (similar). For example, the colony of New York, which in 1763 passed a law applying to "Orchard[s], Garden[s], Corn-Field[s], or other inclosed Land whatsoever," found that the unauthorized carrying of firearms was leading to a number of issues, including creating "great Danger of the Lives of his Majesty's Subjects, the Ruin and Destruction of the most valuable Improvements, the grievous Injury of the Proprietors, and the great Discouragement of their Industry." 1763 NY Act 441–442.

***31** New York had reason to be concerned. Historically, poaching was dangerous to people and property. Stray

gunshots injured and even killed people. See Brady, 78 Stan. L. Rev. Online, at 167–168. And poachers were known for "strik[ing] back with deadly force when cornered." T. Lund, American Wildlife Law 30 (1980). Not only was poaching dangerous to bystanders and property owners, but the tactics used by hunters—including creating fires and leaving carcasses to rot—caused property damage. *Id.*, at 32. In the face of such threats and given the difficulty of policing poaching, historical legislatures likely used all the tools they could muster to decrease the harms related to poaching and reasonably decided that property owners should at least be on notice before accepting the risk of these harms.

These historical analogues suffice to demonstrate a tradition of state regulation within which Hawaii's law fits comfortably. Like Hawaii's, these laws required consent for armed entry onto private property open to the public. And like Hawaii's, they did so to protect property owners' rights and to prevent the harms that generally accompanied unauthorized armed entry onto private land.

B

At step two, the majority again misapprehends this Court's precedents. It observes that many of the analogues discuss unauthorized hunting—and goes no further, essentially requiring a "dead ringer" for Hawaii's law. *Ante*, at ––––––––. But *Rahimi* demands more effort. The lack of an exact match cannot be dispositive; instead, the majority should have searched for the animating principles in Hawaii's analogues. 602 U.S. at 691, 144 S.Ct. 1889.[12] The majority's arguments for why Hawaii's analogues are insufficient do not follow from *Rahimi's* reasoning.

12 ['What do I mean by "principles"? The majority assesses the analogues at the lowest level of generality: It looks to their texts and determines that these laws were targeted at hunting. But *Rahimi* instructs that the relevant "why" is not necessarily the "why" that is immediately apparent on the face of the law; the analogue need not be a "precis[e] match." 602 U.S. at 692, 144 S.Ct. 1889. Looking for a principle requires searching for whether the analogues were instituted "for similar reasons." *Ibid.* That often requires going up a level of generality to understand the broader problem that a legislature chose to attack. In other words, " '[a]nalogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." *Id.*, at 740, 144 S.Ct. 1889 (BARRETT, J., concurring).

First, the majority insists that the "why" is different because the historical laws targeted poaching. In the majority's view, the "obvious aim" of Hawaii's founding-era analogues "was to prevent the distinctive harms and risks associated with unauthorized hunting." *Ante*, at ––––; see *ante*, at –––– – –––– (noting further that the laws targeted conduct that "entailed the theft of private property" and "the firing of guns").

But to set the principle of Hawaii's analogues at "poaching" is to demand a historical twin insofar as it requires the modern legislature to target an identical problem as legislatures in the past. Such a narrow search results in a "law trapped in amber." *Rahimi*, 602 U.S. at 691, 144 S.Ct. 1889. Seen at the correct level of generality, however—*i.e.*, one that does not put the modern legislature into a "regulatory straight-jacket," *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111—historical laws targeting poaching are also appropriately viewed as being aimed at protecting the property rights of landowners from the harms of unauthorized armed carry on their property. Hawaii's law does the same.

The majority is likewise mistaken in maintaining that Hawaii's law is not "relevantly similar" to its proffered analogues because Hawaii does not restrict conduct that produces effects similar to poaching. *Ante*, at –––– – –––– (internal quotation marks omitted). It asserts—without evidence—that this is true because "[o]thers on the premises will not even notice a person peacefully carrying a concealed weapon in the manner demanded by Hawaiian law." *Ante*, at ––––. That is sheer speculation. It also misses the point. The step-two question is not whether the most anodyne version of the conduct that the modern law targets would produce the same effects as the harms highlighted in the historical laws. Rather, we ask whether the analogues and the modern law target " 'relevantly similar' " issues. *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889. Here the answer is clearly yes: Both the analogues and § 134–9.5 aim to fortify landowners' right to exclude and protect their interests from the effects of unauthorized armed carry on their private property.

