UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

SILENCER SHOP FOUNDATION, et al., )
Plaintiffs, )
)
VS. ) CAUSE NO. 6:25-CV-056-H
)
BUREAU OF ALCOHOL, TOBACCO, )
FIREARMS AND EXPLOSIVES, et al., )
Defendants. )

---

HEARING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

JULY 7, 2026
SAN ANGELO, TEXAS

---

FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

A P P E A R A N C E S

FOR PLAINTIFFS SILENCER SHOP FOUNDATION, FIREARMS REGULATORY ACCOUNTABILITY COALITION, B&T USA, PALMETTO STATE ARMORY, and SILENCERCO WEAPONS RESEARCH:
WILEY REIN LLP
ATTORNEYS AT LAW
2050 M STREET NW
WASHINGTON, DC 20036
BY: STEPHEN J. OBERMEIER
JEREMY J. BROGGI

FOR PLAINTIFFS GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, BRADY WETZ:
STAMBOULIEH LAW PLLC
ATTORNEYS AT LAW
PO BOX 428
OLIVE BRANCH, MISSISSIPPI 38654
BY: STEPHEN J. STAMBOULIEH

FOR PLAINTIFFS JOHN JENSEN, et al.:
COOPER & KIRK PLLC
ATTORNEYS AT LAW
1523 NEW HAMPSHIRE AVENUE NW
WASHINGTON, DC 20036
BY: JOHN D. OHLENDORF

FOR PLAINTIFF STATE OF TEXAS:
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
SPECIAL LITIGATION UNIT
P.O. BOX 12548
AUSTIN, TEXAS 78711-2548
BY: MUNERA AL-FUHAID

FOR THE DEFENDANTS:
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L STREET NW
WASHINGTON, DC 20005
BY: JODY D. LOWENSTEIN

* * * * *

INDEX

ARGUMENT FOR PLAINTIFFS BY MR. OBERMEIER................ 8
ARGUMENT FOR PLAINTIFFS BY MR. STAMBOULIEH.............. 29
ARGUMENT FOR PLAINTIFFS BY MS. AL-FUHAID................ 40
ARGUMENT FOR PLAINTIFFS BY MR. OHLENDORF................ 45
ARGUMENT FOR DEFENDANTS BY MR. LOWENSTEIN............... 65
REBUTTAL ARGUMENT FOR PLAINTIFFS BY MR. OBERMEIER....... 113
REBUTTAL ARGUMENT FOR PLAINTIFFS BY MR. STAMBOULIEH..... 116
REBUTTAL ARGUMENT FOR PLAINTIFFS BY MR. OBERMEIER (CONTINUED)........................................ 118
REBUTTAL ARGUMENT FOR PLAINTIFFS BY MR. OHLENDORF....... 121
REBUTTAL ARGUMENT FOR PLAINTIFFS BY MS. AL-FUHAID....... 124
REPORTER'S CERTIFICATE.................................. 129

* * * * *

P R O C E E D I N G S

THE COURT: Good morning, everyone. Welcome to the United States District Court for the Northern District of Texas. The Court calls Case Number 6:25-CV-056-H, Silencer Shop Foundation, et al., vs. Bureau of Alcohol, Tobacco, Firearms & Explosives, et al., for a motions hearing.

That case has been consolidated with Jensen vs. ATF. That's Number 6:26-CV-227-H.

I will hear argument today on the parties' cross-motions for summary judgment. Let me start with the parties' appearances. Who is here on behalf of the plaintiffs?

MR. OBERMEIER: Good morning, Your Honor. Steve Obermeier from Wiley Rein. With me is my colleague, Jeremy Broggi. We are here for the lead case, Your Honor, on behalf of Silencer Shop Foundation, Firearms Regulatory Accountability Coalition, B&T USA, Palmetto State Armory, and SilencerCo Weapons Research.

THE COURT: All right. Thank you. And it was Obermeier; is that right?

MR. OBERMEIER: Mr. Obermeier, yes, Your Honor.

THE COURT: All right. Thank you, Mr. Obermeier.

And who is here on behalf of the Jensen plaintiffs?

MR. OHLENDORF: Good morning, Your Honor. John Ohlendorf from Cooper & Kirk. I'm here on behalf of John Jensen and the other plaintiffs in the consolidated case.

THE COURT: All right. Thank you very much. And it was Ohlendorf?

MR. OHLENDORF: Ohlendorf.

THE COURT: All right. Thank you, sir.

And on behalf of the defendants?

MR. LOWENSTEIN: Jody Lowenstein on behalf of the government.

THE COURT: All right. Thank you, Mr. Lowenstein. Welcome.

All right. I'm going to hear argument from both sides. I'll start with the plaintiffs. Counsel for the plaintiffs, both Silencer Shop and Jensen, have a total of 90 minutes. Defense, of course, will also get 90 minutes. I'll give each side a five-minute warning before that time expires. I previously explained that the parties are welcome to divide their 90 minutes however they would like.

Mr. Obermeier, you are arguing on behalf of the Silencer Shop plaintiffs. Are you planning to divide your time in any way with the Jensen plaintiffs?

MR. OBERMEIER: Yes, Your Honor. I guess a couple of things. So there are a few more plaintiffs in our case who are represented here also. I can let counsel introduce themselves. But the way we were going to break this up was, for the lead case, there would be 60 minutes total. I will argue 35 minutes on enumerated powers and remedy, and then I'd

respectfully request 10 minutes of those for rebuttal. My colleague from the Gun Owners of America will argue 15 minutes on the Second Amendment, and they are going to reserve 5 minutes for rebuttal.

THE COURT: You said 15 and 5?

MR. OBERMEIER: Fifteen and 5, yep. And then the States will argue for 10 minutes on the States' interests, and then the remaining-- I'll slow down a minute, Your Honor. The remaining 30 minutes will be for the Jensen case, with 5 minutes for rebuttal in that case--or in that part of the argument.

THE COURT: All right. Doing math quickly, never my strong suit. Let me make sure--

MR. OBERMEIER: I think it adds up.

THE COURT: Let me make sure I understand. For the opening portion of the argument, you will be doing 35 minutes on--you said the enumerated powers, and then you'd like to reserve how much for rebuttal?

MR. OBERMEIER: Ten of those 35 for rebuttal.

THE COURT: Okay. Ten of-- Thank you. Ten of the 35. That's where I was confused.

MR. OBERMEIER: Yeah.

THE COURT: All right. And then the Gun Owners of America will be doing 15 minutes on the Second Amendment. Correct?

MR. OBERMEIER: That's correct, five of which are rebuttal.

THE COURT: Five in rebuttal. And then the State plaintiffs, you said, would like 10 minutes of argument?

MR. OBERMEIER: Ten minutes, yes, Your Honor.

THE COURT: And who will be presenting argument for the States?

MS. AL-FUHAID: Good morning, Your Honor. Munera Al-Fuhaid on behalf of the State of Texas.

THE COURT: Tell me your last name again.

MS. AL-FUHAID: Al-Fuhaid. A-l - F-u-h-a-i-d. And I gave your court reporter my card, so she has that.

THE COURT: Thank you very much. All right. And any time for rebuttal?

MS. AL-FUHAID: No, Your Honor. Thank you.

THE COURT: Okay. All right. And then 30 minutes for the Jensen plaintiffs?

MR. OBERMEIER: For the Jensen case, correct.

THE COURT: Okay. So Jensen plaintiffs will argue after the States; is that right?

MR. OHLENDORF: (Nods head up and down.)

THE COURT: Okay. Are the Jensen plaintiffs reserving any time for rebuttal?

MR. OHLENDORF: Five minutes, with the Court's permission.

THE COURT: All right. So you will start with 25, and then five.

Okay. I've given each side 90 minutes, because I know this case is very important for both sides. I know that we've got a lot of ground to cover. There are a lot of arguments. I'm very appreciative of the briefing and the professionalism between the parties. You have helped the Court be very well prepared, and so I greatly appreciate that.

To the extent--one riot, one Ranger. I don't know if you're familiar with that phrase. If you're from--I noticed you had a Montana bar card; is that right?

MR. LOWENSTEIN: Yes, I'm from Montana.

THE COURT: It's a famous Texas saying: one riot, one Ranger. So you're the one Ranger today. You do not have to use 90 minutes, of course. I've presented argument many times, and 90 minutes, I'm sure, might seem daunting for just you. But they are your minutes if you'd like. If you need the 90 minutes, they are yours to use. If you want to cede them back, totally understand. Make sense?

MR. LOWENSTEIN: Thank you, Your Honor, yes.

THE COURT: All right. Mr. Obermeier, you may proceed.

MR. OBERMEIER: Thank you, Your Honor.

As the government says right out of the gate--

THE COURT: Pardon me. Let me say one final thing.

For the benefit of both sides, I'm going to do my best to not speak for 20 minutes. I know each side might have some opening remarks that they would like to give, and given that there's 90 minutes here, I will withhold my questions. Don't take it as a sign that I'm not buying what you're trying to sell; I just want to give you some space before I jump in with questions. If I jump in before 20 minutes, please forgive me. I'm doing my best.

MR. OBERMEIER: I welcome the questions within 20 minutes or not, Your Honor, but I'll get started regardless.

THE COURT: All right. Thank you.

MR. OBERMEIER: As the government says right out of the gate in its opening brief, the National Firearms Act was enacted in 1934 to, quote, curtail armed crime. Specifically, it was enacted to suppress the use and spread of what Congress believed to be dangerous, quote, gangster weapons, which included short-barreled shotguns, short-barreled rifles, so-called any other weapons, silencers, machine guns, and destructive devices.

But Congress knew it lacked the power to directly regulate violent crime. That's a, quintessentially, state police power. So in enacting the NFA, it came up with a different way to suppress the use of these weapons, kind of a bank shot, in using the taxing power.

Now, Congress also knew it could regulate weapons

if they crossed state lines, and I'll come back to that. But it wanted to regulate these particular weapons regardless of whether they traveled in interstate commerce, so it endeavored to tax the weapons out of existence. The NFA included what were, at the time, debilitating taxes on the transferring and making of the firearms themselves, and it created a registration and tracking regime in support of the taxing scheme.

Now, over the years, the Supreme Court and the Fifth Circuit upheld the constitutionality of the NFA under Congress's taxing power. But then, last year, in the One Big Beautiful Bill Act, it zeroed out the transfer and making tax on four of the categories of weapons: the SBRs, the SBSGs, the silencers, and the AOWs, and we call those the untaxed firearms. And in doing so, Congress eliminated its ability to rely on the taxing power as authority to regulate intrastate possessing, transferring, and making of those weapons. And as a result, those regulations are now plainly unconstitutional and should be enjoined.

The government has two responses--or two main responses, I should say. First, the government responds that the challenged provisions continue to support a tax that has not been zeroed, the so-called special occupancy tax. But during the course of briefing, the Fifth Circuit decided the *Hobby Distillers*, or what's called the *McNutt* case, which

effectively decides that issue in Plaintiffs' favor.

First, that case confirms that a statute cannot be sustained under the taxing power if it does not raise revenue. So the challenged NFA provisions cannot be justified under the taxing power by the zeroed-out making and transfer taxes. And notably, the government never really disputed that, but *McNutt* made that clear.

So that leaves the government in the position of having to establish that the provisions are still both necessary and proper to support the special occupancy tax, and the government can't establish either. And this is where the *McNutt* case really sort of sets the framework. So in that case, the Court explained that, to be necessary, the statute must be plainly adapted to effectuate Congress's taxation of the relevant article.

So the challenged provisions here are clearly not plainly adapted to effectuate the special occupancy tax. As an initial matter, you start with the plain text and structure of the statute. It confirms the mismatch. The NFA established a making and transferring tax and registration regime that taxed the firearms, and then it separately established an annual occupational tax and registration regime that taxed firearm businesses.

Nowhere in the legislative history or the text does it say that the making and transfer provisions support the

special occupational tax, and we are aware of no case ever holding as much. And, to the contrary, the *Haynes* Supreme Court case describes the difference--or the distinction.

So the government hangs its hat almost entirely on its declarations. Of course, those came in before the plainly adapted standard was established by *McNutt*, so they are sort of still working under a rational basis standard at the time. But those declarations even there support Plaintiffs.

They try to develop this anticircumvention theory, but it's unsupportable, because only a tiny percentage of the firearms' transactions could apply to an unpaid special occupancy tax. And we have the numbers in there. It's, like, 88 percent to 98 percent of transactions. But the bottom line, Your Honor, is, at most, a minuscule number of transactions could be said to have applied to the special occupancy tax.

And then the theory just doesn't make sense. The idea that individuals would submit their transferring forms but not their special occupancy tax forms just is not sort of a credible theory.

But even if the government could somehow establish that the challenged provisions are necessary, they can't establish that they're proper under *McNutt*. The Fifth Circuit explained that a law is not proper where the constitutional theory to sustain it lacks any limiting principle. And the Fifth Circuit didn't pull this out of nowhere. This comes--

this goes back to *Lopez*, and you could sort of trace it through the case law.

And that's precisely the case here, as it was in *McNutt*. There is no limiting principle to the government's aid in the collection of an occupancy tax theory. And the government has effectively conceded as much in refusing to respond to what's been called the broccoli hypothetical, or otherwise offer a limiting principle in any of its many pages of briefing. So that sort of shows that the taxing power no longer establishes the requisite baseline for these provisions.

So the government's second response to this argument is that the challenged provisions are nonetheless supportable under the Commerce Clause. And there are multiple reasons why this argument fails, as well.

The first is that this Court need not even look to the Commerce Clause in this case. So I want to be clear. We're not here debating that a statute could not be authorized by multiple congressional powers. That, of course, could happen. We're not contending that Congress needs to recite every power on which it relies. What we're saying here is that the language and legislative history of the NFA make it clear that Congress was relying only on the taxing power in applying the challenged provisions to intrastate activity. So that's *Sonzinsky*, *Parker*, *Ross*. They emphasize that the NFA was based on the taxing power. And if you look at--it's an important

case, I think, for us, Your Honor, the *Florida Prepaid* case. I know it's a footnote, but the Supreme Court makes very clear, if it's clear what power that Congress was relying on, you don't have to look at--sort of make up other powers to think about.

And the Supreme Court's tariff--recent tariff case also supports that point. The Court said there: When Congress addresses both the power to regulate and the power to tax, it does so separately and expressly. The power to regulate commerce is entirely distinct from the right to levy taxes.

And that's exactly the case here. This was a taxing statute. It's entirely distinct from commerce.

There is no dispute that the NFA, relying on the Commerce Clause, expressly regulates interstate transfer of NFA firearms. But there is--also can be no serious dispute that the intrastate regulation was based on the taxing power.

And there's an exchange in the Ways and Means Committee Hearings on the NFA that makes this very clear. So Attorney General Hill is asked specifically about a gun shipped from one state to another and then sold in the receiving state. And the Attorney General says that the interstate shipment is covered by the Commerce Clause, but the intrastate transaction is covered by the taxing power. And his quote is: We have to use both of those powers to solve this problem.

In fact, application of the Commerce Clause to this

taxing scheme doesn't even make sense. What's really going on here is, the government is trying to fit a square peg in a round hole. They are taking an expressly tax regime and now trying to say, well, it could also be commerce. And this Court doesn't have to do that. And, in fact, that explains a lot of the messiness of the briefing on the Commerce Clause issue.

However, if the Commerce Clause--if the Court thinks it needs to address the Commerce Clause, it still cannot support the challenged provisions as applied to intrastate conduct for the same basic reason. It's a tax regime; it's not a regulation of commerce.

And so just to be clear on this discernability issue we bring up, it means you don't have to address the Commerce Clause, but it also bleeds into the analysis in the sense that the--because it's a taxing statute, it makes no sense as a commerce regulation.

So it's black-letter law that Congress can regulate three categories of interstate commerce. There's the channels of interstate commerce, not at issue here; the instrumentalities of interstate commerce, which I'll come back to; and activities that substantially affect interstate commerce.

So the government starts by arguing that the challenged provisions regulate the instrumentalities of interstate commerce. But that's precisely what we are not

arguing. Just as the plaintiffs did in *Raich*, we are challenging the provisions at issue as applied to purely intrastate activities. So we are clearly in the realm of whether those purely intrastate activities substantially affect interstate commerce, and they do not. The Commerce Clause only lets Congress reach intrastate when necessary and proper to achieve a market outcome in a comprehensive interstate market.

The NFA's possession, making, and transfer requirements flunk that test, because Congress did not seek to accomplish any outcome in the market for NFA weapons. A different way to think of it is, it sought to tax and regulate the commodities, the NFA firearms, not regulate commerce. And this case is thus not *Wickard* and *Raich*. It's more like *Lopez* and *Morrison*, and especially *Hobby Distillers*, meaning the district court's analysis of that.

So *Wickard*, that's a regime regulating the price and supply of wheat, and the Court said it could be affected by the aggregate at-home production of wheat. So commerce is being regulated; at-home production affects commerce; it's okay.

*Raich* is basically the same thing, regulating a market for illicit drugs: marijuana. At-home production of marijuana could affect that.

*Hobby Distillers* is different. That's more like us. That regime regulated many aspects of spirits but not the

market for spirits, such that the banning of at-home liquor production can be said to affect the market.

