UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| SILENCER SHOP FOUNDATION, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO, <br> FIREARMS AND EXPLOSIVES, et al., <br><br>     Defendants. | No. 6:25-CV-056-H |

## MEMORANDUM OPINION AND ORDER

Article I of the Constitution gives Congress certain enumerated powers. Among those powers is the authority to "lay and collect Taxes." U.S. Const. art. I, § 8. cl. 1. In 1934, Congress invoked its taxing power to enact the National Firearms Act—a scheme to constrict the market for certain classes of firearms. As passed, the NFA required individuals to pay a tax before transferring or making a covered firearm. And it included burdensome regulatory provisions to aid the collection and enforcement of those taxes. At that time, the NFA possessed the key feature of any tax: It produced some revenue for the government.

But that is no longer true. In 2025, Congress eliminated the NFA's transfer and making taxes for four categories of firearms: short-barreled shotguns, short-barreled rifles, silencers, and a final, defined group of miscellaneous firearms. Because today's NFA does not generate any revenue from untaxed firearms, its regulatory provisions cannot be upheld under the taxing power. And there is no sign in the NFA's text, structure, or statutory history that Congress invoked any other power in crafting the NFA provisions at issue. Thus, the regulatory provisions must be enjoined as unconstitutional because they exceed Congress's enumerated powers.

The plaintiffs are a coalition of individuals, businesses, associations, and states. What began as one case is now two: Recently, another judge in this district transferred a related action, *Jensen v. ATF*, No. 6:26-CV-227, to this Court. The Court consolidated *Jensen* with the lead case, *Silencer Shop Foundation v. ATF*, No. 6:25-CV-056, and set both cases for decision on cross-motions for summary judgment. *See* Dkt. Nos. 48; 59; 117; 118. With the NFA's taxes now eliminated, each set of plaintiffs alleges that the NFA's regulatory provisions for untaxed firearms exceed Congress's Article I enumerated powers. They also claim that those same NFA provisions infringe the Second Amendment right to "keep and bear Arms."

The Court agrees on the first point and need not reach the second. By zeroing out the transfer and making taxes for most NFA firearms, Congress eliminated the constitutional basis for the regulations that formerly supported the taxes for those firearms. No longer can the challenged NFA provisions be justified—as they have been for nearly 90 years—under Congress's taxing power. *See Sonzinsky v. United States*, 300 U.S. 506 (1937). And because Congress enacted the challenged NFA provisions under the Taxing Clause only, the NFA cannot be retroactively justified under another power that Congress never invoked, such as its authority to regulate interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. Thus, the challenged NFA provisions exceed Congress's enumerated powers.

With that understanding, the Court accepts the plaintiffs' invitation—offered at the motions hearing—to forgo adjudication of their Second Amendment claims. The Court does not decide constitutional questions unnecessarily, especially when the plaintiffs will receive no less relief than they would get for prevailing under the Second Amendment.

Remedy-wise, the plaintiffs in both cases are entitled to a permanent injunction barring enforcement of the challenged NFA provisions against them, their members, and their customers. But that is as far as it goes. Federal courts lack power to issue universal injunctions that provide relief to parties not before the Court. *See Trump v. CASA, Inc.*, 606 U.S. 831 (2025). The Court's remedy is limited in other respects, too. The *Jensen* plaintiffs lack Article III standing to challenge the NFA's regulation of "any other weapon"—the final, defined group of miscellaneous firearms—because they did not establish as much from the start of the case. The Court also declines to issue the requested declaratory judgments because they would provide no further relief.

But to be clear: The challenged NFA provisions are unconstitutional.[1] Congress's choice to eliminate the transfer and making taxes matters, and the defendants cannot save the NFA's regulatory scheme by referring to a power that Congress never invoked. Efforts to render the NFA constitutional must come from Congress, not this Court.

## 1. Background

### A. Legal Framework

#### i. The National Firearms Act

The National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934), is an "interrelated statutory system for the taxation of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968). Enacted in 1934, the NFA was Congress's attempt to regulate so-called "gangster weapons" linked to Prohibition Era violence. *See* Stephen P.

---

[1] The challenged NFA provisions are 26 U.S.C. §§ 5812(a)–(b), 5822, 5841(a)–(c), (e), 5842(b), 5861(b)–(f), (i), 27 C.F.R. §§ 479.62(a)–(d), and 479.84(a)–(d). A few of the NFA provisions— specifically, those dealing with marking regulated firearms—are challenged by the *Jensen* plaintiffs only. *See* 6:26-CV-227, Dkt. No. 26 at 17. The Court's final judgment specifies the provisions from which only the *Jensen* plaintiffs are entitled to relief.

Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 Wyo. L. Rev. 149, 153 (2025); *Johnson v. United States*, 576 U.S. 591, 640–41 & n.9 (2015) (Alito, J., dissenting).  But the NFA's definition of "firearm" is "both highly under- and over-inclusive," *Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023), and it does not reflect the word's ordinary meaning.  *See United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 507 (1992) ("The word 'firearm' is used as a term of art in the NFA.").  For example, while the NFA regulates "poison gas," "missile[s]," and sawed-off shotguns, it excludes handguns and other widely legal and popular firearms, like a standard AR-15.  *See* 26 U.S.C. § 5845(a), (e), (f); *see Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025) ("The AR-15 is the most popular rifle in the country.").

NFA "firearm[s]" include short-barreled shotguns, short-barreled rifles, silencers, and "any other weapon[s]" (AOW).[2]  26 U.S.C. § 5845(a).  The statutory definition also covers machineguns and destructive devices, which are subject to additional provisions apart from the NFA.  *See, e.g.*, 18 U.S.C. § 922(o) (making it "unlawful for any person to transfer or possess a machinegun," with some exceptions).

Those who wish to own or transfer NFA firearms face a strict regulatory regime. Recognizing constitutional limits on its authority to regulate intrastate firearms activities, Congress enacted the NFA as "a taxing scheme."  *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018); *see* Halbrook, *supra* at 154–55.  The scheme centers on two distinct sets of

---

[2] "Any other weapon" is defined as a weapon "capable of being concealed on the person from which a shot can be discharged," "a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell," or a weapon "with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made . . . without manual reloading."  26 U.S.C. § 5845(e); *see United States v. Cheramie*, 520 F.2d 325, 333 & n.18 (5th Cir. 1975) (affirming a conviction where a pen gun was "any other weapon").

taxes.  First, importers, manufacturers, and dealers of NFA firearms must pay an annual "special (occupational) tax" of $500 or $1,000 depending on the nature of their business.  26 U.S.C. § 5801(a).  Second, for most of its history, the statute imposed a $200 tax (roughly $5,000 in today's dollars) on those who transferred or made a listed firearm.[3]  *Mock*, 75 F.4th at 569; *see* 26 U.S.C. § 5853(a), (b) (exempting states and their political subdivisions from both taxes).  The $200 transfer and making taxes—seen as quite severe in the 1930s—were "explicitly intended to tax [NFA] weapons out of existence," thus achieving Congress's goal of curtailing transactions in disfavored firearms.  *Mock*, 75 F.4th at 569 & n.10.

To aid in collecting NFA taxes, Congress imposed "comprehensive requirements" involving registration, reporting, and recordkeeping.  *Haynes*, 390 U.S. at 88.  To transfer an NFA firearm,[4] the transferor must file a written application, known as a Form 4, with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  27 C.F.R. § 479.84(a).  The transferee must give ATF his fingerprints, photograph, and other private information like his date of birth and home address.  *Id.* § 479.84(b); 26 U.S.C. § 5812(a).  The application also requires a detailed description of the firearm at issue, including exact specifications about its caliber, gauge, size, barrel length, serial number, and manufacturer.  27 C.F.R. § 479.84(b)(1), (8).  Under ATF regulations, the transferee must then send a copy of the application to the chief local law enforcement officer, *id.* § 479.84(c), who is then asked to contact ATF if he "ha[s] information that may disqualify [the applicant] from acquiring or possessing a firearm."  ATF, Application to Transfer and Register NFA Firearm (Tax-Paid) at 2, https://perma.cc/744P-LAU5.  Finally, the transferee cannot take possession of the

---

[3] One exception: To transfer an AOW, the tax was only $5.  *See* 26 U.S.C. § 5811 (1968).

[4] The term "transfer" includes "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of" an NFA firearm.  26 U.S.C. § 5845(j).

firearm until ATF approves the application, which can take weeks.  26 U.S.C. § 5812(b); ATF, Current Processing Times, https://perma.cc/CWA4-4EAR.

Similar requirements apply to making an NFA firearm.[5]  *See* 26 U.S.C. § 5822.  A maker must complete a different application, called a Form 1, that requires substantially the same information as a Form 4.  27 C.F.R. § 479.62(a).  Besides filing a written application with ATF, providing the necessary information, and notifying local law enforcement, *see id.* § 479.62(b)–(c), a maker must engrave a serial number on his firearm.  26 U.S.C. § 5842(a); 27 C.F.R. § 479.102(a)(1).  And again, he must wait until ATF approves his application before taking any action.  27 C.F.R. § 479.64(c).

More broadly, the NFA requires that all covered firearms (except those belonging to the United States) be registered in the National Firearms Registration and Transfer Record, a central registry maintained by ATF.[6]  26 U.S.C. § 5841(a).  The registry lists each NFA firearm, along with the name and address of the person entitled to possess that firearm.  *Id.* § 5841(a)(1)–(3).  At all times, a person possessing a registered firearm "shall retain proof of registration" that can be made available "upon request."  *Id.* § 5841(e).  It is illegal for one to "receive or possess a firearm" that was transferred or made in violation of the statute or which is not registered to him.  *Id.* § 5861(b)–(d).  And the NFA prohibits transferring or making a firearm without complying with its provisions.  *Id.* § 5861(e)–(f).

---

[5] The term "make" includes "manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a[n] [NFA] firearm."  26 U.S.C. § 5845(i).

[6] Historically, the Secretary of the Treasury administered and enforced the NFA.  The statute still refers to the "Secretary," even though the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), transferred ATF from the Department of the Treasury to the Department of Justice.  Today, the Attorney General administers the NFA, a task delegated to ATF.  *See* 26 U.S.C. § 7801(a)(2); 28 C.F.R. § 0.130(a)(1)–(3).

Unlike the NFA's sister statute, the Gun Control Act, Pub. L. No. 90-618, 82 Stat. 1213 (1968), Congress did not tie the NFA to interstate or foreign commerce. *Cf.* 18 U.S.C. § 922(a)(1)(A) (making it unlawful for any non-licensed person "to engage in the business of importing, manufacturing, or dealing in firearms . . . in interstate or foreign commerce"); *see also Polymer80, Inc. v. Garland*, No. 4:23-CV-029, 2023 WL 3605430, at *1 (N.D. Tex. Mar. 19, 2023) ("The Gun Control Act of 1968 regulates firearms in interstate commerce."). The NFA, in contrast, applies equally to a firearm made in one's home or transferred in a private sale between neighbors (an intrastate activity) and a firearm purchased commercially and shipped to a customer in another state (an interstate activity).

Lastly, the NFA's restrictions "have teeth." *Mock*, 75 F.4th at 570. Violating the statute carries a potential term of imprisonment of up to ten years, 26 U.S.C. § 5871, a fine of $10,000, *id.*, and seizure and forfeiture of the firearm. 26 U.S.C. § 5872. Because NFA violations may constitute a felony, one could be subject to "a lifetime ban on ownership of firearms." *Mock*, 75 F.4th at 571 (citing 18 U.S.C. § 922(g)(1)).

### ii.    The One Big Beautiful Bill Act

On July 4, 2025, President Trump signed into law the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025). The Act, among other things, amended the NFA to eliminate the transfer and making taxes on short-barreled shotguns, short-barreled rifles, silencers, and AOWs. 139 Stat. at 247–48. So for those firearms, the current tax rate is "$0," effective January 1, 2026. 26 U.S.C. §§ 5811(a)(2) (transfer), 5821(a)(2) (making). But Congress did not eliminate the $200 transfer and making taxes for machineguns and destructive devices, *see id.* §§ 5811(a)(1), 5821(a)(1), nor did it change the $500 or $1,000 special occupational tax on importers, manufacturers, and dealers of NFA firearms. *See id.*

§ 5801(a).  And most importantly, Congress left in place the "web of regulation" that was originally meant to "aid[] enforcement" of the NFA's now-extinct taxes.  *See United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972).  The regulatory requirements are still enforced.

### B.    The Parties

Two sets of plaintiffs bring claims against the same defendants: Acting Attorney General Todd Blanche, in his official capacity; the United States Department of Justice; Director of ATF Robert Cekada, in his official capacity; and ATF.[7]

The first set of plaintiffs comes from the lead case, *Silencer Shop Foundation v. ATF*, No. 6:25-CV-056.  Brady Wetz is a gun enthusiast and resident of San Angelo who is deterred from making, acquiring, transferring, and possessing NFA firearms because of the statute's onerous registration requirements.  Dkt. No. 50 at 7–16.  Silencer Shop Foundation is a Texas nonprofit organization that defends and restores Second Amendment rights.  *Id.* at 29.  It wants to acquire and transfer NFA firearms for demonstrative and educational purposes without having to complete "burdensome, privacy-invasive application[s]."  *Id.* at 31.  Commercial plaintiffs B&T USA, LLC, Palmetto State Armory, LLC, and SilencerCo Weapons Research, LLC, are companies that make, transfer, and possess NFA firearms as part of their businesses.  *Id.* at 34–45.  They allege injuries from having to expend time and effort to comply with the NFA, as well as the loss of revenue that comes from potential customers being deterred by the statute's regulatory requirements.  *Id.*  Three associations— Gun Owners of America, Inc., Firearms Regulatory Accountability Coalition, Inc., and Gun Owners Foundation—sue on behalf of their members: gun owners and firearms

---

[7] Acting Attorney General Blanche and Director Cekada are automatically substituted for their predecessors, Pamela Bondi and Daniel Driscoll.  *See* Fed. R. Civ. P. 25(d).

manufacturers, retailers, and importers.  *Id.* at 25–28, 46–48.  All these plaintiffs are joined by 15 states—Texas, Alaska, Georgia, Idaho, Indiana, Kansas, Louisiana, Montana, North Dakota, Oklahoma, South Carolina, South Dakota, Utah, West Virginia, and Wyoming— who allege that their agencies and employees are injured by the compliance costs associated with acquiring and possessing NFA firearms for law-enforcement purposes.  *See id.* at 49– 50; Dkt. Nos. 15 ¶ 54; 49 at 23–24.