***32** What is more, these historical analogues obviously had purposes beyond poaching. For example, New Jersey first enacted in 1722, and then repeatedly reenacted, a law that banned "trespassing with guns" along with a prohibition on "presum[ing] ... to hunt ... on any lands not [the trespasser's] own." 1771 N. J. Laws 26, 29; 1722 N. J. Laws 101. In other words, regulating hunting was only one of the law's objectives. Several Reconstruction-era laws more generally "prohibit[ed] the carrying of fire-arms," without any mention of game. 1865 La. Acts, No. 10; see also 1866 Tex. Laws 1321, § 1 (same). And even for those laws that did not so clearly apply beyond hunting, the "why" was nevertheless broader than harms directly related to poaching. Such laws barred unauthorized possession on "enclosed land or premises of another" (which, as I note above, included businesses), so their "why" encompassed more than stopping the taking of game or destruction of property. See, *e.g.*, 1865 Fla. Acts, § 19, at 27. It would be odd for a statute that sought only to prevent poaching to include businesses.

The majority also rejects Hawaii's analogues based on the contention that the "coverage" of the historical laws "differed sharply from that of the Hawaii law now before us." *Ante*, at ——. The analogues, the majority says, applied only "where game could be found." *Ibid.* But as I have already explained, several of the historical laws applied to "premises," so they covered more than merely those places where wild animals roamed.

In the end, the majority simply refuses to acknowledge that the principles underlying these historical regulations are indistinguishable from the principles underlying Hawaii's. But there is a long historical tradition of States requiring those wishing to carry firearms onto private property to seek the express permission of the property owner and doing so for similar reasons as Hawaii. And if judges may nonetheless reject this lengthy track record because the risks from unauthorized carry were primarily related to *hunting* in the 18th and 19th centuries—as the majority does—no one can seriously claim that the *Bruen* test actually constrains judicial discretion.

To the contrary, the majority's analysis demonstrates that, under *Bruen*, a judge can always choose to invalidate a modern regulation, so long as the judge points to some distinction between the modern regulation and the historical examples (really, *any* difference at all, no matter how small or irrelevant). Judges still have plenty of discretion left to exercise. And the unfortunate reality is that, regardless of the historical record, the will of the State's legislature, or the needs of the local community, *Bruen*'s historical inquiry almost always "cabins" judicial discretion in only one direction: stymieing legislative efforts to restrict guns.[13]

13 Like the majority, Justice BARRETT concludes that Hawaii's law is not "relevantly similar" to the historical analogues Hawaii proffers. *Ante*, at —— – —— (concurring opinion). But, as my discussion shows, whether historical laws are "relevantly similar" to modern ones depends on how the laws are characterized—which the Court controls. For example, Justice BARRETT ignores what Hawaii says about the "why" of its own law: that its aim was to "respec[t] the right of private individuals and entities to choose for themselves whether to allow or restrict the carrying of firearms on their property." 2023 Haw. Sess. Laws 114. Instead, she assigns to Hawaii a *different* "why." *Ante*, at —— – ——, —— (asserting that Hawaii enacted its law to keep people from carrying guns in spaces open to the public). Justice BARRETT further reasons that *that* "why" is not sufficiently similar to the historical analogues because the founding-era laws had another purpose. *Ante,* at —— – —— (maintaining that the historical laws were aimed at preventing the "particular abuse of firearms" related to poaching in "specific places").

But, of course, if *Bruen* allows reviewing courts to reject the "why" proffered by the modern legislature (as it apparently does), then its test becomes a shell game. Courts can always find a different way to frame the founding-era laws—or the modern one—so that the contested regulation can never meet the mark.

### C

***33** Finally, a note regarding the majority's step-two discussion of Hawaii's effort to use a Black Code (namely, Louisiana's 1865 law) as a historical analogue. The majority says that the idea of such a law contributing to "the original understanding of the right to keep and bear arms cannot be taken seriously" "[u]nless we put history entirely out of our minds." *Ante*, at ——. By "history" it presumably means America's long and tortured past of racial discrimination and

violence. But this reasoning provides yet another example of the majority straying from its supposedly disciplined test.

The Black Codes were a series of "harsh and restrictive" laws that Southern legislatures enacted in the wake of the Civil War to control former slaves. D. Nieman, To Set the Law in Motion: The Freedmen's Bureau and the Legal Rights of Blacks, 1865–1868, p. 72 (1979). These laws were a "legal means of subordinating" the newly freed Black population. E. Foner, Reconstruction: America's Unfinished Revolution, 1863–1877, p. 198 (1988). The Black Codes impacted nearly every aspect of life for freedmen in the South "[v]irtually from the moment the Civil War ended." *Id*., at 198–203. As relevant here, this included whether freedmen could carry firearms. *Id*., at 203–204. Indeed, as my colleagues have previously explained, laws that restricted the ownership and possession of guns as part of the Black Codes made life dangerous for millions of Black people in the South for over a century. See *McDonald v. Chicago*, 561 U.S. 742, 846–850, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring) (discussing the impact of the Black Codes on freed Blacks); see also *id*., at 770–778, 130 S.Ct. 3020.