So then you can go to the *Lopez-Morrison* factors, and, under those, the challenged NFA regulations are not covered by the Commerce Clause when applied intrastate. The law is not economic in nature. It's part of a criminal statute. Like I said, government says it right out of the gate.

With respect to the provisions at issue, there is no express jurisdictional element. And that was important to *Lopez*. None of that is mentioned here. And, you know, as I mentioned previously, there is a jurisdictional hook with respect to interstate transfers in the NFA. So Congress knew how to use it; it did use it; it specified it; but also knew it couldn't use it in the intrastate transactions, which is why it's not in these provisions.

There's also no express Congressional findings regarding the effects upon interstate commerce outside of the provision I was just mentioning. The link between the intrastate-regulated activity and interstate commerce is attenuated, so it's not necessary. This is sort of where *Lopez* lines up with *McNutt*.

And then there is--this no limiting principle plays an important role in the Commerce Clause too. I think this is important. That means it's not proper, regardless of anything

else, when you get to the proper analysis, because there's no limiting principle. So it's a substantial effects test. Per *Raich*, that means you need necessary and proper. So it's got to be proper. And without the limiting principle, which again, the government effectively concedes, it's not proper.

Your Honor, I have nothing further on the enumerated powers. I'm happy to answer questions on those.

THE COURT: Yeah, I do have-- On the Commerce Clause, why limit the textual argument to intrastate activity? What in the text and structure of the challenged provisions shows Congress invoking Commerce Clause for intra--or interstate activity?

MR. OBERMEIER: So it's Section 5861(j). And I can read you the language if you'd like, Your Honor, but-- One second, please, Your Honor.

It says: It shall be unlawful for any person to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter.

So that provision expressly addresses the interstate transaction, and the legislative history, which we go into in some detail, talks about that specific transaction, the interstate transaction. And that's the exchange with the Attorney General that I was describing, which is in the Ways and Means Committee hearing.

THE COURT: General question. Can you please define what exact NFA provisions that you're challenging in the respective cases? In Silencer Shop, there appears to me to be some daylight between the provisions listed in your complaint and those that are listed in your proposed order granting the motion for summary judgment. Are these two cases challenging the same provisions, or not?

MR. OBERMEIER: I kind of thought you were going to ask that, so I have that here.

THE COURT: So spell it out for me.

MR. OBERMEIER: Okay. So page 7 of our opening brief lists the provisions that we're challenging. We call those the challenged provisions.

THE COURT: All right.

MR. OBERMEIER: There are--

THE COURT: Page 7 of Silencer Shop's opening--

MR. OBERMEIER: Excuse me. Silencer Shop's opening brief.

THE COURT: Opening brief. Okay.

MR. OBERMEIER: There are more of them than are in the complaint. So the brief applies only--the briefing applies only to the provisions in the brief. The complaint is broader. But we're focused on the provisions that are in the brief on page 7.

THE COURT: Okay. So the complaint is broader, but

your challenge is limited to the ones in your complaint--

MR. OBERMEIER: That's correct.

THE COURT: --in your brief?

MR. OBERMEIER: That's correct.

THE COURT: Okay. Thank you very much.

MR. OBERMEIER: And then I actually--I have a--I never use exhibits in arguments, but I have sort of a table of the provisions if it would be helpful. But I can read them to you, as well. So if you just sort of break it down into the possession requirements, so that's 5841(e).

THE COURT: Okay.

MR. OBERMEIER: And then 5861(b) to (d).

And then if you go to the transfer requirements, 5812(a) to (b), 5861(e), and then 27 CFR 479.84(a) to (d).

THE COURT: Thank you. Is that the list?

MR. OBERMEIER: I've got one more on the making--

THE COURT: Go ahead. Pardon me.

MR. OBERMEIER: Sorry.

THE COURT: Pardon me. I thought you were done. Go ahead.

MR. OBERMEIER: Making requirements, 5841(a) to (c), 5822, and 27 CFR 479.62(a) to (b), and (d), and 5861(f).

And again, Your Honor, this sort of shows what we're challenging and what we're not. I'm happy to file it. I'm happy to distribute copies if it would be helpful.

THE COURT: Does opposing counsel have a copy?

MR. LOWENSTEIN: No, and I object to the introduction of this exhibit. They could have sent this to us. They didn't. This is the first I'm hearing of this exhibit. So I object that it be presented to the Court.

THE COURT: Okay. I have-- It's redundant to what you've called out to me?

MR. OBERMEIER: It is not meant to surprise anyone. I was just thinking, preparing in the last 24 hours, it might be helpful, so not meant to be anything--

THE COURT: Okay. That's fine.

All right. We'll let Mr. Ohlendorf speak for himself, but is it your understanding that the Jensen plaintiffs challenge an identical list, or is it narrower or broader?

MR. OBERMEIER: They include, from what we can tell, a few additional provisions. So their challenge--I can give you those, too. Their challenge includes-- And Mr. Ohlendorf can correct me, but their challenge includes 5861(i) to (j), 5871, and 5872.

THE COURT: All right. And on that front, what other material differences are there between the Silencer Shop plaintiffs and the Jensen plaintiffs? And while you're thinking about that, I'll note a few that appear to the Court, but maybe I'm incorrect.

There's an objection to the Jensen plaintiffs' Article III standing to challenge the NFA's regulation of the AOWs. The Second Amendment claim in Jensen appears to the Court to be narrower than the challenge brought by Silencer Shop in that it only challenges the NFA's regulation of short-barreled rifles and silencers. And the Jensen plaintiffs seek a party-specific injunction, not a universal one. Otherwise, the arguments appear to be fairly identical, but I wanted to know if either side believes I'm missing anything on that front.

MR. OBERMEIER: I don't believe you're missing anything, Your Honor. I'll let Mr. Ohlendorf chime in when he's up here if he thinks there's anything missing, but I don't think you're missing anything.

THE COURT: All right. Assume with me, sir, that-- if the Court were to conclude that the challenged NFA provisions exceeded Congress's enumerated powers, and--just assume that the remedy that the Court chose were a permanent injunction on that basis. Under those circumstances, in your view, would the Court be required to also reach the Second Amendment issue, or not?

MR. OBERMEIER: I don't believe so, Your Honor. I think once you're enjoined in that respect-- And I'll let counsel, if they disagree with me, say differently. But I think once they are enjoined with respect to those, I don't

think you need to go on to the Second Amendment.

THE COURT: All right. Thank you very much. I'm sure I have more questions, but I'm going to ask my IT specialist--Kris, could you come up here for a second? I'm just having an iPad problem. Thank you. Just bear with me one second.

(PAUSE)

THE COURT: It's a government operation. The government waits until arguments begin for all systems to just crash, of course. Working fine until you come on the bench, but once you're on the bench, then someone in the--the wizard behind the drapes starts pulling the levers.

All right. Pardon that interruption. Let's talk about facial versus as-applied for a second. In your view, the plaintiffs have brought an as-applied challenge, not a facial challenge. Correct?

MR. OBERMEIER: Yes, Your Honor. I'm happy to talk through this--well, it can wait for your question or sort of talk through where I think we are on this. So I think-- And a lot of ink has been spilled on this. I'm not sure that it really matters.

So there's--the debate is whether we are challenging the NFA provisions, I think, in their totality, as applied only to intrastate conduct, or as it applies to the plaintiffs' conduct here. Those are the three, I guess, ways

you could look at this.

So we're not challenging the provisions in their totality. I think that's part of the problem, is the intrastate aspect of it. So put that aside for one second. So-- Then no one disputes that, if we're challenging the plaintiffs' conduct here, it is an as-applied challenge. I don't think there's any dispute about that. And we do challenge application to the plaintiffs' conduct. It's expressed in the complaint--it's paragraph 70--where we say--I believe it's paragraph 75, as well, but both facially and/or as applied to Plaintiffs. And then the plaintiffs' uncontested declarations establish that they possess, transfer, and make untaxed firearms generally and engage in purely intrastate possession, transfers, and making.

THE COURT: Well, labels don't matter in this analysis. Correct? I mean, do you agree with me that the case law makes clear what we call them doesn't matter; it's their nature that counts?

MR. OBERMEIER: I think that's correct, Your Honor.

THE COURT: You're seeking a universal injunction, are you not?

MR. OBERMEIER: No, we're not seeking a universal injunction. So I can come back to that, too, but--so--but what I'm trying to say, Your Honor, is, there is an as-applied aspect to these plaintiffs in our challenge, but I want to talk

about the intrastate conduct involving the untaxed firearms, because I think that's kind of where the action is here.

So the government cited *John Doe Number 1 v. Reed*, and that suggests that the intrastate application of these regulations--so beyond Plaintiffs--could be categorized as a facial challenge. I just don't know that it matters, because we would still win under *Salerno*. And here's why. *Doe* makes clear that *Salerno* is applied, quote, to the extent of the reach of the challenge. So what that means here is, it would be the intrastate activity that we're challenging, and we win in all applications of that when applied intrastate.

THE COURT: What remedy do you seek? It was my understanding that you were seeking a universal injunction. You're asking for declarations and a permanent injunction that these regulations are no longer supportable, either under the enumerated powers or under the Second Amendment, and, as a result, they are wholly constitutional, and you're asking for a remedy that extends beyond the parties in this case. What do I have wrong about that?

MR. OBERMEIER: Well, okay. I guess a couple of things, Your Honor. First of all, I wouldn't call it a universal injunction. So the *CASA* case said there are no longer universal injunctions. What we're talking about is a blanket ban with respect to these--with respect to these regulations for intrastate conduct, and the blanket ban comes

from the fact that, in order to give this group of plaintiffs complete relief, only that works.

And so I know that's a fine distinction, but the *CASA* case basically ends with the Supreme Court saying, we're going to send it back to the district court to address this particular issue. Whether you still have to apply it completely in order to give the plaintiffs complete relief, that's where we think we are. So I do think it's important--that distinction is important for what we're seeking.

THE COURT: So it will-- Let me make sure I understand the fine distinction you're trying to make. You're only seeking relief for your plaintiffs. It happens to--will apply to everyone throughout the country, but that's the only way that this Court can provide relief to the plaintiffs.

MR. OBERMEIER: That's--

THE COURT: Just a secondary effect is that there's a spillover effect to everyone else who might be affected by this, so it's universal in that regard, but it's only because we're not able--or in your view, the Court is not able to fashion a remedy that's more limited?

MR. OBERMEIER: Yes. Or, maybe put slightly differently, if it was more limited, it would not be able to--it would not afford complete relief. The only way to afford complete relief is to make it a blanket ban.

THE COURT: Why couldn't I afford complete relief

if I said--if I were to agree with you--it applies to the plaintiffs listed in the complaint and their customers--and I know you want a little bit more than that--the customers, the associational members, et cetera, and no further? So if you're not an association, a member of that association, a customer of the commercial entities, it doesn't apply to you.

MR. OBERMEIER: Because in order to make sure that it applies to all of those--to the plaintiffs and all of those--I'll just say related parties. I'm not sure if that's the right term. In order to administer that, keep track of all that, know who they are, the only way to effectively make sure that happens is to make it a blanket ban. That's our argument.

But I will say, Your Honor, even if it's not a blanket ban, to the extent the injunction goes the way you are just saying it, Your Honor, which is the plaintiffs, their customers, the individuals--and I can go through the list--we would be okay with that, as well.

THE COURT: Help me-- Okay. All right. That's helpful. Help me-- To go back to interstate versus intrastate, help me understand why you're limiting your claim today to intrastate activity. Do I understand that correctly, first of all? Because I don't think that's in your complaint--

MR. OBERMEIER: Well--

THE COURT: And at least in the Silencer Shop case, the plaintiffs don't challenge the two provisions that you say

show that Congress invoked the Commerce Clause for interstate activity.

MR. OBERMEIER: Right.

THE COURT: Has there been a change today?

MR. OBERMEIER: No, Your Honor. I think it is--

THE COURT: Where have I lost you?

MR. OBERMEIER: I'm sorry?

THE COURT: Where have I lost you? Because that's what it sounds like to me. It sounds like you're limiting your claim to intrastate activity.

MR. OBERMEIER: I completely understand why it sounds that way and sounds a little different. There's two ways you can sort of look at it. We are not challenging the interstate provision. So you could say, with respect to that-- with respect to the provisions we are challenging, everything is covered. But the interstate provision--the interstate provision says that in order for the firearm to be transferred interstate, it has to comply with all the rules in this chapter.

And so those rules that we're challenging, to the extent it's an interstate transfer, they would, I think, technically still be alive, if that makes sense, right? So I'm trying-- We're not seeing anything different today, but I'm trying to be as specific for Your Honor as possible so that you don't bump into this issue where it's saying that the

challenged--that the interstate provision incorporates the rest of the chapter.

THE COURT: I see.

MR. OBERMEIER: Does that make sense?

THE COURT: Okay. Yes, I think so.

All right. Well, you mentioned that your argument was up and you'd welcome questions. I think your 25 minutes are up. I didn't give you a five-minute warning because we've now engaged in questioning. Is there anything else before--I know you're saving time for rebuttal, but--

MR. OBERMEIER: Nothing else, Your Honor. I'll wait for rebuttal. Thank you very much.

THE COURT: All right. I'd be glad to hear now for 15 minutes from the Gun Owners of America. And I'm sorry I didn't get your appearance earlier. Who is here on behalf of the Gun Owners of America?

MR. STAMBOULIEH: Good morning, Judge. My name is Stephen Stamboulieh. I'm here on behalf of Gun Owners of America, Gun Owners Foundation, and Mr. Brady Wetz.

THE COURT: All right. Thank you very much.

MR. STAMBOULIEH: Yes, Your Honor.

THE COURT: And it was Stamboulieh?

MR. STAMBOULIEH: Stamboulieh.

THE COURT: Stamboulieh.

MR. STAMBOULIEH: Yes, sir.

May I proceed, Your Honor?

THE COURT: Yes.

MR. STAMBOULIEH: Real quick, going back to the question that you were asking my co-counsel here, I don't think that this Court has to reach a Second Amendment if they--if the Court rules in favor of the taxing clause issues that he has raised. However, for interest of being complete, if we were--if the Court was to rule on the Second Amendment, as well, and we go up on appeal and there was something wrong with the taxing issue, the taxing clause analysis, then we could, at that point, rely on any Second Amendment analysis. So I would agree with the Court that it's not absolutely required--

THE COURT: I didn't say that. Mine was a question. I wasn't suggesting that I should or I shouldn't. I wanted the parties' views. So to the extent you believe I have indicated that I shouldn't have to, that--this was an honest question. I'm not sure whether I would have to or not--

MR. STAMBOULIEH: Yes, sir.

THE COURT: --so I wanted the parties' views.

MR. STAMBOULIEH: I didn't read into it too much; I'm just giving you my opinion as the attorney for Gun Owners of America.

I'm not going to regurgitate what is in our briefs, Your Honor, as I think that we've done a pretty good job at briefing everything. But I will bring to this Court's

attention a case that I think is very, very important, especially in this. So as the Court knows, on June 25th, the Supreme Court released its opinion in *Lopez*, in *Wolford v. Lopez.* And initially when I read this, I thought it might be a narrow case, but I believe that *Wolford* is groundbreaking. It completely refocuses the entire judiciary on how they must conduct a Second Amendment analysis under *Bruen*. And you might say, why? Well, the Supreme Court laid out the Step One of the *Bruen* framework with absolute unmistakable clarity.

To satisfy Step One, the Court needs to answer only three straightforward questions: does the law apply to the people, does it concern any form of arms, and does the law place any restrictions on either the keeping or the bearing of those arms.

And the Supreme Court made the consequences of those answers explicit. If the challenged law fails the plain text of the Second Amendment, it is presumptively unconstitutional.

Now, you might ask why I'm bringing this up, because we have some Fifth Circuit case law--

THE COURT: I think I know why you're bringing it up.

MR. STAMBOULIEH: --about *Peterson* and the *Comeaux* case. And so I want to talk about that. But there's no room for procedural hurdles, as Justice Barrett said in her

concurrence. The courts cannot allow the smuggling of additional limits drawn from our regulatory tradition into the plain text stage of the inquiry. Once that presumption is established, the framework is set. The Court must conduct the historical analysis based on the record prepared by the parties, et cetera.

The founding era analogues that the parties have to present to the Court must match both the how and the why of the modern regulation. And I think, when the Court reviews the DOJ's brief, the analogues that were presented by DOJ--1837 Bowie knife regulations, late 1800 pocket pistol, racist analogues--don't match the how and the why. And further, *Wolford* has told us in not so--in very explicit terms that we're not allowed to rely on the racist analogues anymore.

If we look at what we have from DOJ, we have basically a mere smattering of alleged analogues. And why? It's because the government has grown accustomed to the shortcuts that the circuits have created at Step One to find simply that either something is not an arm and we don't even need to get into the rest of the historical analysis. And as the DOJ openly admitted in their cross-motion docket entry at footnote 10--Docket Entry 60, I'm sorry, at footnote 10--many courts have historically rejected Second Amendment challenges to the NFA on a threshold ground and thus never conducted a historical analysis. This is in DOJ's brief.

So they are admitting that the courts haven't even conducted the historical analysis that's required under *Bruen*, because the courts have just as a threshold matter saying NFA is fine; or, as they said in *United States v. Peterson*, NFA is presumptively constitutional.