The second set of plaintiffs comes from *Jensen v. ATF*, No. 6:26-CV-227, a related case transferred to this Court and consolidated with *Silencer Shop*.  Dkt. No. 116.  John Jensen, Jeremy Neusch, and David Lynn Smith are Texas firearms owners who wish to avoid the NFA's regulatory requirements as a precondition to making, transferring, and possessing covered firearms.  No. 6:26-CV-227, Dkt. No. 19 at 5–15.  Hot Shots Custom, LLC, a federally licensed firearms dealer, or FFL, alleges similar injuries as the commercial plaintiffs in *Silencer Shop*.  *Id.* at 16–17.  And three associations—Texas State Rifle Association, FPC Action Foundation, and Citizens Committee For The Right To Keep And Bear Arms—look to defend their members from allegedly unlawful firearms restrictions under the associational-standing doctrine, like the associations in *Silencer Shop*.  *Id.* at 18–23.

### C.    Procedural History

The *Silencer Shop* plaintiffs filed suit on July 4, 2025—the same day the President signed the One Big Beautiful Bill Act into law.  *See* Dkt. No. 1.  They challenge the NFA's regulatory provisions for NFA firearms that are no longer subject to the transfer and making taxes—specifically, short-barreled shotguns, short-barreled rifles, silencers, and AOWs.  *See* Dkt. No. 15.  They do not contest the provisions' application to machineguns and

destructive devices (to which the transfer and making taxes still apply), nor do they target the special occupational tax for importers, manufacturers, and dealers of NFA firearms.

The complaint in *Silencer Shop*, as amended, raises two claims: (1) the NFA's regulatory requirements exceed Congress's Article I enumerated powers, and (2) those same requirements infringe the Second Amendment. *Id.* ¶¶ 66–75. As the argument goes, the NFA hinges on Congress's taxing power, so the statute's regulatory requirements are no longer constitutional with respect to the untaxed firearms they purport to regulate. *See id.* And the NFA's registration scheme, the complaint alleges, finds no support in the Nation's historical tradition of firearms regulation. *Id.* ¶¶ 62–65. Against that backdrop, the *Silencer Shop* plaintiffs request a universal injunction preventing the defendants from implementing or enforcing the NFA's regulatory requirements for *any* untaxed firearms, including those transferred and made by parties not before the Court. *Id.* ¶¶ 76–77.

The parties agree that the case "presents only pure questions of law" and can be resolved through cross-motions for summary judgment. Dkt. No. 36 at 1. Both sides filed their summary-judgment motions (Dkt. Nos. 48; 49; 59; 60) and accompanying responses (Dkt. Nos. 75; 85; 115). Along the way, the Court permitted various supplemental filings, as well as briefs from two groups of amici.[8] *See* Dkt. Nos. 78; 89; 91; 111; 112; 113.

Meanwhile, the *Jensen* plaintiffs filed a nearly identical case in the Amarillo Division. *See* No. 2:25-CV-223, Dkt. No. 1. Like the *Silencer Shop* plaintiffs, the plaintiffs in *Jensen* seek declaratory and injunctive relief on enumerated-powers and Second Amendment claims. *Id.* ¶¶ 81–96. Their arguments are largely the same as those in *Silencer Shop*, but

---

[8] Amici are the City of Baltimore, Maryland; the City of Columbus, Ohio; Harris County, Texas; the Brady Center to Prevent Gun Violence; Everytown for Gun Safety; and the Giffords Law Center to Prevent Gun Violence. *See* Dkt. Nos. 78; 89.

their requested relief is narrower.  The Second Amendment claim in *Jensen* only targets the NFA's application to silencers and short-barreled rifles (not short-barreled shotguns and AOWs).  *Id.* ¶ 92.  And the *Jensen* plaintiffs request a party-specific injunction, not universal relief.  *See id.* ¶¶ 87, 96.  Otherwise, the procedural history in *Jensen* is like that in *Silencer Shop*, with the parties filing and responding to cross-motions for summary judgment.  When briefing was done, the district judge in Amarillo transferred *Jensen* to the San Angelo Division because the issues substantially overlap with those in *Silencer Shop*, which was filed first.  *See* No. 6:26-CV-227, Dkt. No. 63; *see Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999) ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap.").  The Court then consolidated *Jensen* with *Silencer Shop*, the lead case, because they "involve a common question of law or fact."[9]  Dkt. No. 116 at 1 (quoting Fed. R. Civ. P. 42(a)).

On July 7, 2026, the Court held an in-person hearing on the cross-motions for summary judgment.  Dkt. No. 132.  The Court heard oral argument from counsel for both the *Silencer Shop* and *Jensen* plaintiffs, as well as the defendants, and took the cross-motions under advisement.  The cross-motions are ripe for decision.

## 2.   Legal Standard

A movant is entitled to summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

---

[9] Because of the commonality, the Court discusses the plaintiffs' and defendants' arguments without distinguishing between the two cases, unless otherwise noted.

P. 56(a).  "[S]ummary judgment is appropriate where the only issue before the court is a pure question of law."  *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

### 3.    Threshold Issues

The Court must resolve two threshold issues before reaching the merits.  Because "[j]urisdiction is always first," the Court starts by assessing the plaintiffs' standing to bring this suit.  *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021) (quotation omitted).  It then considers whether the plaintiffs attack the challenged NFA provisions facially, as applied to their "particular circumstances," or both.  *Umphress v. Hall*, 133 F.4th 455, 465 (5th Cir. 2025) (quotation omitted).  The latter question affects the scope of review.

### A.    Standing

Article III of the U.S. Constitution limits federal-court jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).  One party with standing satisfies Article III's requirement.  *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint.").

To show Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  An injury in fact must be "real" and "particularized," not "abstract" or "generalized."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient

likelihood of future injury," *id.*—i.e., that "the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted) (quoting *Clapper*, 568 U.S. at 414 n.5). Further, "if a plaintiff is an object of the action (or forgone action) at issue, then there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (internal quotation marks omitted).

Plaintiffs, as the party invoking federal jurisdiction, bear the burden of proving standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and they must do so "for each claim that they press" and "for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Standing is assessed "at the time the action commences." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000); *accord Murthy*, 603 U.S. at 58 (noting that the plaintiff must establish standing at the outset "and maintain[] it thereafter" (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020))).

With one exception, the defendants do not challenge standing. *See* Dkt. No. 133 at 111:15–17. But even where standing is not challenged, a court "must—where necessary—raise it *sua sponte*." *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002). For the sake of thoroughness, the Court briefly considers each element of standing before addressing the one respect in which the defendants dispute jurisdiction.

First, the Court concludes that the plaintiffs are injured by the NFA's regulation of untaxed firearms. The individual, state, and organizational plaintiffs are the objects of the challenged NFA provisions. They must adhere to the statute's burdensome registration

requirements—therefore incurring compliance costs—or else face strict penalties for non-compliance. *See, e.g.*, Dkt. No. 50 at 12. This "amounts to an increased regulatory burden," which "typically satisfies the injury in fact requirement." *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). The story is the same for the commercial plaintiffs. The NFA provisions at issue not only force the commercial plaintiffs to expend resources; they also deter customers from purchasing NFA firearms from their businesses, thus causing a prototypical "pocketbook injury." *Collins v. Yellen*, 594 U.S. 220, 243 (2021); *see Czyzewski v Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); Dkt. No. 50 at 36, 40; No. 6:26-CV-227, Dkt. No. 19 at 16–17. Further, complying with the NFA's registration scheme requires the commercial plaintiffs "to divert time and resources away from their regular business," which is a concrete injury. *Book People, Inc. v. Wong*, 91 F.4th 318, 331 (5th Cir. 2024) (citation modified). Thus, the individual, state, and organizational plaintiffs are injured in fact.

The last two elements of standing are easily satisfied. There is little doubt that the above-noted injuries are "fairly traceable" to the challenged NFA provisions. *Spokeo*, 578 U.S. at 338. And the relief the plaintiffs seek—an injunction barring enforcement of the NFA's regulatory requirements for untaxed firearms—would redress their injuries. *All. for Hippocratic Med.*, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."). If the requirements were not in effect, the plaintiffs could make, transfer, and possess untaxed firearms without having to incur the compliance costs or potential penalties—and they would do so almost immediately. *See, e.g.*, Dkt. No. 50 at 15–16; No. 6:26-CV-227, Dkt. No. 19 at 7, 11, 15. For those reasons,

the Court concludes that the individual, state, and organizational plaintiffs have established traceability and redressability and thus have standing to sue under Article III.

The analysis for the associational plaintiffs is different, but similarly straightforward. Under Supreme Court precedent, an association may have standing solely as a representative of its members.[10]  To utilize that doctrine, an association must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the [association's] purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  The associational plaintiffs here count the individual plaintiffs—who have standing—among their members.  *See, e.g.*, Dkt. No. 50 at 8; No. 6:26-CV-227, Dkt. No. 19 at 16, 23.  The interests the associations seek to protect are germane to their purpose of "preserv[ing] and defend[ing] the Second Amendment rights of gun owners."  Dkt. No. 50 at 18; *see also Texas v. ATF*, 737 F. Supp. 3d 426, 437–39 (N.D. Tex. 2024) (recognizing associational standing for the Gun Owners Foundation and Gun Owners of America, Inc., both plaintiffs in *Silencer Shop*); *FRAC v. Garland*, No. 1:23-CV-003, 2024 WL 4920002, at *2–4 (D.N.D. Apr. 4, 2024) (same for Firearms Regulatory Accountability Coalition, Inc.).  Lastly, neither the claims nor relief sought require the participation of individual members because the associations "seek[] a declaration, injunction, or some other form of prospective

---

[10] Jurists have questioned whether associational standing comports with Article III, considering it allows an association to assert its members' injuries instead of its own.  *See All. for Hippocratic Med.*, 602 U.S. at 398–405 (Thomas, J., concurring); *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 537–42 (6th Cir. 2021) (Murphy, J.).  Setting aside those well-reasoned critiques, the Court is bound to apply the associational-standing doctrine here.

relief" which, "if granted, will inure to the benefit of th[eir] members." *Hunt*, 432 U.S. at 343 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)).  Accordingly, the associational plaintiffs have standing to sue on their members' behalf.

The defendants do contest standing in one respect, however.  They argue that the *Jensen* plaintiffs lack standing to challenge the NFA's regulation of AOWs.  *See* No. 6:26-CV-227, Dkt. No. 29 at 20–22.  As they see it, the *Jensen* plaintiffs did not argue or submit any evidence at the outset of the case that the NFA's requirements on the making, transfer, and possession of AOWs are injuring them or will soon do so.  *Id.*  Indeed, the complaint in *Jensen* says nothing about any plaintiffs' intent to make, acquire, or transfer an AOW.  By contrast, the complaint details the plaintiffs' desire to obtain and transfer silencers, short-barreled rifles, and short-barreled shotguns.  No. 6:26-CV-227, Dkt. No. 1 ¶¶ 1, 13, 19, 20, 21.  The declarations submitted with the summary-judgment motion also omit AOWs as a firearm that a plaintiff would make or transfer but for the NFA.  *See* No. 6:26-CV-227, Dkt. No. 19 at 7, Decl. of John Jensen (listing silencers and a short-barreled rifle but no AOWs); *id.* at 11, Decl. of Jeremy Neusch (listing silencers, short-barreled rifles, and short-barreled shotguns but no AOWs), *id.* at 15, Decl. of David Lynn Smith (listing silencers and short-barreled rifles but no AOWs); *id.* at 17, Decl. of Hot Shots Custom LLC (listing silencers, short-barreled rifles, and short-barreled shotguns but not AOWs).  Thus, both the complaint and the initial declarations in *Jensen* reveal nothing about those plaintiffs' desire to make or acquire an AOW.  That is a problem: At summary judgment, the plaintiffs must point to "'specific facts'" by "affidavit or other evidence" that establish each element of standing. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P 56(e)).  "[G]eneral factual allegations of injury" are not enough.  *Tex. State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022)

(quotation omitted)).  The *Jensen* plaintiffs' summary-judgment motion is unsupported by any evidence that they are or will be harmed by the NFA's regulation of AOWs.

Recognizing this defect, four *Jensen* plaintiffs filed supplemental declarations with their combined reply and response describing (for the first time) their intention to make and acquire an AOW if not for the NFA.  *See* No. 6:26-CV-227, Dkt. No. 57.  That tactic fails.  First, and most importantly, standing is assessed at the start of the case.  *Friends of the Earth*, 528 U.S. at 191.  The supplemental declarations give no indication that the plaintiffs sought to transfer or make an AOW when they filed their complaint.  The complaint's reference to the three other categories of untaxed NFA firearms suggests the opposite.  And on a more basic level, litigants cannot manufacture standing by claiming new intentions after they are called out for failing to demonstrate injury.  Second, while "it is within the trial court's power" to allow a plaintiff to support his standing with evidence submitted mid-litigation, *see Warth*, 422 U.S. at 501, the Court declines to exercise that discretion here.  There is no contention—in the supplemental declarations or otherwise—that the *Jensen* plaintiffs intended to make, acquire, or transfer AOWs when this case began.  So, there is no valid basis for considering the supplemental declarations.

Without evidence that the *Jensen* plaintiffs were harmed by the NFA's regulation of AOWs from the start of the case, those plaintiffs lack standing to challenge such regulation.  But in all other respects, the plaintiffs in both cases have Article III standing to proceed.