Given the Court's commitment to elevating the history and tradition of firearm use and regulation when deciding Second Amendment challenges, the idea that courts must categorically exclude historical laws that restricted Black people from possessing firearms (not unlike the categorical exclusion of the people who were historically bound by those laws) warrants further scrutiny.

As I see it, there are two potential reasons to use—or exclude—the Black Codes in *Bruen*'s history-and-tradition test. First, it could be that the Black Codes regulated guns consistent with the Second Amendment but States chose to exercise their regulatory authority in a discriminatory fashion. See I. Bartrum, Structural Originalism: A Second Amendment Case Study, 27 U. Pa. J. Const. L. 846, 902–907 (2025) (explaining that the Black Codes were understood to be a discriminatory application of permissible regulations on the right to armed self-defense). Under this framing, those gun regulations are not examples of an unconstitutional abridgment of the right to bear arms, but rather exemplify a violation of a different constitutional Amendment—the Fourteenth. Alternatively, it could be that States did *not* have the constitutional authority under the Second Amendment to enact such regulations but did so anyway for discriminatory reasons. Under that framing, not only did the States violate the Constitution by acting on the basis of race; they *also* violated the right to bear arms.

Only the second set of circumstances justifies removing these laws (and the experiences of those they targeted) from the body of evidence that determines the historical reach of the Second Amendment under *Bruen*.[14] So, it might well be that the Black Codes are invalid inputs for *Bruen*'s test, but only if they violated the Second Amendment—which may or may not be the case.[15]

14 Though the majority eschews this distinction here, in other contexts, certain of my colleagues have engaged in a similar analysis, concluding that discriminatory laws might still bear on the Court's considerations of constitutional questions. See, *e.g.*, *Ramos v. Louisiana*, 590 U.S. 83, 141–142, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020) (ALITO, J., dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for ... reasons" related to "[r]acism, white supremacy, [and] the Ku Klux Klan," "that is deplorable, but what does that have to do with the broad constitutional question before us? The answer is: nothing").

15 This type of nuanced analysis is important, for it values the historical experiences of Black people as targets of invidious race discrimination and ensures that they are not (here again) excluded from the constitutional baseline that *Bruen* purports to draw. Cf. R. Siegel, How "History and Tradition" Perpetuates Inequality: *Dobbs* on Abortion's Nineteenth-Century Criminalization, 60 Houston L. Rev. 901, 906 (2023) (noting that looking solely to history and tradition "elevate[s] the significance of laws adopted at a time when women and people of color were judged unfit to participate and treated accordingly by constitutional law, common law, and positive law").

***34** The Court bypasses any meaningful analysis of whether Louisiana's law comported with, or abridged, historical understandings of the right to carry (as opposed to the right to carry *equally*). Instead, it cuts Black Codes out of this country's tradition categorically and completely, as if the majority does not see, or understand, the implications of

making this excision. And the majority's exclusion operates indiscriminately and without clear definition. If the point of taking the Black Codes out of the equation is that they are not a valid part of our Nation's historical tradition, then the Court must provide guidelines on how to determine the type of history that *can* be considered to ensure that this inquiry does not become a free pass to quick invalidation. [16]

16 By this I mean that the majority must explain how one is to go about accurately identifying such a verboten law. For facially neutral Black Codes, should courts consult legislative history to understand what the legislature was trying to do? How much racial motivation is too much? What about laws that were facially neutral and passed for seemingly neutral reasons, but were *enforced* discriminatorily? And finally, does only *racial* animus matter? What do we do about other types of animus? For example, consider the use of statutes that were prejudiced against Catholics. See *Kanter v. Barr*, 919 F.3d 437, 457 (CA7 2019) (Barrett, J., dissenting). Does it offend history to use those?

Here, Hawaii has presented evidence that, even though the relevant gun restriction was a Black Code, it violated the Fourteenth Amendment but not the Second—evidence the majority ignores. For example, when General Sickles announced the end of South Carolina's laws prohibiting gun possession by Black people in 1866, he declared: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed." D. Sickles, General Order No. 1 in A Handbook of Politics for 1868, p. 37 (E. McPherson ed. 1868). But he did not consider laws requiring express consent for armed entry—even those enacted as part of the Black Codes—among the laws that had offended the Second Amendment. Rather, in his view, no person (of any race) had the right to carry a firearm onto private land without consent. *Ibid*. In this same way, it appears that the Louisiana analogue on which Hawaii relies was unconstitutional, but perhaps not for the reason that would allow the majority to ignore it as evidence of the historical limits of the Second Amendment. [17]