We submit that that failure to conduct a historical analysis would not have worked after *Bruen*, and it certainly cannot continue to work after *Wolford*. We--

THE COURT: I understand that you believe *Peterson* was incorrectly decided.

MR. STAMBOULIEH: Yes, sir.

THE COURT: Is it your position--are you arguing that *Wolford* overrules *Peterson* and *Comeaux*?

MR. STAMBOULIEH: I am arguing that, sir, yes, absolutely. If we have *United States v. Peterson*, and even *Comeaux*, and if we read Judge Clement's concurrence in the *Comeaux* case--and I don't have the citation for that, but it was just decided about a week before *Wolford*, where they said that suppressors are, in fact, Second Amendment arms. But since we're bound by *Peterson* at the Fifth Circuit at the panel level, of course, *Peterson* held that, at Step One, since you didn't allege that it was abusive and you didn't allege that you were somehow deterred from providing--from making an NFA application, then you lose at Step One.

Well, that's obviously wrong. That logic was

overruled by the Supreme Court. Now, of course, the Supreme Court, in *Wolford*, didn't reach down and say specifically that we, the Supreme Court, are overruling *United States v. Peterson* and *United States v. Comeaux*. But the Supreme Court abrogated the logic that the Fifth Circuit relied on where they, as Justice Barrett warned, smuggled in these additional requirements at the Step-One inquiry of *Bruen*. You can't do that anymore.

THE COURT: So you recognize that the Supreme Court did not expressly overrule those cases. What is the standard for determining whether a Supreme Court case has implicitly or impliedly overruled circuit precedent?

MR. STAMBOULIEH: That's a great question, and I don't have an exact answer for you, but I feel confident that this Court, while being bound both by the Fifth Circuit and the Supreme Court--the Supreme Court has to be the court that we look to if it abrogates what the Fifth Circuit has done. So if the Supreme Court issues an opinion saying this is how we're going to do these analyses but the Fifth Circuit is doing something differently, it seems like this Court--I don't know this for a fact, but it just seems to me that the Court would have to follow what the Supreme Court says, because the Supreme Court sits above everybody else at the table.

THE COURT: How are the two sets of cases-- You have five minutes remaining, by the way.

MR. STAMBOULIEH: Yes, sir.

THE COURT: How are the two cases irreconcilable?

MR. STAMBOULIEH: I'm sorry, I--

THE COURT: How are the two cases irreconcilable?

MR. STAMBOULIEH: With--

THE COURT: *Peterson* and the recent Supreme Court opinion.

MR. STAMBOULIEH: Yes, sir. So in *Peterson*, what they did is they skipped over a Step-Two analysis and they basically said, well, we're going to assume that Step One--at Step One, that a suppressor is an arm, but we're not going to get into any historical analysis, because we believe that the NFA is presumptively constitutional under footnote 9 of *Bruen*, which doesn't have anything to do with the NFA, but that's what we're going to believe.

But that's not what *Wolford* says a *Bruen* Step-One analysis is. It has to answer those three questions. Do the people want to keep and bear an arm, period, end of story. You move on to Step Two. Step Two comes in and then you can make these arguments. DOJ could say, "Hey, but look at *Bruen* footnote 9," or they could say, "But we have all these historical analogues." But it's Step One, where, if we look at *Comeaux* where they acknowledge in the concurrence and in actually the--in the majority opinion, that *U.S. v. Peterson* completely skipped over Step One, I think that that answers the

Court's question that we should follow what *Wolford* says, three steps--or the three subsidiaries, I think Justice Alito called it, under Step One: arms, people, and restrictions on the keeping or bearing. And then we move to Step Two.

THE COURT: Does *Wolford* say anything about footnote 9 from *Bruen*?

MR. STAMBOULIEH: I don't recall that it mentioned footnote 9 at all.

THE COURT: If it doesn't, how can it be clearly irreconcilable with *Peterson*?

MR. STAMBOULIEH: Well, I think the--I think how Justice Alito--or the majority of the Court framed the Step One, Step Two, Step--I'm sorry, the subsidiary one, two, and three is exactly contrary to what the Fifth Circuit did. So I don't know how the Fifth Circuit could say that what we did was compatible with either *Bruen* or *Wolford*, especially given what Justice Barrett says in concurrence, that we're not allowed to smuggle in additional regulatory things.

THE COURT: Okay. All right. To go back to my initial question. In the complaint from the Silencer Shop plaintiffs, which includes your client, there was a request for either an injunction or a declaratory judgment on both the enumerated powers and the Second Amendment. But I understand the plaintiffs today to tell me that, in your view, if the Court resolved the case on the enumerated powers, I would not

need to reach and resolve the second request from the plaintiffs regarding the Second Amendment. Is that correct?

MR. STAMBOULIEH: And what I was saying earlier, Your Honor, the first thing I said was, while I think that that is a true statement, I think it would be beneficial to the Fifth Circuit when this does go up on appeal, depending on who loses or who wins, for the Fifth Circuit to have the benefit of this Court's opinion on the Second Amendment, too, so if there was something at issue with the Court's analysis under the taxing clauses, then we would at least be able to rely on a Second Amendment finding, as well.

THE COURT: Assume with me for a second that I believe the plaintiffs have raised a facial challenge and that if *Wolford* impliedly overruled some Fifth Circuit precedent, that's for the Fifth Circuit to decide and not for the lowly district court judge in San Angelo, Texas. So facial, and the Supreme Court didn't overrule those cases expressly anyway. Do you necessarily lose under those circumstances?

MR. STAMBOULIEH: Well, absolutely--

THE COURT: And I know you challenge those assumptions--

MR. STAMBOULIEH: Yes, sir.

THE COURT: --but assume with me that they are present. Does *Peterson* foreclose your argument?

MR. STAMBOULIEH: I'm assuming that they are

correct, Your Honor, and no, it doesn't, actually, because if we look at the declarations of Mr. Wetz where he says that he would, in fact, file additional Form 4's and Form 1's but for the amount of time it takes him to do this, that he's treated basically like a criminal and he has to go through arrest-like procedures of doing mug shots, getting fingerprinted, having to pay--well, in this case, he doesn't have to pay any more--

THE COURT: That's as-applied? That would be an as-applied argument?

MR. STAMBOULIEH: Well, it would be--

THE COURT: If you're relying on those specific circumstances, as applied to him, maybe. But a facial challenge that, under no circumstances--there's not any circumstance where this could be ruled to be constitutional, doesn't that run straight into *Peterson* if this were a facial challenge, or no?

MR. STAMBOULIEH: Well, *Peterson* was an as-applied challenge with regard to--I'm pretty sure *Peterson* was as-applied.

THE COURT: If it's--and if it's constitutional in one circumstance and only one circumstance, it can't be facially invalid, I guess is the question I'm asking and the point I'm trying to make.

MR. STAMBOULIEH: Well--

THE COURT: It would be my understanding that, if

this were facial and if *Peterson* applies, I have difficulty seeing how *Peterson* wouldn't foreclose the facial challenge, but I wanted to give you a chance to address that. And if the only answer is, well, we still have an as-applied argument, that's fine, and we could go to the as-applied argument.

MR. STAMBOULIEH: Well, we do have an as-applied argument, but I want to make sure that-- We do have the *Salerno* test, which talks about, you know, at least one application of the law. We also have the plainly legitimate sweep, which I believe the Fifth Circuit applies to some Second Amendment case law. I know the Second Circuit does at least, not that that's really helpful here.

So it wouldn't necessarily be just one application could make an unconstitutional law constitutional, but I'm not prepared to argue that, just because I haven't reviewed it specifically with regards to this case unfortunately. But I'm happy, if the Court has a question, to get back to the Court on that.

THE COURT: No, that's fine. I think you've answered the questions. Thank you very much.

MR. STAMBOULIEH: Yes, sir.

THE COURT: Was there anything else?

MR. STAMBOULIEH: No, sir.

THE COURT: All right. Thank you very much.

I'd be glad to hear now from the State of Texas.

You are welcome to pull those down. I know that they are tall. Yeah, and would you pull the other one down as well. Thank you very much.

All right. Whenever you're ready.

MS. AL-FUHAID: Thank you, Judge Hendrix. May it please the Court. My name is Munera Al-Fuhaid, and I represent Plaintiff the State of Texas in this matter.

This Court can resolve this case and enter declaratory and injunctive relief on the basis of the arguments my esteemed colleagues have already presented to the Court. However, I would like to separately emphasize the unique harms that the States suffer in this matter due to the challenged National Firearms Act provisions.

First, the Act imposes a straightforward pocketbook injury on the States. Second, the Act encroaches upon the States' sovereign rights to enforce their own laws. The Act's registration requirements increase the States' regulatory burdens by increasing reporting and compliance costs, creating an injury in fact.

Notwithstanding the tax cuts enacted by the One Big Beautiful Bill Act, the States must continue to comply with the Act's registration requirements to be able to acquire, possess, and transfer certain weapons for law enforcement purposes. These registration requirements mandate that the States complete and submit a Bureau of Alcohol, Tobacco, Firearms &

Explosives Form 10 to the National Firearms Division of ATF each time they acquire a silencer, a short-barreled rifle, or a short-barreled shotgun. Generating these forms imposes costs upon the States. The States must complete Form 10 for every firearm silencer, every short-barreled rifle or short-barreled shotgun that each law enforcement agency within its jurisdiction acquires. Completing a required registration form for each NFA-regulated weapon is costly and imposes an administrative burden on the States. These registration requirements remain in place even after the elimination of the NFA taxes that supported them.

The States are compelled to produce those forms. If they don't, they will be unable to carry out their essential law enforcement functions. In Texas, the Department of Public Safety enforces laws that protect the public safety, prevent crime, and detect crime. Mr. Derek Prestridge's declaration at ECF Number 50, which is the appendix to the plaintiffs' summary judgment brief--at pages 43 and 44 of the appendix, Mr. Prestridge's declaration explains that the acquisition, the possession, and the transfer of firearms, including NFA-regulated firearms like silencers, short-barreled rifles, and short-barreled shotguns, is indispensable to carrying out the Department of Public Safety's law enforcement obligations. Compliance with the NFA-mandated registration requirements inflicts a classic pocketbook injury on the States.

The State plaintiffs are also injured because the National Firearms Act prevents them from applying their own laws and policies governing their own intrastate firearms markets. Though the Court does not have to reach this ground because it can find standing based on the States' pocketbook injuries or any of the other plaintiffs' alleged injuries, this Court has discretion to find standing on any grounds supported by the law and the record.

It is well established that States have a sovereign interest in the power to create and enforce a legal code. Thus, whenever a State is prevented from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury. That irreparable injury is real whether it is a federal court or a federal law that prevents a State from implementing its own laws and policy preferences.

The NFA's requirements do just that. For example, Texas allows its citizens to own silencers without imposing any registration requirement. The Texas Government Code explicitly addresses silencers that are manufactured in Texas, sold in Texas, and that remain in Texas; for example, by requiring that they be stamped with the phrase "Made in Texas."

But Congress has deemed it a felony for a Texas citizen to possess an unregistered silencer in Texas, even if that silencer never leaves the state. So states like Texas can no longer craft their own solution to these complicated policy

issues. Instead, the NFA requires states to regulate the intrastate possession, acquisition, and transfer of firearms as the federal government sees fit.

Under our system of federalism, the states possess the police power, which is the general power of governing. Congress has no police power. It cannot act without an enumerated power. That Congress has passed a law outside the scope of its enumerated authority does not, by itself, create the power to do so.

In *McCulloch v. Maryland*, the United States Supreme Court held that the Necessary and Proper Clause only authorizes congressional action incidental to an enumerated power. So an otherwise unconstitutional act of Congress cannot be incidental to the exercise of an enumerated power if Congress has not exercised that enumerated power in the first place.

Adopting Defendants' position in this case would effectively allow them to exercise a general police power, and this Court should not allow the federal government to aggrandize that power to itself.

And unless the Court has questions, Plaintiffs would like to reserve the remainder of our time for rebuttal.

THE COURT: I do have a question for you.

MS. AL-FUHAID: Yes.

THE COURT: And if you're not able to answer it,

that's fine, but you are my representative from the States.

MS. AL-FUHAID: Yes, Your Honor.

THE COURT: Is that fair? Do you speak for the States today? I know you represent the--

MS. AL-FUHAID: I represent Texas, but I am here to present the States' interests.

THE COURT: All right. Texas has provided the Court with evidence of what it views as the harm as a result of the challenged regulations here. The other States have not. Does that matter? Can the Court, could the Court include any relief to the remaining fourteen States? If the Court were to issue an injunction, for example, could I include the other fourteen States in that injunction, given that they have not provided evidence of the harm? And, if so, how?

MS. AL-FUHAID: Yes, Your Honor, because the States--the fifteen States, including Texas, are not the only plaintiffs in this case, and the associational and business plaintiffs also have customers and association members throughout those states and throughout the entire country. So to be able to afford complete relief to all of the plaintiffs, any injunction or declaratory relief that the Court crafted would need to apply to all of those plaintiffs.

THE COURT: Well, couldn't I say the associational plaintiffs, their customers, the business entities? Isn't that a separate issue than the remaining fourteen States? If I'm

saying the business entities, the associational plaintiffs, Silencer Shop, Texas, why would I need to enclose the remaining fourteen? And if I were inclined to do so, can I do so? That's really-- I certainly have evidence from Texas as to what you believe is evidence of harm. I don't--I don't think--do I have evidence from the other fourteen States?

MS. AL-FUHAID: No, Your Honor.

THE COURT: Okay. So how could I include them and--in a remedy?

MS. AL-FUHAID: Well, Mr. Obermeier may be able to put a finer point on it than I can, but--

THE COURT: I've divided argument before, so if you want to just defer to him, that's perfectly fine.

MS. AL-FUHAID: Well, my understanding is that, because the other plaintiffs have customers and members throughout the states and because they are seeking to challenge the regulations as applied to an intrastate market, that would necessarily affect intrastate activities in those states.

THE COURT: All right. Thank you very much.

MS. AL-FUHAID: Thank you, Your Honor.

THE COURT: I appreciate it. That was my primary question for the State of Texas. Thank you for being here.

All right. Mr. Ohlendorf for the Jensen plaintiffs.

MR. OHLENDORF: Good morning again, Your Honor. I

am going to endeavor to not repeat the arguments of my able co-counsel, so I'll try to just draw out a couple of additional points that I think are worth making and then, of course, I think maybe a couple of distinctions that I saw in our arguments and then, of course, answer any questions the Court has.

And I'll begin, if I may, with the taxing power. I think it's clear from the history and from the design of the NFA that the challenged registration provisions were designed initially to--and upheld by the Supreme Court and the Fifth Circuit to aid in the enforcement of the collection of the taxes on makings and transfers.

I read the government's brief to essentially give up the ghost on that, on any argument that they are still plainly adapted to aid in the collection of those taxes now that they have been zeroed out, and I think really the main fighting issue is whether they support the collection of the special occupational tax. And I think they just clearly don't for multiple reasons.

The first one that I really want to emphasize is, I think it's plain from the text and the structure of the Act itself that it just makes no sense and is certainly not plainly adapted for the Court to enforce the occupational taxes through these registration provisions that are being challenged, because the occupational taxes, under Section 5801, only apply

to entities that are in the business of either making or dealing or importing firearms. The idea is that, you know, these are firearms companies that owe this occupational tax. And our registration provisions, the ones that we are challenging, by express text and design, do not apply to entities who are in the business of making and transferring firearms. Under Section 5852(c) and (d), an entity who is a manufacturer, in the business of manufacturing firearms, does not have to comply with the making registration requirements. And transfers between two firearm dealers are not subject to the transfer registration requirements. So it's--it would be--it is in a sense, I think, the very opposite of plainly adapted to aid in the collection of these taxes when, by design, they do not apply to the entities that owe the taxes.

I also think-- I agree with everything my co-counsel said on this point, as well, but I also think that the declaration by Mr. Albro, which the Court has now granted and is part of the record in this case--I think it's actually very friendly to me, far more friendly to me than to our friends on the other side, because if you drill down and you look at the numbers that he provides, what they essentially show is that it's only in around a tenth of a percent--I think it's .14 percent of registration instances that they have even potentially found any information that aids in the enforcement of the occupational tax. I say "even potentially" because I

think there's a lot of ambiguity in Mr. Albro's declaration. He says, "Well, they helped us find special occupational tax issues." I'm not sure exactly what that means. It's not clear to me, when he talks about where they got this information from, that it was actually from the specific forms that non-occupational tax payers fill out as opposed to the separate forms that those who are in the business of making and transferring firearms fill out that actually led to these information on occupational tax issues.

And then I think, also, there's been no showing whatsoever that the government couldn't have found out this point-zero--the .1 percent of information in another way, through the registration provisions in 5802 that were, in fact, designed to enforce the occupational tax provision, or through the recordkeeping requirements of 5843.

But even spotting all of that, where you end up is that in around 99.9 percent of instances, people are submitting their fingerprints, their birth dates, their photographs, waiting a month, going through these onerous registration provisions, getting their--you know, their firearms into a central government database so that in .1 percent of instances, the government might find information that aids the enforcement of their occupational taxes. I think that is the very--again, the very antithesis of provisions plainly adapted to the enforcement of these occupational taxes.