## B.    Facial vs. As-Applied Challenges

The next question is whether the plaintiffs raised facial or as-applied challenges to the NFA's regulatory requirements.  The parties heavily dispute this question, and it is no wonder why: "[C]lassifying a lawsuit as facial or as-applied affects the extent to which the

invalidity of the challenged law must be demonstrated." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). To be sure, "[t]his area of law is murky." *LIA Network v. City of Kerrville*, 163 F.4th 147, 161 (5th Cir. 2025). Courts and litigants regularly dispute "the attributes and analysis necessary for each type of challenge." *Id.*; *see also* Scott A. Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes In Toto*, 98 Va. L. Rev. 301, 307 (2012) ("The Supreme Court has explicitly acknowledged that there is much confusion over the definitions and attributes of facial, as-applied, and overbreadth challenges." (citing *United States v. Stevens*, 559 U.S. 460 (2010))). But there is some common ground. A facial challenge, all agree, is a claim that the challenged law or policy "is unconstitutional in all its applications." *Bucklew*, 587 U.S. at 138. An as-applied challenge, by comparison, considers whether a law—though constitutional in some cases—"is nonetheless unconstitutional as applied to [a defendant's] activity." *United States v. Morgan*, 147 F.4th 522, 526 (5th Cir. 2025) (alteration in original) (quoting *Spence v. Washington*, 418 U.S. 405, 414 (1974)).

A facial challenge is far harder to win. A plaintiff cannot prevail on a facial challenge "unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (alterations in original) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). Put simply, the challenged statute must be "unconstitutional in all of its applications." *Wash. State Grange*, 552 U.S. at 449. With that understanding, "a facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." *Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019) (citation modified). For a facial claim, courts must take

– 18 –

care to "consider the circumstances in which" the challenged statute is "most likely to be constitutional" instead of "focus[ing] on hypothetical scenarios where [the statute] might raise constitutional concerns." *United States v. Rahimi*, 602 U.S. 680, 701 (2024).

How does a court categorize a claim as facial or as applied? Again, the answer is not always clear-cut: Challenges may have features of both. But the Fifth Circuit has provided some guidance. Courts should "look to see whether the 'claim and the relief that would follow . . . reach beyond the particular circumstances of the [ ] plaintiffs.'" *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014) (alterations in original) (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)). "If so, regardless of how the challenge is labeled by a plaintiff, '[t]hey must therefore satisfy [the] standards for a facial challenge to the extent of that reach.'" *Id.* (first alteration in original) (quoting *Reed*, 561 U.S. at 194). This analysis places a premium on the nature of the requested relief. A request for universal relief, for example, indicates that a challenge is facial, not as applied. *See, e.g.*, *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010) ("Our conclusion that the challenges are facial attacks is confirmed by the relief sought by the plaintiffs: that the pledge be invalidated in its entirety, not merely that it not be applied to them or their children."). And it is "essential" that an as-applied challenge have a "developed factual record" with "[p]articularized facts." *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014).

Before getting into the analysis, the Court adds a disclaimer: As it turns out, the dispute over whether the plaintiffs brought facial claims, as-applied claims, or both is somewhat tangential. As explained below, the plaintiffs prevail on their enumerated-powers claims no matter how they are understood, and the plaintiffs' Second Amendment claims are abandoned. More importantly, because the Court tailors its remedy to the parties, *see*

*infra*, Remedy § 5, it effectively grants as-applied relief no matter how the plaintiffs' claims are categorized.  That approach—compelled by historical principles of equity and the Supreme Court's decision in *CASA*—tracks the principles underlying the facial/as-applied distinction.  As the Supreme Court has explained, the difference between a facial and as-applied challenge ultimately "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010); *accord Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218–19 (5th Cir. 2023).  "[S]uccessful facial challenges invalidate the regulation altogether, whereas successful as-applied challenges result in injunctions that protect only the plaintiff."  *LIA Network*, 163 F.4th at 162.  With that understanding, successful pre-*CASA* facial challenges—which naturally show that a law is unconstitutional in any circumstance—often resulted in universal injunctions that provided relief to parties not before the court.  Post-*CASA*, a court may grant equitable relief only to the parties "'actually or constructively before it,'" *CASA*, 606 U.S. at 844 (quotation omitted), and only "to the extent necessary and appropriate to afford them complete relief." *Id.* at 861; *see United States v. Texas*, 794 F. Supp. 3d 427, 454–55 (W.D. Tex. 2025) (noting how *CASA* transformed the remedial framework for facial challenges).  Thus, under *CASA*, even a successful facial challenge will most often result in essentially as-applied relief.  *See Healthy Vision Ass'n v. Brown*, 821 F. Supp. 3d 642, 656 (N.D. Tex. 2026) (Hendrix, J.) (imposing a party-specific injunction despite concluding that a state statute was facially unconstitutional under the First Amendment).  That narrower remedial focus takes much of the pressure off the facial/as-applied distinction—at least in a case like this one where the bottom-line remedy is the same no matter how the claims are conceived.

That said, the plaintiffs' claims are best understood as facial challenges.  Start with *Silencer Shop*.  In both their complaint and summary-judgment briefing, the plaintiffs claim and argue that the NFA's regulation of untaxed firearms categorically exceeds Congress's enumerated powers and categorically violates the Second Amendment.  *See* Dkt. Nos. 15 ¶ 67 ("The NFA's regulatory requirements pertaining to untaxed firearms exceed Congress's enumerated powers . . . ."); *id.* ¶ 72 ("The NFA's regulatory requirements pertaining to untaxed firearms violate the Second Amendment . . . ."); Dkt. No. 49 at 12 ("Applying the NFA to the now-untaxed firearms is flatly unconstitutional.").  Rarely do the *Silencer Shop* plaintiffs mention their "particular circumstances" or argue that the NFA is unconstitutional with respect to the specific activities that they wish to undertake.  *Freedom Path*, 913 F.3d at 508 (quotation omitted).  And most notably, they seek, first, two unqualified declarations that the NFA's regulatory requirements for untaxed firearms are unconstitutional and, second, "a blanket ban on the enforcement" of those requirements through a universal injunction.  Dkt. No. 49 at 59 (quotation omitted).  All those remedies extend well beyond the plaintiffs' circumstances and thus reflect a facial challenge.  *See Croft*, 624 F.3d at 164.

The analysis is similar for *Jensen*.  While the *Jensen* plaintiffs do not seek a universal injunction, they do request categorical declarations that the NFA's regulatory provisions exceed Congress's enumerated powers and violate the Second Amendment with respect to short-barreled rifles and silencers.  No. 6:26-CV-227, Dkt. No. 1 ¶¶ 86, 96.  Like a request for a universal injunction, a request for categorical declaratory relief extends to parties not before the court and therefore implicates a facial attack.  *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal

plaintiffs . . . ."). And like the *Silencer Shop* plaintiffs, the *Jensen* plaintiffs do not tailor their complaint or summary-judgment arguments to their specific circumstances, arguing that "the NFA is unconstitutional as to the untaxed firearms." *See, e.g.*, No. 6:26-CV-227, Dkt. Nos. 1 ¶ 2; 26 at 26 ("The NFA's regulation of untaxed firearms is unconstitutional because it exceeds Congress's constitutional authority on two separate, independent grounds."). So the claims in *Jensen*, like those in *Silencer Shop*, are properly construed as facial challenges.

Both sets of plaintiffs raise the same counterarguments. First, they note that the complaints ask for relief "both facially and/or as applied." Dkt. No. 15 ¶¶ 70, 75; No. 6:26-CV-227, Dkt. No. 1 ¶¶ 86, 96. But the Supreme Court has been clear: "The label is not what matters." *Reed*, 561 U.S. at 194. What matters instead is the nature of the claim and the relief sought—and here, those considerations point to a facial challenge. *See Cath. Leadership Coal.*, 764 F.3d at 426.

Second, the plaintiffs argue that they must have raised an as-applied challenge because they only challenge the NFA "as applied to firearms it does not tax." Dkt. No. 75 at 14 (emphasis omitted) (quoting Dkt. No. 49 at 12); *see* No. 6:26-CV-227, Dkt. No. 56 at 31 (similar). But that conclusion does not follow: A plaintiff may facially attack a portion of a statute. *See, e.g.*, *Rahimi*, 602 U.S. at 693 (deciding a facial challenge to 18 U.S.C. § 922(g)(8), a part of the Gun Control Act). Indeed, the Supreme Court addressed a similar situation in *Reed*. There, the plaintiffs challenged referendum petitions under Washington's Public Records Act (PRA) as violative of the First Amendment. 561 U.S. at 191. The Supreme Court noted that the plaintiffs' claim had characteristics of both a facial and as-applied challenge. *Id.* at 194. "The claim [was] 'as applied' in the sense that it [did] not seek to strike the PRA in all its applications, but only to the extent it covers referendum

petitions." *Id.* And "[t]he claim [was] 'facial' in that it [was] not limited to [the] plaintiffs' particular case, but challenge[d] application of the law more broadly to all referendum petitions." *Id.* The "important point," the Supreme Court held, was that the "plaintiffs' claim and the relief that would follow"—a universal injunction against any disclosure of referendum petitions to the public—would "reach beyond the particular circumstances of [the] plaintiffs." *Id.* Thus, the plaintiffs in *Reed* had to satisfy the facial standard. *Id.*

So too here. The plaintiffs' claims are "as applied" in that they only address untaxed firearms. But they are ultimately "facial"—like most enumerated-powers challenges— because they seek relief that extends beyond the plaintiffs' specific activities. *See Tex. Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 636–37 (E.D. Tex. 2024) ("By their very nature, almost all constitutional challenges to specific exercises of enumerated powers, particularly the Commerce Clause, are facial." (quotation omitted)), *stayed pending appeal sub nom. McHenry v. Tex. Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025). *Reed* is indistinguishable.

Third, the plaintiffs note that their summary-judgment arguments on the Commerce Clause largely challenge the NFA's regulation of untaxed firearms "as applied to intrastate possession, transfer, and making." Dkt. No. 49 at 31; *see* No. 6:26-CV-227, Dkt. No. 56 at 34. That, however, is not their claim. Their claim—as stated in both complaints—is that the NFA's regulatory requirements on untaxed firearms categorically exceed Congress's enumerated powers under Article I, not only so far as they apply to intrastate activities. Dkt. No. 15 ¶¶ 66–70; No. 6:26-CV-227, Dkt. No. 1 ¶¶ 81–87. A claim raised for the first time in a summary-judgment motion "is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Thus, any suggestion that the plaintiffs brought as-applied claims based on their summary-judgment briefing falls flat.

In sum, the plaintiffs attack the NFA's regulation of untaxed firearms facially, not as applied to their particular activities.  So they must show that "no set of circumstances exists" under which the challenged NFA provisions "would be valid."  *Salerno*, 481 U.S. at 745.  But the effect of that requirement is muted where, as here, the Court must limit relief, even for a successful facial challenge, to the parties before it.  *See CASA*, 606 U.S. at 844.

**4.    Analysis**

With the threshold matters resolved, the Court turns to the merits.  To recap, the plaintiffs in *Silencer Shop* and *Jensen* contend that the NFA's regulatory requirements for untaxed firearms exceed Congress's enumerated powers under Article I.  They argue that the NFA was enacted only pursuant to Congress's enumerated power to tax.  And so, the plaintiffs say, when Congress eliminated the transfer and making taxes for short-barreled shotguns, short-barreled rifles, silencers, and any other weapons, it cut off the constitutional foundation for the provisions that helped collect and enforce the transfer and making taxes for those kinds of NFA firearms.  The challenged NFA provisions are, specifically, those mandating registration and other tasks before making, transferring, or possessing NFA firearms, as well as the associated penalties.  *See* 26 U.S.C. §§ 5812(a)–(b), 5822, 5841(a)–(c), (e), 5842(b), 5861(b)–(f), (i), 27 C.F.R. §§ 479.62(a)–(d), 479.84(a)–(d).  Dkt. Nos. 49 at 18; 133 at 20:8–22; No. 6:26-CV-227, Dkt. No. 26 at 16–17.[11]

The defendants respond that the challenged NFA provisions can still be upheld under the taxing power because they support the collection of the special occupational tax on manufacturers, importers, and dealers of NFA firearms—which Congress left untouched

---

[11] A few of the NFA provisions—specifically, those dealing with marking regulated firearms—are challenged by the *Jensen* plaintiffs only.  *See* 6:26-CV-227, Dkt. No. 26 at 17.  The Court's final judgment specifies the provisions from which only the *Jensen* plaintiffs are entitled to relief.

in the One Big Beautiful Bill Act. And they argue that if the taxing power does not support the NFA's regulation of untaxed firearms, the Court should nonetheless uphold the statute based on Congress's power to regulate interstate commerce and its authority under the Necessary and Proper Clause. According to the defendants, the challenged NFA provisions directly regulate, typically, persons and things in interstate commerce, thus defeating the plaintiffs' facial challenge. *See United States v. Lopez*, 514 U.S. 549, 558 (1995).

Given Congress's removal of the taxes from the statutory scheme, the Court agrees that the NFA's regulatory requirements for untaxed firearms cannot be sustained under the taxing power or the Necessary and Proper Clause. Nor can they be sustained under the commerce power because Congress never invoked that power in enacting the NFA. To the contrary, Congress relied clearly and exclusively on its taxing power. Lastly, because the plaintiffs have abandoned their Second Amendment claims under these circumstances, it would go too far to resolve those constitutional questions in this case. The Court addresses each point in turn.

### A.    The NFA's regulatory requirements exceed Congress's enumerated powers with respect to untaxed firearms.

The federal government is "one of enumerated powers." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819). The Constitution embodies that principle by vesting certain limited powers in the legislative branch. U.S. Const. art. I, § 1. Congress may, for instance, "establish Post Offices," "constitute Tribunals inferior to the supreme Court," and "provide and maintain a Navy." U.S. Const. art. I, § 8, cls. 7, 9, 13. The enumeration of powers, however, "presupposes something not enumerated." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824). Thus, Congress may only exercise those powers the Constitution expressly vests in it, leaving the rest to the States and the people. *See* U.S. Const. amend. X;

*see also Murphy v. NCAA*, 584 U.S. 453, 471 (2018) ("[A]ll other legislative power is reserved for the States, as the Tenth Amendment confirms."). No matter how much the federal government grows, "it still must show that a constitutional grant of power authorizes each of its actions." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535 (2012) (*NFIB*). This principle, core to our federal system of government, "protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

One power granted to Congress is the authority to "lay and collect Taxes." U.S. Const. art. I, § 8, cl. 1. At the founding, this power was thought to allow Congress to "charge or demand money from taxpayers." *McNutt v. DOJ*, 173 F.4th 204, 215 (5th Cir. 2026). After all, "the essential feature of any tax" is that "[i]t produces at least some revenue for the [g]overnment." *NFIB*, 567 U.S. at 564; *see United States v. Butler*, 297 U.S. 1, 61 (1936) ("A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the government."). Therefore, without a tax that raises at least some revenue, Congress cannot enact a statute under its taxing power. *See Texas v. United States*, 945 F.3d 355, 390 (5th Cir. 2019), *rev'd on other grounds*, *California v. Texas*, 593 U.S. 659 (2021). But if Congress does collect some revenue, it may tax activity that it cannot otherwise regulate under a different enumerated power. *NFIB*, 567 U.S. at 537 (citing *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867)).