17 Justice BARRETT's helpful recounting of the historical circumstances surrounding Louisiana's law proves the point. Louisiana's law and Hawaii's other analogues have the same basic "why" insofar as they were all enacted to protect property rights and to prevent the harms that can follow from unauthorized armed entry, including harms from poaching. These laws were also facially identical. As Justice BARRETT sees it, the difference between Louisiana's law and those of the other states was Louisiana's discriminatory intent: Louisiana enacted *its* anti-poaching law with the illicit motive of keeping freedmen from being able to hunt and thereby sustain themselves. *Ante*, at ––––– – –––––, –––––, n. 10 (concurring opinion). But even if that makes Louisiana's "why" relevantly different, this seems to be a Fourteenth Amendment problem, not a Second Amendment one. Louisiana's historical consent-to-carry law was identical to the consent-to-carry laws of other States, and all were enacted to prevent poaching and other related harms. That Louisiana's Legislature had a discriminatory intent when it chose to subject only former slaves to this restriction should be neither here nor there for *Bruen* purposes. There is no clear Second Amendment-based explanation for why Louisiana's decision to exercise the same power other states had used for the same reason —*i.e.*, to prevent poaching and the effects of poaching, including theft of game (admittedly in a racially discriminatory manner on Louisiana's part) —does not count when assessing what the Second Amendment permits under *Bruen*.

***35** Confronting the origins of these laws is certainly uncomfortable. The Black Codes were ugly. And racist. And deplorable. Even now, long after their abolishment and the end of the Jim Crow era, Black Americans are *still* saddled with the ramifications of centuries of legally authorized exclusion, notwithstanding the much-heralded arrival of "colorblindness." See *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 409–411, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023) (JACKSON, J., dissenting).

But the characteristics that make the Black Codes detestable do not automatically render these laws irrelevant to a fair assessment of the right to carry firearms, especially given how the Court assesses that right. The Court has decided to use history as the metric, and these laws are part of our Nation's history. So the Court must make an actual assessment of the relevance of what the historical record reveals. To be sure, it

would certainly be most convenient for all concerned to skip past the nuance and ignore these painful realities. But choices have consequences: Where the Court has opted to tether its Second Amendment analysis to facts about America's past, it must contend with our Nation's *entire* history, warts and all.

To do otherwise calls into question the legitimacy of the Court's endeavor to rely solely on historical guidance. It deepens race-based wounds, by classifying the experiences of those who have been historically excluded as categorically irrelevant. It empowers the Judiciary, by allowing the Court to cavalierly pick and choose which parts of the historical record count. And it exposes flaws in the test this Court has crafted —demonstrating, once again, that the discretion to cull the history lies with the Court and seems to operate in service of a single goal: preventing the government from responding to issues arising from the possession of firearms.

To be clear, I am not suggesting that courts *must* accept Black Codes as historical analogues. My point is merely that the Court cannot have it both ways. Either history does matter, and if so, *all* potentially relevant historical experiences must be thoroughly examined to determine whether they reflect our Nation's history and tradition of firearm regulation. Or, it does not, and the Court should just admit that the test it has created is boundless, allowing it to accept or excise any historical analogue it chooses for any reason it prefers.

* * *

In my view, our adoption of the *Bruen* test was a grave mistake. See, *e.g.*, *Rahimi*, 602 U.S. at 740–747, 144 S.Ct. 1889 (JACKSON, J., concurring); *Hemani*, 608 U. S., at ––––, ––– S.Ct. –––– (same). But to the extent the Court has embraced this test, surely it cannot shirk responsibility for adhering to *Bruen*’s tenets, whatever the result.

Today, the majority fails to faithfully apply its own jurisprudence. It alters the *Bruen* test and overrides Hawaii's considered—and in my view, constitutionally sound —judgment that the property interests of its residents should be protected against unauthorized armed entry. For the reasons I have explained, Hawaii's law is an exercise of state regulatory power that has historically sounded in property law, not the Second Amendment. And it is also entirely consistent with a lengthy historical tradition of States enacting similar restrictions for exactly this reason.

Yet, the majority concludes that *Bruen* requires striking down Hawaii's law as unconstitutional. From this day forward, it will be difficult to view *Bruen* as anything more than a fig leaf. While purporting to constrain judges, the majority has unmasked the discretionary choices that lie beneath the Court's decisions regarding which analogues are “vastly different,” *ante*, at ––––, and whose historical experiences are worthy of inclusion. Of course, the real irony is that the Court's effort to rein in judicial discretion has resulted in an arbitrary rule that unleashes judges to thwart gun regulation at every turn.

**All Citations**

609 U.S. ----, --- S.Ct. ----, 2026 WL 1825723

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.