THE COURT: Assume with me that I agree with you on the taxing power. What about the Commerce Clause, and, in particular, what about the Fifth Circuit's statements in *Ardoin* and *Arce* about the Commerce Clause's ability to support the challenged regulations and provisions here?

MR. OHLENDORF: And which Fifth Circuit cases did Your Honor have in mind?

THE COURT: Everyone might be saying it differently. I say *Ardoin*. *Ardoin*. A-r-d-o-i --

MR. OHLENDORF: *Ardoin*. Of course. Of course, yes. So I think--you know, I think--of course, I'd refer Your Honor to our briefs. I think that is dicta in *Ardoin*. But even if you feel constrained by that dicta, I think that is--*Ardoin* deals with machine guns, right? And so just to lay a little bit of the groundwork here, right, so we're here under--this argument is under *Lopez* category three, the substantial effects category, right, so--and under that category, you know, illustrated by *Wickard*, illustrated by *Raich*, the logic of this is where Congress is regulating the price or attempting to freeze out an interstate marketed item. Under the Necessary and Proper Clause, it has power to reach into a state and regulate purely intrastate instances of that market.

And that's essentially just a recognition of the laws of supply and demand, right? Each individual instance or participation in an interstate market is going to affect the

price of the interstate market. And so there is logic in saying that, you know, Congress can reach within a state and get at those instances that affect a price that it's trying to regulate net.

I think *Ardoin*--the reasoning there is, under Section 922, right, not challenged here, Congress is regulating the interstate market in machine guns by essentially freezing out any transfer of post-NFA machine guns. So I think there is some sense under this *Raich*, under this *Wickard* reasoning that if Congress does have in place a regulation--essentially a price regulation making the price prohibitive of an interstate market, then it can reach in into the state, and perhaps these NFA provisions are supportable in aid under this *Raich* reasoning of Congress's regulation of the interstate market.

I think there's good arguments on the other side. I found Judge Jones's opinion in the *Kirk* case and then Judge Alito's opinion in the *Rybar* case pretty compelling, to be candid with you, Your Honor. But, of course, those are not binding precedent, and I can see the logic behind the binding precedent going the government's way on that issue because of the interstate regulation of machine guns. The difficulty here--

THE COURT: Let me pull you back to the first point you mentioned about *Ardoin*. You said it's dicta. Why is it dicta?

MR. OHLENDORF: Why is it--sorry?

THE COURT: Dicta. I believe that was the first point you made was, oh, those Fifth Circuit cases, the language there on which the defendants rely, it's dicta. It's not binding on me. Why, in your view, is that the case?

MR. OHLENDORF: Yeah, I mean, to me, the thrust of the Court's decision there is based on the taxing power. And then as really sort of an unreasoned half of a line, it says, oh, it could also be supportable under the commerce power. The necessary ratio decidendi of that decision, I think, is the taxing power. But again, you know, I understand the awkward position of a district court who feels, of course, constrained by circuit precedent. Again, appreciate Your Honor's position and that you may feel constrained by that. I think it's dicta, but I certainly don't think it's a--

THE COURT: Yeah, and to be clear, I've not taken a position today. I'm trying to understand the parties' views and to understand their arguments, which is helpful.

And speaking of, let me take you somewhere else. Do you challenge the NFA provisions that expressly invoke interstate or foreign commerce; namely, the 5861(j) and (k)?

MR. OHLENDORF: I think-- So let me first begin to answer that by drawing a distinction. I think this is a real difference between our arguments and between the Silencer Shop plaintiffs' arguments, in that I do not think the challenge to

the registration provisions should be confined to simply intrastate applications of those provisions. We do challenge those, as well. We bring both facial and as-applied challenges. But I think those are unconstitutional on their face, even as applied potentially to interstate transactions, because there is no jurisdictional element in the statute that ensures--that ensures that any transaction, any conviction under the statute is dealing with an item that has traveled interstate.

That's the key--the key deficiency, of course, in the *Lopez* case. In *Lopez*, of course, many firearms that are possessed outside of schools have been--perhaps the great majority have been transferred interstate. I find it interesting, if you look at the Fifth Circuit's decision that was upheld in *Lopez*, they say, in fact--they don't address it, but they say, in fact, it was not--it was stipulated, essentially, in that case that the firearm at issue there had been transferred interstate.

But the deficiency in that case and the deficiency here is that there was no jurisdictional element in the statute, in the crime limiting its application to those instances. We see the same reasoning in the Fifth Circuit's decision in the *United States vs. Bird* case. That's the one that dealt with the FACE Act, the Access to Clinics Act. The Court said many abortion doctors may travel from one state to

another; the equipment may have moved interstate; but there's no jurisdictional element in the state that ensures that that necessary nexus to the commerce power has been met.

Now, perhaps-- Coming back to Your Honor's specific question about-- I think the hardest one is really 5861(j). Perhaps a conviction under 5861(j), since the text of that subprovision refers specifically to interstate transfers, perhaps that would supply a jurisdictional nexus that would support that particular provision. If the registration provision is gone as to interstate conduct, I'm not sure there's really anything left of 5861(j).

But again, the main distinction I wanted to draw is, we really do think that the facial challenge here under the Commerce Clause is good even as to interstate instances, because there's no jurisdictional requirement. Certainly Congress--under the commerce power, under *Lopez* category two, right, the instrumentalities, the things in interstate commerce, Congress may well be able to pass a statute providing for registration specifically of those items that have moved interstate and supplying a jurisdictional element, but it hasn't done so here.

THE COURT: I appreciate the explanation, and that's helpful. To be clear, it was my understanding you don't challenge these two provisions, the 5861(j) and (k), in this case. Is that right?

MR. OHLENDORF: That's correct, Your Honor.

THE COURT: Okay. I understand there may be arguments, but you have not made them in this case, and none of the plaintiffs in either case is challenging those two provisions?

MR. OHLENDORF: Not in the Jensen case, Your Honor.

THE COURT: Okay. All right.

All right. Another question I have regarding the remedy. If the Court were to issue, say, a permanent injunction, could or should the Court also enter declaratory relief? It's my understanding that precedent indicates that when relief is provided through an injunction, the Court should not provide it simultaneously with a declaratory judgment. Am I wrong about that? And, if so, why?

MR. OHLENDORF: I'll be candid with Your Honor. I'm not familiar with the precedent you're referring to.

THE COURT: Okay.

MR. OHLENDORF: And we'd be happy to engage in, you know, letter briefs following argument if the Court requires that. What you say makes sense to me. If the injunctive relief, in the terms of the injunction, makes clear that these provisions are unlawful and cannot be enforced in our case against our plaintiffs and their customers and their members, I don't see a further declaration really providing any additional meaningful relief.

THE COURT: Okay. Well, I can hear from the other parties in rebuttal about that, as well. And to the extent the Court needs additional briefing, I can ask for it. I don't need a letter brief right now, but I'll let you know if that changes.

On the Commerce Clause, obviously, courts have to give every reasonable construction to save a statute from unconstitutionality. So again, assuming you prevail on the taxing power argument, why doesn't that principle require the Court to save the statute under the Commerce Clause, if it could? I mean, isn't that what *NFIB* did?

MR. OHLENDORF: That is--it's sort of the converse of what *NFIB* did. And I don't disagree with the principle. I do-- Again, I would associate myself with my co-counsel's reference to the *Florida Prepaid Postsecondary* case. I do think that deals with a situation more analogous to what we have here, where not only is it clear that Congress was single-mindedly acting pursuant to one, and only one, of its enumerated powers, but there's legislative history essentially disclaiming any reliance on the commerce power. I think we fall within, sort of, the four walls of that footnote in *Florida Prepaid*.

But, you know, I am happy for Your Honor to take the argument on their merits--the Commerce Clause argument on its merits. And again, for reasons I've already--I don't think

there's really any solace for the government in category two, the things in interstate commerce, because of this lack of a jurisdictional nexus.

And so I think all they are left with is the *Raich* category, the substantial effects category. And the difficulty with that is that, yes, the government can reach interstate--intrastate instances of an interstate market in order to make effective an interstate price control. Here, there simply is no federal regulation of prices in the interstate market in the firearms at issue. Arguably, again, there is with machine guns, but for these weapons, there simply is nothing there to be regulating in support of. It's as though the government is regulating the Cheshire Cat smile after the cat is already gone. There's simply nothing for that necessary and proper hook--to trigger that necessary and proper hook.

The government says, well, you know, that's sort of cradle-to-grave regulations of this market. We impose registration requirements on the dealers. We impose registration requirements on the transfers. We impose registration requirements on the possession. But I think, you know, pointing to the very registration provisions that are being challenged is just utterly circular, again, in the absence of any sort of federal regulation of the prices in these items in the interstate market that would trigger this category three power.

THE COURT: Are there any aspects of--or applications of the NFA that could be sustained under the commerce power?

MR. OHLENDORF: As written, I think no, Your Honor, again, with respect to the provisions that we have challenged and with respect to these firearms. And, again, certainly Congress, I think, would have, under current Commerce Clause doctrine, power to enact a new statute that would reach some of the things that the NFA reaches.

THE COURT: Okay.

MR. OHLENDORF: But absent that jurisdictional nexus, the statute, as written, cannot constitutionally have any application, even to those instances that could be captured under a better drafted law.

THE COURT: All right. So you agree with me that--again, still on the Commerce Clause--Congress, of course, doesn't have to explicitly state its recital of power when it's enacting legislation. That's *Woods*. You agree with that?

MR. OHLENDORF: Of course.

THE COURT: And there's a separate rule that courts are required to, when they can, save a statute from unconstitutionality, if possible. But if I understand your argument correctly, *Florida Prepaid*, in this footnote, says, well, all that's true, but when Congress speaks clearly in acting--in enacting legislation on X power, that is the only

basis on which the statute must rise or fall, and that would supersede these other, more general principles?

MR. OHLENDORF: That is our respectful submission to you, Your Honor.

THE COURT: Okay. All right. I understand. Thank you for that clarification.

MR. OHLENDORF: I haven't been keeping track of my own time. I--

THE COURT: You have probably seven minutes left.

MR. OHLENDORF: Oh, very good. So I'm happy to answer any other questions on enumerated powers, but also happy to discuss the Second Amendment, and--

THE COURT: Before we get to Second Amendment, let me ask you the same questions about facial versus as-applied. What remedy do you seek in this case?

MR. OHLENDORF: What remedy?

THE COURT: Uh-huh.

MR. OHLENDORF: Yeah, the remedy that we have requested is not--and I don't want to get over the skis of my co-counsel, but we trust the Court to be able to craft an injunction that gives effective relief to our, of course, named plaintiffs. We would ask that it also apply to the associational plaintiffs and all of their members and then the dealer and any dealer members of the association and their customers. I think that is what is necessary to afford

complete relief in this case.

THE COURT: So complete relief could be afforded just by limiting relief to all of the named plaintiffs in both cases?

MR. OHLENDORF: Correct. Again, on the understanding that it reaches members and reaches customers.

THE COURT: If that's the case, does it matter whether the Court views the challenges as facial or as-applied, if, via *CASA* or otherwise, the Court is required to limit the remedy?

MR. OHLENDORF: I don't know that the dispute over labels matters, Your Honor. I think the facial/as-applied distinction is one of the most vexed areas of Supreme Court jurisprudence. You know, I seem to--you read three--you read three cases on the subject and you seem to come up with four different views of what this distinction is. My--the best sense that I have been able to make of the distinction, which has support in some of the cases, is that it really is a distinction that goes to the scope of the remedy.

THE COURT: All right. Thank you. On your answer on the remedy that you're seeking, I want to make sure I heard you correctly. You might have said fashion a remedy to current members of associational plaintiffs. Is it--would it be limited to that, or would it also include potential future members of associational plaintiffs?

MR. OHLENDORF: I don't think we briefed this issue, and I haven't thought deeply about it, but I would think that, to afford complete relief, it would just be all of the membership ongoing of those associations.

THE COURT: So current, and if someone--

MR. OHLENDORF: Joins the association.

THE COURT: --joins the next day after my order, they would be covered, as well?

MR. OHLENDORF: I think that's correct, Your Honor. And I say that because the nature of the injunctive remedy is an ongoing--is an ongoing remedy, right? It's a forward-looking remedy.

THE COURT: All right. On standing, you filed supplemental declarations mid-briefing describing, for the first time, I think--please correct me if I'm incorrect--your clients' intentions to make and acquire AOWs--any other weapons--if not for the NFA. Why should the Court consider those supplemental declarations if standing is assessed, as I believe it must be, at the start of the case?

MR. OHLENDORF: That is definitely true, Your Honor. We concede that principle. But I would rely upon, I think, an equally settled principle that the burden of demonstrating and articulating standing shifts throughout the course of the litigation and becomes more burdensome and more specific.

And so in our complaint, we allege generally in, I believe, paragraph 85 just that the plaintiffs generically--they are injured by the challenged provisions of the NFA. Then in our initial declarations, we put forward some additional meat on those bones, right? And then the government, in briefing, pointed out that this issue that we hadn't really supported, our injury as--with respect to the statutorily defined any other weapons. And in response to that, we put a little additional meat on the bones.

But I think that is just all part of this process that, for example, the *Steel Co.* decision recognizes happens in litigation, that you start general and--with just kind of allegations, and then you become more specific in supporting and articulating and putting meat on those bones throughout the course of the litigation. Nothing in the declarations suggests that this is a new-found desire. There's nothing that, oh, you know, I actually thought about it yesterday and I would like to purchase these firearms. They say, you know, we're providing additional supplemental information in addition to what we provided in our initial declarations.

THE COURT: Are there discussion in the declarations that indicate your clients were injured by the NFA's regulations of AOWs at the time the suit was filed?

MR. OHLENDORF: I don't think there's anything specific either way, Your Honor, in the declaration as to the

time frame. I would--the same thing is true in the initial declarations, right? There's nothing in those that say, you know, as of the time the complaint was filed, I had these desires. Again, we're just providing additional information and further proof to bear out the more general allegations in the complaint.

THE COURT: All right. Thank you. I think you were going to mention some arguments about the Second Amendment. And if you would start with your view as to whether the Court could or should reach that issue if it concluded that the challenged regulations fell under the enumerated powers.

MR. OHLENDORF: And my answer to that, Your Honor, is, if you agree with our view of the scope of the Commerce Clause challenge and that it reaches interstate applications of these registration provisions, then I agree with everything that my friend said. I think there's no need to reach the Second Amendment issue. It's an independent argument. The Court might determine that it's helpful to provide its analysis for further review. It might prefer to wait for further guidance from the Fifth Circuit on the issue. I think it's within the Court's discretion.

Now, if you read the--if you reach the Commerce Clause issue and you conclude--and you limit your analysis of the Commerce Clause issue to just intrastate possession or intrastate transfers, then I think, you know, we would ask that

you reach the Second Amendment issue, because that clearly sweeps in the whole ballgame. Our view of the Commerce Clause challenge is that it does, as well, again, because of this lack of a jurisdictional nexus. But if you side with our friends on the same side of the aisle on that issue, then I do think that the Second Amendment is providing some independent heft.

THE COURT: Okay. And if the Court were required to reach it or if it did reach it, why doesn't the Fifth Circuit case law, as it stands now--regardless of what you or the defense or the Court thinks about that precedent, why doesn't it foreclose this argument?

MR. OHLENDORF: Yeah, and I am happy to dilate on what I think of the precedent, and it's not favorable. But understanding that we, of course, have to set that aside, I'm going to give you the same basic answer that my friend did, which is *Wolford*. And to my knowledge, the standard is, you know, is the reasoning irreconcilable between a new decision of the Supreme Court and a previous decision of the circuit court.

And here, I think it is. I think it is. I think--because *Peterson* and *Comeaux* so clearly say that we are deciding this under Step One, based on what is plainly something that can only come from Step Two after *Wolford*, a historical tradition of licensing regimes, the historical tradition that certain people are not allowed to possess or carry firearms. You know, *Bruen*--this footnote 9 in *Bruen*

essentially says, well, you're going to do a bank shot from that historical tradition to a licensing regime that's just designed to ensure that only the law-abiding and responsible carry firearms. But all of that is clearly a matter of historical tradition, and I think *Wolford* is crystal clear that those types of arguments are simply out of place under Step One.

So I do think that that central reasoning of *Peterson* is simply irreconcilable with this clarification in *Wolford* about the line between Step One and Step Two. Again, Your Honor, I appreciate the awkward position of a district court judge trying to square circuit precedent with more recent Supreme Court precedent.

And so the only other point I would make is, *Peterson* and *Comeaux*, those were silencer cases. They did not deal with short-barreled rifles. I understand the argument that they could very easily be extended--the reasoning could very easily be extended to short-barreled rifles. But certainly, I think, in light of *Wolford*, no court should be in the business of extending the reasoning of these cases.

THE COURT: Are you aware of any cases at the Fifth Circuit where the parties are arguing that *Wolford* has undermined or overruled *Peterson*, *Comeaux*, or other Fifth Circuit cases?

MR. OHLENDORF: I am personally not aware, Your

Honor.

THE COURT: Okay.

MR. OHLENDORF: I wouldn't be surprised if this was the first case to really deal with the issue, but--

THE COURT: All right. Understood.

MR. OHLENDORF: That is all--that is all I have, Your Honor. I think I have drawn out the points that--the additional points I wanted to make in the presentation--

THE COURT: All right. Thank you very much. Appreciate it.