Another power is Congress's authority "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Originally understood, that authority only permitted Congress "to regulate the buying and selling of goods and services trafficked across state lines." *United States v. Hemani*, 146 S. Ct. 1677, 1695 (2026) (Thomas, J., concurring) (quotation omitted). But the Supreme Court's modern Commerce Clause

– 26 –

precedents have "drifted far from the original understanding." *Lopez*, 514 U.S. at 584 (Thomas, J., concurring). Today, Congress may use its commerce power to regulate "the use of the channels of interstate commerce," "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and "those activities that substantially affect interstate commerce." *United States v. Morrison*, 529 U.S. 598, 609 (2000) (quotation omitted). Especially when it comes to the "expansive" third category, courts must avoid reading the Commerce Clause to "creat[e] a general federal authority akin to the police power." *NFIB*, 567 U.S. at 536. Doing otherwise risks "obliterat[ing] the distinction between what is national and what is local." *Morrison*, 529 U.S. at 608 (quotation omitted).

Lastly, under the Necessary and Proper Clause, the Constitution permits Congress to "make all Laws which shall be necessary and proper for" executing its enumerated powers. U.S. Const. art. I, § 8, cl. 18. The Clause "is not itself a grant of power," however. *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 247 (1960). It only confers "authority to enact provisions 'incidental to [an] [enumerated] power, and conducive to its beneficial exercise." *NFIB*, 567 U.S. at 559 (second alteration in original) (quoting *McCulloch*, 17 U.S. at 418).

### i.     The taxing power cannot sustain the challenged NFA provisions.

Congress invoked its taxing power when enacting the NFA in 1934. The Supreme Court held as much in *Sonzinsky v. United States*, endorsing the NFA as a "taxing measure" and noting that its registration provisions were "obviously supportable as in aid of a revenue purpose." 300 U.S. at 513. Since then, the Supreme Court has reaffirmed the NFA's constitutional basis, remarking on the statute's "obviously regulatory" taxes, *NFIB*, 567 U.S. at 567 (citing *Sonzinsky*, 300 U.S. at 513), and its "interrelated statutory system for the taxation of certain classes of firearms." *Haynes*, 390 U.S. at 87. The Fifth Circuit has done

the same.  *See, e.g.*, *Ross*, 458 F.2d at 1145; *United States v. Ridlehuber*, 11 F.3d 516, 527 (5th Cir. 1993) ("[T]he requirement that a transferee must refuse to accept possession of an unregistered firearm is rationally designed to aid in the collection of taxes imposed by other provisions of the [NFA]." (citation modified)).  Here, the question is straightforward: Can the NFA's regulatory requirements still be justified under the taxing power after Congress eliminated the transfer and making taxes for most covered firearms?  The answer is no.

### a.    The NFA's regulatory requirements for untaxed firearms no longer support the collection of any revenue.

By zeroing out the transfer and making taxes on "any firearm" except for "a machinegun or a destructive device," the One Big Beautiful Bill Act eliminated the constitutional basis for the NFA's regulation of those firearms.  *See* 139 Stat. at 247–48. Recall the "essential feature of any tax": It must produce "at least some revenue for the [g]overnment."  *NFIB*, 567 U.S. at 564; *see McNutt*, 173 F.4th at 215 ("It is also obvious that the purpose of a tax is to raise revenue for the government.").  That principle "follows from the text" of the Taxing Clause, which empowers Congress to "'lay and collect Taxes'" in order "'to pay the Debts and provide for the common Defence and general Welfare of the United States.'"  *California*, 593 U.S. at 707 (Alito, J., joined by Gorsuch, J., dissenting) (quoting U.S. Const. art. I, § 8, cl. 1).  "A tax cannot assist in paying debts or providing for the general welfare or defense if it raises no money."  *Id.*

What's more, the notion that a tax must collect revenue tracks the original public meaning of "lay," "collect," and "tax."  *Id.*  During the founding era, to "lay" meant to "assess; to charge; to impose."  *Id.* (quoting 2 Noah Webster, An American Dictionary of the English Language (1828)).  "To 'collect' meant to 'gather money or revenue from debtors; to demand and receive.'"  *Id.* (quoting 1 Webster).  "And a 'tax' meant '[a] rate or

sum of money assessed on the person or property of a citizen by government, for the use of the nation or state.'" *McNutt*, 173 F.4th at 215 (alteration in original) (quoting 2 Webster). These terms, when read together, confirm that "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, *no more*." *Id.* at 216 (emphasis in original) (quoting *NFIB*, 567 U.S. at 574).

The challenged NFA provisions do not support the collection of *any* revenue.  Put differently, they are no longer "obviously supportable as in aid of a revenue purpose"—the essential requirement for any taxing-power statute. *Sonzinsky*, 300 U.S. at 513; *cf. Texas*, 945 F.3d at 389–90 (holding that the Affordable Care Act's "individual mandate" could not be upheld under the taxing power because Congress set the "shared responsibility payment"—which the Supreme Court interpreted as a tax in *NFIB*, 567 U.S. at 561–74—at zero);[12] *McNutt*, 173 F.4th at 216 (holding that challenged provisions "exceed[ed]" the taxing power "[p]rimarily" because they did not "raise[] revenue").  Therefore, the NFA's regulatory requirements for transferring, making, and possessing untaxed firearms cannot be sustained under the taxing power.[13]

> **b.      The firearms provisions at issue do not support collection of the special occupational tax—a valid taxing statute.**

The defendants disagree that the One Big Beautiful Bill Act renders the challenged NFA provisions unconstitutional under the taxing power because, in their view, those

---

[12] Although the Supreme Court reversed the Fifth Circuit's judgment in *Texas* on Article III standing grounds, it did not address the panel's taxing-power analysis. *See California*, 593 U.S. at 666.

[13] At the motions hearing, counsel for the *Silencer Shop* plaintiffs appeared to argue that the taxing power cannot support only the intrastate transfer, making, and possession of NFA firearms. *See* Dkt. No. 133 at 10:15–17.  To the extent that argument was raised, the Court disagrees.  Nothing in the text or structure of the challenged NFA provisions suggests that they are still constitutional for interstate activities. *See id.* at 51:22 to 52:2 (oral argument from *Jensen* plaintiffs).

provisions still aid enforcement of a different tax in another section of the NFA: the special occupational tax on businesses that transact in covered firearms. Dkt. No. 60 at 18–22; *see* 26 U.S.C. § 5801(a). But the regulatory requirements at issue have always been understood to support collection of the now-extinct transfer and making taxes—not the special occupational tax. That tax has its own regulatory scheme, which no one challenges here. *See* 26 U.S.C. § 5802. Thus, the challenged NFA provisions governing *firearms* have no "reasonable relation" to the special *occupational* tax. *United States v. Doremus*, 249 U.S. 86, 93 (1919) (explaining that courts may uphold federal legislation—irrespective of Congress's motives—if it has "some reasonable relation to the exercise of the taxing authority").

Text, structure, and precedent prove the point. The special occupational tax applies to "every importer, manufacturer, and dealer in [NFA] firearms." 26 U.S.C. § 5801(a); *see id.* § 5801(a)(1) ($1,000 for importers and manufacturers); *id.* § 5801(a)(2) ($500 for dealers). ATF enforces this tax through an occupational registration mandate—set out in a different section of the NFA than the challenged provisions—that tells "each importer, manufacturer, and dealer in firearms" to "register with" the agency. *Id.* § 5802; *see also* 27 C.F.R. § 479.88. Unlike the challenged NFA provisions, *see* 26 U.S.C. §§ 5812, 5822, 5841, the occupational registration mandate does not address transferring, making, or possessing listed firearms; it only governs specific businesses. The NFA thus creates two distinct regulatory pathways: one focused on the transfer and making taxes and another focused on the occupational tax. That is why "[s]eparate taxes are imposed on the making and transfer of [NFA] firearms by persons *other than those obliged to pay the occupational taxes.*" *Haynes*, 390 U.S. at 88 (emphasis

added).  And it explains why businesses that pay the special occupational tax are exempt from the transfer and making taxes, with some exceptions.[14]  *See* 26 U.S.C. § 5852(c), (d).

In addition to this text and statutory structure, case law supports treating the two sets of taxes, and their accompanying regulations, as discrete statutory schemes.  The Fifth Circuit has often noted that the NFA's regulatory requirements are tied to specific taxes.  In *Bezet v. United States*, for example, the court referred to Section 5821, "tax[ing] the making of firearms," and Section 5822, "establish[ing] registration and application requirements for making firearms."  714 F. App'x 336, 338–39 (5th Cir. 2017).  Similar language can be found in *United States v. Gresham*, where the court recognized that "[Section] 5861(d) is constitutional because it is 'part of the web of regulation aiding enforcement of the transfer tax provision in [Section] 5811.'"  118 F.3d 258, 262 (5th Cir. 1997) (quoting *Ross*, 458 F.2d at 1145)).  Lastly, in *United States v. Matthews*, the court noted that "the [NFA's] registration requirement was . . . designed to aid the collection of tax on any future transfer of the registered [firearm]."  438 F.2d 715, 717 (5th Cir. 1971).  The implication is that the NFA's regulatory requirements for transferring, making, and possessing NFA firearms cannot be understood to support collection and enforcement of a tax in another part of the statute.

Properly understood, the NFA's occupational regulations support collection of the occupational tax, while the firearms regulations—the only provisions challenged here—support collection of the transfer and making taxes.  *See Sonzinsky*, 300 U.S. at 512 (noting that "[e]ach [NFA] tax is on a different activity and is collectible independently of the other").  But with the transfer and making taxes set at zero, the regulatory requirements for

---

[14] The statutory exemption from the transfer tax applies only to transfers of NFA firearms between special occupational taxpayers.  26 U.S.C. § 5852(d).

those taxes cannot be justified under the taxing power as "in aid of a revenue purpose." *Id.* at 513. There is simply no revenue to be had. No amount of references to a different tax in a different section of the statute with different regulatory requirements can change that.

### c. The Necessary and Proper Clause does not allow what the taxing power forbids: dressing up the challenged NFA provisions as aids for the special occupational tax.

The defendants also argue that the challenged NFA provisions can still be upheld under the Necessary and Proper Clause—the "last, best hope of those who defend ultra vires congressional action." *Printz v. United States*, 521 U.S. 898, 923 (1997). In the defendants' telling, the NFA's regulation of untaxed firearms "assist[s] in collecting and enforcing the NFA's special occupational tax," thus "effectuating" the taxing power.[15] Dkt. No. 60 at 37. More bluntly, the defendants attempt to justify the regulation of now-untaxed firearms because those regulations supposedly aid in the enforcement of an entirely separate tax stemming from an entirely different section of the statute. The Court disagrees.

To be sure, the special occupational tax is itself a valid taxing-power statute. *Sonzinsky*, 300 U.S. at 513–14. And the Necessary and Proper Clause permits laws that "carry[] into Execution" an enumerated power. U.S. Const. art. I, § 8, cl. 18. But that does not mean Congress satisfies the Constitution by slapping the "necessary and proper" label on any provision that, while not independently sustainable under the taxing power, can be somehow linked to revenue generation. *See, e.g.*, *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 529 (N.D. Tex. 2024), *aff'd as modified*, *McNutt v.*

---

[15] The defendants advance the same arguments in defense of the taxing power and the Necessary and Proper Clause. Dkt. No. 60 at 18–22, 37–38. The Court explained why text, structure, and precedent foreclose viewing the challenged NFA requirements as valid taxing-power provisions that assist enforcement of the special occupational tax. *Supra*, Analysis § 4.A.i.b. Thus, the Court addresses the defendants' other arguments in the context of the Necessary and Proper Clause.

*DOJ*, 173 F.4th 204 (5th Cir. 2026).  Although the Necessary and Proper Clause "give[s]" Congress great latitude in exercising its powers," *NFIB*, 567 U.S. at 537, it "does 'not give Congress *cart blanche*.'"  *Hobby Distillers*, 740 F. Supp. 3d at 526 (quoting *United States v. Comstock*, 560 U.S. 126, 158 (2010) (Alito, J., concurring)).  Or as Justice Thomas put it, the "Necessary and Proper Clause is not a warrant to Congress to enact any law that bears some conceivable connection to the exercise of an enumerated power."  *Gonzales v. Raich*, 545 U.S. 1, 59–60 (2005) (Thomas, J., dissenting).

Instead, the text of the Clause sets limits on its use.  First, a law must be "necessary." The Fifth Circuit recently elaborated on this requirement in *McNutt*.  Quoting Chief Justice Marshall in *McCulloch*, the Fifth Circuit noted that "'necessary' does not always mean 'indispensable' and may instead connote 'one thing [that] is convenient, or useful, or essential to another.'"  *McNutt*, 173 F.4th at 218 (alteration in original) (quoting *McCulloch*, 17 U.S. at 367, 413–14).  The relevant test, the Fifth Circuit held, is whether the challenged law is "plainly adapted" to an enumerated power.[16]  *Id.* (quoting *McCulloch*, 17 U.S. at 421); *see NFIB*, 567 U.S. at 537.  That is no less true in the taxing context.  Indeed, because the taxing power only extends to revenue generation, it "does not give Congress the same degree of control over individual behavior [as the commerce power]."  *NFIB*, 567 U.S. at 573.  As another judge in this district explained, "Congress cannot rely on a 'reasonable' or 'rational' connection to an existing tax to regulate *every* individual behavior occurring before that tax obligation becomes effective."  *Hobby Distillers*, 740 F. Supp. 3d at 529 (emphasis in

---

[16] *McNutt* rejected the notion that modern precedent "import[s] some kind of rational basis test into the Necessary and Proper Clause."  173 F.4th at 218 n.12.  So while some cases describe the test as one of means-end rationality, *see, e.g.*, *Comstock*, 560 U.S. at 134, *McNutt* counsels that *McCulloch*'s "plainly adapted" formulation—quoted most recently in *NFIB*—still applies.

original).  Put differently, the question is not whether challenged regulations "have a 'reasonable connection' to revenue, but whether they are needful and 'plainly adapted' to executing Congress's taxes."  *Id.* (quoting *McCulloch*, 17 U.S. at 324–25, 421).