All right. I believe that is all the opening argument for the plaintiffs. All right. I'll hear from the Department of Justice. And was it Lowenstein? Lowenstein?

MR. LOWENSTEIN: Lowenstein. Thank you, Your Honor.

THE COURT: Lowenstein. All right. Mr. Lowenstein, whenever you're ready.

MR. LOWENSTEIN: Thank you.

Well, there was a lot there. I'll endeavor to address all of that at once. There does seem to be kind of some constant shifting sands about the nature of plaintiffs'--each plaintiff's challenges here. I'm not sure I'm completely following what they may have disclaimed or not disclaimed with respect to what activities they are seeking to address that's regulated under the NFA.

But I think it's really no matter, because the NFA, in its current form, is entirely constitutional and in all relevant respects. Its regulation of short-barreled shotguns and rifles, suppressors, and AOWs fits comfortably within Congress's powers to tax and regulate interstate commerce and does not offend the Second Amendment.

I think Plaintiffs' arguments to the contrary rely on the application of incorrect constitutional standards, are incompatible with binding, controlling precedent, and just simply do not reflect how courts adjudicate the constitutionality of an act of Congress.

And, of course, I welcome the Court's questions whenever it has them.

THE COURT: Okay.

MR. LOWENSTEIN: I'll just start with the taxing power and walk through that first.

Here, we need to clarify the proper standard, because plaintiffs, throughout their briefing and today, have applied the incorrect standard for evaluating a regulation under Congress's taxing power. They apply what they describe as a necessary and plainly adapted standard. They derive that solely from *Hobby Distillers* in their briefing. And that's where the district court was applying the Necessary and Proper Clause. And necessary and plainly adapted is taken from the necessary and proper jurisprudence of the Supreme Court.

We know from long-standing Supreme Court precedent that the correct standard to evaluate whether a regulation is a valid exercise of Congress's taxing power is whether that regulation is reasonably related to a valid tax, or you could say to a revenue-raising purpose. We cite *Doremus* for that standard, and the Supreme Court has repeatedly cited *Doremus* as properly applying a reasonable relationship standard.

I'll give you *Martinson*, 256 U.S. 41. I'll give you *Day*, 265 U.S. 545. And even before *Doremus*, you had *Felsenheld*, which applied a reasonableness standard. That's 186 U.S. 126. And I believe the Fifth Circuit, in *McNutt,* acknowledged that when you have a valid tax at issue, the reasonable relationship standard is what applies. And that's also what's been applied in the NFA context in the Fifth Circuit's decisions in *Bezet* and *Ridlehuber*.

THE COURT: Yeah, I understand why you would make this argument. Assume that I disagree with you because I believe the new Fifth Circuit precedent would require me to apply a different standard. I'm not certain that's the case; I'm just asking you to assume with me. Does it change the outcome?

MR. LOWENSTEIN: No, I don't believe so.

THE COURT: All right. So if I agree with their standard, in your view, you still win. Why?

MR. LOWENSTEIN: Absolutely. Well, I think we

have--you know, if I may say, I think we, because of the reasonable relationship standard--which is a rational basis standard. That is how the Fifth Circuit has always understood standards, that you use reasonable relationship.

You can rely on just plausible explanations for why a regulation would facilitate a valid tax. But we didn't just rely on plausible explanations. We provided this Court with undisputed testimony from the chief of ATF's NFA Division about how it is actually, in practice, utilizing the NFA's existing regulations to help assess, collect, and enforce the special occupational tax. And we have addressed this in our briefing, but I'll walk through it.

It does so in a couple ways. The first is that the NFA--the making and transfer requirements allow the government to obtain necessary information to ensure that those who owe the special occupational tax are actually paying it. For instance, ATF reviews all transfer applications, and those with qualified businesses associated with the firearm, it will ensure, before ever approving that application, that the qualified business is up to date on its special occupational tax payment.

And then outside of those who are-- And this is kind of one of Plaintiffs' primary, I think, and unfounded criticisms, is that why don't you just look at--why doesn't ATF just look at a list of qualified businesses and see if they are

up to date on their special occupational taxes. But that would not capture those who are not registered as qualified businesses under 5802 but should be.

And by reviewing making and transfer applications, ATF can determine, is there somebody, you know, consistently making NFA weapons and should be registered as a qualified manufacturer. And the same true with, you know, consistently selling NFA weapons and should they be registered as a qualified dealer. The existing making, transfer, and registration requirements allow the government to obtain that information and ensure that the special occupational tax is being made.

And here's somewhere where I'd like to address this idea that, well, you know, this just really isn't coming up that much. There aren't that many cases where the special occupational tax is being evaded. But I think there's a few things on this. I think, if anything, that proves that the NFA, in its current form, is effective at deterring tax evasion, which is a valid basis for Congress to regulate under its taxing power.

And we see that outside the NFA context and within the NFA context in the case law, that tax deterrence--whether you want to look at *Doremus*, whether you want to look at *Nigro,* whether you want to look at all the NFA cases--*Ridlehuber*, *Ross*, *Matthews*, *Gresham*--they all say that Congress can

regulate to deter tax circumvention.

Moreover, Congress is not limited to only regulating on the taxing power when tax circumvention is pervasive. Once there's a valid tax at issue, it can fully regulate to ensure that its taxes are being paid.

Moreover, I'd point the Court to *Sanchez*, an often-quoted taxing case from the Supreme Court that says this question of negligibility--whether, you know, the revenue that's being collected is negligible--is not relevant when you are determining whether Congress has validly regulated under its taxing power.

Now, I just mentioned deterrence. That's also in the undisputed record evidence that the existing NFA regulations help deter tax circumvention. If a qualified business has not paid its special occupational tax, it cannot register its firearms, whether that's a manufacturer or a dealer, to a transferee, or upon making the weapon.

Now, that really puts-- And we see this, too, in the NFA cases. That puts a manufacturer or dealer to a choice. It can pay the tax that's owed and be able to register a weapon to make it marketable to prospective purchasers, or it can not pay the tax, not register them, and therefore make them very unmarketable, because any prospective purchaser would take on criminal liability by taking on an unregistered weapon. And this is throughout all the Fifth Circuit NFA cases that we cite

in our briefing, that that is a valid way that the NFA's regulations help to support upstream taxes. Regulating the possessors to make sure that they can only take possession of registered weapons helps enforce those who are upstream from the firearm that they have paid their taxes.

And I think that's an important point here, is that the NFA cases, whether it's the Fifth Circuit or the other collection of Court of Appeals cases we cite in our briefing, squarely reject one of Plaintiffs' principle arguments here, and that is that Congress cannot regulate those without a tax obligation under its taxing power. That's incompatible with existing binding precedent.

The criminal defendants in *Ridlehuber*, *Ross*, *Matthews*, they had no tax obligation, and yet, the courts there said that regulating them was permissible under the taxing power. Not the Necessary and Proper Clause. Under the taxing power, because it helped the government enforce and collect upstream taxes, all the way back to the maker, or the one who produced it. Most of the time, that's going to be a qualified business who owes the special occupational tax. And in virtually all instances, a qualified manufacturer would have never owed the making tax, because it's exempted from the making tax. And it wouldn't have owed the transfer tax either, typically, because it's a--when it--it will typically transfer that to a distributor or a dealer who is also a special

occupational tax payer and is also exempt from that.

So the reasoning in these cases, while not mentioning the special occupational tax, are squarely applicable to how ATF is currently enforcing the special occupational tax with the use of these NFA regulations.

THE COURT: I understand that argument. Let's set aside the declarations for a second and the specifics that you just mentioned. I'd like to ask you about the text or the structure of the NFA itself and the challenged NFA provisions. What in the text or structure of those challenged NFA provisions aid the collection or enforcement of the special occupational tax?

MR. LOWENSTEIN: Well, you know, it's kind of, like, Plaintiffs say that the text never says they do, but the text never says they don't or cannot. And the text lays out a reticulated regulatory scheme, and I think it is just statutorily incorrect to say that the challenged regulations don't apply to qualified businesses. I think that's what one of Plaintiffs' counsel said is that they don't apply. The transfer requirements apply to both qualified businesses who owe the special occupational tax and individuals who are non-SOT payers. So does the regulation--

THE COURT: Is your answer it doesn't say anything one way or the other but you think it's just implicit, I guess?

MR. LOWENSTEIN: Well, it's not implicit in the

sense of--that a-- Qualified businesses are not exempt from the transfer requirements in 5812.

THE COURT: But the text does make clear that it is supporting the making and transfer taxes.

MR. LOWENSTEIN: Sure.

THE COURT: Obviously.

MR. LOWENSTEIN: And we agree that that's--

THE COURT: They are focused on making and transfer taxes. There's nothing in there about special occupational taxes. I think we have an agreement on that. So they are addressing make and transfer taxes. They're not addressing special occupation taxes. So why does the text and structure indicate that that's a valid use of the taxing power? Or maybe you're just making a pure necessary and proper argument.

MR. LOWENSTEIN: So I actually don't think-- Sorry. I want to step back. I agree with the--

THE COURT: Well, then, yeah, let's back up. What in the text of the challenged NFA provisions indicate that they support the special occupational tax?

MR. LOWENSTEIN: Well--

THE COURT: I thought the answer was, there's nothing in the text. Is that wrong?

MR. LOWENSTEIN: Oh, no. I think if you look at the text-- For instance, just take the transfer requirements in 5812. That's a challenged regulation that Plaintiffs are

challenging here. That applies to qualified businesses that pay the special occupational tax, and sometimes only ever paid the special occupational tax historically. They were-- You know, a qualified manufacturer oftentimes would never have paid any other tax but the special occupational tax.

And I also want to step back, because I think I may have agreed with the Court on something that I actually don't agree with--

THE COURT: Okay.

MR. LOWENSTEIN: --and that's that anything in 5812 or 5822 says these are only facilitating the making or the transfer taxes. I don't see anything in the text that says that. This is a reticulated regulatory regime that applies to the whole entire life cycle of an NFA weapon. And throughout that life cycle, you're going to have qualified businesses who owe the special occupational tax interacting with those who don't. And along that whole line, this regulatory regime applies to--the prohibitions apply to both SOT payers and non-SOT payers. The registration requirement does.

And if you look at the case law, just--let's just stick to the Fifth Circuit. The reasoning there is that regulating mere possessors, as sometimes they refer to them, or the end purchaser, with a registration requirement helps the government enforce upstream taxes. And again, I'll repeat it as, most of the time, those upstream taxes are going to be the

special occupational tax. The rationale of these cases, while not listing out what taxes exactly--sometimes they do; sometimes they, colloquial, just will refer to the transfer tax. But the reasoning applies equally to the special occupational tax, and *Ridlehuber* says it applies to all the taxes imposed under that.

And so I don't accept that the text has dedicated the making or transfer requirements only to enforcement of the making or transfer tax. And there's certainly no rule--and I think this also underlies Plaintiffs' argument, is that a regulation can only support one tax at a time. There's no constitutional rule like that out there. And so I would disagree, as well, there.

So I think the text does--there's nothing contrary in the text to our argument here. And because it lays out its structure and its operation as a reticulated regulatory regime that applies to all people who trade in NFA firearms, I think it's--I think it's completely consistent with the text, our argument.

THE COURT: What do you make of the hypotheticals in response from the plaintiffs that, in their view, there's no limiting principle to your argument? The government, in your--in their view, under your argument, the government can issue meager occupational tax on fill-in-the-blank item. Broccoli was the example. So grocers are--there's some, you know,

minimal tax, and that--does the--would that allow the government, from that point, to regulate consumers for compliance with that tax in an onerous way? And, if not, why not? What is the limiting principle?

MR. LOWENSTEIN: So--

THE COURT: You know the broccoli hypothetical I'm talking about, or no?

MR. LOWENSTEIN: I'm familiar with these imaginary taxes on sandwiches and broccoli. What I'll say and--what I'll say first and foremost is, this is not something the Court should be engaging with. And let me--

THE COURT: I am engaging with it. Welcome.

MR. LOWENSTEIN: Well, I'm happy to--

THE COURT: Just jump in--just jump into the deep end with me.

MR. LOWENSTEIN: Sure.

THE COURT: They have raised a point that I think is a fair one--you might not--that there's not any limiting principle here. I know that those taxes don't currently exist. Fill in the blank with a widget, right? It can be a firearm; it can be a widget; it can be broccoli. What is preventing the government, if anything--and maybe it's nothing--from imposing an occupational tax on an item and then leveraging--for the supplier of it--and then leveraging that for regulation for all those who consume it?

MR. LOWENSTEIN: Well, I'd obviously have to know more about how this, you know, taxing scheme worked, but what I'll say is, what prevents it is a political remedy. And we know this from the Supreme Court's decision in *Kahriger*. *Kahriger* says: Unless there are provisions extraneous to any tax need, courts are without authority to limit the exercise of a taxing power. And it goes on to say: As is well known, the constitutional restraints on taxing are few. The remedy for excessive taxation is in the hands of Congress, not the courts.

So, you know, I don't know enough about these--you know, these hypothetical taxing schemes to tell you whether they are reasonably related to a tax, but it's emphatically not the province of courts to impose extra constitutional limitations on Congress's power to enforce its own taxes. That needs to be left to the American people.

THE COURT: I think maybe part of how we're talking past each other is, I'm talking about the Necessary and Proper Clause arguments--

MR. LOWENSTEIN: Okay.

THE COURT: --and I think you're talking about the taxing power. Is there a limit to your necessary and proper argument? Because you're also asking me to uphold the challenged provisions under the Necessary and Proper Clause.

MR. LOWENSTEIN: Sure.

THE COURT: Is there a limiting principle to that?

what I heard you just say, I think, is, not really, other than just the political process, that if someone were dumb enough--if Congress were dumb enough to issue those kinds of regulations, the people can hold them accountable.

MR. LOWENSTEIN: Well, here's where I'm kind of struggling, is--because I keep reverting to the taxing power, is because it would be--I think it's kind of odd to say that something is outside the Necessary and Proper Clause power but within the power of the taxing power, because the Necessary and Proper Clause, as we know--exercises of it are to support or effectuate an enumerated power, and so they are interconnected, and that's why I'm having a tough time--

THE COURT: They are.

MR. LOWENSTEIN: --interacting with the Necessary and Proper Clause as somehow some sort of separate power, which I don't really think you can separate the two.

THE COURT: So are you fine just relying solely on an argument that these provisions can be upheld solely on the taxing power, and if they are not upheld on that enumerated power, then the Necessary and Proper Clause argument would also fail?

MR. LOWENSTEIN: Well--

THE COURT: Because you're the one that raised necessary and proper.

MR. LOWENSTEIN: So I don't want to go that far,

because we have--and I want to make clear here, we have a concededly valid federal tax here. Plaintiffs do not say that the special occupational tax is not a valid tax. They have conceded that. And so we do have an exercise of the taxing power.

THE COURT: Yeah, they're not challenging the special occupational tax. I know you know that.

MR. LOWENSTEIN: Sure, sure. So I'm trying to think through what the Necessary and Proper Clause can add. I really think the--I really think the analysis is duplicative of that under the taxing power itself. And so that's--our position is--I think, in *Comstock*, you see that it's a--the test is whether the means are rationally related to the implementation of a constitutionally enumerated power.

And so I'm not--I think the Necessary and Proper Clause does support the NFA's regulations with respect to the special occupational tax, just as the taxing power does. And so I don't really see much daylight between the two.

THE COURT: All right. Assume with me that the Court concludes that the NFA provisions cannot be sustained on the taxing power.

MR. LOWENSTEIN: Okay.

THE COURT: Okay? You with me?

MR. LOWENSTEIN: Yep.

THE COURT: All right. Obviously, we have the

separate special occupational tax. I agree with you. That tax is still in place. It's a valid tax. So the question is whether the Necessary and Proper Clause can sustain the challenged NFA provisions as an aid of the special occupational tax. Right?

MR. LOWENSTEIN: Okay.

THE COURT: You understand the hypothetical so far?

MR. LOWENSTEIN: Yes.

THE COURT: Okay. You would need--my question is, can you offer me a limiting principle as to why the challenged NFA provisions are proper?

MR. LOWENSTEIN: Because they actually, based off of record evidence, are, in fact, supporting in a necessary way the enforcement of the special occupational tax. Without the NFA's existing regulations, ATF would have a Herculean task to try to find those who are not registering as qualified businesses and acting outside of the taxing scheme, making weapons, selling weapons. I'm not sure--Plaintiffs have certainly not offered any way in which ATF can find those people. It would leave the NFA's--the enforcement of the special occupational tax and the NFA to voluntary registrants, and that is exactly what the NFA was designed not to do, is--like *Doremus* says or *Nigro* says, keeping traffic in all this NFA firearms aboveboard, subject to government oversight, so that the government knows who is trading in these weapons

and what taxes do they owe and we can enforce them.

And I want to point the Court to *Nigro*, which we do cite in our briefing. It actually looks at a federal statute and acknowledges that the statute created a functional registration of purchasers, their drugs--in that case, it was drugs--effective registration of purchasers to ensure that all of the traffic in drugs--those regulated drugs was aboveboard. Those purchasers didn't owe a tax. It was to enforce the taxes on those who were selling them. That is squarely applicable here, whether you want to rely on the taxing power or the Necessary and Proper Clause.