Second, a law must also be "proper."  The founding generation frequently used the term "proper" when "discussing 'the allocation of governmental powers' or the separation of powers."  *McNutt*, 173 F.4th at 220 (quoting Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 Duke L.J. 267, 291 (1993)).  Thus, a law is not "consist[ent] with the letter and spirit of the [C]onstitution," *McCulloch*, 17 U.S. at 421, and therefore improper, if it infringes on the "system of 'dual sovereignty'" on which our federal structure is based.  *Printz*, 521 U.S. at 918 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)); *see McNutt*, 173 F.4th at 221.  In other words, Congress cannot use the Necessary and Proper Clause to exercise a plenary police power that the Constitution—by enumerating a set of limited powers for the federal government—reserves to the States.  *See Morrison*, 529 U.S. at 618 & n.8.

Here, the challenged NFA provisions are neither necessary nor proper as they relate to the special occupational tax.  Arguing otherwise, the defendants point to declarations from an ATF employee indicating that the agency uses the NFA's regulations for untaxed firearms—which only pertain to transfer, making, and possession—to collect and enforce the special occupational tax.  *See* Dkt. Nos. 61 at 185–92; 86 at 4–7; 127 at 1–4; No. 6:26-CV-227, Dkt. No. 30 at 185–92.  But the evidence does not support the defendants' position.

First, the defendants raise what the plaintiffs call an "anticircumvention theory."  *See* Dkt. No. 75 at 21.  According to the declarations, ATF reviews transfer and making applications to ensure that those who are supposed to be paying the special occupational tax

are in fact doing so.  "A sustained increase in the transfer of NFA firearms," for example, "may indicate that an individual is engaged in the business of dealing in firearms and should be licensed and paying" the special occupational tax.  Dkt. No. 61 at 190.  Relatedly, "the repetitive making of certain firearms by the same individual may indicate that individual is engaged in the business of manufacturing those firearms," requiring them to pay the special occupational tax.  *Id.* at 191.  But even if this rationale holds in some cases, it does not apply in most of them.  By the defendants' own admission, "[t]he vast majority of NFA firearms are made by qualified manufacturers that must be FFLs and pay the [special occupational tax]."  *Id.*  The same goes for transfers.  *See id.* at 191–92.  For instance, between 2016 and 2020, the following percentages of untaxed firearms were made by qualified manufacturers subject to the special occupational tax: 87.5% of silencers, 88% of short-barreled rifles, 97% of AOWs, and 98.5% of short-barreled shotguns.  *Id.* at 191.  Thus, the challenged NFA provisions might inform collection of the special occupational tax in only about 1 to 12% of cases—that is, those times when a firearm is made or transferred by one who is *not* subject to the occupational tax regime.  *See* Dkt. No. 75 at 21.  Because the firearms provisions at issue regulate persons who need not abide by the occupational regime, they are not plainly adapted to collecting or enforcing the special occupational tax.

The defendants respond with statements from its affiant that ATF "regularly denies applications where a transferor or transferee hasn't properly paid the [special occupational tax]," suggesting that the NFA's application and registration requirements do in fact support enforcement of the occupational tax regime.  Dkt. No. 85 at 16 (quoting Dkt. No. 86 at 6).  In 2025, ATF disapproved 691 applications due to "issues" with the special occupational tax, "including a transferor's or transferee's failure to properly pay" the tax.  *Id.* (quoting

Dkt. No. 86 at 6).  It is unclear how many of those 691 applications were disapproved for

nonpayment.  But even if all 691 applications were disapproved for failure to pay the special

occupational tax, that is still a drop in the bucket considering the "2,195,034 total NFA

weapons [that] were transferred" in 2025, according to ATF statistics.  Dkt. No. 61 at 192.

The defendants miss the import: At most, 691 defective occupational transfers out of nearly

2.2 million (or 0.03%) could even potentially be linked to the challenged NFA provisions.

This "unrebutted evidence" (in the defendants' words) does not establish that the NFA's

firearms regulations are plainly adapted to supporting the special occupational tax.[17]  *See*

Dkt. No. 85 at 16.

Second, to the extent ATF claims to use the challenged NFA provisions to criminally

enforce the special occupational tax, that cannot be true.  *See* Dkt. No. 86 at 6 (alleging that

the NFA's regulatory requirements for untaxed firearms "support the assessment, collection,

and enforcement" of the special occupational tax).  Section 5848 of the NFA bars use of

firearms registration information in criminal prosecutions.  26 U.S.C. § 5848(a); *see United

States v. Freed*, 401 U.S. 601, 606 (1971) (noting that Section 5848 is a "barrier against

us[ing]" NFA-mandated registration information "in a prosecution for prior or concurrent

offenses").  As the plaintiffs rightly explain, the statute thus bars the plaintiffs from arguing

---

[17] The defendants contend that the plaintiffs' views on this point are "simply beside the point" because they do not rebut the "sworn testimony" in the ATF declarations.  Dkt. No. 85 at 14–15 (citing *Collins v. Jackson Pub. Sch. Dist.*, 609 F. App'x 792, 795–96 (5th Cir. 2015) ("Arguments in briefs, like allegations in a complaint, are assertions, not evidence" sufficient to create a genuine factual dispute on summary judgment.)).  That contention is a red herring.  The plaintiffs do not dispute the facts in the declarations; they argue that the undisputed evidence does not support the assertion that the challenged regulatory requirements can be sustained in relation to the special occupational tax.  That is a legal argument, not a factual one.  *Cf.* Dkt. No. 60 at 16 (defendants conceding that "the parties dispute no material facts" and agree that only legal questions remain).

that the NFA's regulation of untaxed firearms is plainly adapted to at least the criminal enforcement of the special occupational tax.  *See* Dkt. No. 75 at 22–23.

Lastly, the challenged NFA provisions are not a "proper" means of collecting the special occupational tax.  Again, a law is not "proper" if it encroaches on the States' police power by giving the federal government all-encompassing authority to regulate matters that lack a "plain connection" to an enumerated power.  *McNutt*, 173 F.4th at 221.  The defendants' theory, however, would do just that.  As explained above, the NFA's text and structure, as well as the case law, demonstrate that Congress enacted the challenged NFA provisions to aid enforcement of the transfer and making taxes—and those taxes alone.  *See supra*, Analysis § 4.A.i.b.  That was all well and good when those taxes generated revenue. But with those taxes gone, the challenged provisions lack any connection to an enumerated power, not to mention a "plain" one.  *McNutt*, 173 F.4th at 221.  If the defendants were correct that the provisions can still be sustained under the Necessary and Proper Clause, that theory would open the door to limitless federal regulation.  Consider the plaintiffs' hypotheticals.  *See* Dkt. No. 75 at 24; No. 6:26-CV-227, Dkt. No. 56 at 23.  If, for example, Congress imposed an annual $1 occupational tax on grocers, "anyone wishing to possess broccoli" could be forced to jump through endless federal regulatory hoops—applications, fingerprints, and so on—just to ensure that they are not unlawfully evading the grocer tax. *See* Dkt. No. 75 at 24.  If that is outlandish for broccoli, it is no less so for firearms.  *See United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) ("[T]he Second Amendment 'is not a second-class right.'" (emphasis omitted) (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022))).  Without a "limiting principle," the defendants' theory of

regulation—nothing less than a federal police power—stretches far beyond what the Constitution allows. *McNutt*, 173 F.4th at 221.

To summarize: The challenged NFA provisions cannot be sustained under the taxing power. Because of the One Big Beautiful Bill Act, they do not support the collection of any revenue—the "essential feature of any tax." *NFIB*, 567 U.S. at 564. Moreover, because the challenged provisions are only designed to support enforcement of the now-extinct transfer and making taxes, they cannot be upheld in relation to the special occupational tax, either under the taxing power or the Necessary and Proper Clause. Without more, the challenged NFA provisions lack a valid constitutional basis.

> ### ii. The challenged NFA provisions cannot be independently sustained under the Commerce Clause.

That does not end the matter. Aside from the taxing power, the defendants argue that the NFA's regulation of untaxed firearms may be upheld as an exercise of Congress's enumerated power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In their view, the challenged NFA provisions regulate, typically, the "persons and things" flowing through an interstate firearms market, thus dooming the plaintiffs' facial claims. Dkt. No. 60 at 25 (citing *Lopez*, 514 U.S. at 558). Here is the problem: Congress did not invoke the Commerce Clause in enacting the NFA. To the contrary, the NFA's text and structure, as well as its role in the larger scheme of federal firearms regulation, show that it is a taxing statute—and a taxing statute only. And although a statute's constitutionality does not depend on express recitals of an enumerated power, courts must be able to discern the constitutional basis on which Congress relied. And there is no sign here that Congress relied on its commerce power to craft the provisions.

Start with first principles.  "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."  *Morrison*, 529 U.S. at 607.  In assessing whether a statute is rooted in an enumerated power, courts focus primarily on the statute's text, structure, and place in the U.S. Code.  *Cf. NFIB*, 567 U.S. at 561–74 (assessing each of these factors in concluding that the Affordable Care Act's individual mandate could be upheld as an exercise of the taxing power).  Certainly, the "question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."  *Id.* at 570 (quoting *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948)).  In other words, to legislate under any given power, Congress need not say: "This is a Commerce Clause statute" or "We are enacting this law pursuant to our power to tax."  And it would be wrong for a court to strike down a statute "because Congress used the wrong labels or failed to identify the source of its power."  *United States v. Clay*, 128 F.4th 163, 183 (3d Cir. 2025) (internal quotation marks omitted) (Hardiman, J.) (quoting *United States v. Park*, 938 F.3d 354, 363 (D.C. Cir. 2019)).  Consistent with this understanding, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).

But these principles, while deferential to Congress's lawmaking authority, are not a get-out-of-unconstitutionality-free card.  Courts must still "be able to discern a basis for Congress's exercise of an enumerated power."  *Clay*, 128 F.4th at 183 (quoting *Park*, 938 F.3d at 363).  The analysis, rooted in statutory interpretation, seeks to pinpoint the enumerated power, or combination of powers, on which Congress relied.  As Alexander Hamilton, writing as Publius, explained, "[t]he propriety of a law, in a constitutional light,

must always be determined by the nature of the powers *upon which it is founded*." The Federalist No. 33, at 206 (J. Cooke ed. 1961) (emphasis added). Even in *Woods*, the case most often cited for the notion that Congress need not expressly describe its choice of an enumerated power, the Supreme Court went on to reason that Congress's chosen power—in that case, its "war power"—was "plain from" the record. *Woods*, 333 U.S. at 144. The same was true in *NFIB*, where the Supreme Court adopted a saving construction under the taxing power, but only after analyzing text, structure, and statutory history to confirm that the taxing power was a "fairly possible" basis for the statute. *See NFIB*, 567 U.S. at 563 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

It follows that the government cannot employ post-hoc justifications to save a statute based on an enumerated power that Congress never invoked. The same goes for the courts. A century ago, the Supreme Court recognized "that it is the duty of a court in considering the validity of an act to give it such reasonable construction as can be reached to bring it within the fundamental law." *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 518 (1926). At the same time, "amendment may not be substituted for construction," and a court "may not exercise legislative functions to save the law from conflict with constitutional limitation." *Id.* In more modern terms, when Congress is "explicit about invoking its authority" under a specific power, it "precludes consideration of" a different power "as a basis for" the statute. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 n.7 (1999).

How does one determine what power Congress invoked? The best evidence, as always, is the statutory text. *See NFIB*, 567 U.S. at 563–64; *cf. Fla. Prepaid*, 527 U.S. at 642 n.7 ("There is no suggestion in the language of the statute itself . . . that Congress had in mind the Just Compensation Clause of the Fifth Amendment."). Thus, the Court turns to

– 40 –

the tools of statutory interpretation—text, but also structure—to determine whether the

NFA's regulatory requirements can be understood as an invocation of the commerce power.

> a.    **Congress enacted the NFA under the taxing power—and the taxing power only.**

The NFA is only a taxing statute.  Starting with its preamble, the NFA claims "to tax

the sale or other disposal of" "certain firearms and machine guns."  Pub. L. No. 73-474, 48

Stat. at 1236; *see Bittner v. United States*, 598 U.S. 85, 98 n.6 (2023) ("A preamble, purpose

clause, or recital is a permissible indicator of meaning." (quoting Antonin Scalia & Bryan A.

Garner, Reading Law: The Interpretation of Legal Texts 217 (2012))).  Subchapter A—titled

"Taxes"—has three parts: "Special (Occupational) Taxes," "Tax on Transferring Firearms,"

and "Tax on Making Firearms."  Pub. L. No. 90-618, § 201, 82 Stat. 1213, 1227–28 (1968).

Section 5811, the tax on transfers, provides that "[t]here shall be levied, collected, and paid

on firearms transferred a tax at the rate of" $0 or $200 for machineguns and destructive

devices.  26 U.S.C. § 5811(a).  The same language features in Section 5821: the making tax.

*Id.* § 5821(a).  Next to both provisions are most of the challenged NFA requirements, which

expressly prohibit any transfer or making until the relevant "tax" is paid, among other

things.  *Id.* §§ 5812(a), 5822.  It makes sense, then, why the Supreme Court has held for

decades that the NFA is founded on "the taxing power": The statute speaks of taxation

through and through.  *NFIB*, 567 U.S. at 567 (citing *Sonzinsky*, 300 U.S. at 513); *see also*

*Haynes*, 390 U.S. at 98 & n.12 ("[A]s we have repeatedly indicated . . . [the Supreme] Court

must give deference to Congress' taxing powers . . . ." (citing, for example, *Sonzinsky*, 300

U.S. at 506)).