Let me just check my notes here. So I'm happy to turn to the Commerce Clause, unless there's any--

THE COURT: I'm happy to leave this subject. I'm not sure if there's anything else I can really say or ask. I was interested in the limiting principle. I haven't really heard one, other than it's just--this is just part of the scheme and it's necessary for all the reasons you have identified.

So where did you want to turn next?

MR. LOWENSTEIN: To the Commerce Clause issue, Your Honor.

THE COURT: Okay. Go ahead. And on there, I have a basic question. Can a court uphold a law based on an enumerated power that Congress never invoked?

MR. LOWENSTEIN: Absolutely. And--

THE COURT: Why?

MR. LOWENSTEIN: --and the Court cited one of the cases in *NFIB*. There was no indication that Congress thought it was exercising the taxing power in enacting the ACA's individual mandate.

THE COURT: What part of the statute was the mandate in? What section of the U.S. Code was the mandate in?

MR. LOWENSTEIN: Oh, I'm not sure about that, Your Honor.

THE COURT: All right.

MR. LOWENSTEIN: But I'll address it more generally here. This is a--this idea that Congress has to have in mind is a--the power it's exercising features prominently in Plaintiffs' argument, and I understand why. They do not want this Court to get to the Commerce Clause. But that is not how courts evaluate whether it can--a court can sustain an act of Congress on enumerated power.

And I'll point the Court--so not only to *NFIB*, but I'll point the Court to two Fifth Circuit cases that lays out the proper analysis here. *Ussery vs. Louisiana*, 150 F.3d 431. This is what the Fifth Circuit said, and I think its application here is going to be pretty obvious: A court must, quote, make an objective inquiry, namely whether Congress could have enacted the legislation at issue pursuant to a

constitutional provision granting it the power. As long as Congress had such authority as an objective matter, whether it also had the specific intent to legislate pursuant to that authority is irrelevant, end quote.

And I'd also point the Court to *Lesage vs. Texas*, 158 F.3d 213, quote: The State suggests that Congress intended to invoke its powers under the Spending Clause rather than the Fourteenth Amendment when it enacted Title VI. Assuming arguendo the validity of that proposition concerning the subjective intent of certain legislators, it is entirely irrelevant to our inquiry.

This is an entirely objective inquiry. Those cases, including *NFIB*, squarely reject this notion that Congress had to believe that it had a certain power or what it intended to exercise. The question for the Court is an objective one: does Congress have the power. And if it does, *NFIB* says that's enough to sustain it.

THE COURT: Then why did Chief Justice Roberts go to great ends in *NFIB*, in looking at the text and structure of the statute at issue there, and concluded that there were Exhibits A through F indicating that Congress was acting based on its taxing power? So I think I disagree with you on your basic proposition that nothing in the statute indicated that Congress was acting under the taxing power and, therefore, it didn't matter; it was still justified under the taxing power.

That's not my understanding of the case. I thought that Justice Roberts walked through the statute and said, we have all sorts of evidence here that Congress was acting pursuant to its taxing power. It didn't say so, and it doesn't have to say so. But we have plenty of circumstantial evidence that it was. Didn't Chief Justice Roberts do that--

MR. LOWENSTEIN: Oh, absolutely.

THE COURT: --or am I misremembering the case?

MR. LOWENSTEIN: Absolutely. And I want to be clear here. I'm not saying the Court ignores the text and practical operation of the statute. That's what matters. The Court should be looking to the text and practical operation of the statute to determine what does the statute do and then ask, what it does, does that fall within one of Congress's powers. I'm just--

THE COURT: Okay.

MR. LOWENSTEIN: --addressing the idea that Congress didn't have to have in its mind, or the Court goes and looks through the historical record or the legislative history and goes, "Did you ever say that's what you were trying to do, Congress," and pry open Congress's collective mind. That's what's not appropriate, but the text and operation of the statute is, and that clearly, inescapably shows that the NFA regulates interstate commerce.

The NFA expressly regulates importers,

manufacturers, dealers. Those are commercial actors who operate in an interstate firearms market. It directly regulates commercial activities that happen in interstate market, like importing, manufacturing, other types of making, distributing, dealing, transporting, leasing. Those are commercial activities that it directly and sometimes expressly regulates. And we have had a concession here today that firearms are regulated under the NFA as a commodity that is traded in an interstate firearms market. So I think it's inescapable that the text and basic operation of the statute shows that the NFA regulates interstate commerce.

And then what we know from *Raich* is, courts do not start to excise individual applications of a statute that are part of a concededly valid regulatory regime. The vast majority of the NFA fits squarely within Congress's power to regulate the persons and things in interstate commerce. The fact that it also reaches intrastate activities is beside the point, because we know from *Raich* that's not the role of the Court to start to carve up, you know, larger regulations that are, you know, validly within Congress's Commerce Clause authority. We think that's the--we think that's the Commerce Clause analysis that the Court should do if it gets there.

THE COURT: All right. The statute speaks for itself. So the preamble of the NFA says it aims to tax the sale or other disposal of certain firearms and machine guns.

Right?

MR. LOWENSTEIN: Yes.

THE COURT: Subchapter (a) of the statute titled Taxes has three parts: a special occupation tax, tax on transferring firearms, and tax on making firearms. Right?

MR. LOWENSTEIN: Yes.

THE COURT: 5811, tax on transfers, provides there shall be levied, collected, and paid on all firearms transferred a tax at the rate of zero or $200 for machine guns and destructive devices.

The same language features in Section 5821, the making tax. And then next to both of those provisions are most of the challenged NFA requirements here, and those expressly prohibit any transfer or making until a relevant tax is paid.

Given the lengths that Congress went to in enumerating all of this taxing power, what do you do with *Florida Prepaid*?

MR. LOWENSTEIN: Sorry. Can you--

THE COURT: What do you do with *Florida Prepaid*?

MR. LOWENSTEIN: Oh, *Florida Prepaid* has nothing to do with sustaining an act of Congress on enumerated power that wasn't, you know, considered. *Florida Prepaid* is a case where the Court was asking whether Congress had validly abrogated a State's sovereign immunity from patent infringement suits through the Patent Remedy Act by virtue of its power under

Section 5 of the Fourteenth Amendment.

To determine that, as a substantive analysis under Section 5 of the Fourteenth Amendment, the Court had to ask whether Congress validly exercised Section 5 as a remedial legislation aimed at securing the Fourteenth Amendment's protection for patent holders. To do that, it had to ask what wrong or what evil constitutional wrong was it trying to remedy, and the Court determined that, if anything, it was one of a violations of due process. And then it dropped that footnote to say, you know, one party-- And the government wasn't defending it on these grounds. One party says it was also trying to remedy violations of the Just Compensation Clause, but there's no indication in the text or the legislative history, so we're not going to consider that.

That reflects a substantive Section 5 analysis, not the principle that courts try to look into the legislative history to see what Congress thought. *Florida Prepaid* has nothing to do with the issue that Your Honor and myself are discussing, is, what can the Court consider as a basis-- enumerated powers basis. That's not what *Florida Prepaid* was about.

THE COURT: Well, they're pointing me to a footnote that says, when Congress speaks clearly about the power on which it is basing its action, courts must judge that statutory regime, and its constitutionality will rise and fall based on

that power and that power alone. It is beyond the Court's authority to say, well, maybe that power didn't work but there's another provision that Congress didn't talk about or even think about, and I can save it there.

They are representing to me that's what *Florida Prepaid*--the footnote in particular--is about and why it could apply here. I understand the factual distinctions you're talking about. That's a provision in a Supreme Court majority opinion that's just there. Why wouldn't-- Assume that I believe Congress spoke clearly that it was acting on a taxing power here. Does *Florida Prepaid*--this proposition within it--undermine your argument? And if--

MR. LOWENSTEIN: Not at all.

THE COURT: Okay. Help me understand specifically why not.

MR. LOWENSTEIN: Because I don't think it's a factual distinction. I think it is a legal analysis distinction. In *Florida Prepaid*, when it was talking about--when-- We have to read cases in their context, and that footnote is addressing that Congress was not trying to remedy, through Section 5 of the Fourteenth Amendment, state violations of the Just Compensation Clause. That's a substantive Section 5 analysis. That is not the broader principle that we're discussing where there's a question about what enumerated powers-- The Just Compensation Clause doesn't--that's not an

enumerated power. That is a right.

And so to say that they are not considering the Just Compensation Clause is not to say they are not considering an enumerated power to sustain an act of Congress that Congress may not have recited or thought it was using. It has nothing to do with how courts analyze whether they are going to sustain an act of Congress. It had to do--it was a substantive Section 5 analysis about what wrong was Congress, with the Fourteenth Amendment, trying to remedy. So I think *Florida Prepaid* is completely irrelevant.

THE COURT: I see.

MR. LOWENSTEIN: And it's incompatible with *NFIB,* all the Supreme Court cases that *NFIB* relied on to say that--how courts are supposed to go about determining whether an enumerated power can sustain. And Fifth Circuit precedent that binds this Court and is very clear, it is an objective analysis, and those Fifth Circuit cases rely on the same--the same, you know, Supreme Court jurisprudence that *NFIB* did.

So I think *Florida Prepaid* is beside the point, and so is *Bird*, *Bird*'s footnote that they rely on with little snippets from the footnote about purpose. *Bird* was just explaining how the substantial effects test works, and the underlying concept. *Bird* says, you know, Congress doesn't have the power under the Commerce Clause to regulate only interstate activities for their own sake without any relation to its

impact on interstate commerce. Nobody is arguing that Congress has that authority. That's what that footnote says. And the footnote relies on *Darby* at the very start to say, you don't look into the purposes or motives of Congress when determining whether enumerated power can sustain an act. So the footnote from *Bird* that they rely on, too, is completely beside the point.

THE COURT: I have a few more questions on the Commerce Clause--

MR. LOWENSTEIN: Yeah.

THE COURT: --before we move on.

In 1934, do you think Congress would have believed it constitutional to enact the NFA under the Commerce Clause?

MR. LOWENSTEIN: I'm not sure I can answer that question. However, I just want to be clear-- I'm not trying to escape the question. I can't say what Congress believed it could or could not do collectively. However, just to be clear, the current NFA is not the 1934 Act. It's the reenactment in 1968 as Title II of the Gun Control Act, which was Congress's effort to completely rehaul how it regulates commerce-- interstate commerce in arms. And so at that point, absolutely, Congress knew that it had the power under the Commerce Clause to do what the NFA does.

THE COURT: Can you give me an example of a statute that has or could be sustained under the Commerce Clause that

is included in the Internal Revenue Code?

MR. LOWENSTEIN: I don't have an example handy for Your Honor, no.

THE COURT: Can you give me an example of a statute that is a taxing statute that refers to taxes that was justified under the Commerce Clause, and not the taxing power?

MR. LOWENSTEIN: I'm not aware of any examples, Your Honor.

And if I may just add, I don't--you know, we cite in our brief that this idea that taxing is just completely separate from commerce is--well, one, it's just--that's just not practical reality. You can tax entities engaged in commerce and, in so doing, you are also regulating interstate commerce.

So this idea that, yes, the NFA--the NFA requirements support the NFA taxes, we agree with that. That's one of our principle arguments in our brief. But Justice Story, as old as Justice Story--and in *United States vs. Butler*, the Supreme Court said that taxing oftentimes is going to be intertwined with other powers. And here, it's intertwined with the power to regulate interstate commerce. So just because, you know, there's a tax in 5811 doesn't mean the requirements in 5812 say all we're doing is just supporting the tax.

THE COURT: All right. Let's talk about the Gun

Control Act and compare it to the National Firearms Act. The Gun Control Act expressly invokes, I believe, interstate commerce. It's located in Title 18. It's not located in the Internal Revenue Code. And so when Congress wants to act based on the Commerce Clause, it has done so, and it has done so expressly in the Gun Control Act, I think. I mean, do you agree with that as a factual matter?

MR. LOWENSTEIN: Well, I think--I guess I'm--I mean, the Gun Control Act is quite large; many of the amendments since 1968. There's other provisions that don't invoke the Interstate Commerce Clause. Take 922(o) that prohibits civilian possession and transfers of post-1986 machine guns. It doesn't invoke expressly the Interstate Commerce Clause.

And so I understand maybe the Act utilizes language about interstate commerce. I don't think there's, like, a--there's no requirement that Congress recite its power in the--

THE COURT: But it did in the Gun Control Act.

MR. LOWENSTEIN: In the Gun Control Act in Title--

THE COURT: In the great majority of provisions, it does.

MR. LOWENSTEIN: Sure.

THE COURT: There's jurisdictional hooks throughout. It's in Title 18. It's not in the IRS code.

So my question is, is that circumstantial evidence

or direct evidence that Congress based the NFA on the taxing power and the GCA on the Commerce Clause power? It seems like they're talking about two different things, two different sources of power simultaneously.

MR. LOWENSTEIN: So I'll first say no, I don't think so. I mean, I do agree that the NFA is based on the taxing power. I agree with that. But it also regulates interstate commerce, and I don't think just because, in a different title of the Gun Control Act, they more profusely use interstate commerce expressly suggests that they couldn't have possibly been regulating interstate commerce in the NFA, which is a statute that textually regulates commerce that almost always occurs in an interstate firearms market.

And I'll say, this--and this is--and maybe this gets a little bit to Your Honor's point--is, Plaintiff, you know, referred to--I think it's 5861(j), which uses interstate commerce. That is something that Congress does, when it says in interstate commerce, to limit the reach of a provision to just that stuff in interstate commerce. And I'll point the Court to just one case that stands for this proposition, *Circuit City Stores vs. Adams*, 532 U.S. 105. When Congress uses the words "in commerce," it is limiting the reach of the operative provision so as not to extend to the outer limits of its authority under the Commerce Cause.

So the NFA does that in one prohibition, and then,

in subsection (k) of 5861, it limits it to importing firearms. But otherwise, it's the full reach of the Commerce Clause. So that's why it--I mean, that is one explanation for why it doesn't use "in interstate commerce" throughout it.

THE COURT: Okay. What else do you have for me on the Commerce Clause?

MR. LOWENSTEIN: I'd like to just briefly--we think *Ardoin* forecloses any argument that the NFA exceeds Congress's Commerce Clause authority. In *Arce*, which came after, it acknowledged that *Ardoin* is a holding. And *Ardoin* never subjugates the Commerce Clause holding as though it's kind of a beside-the-point. And it also adopts the reasoning of the Fourth Circuit's decision in *Jones* which says nobody could debate that the NFA is beyond the Commerce Clause. And in that case, there was sales--there were sales of firearms interstate. That was part of the reasoning. And, of course, that would not be beyond Congress's power under the Commerce Clause, because that is a thing in interstate commerce, and the people selling them are persons in interstate commerce. And nothing about *Ardoin* is limited, in its Commerce Clause rationale, to just machine guns.

THE COURT: Setting aside the machine gun points for a second, the first argument from opposing counsel is that the language on which you rely is dicta. It's an alternative holding that could be removed from the case and the result

would not change. Isn't that so, and, if it's not so, what am I missing about the case?

MR. LOWENSTEIN: Well, I'll just say the Fifth Circuit doesn't think that that's what *Ardoin* says. In *Arce*, which is a case we have in our brief--I don't have the cite for you--it says that, in *Ardoin*, we held that the NFA can be upheld on taxing or Commerce Clause.

THE COURT: Lets get to *Arce* in a second. Let's start with *Ardoin*. The Commerce Clause is an alternative holding. Yes? No? Is it something else? Is it--

MR. LOWENSTEIN: It's an equal holding. If you--I think if you look at the opinion, it's on equal grounds with the taxing power. So I don't think you can say one or the other is more important than the other.

THE COURT: Okay. If the Commerce Clause discussion in *Ardoin* were removed, could the Court reach the same conclusion?

MR. LOWENSTEIN: Absolutely. And--

THE COURT: Okay. And I take your point on *Arce* that--it was described more broadly later in *Arce*. Tell me about that case.

MR. LOWENSTEIN: *Arce*?

THE COURT: Yes.

MR. LOWENSTEIN: Oh--

THE COURT: You're calling it "*Arce*."

MR. LOWENSTEIN: Oh, yeah, *Arce*.

THE COURT: A-r-c-e, at least where I'm from, is "Arce," and it sounds so much nicer, and I want to help my-- and I want to help my court reporter. You like this case, so you don't want to call it an "arse" for sure.

Tell me about that case.

MR. LOWENSTEIN: Your Honor, I apologize. I don't have familiarity with the full background of that case. I don't believe it was an actual enumerated powers challenge to the NFA.

And I just want to be clear. We don't have to hang our hat on *Ardoin*. We think it does foreclose-- I don't want to make it seem like we're--you know, we really need it to win here. We think the Commerce Clause power is straight--the analysis is straightforward. We've gone through it. I just don't want to suggest that we need *Ardoin* or we're in trouble.

THE COURT: All right. It's helpful to you, but it's not so strong that it just forecloses the argument?

MR. LOWENSTEIN: We think it does. We think it is a holding of the Court. We think-- I guess I just don't understand how a Court sets that aside and says, it doesn't say what it says and I'm not going to, you know, follow it.