Indeed, the Supreme Court has cited far less tax-centric language as evidence that

Congress invoked the taxing power.  In *NFIB*, the Supreme Court considered the Affordable

Care Act's "[s]hared responsibility payment," which the Act described as a "penalty," not a "tax."  567 U.S. at 563–64.  Despite Congress's choice of label, the Supreme Court held that the shared responsibility payment was a valid use of Congress's taxing power because it possessed certain characteristics that made it "look[] like a tax"—including that it generated revenue, could be found in the Internal Revenue Code, and was enforced by the Internal Revenue Service.  *Id.* at 563.  In reaching this conclusion, the Supreme Court noted several precedents holding that an exaction may fall within the taxing power no matter what it is called.  *Id.* at 564–65 (discussing cases); *cf. Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) ("I[n] passing on the constitutionality of a tax law 'we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it.'" (quotation omitted)).

Now consider how much easier the analysis is when, as here, a statute actually speaks of taxation.  *See, e.g.*, 26 U.S.C. §§ 5811, 5821.  Here, as in all things, the Court "must take Congress at its word" and "presume it meant what it said."  *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019).  The NFA's tax-centric language thus goes to show that Congress invoked its taxing power when enacting the statute.

What Congress did not say is even more telling.  The challenged NFA provisions do not mention interstate or foreign commerce.  *See, e.g.*, 26 U.S.C. §§ 5812, 5822, 5841.  And those provisions have "no express jurisdictional element which might limit [their] reach to a discrete set of [firearms-related activities] that additionally have an explicit connection with or effect on interstate commerce."  *Lopez*, 514 U.S. at 562.  While not strictly necessary, "including a jurisdictional hook is 'standard operating procedure for Commerce Clause legislation.'"  *Smith v. U.S. Dep't of the Treasury*, 761 F. Supp. 3d 952, 967 (E.D. Tex. 2025)

(quotation omitted).  Without these jurisdictional limits, the NFA's firearms regulations creep into purely intrastate activities—like crafting a silencer out of household objects or giving away a covered firearm to another in-state resident.  *See* Dkt. No. 15-1 at 7, 9–10.

The absence of a jurisdictional hook—and, for that matter, any other interstate-commerce language—indicates that Congress did not employ the Commerce Clause in enacting the challenged NFA provisions.  And "[w]hen Congress addresses both the power to regulate and the power to tax, it does so separately and expressly."  *Learning Res., Inc. v. Trump*, 607 U.S. 229, 249 (2026); *see also, e.g.*, 2 U.S.C. § 622(8)(B)(i) (defining a "government-sponsored enterprise" to include a corporate entity that does not have "the power to tax or to regulate interstate commerce").  That drafting standard is no surprise, "as the 'power to regulate commerce' is 'entirely distinct from the right to levy taxes.'"  *Learning Res.*, 607 U.S. at 250 (quoting *Gibbons*, 22 U.S. at 201).

Because the challenged NFA provisions focus exclusively on taxation, the only "reasonable construction" is that they are based on the taxing power alone.  *Carhart*, 550 U.S. at 153 (quoting *Edward J. DeBartolo Corp.*, 485 U.S. at 575).  Therefore, the NFA's "constitutional bedrock," as the Fifth Circuit explained, "is 'the power to tax' rather than 'the commerce power.'"  *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992) (quoting *Ross*, 458 F.2d at 1143 & n.3); *see United States v. Lopez*, 2 F.3d 1342, 1348–49 (5th Cir. 1993) ("The National Firearms Act . . . is grounded on Congress' taxing power under Article I, Section 8, Clause 1."), *aff'd*, 514 U.S. 549 (1995).

The NFA's structure confirms this conclusion.  The statute is housed in Title 26, the Internal Revenue Code, and all taxes collected go to the Treasury's general fund.  *See* ATF, Fact Sheet – Facts and Figures for Fiscal Year 2024 (Mar. 2025), https://perma.cc/4687-

5R2F.  Those are signs that "Congress enacted the NFA pursuant to its enumerated taxing power."[18]  *United States v. Dodge*, 61 F.3d 142, 145 (2d Cir. 1995); *see NFIB*, 567 U.S. at 563–64 (considering the same factors for the shared responsibility payment).

Also consider that the NFA includes two discrete provisions—unchallenged here—that do explicitly reference interstate or foreign commerce.  *See* Dkt. No. 133 at 53:23–25 to 54:1.  In contrast to the challenged NFA requirements, these two provisions focus on "importation" and "interstate transportation" of covered firearms.  Pub. L. No. 73-474, 48 Stat. at 1236 (preamble).  Section 5861(j) makes it unlawful "to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required," and Section 5861(k) prohibits "receiv[ing] or possess[ing] a firearm which has been imported or brought into the United States" in violation of the NFA.  That Congress did not include similar commerce language in the challenged NFA provisions suggests an intentional choice: When Congress chooses to invoke the Commerce Clause, it knows how to do so.  With that in mind, courts often "presume[] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another."  *Martinez v. Caldwell*, 644 F.3d 238, 242 (5th Cir. 2011) (quoting *City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 338 (1994)); *see* Scalia & Garner, Reading Law at 107.  Thus, far from making the entire statute about commerce, Congress's jurisdictional references in two distinct NFA provisions indicate that the challenged requirements are not founded on the Commerce Clause.  Because those challenged NFA requirements "say[] nothing about interstate

---

[18] Also remember that the NFA, for most of its history, required individuals to pay taxes to and register their firearms with the Secretary of the Treasury.  *See supra*, n.6.  "[W]hich agency is responsible for" enforcement bears on "whether something Congress codifies as a tax is, really, a tax."  *Hobby Distillers*, 740 F. Supp. 3d at 524 (citing *NFIB*, 567 U.S. at 563–65).

commerce," the Court "will not ascribe to Congress an intent to exercise its power under the [C]ommerce [C]lause when it has invoked the taxing power in enacting the legislation." *United States v. Giannini*, 455 F.2d 147, 148 (9th Cir. 1972).

The conclusion that Congress only based the NFA on its taxing power becomes even clearer when considering the NFA's sister statute, the Gun Control Act. The GCA has its roots in the Federal Firearms Act, 52 Stat. 1250 (1938), enacted just four years after the NFA. Unlike the NFA, the FFA applied to all firearms, and it cabined its provisions to interstate commerce. *Lopez*, 2 F.3d at 1349. For example, the FFA prohibited "any manufacturer or dealer" not licensed under the statute from transporting, shipping, or receiving any firearm or ammunition "in interstate or foreign commerce," 15 U.S.C. § 902(a) (1938), and it prohibited "any person" from receiving any firearm or ammunition "transported or shipped in interstate or foreign commerce in violation of" the statute. *Id.* § 902(b) (1938). *See Lopez*, 2 F.3d at 1349. So "[i]t is clear that in enacting the Federal Firearms Act Congress was exercising the power conferred upon it by the [C]ommerce [C]lause." *Cases v. United States*, 131 F.2d 916, 923 (1st Cir. 1942); *see United States v. Rybar*, 103 F.3d 273, 279 (3d Cir. 1996) ("Although the [NFA] was enacted under the taxing power, four years later Congress used the commerce power to regulate firearms with the passage of the [FFA]. All subsequent federal firearms legislation was enacted under the commerce power." (internal citation omitted)).

The GCA is an outgrowth of the commerce-based FFA. The GCA and the Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, 82 Stat. 197 (1968), "enlarged and extended the Federal Firearms Act." *Barrett v. United States*, 423 U.S. 212, 219–20 (1976). With some limited exceptions, the GCA and the Crime Control Act "maintained the same

– 45 –

essential jurisdictional bases" from earlier legislation—specifically, "an express nexus either to interstate commerce or to the conduct of, or dealings with, federally licensed dealers or manufacturers, or to both." *Lopez*, 2 F.3d at 1351, 1353.  The statutes also recodified the commerce-based FFA provisions in Title 18 ("Crimes and Criminal Procedure") and left the tax-based NFA provisions in Title 26 ("Internal Revenue Code").  *Id.* at 1350, 1352.  The GCA and the Crime Control Act therefore maintained the dual system of federal firearms regulation that had existed since the 1930s: a taxing scheme for "especially dangerous and unusual" weapons, *Mock*, 75 F.4th at 567 (quotation omitted), and a commerce framework for everything else.

This statutory history, which the defendants do not address, underscores how "the NFA and the GCA are different statutes passed at different times to address different problems using different language." *Bondi v. VanDerStok*, 604 U.S. 458, 483 (2025); *see United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) ("Statutory history, 'the record of enacted changes Congress made to the relevant statutory text over time,' can also provide helpful context." (quoting *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting))); *see also Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (en banc) (Willett, J., concurring) (distinguishing between statutory history and legislative history).[19] The Fifth Circuit highlighted the dichotomy decades ago, noting that the NFA and GCA address "clearly distinct" subjects and are "contained in wholly different titles of the United States Code." *Parker*, 960 F.2d at 500.  The GCA, the Fifth Circuit explained, "has no roots or antecedent in the [NFA] [and] is in no way related or tied to taxation." *Lopez*, 2 F.3d at

---

[19] The parties discuss the NFA's legislative history in detail.  But the Court does not rely on legislative history "for the simple reason that [it is] not law." *United States v. Nazerzadeh*, 73 F.4th 341, 347 (5th Cir. 2023) (alteration in original) (quotation omitted).

1349.  Instead, the GCA, as shown by its text and history, is a clear exercise of the commerce power.  That "[t]he [NFA] is silent on the score of commerce" confirms that it is a taxing statute—and a taxing statute alone.[20]  *United States v. Tous*, 461 F.2d 656, 657 (9th Cir. 1972).

For these reasons, the challenged NFA provisions may not be sustained under the Commerce Clause.  Congress passed the NFA under its taxing power only.  And because the NFA's regulation of untaxed firearms can no longer be upheld as supporting a revenue purpose, the challenged provisions therefore exceed Congress's enumerated powers.

### b.    The defendants' counterarguments are unpersuasive.

The defendants advance several counterarguments for why the Court should evaluate the challenged NFA provisions under the Commerce Clause.  *See* Dkt. No. 60 at 31–33; No. 6:26-CV-227, Dkt. No. 29 at 35–37.  None have merit.

First, the defendants raise their own textual points, arguing that the "statutory text plainly indicates that Congress sought to regulate commercial actors and commodities that are often part of interstate commerce."  Dkt. No. 60 at 33.  They point to a few provisions—for example, the NFA's definition of "transfer" which includes "selling" and "leasing"—to support this understanding.  *Id.* (quoting 26 U.S.C. § 5845(j)).  But the two places in the NFA that explicitly or implicitly refer to interstate or foreign commerce either confirm the Court's interpretation or must be understood in their context.  By invoking its commerce power for two discrete provisions—Section 5861(j), dealing with transporting, delivering, or receiving unregistered firearms in interstate commerce, and Section 5861(k), barring

---

[20] For what it's worth, in 1934, enacting the NFA under the Commerce Clause would have almost certainly been viewed as unconstitutional.  The modern, expansive view of the commerce power did not begin to rear its head until years later.  *See Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942).

receiving or possessing an unlawful firearm that has been imported or brought into the United States—Congress revealed that it "knew exactly how" to enact the challenged NFA provisions under the Commerce Clause "if [it] [had] wanted to." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018). And the NFA's reference to "transfers"—while suggestive of commerce—"cannot be construed in a vacuum." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quotation omitted). The "transfer" provisions of the NFA (a.k.a. "Part II—Tax on Transferring Firearms") are found in subchapter A—titled "Taxes." Because words are supposed to be read against the backdrop of the entire statutory scheme, *Sturgeon*, 577 U.S. at 438, "transfers" must be understood in the NFA in relation to taxes, not commerce.

Second, the defendants note that Congress may legislate under more than one enumerated power. Dkt. No. 60 at 31–32. A court, the argument continues, may therefore uphold a statute under a different power than it has before. *Id.* at 32. Fair enough. *See, e.g.*, *Morrison*, 529 U.S. at 607 ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."). But that uncontroverted assertion begs the question here: Did Congress employ the commerce power in enacting the challenged NFA provisions? That Congress could have legislated pursuant to a particular enumerated power does not answer whether Congress invoked that power in enacting a given statute. And again, the text, structure, and statutory history "do[] not show that Congress, in enacting the [NFA], was invoking the Commerce Clause." *Lopez*, 2 F.3d at 1364 n.45.

Third, contrary to the defendants' suggestion, it matters little that a law "does not depend on recitals of the power which it undertakes to exercise." *Woods*, 333 U.S. at 144; *see* Dkt. No. 60 at 33. Chief Judge Sutton put it perfectly: "In enumerated-power cases, there often will be a question whether Congress invoked its powers under the Commerce

Clause . . . or the Taxing Clause." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 553 (6th Cir. 2011) (Sutton, J., concurring in part), *abrogated by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). The *Woods* principle merely establishes that "congressional recitals provide sufficient grounds for invoking a power but not the exclusive means for doing so." *Id.* Courts must still analyze whether a statute has the distinct substantive traits associated with each enumerated power; they "may not simply label a law something it is not." *Id.*

*Woods* itself is a prime example. The *Woods* Court, after explaining that Congress need not expressly state its chosen power, then reasoned that "Congress was invoking its war power" in passing the law under review. *Lopez*, 2 F.3d at 1364 n.45 (quoting *Woods*, 333 U.S. at 143). The Supreme Court then upheld the law under the war power. *Woods*, 333 U.S. at 141–43. So there too the Supreme Court recognized that courts must discern the basis on which Congress legislated. And here, "there is no substantial indication that the commerce power was even invoked." *Lopez*, 2 F.3d at 1364.