So we think it says what it says. Yes, it is not a thoroughly reasoned, prolix opinion on that question. It does adopt the reasonings expressly from the Fourth Circuit in

*Jones*, and *Jones* explains exactly why it's within the Commerce Clause, so--

THE COURT: When two circuit court opinions conflict, does the earlier control or does the latter control?

MR. LOWENSTEIN: Your Honor, I want to be careful here, just because I don't have the Fifth Circuit's rule in mind, but I do know that there are circuits that treat it as, the earlier opinion controls because the latter panel should have followed the earlier opinion. I think that's generally accepted.

THE COURT: And that's my understanding of the Fifth Circuit. Have you practiced mostly in the Ninth in Montana? Is that why you hesitate about the Fifth?

MR. LOWENSTEIN: The vast majority of my cases have been in Texas since I joined the Department.

THE COURT: Okay. That's my understanding of the rule in the Fifth Circuit, as well, that when two circuit court--Fifth Circuit Court opinions conflict, the earlier controls, not the latter, for the very reason that you have identified. The latter panel should have seen the earlier panel. It's obviously precedential. If it's published, you have to follow it.

There are earlier Fifth Circuit cases, earlier than *Ardoin*--because *Ardoin* came before *Arce*, obviously--and those cases recognize--and I'm quoting from *Parker*--the

constitutional bedrock of the NFA is the power to tax rather than the commerce power.

That's *Parker* from 1992. Why wouldn't that earlier case control?

MR. LOWENSTEIN: Well, *Parker* specifically wouldn't control because I believe that's a double-jeopardy habeas case. Certainly--

THE COURT: Well, *Arce* is a Sentencing Guidelines case. Right?

MR. LOWENSTEIN: But *Ardoin*--

THE COURT: We're dealing with, like, language out of the context that you have brought to the Court saying, hey, look, the Fifth Circuit has held this and I'm bound by it. So there might be a different--

MR. LOWENSTEIN: But *Ardoin* is an enumerated powers case.

THE COURT: Okay. Go ahead.

MR. LOWENSTEIN: Well, I guess the question would be, is *Ardoin* incompatible with *Parker*, and--

THE COURT: Yes.

MR. LOWENSTEIN: And *Ardoin* is an enumerated powers case. It actually considered the enumerated powers question. *Parker* is a double-jeopardy habeas case that just refers to, I think, quoted language from *Ross* about constitutional bedrock. And I don't know of a test of what is a bedrock and not a

bedrock. I just know of a test that there needs to be an enumerated power that sustains an act of Congress, whether it's a bedrock or not.

THE COURT: So the language in *Parker*, in your view, doesn't control the issue; it's dicta essentially?

MR. LOWENSTEIN: Well, certainly if--yes, certainly, *Parker*'s would be, because it was just tacking through, I think, a bunch of reasons why it was going to reject a habeas petition based on double jeopardy, I believe.

THE COURT: Okay. Is *Ardoin* and *Arce* pre-*Lopez* or post-*Lopez*?

MR. LOWENSTEIN: So *Ardoin*, I know, is pre-*Lopez,* although pre-Supreme Court *Lopez*, it does--it's aware of its Fifth Circuit--the Fifth Circuit's decision in *Lopez* that was affirmed by the Supreme Court. *Ardoin* has it in a footnote. And so this idea that *Ardoin*--the Fifth Circuit just had no idea that there were any limits on the Commerce Clause whatsoever is contrary to what *Ardoin* says.

*Arce*, I'm sorry, Your Honor, I do not know if it's post-*Lopez*. I believe it is.

THE COURT: Well, *Arce* came later, so it must be.

MR. LOWENSTEIN: Okay.

THE COURT: *Lopez*, a sea change in Commerce Clause analysis. Agreed?

MR. LOWENSTEIN: I hesitate a little bit with "sea

change," because it talks a lot about post--or pre-*Lopez* case law and relies a lot about it. The three categories are based off of pre-*Lopez* case law. It distinguishes itself from case law that was before *Lopez* about regulating classes of activities and not, you know, eliminating the interstate aspects of that from the class of activities.

So I do understand that it is a monumental Commerce Clause case certainly, but I don't--I just want to kind of fight a little bit the idea that it's a sea change.

THE COURT: Okay. Well, I don't want to quibble with you. I'll use "monumental." That's fine. That was your word. So we have a monumental Supreme Court case in the Commerce Clause arena that greatly impacted, at the very least, Commerce Clause analysis, the way courts, the way scholars think about the Commerce Clause and how--the calculus we use in evaluating the scope of Congress's Commerce Clause power.

That postdates *Ardoin*. Should I view *Ardoin* as somehow abrogated by *Lopez* and *Morrison* because it predates these monumental cases? Judge Smith, I believe it was, writing for the majority in *Ardoin*, is writing without the benefit of this monumental case.

MR. LOWENSTEIN: No, because I don't think they are incompatible. The NFA is nothing like the statute at issue in *Lopez*. What the Court in *Lopez* focused on is, the statute in *Lopez*, 922(q) at the time, prohibited firearm possession in a

local school zone. It says, that's completely interstate, completely not--has nothing to do with commerce or any sort of economic activity, and so, because of that--and it's not part of any regulation of a class of activities that happen in interstate commerce, or intrastate, and so we're going to look at these different, you know, considerations to determine whether it can still be upheld under the substantial effects test, and it said no; as a facial matter, no, because of its various considerations.

The NFA regulates expressly commercial activities. And so commercial activities, most of which happen in interstate commerce, are part of a class of activities that also reaches intrastate instances of the class of activities. So I don't think *Lopez* abrogates *Ardoin*, and I also don't think that's just how precedent works. I think if there's an intervening Supreme Court case that, you know--I mean, the standard in the Fifth Circuit, to answer something we're going to get to in the Second Amendment, is, unequivocally directs the contrary. I don't think *Lopez* does that. And *Raich* supports *Ardoin*. So I think--I don't think *Ardoin* gets, like, wiped off the books.

THE COURT: If I remember correctly, the laws at issue in *Ardoin* and *Lopez* both lacked jurisdictional hooks.

MR. LOWENSTEIN: Yes.

THE COURT: How did Congress fix the Gun-Free

School Zone Act after *Lopez*?

MR. LOWENSTEIN: I believe it added a jurisdictional hook.

THE COURT: Okay.

MR. LOWENSTEIN: And just to acknowledge that, there's no jurisdictional hook in the statute under--in *Raich* or in *Taylor*, and those were upheld on Commerce Clause grounds. I don't think a lack of a jurisdictional hook matters when you're regulating commercial economic activities as part of a larger regulatory scheme.

THE COURT: All right. Anything else on the Commerce Clause?

MR. LOWENSTEIN: No, Your Honor. We can turn to the Second Amendment here--

THE COURT: All right.

MR. LOWENSTEIN: --if that's where you want to go, Your Honor.

THE COURT: Of course, yeah.

MR. LOWENSTEIN: Okay. I think the-- You know, we provided multiple grounds on which this Court can reject--could reject Plaintiffs' Second Amendment challenge. Their challenge is squarely foreclosed by *Peterson*. I don't think there's really-- Well, I suppose there is a dispute on that. *Peterson* held that the NFA is presumptively constitutional because it utilizes requirements or standards--objective definite

standards just like the shall-issue regimes that were sanctioned in *Bruen* footnote 9. And that--it still is subject to as-applied challenges for abuses, like lengthy wait times.

Plaintiffs have tried to, in various ways, limit *Peterson* to its facts, but we know from *United States vs. Comeaux*, only a couple of weeks ago, the Fifth Circuit said, *Peterson* is a binding holding on the NFA. It lays down a controlling rule of decision and absolutely forecloses, as it says in, I think, footnote 4--absolutely forecloses a facial challenge.

So *Peterson* and *Comeaux* foreclose Plaintiffs' Second Amendment challenge in its entirety, and we think that's all the Court should say, you know, consistent with principles of judicial restraint, particularly in the constitutional context.

And I'll just also say, just on *Wolford*--because that's another ground that--kind of a Hail Mary pass to try to get away from *Peterson*. The standard, as we know from *Wilson* January 2026 decision from the Fifth Circuit, that the Supreme Court has to unequivocally direct that circuit precedent is wrong, and that's when a panel's determining of the Fifth Circuit--whether it should follow panel decision, I think all the more a district court should wait until there's an unequivocal direction from either the Supreme Court or the Fifth Circuit that the Fifth Circuit's holding should just be

set aside, particularly one as recent as this.

THE COURT: I get enough humble pie from the Fifth Circuit. You don't have to remind--you don't have to scoreboard me here.

On the Second Amendment, let me start with my threshold question that I asked the plaintiffs that I want to ask you. Assume that I resolve the case on the enumerated powers ground, and assume with me that I don't believe the challenged regulations can be justified there. Do you agree with the plaintiffs that the Court need not resolve or reach the Second Amendment claim?

MR. LOWENSTEIN: It might matter on the remedy. I think I do agree with Plaintiffs there, is, it might matter on remedy, depending on, like, you know, the--I guess the nature of what you say on the enumerated powers; if it's, you know, all of the NFA, just the interstate applications. But yes, as long as ruling on the Second Amendment would not change anything. We think it's directed by Supreme Court in *Jean* and *Escambia* that, when it comes to constitutional issues, courts do not just unnecessarily opine on those issues. So yes, I would agree on that.

THE COURT: Still on the Second Amendment, is there a particular length of time at which a point of delay in processing these NFA applications becomes abusive under *Bruen*'s footnote 9?

MR. LOWENSTEIN: That's not something that I have had an opportunity to think through. I think, if you look at *Bruen* footnote 9, I'll just--what I'll add is, *Bruen* footnote 9 says that, you know, shall-issue regimes that use objective definite standards just don't necessarily prohibit anybody from exercising their Second Amendment rights. That seems to kind of be the--you know, the conceptual thrust there. So I suppose that, in an as-applied challenge, which this is not, a court would look to, is the exercise of a Second Amendment right actually being denied to that person through a lengthy wait time.

Again, that's not a definitive answer on exactly how you would work through that, because I have not had the opportunity to think through what an as-applied challenge would look like.

THE COURT: You mentioned that *Peterson*, in your view, squarely forecloses the Second Amendment argument. Is it your position, therefore, that *Peterson* applies to all aspects of the NFA and to all NFA firearms?

MR. LOWENSTEIN: Yes. There's nothing about *Peterson*'s reasoning that limits itself to just the regulation of suppressors. The whole--*Peterson* and *Comeaux*'s application of *Peterson* focus on the nature of how the NFA applies to all NFA-regulated firearms. And in *Comeaux*, the Fifth Circuit found that suppressors are arms, so it would be particularly

odd to then say, well, just only some arms, but not other arms. So, yes, it applies to all NFA weapons.

THE COURT: Okay. Those were my questions on the Second Amendment, but I'd be glad to hear anything else you have on this issue.

MR. LOWENSTEIN: I don't think I have anything further. I think *Peterson* resolves this.

THE COURT: All right. Can we turn to the remedy?

MR. LOWENSTEIN: Absolutely.

THE COURT: I have a few questions there, and I'd be glad to hear arguments you have, as well.

Obviously, you disagree with the plaintiffs on the merits. Do you agree that the remaining permanent injunction factors--irreparable harm, balance of the equities, and the like--would weigh in their favor if I disagreed with you on the merits?

MR. LOWENSTEIN: So I--categorically, I wouldn't say that, you know, if the NFA is unconstitutional and they were being actually regulated and harmed by it, that somehow, you know, the other factors aren't satisfied. What I will say, though, is, not to the scope of relief that they request.

THE COURT: Agreed. Yeah, that's fine. Scope is a different question.

MR. LOWENSTEIN: Sure. Understood.

THE COURT: So if I disagree with you on the

merits, you would agree that the remaining factors would weigh in their favor? It would be--under those--under that assumption, they were being irreparably harmed, the balance of equities weigh in their favor, and they are entitled to some relief?

MR. LOWENSTEIN: Some injunction, I--yes.

THE COURT: All right. You argue on the scope that any injunction should not extend to the commercial plaintiffs' customers. Tell me why.

MR. LOWENSTEIN: Or I think even--you know, I think the commercial plaintiff in *Jensen*, even to the commercial plaintiff in *Jensen*, because the only harm that I think is being alleged--the irreparable harm being alleged here is lost sales, but it's just based off of-- We're at the summary judgment stage. The Court has got to actually find evidence of irreparable harm that substantiates it. It can't just be an argument anymore. It can't just be an allegation anymore. And all we see in the record evidence is just a conclusory statement that, we're losing sales. But there's nothing more to it. It's one sentence. And that's what the whole basis of their harm is based on.

And so I'd point the Court to Judge Boyles' decision in the *Second Amendment Foundation* case that says that's clearly not good enough to substantiate irreparable harm; it's just a declarant's conclusory assertion.

THE COURT: All right. And as for the customers? Assume that I disagree with you on the commercial entity.

MR. LOWENSTEIN: Well, I think--

THE COURT: Why should it not also go to their customers? If I believe the record establishes that there is some kind of financial harm, or harm otherwise, being done to the commercial entity, why wouldn't the customers also need to be covered, given that they are the source of the profit in the first place?

MR. LOWENSTEIN: So I think what I take issue with is not-- If the commercial plaintiffs--and this is baked into Your Honor's question, I think--the commercial plaintiffs have established that they actually are harmed here and have substantiated that, then they would need customers to be able to purchase their weapons, and I understand that logic. But to extend it to the customers of the members of the associated-- associational plaintiffs is the issue that we're taking--that's what we take issue with, that we're getting too far afield of this Court's jurisdiction, and I'm not aware of any case that extends it so far away.

THE COURT: Okay. So you don't take issue with the commercial entities' customers; you take issue with the associations' members' customers.

MR. LOWENSTEIN: Assuming the commercial plaintiffs have actually proven that they are harmed here, they have

irreparable harm, and substantiated it in the record, which I don't think they have. But, yes, I think I'm agreeing with Your Honor.

THE COURT: All right. Do you agree, or not, that, like Texas, the other fourteen States are affected in materially the same way by these regulations? That the States' interests are similar?

MR. LOWENSTEIN: Absolutely not.

THE COURT: Okay. Why not?

MR. LOWENSTEIN: There is no evidence in the record on how any of the other fourteen States-- You know, counsel's presentation up here said "States," States this, States that. Texas has evidence in the record; fourteen States have zero evidence. There's zero evidence this Court could write an opinion on that says those fourteen States are irreparably harmed and therefore deserving of injunctive relief. They have failed at the summary judgment stage to obtain an injunction, I think, period.

THE COURT: Okay. All right.

All right. Those were my remedy questions primarily, but I'd be glad to hear from you more on this. In particular, I'd like to hear your argument on the Jensen plaintiffs' standing with respect to the any other weapons, once we're done with remedies. If you have more for me on remedies, I'd be glad to hear from you.

MR. LOWENSTEIN: No, that's all. I'm happy to address this. Your Honor got to it in your question to counsel. There's, again, no evidence in the record to base a finding that the Jensen plaintiffs, at the time this lawsuit was filed, were being harmed by the NFA's regulation of AOWs. Without that, there can--there's no factual basis in the record to find standing to challenge those. The declarations do not say that's the case.

And I think the Court should look with--you know, should look suspect on these, you know, new-found assertions in these declarations because, you know, these plaintiffs, they identified specific firearms that they want to make or obtain, and nowhere in there was there any reference to an AOW. And the same thing is true about the commercial plaintiff. It said exactly what it sells. Did not reference AOWs, not in the complaint. Yes, you substantiate your allegations and arguments at summary judgment, but you do not just add new bases for standing. So I think that--I think there's no basis to find standing to challenge those regulations.

THE COURT: Setting aside the AOWs, is there evidence that they were harmed at the start of the lawsuit with respect to the short-barreled rifles, the short-barreled shotguns, and silencers?

MR. LOWENSTEIN: I think their declarations probably do enough to show that they wanted to engage in

otherwise--you know, in prohibited conduct but weren't because of the NFA's regulations with respect to whether it's make--there's, you know, plaintiffs that want to make or obtain or, you know, refashion weapons that are suppressors and SBRs and SBSs, yes.

THE COURT: All right. Thank you. Let me just make sure I have no other questions. I think I've gotten to the questions I wanted to ask the defense, but let me just confirm.

(PAUSE)

THE COURT: On standing. We'll just stay there for a second. Apart from the Jensen plaintiffs on this issue, do you agree that the remaining plaintiffs in both cases have standing in all other aspects?

MR. LOWENSTEIN: I think their declarations probably do enough to satisfy the standing in this context, yes.

THE COURT: All right. It's my understanding from the case law, cases like *Chester vs. Laroe*, that when one plaintiff sufficiently alleges standing with respect to a particular category of firearms--let's just say silencers--that other plaintiffs have standing to challenge those regulations, as well, even if they don't assert or allege an intention to make or transfer a silencer. One plaintiff has standing; they're in the door. Am I misunderstanding that case law?

MR. LOWENSTEIN: I don't think that would be exactly right. It's not if they--if they are harmed in some way by the NFA--by an NFA regulation of a suppressor, that they can challenge all regulations of suppressors. It would be--it would be more the regulation of what activity. So you would--you know, a court would want to find that they want to make a suppressor, so then the NFA's regulation of making suppressors, they have--all plaintiffs would, you know--or if one plaintiff has standing, the plaintiffs would collectively have standing. But then when you get to the remedy, then you--then a court would narrow in on who is actually harmed, which plaintiff is actually harmed. If a plaintiff hasn't substantiated that they are harmed by the NFA's regulation of making suppressors, they are not entitled to injunctive relief with respect to--

THE COURT: I see.