Lastly, the defendants rely on a brief discussion in a Fifth Circuit case, *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994), that states with little explanation that the NFA may be sustained under the commerce power. But *Ardoin*'s unreasoned statements about the Commerce Clause—which it incorporated by reference from a fact-bound Fourth Circuit decision—do not foreclose the issue here. For one, *Ardoin* came before *Lopez* and *Morrison*, which worked a sea change in modern Commerce Clause doctrine by underscoring constitutional limits on Congress's regulatory power through the application of three discrete categories of permissible regulation. *See Lopez*, 514 U.S. at 558–59; *see also United States v. Bailey*, 115 F.3d 1222, 1233 (5th Cir. 1997) (Smith, J., dissenting) ("*Lopez* is a landmark, signaling the revival of federalism as a constitutional principle, and it must be

– 49 –

acknowledged as a watershed decision in the history of the Commerce Clause."). "[W]here an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis," circuit precedent may be implicitly overruled. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (citation modified) (quoting *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 742 (5th Cir. 2018)). Such is the case here, where *Ardoin* never conducted the commerce-power analysis now required by binding Supreme Court precedent. Further, *Ardoin*'s statements about the Commerce Clause are dicta and conflict with prior Fifth Circuit decisions holding that "'the constitutional bedrock for the [NFA]' is 'the power to tax' rather than 'the commerce power.'" *Parker*, 960 F.2d at 500 (quoting *Ross*, 458 F.2d at 1143 & n.3). The Court is not bound by dicta, and when two "panel opinions appear to conflict," the earlier one controls. *H&D Tire & Auto.-Hardware, Inc. v. Pitney Bowes Inc.*, 227 F.3d 326, 330 (5th Cir. 2000). For those reasons, too, *Ardoin* does not help the defendants as much as they think.

In *Ardoin*, the Fifth Circuit addressed whether 18 U.S.C. § 922(o)—which amended the Gun Control Act to criminalize the possession of machineguns manufactured after 1986—"implicitly repealed portions of the NFA." 19 F.3d at 179. The defendant argued that he could not be convicted under the NFA for failing to register a machinegun because, after Congress enacted Section 922(o), ATF "refuse[d] to accept applications to register or to pay the tax" on machineguns. *Id.* Thus, the argument went, Section 922(o) implicitly repealed the NFA provisions under which he was charged and ultimately convicted.

The Fifth Circuit rejected that argument by citing a Fourth Circuit case, *United States v. Jones*, 976 F.2d 176 (4th Cir. 1992). The *Jones* panel held that the NFA's provisions regarding machineguns could still be supported under the taxing power, notwithstanding

Section 922(o). *Id.* at 183–84. It then said, almost as an afterthought, that there could be "no serious contention" that the NFA's proscriptions "exceed[] Congress'[s] power to regulate interstate commerce" on the specific facts of the case: "two machine guns which were transported between two states for sale." *Id.* at 184. Despite this fact-bound conclusion, the *Ardoin* majority simply "adopt[ed] the analysis of the Fourth Circuit." 19 F.3d at 180. And it concluded by stating—in much more categorial terms than *Jones* did— that "[t]he NFA can be upheld on the preserved, but unused, power to tax or on the power to regulate interstate commerce." *Id.*

Judge Wiener disagreed with the majority's asides on the Commerce Clause. He explained that the NFA's constitutionality could not "be rescued by incanting—as did the Fourth Circuit in *Jones*—that the [NFA] 'could' be upheld under Congress'[s] power to regulate interstate commerce." *Id.* at 187 (Wiener, J., dissenting in part, concurring in part, and dissenting in the result). The only way the NFA could "be upheld under the Commerce Clause," he explained, was if the statute "were expressly adopted (or now readopted) by Congress under that clause." *Id.* But the "undeniable fact" is that "Congress *did not* enact the NFA under the Commerce Clause," nor has it "seen fit to re-enact it under that clause in all the decades that have ensued since the NFA's original enactment under Congress'[s] power to tax." *Id.* (emphasis in original). To Judge Wiener, the majority's Commerce Clause comments raised separation-of-powers concerns: Judges may not "uphold[] laws on the basis of enumerated powers that are different from the ones invoked by Congress." *Id.* at 188. Because "Congress expressly passed the NFA pursuant to its power to tax," Judge Wiener resisted any suggestion that "Congress now intends to augment the power and scope of [the NFA] by imbuing it with the authority of the modern Commerce Clause." *Id.*

– 51 –

Indeed, absent from *Ardoin* (and from *Jones*) was any discussion of the Supreme Court's modern approach to Commerce Clause legislation.  That makes sense: Both cases were decided before *Lopez* and *Morrison*.  Those latter cases "canvassed and clarified" the Supreme Court's Commerce Clause precedents and "provide[d] the proper framework" for analyzing claims that Congress exceeded its commerce power in enacting a particular statute.  *See Morrison*, 529 U.S. at 609 (discussing *Lopez*).  By delineating three categories of permissible Commerce Clause legislation, *Lopez* and *Morrison* limited congressional authority to regulate in areas that, historically, have been reserved to the states.  And for the broadest and most manipulable category—"'activities that substantially affect interstate commerce'"—the cases identified several "significant considerations" for courts to review.  *Id.* (quoting *Lopez*, 514 U.S. at 558–59).  These significant considerations include, among others, whether the law is "economic" in nature, whether it contains an "express jurisdictional element" to "limit its reach to" activities with "an explicit connection with or effect on interstate commerce," and whether there are any "express congressional findings regarding the effects upon interstate commerce" of the regulated activity.  *Id.* at 610–12; *Lopez*, 514 U.S. at 561–63.

At the very least, *Lopez* and *Morrison* "change[d] the focus of the relevant analysis," thus undercutting *Ardoin*'s precedential basis.  *Bonvillian*, 19 F.4th at 792 (internal quotation marks omitted); *accord Hoskins v. Bekins Van Lines*, 343 F.3d 769, 775–76 (5th Cir. 2003) (finding circuit precedent abrogated "[b]ecause the legal landscape surrounding the complete preemption doctrine [had] shifted").  In fact, when it comes to the plaintiffs' argument that the NFA's restrictions on possessing untaxed firearms violate the Commerce Clause, *Lopez* supports their position and contradicts *Ardoin*: Firearm possession "has

nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."  *Lopez*, 514 U.S. at 561; *see also Alvarez v. City of Brownsville*, 904 F.3d 382, 398 (5th Cir. 2018) (en banc) (Ho, J., concurring) (explaining that district courts are not bound by circuit precedent that directly conflicts with Supreme Court precedent). Understandably, the *Ardoin* majority could not have addressed the categories or factors identified in *Lopez* and *Morrison*.  Still, because *Ardoin* did not apply *Lopez* and *Morrison*'s test for assessing Commerce Clause challenges, its discussion of the commerce power has been abrogated.  *See Bonvillian*, 19 F.4th at 792; *cf. United States v. Barber*, No. 4:20-CR-384, 2023 WL 1073667, at *4 (E.D. Tex. Jan. 27, 2023) (applying *Bruen* as opposed to the Fifth Circuit's pre-*Bruen* precedent and noting the "district courts' obligation to apply intervening Supreme Court precedent that conflicts with circuit authority").  Thus, *Ardoin* does not bind the Court.

Plus, *Ardoin*'s statements about the commerce power cannot be read for more than what they are: dicta.  "A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it."  *Villegas v. Noem*, 149 F.4th 554, 563–64 (5th Cir. 2025) (internal quotation marks omitted) (quoting *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004)); *see also Obiter dictum*, Black's Law Dictionary (12th ed. 2024) (defining dictum as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential").  "A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law."  *Villegas*, 149 F.4th at 564 (quoting *Int'l Truck*, 372 F.3d at 721).  Here, *Ardoin*'s talk of the commerce power was not necessary to its

– 53 –

holding.  Before addressing the Commerce Clause, the majority recognized that, under the

NFA, "ATF has the authority to tax now-illegal machineguns."  *Ardoin*, 19 F.3d at 180.  It

then said that the NFA "could" be upheld under the Commerce Clause, too.  *Id.*  But the

majority had no reason to reach that point since it had already recognized that the NFA

could be sustained under "the taxing power."  *Id.*  Thus, *Ardoin*'s commerce-power language

can be deleted without undermining the case's analysis.  That makes it dicta.  *See Villegas*,

149 F.4th at 563–64.

　　And being a peripheral point, the majority's discussion of the Commerce Clause may

not have received full and careful consideration.  The opinion suggests as much by simply

"adopt[ing]" *Jones*.  *Ardoin*, 19 F.3d at 180.  *Ardoin* then overstated the Fourth Circuit's

holding, which was expressly limited to the NFA's "application in [that] case to two

machine guns which were transported between two states for sale."  *Jones*, 976 F.2d at 184.

*Jones* did not categorically hold that "[t]he NFA can be upheld . . . on the power to regulate

interstate commerce," as *Ardoin* suggests.  *Ardoin*, 19 F.3d at 180.  *Ardoin*'s loose language

about *Jones* further indicates that its discussion of the commerce power was not fully and

carefully considered and is therefore dicta.

　　The same goes for *United States v. Arce*, 118 F.3d 335 (5th Cir. 1997), another case on

which the defendants rely.  *Arce* was a sentencing appeal that challenged a district court's

upward departure for convictions related to making and possessing unregistered silencers

and machineguns.  *Id.* at 338.  In language that was not essential to the outcome, the *Arce*

panel remarked that the Fifth Circuit had "recently held that the constitutionality of the

NFA can be upheld based on either the taxing power or on the interstate commerce power."

*Id.* at 342.  But that language was conditional (e.g., how "the NFA *can be* upheld"), and the

panel quicky turned to why the departure would be valid "[e]ven if the NFA were based solely on the taxing power." *Id.* (emphasis added).  This suggests that the *Arce* panel did not understand *Ardoin* to have conclusively decided the Commerce Clause issue.  In fact, about a month after *Arce*, another Fifth Circuit panel noted that the NFA "is a legitimate exercise of the taxing power, so infirmities in the commerce power are beside the point." *United States v. Solis*, 124 F.3d 192, 192 (5th Cir. 1997) (unpublished).  That is an odd thing to say if *Ardoin* had already held that the NFA could be sustained under the Commerce Clause.

Lastly, *Ardoin* clashes with two prior Fifth Circuit decisions recognizing that the NFA's "'constitutional bedrock'" is the taxing power "rather than 'the commerce power.'" *Parker*, 960 F.2d at 500 (quoting *Ross*, 458 F.2d at 1143 & n.3).  Oddly, *Ardoin* quoted these two cases.  *See* 19 F.3d at 179 n.3.  It then contradicted them by concluding that the NFA could be upheld under the Commerce Clause.  What happens then?  In the Fifth Circuit, when two panel decisions "appear to conflict," the earlier decision prevails.  *H&D Tire*, 227 F.3d at 330.  Thus, the Fifth Circuit's earlier statements that the NFA is rooted in the taxing power "rather than" the commerce power supersedes *Ardoin*'s contrary language.  For all these reasons, the defendants' reliance on *Ardoin*, like their other counterarguments, fails.

*   *   *

In sum, the challenged NFA provisions rise and fall on the taxing power.  When it enacted the NFA, Congress invoked the Taxing Clause—not its power to regulate interstate commerce.  As a result, Congress's later decision to eliminate the transfer and making taxes for most NFA firearms has constitutional consequences.  Without revenue generation, the regulatory requirements for those firearms—which were designed to support the transfer

– 55 –

and making taxes—cannot be upheld under the taxing power.  The challenged NFA provisions thus exceed Congress's enumerated powers.

###### B.  The plaintiffs abandoned their Second Amendment claims.

Putting aside Article I's enumerated powers, both sets of plaintiffs alleged that the challenged NFA provisions also violate the Second Amendment right to "keep and bear Arms."  Dkt. No. 51 ¶¶ 71–75; No. 6:26-CV-227, Dkt. No. 1 ¶¶ 88–97.  But at the motions hearing, everyone agreed that the Court can bypass the Second Amendment claims if it concludes—as it does today—that the challenged NFA provisions exceed Congress's enumerated powers in all their applications.  Dkt. No. 133 at 22:15 to 23:1; 30:3–7; 62:13–21; 104:5–21.  Thus, the Court finds that the plaintiffs abandoned their Second Amendment claims by inviting the Court to avoid them under the circumstances here.

Moreover, in concluding that the Second Amendment claims are abandoned, the Court adheres to the "longstanding principle of judicial restraint" requiring courts to "avoid reaching constitutional questions in advance of the necessity of deciding them."  *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)); *accord Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016) (en banc).  The Court's injunction, as detailed below, confers no less relief than the plaintiffs would obtain if they prevailed on their Second Amendment claims.  By encompassing interstate applications of the challenged NFA provisions, the injunction affords the same relief that a successful Second Amendment challenge would entail.  Accordingly, the Court need not—and indeed, should not—wade into the parties' Second Amendment arguments.

### 5.    Remedy

Having concluded that the NFA's regulatory provisions for untaxed firearms exceed Congress's enumerated powers, the Court now considers the proper remedy.  The plaintiffs seek both injunctive relief and declaratory judgments.  As explained below, they are entitled to party-specific injunctions but not declaratory relief.

### A.    Permanent Injunction

#### i.    The plaintiffs prevail on each of the permanent-injunction factors.

The permanent-injunction standard is "essentially the same" as for a preliminary injunction. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).  "A party seeking a permanent injunction must show: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  The requesting party must "'clearly carr[y] the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (quotations omitted).

The plaintiffs have satisfied their burden on each permanent-injunction factor.  As noted, the plaintiffs have shown actual success on the merits of their enumerated-powers claims. *See supra*, Analysis § 4.A.  They also face irreparable harm without an injunction.  For one, compliance with unconstitutional provisions for transferring and making untaxed NFA firearms subjects the plaintiffs to "nonrecoverable compliance costs." *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 677 (5th Cir. 2024) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)); *see Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023)

("[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm."). And the government cannot be required to compensate the plaintiffs for those costs, along with the lost profits sustained by the commercial plaintiffs, because the government has "sovereign immunity for any monetary damages." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Lastly, subjection to an unconstitutional law is itself irreparable harm. *See Hobby Distillers*, 740 F. Supp. 3d at 535.