MR. LOWENSTEIN: --with respect to those regulations.

THE COURT: To go back to the Jensen plaintiffs' standing, what is different in substance between the initial declarations and the supplemental declarations, apart from timing?

MR. LOWENSTEIN: My only understanding is, the supplemental declarations just added more--not more--new allegations about them saying they want to--they want to either make or obtain an AOW and that the commercial plaintiffs sell

AOWs. It's just AOW-focused, those supplemental declarations, is my understanding.

THE COURT: All right. Thank you.

Well, thank you for your patience with all of my questions.

MR. LOWENSTEIN: Oh, thank you for the questions, Your Honor.

THE COURT: I know it's hard to be at the podium that long. I appreciate your preparation and your help to the Court.

All right. I'll hear rebuttal argument, and we will start with counsel for Silencer Shop. You have ten minutes. I'll give you a two-minute warning.

MR. OBERMEIER: Okay. Thank you, Your Honor. I may not even need the full ten minutes. I have, sort of, three points I want to make.

The first is, I just want to go back to the scope of relief that we're requesting in terms of the intrastate issue, because I fear I may have overcomplicated something that was supposed to be simple.

We are not challenging subsection (j), the interstate transfer of these firearms into-- That is the only point I'm trying to make. Anything else happening intrastate after that transfer would be covered by our challenge. That's exactly the exchange you'll see with the Attorney General in

the legislative history. So I actually--I'm not sure there is any daylight between us and the Jensen plaintiffs. That's the only point we're trying to make, and the fact that subsection (j) says, consistent with the rest of the chapter. That's the only point we were trying to make. So if I overcomplicated that, I apologize. But I want to be very clear, we are not in any way limiting this, any way from our briefs or in any way else. It's just to address that specific point.

THE COURT: Thank you.

MR. OBERMEIER: Second is a substantive point, which is on this issue of the limiting principle. And I think the exchange you had, Your Honor, is just--is devastating for the government's case with respect to both powers, if you even get to Commerce Clause.

When you're in necessary and proper realm, which you are with respect to both here, it's very clear what "proper" means. You've got to have a limiting principle. And I did not hear one. I think Your Honor said the same thing. Once you're there, all the other stuff sort of falls by the wayside, I think, because you cannot establish that element, as established by the Fifth Circuit dating back to *Lopez* and *Morrison*.

I do want to make a couple of points for the State, though I would welcome my co-counsel back up to use some of my

time if she'd like. The States can support--can submit additional affidavits to support the injury to the rest of the States if you would like. They can supplement the record with those. And also, you could take judicial notice of the forms that are filed by those other States, the fact that they are regulated by these provisions, and get to the same place.

I think I have made the points that I needed to make, but I wanted to make sure I made those points, as well, Your Honor.

THE COURT: Well, I'm not going to instruct any party to file anything unless it's a briefing order that I just need the parties' views on, a legal issue. But otherwise, it's within the parties' discretion to try to file what they would like. But I appreciate those points.

MR. OBERMEIER: Understood, Your Honor. And those are really the only--I mean, there's a ton of stuff I could respond to, but I'm going to just leave it at those three points, unless Your Honor has any further questions for me.

THE COURT: One question on the--your first point, your clarification of the scope of your challenge. Assume with me that there is a transfer between two private individuals that live in different states, so a private transfer of a suppressor from a Texan to someone in New Mexico. The challenged NFA provisions apply to that transaction. So does your challenge extend to that application?

MR. OBERMEIER: So that's the issue I'm trying to get to, right?

THE COURT: Okay.

MR. OBERMEIER: So that silencer goes from Texas to New Mexico. The provision says, when it travels in interstate, it has to comply with the rest of the chapter, which I believe incorporates what we are challenging. So all I'm trying to say by "intrastate" is that we are not debating that aspect of subsection (j).

THE COURT: All right. Thank you very much.

All right. Thank you very much. Appreciate it.

MR. OBERMEIER: Thank you, Your Honor, very much.

THE COURT: All right. Next from Gun Owners of America.

MR. STAMBOULIEH: Thank you, Your Honor. I will try to go quickly.

Just to respond to a question about how much is too much of a delay, there was a case in the Fifth Circuit called *McRorey*, one that Gun Owners of America litigated and I argued. They suggested that three to ten days was a perfect amount of time for a delay. We obviously disagree with that.

However, in the DOJ's brief, on page 30 of their brief, they have a perma.cc link that goes to the previous ATF's transfer processing times. At that point, for a Form 1 on a paper form, we were sitting at about 28 days. As of this

morning, a Form 1 paper form is sitting at 33 days. A Form 1 e-form is 62 days. Now, I'm not a math person, but 33 days and 62 days is longer than three to ten days that *McRorey* said is A-okay.

So if we talk about just, like, in the context of delay and Second Amendment specifically, then I would submit that the processing times are not just--I'm sorry--violate the Second Amendment. It can't be, as my friend said over here, that, as long as you get--as long as you get to exercise your Second Amendment right, doesn't really matter how long the delay is at the end of the day, as long as you get to exercise it. That's Ninth Circuit, what they use over there, and for some reason, it's escaping my mind, even though they use it in all my cases over there.

But if you're delayed at all in the exercise of a right, you're delayed in the exercise of a right, and your rights are being violated. Doesn't matter if it's 45 minutes or two weeks. In my opinion, the Constitution is the Constitution, and the Second Amendment is not a second-class right and subject to an entire different body of rules.

THE COURT: Those delays that you just mentioned are within the statutory processing time of the shall-issue regime that's blessed in *Bruen*, no? Or no?

MR. STAMBOULIEH: Well, it is in the process of--that the ATF takes this amount of time, but the time frame is

not set within the statute. So they might, next week, take eight days to do something. The last transfer I did for a suppressor took eight to--I'm sorry--eight years ago took 13 months. So they have gotten faster, but the time frames differ because there's no set time. They don't have to do it, like, within 30 days or 10 days or anything like that.

THE COURT: I see. Okay. Thank you very much.

MR. STAMBOULIEH: Thank you, sir.

THE COURT: Mr. Obermeier, would you step back to the podium. I should have asked you a few questions on remedy, and I want to ask you so you have a chance to address them, and also so the Jensen plaintiffs can--

MR. OBERMEIER: I'm sorry, Your Honor. Questions about what? I didn't catch that.

THE COURT: Remedies.

MR. OBERMEIER: Oh, remedies. Okay.

THE COURT: Yeah. Why should any injunction that the Court might issue extend to resident family members of those that are otherwise covered by the injunction? Why do I-- if I agreed with you that you're entitled to an injunction, why does it need to go all the way to resident family members?

MR. OBERMEIER: It's just to address the practical issue of law enforcement showing up and one of these firearms is in the house and who it belongs to. So it's just confirming that everyone in the house would be covered so that no one

could get--well, could get caught up with, father says it's my gun; well, you know, your son here, could be his gun, so we're going to get him.

That's the point of that. And there's a--we cite a case from Judge Tipton where he applied it to family members, *Texas vs. ATF*.

THE COURT: You've cited that in your brief?

MR. OBERMEIER: It should be in our briefs, yes.

THE COURT: So this argument is in your brief?

MR. OBERMEIER: I believe that is true. Yeah, that's correct.

THE COURT: Okay. Sorry. Where--can you--

MR. OBERMEIER: Usually when I'm asked that question by a judge, I've missed something, so, sorry.

THE COURT: Well, I'm--

MR. OBERMEIER: I believe it's in there.

THE COURT: We've covered a lot of ground and there are a lot of issues, so I might be overlooking it. But can you point me to where that is either cited or where that's in your brief? And if you need a second, we can do it at the end of the argument, that's fine.

MR. OBERMEIER: I'll take a look. I believe it is in the reply, but we'll--my colleague will take a look too.

THE COURT: Yeah. And specifically, the argument that's made. If you cite a case in support of it, great, but

the argument, as I understand it, is, well, the injunction should extend to resident family members to prevent potential criminal fall-out.

MR. OBERMEIER: Right.

THE COURT: That there could be an argument from a U.S. Attorney's Office that someone is in constructive possession of a suppressor--

MR. OBERMEIER: That's right.

THE COURT: --that's not registered, and because of that, we want to protect them all, I'd like to know where that is in your brief.

Same question for supporters of the associational plaintiffs. You seek an injunction that covers, among other things, supporters. Why should supporters be covered? How could the Court tailor an injunction to include supporters? I'm not sure what would make someone a supporter. I have the difficult--I would, if I got this far, have the difficult job of crafting an injunction that's specific enough for the parties to follow. Help me understand.

MR. OBERMEIER: Let me be clear. If it's the plaintiffs and their members, we're very good. Supporters, there's actually another case we cite, another *Texas vs. ATF* case, which is in a different--I believe that one is Northern District; the other one is Southern District--where that was applied, as well. So we're basing it on that, and we can find

you where in that brief--where that is in the brief, as well.

THE COURT: Did I hear you correctly to say that you're happy if it's just the association and their members?

MR. OBERMEIER: We'd like it to be the supporters, Your Honor, but if we get the members, we will be--we'd be happy.

THE COURT: Okay. All right. Thank you.

MR. OBERMEIER: Oh, and, Your Honor, these are on page 48 of our reply, so that's Docket Number 75. And we cite both of the *Texas v. ATF* cases, Northern District of Texas and Southern District of Texas.

THE COURT: All right. And is the potential criminal fall-out argument made, or just the cases cited?

MR. OBERMEIER: It's just cited. It's referenced to resident family members, and maybe that's why you're not remembering it from the briefing, Your Honor.

THE COURT: Okay. Thank you.

All right. Thank you very much, Mr. Obermeier.

MR. OBERMEIER: Thank you, Your Honor.

THE COURT: Okay. From the Jensen plaintiffs.

MR. OHLENDORF: Thank you, Your Honor. I just have three brief points, subject to the Court's questions, and the--sort of a miscellany of points.

First, on the *Florida Prepaid Postsecondary* case, you know, I think my friend pointed out, which I agree with,

that that case arose in a different legal context. The Court there was asking whether the legislation before it was supportable as a matter of abrogating state sovereign immunity under a particular enumerated power, because, of course, under the sovereign immunity case law, Congress can only abrogate immunity under particular powers.

So, yes, it is a different legal context, but I struggle to find the reason why the principle that the Court articulated in the footnote that we cite would be different in that context than the context here, where we're simply asking the, you know, very similar question, is this law supportable under a particular enumerated power.

So I grasp the distinction, but I don't see any real--any real difference between the two sides of it.

THE COURT: Can you cite another case to me that supports the same proposition?

MR. OHLENDORF: I am not familiar with one beyond the *Florida Prepaid* case, Your Honor.

THE COURT: All right.

MR. OHLENDORF: On commerce power, my friend, you know, really, I think, wraps himself within *Wickard* and *Raich,* but those cases simply don't stand for the proposition that, so long as there is an interstate market in something, the government can do whatever it wants with respect to that thing.

And I think it's instructive to think about the

laws that were actually at issue in *Wickard* and *Raich*, right? In *Wickard*, you had a comprehensive price control law of wheat, at the interstate wheat market. In *Raich*, you were dealing with the Controlled Substances Act, which was this cradle-to-grave regulation of the prices and the transfers and the commerce in any controlled substance.

There simply is no analogue in this context. Perhaps, again, in the machine gun context, you could say that Section 922 is an analogue. But with respect to these firearms, there simply is no analogue to that comprehensive interstate price regulation. And that is critical, because the whole reasoning of *Wickard* and *Raich* is that, under the Necessary and Proper Cause, again, because of the laws of supply and demand, that comprehensive market regulation is what unlocks the ability to reach intrastate instances of the market. If you don't have the comprehensive regulation, that door is never unlocked.

And then finally, Your Honor, on standing, I really don't have that much to add to the points that I made before, simply to say with respect to the time frame that--you know, that my clients want to engage in this conduct, we allege in the complaint--and, again, paragraph 85--just very generally, at the time of the complaint, we are injured by the challenged provisions. We come along in the initial declarations and flesh that out and provide testimony supporting it without

giving any time frame. Government seems satisfied with that.

Then we come along with the supplemental declarations and, again, flesh out further, we also would like to do this; don't provide any time frame. But the government is not satisfied. I suppose the only difference is, you know, the government tried to kind of cast aspersions on the fact that we filed these declarations later. The explanation for that is simple. It was in response to the points the government made in their briefing.

I have nothing further for Your Honor, unless you have questions for me.

THE COURT: All right. Thank you very much. I have no further questions.

I have one question for the attorney for the State of Texas. If the answer is no, that's perfectly fine. But would the State of Texas like to respond to the arguments that were made by the defense that the remaining States have not provided any evidence of harm and the Court can't fashion any remedy that would include them?

MS. AL-FUHAID: Well, Your Honor, the remaining States--the remaining fourteen States have not provided declarations, so that is true. But the Court can still fashion a remedy, because those States are still the object of the regulations. And *Contender Farms* said that that was sufficient to support standing.

THE COURT: So just the obvious reality that they are the object of the regulation alone--

MS. AL-FUHAID: Yes, Your Honor. And--

THE COURT: --in your view is enough?

MS. AL-FUHAID: Yes.

THE COURT: And what was the case on which you relied?

MS. AL-FUHAID: *Contender Farms*.

THE COURT: Okay.

MS. AL-FUHAID: And I don't know which page, but I believe that is cited in the briefing.

Every state in the nation has law enforcement agencies, so they are all required to file these forms.

THE COURT: Okay. Thank you very much.

MS. AL-FUHAID: Thank you, Your Honor.

THE COURT: All right. Again, I want to thank both sides for your preparation, your diligence today. You have come a long way, no doubt. It's worth it. I hope you enjoy your time in San Angelo. It's a lovely place. But I know that this is complex work. I know it is emotional work for both sides. I know both sides care deeply about this. I know this is the first time you're getting to oral argument on this issue. I understand you came to the precipice of oral argument in Missouri and then it was delayed. Is that right? Okay. I'm getting affirmative nods. So I'm glad--I know this is the

first time these arguments have been presented. I know the circuit case law undoubtedly must differ between Texas and Missouri, so you have different arguments to make in different courts. You've done a very fine job for your clients. I greatly appreciate it.

And on the subject of thank-you's, if the Court can take just a moment of personal preference here. I want to thank the Clerk's Office staff for helping stand this argument up. There are a lot of moving pieces here. They've, as always, done a great job.

Most importantly today, I want to give a special thank-you to one of our court security officers. His name is Keith Fletcher. And I want to take the time to do that publicly because he has been an integral member of our court family, and unfortunately, despite my efforts to convince him otherwise, he is retiring from the Court Security Officer Service at the end of the summer. I don't know if I will be back in our San Angelo courthouse before then, so this might be my only opportunity to embarrass him, and so I must take it now.

Keith has a history of service to his community, his state, and his country. He is a retired cop. After that retirement, most people would kick their feet up and enjoy their life and go hunting and enjoy their land out here. And he said, you know what, I think I'm going to be a court

security officer at this point and support the mission of the U.S. Courts. He has done that in spades for years.

He also has a particular love of this courthouse. The court security officers can move to different courthouses and kind of flood resources, depending on where they are needed. We've had some that joined us today who are from different courthouses because we thought we might have extra people here.

But Keith has spent most of his time in San Angelo, loves this courthouse even when it doesn't love him back, like no air-conditioning, like noxious fumes, like water coming through the roof. He is always undeterred. He loves the building unconditionally, and he instills that love of the history of San Angelo and the history of this building in everyone who visits. So he's not like most court security officers. He will take you on a tour and point out all of these historical artifacts in the building and really brings the place to life, and it makes everyone's time here more enjoyable. He has served faithfully, he has served diligently, and he didn't have to do that.

After this, he will move on to become the county judge of a neighboring county, because he's still not done serving our state, our counties, and our country.

Because of his particular connection with our courthouse, I wanted to take the time to thank him, and I

wanted to give him just a small token of our appreciation that comes from the building.

So, Mr. Fletcher, if you would step up here, please.

Sir, this flag flew over your courthouse in San Angelo. I hope you take it with you. I hope you show it off to all your folks when you move on. We will miss you here in San Angelo. We'll miss you very much.

MR. FLETCHER: Thank you, Judge.

(APPLAUSE)

THE COURT: All right. Thank you again for your patience with that.

Mr. Fletcher, thank you, as well.

Everyone have a safe trip home. Court is adjourned. I would like to see the attorneys in chambers just very briefly. Nobody is in trouble, don't worry. I know what it feels like. Nobody is in trouble. Everything is fine. But before you leave--you've come all this way. I just would like to see you in chambers, meet you face-to-face. My courtroom deputy can take you back once I'm back there.

We're adjourned.

(END OF HEARING)

I, Mechelle Daniel, Federal Official Court Reporter in and for the United States District Court for the Northern District of Texas, do hereby certify pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*/s/ Mechelle Daniel* **DATE** JULY 13, 2026

MECHELLE DANIEL, CSR #3549
FEDERAL OFFICIAL COURT REPORTER