The last two factors—the balance of hardships and the public interest—merge "when the government opposes an injunction." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024); *see Nken v. Holder*, 556 U.S. 418, 435 (2009). Of course, the defendants have no legitimate interest in enforcing unconstitutional laws, *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), just as "[t]here is generally no public interest in the perpetuation of unlawful [government] action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (first alteration in original) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). The plaintiffs have thus carried their burden on each permanent-injunction factor.

### ii.    The Court's injunction extends only to the parties.

Now consider the scope of the injunction. The *Silencer Shop* plaintiffs request a "blanket ban" on enforcement of the challenged NFA provisions—a remedy that would necessarily extend to parties not involved in the litigation. Dkt. No. 49 at 59 (quoting *CASA*, 606 U.S. at 853). Alternatively, they seek a party-specific injunction that reaches each of the plaintiffs, including agencies and political subdivisions of each plaintiff state, the commercial plaintiffs' customers, the associational plaintiffs' "individual and [commercial] members and supporters," the customers of the associational plaintiffs' commercial

members, and the "resident family members" who live in the same household as those covered by the injunction. *Id.* at 61 (internal quotation marks omitted). Meanwhile, the *Jensen* plaintiffs limit their requested relief to the plaintiffs, the commercial plaintiff's current and future customers, and the associational plaintiffs' individual and commercial members (including their customers). *See* No. 6:26-CV-227, Dkt. No. 26 at 55.

Under the Supreme Court's decision in *CASA*, the Court may not impose a universal injunction of the kind requested by the *Silencer Shop* plaintiffs. Addressing limitations on injunctive relief under the Judiciary Act of 1789, the *CASA* Court held that federal courts likely lack equitable authority to issue universal injunctions. 606 U.S. at 841–47. That is because the Judiciary Act "encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception"—a category that did not include the universal injunction or any similar form of relief. *Id.* at 841 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Rather, at the founding, traditional equitable remedies were typically party specific. *Id.* at 842. Because universal injunctions "lack[] a historical pedigree," the federal courts' power to issue injunctive relief under the Judiciary Act is limited to providing "complete relief to the plaintiffs before the court."[21] *Id.* at 847, 852 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *accord Calderon Lopez v. Lyons*, 813 F. Supp. 3d 692, 709 (N.D. Tex. 2025) (Hendrix, J.).

---

[21] Consider too that imposing a universal injunction would short-circuit review of similar challenges to the NFA pending in other courts. *See Brown v. ATF*, No. 4:25-CV-1162 (E.D. Mo.); *Roberts v. ATF*, No. 2:26-CV-091 (E.D. Ky.). Even if a universal injunction were appropriate, judicial restraint favors allowing the constitutional questions here to percolate through the federal courts. *See Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see also W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985) (noting that district courts should "avoid rulings which may trench upon the authority of sister courts").

Here, the Court can provide complete relief to the plaintiffs by tailoring its injunction to the parties involved.  *See CASA*, 606 U.S. at 851–52.  By prohibiting the defendants from enforcing the challenged NFA provisions against the plaintiffs and certain other individuals and entities that are closely associated with the plaintiffs, the Court can relieve the plaintiffs of the irreparable injury of being subjected to an unconstitutional law.

The *Silencer Shop* plaintiffs raise concerns about workability.  In their view, a party-specific injunction is "unworkable" because they seek relief for millions of individual and commercial members, customers, and state officials across the nation.  Dkt. No. 49 at 59–60 (quoting *CASA*, 606 U.S. at 853).  The implication is that it would be impossible or at least extremely difficult to enforce a party-specific injunction, whereas a "blanket ban" would be easily administrable.  *See id.* at 59 (quoting *CASA*, 606 U.S. at 853).  The *CASA* Court did not see it that way: *CASA* also involved multiple large plaintiff membership organizations, and yet the Supreme Court intimated that a universal injunction would be inappropriate in that case.  606 U.S. at 852–54; *see also Mock v. Garland*, 697 F. Supp. 3d 564, 591–92 (N.D. Tex. 2023) (limiting injunction in a Second Amendment case to the members of a large gun-rights organization).  In any event, if there are practical difficulties with enforcing a party-specific injunction, that is "the National Government's problem, not [the Court's]."  *Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring).  Under Supreme Court precedent, the Court's remedy may provide complete relief to the plaintiffs—nothing more.

Questions remain, however.  First, the defendants reject the notion that any party-specific injunction should extend to the commercial plaintiffs' customers and the customers of the associational plaintiffs' commercial members.  *See* Dkt. No. 60 at 46; *see also* Dkt. No. 49 at 22 (noting that the commercial plaintiffs "assert an Article III injury on behalf of

[their] customers"). Because the commercial plaintiffs are injured by the lost profits from enforcement of the challenged NFA provisions, *see, e.g.*, Dkt. No. 50 at 40, the injunction must reach the commercial plaintiffs' customers—both current and future—to provide the commercial plaintiffs with complete, "forward-looking" relief. *See TransUnion LLC*, 594 U.S. at 435. If those customers still confront the NFA's regulatory provisions for untaxed firearms, then they will still be deterred from purchasing those firearms from the commercial plaintiffs, thus perpetuating the constitutional injury. *See Mock*, 697 F. Supp. 3d at 592 (extending injunction to enforcement of a challenged ATF rule against a commercial plaintiff "and all of its downstream customers"). The same logic applies to current and future customers of the associational plaintiffs' commercial members. *See Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 697 F. Supp. 3d 601, 634 (N.D. Tex. 2023) (enjoining an ATF rule as to "the downstream customers of any commercial member of an Organizational Plaintiff"). Those commercial members are no less injured by customers' reluctance to purchase NFA firearms from them because of the challenged NFA provisions. *See* Dkt. No. 50 at 27–28. Thus, to provide complete relief to the commercial members of the associational plaintiffs, the injunction must also encompass their current and future customers.

But to be clear, the Court's injunction does not extend to the above-noted customers in all circumstances. Because the injunction remedies the injuries to the plaintiffs, it only covers current and future customers' transactions with the plaintiffs and their commercial members. The practical benefit to the non-party customers, in other words, "[is] merely incidental." *CASA*, 606 U.S. at 852 (alteration in original) (quoting *Trump*, 585 U.S. at 717 (Thomas, J., concurring)). Therefore, the Court's injunction does not allow a commercial plaintiff's customer (or the customer of an associational plaintiff's commercial member) to

avoid the challenged NFA provisions "for *all* NFA firearms they possess, transfer, sell, make, and manufacture." *See* No. 6:26-CV-227, Dkt. No. 60 at 38 (emphasis in original).

Second, the defendants dispute the *Silencer Shop* plaintiffs' request that the injunction reach "resident family members" who live in the same household as those covered by the injunction. Dkt. No. 49 at 61 (quotation omitted). True, the *Silencer Shop* plaintiffs make no argument for why the injunction should cover resident family members of *any* individual covered by the injunction, including, for example, a customer of a commercial member of an associational plaintiff. *See* Dkt. No. 85 at 32. While the plaintiffs point to *Texas v. ATF*, 700 F. Supp. 3d 556 (S.D. Tex. 2023), as an example where a court extended an injunction to include resident family members, the plaintiffs there explained why their resident family members needed the injunction's protection. *See Texas v. ATF*, No. 6:23-CV-013 (S.D. Tex. May 30, 2023), Dkt. No. 46 at 7. The party-presentation principle does not permit the Court to inject arguments that the *Silencer Shop* plaintiffs failed to raise. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (citing *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)).

Third, the defendants contend that the injunction cannot cover the associational plaintiffs' "supporters," as the *Silencer Shop* plaintiffs request. Dkt. No. 49 at 61. It is true that courts have suggested as part of a standing analysis that associational plaintiffs may bring suit on behalf of their "supporters," but only when they possess sufficient "'indicia of membership.'" *Texas*, 737 F. Supp. 3d at 438 (quoting *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012)). *But see Hunt*, 432 U.S. at 342 (noting that an association "may have standing solely as the representative of its *members*" (emphasis added and quotation omitted)). Here, the associational plaintiffs in *Silencer Shop* give zero indication of what makes someone a "supporter," and "it is not this Court's role to operate

on inferences or to impose an arbitrary scope on who those supporters might be." *Texas*, 700 F. Supp. 3d at 567; *see also* Fed. R. Civ. P. 65(d) (requiring that an injunction "state its terms specifically" and "describe in reasonable detail" the conduct "restrained or required"). The Court thus declines to extend its injunction to any associational plaintiff's "supporters."

Fourth, as to the state plaintiffs in *Silencer Shop*, the defendants correctly note that only one state—the State of Texas—provided a declaration describing how the state's law-enforcement agencies must comply with the NFA. Dkt. No. 60 at 46; *see* Dkt. No. 50 at 49–50. According to the defendants, that means the Court has no ground to include the other 14 plaintiff states in its injunction. Dkt. Nos. 60 at 46; 85 at 31.

Not so. Under Federal Rule of Evidence 201, the Court may take judicial notice of reliable, publicly available materials demonstrating that the other plaintiff states are injured in the same way as Texas. *See, e.g.*, *Bavely v. Panini Am., Inc.*, No. 4:22-CV-093, 2023 WL 12098401, at *6 (E.D. Tex. June 7, 2023) (considering judicially noticed records in assessing the plaintiff's constitutional standing). Here, ATF's website explains that the agency's National Firearms Act Division features a Government Support Branch that "processes all NFA applications from local, *state*, and federal law enforcement and government organizations." ATF, National Firearms Act Division, https://perma.cc/H95N-HBMW (emphasis added). "The Fifth Circuit has determined that courts may take judicial notice of governmental websites." *In re Katrina Canal Breaches Consol. Lit.*, 533 F. Supp. 2d 615, 632 (E.D. La. 2008) (quotation omitted).

Further, "[t]he Court takes judicial notice of ATF's National Firearms Act Handbook," which explains how states and their political subdivisions must comply with the statute. *Colon v. ATF*, No. 8:23-CV-223, 2024 WL 309975, at *2 n.4 (M.D. Fla. Jan. 26,

2024).  The Handbook notes, for instance, that NFA firearms may not "be lawfully possessed by States and political subdivisions of the States" unless they are "registered in the [National Firearms Registration and Transfer Record]."  ATF, National Firearms Act Handbook § 3.2.2, *available at* https://perma.cc/P3NL-G35G.  And it explains how states and their political subdivisions must comply with the challenged NFA provisions—despite being exempt from the transfer and making taxes, *see* 26 U.S.C. § 5853(a), (b)—by filing the applicable forms before transferring or making an NFA firearm.[22]  *Supra*, Handbook §§ 6.2, 9.4.3.

Based on this judicially noticed information, the Court finds that the other 14 plaintiff states are no less the "object" of the challenged NFA provisions as Texas.  *See Diamond Alt. Energy*, 606 U.S. at 112 (quotation omitted).  Thus, the Court's injunction will accordingly extend to those states, their agencies, and their political subdivisions.

In sum, the plaintiffs are entitled to a permanent injunction—but only so far as it prohibits the defendants from enforcing the challenged NFA provisions against the plaintiffs and, where applicable, their agencies, political subdivisions, members, and customers—both current and future.

### B.    Declaratory Judgment

The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "Any such declaration shall have the

---

[22] To make an NFA firearm, a state entity must complete the same Form 1 as an individual maker.  *See supra*, Handbook § 6.2.  But when an NFA firearm is transferred to or from a state entity, the transferor must submit a Form 5—a different form that authorizes the tax-exempt transaction.  *Id.* § 9.4.3; 27 C.F.R. § 479.90(b).  Moreover, if a state entity "acquires for official use a firearm not registered to it," the entity must register the firearm with a Form 10.  27 C.F.R. § 479.104.

force and effect of a final judgment or decree and shall be reviewable as such." *Id.* Federal courts have "discretion in determining whether and when to entertain an action under the Declaratory Judgment Act," even when the suit satisfies the "jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

The Court declines to enter declaratory relief here. "Ample precedent establishes that [a court] should not exercise [its] discretion to extend declaratory relief when a challenged law or policy no longer affects the plaintiff." *Texas v. EEOC*, 933 F.3d 433, 451–52 (5th Cir. 2019). Because the Court enjoins the defendants from enforcing the challenged NFA provisions against the plaintiffs, a declaratory judgment would be redundant and provide no further relief. *Id.* at 451 n.38. *See, e.g.*, *Vaping Dragon LLC v. U.S. Food & Drug Admin.*, No. 1:25-CV-081, 2026 WL 266277, at *19 (N.D. Tex. Feb. 2, 2026) (Hendrix, J.) (declining a request to extend declaratory relief in addition to a permanent injunction).

### 6.    Conclusion

In sum, the Court concludes that the challenged NFA provisions exceed Congress's Article I enumerated powers and are therefore unconstitutional. At the parties' urging, the Court does not reach the plaintiffs' Second Amendment claims. Thus, the Court grants in part and denies in part the cross-motions for summary judgment (Dkt. Nos. 48; 59; 117; 118).

The plaintiffs are entitled to a permanent injunction against the challenged NFA provisions, but not declaratory relief. Accordingly, and as further detailed in the Final Judgment, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the United States Department of Justice, Todd Blanche in his official capacity, Robert Cekada in his official capacity, their divisions, bureaus, agents, officers, commissioners, employees, and anyone

acting in concert or participation with them, including their successors in office, are permanently enjoined from enforcing the challenged NFA provisions as to untaxed firearms against the plaintiffs and, where applicable, the plaintiffs' agencies, political subdivisions, members, and customers—both current and future.  The *Jensen* plaintiffs are entitled to relief from two additional NFA provisions that only they challenge.  *See supra*, n.10; 26 U.S.C. §§ 5842(b), 5861(i).  The Court's permanent injunction does not extend to the NFA's regulation of AOWs as it relates to the *Jensen* plaintiffs, as those plaintiffs lack standing with respect to those firearms.

All other relief not specified here is denied.[23]

The Court stays the effect of this Order for seven days from the date of entry to allow the defendants to seek relief, if any, at the appellate level.

So ordered on August 5, 2026.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

---

[23] To the extent the plaintiffs seek attorneys' fees, *see* Dkt. No. 15 at 22; No. 6:26-CV-227, Dkt. No. 1 at 31, their request is denied without prejudice to filing an appropriate motion after final judgment.